### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### Northern Division

| | |
|---|---|
| CHELSEA GILLIAM, )<br><br>    Plaintiff, )<br><br>    v. )<br><br>DEPARTMENT OF PUBLIC SAFETY )<br>AND CORRECTIONAL SERVICES, )<br>CAROLYN SCRUGGS, *in her official capacity*, )<br>ANNIE D. HARVEY, *in her official capacity*, )<br>DAMILARE S. ADISA-THOMAS, *in her official capacity*, )<br>NURUDEEN MATTI, *in his official capacity*, )<br>SHARON BAUCOM, *in her individual and official capacities*, )<br>EVETTE NEAVES, *in her individual and official capacities*, )<br>BETSY NWOSU, *in her individual and official capacities*, )<br>HOUSING DOES, *in their individual capacities*, )<br>HEALTH CARE DOES, *in their individual capacities*, )<br>CUSTODY DOES, *in their individual capacities*, and )<br>    SERVE ON: )<br>    Stuart M. Nathan, Counsel )<br>    Assistant Attorney General )<br>    6776 Reisterstown Road )<br>    Baltimore, Maryland 21215 )<br><br>CORIZON HEALTH, INC. )<br>Two Penns Way, Suite 200 )<br>New Castle, Delaware 19720 )<br>    SERVE ON: )<br>    The Corporation Trust, Inc. )<br>    2405 York Road )<br>    Suite 201 )<br>    Lutherville Timonium, Maryland 21093-2264, )<br><br>    Defendants. )<br>    ) | Civil Action No.  1:23-cv-1047<br><br>JURY DEMAND |

### COMPLAINT
### FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

## INTRODUCTION

1.      Plaintiff Chelsea Gilliam is a woman. Yet, because she is transgender and has gender dysphoria, when Ms. Gilliam was incarcerated by the Maryland Department of Public Safety and Correctional Services, she was housed with men, left unprotected from assault, harassed, held in solitary confinement, and denied necessary medical treatment.

2.      As a result of her traumatic experience, Ms. Gilliam suffered harm, including exacerbation of her gender dysphoria and physical and emotional distress, and she continues to suffer harm from Defendants' actions, including anxiety and depression.

## PARTIES, JURISDICTION, AND VENUE

3.      Ms. Gilliam is a Black woman, who, for all relevant time periods, was and is a person with a disability and a transgender woman.  Ms. Gilliam has gender dysphoria, a condition marked by a significant incongruence between one's experienced/expressed gender and the gender assigned at birth, lasting at least 6 months, and associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.[1]

4.      Gender dysphoria is recognized as a serious medical condition, including by the American Medical Association, the American Psychiatric Association, the American Psychological Association, the Endocrine Society, the World Professional Association for Transgender Health, and courts across the country. Treatment for gender dysphoria, often consisting of social transition, hormone therapy, and surgery, is medically necessary for many transgender people and can effectively treat, and even cure, the condition. Without treatment,

---

[1] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (2022) ("DSM-5-TR")*.

individuals with gender dysphoria will often experience anxiety, depression, the inability to function effectively, and even self-harm and suicide.

5.      Ms. Gilliam was incarcerated at Baltimore City Correctional Center ("BCCC") and Maryland Reception, Diagnostic and Classification Center ("MRDCC"), from December 17, 2021, to May 13, 2022.

6.      Ms. Gilliam was for all relevant time periods a pretrial detainee at BCCC and MRDCC, as she was held without conviction of a crime.

7.      Ms. Gilliam is now on supervised probation. People on supervised probation are at greater risk of re-incarceration.[2]

8.      Defendant Department of Public Safety and Correctional Services ("DPSCS") is a department of the Maryland state government. DPSCS includes the Maryland Division of Corrections ("DOC"), which incarcerates criminal defendants sentenced by Maryland courts, as well as pretrial detainees. MRDCC and BCCC are DOC facilities.

9.      Defendant Carolyn Scruggs is the Secretary of DPSCS. The Secretary is responsible for administering DPSCS. Secretary Scruggs knows or should know DPSCS's policies and practices regarding inmates, including transgender inmates. She is or should be aware of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated at BCCC and MRDCC. She is sued in her official capacity.

10.     Defendant Annie D. Harvey is the Commissioner of Corrections. The Commissioner is responsible for the incarceration of inmates and supervision of correctional staff. Commissioner Harvey is aware or should be aware of DPSCS and DOC policies regarding

---

[2] *See generally* Jennifer L. Doleac, *Study After Study Shows Ex-Prisoners Would Be Better Off Without Intense Supervision*, Brookings (July 2, 2018), https://www.brookings.edu/blog/up-front/2018/07/02/study-after-study-shows-ex-prisoners-would-be-better-off-without-intense-supervision/.

transgender inmates. She is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated at BCCC and MRDCC. She is sued in her official capacity.

11.     Defendant Damilare Adisa-Thomas is the Administrator of BCCC and is responsible for the governance and policies of the institution. Administrator Adisa-Thomas is responsible for the safety, security, and treatment of all inmates at the facility. Administrator Adisa-Thomas is or should be aware of DPSCS and DOC policies regarding transgender inmates. She is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to the treatment of individuals incarcerated at BCCC. She is sued in her official capacity.

12.     Defendant Nurudeen Matti is the Warden of MRDCC and is responsible for the governance and policies of the institution. Warden Matti is responsible for the safety, security, and treatment of all inmates at the facility. Warden Matti is or should be aware of DPSCS and DOC policies regarding transgender inmates. He is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to the treatment of individuals incarcerated at MRDCC. He is sued in his official capacity.

13.     Defendant Sharon Baucom is the Chief Medical Officer of the Maryland Department of Public Safety and Correctional Services. The Chief Medical Officer is responsible for the provision of medical care and supervision of correctional medical staff. Dr. Baucom is or should be aware of DPSCS and DOC policies regarding transgender inmates. She is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated at BCCC and MRDCC. She is sued in her individual and official capacities.

14. Defendant Evette Neaves is the Prison Rape Elimination Act ("PREA") Compliance Manager at BCCC. Ms. Neaves is responsible for ensuring compliance with PREA, including through oversight of PREA Coordinators. Ms. Neaves is or should be aware of DPSCS and DOC policies regarding PREA and transgender inmates. She is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated at BCCC. She is sued in her individual and official capacities.

15. Defendant Betsy Nwosu is the PREA Compliance Manager at MRDCC. Ms. Nwosu is responsible for ensuring compliance with PREA, including through oversight of PREA Coordinators. Ms. Neaves is or should be aware of DPSCS and DOC policies regarding PREA and transgender inmates. She is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated at MRDCC. She is sued in her individual and official capacities.

16. "Housing Does" are the Facility Security Chief, Case Management staff, correctional officers, and other staff who were employed at BCCC and MRDCC during the relevant time periods pertaining to the acts and omissions herein. They were responsible for the implementation of DPSCS housing policies and procedures, and for the safety of inmates, including Ms. Gilliam.

17. Housing Does supervised or participated in the actions Ms. Gilliam complains of herein. The identities of Housing Does are unknown and cannot be found without access to Ms. Gilliam's custody file, to which she does not currently have access. Ms. Gilliam will substitute the true names of Housing Does when she is able to ascertain their identities through discovery.

18.     "Health Care Does" are medical providers and other staff who were contracted or employed at BCCC during the relevant time periods pertaining to the acts and omissions herein. They were responsible for ensuring the provision of medical treatment to inmates, including Ms. Gilliam. They participated in the denial of adequate and necessary treatment for Ms. Gilliam's gender dysphoria.

19.     The identities of Health Care Does are unknown and cannot be found prior to discovery. Ms. Gilliam will substitute the true names of Health Care Does when she is able to ascertain their identities through discovery.

20.     "Custody Does" are custody supervisors, correctional officers, PREA Coordinators, and other staff who were employed at BCCC and MRDCC during the relevant time periods pertaining to the acts and omissions herein. They were responsible for the implementation of DPSCS policies and procedures, including PREA policies and procedures, and for the safety of inmates, including Ms. Gilliam.

21.     Custody Does supervised or participated in the actions Ms. Gilliam complains of herein. The identities of Custody Does are unknown and cannot be found prior to discovery. Ms. Gilliam will substitute the true names of Custody Does when she is able to ascertain their identities through discovery.

22.     Defendant Corizon Health, Inc. is a private, for-profit corporation contracted to provide health care services to inmates in the custody of DPSCS, including medical and mental health services. As the health care provider at both BCCC and MRDCC, Corizon is responsible for ensuring that inmates receive adequate physical and psychological treatment while incarcerated.

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over Ms. Gilliam's claims under the Fourteenth Amendment, 42 U.S.C. § 1983 ("Section 1983"), the ADA and Section 504 because this action arises under the Constitution and laws of the United States.

24.     This Court has supplemental jurisdiction over Ms. Gilliam's state law claims pursuant to 28 U.S.C. § 1367(a) because the facts of the federal and state law claims form part of the same case or controversy.

25.     Venue is proper in this Court under 28 U.S.C. § 1391 because the events described in this action took place within this judicial district.

26.     Ms. Gilliam has followed the procedure to bring a tort claim against the state of Maryland and has had her claim statutorily denied by the Maryland State Treasurer, as they failed to give notice of a final decision within six months of filing the claim, pursuant to Md. Code Ann., State Gov't §§ 12-106, 12-107 (West 2022). The written claim to the Treasurer was submitted within one year of Ms. Gilliam's injury, and this claim is filed within three years after the cause of action arose. Md. Code Ann., State Gov't § 12-106(b)(1)–(3) (West 2022).

## STATEMENT OF FACTS

27.     Ms. Chelsea Gilliam is a Black transgender woman. Ms. Gilliam was diagnosed with gender dysphoria in approximately 2003, when she was 17 years old. She began treatment for gender dysphoria at that time.

28.     Ms. Gilliam has identified and lived exclusively as a woman for over fourteen years. She legally changed her name to Chelsea in 2009. She has a distinctly feminine appearance.

29.     Ms. Gilliam received hormone treatments for her gender dysphoria for 18 years prior to her incarceration and has continued to receive hormone treatments since her release. She

originally received it every two weeks and has received hormone treatments once a week for the past 15 years.

30.     During her incarceration at BCCC and MRDCC, Ms. Gilliam was consistently misgendered by staff at both facilities. Ms. Gilliam was also denied hormone treatment for the majority of her incarceration.

31.     Despite her female gender identity, Ms. Gilliam was placed with male inmates and forced to shower with men at BCCC, despite the known risk of sexual assault from male inmates and in contravention of Defendants' own policy.

32.     Ms. Gilliam was, in fact, physically and sexually assaulted by a male inmate while in the shower at BCCC. Despite Ms. Gilliam reporting her assault, DPSCS took no action. DOC staff eventually promised Ms. Gilliam accommodations, including the ability to shower and go to recreation facilities separately from male inmates. In practice, however, staff refused to honor those accommodations.

33.     Following her transfer to MRDCC, Ms. Gilliam was kept in administrative segregation because of her gender identity for approximately three months. She was shackled in a three-piece shackle any time she left her cell, including when she was in the shower, despite having had no write-ups or disciplinary infractions. She was only allowed out of her cell for one hour per day except on weekends, when she was not allowed out of her cell at all. When she asked at a review to be moved to the general population, Defendants demanded that she sign a waiver of liability in order to be moved. Ms. Gilliam declined to sign this coercive document and remained in administrative segregation until the end of her incarceration.  Ms. Gilliam describes being in administrative segregation as feeling punitive, like she did something wrong and was being maliciously punished for that perceived wrong.

I.      **CLEAR STANDARDS GOVERN TREATMENT OF TRANSGENDER INMATES**

      A.      **DPSCS Policies**

            1.      **Housing and Showers**

34.     DPSCS recognizes that being transgender is a risk factor for sexual assault.

*Assessment for Risk of Sexual Victimization and Abusiveness*, OPS.200.0006, § .05(g) (2018)

(hereinafter "DPSCS Sexual Victimization Policy").

35.     The DPSCS Sexual Victimization Policy requires DPSCS staff to assess each

inmate's risk for being sexually abused within 72 hours of arrival, every 30 days, and upon

request or incident of sexual abuse, and to take that assessment into account when making inmate

housing assignments.  *Id.* §§ .03, .05(B) (2018).

36.     The DPSCS Sexual Victimization Policy specifically requires that victimization

risk must be considered "[w]hen deciding to assign a transgender . . . inmate to a facility for male

or female inmates and in other housing . . . assignments." *Id.* § .05(C)(1)(c). The policy also

provides that "[a] transgender . . . inmate's own views with respect to personal safety shall be

seriously considered." *Id.* § .05(C)(3).

37.     DPSCS policy also provides that a "Gender Dysphoric inmate's housing

placement shall be made on a case-by-case basis seriously considering the inmate's opinion

regarding the inmate's safety and the inmate's biological gender presentation and appearance."

*Identification, Treatment, and Correctional Management of an Inmate Diagnosed with Gender*

*Dysphoria*, OPS 131.0001, § .05(J)(1) (2016) (hereinafter DPSCS Gender Dysphoria Policy).

38.     The facility's Security Chief and Case Management staff must consider various

factors in determining an inmate's gender presentation and appearance, such as "[i]ntact external

genitalia and secondary sex characteristics, such as pubic hair, chest hair, facial hair; and

[s]pecific factors, such as partial completion of sex reassignment surgery, removal or augmentation of breasts, or removal of testicles." *Id.* § .05(J)(1)(a)–(b).

39.     Additionally, DPSCS policy provides that "[m]ental health staff may provide input as to clinical recommendations related to housing of a Gender Dysphoric inmate to the managing official and Case Management staff[.]" *Id.* § .05(J)(3).

40.     Likewise, according to the DPSCS Sexual Victimization Policy, "[t]ransgender . . . inmates shall be given the opportunity to shower separately from other inmates." *Id.* § .05(C)(4).

### 2.     Hormone Treatment

41.     DPSCS policy states that "[a]t the time of intake in a Department correctional facility, if an inmate is currently under hormonal therapy as part of an established regimen for Gender Dysphoria and the contracted medical services provider verifies the treatment and determines that the regimen. . . .[i]s not contraindicated, the contracted medical services provider shall. . . .[c]ontinue the hormonal therapy[.]" *Id.* §§ F(1), (1)(a)–(1)(a)(i).

### 3.     Administrative Segregation

42.     DPSCS policy stipulates that LGBTQ inmates may not be placed in "dedicated facilities, units, or wings solely on the basis of such identification or status." DPSCS Sexual Victimization Policy, *supra* § .05(C)(5).

43.     Similarly, DPSCS policy states that upon being assigned to administrative segregation, a "case management team shall review the inmate's administrative segregation status within five working days of the inmate's placement on segregation." Dept. of Pub. Safety and Correctional Servs., Division of Correction, *Case Management Manual*, DOC 100.0002, § 17(B)(4)(a) (2019) (hereinafter DPSCS Case Management Manual).

44.    Members of the case management team are required to "consider available alternatives to continued administrative segregation." *Id.* § 17(B)(4)(c).

45.    DPSCS policy provides that inmates who are assigned to administrative segregation "shall have the opportunity to respond to the reasons stated for being in administrative segregation." *Id.* § 17(B)(4)(B).

46.    This process should reoccur at least every seven days for the first sixty days of administrative segregation, and at least once every thirty days thereafter. *Id.* § 17(B)(5)(a).

**B.    Prison Rape Elimination Act Requirements**

47.    The Prison Rape Elimination Act ("PREA") regulations also specifically require:

   a) The agency shall use information from the risk screening required by § 115.41 to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive.
   . . .
   c) In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether the placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.
   . . .
   e) A transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration.[3]

48.    The PREA regulations also specifically require that "[t]ransgender and intersex inmates shall be given the opportunity to shower separately from other inmates."[4]

49.    The PREA regulations further provide that:

   (a) Inmates at high risk for sexual victimization shall not be placed in involuntary segregated housing unless an assessment of all available

---

[3] 28 C.F.R. § 115.42 (2022).

[4] 28 C.F.R. § 115.42(f) (2022).

alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers.

(b) Inmates placed in segregated housing for this purpose shall have access to programs, privileges, education, and work opportunities to the extent possible. If the facility restricts access to programs, privileges, education, or work opportunities, the facility shall document:
(1) The opportunities that have been limited;
(2) The duration of the limitation; and
(3) The reasons for such limitations.

(c) The facility shall assign such inmates to involuntary segregated housing only until an alternative means of separation from likely abusers can be arranged, and such an assignment shall not ordinarily exceed a period of 30 days.

(d) If an involuntary segregated housing assignment is made pursuant to paragraph (a) of this section, the facility shall clearly document:
(1) The basis for the facility's concern for the inmate's safety; and
(2) The reason why no alternative means of separation can be arranged.

(e) Every 30 days, the facility shall afford each such inmate a review to determine whether there is a continuing need for separation from the general population.[5]

### C.    World Professional Association for Transgender Health Standards of Care

50.    The World Professional Association for Transgender Health ("WPATH") is a nonprofit, multidisciplinary professional association dedicated to understanding and treating gender dysphoria. WPATH is recognized internationally as the leading professional organization devoted to the understanding and treatment of gender dysphoria. WPATH publishes and regularly updates the Standards of Care for the Health of Transgender and Gender Diverse People (the "Standards of Care"),[6] based upon the best available science and expert professional consensus.

---

[5] 28 C.F.R. § 115.43 (2022).

[6] World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Version 7* 67 (2011), https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwj-j__t29P7AhXWEVkFHbBjAnEQFnoECCUQAQ&url=https%3A%2F%2Fwww.wpath.org%2Fmedia%2Fcms%2F

11

51.     The seventh version of the Standards of Care was in effect during Ms. Gilliam's incarceration. The eighth and current version of the Standards of Care was released in September 2022. The Standards of Care are widely recognized in the medical community as the authoritative standards for the provision of transgender healthcare.

52.     The Standards of Care have established medical treatment standards for persons living with gender dysphoria that are recognized and accepted within the medical community, and that reflect a rigorous and methodological evidence-based approach grounded in published literature and consensus-based expert opinion. Courts also have acknowledged that the Standards of Care provide widely accepted protocols for treating individuals with gender dysphoria.

53.     The Standards of Care explicitly apply in institutional settings, such as jails and prisons. "The [Standards of Care] in their entirety apply to all transsexual, transgender, and gender nonconforming people, irrespective of their housing situation."[7]

### 4.     Housing and Showers

54.     Version 7 of the Standards of Care provided:

Housing and shower/bathroom facilities for [transgender] people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety. Placement in a single-sex housing unit, ward, or pod on the sole basis of the appearance of external genitalia may not be appropriate and may place the individual at risk for victimization.[8]

55.     Building upon these earlier recommendations, the current Standards of Care make clear that:

[t]he separation of people based on sex assigned at birth . . . can create an inherently dangerous environment. Gender diverse people are extremely vulnerable to stigmatization, victimization, neglect, violence, and sexual abuse.

___

Documents%2FSOC%2520v7%2FSOC%2520V7_English.pdf&usg=AOvVaw0TLAbNacS9DZm7-Mldw3u3 (hereinafter Standards of Care Version 7).

[7] *Id.*

[8] *Id.* at 68.

> This systemic sex-segregated rigidity often fails to keep [transgender and gender diverse] people safe and may impede access to gender-affirming health care. As a result, institutions should follow procedures that routinely evaluate the housing needs and preferences of [transgender and gender diverse] inmates.[9]

56.     The current version of the Standards of Care also states that "institutional administrators, health care professionals, and other officials responsible for making housing decisions for [transgender and gender diverse] residents consider the individual's housing preference, gender identity and expression, and safety considerations, rather than solely their anatomy or sex assignment at birth."[10]

57.     The current version of the WPATH Standards of Care recommends that "institutional personnel establish housing policies that ensure the safety of transgender and gender diverse residents without segregating or isolating these individuals,"[11] noting that

> [a]ssigning placement for a [transgender] resident solely on the basis of their genital anatomy or sex assigned at birth is misguided and places people at risk for physical and/or psychological harm. It is well established within carceral settings, transgender individuals are far more likely than other prisoners to be sexually harassed, assaulted, or both.[12]

58.     The Standards of Care further "recommend institutional personnel allow transgender and gender diverse residents the private use of shower and toilet facilities, upon request"[13] because "[transgender] individuals in institutions are often deprived of privacy in

---

[9] E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23 Int'l J. of Transgender Health S1, S108 (2022), https://www.wpath.org/publications/soc [hereinafter Standards of Care Version 8].

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.* at S108–09. *See also Standards of Care Version 7, supra* note 6 at 68.

bathroom and shower use, which can result in psychological harm and/or physical and sexual abuse."[14]

### 5.    Hormone Treatment

59.    Gender affirming hormone treatment has been accepted as medically necessary treatment since the first WPATH Standards of Care were published in 1979. Version 7 of the Standards of Care provided that "[a]ccess to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. . . . People who enter an institution on an appropriate regimen of hormone therapy should be continued on the same, or similar, therapies and monitored according to the [Standards of Care]. . . . The consequences of abrupt withdrawal of hormones . . . include a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality."[15]

60.    Following the abrupt withdrawal of her hormone treatment, Ms. Gilliam experienced similar consequences. Her skin broke out as facial hair reemerged, causing her to scratch and scar her neck. She felt frustrated and sad when she looked at her body. Her gender dysphoria became worse as increased testosterone would cause her to get an erection. As a result, Ms. Gilliam wanted to kill herself.

61.    WPATH's current Standards of Care also recommend that health care professionals initiate and continue gender-affirming hormone therapy due to its demonstrated

---

[14] *Standards of Care Version 8*, *supra* note 9, at S109. *See also Standards of Care Version 7*, *supra* note 6 at 68; Nat'l. Comm'n on Correctional Health Care, *Transgender and Gender Diverse Health Care in Correctional Settings*, ¶ 23 (2020).

[15] *Standards of Care Version 7*, *supra* note 6 at 68. *See also* Standards of Care Version 8, *supra* note 9, at S109; Nat'l. Comm'n on Correctional Health Care, *Transgender and Gender Diverse Health Care in Correctional Settings*, ¶ 20 (2020) ("Transgender individuals should be placed in the least restrictive environment necessary to ensure their safety. Isolation restrictive housing, or segregation should not be relied on exclusively or indefinitely to ensure safety.").

improvement in psychosocial functioning and quality of life.[16] Indeed, "[i]n many cases, hormone therapy is considered a lifesaving intervention."[17]

62.     The Standards of Care note that the delay of necessary hormone treatment can result in significant negative mental health outcomes. Therefore, "[a]s with all medically necessary health care, access to gender-affirming hormone therapies should be provided in a timely fashion."[18]

### 6.     Administrative Segregation

63.     The Standards of Care specifically call for transgender inmates not to be segregated or isolated, noting that "[isolation can cause severe psychological harm and gross disturbances of functioning. National prison standards organizations as well as the United Nations consider isolation longer than 15 days to be torture."[19]

## II.     DEFENDANTS HOUSED PLAINTIFF WITH MEN IN SPITE OF THE RISK OF SEXUAL VICTIMIZATION

64.     On December 17, 2021, Ms. Gilliam was arrested for an alleged assault. Despite her legal name change, the police used her previous male name.

65.     Following her arrest, Ms. Gilliam was sent to BCCC.

66.     Despite her female gender identity, feminine appearance, and years of hormone therapy treatment, and in contravention of DPSCS's own policy, Ms. Gilliam was housed with male inmates at BCCC until February 2, 2022.

67.     None of the Defendants assessed Ms. Gilliam for risk of sexual victimization and she was never asked her own view regarding what would be a safe housing placement. Instead,

---

[16] *Standards of Care Version 8*, *supra* note 9 at S125–26.

[17] *Id.* at S126.

[18] *Id.* at S106.

[19] *Id.* at S108.

Defendants housed Ms. Gilliam with male inmates simply because she was assigned the male gender at birth. When she complained, one of the Housing Does told her "you are a man and you are in jail."

68.     On information and belief, the BCCC Security Chief and Case Management staff did not take Ms. Gilliam's gender presentation and appearance, her gender-confirming medical treatment, or her own views into account when making her housing determination, as required by DPSCS policy. Nor did mental health staff provide input into Ms. Gilliam's housing assignment, as provided for by DPSCS policy.

69.     Transgender inmates are far more likely to be sexually assaulted than cisgender[20] inmates. A study of transgender women in men's prisons in California found that 59% had been sexually assaulted, compared to just 4% of the general population, while the United States Department of Justice has estimated that 35% of transgender inmates were sexually assaulted in state and federal prison between 2007 and 2012.[21]

70.     Housing assignments based on sex assigned at birth leave transgender women especially vulnerable to sexual abuse at the hands of other inmates. "Because transgender women are at high risk for sexual assault and other forms of violence while incarcerated, where and how they are housed during periods of incarceration has serious implications for their physical and mental health."[22]

---

[20] "Cisgender" means "of, relating to, or being a person whose gender identity corresponds with the sex the person had or was identified as having at birth." *Cisgender*, *Merriam-Webster Dictionary* (2023), https://www.merriam-webster.com/dictionary/cisgender.

[21] *See, e.g.*, Valerie Jenness et al., *Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault* 2 (2007), https://cpb-us-e2.wpmucdn.com/sites.uci.edu/dist/0/1149/files/2013/06/BulletinVol2Issue2.pdf; U.S. Dep't of Justice Off. of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates 2011-12* 2 (2014), https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwiPpvHgw9v7AhXsEVkFHXCyCJsQFnoECAkQAQ&url=https%3A%2F%2Fbjs.ojp.gov%2Fcontent%2Fpub%2Fpdf%2Fsvpjri1112_st.pdf&usg=AOvVaw0txF6wEVRrlWwjf0s96Qk8.

[22] Elida Ledesma & Chandra L. Ford, *Health Implications of Housing Assignments for Incarcerated Transgender*

### III.   DEFENDANTS SUBJECTED PLAINTIFF TO HARASSMENT, SEXUAL ASSAULT, AND HUMILIATION

71.    While Ms. Gilliam was housed with male inmates at BCCC, she was repeatedly harassed by Custody Does and inmates on account of her gender identity.

72.    Throughout her time at BCCC, many of the Housing, Health Care, and Custody Does consistently called Ms. Gilliam by her previous male name (her "dead name"), rather than by her legally changed chosen name.

73.    In contravention of DPSCS's own policy, Custody Does forced Ms. Gilliam to shower and use the toilet alongside male inmates. Because the toilets were not in individual stalls, they were open for all to see from the adjoining common area, cells, and entryway/vestibule.

74.    Ms. Gilliam's dorm leader complained about Ms. Gilliam being naked and showering as a woman. Other inmates refused to talk to her at all for fear of being harassed.

75.    An inmate nicknamed "Christopher" sexually propositioned Ms. Gilliam and she refused him. In fear of him, she started avoiding him in the showers, until he threatened her life and told her, "Bitch, get up and take a shower."

76.    Ms. Gilliam proceeded to the shower. There, Christopher threatened her with a knife and sexually assaulted her by masturbating against her and digitally penetrating her anus.

77.    On the date of the assault, Ms. Gilliam gave one of the Custody Does a written description of the assault in red ink. She reported the assault again following the subsequent physical assault of her close friend by a different inmate.

78.    Defendants did not take any action.

_Women_, 110 A, J. Pub. Health 650–54 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7144448/.

79.     Ms. Gilliam subsequently told Healthcare Doe, "Miss C" in the Mental Health Department, about the assault. Miss C said that the PREA Coordinator would see her.

80.     The PREA Coordinator, Custody Doe "Miss Ogar", eventually arrived, and Ms. Gilliam told her about the assault.

81.     Miss Ogar agreed DPSCS should resume Ms. Gilliam's hormone therapy. Miss Ogar also told Ms. Gilliam that she could go to recreation and shower alone. However, Defendants never implemented this accommodation.

82.     In the last week of January 2022, DPSCS staff moved Ms. Gilliam to a single cell. While she was supposed to be able to shower and go to recreation separate from male inmates, many of the Custody Does would not honor that accommodation.

83.     Accordingly, on or about February 2, 2022, Ms. Gilliam wrote a statement about needing separate shower time and about the assault. She handed it to a Custody Doe, but never received an official response.

84.     Custody Does periodically brought male inmates to her cell to see if they would room with her. The men often reacted badly, and the Custody Does laughed. Eventually, the Custody Does placed Ms. Gilliam with a male cellmate.

85.     Despite Ms. Gilliam's feminine appearance, her female gender identity, her history of hormone therapy, and the well-known risk of sexual assault against transgender inmates, DPSCS and its staff decided to house Ms. Gilliam with male inmates, did not consult with her on her own safety needs per DPSCS policy, and forced her to shower and use the toilet with men. Predictably, Ms. Gilliam was sexually assaulted by another inmate as a result.

## IV.   DEFENDANTS DENIED PLAINTIFF NECESSARY MEDICAL TREATMENT

86.     Defendants denied Ms. Gilliam her hormone treatments throughout her time at BCCC, despite self-identifying as a transgender woman in need of continuing her medically

prescribed hormone treatment. Ms. Gilliam had told Defendants since her arrival at BCCC in December 2021 that she needed weekly hormone treatment. Defendants only began to take that request seriously after Ms. Gilliam was sexually assaulted over a month later.

87.     No medical provider conducted the evaluation required by DPSCS policy until after February 2, 2022, when PREA Coordinator Ogar approved hormone treatment.

## V.     DEFENDANTS SEGREGATED PLAINTIFF

88.     On or about February 2, 2022, DPSCS officials transferred Ms. Gilliam to MRDCC. Her situation did not improve.

89.     From the time Ms. Gilliam arrived at MRDCC in February 2022 until she left more than three months later, DPSCS held her in administrative segregation, a form of solitary confinement, solely because she is transgender.

90.     While in administrative segregation, MRDCC staff shackled Ms. Gilliam from her wrists to her waist and then down to her feet whenever she left the cell. MRDCC staff shackled Ms. Gilliam even though she had no disciplinary infractions.

91.     Defendants also denied Ms. Gilliam access to programming she would have been able to participate in if she had not been in administrative segregation.

92.     Once again, Defendants failed to solicit or consider Ms. Gilliam's own views with respect to her personal safety and housing, in direct defiance of DPSCS policy. DPSCS Gender Dysphoria Policy, *supra* § .05(J)(1).

93.     Likewise, Defendants failed to periodically review Ms. Gilliam's placement in administrative segregation or, for several months, to provide Ms. Gilliam an opportunity to respond to the reasons for placing her there—all in clear contravention of DPSCS policy. *See* DPSCS Case Management Manual, *supra* §§ 17(B)(4)(a)–(c), 17(B)(5)(a).

94.     Upon information and belief, Defendant case management staff members did not consider available alternatives to administrative segregation pursuant to DPSCS policy, such as reassigning Ms. Gilliam to a women's prison in accordance with her gender identity. *See id.* §§ 15(4)(c), (5)(c).

95.     When Ms. Gilliam finally obtained an administrative segregation review, Defendants would only offer her placement in general population of the men's prison, not placement in a women's facility, and only if she signed a release saying she would not hold DPSCS liable if something happened to her in the general population of the men's prison.

96.     Ms. Gilliam refused to sign this release and remained in administrative segregation for over three months, from early February 2022 until she was released in mid-May 2022.

97.     The harm of administrative segregation is well known. Administrative segregation is not substantively different from punitive segregation. [23] Physical conditions "are often more harsh and less sanitary[,]" than in the general population, and transgender inmates in segregation "find their rights and 'privileges' dramatically restricted."[24]

98.     Likewise, "[t]he catastrophic consequences of isolation on human beings' basic mental stability, health, and ability to function have been well-documented."[25] Transgender inmates in administrative segregation suffer from "intense anxiety, confusion, lethargy, panic, impaired memory, psychotic behavior, hallucinations and perceptual distortions, difficulty

---

[23] *See* Gabriel Arkles, *Safety and Solidarity Across Gender Lines: Rethinking Segregation of Transgender People in Detention*, 18 Temp. Pol. & Civ. Rts. L. Rev. 515, 540–41 (2009).

[24] *Id.*

[25] *Id.* at 538.

eating, inability to communicate, hypersensitivity to external stimuli, violent fantasies, and reduced impulse control."[26]

99.     Ms. Gilliam suffered anxiety and depression as a result of her time in administrative segregation.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of 42 U.S.C. § 1983: Fourteenth Amendment Failure to Protect
(DEFENDANTS SCRUGGS, HARVEY, ADISA-THOMAS, and MATTI, in their official capacities, NEAVES, HOUSING DOES and CUSTODY DOES, in their individual capacities)**

100.     Plaintiff adopts and incorporates the preceding paragraphs as they appear above and says further:

101.     42 U.S.C. § 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

102.     Plaintiff brings suit under 42 U.S.C. § 1983 to seek redress for Defendants' violation of her rights under the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment guarantees that no state "shall. . . .deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1.

103.     Under the Due Process Clause, the rights of pretrial detainees like Ms. Gilliam are at least as great as those afforded to convicted prisoners under the Eighth Amendment to the United States Constitution.

---

[26] *Id.*

104.     The Fourteenth Amendment, like the Eighth Amendment, mandates that correctional officials protect pretrial detainees from violence, including sexual violence, at the hands of other pretrial detainees—just as they are obligated to do for prisoners.  28 C.F.R. § 115.43 (2022).

105.     Transgender inmates are especially vulnerable to sexual violence. *See supra* notes 22–23.

106.     DPSCS policy requires consideration of transgender identity when making housing decisions. *See, e.g.*, DPSCS Sexual Victimization Policy, *supra* § .05(C)(1)(c); DPSCS Gender Dysphoria Policy, *supra* § .05(J)(1)(a)–(b).

107.     Defendants' failure to provide adequate screening and their insistence on housing Ms. Gilliam with male inmates directly led to her sexual assault at the hands of a male inmate.

108.     As a transgender woman, Ms. Gilliam was put at a substantial risk of sexual assault by her housing assignment, which is a serious harm and a deprivation of rights severe enough to violate the Fourteenth Amendment to the United States Constitution.

109.     Defendants knew of, but disregarded, the risk by housing Ms. Gilliam with male inmates.

110.     Defendants' failure to protect Ms. Gilliam violated the Fourteenth Amendment to the United States Constitution. As a result of these actions, Ms. Gilliam has suffered damages including pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained.

**COUNT II**
**Violation of 42 U.S.C. § 1983: Fourteenth Amendment Failure to Provide
Adequate Medical Care**
**(DEFENDANTS SCRUGGS, HARVEY, ADISA-THOMAS, and BAUCOM,
in their official capacities, and HEALTH CARE DOES, in their individual capacities,
and CORIZON HEALTH, INC.)**

111.    Plaintiff adopts and incorporates the preceding paragraphs as they appear above and says further:

112.    Under the Due Process Clause, the rights of pretrial detainees like Ms. Gilliam are at least as great as those afforded to convicted prisoners under the Eighth Amendment to the United States Constitution.

113.    The Fourteenth Amendment, like the Eighth Amendment, protects pretrial detainees from correctional officials who are deliberately indifferent to their serious medical needs.

114.    A medical need is serious when it is diagnosed by a physician as mandating treatment.

115.    Gender dysphoria is a serious medical condition. Ms. Gilliam was diagnosed with gender dysphoria in 2003. She has also received regular weekly hormone therapy as treatment since 2008.

116.    Defendants knew of Ms. Gilliam's history of gender dysphoria and knew that without necessary treatment it would cause her severe mental distress.

117.    By refusing to give her hormone therapy, Defendants failed to provide Ms. Gilliam with adequate and necessary treatment for her gender dysphoria for almost two months. This was in defiance of DPSCS's own policy on the continuation of hormone treatment. *See* DPSCS Gender Dysphoria Policy, *supra* §§ .05(B)(1), F(1), (1)(a)–(1)(a)(i).

118.    Defendants acted with deliberate indifference to the substantial risk of serious harm from their failure to provide hormone therapy.

119.    Ms. Gilliam experienced severe emotional harm as a result of Defendants' deliberate indifference to her need for continued treatment for gender dysphoria, including depression and anxiety.

120.    Defendants' failure to provide adequate medical treatment to Ms. Gilliam violated the Fourteenth Amendment to the United States Constitution. As a result of these actions, Ms. Gilliam has suffered damages including pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained.

**COUNT III**
**Violation of 42 U.S.C. § 1983: Fourteenth Amendment Cruel and Unusual Punishment**
**(DEFENDANTS SCRUGGS, HARVEY, and MATTI, in their official capacities, and**
**HOUSING AND CUSTODY DOES, in their individual capacities)**

121.    Plaintiff adopts and incorporates the preceding paragraphs as they appear above and says further:

122.    Under the Due Process Clause, the rights of pretrial detainees like Ms. Gilliam are at least as great as those afforded to convicted prisoners under the Eighth Amendment to the United States Constitution.

123.    Under the Due Process Clause, a pretrial detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.

124.    Defendants' placement of Ms. Gilliam in administrative segregation at MRDCC—a setting far more isolated and punitive than general population—for three months on the basis of her transgender status is cruel and unusual and unjustified.

125.     As a transgender woman, Ms. Gilliam was put at a substantial risk of serious harm and a deprivation of rights severe enough to violate the Fourteenth Amendment to the United States Constitution.

126.     Defendants knew of or should have known of this risk, but disregarded it by housing Ms. Gilliam in administrative segregation for more than three months.

127.     Defendants' segregation of Ms. Gilliam violated the Fourteenth Amendment to the United States Constitution. As a result of these actions, Ms. Gilliam has suffered damages including pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained.

**COUNT IV**
**Violation of 42 U.S.C. § 1983: Fourteenth Amendment Discrimination Based on Sex (DEFENDANTS ADISA-THOMAS, MATTI, BAUCOM, NEAVES, NWOSU, HOUSING DOES, HEALTHCARE DOES, AND CUSTODY DOES, in their individual capacities, and CORIZON HEALTH, INC.)**

128.     Plaintiff adopts and incorporates the preceding paragraphs as they appear above and says further:

129.     The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination on the basis of sex by state actors. Such discrimination is subject to intermediate scrutiny.

130.     Sex discrimination includes discrimination against transgender individuals, who are treated as a quasi-suspect class under the Fourteenth Amendment.

131.     Defendants discriminated against Ms. Gilliam on the basis of sex when: (a) they housed Ms. Gilliam with male inmates in spite of her female gender identity; (b) they put her at significant risk of sexual assault and failed to respond appropriately to her sexual assault; (c) they called her by her "dead" name even though she had legally changed her name; (d) guards

harassed and laughed at her because of her transgender status;  and (e) Defendants denied her needed medical treatment based on her gender identity.

132.    Defendants also discriminated against Ms. Gilliam on the basis of sex when they did not allow her to shower separately from male inmates. Had Ms. Gilliam been a cisgender woman, Defendants never would have required her to shower alongside male inmates.

133.    Defendants further discriminated on the basis of sex when they housed Ms. Gilliam in administrative segregation solely on the basis of her transgender status.

134.    While she was housed in administrative segregation, Ms. Gilliam experienced an atypical and significant hardship compared to cisgender inmates. Defendants placed her in administrative segregation—far more punitive than general population—after she had been sexually assaulted, ignored, and mistreated due to her gender identity.

135.    Defendants' actions were not substantially related to any important government interest.

136.    Defendants' discrimination on the basis of sex against Ms. Gilliam violated the Fourteenth Amendment to the United States Constitution. As a result of these actions, Ms. Gilliam has suffered damages including pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained.

**COUNT V**
**Discrimination on the Basis of Disability**
**Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.**
**(DEFENDANTS DEPARTMENT OF PUBLIC SAFETY & CORRECTIONAL SERVICES, SCRUGGS, HARVEY, ADISA-THOMAS, and MATTI, in their official capacities)**

137.    Plaintiff adopts and incorporates the preceding paragraphs as they appear above and says further:

138.    The purpose of the Americans with Disabilities Act ("ADA") is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA specifies that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

139.    A public entity may not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service" nor may they afford individuals with a disability "an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(i)–(ii) (2022).

140.    Public entities may not discriminate against people with disabilities "directly or through contractual . . . arrangements[.]" *Id.* § 35.130(b)(1).

141.    Public entities may not use "eligibility criteria that screen out or tend to screen out an individual with a disability . . . from fully and equally enjoying any service, program, or activity" unless it can show that such criteria are necessary. *Id.* § 35.130(b)(8). Nor may a public entity use criteria or methods of administration for "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." *Id.* § 35.130(b)(3)(ii).

142.    Public entities must make "reasonable modifications in policies, practices, or procedures . . . to avoid discrimination on the basis of disability," unless they can show that the modification would "fundamentally alter the nature of the service, program or activity." *Id.* § 35.130(b)(7).

143.     Public entities that are correctional facilities "shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." *Id.* § 35.152.

144.     Ms. Gilliam, as a person with gender dysphoria, is an individual with a disability within the meaning of Title II of the ADA. Gender dysphoria is a mental or physical impairment that substantially limits one or more major life activities. *See* 42 U.S.C. § 12102.

145.     Defendant DPSCS is a department, agency, or instrumentality of the State of Maryland and is thus a "public entity" within the meaning of Title II of the ADA. 42 U.S.C. § 12131(1)(B).

146.     Inmate housing, building facilities, and medical services are services, programs, or activities of a public entity under 42 U.S.C. § 12132.

147.     As a pretrial detainee at BCCC and MRDCC, Ms. Gilliam was qualified to participate in and receive the benefits of DPSCS's services, programs, and activities at these facilities.

148.     Defendants discriminated against Ms. Gilliam on the basis of her gender dysphoria by denying her necessary medical treatment by failing to continue hormone therapy treatment.

149.     Defendants discriminated against Ms. Gilliam on the basis of her gender dysphoria by placing her in administrative segregation and thus denying her equal access to services and unnecessarily segregating her.

150.     Defendants discriminated against Ms. Gilliam by failing to reasonably modify DPSCS housing policies to accommodate her disability.

151.     Defendants denied Ms. Gilliam the benefit of safe housing on the basis of her disability by refusing to let her shower outside of the presence of male inmates.

152.     Defendants subjected Ms. Gilliam to discrimination by subjecting Ms. Gilliam to ridicule and harassment from correctional officers, who targeted Ms. Gilliam because of her gender dysphoria, and by failing to train correctional officers on how to appropriately work with inmates with gender dysphoria. Defendants failed to respond appropriately to this discriminatory harassment and to prevent it from continuing.

153.     Defendants' discriminatory treatment of Ms. Gilliam was done intentionally or with deliberate indifference to her protected rights.

154.     Defendants' discriminatory conduct harmed Ms. Gilliam, causing her pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained. She is entitled to compensatory damages.

**COUNT VI**
**Discrimination on the Basis of Disability**
**Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.***
**(DEFENDANTS DEPARTMENT OF PUBLIC SAFETY & CORRECTIONAL**
**SERVICES, SCRUGGS, HARVEY, ADISA-THOMAS, and MATTI, in their**
**official capacities)**

155.     Plaintiff adopts and incorporates the preceding paragraphs as they appear above and says further:

156.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

157.     Section 504 applies to "each recipient of Federal financial assistance from the Department of Justice." 28 C.F.R. § 42.502 (2022).

158.     Federal funding recipients may not "[d]eny a qualified handicapped person the opportunity accorded to others to participate" or to "achieve the same benefits that others achieve from the program or activity." *Id.* § 42.503(b)(1)(i)–(ii).

159.     Federal funding recipients may not discriminate against people with disabilities "directly or through contractual. . . arrangements[.]" *Id.* § 42.503(b).

160.     Federal funding recipients may not "utilize criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, defeat or substantially impair accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." *Id.* § 42.503(b)(3).

161.     Recipients of federal funding must "administer programs or activities in the most integrated setting appropriate to the needs of qualified [disabled] persons." *Id.* § 42.403(d).

162.     Ms. Gilliam, as a person with gender dysphoria, is an individual with a disability within the meaning of Section 504. Gender dysphoria is a mental or physical impairment that substantially limits one or more major life activities. 29 U.S.C. § 705(20)(B).

163.     Defendant DPSCS is a department, agency, or instrumentality of the State of Maryland and receives federal funding. Defendant DPSCS is, therefore, subject to Section 504's nondiscrimination requirements. 29 U.S.C. § 794(b)(1).

164.     As a pretrial detainee at BCCC and MRDCC, Ms. Gilliam was qualified to participate in and receive the benefits of Defendants' services, programs, and activities. 28 C.F.R. § 42.502 (2022).

165.     Defendants discriminated against Ms. Gilliam on the basis of her gender dysphoria when they denied her necessary medical treatment by failing to continue hormone therapy treatment.

166.     Defendants discriminated against Ms. Gilliam on the basis of her gender dysphoria by placing her in administrative segregation, thus denying her equal access to services and unnecessarily segregating her.

167.     Defendants discriminated against Ms. Gilliam by failing to reasonably modify DPSCS housing policies to accommodate her disability.

168.     Defendants denied Ms. Gilliam the benefit of safe housing on the basis of her disability when they refused to let her shower outside of the presence of male inmates.

169.     Defendants subjected Ms. Gilliam to discrimination when they subjected Ms. Gilliam to ridicule and harassment from correctional officers, who targeted Ms. Gilliam because of her gender dysphoria, and by failing to train correctional officers on how to appropriately work with inmates with gender dysphoria. Defendants failed to respond appropriately to this discriminatory harassment and to prevent it from continuing.

170.     Defendants' discriminatory treatment of Ms. Gilliam was done intentionally or with deliberate indifference to her protected rights.

171.     Defendants' discriminatory conduct harmed Ms. Gilliam, causing her pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained. She is entitled to compensatory damages.

## COUNT VII
## Common-Law Negligence
### (DEFENDANTS BAUCOM, NEAVES, NWOSU, HOUSING DOES, HEALTHCARE DOES, CUSTODY DOES, in their individual capacities, AND CORIZON HEALTH)

172.     Plaintiff adopts and incorporates the preceding paragraphs as they appear above and says further:

173.     Defendants failed to comply with professional standards of care and DPSCS policies during Ms. Gilliam's detention at BCCC and MRDCC. These failures include: failure to

provide timely and necessary medical treatment; failure to adhere to DPSCS guidelines for the treatment of inmates with gender dysphoria; failure to house Ms. Gilliam safely in accordance with her gender identity; segregating her on the basis of her gender identity and dysphoria in a more punitive setting; and denying her access to DPSCS programs and services.

174.    Defendants acted negligently, breaching their respective duties to Ms. Gilliam and causing, as a direct and proximate result, the injuries and damages alleged herein, including but not limited to, sexual assault, physical and psychological harm, and emotional distress.

175.    Defendants' negligent conduct was committed within the scope of their employment.

176.    Defendants knew, had reason to know, or should have known of the risks of their actions.

177.    Defendants' treatment of Ms. Gilliam evinced a reckless disregard for her life and well-being, an utter indifference to her rights, and ill will towards her.

178.     Defendants' negligence proximately caused Ms. Gilliam harm, including emotional distress.

## COUNT VIII
### Intentional Infliction of Emotional Distress
**(DEFENDANTS BAUCOM, NEAVES, NWOSU, HOUSING DOES, HEALTHCARE DOES, AND CUSTODY DOES, in their individual capacities)**

179.    Plaintiff adopts and incorporates the preceding paragraphs as they appear above and says further:

180.    Defendants' intentional failure to provide adequate medical care, failure to protect Ms. Gilliam from sexual abuse at the hands of a fellow inmate, subjection of Ms. Gilliam to ridicule and harassment by guards, and segregation of Ms. Gilliam in a more punitive setting—

all contrary to DPSCS policy—left her with severe emotional distress in the form of anxiety and depression.

181.    Defendants' conduct was committed within the scope of their employment.

182.    Defendants' conduct was intentional, reckless and in deliberate disregard of a high degree of probability that Ms. Gilliam would suffer emotional distress as a result.

183.    Defendants' conduct was extreme, outrageous, and beyond the bounds of decency in society.

184.    As a result of the aforesaid conduct, Ms. Gilliam has suffered, and continues to suffer, from severe and extreme emotional distress.

## **PRAYER FOR RELIEF**

**Wherefore**, PLAINTIFF respectfully requests this Honorable Court to grant the following relief:

A.    Declare unconstitutional and violative of federal law Defendants' practices in denying Plaintiff adequate and necessary medical treatment; housing Plaintiff with inmates inconsistent with her gender identity; segregation of Plaintiff in a more punitive setting on the basis of her gender identity; and failure to protect Plaintiff from assault and sexual assault at the hands of male inmates;

B.    Order that Defendants provide inmates with gender dysphoria with adequate and necessary medical care, house inmates with gender dysphoria in accordance with their gender identity, and adequately train staff to ensure the safe and dignified treatment of inmates with gender dysphoria;

C.    Award compensatory damages;

D.      Award punitive damages;

E.      Award Plaintiff her costs and attorneys' fees in this action; and in addition

F.      Grant any and all additional relief Plaintiff's causes require.

Respectfully submitted,

Eve L. Hill (Bar No. 19938)
Sharon Krevor-Weisbaum (Bar No. 04773)
Jessica P. Weber (Bar No. 17893)
Evan Monod (Bar No. 30541)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland  21202
(410) 962-1030 (phone)
(410) 385-0869 (fax)
ehill@browngold.com
skw@browngold.com
jweber@browngold.com
emonod@browngold.com

*Attorneys for Plaintiff*

Date:   April 18, 2023

## <u>JURY  TRIAL DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs, by their counsel, hereby

demand a trial by jury on all claims so triable in this action.

Respectfully submitted,

Eve L. Hill (Bar No. 19938)
Sharon Krevor-Weisbaum (Bar No. 04773)
Jessica P. Weber (Bar No. 17893)
Evan Monod (Bar No. 30541)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland  21202
(410) 962-1030 (phone)
(410) 385-0869 (fax)
ehill@browngold.com
skw@browngold.com
jweber@browngold.com
emonod@browngold.com

*Attorneys for Plaintiff*