## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

|  |  |  |
|---|---|---|
| CHELSEA GILLIAM,<br>CHLOE GREY, and<br>KENNEDY HOLLAND, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.  1:23-cv-1047 |
| | ) | |
| DEPARTMENT OF PUBLIC SAFETY | ) | JURY DEMAND |
| AND CORRECTIONAL SERVICES, | ) | |
| CAROLYN SCRUGGS, *in her official capacity*, | ) | |
| J. PHILIP MORGAN, *in his  official capacity*, | ) | |
| DAMILARE S. ADISA-THOMAS, *in her official capacity*, | ) | |
| NURUDEEN MATTI, *in his official capacity*, | ) | |
| WILLIAM BAILEY, *in his official capacity* | ) | |
| CHRISTOPHER S. SMITH, *in his official capacity*, | ) | |
| GREGORY A. WERNER, *in his official capacity*, | ) | |
| ORLANDO JOHNSON, *in his official capacity.* | ) | |
| KIMBERLY STEWART, *in her official and individual capacities,* | ) | |
| RONALD S. WEBER, *in his official capacity,* | ) | |
| MICHELE C. GARDNER, *in her official capacity,* | ) | |
| SHARON BAUCOM, *in her individual and official capacities*, | ) | |
| DAVID WOLINSKI , *in his individual and official capacities*, | ) | |
| APRIL PETERSON, *in her individual and official capacities* | ) | |
| BETSY NWOSU, *in her individual and official capacities*, | ) | |
| FATEEMA MOBLEY, *in her individual and official capacities*, | ) | |
| KELLY PARTLOW, *in her individual and official capacities*, | ) | |
| DONALD GALLAGHER, *in his individual and official capacities* | ) | |
| HOUSING DOES, *in their individual and official capacities*, | ) | |
| HEALTH CARE DOES, *in their individual and official capacities,* | ) | |
| CUSTODY DOES, *in their individual and official capacities*, and | ) | |
| | ) | |
| SERVE ON: | ) | |
| Stuart M. Nathan, Counsel | ) | |
| Assistant Attorney General | ) | |
| 6776 Reisterstown Road | ) | |
| Baltimore, Maryland 21215 | ) | |
| | ) | |
| Office of the Maryland State Treasurer | ) | |
| 80 Calvert Street | ) | |
| Annapolis, Maryland 21401, | ) | |
| | ) | |

YESCARE CORP.                                    )
1999 Bryan St. Suite 900                         )
Dallas, Texas 75201                              )
                                                 )
    SERVE ON:                                    )
CT Corporation System                            )
1999 Bryan St. Suite 900                         )
Dallas, Texas 75201                              )
                                                 )
                                                 )
    Defendants.                                  )
_____)

## THIRD AMENDED COMPLAINT
## FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

## INTRODUCTION

1.      Plaintiff Chelsea Gilliam, Plaintiff Chloe Grey, and Plaintiff Kennedy Holland, are women. Yet, because they are transgender and have gender dysphoria, while incarcerated by the Maryland Department of Public Safety and Correctional Services, they have been housed with men, left unprotected from assault, harassed, held in solitary confinement, and denied necessary medical treatment.

2.      As a result of their traumatic experiences, they have suffered harm, including exacerbation of gender dysphoria and physical and emotional distress, and they continue to suffer harm from Defendants' actions, including anxiety and depression.

## PARTIES, JURISDICTION, AND VENUE

3.      Ms. Gilliam is a Black woman, who, for all relevant time periods, was and is a person with a disability and a transgender woman.  Ms. Gilliam has gender dysphoria, a condition marked by a significant incongruence between one's experienced/expressed gender and the gender assigned at birth, lasting at least 6 months, and associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.[1]

4.      Ms. Grey[2] is a white woman, who, is a person with a disability and a transgender woman.  Ms. Grey has gender dysphoria.

5.      Ms. Holland is a Black woman, who, for all relevant time periods, was and is a person with a disability and a transgender woman.  Ms. Holland has gender dysphoria.

---

[1] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (2022) ("DSM-5-TR")*.

[2] Ms. Grey in the Department of Public Safety and Correctional Services' records as Chloe Sasha Scheibe.  On July 13, 2023, the Circuit Court for Allegany County, Maryland ordered her name be legally changed to Chloe Sasha Grey and her gender be legally changed to female.

6.     Gender dysphoria is recognized as a serious medical condition, including by the American Medical Association, the American Psychiatric Association, the American Psychological Association, the Endocrine Society, the World Professional Association for Transgender Health, and courts across the country. Treatment for gender dysphoria, often consisting of social transition, hormone therapy, and surgery, is medically necessary for many transgender people and can effectively treat, and even cure, the condition. Without treatment, individuals with gender dysphoria will often experience anxiety, depression, the inability to function effectively, and even self-harm and suicide.

7.     Ms. Gilliam was incarcerated at Baltimore City Correctional Center ("BCCC") and Maryland Reception, Diagnostic and Classification Center ("MRDCC"), from December 17, 2021, to May 13, 2022.

8.     Ms. Gilliam was for all relevant time periods a pretrial detainee at BCCC and MRDCC, as she was held without conviction of a crime.

9.     Ms. Gilliam is now on supervised probation. People on supervised probation are at greater risk of re-incarceration.[3]

10.     Ms. Grey is currently incarcerated at Patuxent Institution ("Patuxent"), where she was recently placed in the Georgetown University bachelors' degree program. Previously she was incarcerated at Western Correctional Institution (WCI) between 2016 and 2023.

11.     Ms. Holland was incarcerated at BCCC. She was released on supervised parole in August 2023. As with Ms. Gilliam, Ms. Holland is at increased risk of being incarcerated again because she is on supervised parole. She was for all relevant periods incarcerated at DPSCS

---

[3] *See generally* Jennifer L. Doleac, *Study After Study Shows Ex-Prisoners Would Be Better Off Without Intense Supervision*, Brookings (July 2, 2018), https://www.brookings.edu/blog/up-front/2018/07/02/study-after-study-shows-ex-prisoners-would-be-better-off-without-intense-supervision/.

facilities.  She was previously incarcerated at Eastern Correctional Institution (ECI), Maryland

Correctional Institution-Hagerstown (MCIH), Maryland Correctional Institution-Jessup (MCIJ)

and MRDCC.

12.     Defendant Department of Public Safety and Correctional Services ("DPSCS") is a

department of the Maryland state government. DPSCS includes the Maryland Division of

Corrections ("DOC"), which incarcerates criminal defendants sentenced by Maryland courts, as

well as pretrial detainees. MRDCC and BCCC are DOC facilities.

13.     Defendant Carolyn Scruggs is the Secretary of DPSCS. The Secretary is

responsible for administering DPSCS. Secretary Scruggs knows or should know DPSCS's

policies and practices regarding inmates, including transgender inmates. She is or should be

aware of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they

pertain to individuals incarcerated at BCCC and MRDCC. She is sued in her official capacity.

14.     Defendant J. Philip Morgan is the Commissioner of Corrections. The

Commissioner is responsible for the incarceration of inmates and supervision of correctional

staff. Commissioner Morgan is aware or should be aware of DPSCS and DOC policies regarding

transgender inmates. He is or should be aware of the requirements of federal law, including the

Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated at

BCCC and MRDCC. He is sued in her official capacity.

15.     Defendant Damilare Adisa-Thomas is the Administrator of BCCC and is

responsible for the governance and policies of the institution. Administrator Adisa-Thomas is

responsible for the safety, security, and treatment of all inmates at the facility. Administrator

Adisa-Thomas is or should be aware of DPSCS and DOC policies regarding transgender

inmates. She is or should be aware of the requirements of federal law, including the Fourteenth

Amendment, the ADA, and Section 504, as they pertain to the treatment of individuals incarcerated at BCCC. She is sued in her official capacity.

16.     Defendant Nurudeen Matti is the Warden of MRDCC and is responsible for the governance and policies of the institution. Warden Matti is responsible for the safety, security, and treatment of all inmates at the facility. Warden Matti is or should be aware of DPSCS and DOC policies regarding transgender inmates. He is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to the treatment of individuals incarcerated at MRDCC. He is sued in his official capacity.

17.     Defendant William Bailey is the Warden of ECI and is responsible for the governance and policies of the institution. Warden Bailey is responsible for the safety, security and treatment of all inmates at the facility. Warden Bailey is or should be aware of DPSCS and DOC policies regarding transgender inmates. He is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to the treatment of individuals incarcerated at ECI. He is sued in his official capacity.

18.     Defendant Christopher S. Smith is the Warden of MCIJ and is responsible for the governance and policies of the institution. Warden Smith is responsible for the safety, security and treatment of all inmates at the facility. Warden Smith is or should be aware of DPSCS and DOC policies regarding transgender inmates. He is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to the treatment of individuals incarcerated at MCIJ. He is sued in his official capacity.

19.     Defendant Gregory Werner is the Warden of MCIH and is responsible for the governance and policies of the institution. Warden Werner is responsible for the safety, security and treatment of all inmates at the facility. Warden Werner is or should be aware of DPSCS and

DOC policies regarding transgender inmates. He is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to the treatment of individuals incarcerated at MCIH. He is sued in his official capacity.

20. Defendant Orlando Johnson is the Acting Warden of Patuxent Institution and is responsible for the governance and policies of the institution. Warden Johnson is responsible for the safety, security and treatment of all inmates at the facility. Warden Johnson is or should be aware of DPSCS and DOC policies regarding transgender inmates. He is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to the treatment of individuals incarcerated at Patuxent. He is sued in his official capacity.

21. Defendant Ronald S.Weber is Warden of WCI and is responsible for the governance and policies of the institution. Warden Weber is responsible for the safety, security and treatment of all inmates at the facility. Warden Weber is or should be aware of DPSCS and DOC policies regarding transgender inmates. He is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to the treatment of individuals incarcerated at WCI. He is sued in his official capacity.

22. Defendant Kimberly Stewart is the Assistant Warden of Patuxent Institution and is responsible for the governance and policies of the institution. On information and belief, Assistant Warden Stewart also serves as the PREA Compliance Manager at Patuxent. Assistant Warden Stewart is responsible for the safety, security and treatment of all inmates at the facility. Assistant Warden Stewart is or should be aware of DPSCS and DOC policies regarding transgender inmates. She is or should be aware of the requirements of federal law, including the

Fourteenth Amendment, the ADA, and Section 504, as they pertain to the treatment of

individuals incarcerated at Patuxent. She is sued in her official and individual capacities.

23.     Defendant Michele C. Gardner is the Department ADA Coordinator for the

Maryland Department of Public Safety and Correctional Services. Ms. Gardner is responsible for

coordinating and implementing policies regarding inmates with disabilities across DPSCS,

including inmates with gender dysphoria.  She is or should be aware of the requirements of

federal law, including the ADA and Section 504, as they pertain to individuals incarcerated by

DPSCS. She is sued in her official capacity.

24.     Defendant Sharon Baucom is the Chief Medical Officer of the Maryland

Department of Public Safety and Correctional Services. The Chief Medical Officer is responsible

for the provision of medical care and supervision of correctional medical staff. Dr. Baucom is or

should be aware of DPSCS and DOC policies regarding transgender inmates. She is or should be

aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and

Section 504, as they pertain to individuals incarcerated by DPSCS. She is sued in her individual

and official capacities.

25.     Defendant David Wolinski is the Prison Rape Elimination Act ("PREA")

Coordinator at DPSCS. Mr. Wolinski is responsible for ensuring compliance with PREA across

DPSCS. Mr. Wolinski is or should be aware of DPSCS and DOC policies regarding PREA and

transgender inmates. He is or should be aware of the requirements of federal law, including the

Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated

by DPSCS. He is sued in his individual and official capacities.

26.     Defendant April Peterson is the PREA Compliance Manager at Patuxent. Ms.

Peterson is responsible for ensuring compliance with PREA, including through oversight of

PREA Coordinators. Ms. Peterson is or should be aware of DPSCS and DOC policies regarding PREA and transgender inmates. She is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated at Patuxent. She is sued in her individual and official capacities.

27.     Defendant Betsy Nwosu is the PREA Compliance Manager at MRDCC. Ms. Nwosu is responsible for ensuring compliance with PREA, including through oversight of PREA Coordinators. Ms. Nwosu is or should be aware of DPSCS and DOC policies regarding PREA and transgender inmates. She is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated at MRDCC. She is sued in her individual and official capacities.

28.     Defendant Fateema Mobley is the PREA Compliance Manager at MCIJ. Ms. Mobley is responsible for ensuring compliance with PREA at MCIJ. Ms. Mobley is or should be aware of DPSCS and DOC policies regarding PREA and transgender inmates. She is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated at MCIJ. She is sued in her individual and official capacities.

29.     Defendant Kelly Partlow is the PREA Compliance Manager at MCIH. Ms. Mobley is responsible for ensuring compliance with PREA at MCIH. Ms. Mobley is or should be aware of DPSCS and DOC policies regarding PREA and transgender inmates. She is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated at MCIH. She is sued in her individual and official capacities.

30.     Defendant Donald Gallagher is the PREA Compliance Manager at ECI. Mr. Gallagher is responsible for ensuring compliance with PREA at ECI. Mr. Gallagher is or should be aware of DPSCS and DOC policies regarding PREA and transgender inmates. He is or should be aware of the requirements of federal law, including the Fourteenth Amendment, the ADA, and Section 504, as they pertain to individuals incarcerated at ECI. He is sued in his individual and official capacities.

31.     "Housing Does" are the Facility Security Chief, Case Management staff, correctional officers, and other staff who were employed at BCCC, MRDCC, ECI, MCIJ, MCIH, WCI, and Patuxent during the relevant time periods pertaining to the acts and omissions herein. They were responsible for the implementation of DPSCS housing policies and procedures, and for the safety of inmates, including Plaintiffs.

32.     Housing Does supervised or participated in the actions Plaintiffs complain of herein. The identities of Housing Does are unknown and cannot be found without access to Plaintiffs' custody files, to which they do not currently have access. Plaintiffs will substitute the true names of Housing Does when they are able to ascertain their identities through discovery. The Housing Does are sued in their individual and official capacities.

33.     "Health Care Does" are medical providers and other staff who were contracted or employed at BCCC, MRDCC, ECI, MCIJ, MCIH, WCI, and Patuxent during the relevant time periods pertaining to the acts and omissions herein. They were responsible for ensuring the provision of medical treatment to inmates, including Plaintiffs. They participated in the denial of adequate and necessary treatment for Plaintiffs' gender dysphoria.

34.     The identities of Health Care Does are unknown and cannot be found prior to discovery. Plaintiffs will substitute the true names of Health Care Does when they are able to

ascertain their identities through discovery. The Health Care Does are sued in their individual and official capacities.

35.     "Custody Does" are custody supervisors, correctional officers, PREA Coordinators, and other staff who were employed at BCCC,MRDCC, ECI, MCIJ, MCIH, WCI, and Patuxent during the relevant time periods pertaining to the acts and omissions herein. They were responsible for the implementation of DPSCS policies and procedures, including PREA policies and procedures, and for the safety of inmates, including Plaintiffs.

36.     Custody Does supervised or participated in the actions Plaintiffs complain of herein. The identities of Custody Does are unknown and cannot be found prior to discovery. Plaintiffs will substitute the true names of Custody Does when they are able to ascertain their identities through discovery. The Custody Does are sued in their individual and official capacities.

37.     Defendant YesCare Corporation is a private, for-profit corporation contracted to provide health care services to inmates in the custody of DPSCS, including medical and mental health services. As the health care provider at both WCI and Patuxent, YesCare is responsible for ensuring that inmates receive adequate physical and psychological treatment while incarcerated.

38.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the Plaintiffs' claims under the Fourteenth Amendment, Eighth Amendment, 42 U.S.C. § 1983 ("Section 1983"), the ADA and Section 504 because this action arises under the Constitution and laws of the United States.

39.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because the facts of the federal and state law claims form part of the same case or controversy.

40.     Venue is proper in this Court under 28 U.S.C. § 1391 because the events described in this action took place within this judicial district.

41.     Ms. Gilliam has followed the procedure to bring a tort claim against the state of Maryland and has had her claim statutorily denied by the Maryland State Treasurer, as they failed to give notice of a final decision within six months of filing the claim, pursuant to Md. Code Ann., State Gov't §§ 12-106, 12-107 (West 2022). The written claim to the Treasurer was submitted within one year of Ms. Gilliam's injury, and this claim is filed within three years after the cause of action arose. Md. Code Ann., State Gov't § 12-106(b)(1)–(3) (West 2022).

## STATEMENT OF FACTS

42.     Ms. Chelsea Gilliam is a Black transgender woman. Ms. Gilliam was diagnosed with gender dysphoria in approximately 2003, when she was 17 years old. She began treatment for gender dysphoria at that time.

43.     Ms. Gilliam has identified and lived exclusively as a woman for over fourteen years. She legally changed her name to Chelsea in 2009. She has a distinctly feminine appearance.

44.     Ms. Gilliam received hormone treatments for her gender dysphoria for 18 years prior to her incarceration and has continued to receive hormone treatments since her release. She originally was prescribed it every two weeks and was prescribed hormone treatments once a week for the past 15 years.

45.     During her incarceration at BCCC and MRDCC, Ms. Gilliam was consistently misgendered by staff at both facilities. Ms. Gilliam was also denied hormone treatment for the majority of her incarceration.

46.     Despite her female gender identity, Ms. Gilliam was placed with male inmates and forced to shower with men at BCCC, despite the known risk of sexual assault from male inmates and in contravention of Defendants' own policy.

47.     Ms. Gilliam was, in fact, physically and sexually assaulted by a male inmate while in the shower at BCCC. Despite Ms. Gilliam reporting her assault, DPSCS took no action. DOC staff eventually promised Ms. Gilliam accommodations, including the ability to shower and go to recreation facilities separately from male inmates. In practice, however, staff refused to honor those accommodations.

48.     Following her transfer to MRDCC, Ms. Gilliam was kept in administrative segregation because of her gender identity for approximately three months. She was shackled in a three-piece shackle any time she left her cell, including when she was in the shower, despite having had no write-ups or disciplinary infractions. She was only allowed out of her cell for one hour per day except on weekends, when she was not allowed out of her cell at all. When she asked at a review to be moved to the general population, Defendants demanded that she sign a waiver of liability in order to be moved. Ms. Gilliam declined to sign this coercive document and remained in administrative segregation until the end of her incarceration.  Ms. Gilliam describes being in administrative segregation as feeling punitive, like she did something wrong and was being maliciously punished for that perceived wrong.

49.     Ms. Grey is a white transgender woman with a distinctly feminine appearance. Although she has always been trans, Ms. Grey was formally diagnosed with gender dysphoria in March 2021. She formally began to transition in December 2021 when she first received hormone therapy. While DPSCS records still record her pre-transition family name of Scheibe, Ms. Grey legally changed her name and gender identity in 2023.

11

50.     Ms. Grey has been prescribed oral hormone treatment and other gender-affirming medications since December 2021. Although she was formally diagnosed with gender dysphoria in March 2021, her hormone therapy and gender-affirming medications and procedures have been delayed, inconsistent, and denied at both WCI and Patuxent.

51.     While at WCI and Patuxent, Ms. Grey has been ridiculed and disparaged by Health Care, Housing, and Custody Does because of her gender identity. She has also been routinely misgendered and referred to as slurs by those same prison staff members and by other inmates,

52.     Ms. Grey has been routinely housed with men while incarcerated, even after beginning to formally transition in late 2021. She has been repeatedly sexually assaulted by two cellmates and other men housed in her cell tier. Likewise, she has been constantly harassed and misgendered by DPSCS staff and other inmates at WCI and Patuxent.

53.     When she complained about her treatment and the repeated sexual assaults, WCI Housing Does' response was to put her in administrative segregation for one month.

54.     While in administrative segregation, Ms. Grey has felt "dehumanized" as she was ripped from the only support system she had in prison. She has felt "punished" for being transgender and for DPSCS failing to adequately protect her from sexual assault. Being in administrative segregation has made her feel depressed and isolated.

55.     Upon her exit from administrative segregation, Housing Does at WCI forced Ms. Grey to share a cell with an inmate who was known for raping his cellmates, despite the known risks of housing transgender women with men.

56.     Ms. Grey's new cellmate then attempted to rape her, but Officer McCusker saw it and intervened. However, he refused to discipline the would-be rapist inmate.

57.     That inmate then attempted to rape her again. When Ms. Grey attempted to lodge a PREA complaint with the psychologist at WCI, Mrs. Harold, she refused, claiming that "isn't what [we] do here" at WCI.

58.     The Custody Does also removed Ms. Grey from her prison job as an assistant in the educational department, citing to her that she was too distracting for the male students.

59.     Ms. Grey was placed in administrative segregation at Patuxent in retaliation for her complaints and for contacting an attorney to challenge her discriminatory treatment.

60.     Kennedy Holland is a Black transgender woman. She began transitioning in 2003, and was diagnosed with gender dysphoria in 2010. She has a distinctly feminine appearance, and has received gender affirming treatment to align with her gender identity.

61.     Ms. Holland has lived exclusively as a woman for the last twenty years, and received hormone therapy consistently prior to her incarceration. She is supposed to receive oral hormone treatment every day and should receive hormone injections every two weeks. She also should receive blood work every three months to check hormone levels.

62.     Throughout her incarceration, her hormone treatments have been inconsistent. Rather than every two weeks, Ms. Holland had to wait up to a month for hormone injections. Similarly, she has been without oral hormone treatment for up to two months.

63.     Despite being given assurances that she would be housed away from men due to the risk of sexual assault, Ms. Holland was housed with men at MCIJ and ECI. While at MCIJ, she was threatened with sexual assault after an inmate forcibly pulled her into the cell next door to her own. This was a direct result of her being housed with male inmates, despite the known risk of sexual assault from male inmates and in contravention of Defendants' own policy.

64.     Ms. Holland was also promised a private shower at ECI, but was instead forced to shower with men.

65.     Ms. Holland was also strip searched by male correctional officers, at MRDCC. She was continuously misgendered by staff during her incarceration.

66.     Ms. Holland has also been put into administrative segregation multiple times on account of her gender identity. Whenever she complained about being housed with men, Housing and Custody Does gave her one option: to be placed in administrative segregation. She was in administrative segregation at ECI from late June to early August 2022.

67.     While in administrative segregation, Ms. Holland was only let out of her cell every other day for as little as 45 minutes. She describes segregation as feeling punitive.

## I.    CLEAR STANDARDS GOVERN TREATMENT OF TRANSGENDER INMATES

### A.    DPSCS Policies

#### 1.    Housing and Showers

68.     DPSCS recognizes that being transgender is a risk factor for sexual assault. *Assessment for Risk of Sexual Victimization and Abusiveness*, OPS.200.0006, § .05(g) (2018) (hereinafter "DPSCS Sexual Victimization Policy").

69.     The DPSCS Sexual Victimization Policy requires DPSCS staff to assess each inmate's risk for being sexually abused within 72 hours of arrival, every 30 days, and upon request or incident of sexual abuse, and to take that assessment into account when making inmate housing assignments. *Id.* §§ .03, .05(B) (2018).

70.     The DPSCS Sexual Victimization Policy specifically requires that victimization risk must be considered "[w]hen deciding to assign a transgender . . . inmate to a facility for male or female inmates and in other housing . . . assignments." *Id.* § .05(C)(1)(c). The policy also

provides that "[a] transgender . . . inmate's own views with respect to personal safety shall be seriously considered." *Id.* § .05(C)(3).

71.     DPSCS policy also provides that a "Gender Dysphoric inmate's housing placement shall be made on a case-by-case basis seriously considering the inmate's opinion regarding the inmate's safety and the inmate's biological gender presentation and appearance." *Identification, Treatment, and Correctional Management of an Inmate Diagnosed with Gender Dysphoria*, OPS 131.0001, § .05(J)(1) (2016) (hereinafter DPSCS Gender Dysphoria Policy).

72.     The facility's Security Chief and Case Management staff must consider various factors in determining an inmate's gender presentation and appearance, such as "[i]ntact external genitalia and secondary sex characteristics, such as pubic hair, chest hair, facial hair; and [s]pecific factors, such as partial completion of sex reassignment surgery, removal or augmentation of breasts, or removal of testicles." *Id.* § .05(J)(1)(a)–(b).

73.     Additionally, DPSCS policy provides that "[m]ental health staff may provide input as to clinical recommendations related to housing of a Gender Dysphoric inmate to the managing official and Case Management staff[.]" *Id.* § .05(J)(3).

74.     Likewise, according to the DPSCS Sexual Victimization Policy, "[t]ransgender . . . inmates shall be given the opportunity to shower separately from other inmates." *Id.* § .05(C)(4).

### 2.     Hormone Treatment

75.     DPSCS policy states that "[a]t the time of intake in a Department correctional facility, if an inmate is currently under hormonal therapy as part of an established regimen for Gender Dysphoria and the contracted medical services provider verifies the treatment and determines that the regimen. . . .[i]s not contraindicated, the contracted medical services provider shall. . . .[c]ontinue the hormonal therapy[.]" *Id.* §§ F(1), (1)(a)–(1)(a)(i).

### 3.   Administrative Segregation

76.     DPSCS policy stipulates that LGBTQ inmates may not be placed in "dedicated facilities, units, or wings solely on the basis of such identification or status." DPSCS Sexual Victimization Policy, *supra* § .05(C)(5).

77.     Similarly, DPSCS policy states that upon being assigned to administrative segregation, a "case management team shall review the inmate's administrative segregation status within five working days of the inmate's placement on segregation." Dept. of Pub. Safety and Correctional Servs., Division of Correction, *Case Management Manual*, DOC 100.0002, § 17(B)(4)(a) (2019) (hereinafter DPSCS Case Management Manual).

78.     Members of the case management team are required to "consider available alternatives to continued administrative segregation." *Id.* § 17(B)(4)(c).

79.      DPSCS policy provides that inmates who are assigned to administrative segregation "shall have the opportunity to respond to the reasons stated for being in administrative segregation." *Id.* § 17(B)(4)(B).

80.     This process should reoccur at least every seven days for the first sixty days of administrative segregation, and at least once every thirty days thereafter. *Id.* § 17(B)(5)(a).

### B.   Prison Rape Elimination Act Requirements

81.     The Prison Rape Elimination Act ("PREA") regulations also specifically require:

   a) The agency shall use information from the risk screening required by § 115.41 to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive.
   . . .
   c) In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether the placement would ensure the inmate's health and

safety, and whether the placement would present management or
security problems.

. . .

e)  A transgender or intersex inmate's own views with respect to his or her
own safety shall be given serious consideration.[4]

82.  The PREA regulations also specifically require that "[t]ransgender and intersex

inmates shall be given the opportunity to shower separately from other inmates."[5]

83.  The PREA regulations further provide that:

(a) Inmates at high risk for sexual victimization shall not be placed in
involuntary segregated housing unless an assessment of all available
alternatives has been made, and a determination has been made that
there is no available alternative means of separation from likely abusers.

(b) Inmates placed in segregated housing for this purpose shall have access
to programs, privileges, education, and work opportunities to the extent
possible. If the facility restricts access to programs, privileges,
education, or work opportunities, the facility shall document:
(1) The opportunities that have been limited;
(2) The duration of the limitation; and
(3) The reasons for such limitations.

(c) The facility shall assign such inmates to involuntary segregated housing
only until an alternative means of separation from likely abusers can be
arranged, and such an assignment shall not ordinarily exceed a period of
30 days.

(d) If an involuntary segregated housing assignment is made pursuant to
paragraph (a) of this section, the facility shall clearly document:
(1) The basis for the facility's concern for the inmate's safety; and
(2) The reason why no alternative means of separation can be arranged.

(e) Every 30 days, the facility shall afford each such inmate a review to
determine whether there is a continuing need for separation from the
general population.[6]

**C.    World Professional Association for Transgender Health Standards of Care**

---

[4] 28 C.F.R. § 115.42 (2022).

[5] 28 C.F.R. § 115.42(f) (2022).

[6] 28 C.F.R. § 115.43 (2022).

84.     The World Professional Association for Transgender Health ("WPATH") is a nonprofit, multidisciplinary professional association dedicated to understanding and treating gender dysphoria. WPATH is recognized internationally as the leading professional organization devoted to the understanding and treatment of gender dysphoria. WPATH publishes and regularly updates the Standards of Care for the Health of Transgender and Gender Diverse People (the "Standards of Care"),[7] based upon the best available science and expert professional consensus.

85.     The seventh version of the Standards of Care was in effect during Ms. Gilliam's incarceration. The eighth and current version of the Standards of Care has been in effect since September 2022. The Standards of Care are widely recognized in the medical community as the authoritative standards for the provision of transgender healthcare.

86.     The Standards of Care have established medical treatment standards for persons living with gender dysphoria that are recognized and accepted within the medical community, and that reflect a rigorous and methodological evidence-based approach grounded in published literature and consensus-based expert opinion. Courts also have acknowledged that the Standards of Care provide widely accepted protocols for treating individuals with gender dysphoria.

87.     The Standards of Care explicitly apply in institutional settings, such as jails and prisons. "The [Standards of Care] in their entirety apply to all transsexual, transgender, and gender nonconforming people, irrespective of their housing situation."[8]

---

[7] World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Version 7*, 67 (2011), https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwj-j__t29P7AhXWEVkFHbBjAnEQFnoECCUQAQ&url=https%3A%2F%2Fwww.wpath.org%2Fmedia%2Fcms%2FDocuments%2FSOC%2520v7%2FSOC%2520V7_English.pdf&usg=AOvVaw0TLAbNacS9DZm7-Mldw3u3 (hereinafter Standards of Care Version 7).

[8] *Id.*

### 4.    Housing and Showers

88.    Version 7 of the Standards of Care provided:

Housing and shower/bathroom facilities for [transgender] people living in
institutions should take into account their gender identity and role, physical
status, dignity, and personal safety. Placement in a single-sex housing unit,
ward, or pod on the sole basis of the appearance of external genitalia may not
be appropriate and may place the individual at risk for victimization.[9]

89.    Building upon these earlier recommendations, the current Standards of Care make

clear that:

[t]he separation of people based on sex assigned at birth . . . can create an
inherently dangerous environment. Gender diverse people are extremely
vulnerable to stigmatization, victimization, neglect, violence, and sexual abuse.
This systemic sex-segregated rigidity often fails to keep [transgender and
gender diverse] people safe and may impede access to gender-affirming health
care. As a result, institutions should follow procedures that routinely evaluate
the housing needs and preferences of [transgender and gender diverse]
inmates.[10]

90.    The current version of the Standards of Care also states that "institutional

administrators, health care professionals, and other officials responsible for making housing

decisions for [transgender and gender diverse] residents consider the individual's housing

preference, gender identity and expression, and safety considerations, rather than solely their

anatomy or sex assignment at birth."[11]

91.    The current version of the WPATH Standards of Care recommends that

"institutional personnel establish housing policies that ensure the safety of transgender and

gender diverse residents without segregating or isolating these individuals,"[12] noting that

---

[9] *Id.* at 68.

[10] E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23
Int'l J. of Transgender Health S1, S108 (2022), https://www.wpath.org/publications/soc [hereinafter Standards of
Care Version 8].

[11] *Id.*

[12] *Id.*

[a]ssigning placement for a [transgender] resident solely on the basis of their genital anatomy or sex assigned at birth is misguided and places people at risk for physical and/or psychological harm. It is well established within carceral settings, transgender individuals are far more likely than other prisoners to be sexually harassed, assaulted, or both.[13]

92.     The Standards of Care further "recommend institutional personnel allow transgender and gender diverse residents the private use of shower and toilet facilities, upon request"[14] because "[transgender] individuals in institutions are often deprived of privacy in bathroom and shower use, which can result in psychological harm and/or physical and sexual abuse."[15]

### 5.     Hormone Treatment

93.     Gender affirming hormone treatment has been accepted as medically necessary treatment since the first WPATH Standards of Care were published in 1979. Version 7 of the Standards of Care provided that "[a]ccess to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. . . . People who enter an institution on an appropriate regimen of hormone therapy should be continued on the same, or similar, therapies and monitored according to the [Standards of Care]. . . . The consequences of abrupt withdrawal of hormones . . . include a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality."[16]

---

[13] *Id.*

[14] *Id.* at S108–09. *See also Standards of Care Version 7*, *supra* note 7 at 68.

[15] *Standards of Care Version 8*, *supra* note 10, at S109. *See also Standards of Care Version 7*, *supra* note 7 at 68; Nat'l. Comm'n on Correctional Health Care, *Transgender and Gender Diverse Health Care in Correctional Settings*, ¶ 23 (2020).

[16] *Standards of Care Version 7*, *supra* note 7 at 68. *See also* Standards of Care Version 8, *supra* note 10, at S109; Nat'l. Comm'n on Correctional Health Care, *Transgender and Gender Diverse Health Care in Correctional Settings*, ¶ 20 (2020) ("Transgender individuals should be placed in the least restrictive environment necessary to ensure their safety. Isolation restrictive housing, or segregation should not be relied on exclusively or indefinitely to ensure safety.").

94.     Following the abrupt withdrawal of her hormone treatment, Ms. Gilliam experienced similar consequences. Her skin broke out as facial hair reemerged, causing her to scratch and scar her neck. She felt frustrated and sad when she looked at her body. Her gender dysphoria became worse as increased testosterone would cause her to get an erection. As a result, Ms. Gilliam wanted to kill herself.

95.     Likewise, Ms. Holland felt that she experienced a change in her look and in the feeling of her body following the abrupt withdrawal of hormones. She felt "stalled" in her transition, and that she regressed from looking more feminine when she was first in DPSCS custody to looking more masculine when she left DPSCS custody in August 2023. This further exacerbated her gender dysphoria.

96.     Although Ms. Grey started hormone treatment in December 2021, she did not receive an adequate dosage to effectively transition until May 2023. After that, it became a struggle to receive a consistent hormone dose every ten days. She felt happy when she began hormone therapy, but that happiness quickly ended once her hormone treatment became so inconsistent. Like Ms. Gilliam, the return of her facial hair and erections only exacerbated her gender dysphoria.

97.     WPATH's current Standards of Care also recommend that health care professionals initiate and continue gender-affirming hormone therapy due to its demonstrated improvement in psychosocial functioning and quality of life.[17] Indeed, "[i]n many cases, hormone therapy is considered a lifesaving intervention."[18]

---

[17] *Standards of Care Version 8*, *supra* note 10 at S125–26.

[18] *Id.* at S126.

98.    The Standards of Care note that the delay of necessary hormone treatment can result in significant negative mental health outcomes. Therefore, "[a]s with all medically necessary health care, access to gender-affirming hormone therapies should be provided in a timely fashion."[19]

### 6.    Administrative Segregation

99.    The Standards of Care specifically call for transgender inmates not to be segregated or isolated, noting that "[isolation can cause severe psychological harm and gross disturbances of functioning. National prison standards organizations as well as the United Nations consider isolation longer than 15 days to be torture."[20]

## II.    DEFENDANTS HOUSED PLAINTIFFS WITH MEN IN SPITE OF THE RISK OF SEXUAL VICTIMIZATION

100.    On December 17, 2021, Ms. Gilliam was arrested for an alleged assault. Despite her legal name change, the police used her previous male name.

101.    Following her arrest, Ms. Gilliam was sent to BCCC.

102.    Despite her female gender identity, feminine appearance, and years of hormone therapy treatment, and in contravention of DPSCS's own policy, Ms. Gilliam was housed with male inmates at BCCC until February 2, 2022.

103.    None of the Defendants assessed Ms. Gilliam for risk of sexual victimization and she was never asked her own view regarding what would be a safe housing placement. Instead, Defendants housed Ms. Gilliam with male inmates simply because she was assigned the male gender at birth. When she complained, one of the Housing Does told her "you are a man and you are in jail."

---

[19] *Id.* at S106.

[20] *Id.* at S108.

104.    On information and belief, the BCCC Security Chief and Case Management staff did not take Ms. Gilliam's gender presentation and appearance, her gender-confirming medical treatment, or her own views into account when making her housing determination, as required by DPSCS policy. Nor did mental health staff (Health Care Does) provide input into Ms. Gilliam's housing assignment, as provided for by DPSCS policy.

105.    Ms. Grey was sentenced in October 2017 and is serving a life sentence with the possibility of parole. From 2017 to 2023 she was incarcerated at WCI.  Since September 2023 she has been incarcerated at Patuxent.

106.    Ms. Grey has been routinely housed with men while incarcerated, even after beginning to transition in late 2021 while incarcerated at WCI.

107.    Upon informing Custody and Housing Does at WCI of her gender identity, they forced Ms. Grey to come out to her entire housing unit. This led to threatening notes from the men in her unit, including letters with semen in them.

108.    Ms. Grey's situation at Patuxent did not improve, as she has been housed with male inmates in the Georgetown University program. These men continually harass her, threaten to rape and kill her, and refuse to call her by her correct names and pronouns.

109.    When Ms. Grey has complained about this treatment, Assistant Warden Stewart has blamed Ms. Grey for other inmates' reactions because of her feminine appearance.

110.    Although she is currently housed in a single cell, the Assistant Warden threatens to house a man with her. When she complained, the Assistant Warden also threatened to kick her out of the Georgetown University program and return her to WCI.

111.    On information and belief, the WCI and Patuxent Security Chief and Case Management staff did not take Ms. Grey's gender presentation and appearance, her gender-

confirming medical treatment, or her own views into account when making her housing determination, as required by DPSCS policy. Nor did mental health staff (Health Care Does) provide input into Ms. Grey's housing assignment, as provided for by DPSCS policy.

112.    Ms. Holland was arrested in June 2018 and convicted in August 2019 and was released on parole in August 2023.

113.    Following her conviction, she was sent to MRDCC, where she was told by the PREA Coordinator that she would not be in an open housing facility due to the danger of sexual assault by male inmates.

114.    However, Ms. Holland was consistently housed with men throughout her incarceration.

115.    On information and belief, the MRDCC Security Chief and Case Management staff did not take Ms. Holland's gender presentation and appearance, her gender-confirming medical treatment, or her own views into account when making her housing determination, as required by DPSCS policy. Nor did mental health staff (Health Care Does) provide input into Ms. Holland's housing assignment, as provided for by DPSCS policy.

116.    Transgender inmates are far more likely to be sexually assaulted than cisgender[21] inmates. A study of transgender women in men's prisons in California found that 59% had been sexually assaulted, compared to just 4% of the general population, while the United States Department of Justice has estimated that 35% of transgender inmates were sexually assaulted in state and federal prison between 2007 and 2012.[22]

---

[21] "Cisgender" means "of, relating to, or being a person whose gender identity corresponds with the sex the person had or was identified as having at birth." *Cisgender*, *Merriam-Webster Dictionary* (2023), https://www.merriam-webster.com/dictionary/cisgender.

[22] *See, e.g.*, Valerie Jenness et al., *Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault* 2 (2007), https://cpb-us-

117.     Housing assignments based on sex assigned at birth leave transgender women especially vulnerable to sexual abuse at the hands of other inmates. "Because transgender women are at high risk for sexual assault and other forms of violence while incarcerated, where and how they are housed during periods of incarceration has serious implications for their physical and mental health."[23]

## III.   DEFENDANTS SUBJECTED PLAINTIFFS TO HARASSMENT, SEXUAL ASSAULT, AND HUMILIATION

118.     While Ms. Gilliam was housed with male inmates at BCCC, she was repeatedly harassed by Custody Does and inmates on account of her gender identity.

119.     Throughout her time at BCCC, many of the Housing, Health Care, and Custody Does consistently called Ms. Gilliam by her previous male name (her "dead name"), rather than by her legally changed chosen name.

120.     In contravention of DPSCS's own policy, Custody Does forced Ms. Gilliam to shower and use the toilet alongside male inmates. Because the toilets were not in individual stalls, they were open for all to see from the adjoining common area, cells, and entryway/vestibule.

121.     Ms. Gilliam's dorm leader complained about Ms. Gilliam being naked and showering as a woman. Other inmates refused to talk to her at all for fear of being harassed.

---

e2.wpmucdn.com/sites.uci.edu/dist/0/1149/files/2013/06/BulletinVol2Issue2.pdf; U.S. Dep't of Justice Off. of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates 2011-12* 2 (2014), https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwiPpvHg w9v7AhXsEVkFHXCyCJsQFnoECAkQAQ&url=https%3A%2F%2Fbjs.ojp.gov%2Fcontent%2Fpub%2Fpdf%2Fs vpjri1112_st.pdf&usg=AOvVaw0txF6wEVRrlWwjf0s96Qk8.

[23] Elida Ledesma & Chandra L. Ford, *Health Implications of Housing Assignments for Incarcerated Transgender Women*, 110 A, J. Pub. Health 650–54 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7144448/.

122.    An inmate nicknamed "Christopher" sexually propositioned Ms. Gilliam and she refused him. In fear of him, she started avoiding him in the showers, until he threatened her life and told her, "Bitch, get up and take a shower."

123.    Ms. Gilliam proceeded to the shower. There, Christopher threatened her with a knife and sexually assaulted her by masturbating against her and digitally penetrating her anus.

124.    On the date of the assault, Ms. Gilliam gave one of the Custody Does a written description of the assault in red ink. She reported the assault again following the subsequent physical assault of her close friend by a different inmate.

125.    Defendants did not take any action.

126.    Ms. Gilliam subsequently told Healthcare Doe, "Miss C" in the Mental Health Department, about the assault. Miss C said that the PREA Coordinator would see her.

127.    The PREA Coordinator, Custody Doe "Miss Ogar", eventually arrived, and Ms. Gilliam told her about the assault.

128.    Miss Ogar agreed DPSCS should resume Ms. Gilliam's hormone therapy. Miss Ogar also told Ms. Gilliam that she could go to recreation and shower alone. However, Defendants never implemented this accommodation.

129.    In the last week of January 2022, DPSCS staff moved Ms. Gilliam to a single cell. While she was supposed to be able to shower and go to recreation separate from male inmates, many of the Custody Does would not honor that accommodation.

130.    Accordingly, on or about February 2, 2022, Ms. Gilliam wrote a statement about needing separate shower time and about the assault. She handed it to a Custody Doe, but never received an official response.

131.    Custody Does periodically brought male inmates to her cell to see if they would room with her. The men often reacted badly, and the Custody Does laughed. Eventually, the Custody Does placed Ms. Gilliam with a male cellmate.

132.    Despite Ms. Gilliam's feminine appearance, her female gender identity, her history of hormone therapy, and the well-known risk of sexual assault against transgender inmates, DPSCS and its staff decided to house Ms. Gilliam with male inmates, did not consult with her on her own safety needs per DPSCS policy, and forced her to shower and use the toilet with men. Predictably, Ms. Gilliam was sexually assaulted by another inmate as a result.

133.    While at WCI and Patuxent, Ms. Grey has been ridiculed and disparaged by Health Care, Housing, and Custody Does because of her gender identity. She has also been routinely misgendered by those same prison staff members. Examples include:

   a.   On July 17, 2023, an officer in the Property Department at WCI proclaimed to Ms. Grey that "men don't wear make-up" and said that "a pig with lipstick on it is still a pig."

   b.   The next day, an officer posted to the Psychology ward where Ms. Grey receives counseling for her gender dysphoria repeatedly used male pronouns to refer to her. When she asked him to stop, the officer called Ms. Grey an "it."

   c.   When she complained about this behavior to the Psychology Ward supervisor, she was told that "this was how it has always been" and to not expect anything different.

d.      Assistant Warden Bradley Butler at WCI  stated his belief that Gender
Dysphoria is not real. He told Ms. Grey that she was simply trying to start a
"culture war."

134.    In April or May of 2022, Ms. Grey was sexually assaulted in her housing unit by a
male inmate. The male inmate grabbed her breasts and buttocks and urged her to "play ball" with
him. A Housing Doe looked the other way.

135.    When Ms. Grey complained to then-Housing Manager Lt. Forney about the
incident, Forney replied that he would not file a PREA complaint related to the incident.

136.    Before her first stint in administrative segregation, Ms. Grey was forced into sex
by her cellmate, Nicholas Browning. She put up with it because she was terrified of being placed
in administrative segregation if she complained.

137.    When Ms. Grey did complain about the routine sexual assaults by her cellmate,
Housing Does' only response was to place her in administrative segregation for one month.

138.    Upon her exit from administrative segregation at WCI, Housing Does at WCI
forced Ms. Grey to share a cell with an inmate Jones-Harris who was known for raping his
cellmates, despite the known risks of housing transgender inmates with men.

139.    Jones-Harris then attempted to rape her, but an Officer McCusker saw it and
intervened. However, he refused to discipline the would-be rapist inmate.

140.    Ms. Grey was then taken to the psychologist Mrs. Harold, where she was told that
she shouldn't file a PREA complaint because that was "not what [we] do here [at WCI]."

141.    Ms. Grey continued to request a safer housing assignment. Jones-Harris was left
on the same tier and tried to assault her again.

142.     Housing Manager Forney then put her in a single cell on a different tier. Still, male inmates from that tier would wait for her in her cell to demand sex from her. Ms. Grey was afraid to return to her cell for count.

143.     Male inmates on that tier also threatened her about showering, saying they would rape and kill you if she ever tried to shower with them.

144.      Yet Housing Does would also not honor her request to shower separately from male inmates throughout her time at WCI. She continued to risk being sexually assaulted again by showering with male inmates.

145.     In response to her requests to shower separately, Housing Does told her they had never heard of a transgender inmate showering away from the general population. Ms. Grey was told by one Housing Doe to shower in the sink in her cell instead.

146.     Ms. Grey was only allowed to shower separately after the request came from her male cellmate in June 2022.

147.     Since her move to Patuxent, Ms. Grey has again struggled to shower separately. Housing and Custody Does have said that they "forget" to allow her to shower separately. Housing and Custody Does have asked her "don't you like boys?" when she has told them that she needs to shower separately. She has sometimes gone for days without a shower.

148.     On October 15, 2023, after her move to Patuxent, Ms. Grey was again subjected to sexual harassment from another inmate, a man with the last name Williamston. Although she lives on a tier where inmates should not be out of their cells without cuffs and an officer escort, a male inmate went to Ms. Grey's cell.

149.     Williamston pulled out his penis and tried to get Ms. Grey to perform oral sex on him. She refused, and the inmate threw water at her.

150.    She called for Housing and Custody Does to come for over an hour until an officer came and took her out of her cell and to a supervisor downstairs.

151.    After taking her written statement, Custody Does confirmed that they would not file a PREA report regarding the harassment Ms. Grey experienced. She was returned to administrative segregation, where she remains as of the filing of this complaint.

152.    Administrative segregation has taken an emotional and physical toll on Ms. Grey.

153.    While on administrative segregation she has been prohibited from submitting assignments to the Georgetown University bachelors degree program.

154.    Following a meeting with her legal counsel on October 30, 2023, Ms. Grey again suffered retaliation. Several male Housing and Custody Does tried to strip search her. Strip searches are not standard at Patuxent after legal visits.

155.    Ms. Grey was eventually able to get the attention of a female officer, who strip searched her in full view of male inmates.

156.    A male Custody Doe who was involved in this incident later came down to Ms. Grey's cell to tell her that he would never call her by her preferred pronouns. He repeatedly referred to her as an "it"

157.    Throughout her incarceration and to the present, Ms. Grey has been subjected to misgendering, improper pronouns, and not being called by her legal name by other inmates. She has repeatedly been threatened with beating, killing, and rape by other inmates, without intervention or discipline by DPSCS staff.

158.    Ms. Holland likewise experienced pervasive harassment on account of her gender identity during her incarceration. Housing, Health Care, and Custody Does have routinely misgendered her, and threatened her with lockup when she complains.

159.    Ms. Holland was also been strip searched by male correctional officers.

160.    In January 2020, while she was incarcerated at MCIJ, Ms. Holland was forcibly pulled into the cell next door to her own by another inmate, nicknamed "Rico."

161.    Rico and his cellmate threatened Ms. Holland with sexual assault, saying "we can do anything we want with you . . ."

162.    Ms. Holland managed to get away before she was assaulted, but no prison official at MCIJ stopped the would-be assailant. She continued to live next door to Rico and his cellmate until she was transferred to MCIH.

163.    After her transfer to MCIH in the summer of 2020, Ms. Holland was again threatened by a male correctional officer. The officer opened the door to the stall where she was showering, exposing her to male inmates.

164.    The officer then opened the gate between the housing and bathroom facilities in the unit, inviting male inmates to "come and watch it [Ms. Holland] shower."

165.    Thankfully, no inmates took the officer up on his offer. When Ms. Holland complained to the PREA Coordinator at MCIH about this incident, it was dismissed as "not a big deal."

166.    Following her transfer to ECI, Ms. Holland struggled to obtain basic feminine hygiene products and clothing, such as deodorant and undergarments.

167.    At ECI, Defendant Gallagher removed those items from the commissary, leaving transgender prisoners like Ms. Holland without gender-affirming items, thereby exacerbating their gender dysphoria.

## IV.    DEFENDANTS DENIED PLAINTIFFS NECESSARY MEDICAL TREATMENT

168.    Defendants denied Ms. Gilliam her hormone treatments throughout her time at BCCC, despite self-identifying as a transgender woman in need of continuing her medically

prescribed hormone treatment. Ms. Gilliam had told Defendants since her arrival at BCCC in December 2021 that she needed weekly hormone treatment. Defendants only began to take that request seriously after Ms. Gilliam was sexually assaulted over a month later.

169.    No medical provider conducted the evaluation required by DPSCS policy until after February 2, 2022, when PREA Coordinator Ogar approved hormone treatment.

170.    Ms. Grey has received oral hormone treatment since late 2021. Although she was formally diagnosed with gender dysphoria in December 2021, DPSCS staff delayed giving her oral hormone treatment between December 2021 and May 2023..

171.    Ms. Grey is supposed to receive two oral hormones daily, but these were not reordered in a timely fashion, leading her to go weeks without hormone treatment, and exacerbating her gender dysphoria.

172.    From late 2021 until May 2023, DPSCS staff and DPSCS contractor YesCare refused to prescribe the higher dose of hormone therapy Ms. Grey needs to effectively transition.

173.    Ms. Grey has described the situation as one of "passing the buck", where DPSCS officials say that YesCare is to blame, and YesCare employees say that DPSCS policy is to blame.

174.    After May 2023, Health Care Does at WCI refused to give Ms. Grey the recommended higher dose of the hormone Spironolactone because they said that WCI imposes a different maximum than what she has been prescribed.

175.    Health Care Does at WCI likewise denied a medical order for electrolysis hair removal, saying that it would not move forward with that treatment until a DPSCS transgender policy was put into effect pursuant to the recent Trans Health Equity Act. As of the date of this filing, no such policy has been forthcoming.

176.     While Ms. Grey filed grievances at WCI related to her hormone therapy and other transgender health care needs, nothing was done, and her hormone treatment has remained inconsistent at Patuxent. Since she was placed on administrative segregation, Health Care Does have consistently "forgotten" to refill her hormone treatment.

177.     At both WCI and Patuxent, Ms. Grey was prescribed a facial cream called Vaniqa that is used to slow the growth of unwanted facial hair.

178.     While Health Care Does at WCI and Patuxent assert that Vaniqa is no longer sold in the United States, they have yet to find a suitable replacement. Their failure to do so has exacerbated Ms. Grey's gender dysphoria.

179.     Since she was placed on administrative segregation, Custody and Health Care Does have prohibited Ms. Grey from obtaining the razors she uses to shave her facial hair. This has further exacerbated her gender dysphoria.

180.     Ms. Holland's hormone treatment was similarly inconsistent. MRDCC officials were informed of her need for hormones upon her arrival.

181.     Rather than every two weeks, Ms. Holland had to wait up to a month for hormone injections.

182.     Similarly, at times during her incarceration she was without oral hormone treatment for up to two months.

## V.     DEFENDANTS SEGREGATED PLAINTIFFS

183.     On or about February 2, 2022, DPSCS officials transferred Ms. Gilliam to MRDCC. Her situation did not improve.

184.     From the time Ms. Gilliam arrived at MRDCC in February 2022 until she left more than three months later, DPSCS held her in administrative segregation, a form of solitary confinement, solely because she is transgender.

185.    While in administrative segregation, MRDCC staff shackled Ms. Gilliam from her wrists to her waist and then down to her feet whenever she left the cell. MRDCC staff shackled Ms. Gilliam even though she had no disciplinary infractions.

186.    Defendants also denied Ms. Gilliam access to programming she would have been able to participate in if she had not been in administrative segregation.

187.    Once again, Defendants failed to solicit or consider Ms. Gilliam's own views with respect to her personal safety and housing, in direct defiance of DPSCS policy. DPSCS Gender Dysphoria Policy, *supra* § .05(J)(1).

188.    Likewise, Defendants failed to periodically review Ms. Gilliam's placement in administrative segregation or, for several months, to provide Ms. Gilliam an opportunity to respond to the reasons for placing her there—all in clear contravention of DPSCS policy. *See* DPSCS Case Management Manual, *supra* §§ 17(B)(4)(a)–(c), 17(B)(5)(a).

189.    Upon information and belief, Defendant case management staff members did not consider available alternatives to administrative segregation pursuant to DPSCS policy, such as reassigning Ms. Gilliam to a women's prison in accordance with her gender identity. *See id.* §§ 15(4)(c), (5)(c).

190.    When Ms. Gilliam finally obtained an administrative segregation review, Defendants would only offer her placement in general population of the men's prison, not placement in a women's facility, and only if she signed a release saying she would not hold DPSCS liable if something happened to her in the general population of the men's prison.

191.    Ms. Gilliam refused to sign this release and remained in administrative segregation for over three months, from early February 2022 until she was released in mid-May 2022.

192.    After her forced outing to her housing tier, Ms. Grey received a barrage of rape and death threats from the men housed around her. When she complained of this treatment, WCI Housing Does' response was to put her in administrative segregation for a month.

193.    Much like Ms. Gilliam, Ms. Grey was given the choice of remaining in administrative segregation or signing a waiver of liability to end her segregation. Faced with the prospect of a potentially indefinite period of administrative segregation, Ms. Grey felt forced to sign the waiver.

194.    Most recently, in October 2023 Ms. Grey was again placed in administrative segregation at Patuxent.

195.    Ms. Grey was initially placed in administrative segregation, on information and belief, in retaliation for her complaints and for consulting an attorney to challenge her discriminatory treatment.

196.    Ms. Grey has been told that she is in administrative segregation at Patuxent for her own protection. She has not been given a body waiver to leave administrative segregation, and remains there as of the filing of this complaint.

197.    Ms. Holland was also placed in administrative segregation numerous times over the course of her incarceration. She was placed in administrative segregation at ECI from late June to August 2022. She was told by Housing Does that she only had two options: remaining in administrative segregation or living with men.

198.    While in administrative segregation, Ms. Holland was searched by male officers. She was only allowed out of her cell every other day for varying times, sometimes for as little as 45 minutes.

35

199.    The harm of administrative segregation is well known. Administrative segregation is not substantively different from punitive segregation. [24] Physical conditions "are often much more harsh and less sanitary[,]" than in the general population, and transgender inmates in segregation "find their rights and 'privileges' dramatically restricted."[25]

200.    "Extreme isolation" is the consensus term used by correctional experts to describe segregation from the mainstream prisoner population, where prisoners are involuntarily confined to their cells for 20 to 24 hours per day, given at most extremely limited opportunities for direct and normal social contact with other people (i.e., contact that not mediated by bars, restraints, security glass, screens, or the like), and afforded extremely limited if any access to meaningful programming of any kind. *See* Craig Haney, *The Social Psychology of Isolation: Why Supermax Confinement is Psychologically Harmful*, Prison Service Journal, Jan. 2009, at 12 n.1.

201.    The practice of putting people in extended periods of extreme isolation has been viewed by courts, prison authorities, and the United Nations as a practice to be avoided in all but the most limited cases.

202.    In 2015, the U.N. General Assembly revised the Standard Minimum Rules for the Treatment of Prisoners and renamed them the Mandela Rules in honor of Nelson Mandela. The Mandela Rules forbid the use of any solitary confinement for more than 15 days. Econ. & Soc. Counsel Res. 2015/20, Rules 43 & 44 (Sept. 29, 2015), https://undocs.org/A/RES/70/175.

---

[24] *See* Gabriel Arkles, *Safety and Solidarity Across Gender Lines: Rethinking Segregation of Transgender People in Detention*, 18 Temp. Pol. & Civ. Rts. L. Rev. 515, 540–41 (2009).

[25] *Id.* at 541.

203.    Likewise, "[t]he catastrophic consequences of isolation on human beings' basic mental stability, health, and ability to function have been well-documented."[26] Transgender inmates in administrative segregation suffer from "intense anxiety, confusion, lethargy, panic, impaired memory, psychotic behavior, hallucinations and perceptual distortions, difficulty eating, inability to communicate, hypersensitivity to external stimuli, violent fantasies, and reduced impulse control."[27]

204.    Ms. Gilliam, Ms. Grey, and Ms. Holland have all suffered anxiety and depression as a result of their time in administrative segregation.

## VI.    DEFENDANTS DISCRIMINATED AGAINST PLAINTIFFS GREY AND HOLLAND IN WORK ASSIGNMENTS

205.     While incarcerated at WCI, Ms. Grey held a job for three years as an education aide.

206.    Following the start of her transition and diagnosis of gender dysphoria in December 2021, Ms. Grey was removed from her education aide job by WCI officials.

207.    She was told this was done because of fears that as a transgender woman she would be sexually promiscuous on the job.

208.    While she was incarcerated at MCIH, Ms. Holland was interviewed for a job as a clerk in the metal shop.

209.     Although she was qualified for the position, MCIH officials denied her the job because of her gender identity.

210.    She was told that the "transgender community will be sexually promiscuous in situations where the security is not as high" and did not get the job as a result.

---

[26] *Id.* at 538.

[27] *Id.*

## CLAIMS FOR RELIEF

### COUNT I
**Violation of 42 U.S.C. § 1983: Fourteenth Amendment Failure to Protect**
**(PLAINTIFF GILLIAM against DEFENDANTS SCRUGGS, MORGAN, ADISA-THOMAS, MATTI, and WOLINSKI, in their official capacities, and HOUSING DOES and CUSTODY DOES, in their individual capacities)**

211.    Plaintiff Gilliam adopts and incorporates the preceding paragraphs as they appear above and says further:

212.    42 U.S.C. § 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

213.    Plaintiff Gilliam brings suit under 42 U.S.C. § 1983 to seek redress for Defendants' violation of her rights under the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment guarantees that no state "shall. . . .deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1.

214.    Under the Due Process Clause, the rights of pretrial detainees like Ms. Gilliam are at least as great as those afforded to convicted prisoners under the Eighth Amendment to the United States Constitution.

215.    The Fourteenth Amendment, like the Eighth Amendment, mandates that correctional officials protect pretrial detainees from violence, including sexual violence, at the hands of other pretrial detainees—just as they are obligated to do for prisoners.  28 C.F.R. § 115.43 (2022).

216.    Transgender inmates are especially vulnerable to sexual violence. *See supra* notes 23–24.

217.    DPSCS policy requires consideration of transgender identity when making housing decisions. *See, e.g.*, DPSCS Sexual Victimization Policy, *supra* § .05(C)(1)(c); DPSCS Gender Dysphoria Policy, *supra* § .05(J)(1)(a)–(b).

218.    Defendants' failure to provide adequate screening and their insistence on housing Ms. Gilliam with male inmates directly led to her sexual assault at the hands of a male inmate.

219.    As a transgender woman, Ms. Gilliam was put at a substantial risk of sexual assault by her housing assignment, which is a serious harm and a deprivation of rights severe enough to violate the Fourteenth Amendment to the United States Constitution.

220.    Defendants knew of, but disregarded, the risk by housing Ms. Gilliam with male inmates.

221.    Defendants' failure to protect Ms. Gilliam violated the Fourteenth Amendment to the United States Constitution. As a result of these actions, Ms. Gilliam has suffered damages including pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained.

### COUNT II
### Violation of 42 U.S.C. § 1983: Fourteenth Amendment Failure to Provide Adequate Medical Care
### (PLAINTIFF GILLIAM against DEFENDANTS SCRUGGS, MORGAN, ADISA-THOMAS, and BAUCOM, in their official capacities, and HEALTH CARE DOES, in their individual capacities.)

222.    Plaintiff Gilliam adopts and incorporates the preceding paragraphs as they appear above and says further:

223.    Under the Due Process Clause, the rights of pretrial detainees like Ms. Gilliam are at least as great as those afforded to convicted prisoners under the Eighth Amendment to the United States Constitution.

224.    The Fourteenth Amendment, like the Eighth Amendment, protects pretrial detainees from correctional officials who are deliberately indifferent to their serious medical needs.

225.    A medical need is serious when it is diagnosed by a physician as mandating treatment.

226.    Gender dysphoria is a serious medical condition. Ms. Gilliam was diagnosed with gender dysphoria in 2003. She has also received regular weekly hormone therapy as treatment since 2008.

227.    Defendants knew of Ms. Gilliam's history of gender dysphoria and knew that without necessary treatment it would cause her severe mental distress.

228.    By refusing to give her hormone therapy, Defendants failed to provide Ms. Gilliam with adequate and necessary treatment for her gender dysphoria for almost two months. This was in defiance of DPSCS's own policy on the continuation of hormone treatment. *See* DPSCS Gender Dysphoria Policy, *supra* §§ .05(B)(1), F(1), (1)(a)–(1)(a)(i).

229.    Defendants acted with deliberate indifference to the substantial risk of serious harm from their failure to provide hormone therapy.

230.    Ms. Gilliam experienced severe emotional harm as a result of Defendants' deliberate indifference to her need for continued treatment for gender dysphoria, including depression and anxiety.

231.    Defendants' failure to provide adequate medical treatment to Ms. Gilliam violated the Fourteenth Amendment to the United States Constitution. As a result of these actions, Ms. Gilliam has suffered damages including pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained.

## COUNT III
### Violation of 42 U.S.C. § 1983: Fourteenth Amendment Cruel and Unusual Punishment
### (PLAINTIFF GILLIAM against DEFENDANTS SCRUGGS, MORGAN, and MATTI, in their official capacities, and HOUSING AND CUSTODY DOES, in their individual capacities)

232.    Plaintiff Gilliam adopts and incorporates the preceding paragraphs as they appear above and says further:

233.    Under the Due Process Clause, the rights of pretrial detainees like Ms. Gilliam are at least as great as those afforded to convicted prisoners under the Eighth Amendment to the United States Constitution.

234.    Under the Due Process Clause, a pretrial detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.

235.    Defendants' placement of Ms. Gilliam in administrative segregation at MRDCC—a setting far more isolated and punitive than general population—for three months on the basis of her transgender status is cruel and unusual and unjustified.

236.    As a transgender woman, Ms. Gilliam was put at a substantial risk of serious harm and a deprivation of rights severe enough to violate the Fourteenth Amendment to the United States Constitution.

237.    Defendants knew of or should have known of this risk, but disregarded it by housing Ms. Gilliam in administrative segregation for more than three months.

238.    Defendants' segregation of Ms. Gilliam violated the Fourteenth Amendment to the United States Constitution. As a result of these actions, Ms. Gilliam has suffered damages including pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained.

### COUNT IV
### Violation of 42 U.S.C. § 1983: Eighth Amendment Failure to Protect

**(PLAINTIFF HOLLAND against DEFENDANTS SCRUGGS, MORGAN,  SMITH, WERNER, and WOLINSKI in their official capacities, and MOBLEY, AND PARTLOW, CUSTODY DOES, AND HOUSING DOES in their individual capacities)**
**(PLAINTIFF GREY against DEFENDANTS SCRUGGS, MORGAN,  JOHNSON, STEWART, WEBER and WOLINSKI in their official capacities, and STEWART, PETERSON, AND CUSTODY DOES, AND HOUSING DOES in their individual capacities)**

239.    Plaintiffs Grey and Holland adopt and incorporate the preceding paragraphs as they appear above and say further:

240.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." U.S. Const. amend. VIII.

241.    Prison officials are obligated to guarantee inmate safety and protect prisoners from violence at the hands of other prisoners.

242.    Transgender inmates are especially vulnerable to violence. See *supra* notes 23–24.

243.    DPSCS policy requires consideration of transgender identity when making housing decisions. *See, e.g.*, DPSCS Sexual Victimization Policy, supra § .05(C)(1)(c); DPSCS Gender Dysphoria Policy, supra § .05(J)(1)(a)–(b).

244.    Defendants' failure to provide adequate screening and their insistence on housing Ms. Grey and Ms. Holland with male inmates directly led to their physical assault and threats of physical assault at the hands of male inmates.

245.    As  transgender women, Ms. Grey and Ms. Holland were put at a substantial risk of assault by her housing assignment, which is a serious harm and a deprivation of rights severe enough to violate the Eighth Amendment to the United States Constitution.

246.    Defendants knew of, but disregarded, the risk by housing Ms. Grey and Ms. Holland with male inmates.

247.   Defendants' failure to protect Ms. Grey and Ms. Holland violated the Eighth Amendment to the United States Constitution.

248.   As a result of these actions, Ms. Holland and Ms. Grey have suffered damages including pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained.

249.   Ms. Grey, and other transgender prisoners will continue to be injured and aggrieved by Defendants' failure to protect them.

**COUNT V**
**Violation of 42 U.S.C. § 1983: Eighth Amendment Failure to Provide Adequate Medical Care**
**(PLAINTIFF HOLLAND against DEFENDANTS SCRUGGS, MORGAN, BAILEY, and BAUCOM, in their official capacities, HEALTH CARE DOES, in their individual capacities)**
**(PLAINTIFF GREY against DEFENDANTS SCRUGGS, MORGAN, JOHNSON, STEWART, WEBER and BAUCOM, in their official capacities, HEALTH CARE DOES, in their individual capacities, and YESCARE CORP.)**

250.   Plaintiffs Grey and Holland adopt and incorporate the preceding paragraphs as they appear above and say further:

251.   The Eighth Amendment to the United States Constitution protects prisoners from correctional officials who are deliberately indifferent to their serious medical needs.

252.   A medical need is serious when it is diagnosed by a physician as mandating treatment.

253.   Gender dysphoria is a serious medical condition. Ms. Holland was diagnosed with gender dysphoria in 2010.She received regular hormone therapy prior to her incarceration. Ms. Grey was diagnosed in 2021 with gender dysphoria during her incarceration.

254.     Defendants knew of Ms. Grey's and Ms. Holland's history of gender dysphoria and knew that without necessary treatment it would cause them severe mental distress.

255.     By refusing to give them hormone therapy, Defendants failed to provide Ms. Grey and Ms. Holland with adequate and necessary treatment for her gender dysphoria for months at a time.  This was in defiance of DPSCS's own policy on the continuation of hormone treatment. See DPSCS Gender Dysphoria Policy, supra §§ .05(B)(1), F(1), (1)(a)–(1)(a)(i).

256.     Defendants acted with deliberate indifference to the substantial risk of serious harm from their failure to provide hormone therapy.

257.     Ms. Holland experienced severe emotional harm as a result of Defendants' deliberate indifference to her need for continued treatment for gender dysphoria, including depression and anxiety. Ms. Grey experienced and continues to experience severe emotional harm as a result of Defendants' deliberate indifference to her need for continued treatment for gender dysphoria, including depression and anxiety.

258.     Defendants' failure to provide adequate medical treatment to Ms. Grey and Ms. Holland violated the Eighth Amendment to the United States Constitution. As a result of these actions, Ms. Grey and Ms. Holland have suffered damages, including pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained.

259.     Ms. Grey and other transgender prisoners will continue to be injured and aggrieved by Defendants' failure to provide adequate medical care.

**COUNT VI**
**Violation of 42 U.S.C. § 1983: Eighth Amendment Cruel and Unusual Punishment**
**(PLAINTIFF HOLLAND against DEFENDANTS SCRUGGS, MORGAN, BAILEY, in their official capacities, CUSTODY DOES and HOUSING DOES, in their individual capacities**).

**(PLAINTIFF GREY against DEFENDANTS SCRUGGS, HARVEY, JOHNSON, STEWART, WEBER, in their official capacities, CUSTODY DOES and HOUSING DOES, in their individual capacities**).

260.     Plaintiffs Grey and Holland adopt and incorporate the preceding paragraphs as they appear above and say further:

261.     Defendants' placement of Ms. Holland in administrative segregation at ECI—a setting far more isolated and punitive than general population—for two months on the basis of her transgender status is cruel and unusual and unjustified.

262.     Defendants' placement of Ms. Grey in administrative segregation at WCI and Patuxent—a setting far more isolated and punitive than general population—on the basis of her transgender status and in retaliation for her complaints is cruel and unusual and unjustified.

263.     As transgender women, Ms. Grey and Ms. Holland were put at a substantial risk of serious harm and a deprivation of rights severe enough to violate the Eighth Amendment to the United States Constitution.

264.     Defendants knew of or should have known of this risk, but disregarded it by housing Ms. Grey and Ms. Holland in administrative segregation.

265.     Defendants' segregation of Ms. Grey and Ms. Holland violated the Eighth Amendment to the United States Constitution.

266.     As a result of these actions, Ms. Grey and Ms. Holland have suffered damages, including pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained.

267.     Ms. Grey and other transgender prisoners have been injured and aggrieved and will continue to be injured and aggrieved by Defendants' continued use of administrative segregation on the basis of gender identity.

**COUNT VII**
**Violation of 42 U.S.C. § 1983: Fourteenth Amendment Discrimination Based on Sex**
**(PLAINTIFF GILLIAM against DEFENDANTS ADISA-THOMAS, MATTI, BAUCOM,**
**WOLINSKI, NWOSU, HOUSING DOES, HEALTHCARE DOES, and CUSTODY DOES,**
**in their individual capacities,)**
**(PLAINTIFF HOLLAND against DEFENDANTS SMITH, WERNER, BAILEY,**
**BAUCOM, WOLINSKI, MOBLEY, PARTLOW, GALLAGHER, HOUSING DOES,**
**HEALTHCARE DOES, and CUSTODY DOES, in their individual capacities).**

**(PLAINTIFF GREY against DEFENDANTS JOHNSON, STEWART, WEBER, BAILEY,**
**BAUCOM, WOLINSKI, PETERSON, HOUSING DOES, HEALTHCARE DOES, and**
**CUSTODY DOES, in their individual capacities, and YESCARE CORP.).**

268.    Plaintiffs adopt and incorporate the preceding paragraphs as they appear above and say further:

269.    The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination on the basis of sex by state actors. Such discrimination is subject to intermediate scrutiny.

270.    Sex discrimination includes discrimination against transgender individuals, who are treated as a quasi-suspect class under the Fourteenth Amendment.

271.    Defendants discriminated against Ms. Gilliam on the basis of sex when: (a) they housed Ms. Gilliam with male inmates in spite of her female gender identity; (b) they put her at significant risk of sexual assault and failed to respond appropriately to her sexual assault; (c) they called her by her "dead" name even though she had legally changed her name; (d) guards harassed and laughed at her because of her transgender status;  and (e) Defendants denied her needed medical treatment based on her gender identity.

272.    Defendants also discriminated against Ms. Gilliam on the basis of sex when they did not allow her to shower separately from male inmates. Had Ms. Gilliam been a cisgender woman, Defendants never would have required her to shower alongside male inmates.

273.     Defendants further discriminated on the basis of sex when they housed Ms. Gilliam in administrative segregation solely on the basis of her transgender status.

274.     While she was housed in administrative segregation, Ms. Gilliam experienced an atypical and significant hardship compared to cisgender inmates. Defendants placed her in administrative segregation—far more punitive than general population—after she had been sexually assaulted, ignored, and mistreated due to her gender identity.

275.     Defendants discriminated against Ms. Holland on the basis of sex when (a) they housed Ms. Holland with male inmates in spite of her female gender identity; (b) they put her at significant risk of sexual assault by housing her with male inmates, (c) they routinely misgendered her, (d) they denied her a job opportunity because of her gender identity and (e) they denied her needed medical treatment based on her gender identity.

276.     Defendants discriminated against Ms. Grey on the basis of sex when (a) they housed Ms. Grey with male inmates in spite of her female gender identity; (b) they put her at significant risk of sexual assault by housing her with male inmates, (c) they routinely misgendered her, (d) they removed her from a job because of her gender identity and (e) they denied her needed medical treatment based on her gender identity.

277.     Defendants' actions were not substantially related to any important government interest.

278.     Defendants' discrimination on the basis of sex against Plaintiffs violated the Fourteenth Amendment to the United States Constitution. As a result of these actions, Plaintiffs have suffered damages, including pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained.

279.     Ms. Grey and other transgender prisoners will continue to be injured and aggrieved by Defendants' ongoing discrimination.

**COUNT VIII**
**Discrimination on the Basis of Disability**
**Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.***
**(PLAINTIFF GILLIAM against DEFENDANTS DEPARTMENT OF PUBLIC SAFETY**
**& CORRECTIONAL SERVICES, SCRUGGS, MORGAN, GARDNER, ADISA-**
**THOMAS, and MATTI, in their official capacities)**
**(PLAINTIFF HOLLAND against DEFENDANTS DEPARTMENT OF PUBLIC SAFETY**
**AND CORRECTIONAL SERVICES, SCRUGGS, MORGAN, GARDNER, SMITH,**
**WERNER, and BAILEY, in their official capacities)**

**(PLAINTIFF GREY against DEFENDANTS DEPARTMENT OF PUBLIC SAFETY AND**
**CORRECTIONAL SERVICES, SCRUGGS, MORGAN, JOHNSON, STEWART AND**
**WEBER in their official capacities)**

280.    Plaintiffs adopt and incorporate the preceding paragraphs as they appear above and say further:

281.    The purpose of the Americans with Disabilities Act ("ADA") is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA specifies that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

282.    A public entity may not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service" nor may they afford individuals with a disability "an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(i)–(ii) (2022).

283.    Public entities may not discriminate against people with disabilities "directly or through contractual . . . arrangements[.]" *Id.* § 35.130(b)(1).

284.    Public entities may not use "eligibility criteria that screen out or tend to screen out an individual with a disability . . . from fully and equally enjoying any service, program, or

48

activity" unless it can show that such criteria are necessary. *Id.* § 35.130(b)(8). Nor may a public entity use criteria or methods of administration for "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." *Id.* § 35.130(b)(3)(ii).

285.    Public entities must make "reasonable modifications in policies, practices, or procedures . . . to avoid discrimination on the basis of disability," unless they can show that the modification would "fundamentally alter the nature of the service, program or activity." *Id.* § 35.130(b)(7).

286.    Public entities must not discriminate against any individual "because that individual has opposed any act or practice made unlawful by this part" and must not "coerce, intimidate, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed . . . any right granted or protected by" the ADA. 28 C.F.R. § 35.134 (a)-(b).

287.    Public entities that are correctional facilities "shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." *Id.* § 35.152(b)(2).

288.    Ms. Gilliam and Ms. Holland, as people with gender dysphoria, are individuals with a disability within the meaning of Title II of the ADA. Gender dysphoria is a mental or physical impairment that substantially limits one or more major life activities. *See* 42 U.S.C. § 12102.

289.    Defendant DPSCS is a department, agency, or instrumentality of the State of Maryland and is thus a "public entity" within the meaning of Title II of the ADA. 42 U.S.C. § 12131(1)(B).

290.    Inmate housing, building facilities, and medical services are services, programs, or activities of a public entity under 42 U.S.C. § 12132.

291.    As a pretrial detainee at BCCC and MRDCC, Ms. Gilliam was qualified to participate in and receive the benefits of DPSCS's services, programs, and activities at these facilities.

292.    As a prisoner within DPSCS, Ms. Holland was qualified to participate in and receive the benefits of DPSCS's services, programs, and activities at these facilities.

293.    As a prisoner within DPSCS, Ms. Grey is qualified to participate in and receive the benefits of DPSCS' services, programs, and activities at these facilities.

294.    Defendants discriminated against Plaintiffs on the basis of their gender dysphoria by denying them necessary medical treatment by failing to continue hormone therapy treatment.

295.    Defendants discriminated against Plaintiffs on the basis of their gender dysphoria by placing them in administrative segregation and thus denying them equal access to services and unnecessarily segregating them.

296.    Defendants discriminated against Plaintiffs by failing to reasonably modify DPSCS housing policies to accommodate their disabilities.

297.    Defendants denied Plaintiffs the benefit of safe housing on the basis of their disability by refusing to let them shower outside of the presence of male inmates.

298.    Defendants denied Ms. Holland a job opportunity on the basis of her disability by denying her a job on the basis of her gender dysphoria.

299.    Defendants removed Ms. Grey from her job on the basis of her disability by removing her from the job on the basis of her gender dysphoria.

300.     Defendants subjected Ms. Gilliam to discrimination by subjecting Ms. Gilliam to ridicule and harassment from correctional officers, who targeted Ms. Gilliam because of her gender dysphoria, and by failing to train correctional officers on how to appropriately work with inmates with gender dysphoria. Defendants failed to respond appropriately to this discriminatory harassment and to prevent it from continuing.

301.     Defendants subjected Ms. Holland to discrimination by misgendering her and by making her a spectacle for male inmates to gawk at, and by failing to train correctional officers on how to appropriately work with inmates with gender dysphoria. Defendants failed to respond appropriately to this discriminatory harassment and to prevent it from continuing.

302.     Defendants subjected Ms. Grey to discrimination by misgendering her and by forcing her to come out to her housing tier, by failing to train correctional officers on how to appropriately work with inmates with gender dysphoria, by failing to intervene when other prisoners harassed her, and by preventing staff of the Patuxent Georgetown program from intervening when other prisoners harassed her. Defendants failed to respond appropriately to this discriminatory harassment and to prevent it from continuing.

303.     Defendants discriminated and retaliated against Ms. Grey by placing her in administrative segregation because she complained about her treatment, sought accommodations, and consulted an attorney.

304.     Defendants' discriminatory treatment of Plaintiffs was done intentionally or with deliberate indifference to their protected rights.

305.     Defendants' discriminatory conduct harmed Plaintiffs, causing them pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained. They are entitled to compensatory damages.

306.    Ms. Grey and other transgender prisoners will continue to be injured and aggrieved by Defendants' ongoing discrimination.

**COUNT IX**
**Discrimination on the Basis of Disability**
**Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.***
**(PLAINTIFF GILLIAM against DEFENDANTS DEPARTMENT OF PUBLIC SAFETY & CORRECTIONAL SERVICES, SCRUGGS, MORGAN, ADISA-THOMAS, and MATTI, in their official capacities)**
**(PLAINTIFF HOLLAND against DEFENDANTS DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, SCRUGGS, MORGAN,  GARDNER, SMITH, WERNER, and BAILEY, in their official capacities)**

**(PLAINTIFF GREY against DEFENDANTS DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, SCRUGGS, MORGAN, GARDNER, JOHNSON, STEWART AND WEBER in their official capacities)**

307.    Plaintiffs adopt and incorporate the preceding paragraphs as they appear above and say further:

308.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

309.    Section 504 applies to "each recipient of Federal financial assistance from the Department of Justice." 28 C.F.R. § 42.502 (2022).

310.    Federal funding recipients may not "[d]eny a qualified handicapped person the opportunity accorded to others to participate" or to "achieve the same benefits that others achieve in the program or activity." *Id.* § 42.503(b)(1)(i)–(ii).

311.    Federal funding recipients may not discriminate against people with disabilities "directly or through contractual. . . arrangements[.]" *Id.* § 42.503(b).

312.     Federal funding recipients may not "utilize criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, defeat or substantially impair accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." *Id.* § 42.503(b)(3).

313.     Recipients of federal funding must "administer programs or activities in the most integrated setting appropriate to the needs of qualified [disabled] persons." *Id.* § 42.403(d).

314.     Plaintiffs, as people with gender dysphoria, are individuals with a disability within the meaning of Section 504. Gender dysphoria is a mental or physical impairment that substantially limits one or more major life activities. 29 U.S.C. § 705(20)(B).

315.     Defendant DPSCS is a department, agency, or instrumentality of the State of Maryland and receives federal funding. Defendant DPSCS is, therefore, subject to Section 504's nondiscrimination requirements. 29 U.S.C. § 794(b)(1).

316.     As a pretrial detainee at BCCC and MRDCC, Ms. Gilliam was qualified to participate in and receive the benefits of Defendants' services, programs, and activities. 28 C.F.R. § 42.502 (2022).

317.     As a prisoner within DPSCS, Ms. Holland was qualified to participate in and receive the benefits of DPSCS's services, programs, and activities at these facilities. 28 C.F.R. § 42.502 (2022).

318.     As a prisoner within DPSCS, Ms. Grey is qualified to participate in and receive the benefits of DPSCS's services, programs, and activities at these facilities. 28 C.F.R. § 42.502 (2022).

319.     Defendants discriminated against Plaintiffs on the basis of their gender dysphoria when they denied them necessary medical treatment by failing to continue hormone therapy treatment.

320.     Defendants discriminated against Plaintiffs on the basis of their gender dysphoria by placing them in administrative segregation, thus denying them equal access to services and unnecessarily segregating them.

321.     Defendants discriminated against Plaintiffs by failing to reasonably modify DPSCS housing policies to accommodate their disabilities.

322.     Defendants denied Plaintiffs the benefit of safe housing on the basis of their disabilities when they refused to let them shower outside of the presence of male inmates.

323.     Defendants denied Ms. Holland a job opportunity on the basis of her disability by denying her a job on the basis of her gender dysphoria.

324.     Defendants removed Ms. Grey from her job on the basis of her disability by removing her from the job on the basis of her gender dysphoria.

325.     Defendants subjected Ms. Gilliam to discrimination when they subjected Ms. Gilliam to ridicule and harassment from correctional officers, who targeted Ms. Gilliam because of her gender dysphoria, and by failing to train correctional officers on how to appropriately work with inmates with gender dysphoria. Defendants failed to respond appropriately to this discriminatory harassment and to prevent it from continuing.

326.     Defendants subjected Ms. Holland to discrimination by misgendering her and by making her a spectacle for male inmates to gawk at, and by failing to train correctional officers on how to appropriately work with inmates with gender dysphoria. Defendants failed to respond appropriately to this discriminatory harassment and to prevent it from continuing.

54

327.    Defendants subjected Ms. Grey to discrimination by misgendering her and by forcing her to come out to her housing tier, and by failing to train correctional officers on how to appropriately work with inmates with gender dysphoria. Defendants failed to respond appropriately to this discriminatory harassment and to prevent it from continuing.

328.    Defendants discriminated and retaliated against Ms. Grey by placing her in administrative segregation because she complained about her treatment, sought accommodations, and consulted an attorney.

329.    Defendants' discriminatory treatment of Plaintiffs was done intentionally or with deliberate indifference to their protected rights.

330.    Defendants' discriminatory conduct harmed Plaintiffs, causing them pain and suffering, emotional, psychological, and physical distress, violation of dignity, and other pecuniary losses not yet ascertained. They are entitled to compensatory damages.

331.    Ms. Grey and other transgender prisoners will continue to be injured and aggrieved by Defendants' ongoing discrimination.

**COUNT X**
**Common-Law Negligence**
**(PLAINTIFF GILLIAM against DEFENDANTS DPSCS, BAUCOM, WOLINSKI, NWOSU, HOUSING DOES, HEALTHCARE DOES, and CUSTODY DOES, in their official capacities)**

332.    Plaintiff Gilliam adopts and incorporates the preceding paragraphs as they appear above and says further:

333.    Defendants failed to comply with professional standards of care and DPSCS policies during Ms. Gilliam's detention at BCCC and MRDCC. These failures include: failure to provide timely and necessary medical treatment; failure to adhere to DPSCS guidelines for the treatment of inmates with gender dysphoria; failure to house Ms. Gilliam safely in accordance

with her gender identity; segregating her on the basis of her gender identity and dysphoria in a more punitive setting; and denying her access to DPSCS programs and services.

334.    Defendants acted negligently, breaching their respective duties to Ms. Gilliam and causing, as a direct and proximate result, the injuries and damages alleged herein, including but not limited to, sexual assault, physical and psychological harm, and emotional distress.

335.    Defendants' negligent conduct was committed within the scope of their employment.

336.    Defendants' negligence proximately caused Ms. Gilliam harm, including emotional distress.

337.    Defendants acted with actual malice, motivated by hate, to deliberately and willfully injure Plaintiff Gilliam.

## COUNT XI
### Common-Law Negligence
### (PLAINTIFF GILLIAM against DEFENDANTS BAUCOM, WOLINSKI, NWOSU, HOUSING DOES, HEALTHCARE DOES, and CUSTODY DOES, in their individual capacities)

338.    Plaintiff Gilliam adopts and incorporates the preceding paragraphs as they appear above and says further:

339.    Defendants failed to comply with professional standards of care and DPSCS policies during Ms. Gilliam's detention at BCCC and MRDCC. These failures include: failure to provide timely and necessary medical treatment; failure to adhere to DPSCS guidelines for the treatment of inmates with gender dysphoria; failure to house Ms. Gilliam safely in accordance with her gender identity; segregating her on the basis of her gender identity and dysphoria in a more punitive setting; and denying her access to DPSCS programs and services.

340.   Defendants acted negligently, breaching their respective duties to Ms. Gilliam and causing, as a direct and proximate result, the injuries and damages alleged herein, including but not limited to, sexual assault, physical and psychological harm, and emotional distress.

341.   Defendants' negligent conduct was committed within the scope of their employment.

342.   Defendants knew, had reason to know, or should have known the risk of their actions.

343.   Defendants' treatment of Ms. Gilliam evinced a reckless disregard for her life and well-being, an utter indifference to her rights, and ill will towards her.

344.   Defendants' negligence proximately caused Ms. Gilliam harm, including emotional distress.

345.   Defendants acted with actual malice, motivated by hate, to deliberately and willfully injure Plaintiff Gilliam.

**COUNT XII**
**(Intentional Infliction of Emotional Distress**
**(PLAINTIFF GILLIAM against DEFENDANTS BAUCOM, WOLINSKI, NWOSU,**
**HOUSING DOES, HEALTHCARE DOES, and CUSTODY DOES, in their individual**
**capacities)**
**(PLAINTIFF HOLLAND against DEFENDANTS, BAUCOM, WOLINSKI, MOBLEY,**
**PARTLOW, and GALLAGHER, HOUSING DOES, HEALTHCARE DOES, and**
**CUSTODY DOES in their individual capacities)**

**(PLAINTIFF GREY against DEFENDANTS, BAUCOM, WOLINSKI, PETERSON,**
**HOUSING DOES, HEALTHCARE DOES, and CUSTODY DOES in their individual**
**capacities, )**

346.   Plaintiffs adopt and incorporate the preceding paragraphs as they appear above and say further:

347.    Defendants' intentional failure to provide adequate medical care, failure to protect Ms. Gilliam from sexual abuse at the hands of a fellow inmate, subjection of Ms. Gilliam to ridicule and harassment by guards, and segregation of Ms. Gilliam in a more punitive setting—all contrary to DPSCS policy—left her with severe emotional distress in the form of anxiety and depression.

348.    Defendants' intentional failure to provide adequate medical care, failure to protect Ms. Holland from the risk of sexual abuse at the hands of fellow inmates, and segregation of Ms. Holland —all contrary to DPSCS policy—left her with severe emotional distress in the form of anxiety and depression.

349.    Defendants' intentional failure to provide adequate medical care, failure to protect Ms. Grey from the risk of sexual abuse at the hands of fellow inmates, segregation of Ms. Grey, and retaliation and intimidation of Ms. Grey —all contrary to DPSCS policy—left her with severe emotional distress in the form of anxiety and depression.

350.    Defendants' conduct was intentional, reckless, committed with malice, and in deliberate disregard of a high degree of probability that Plaintiffs would suffer emotional distress as a result.

351.    Defendants' conduct was extreme, outrageous, and beyond the bounds of decency in society.

352.    As a result of the aforesaid conduct, Plaintiffs have suffered, and continue to suffer, from severe and extreme emotional distress.

353.    Defendants acted with actual malice, motivated by hate, to deliberately and willfully injure Plaintiffs.

## PRAYER FOR RELIEF

**Wherefore**, PLAINTIFFS respectfully request this Honorable Court to grant the following relief:

A.    Declare unconstitutional and violative of federal law Defendants' practices in denying Plaintiff adequate and necessary medical treatment; housing Plaintiffs with inmates inconsistent with their gender identity; segregation of Plaintiffs in a more punitive setting on the basis of their gender identity; and failure to protect Plaintiffs from assault and sexual assault at the hands of male inmates;

B.    Order that Defendants provide inmates with gender dysphoria with adequate and necessary medical care, house inmates with gender dysphoria in accordance with their gender identity, and adequately train staff to ensure the safe and dignified treatment of inmates with gender dysphoria;

C.    Award compensatory damages;

D.    Award punitive damages;

E.    Award Plaintiffs their costs and attorneys' fees in this action; and in addition;

F.    Grant any and all additional relief Plaintiffs' causes require.

Respectfully submitted,

Eve L. Hill (Bar No. 19938)
Sharon Krevor-Weisbaum (Bar No. 04773)
Jessica P. Weber (Bar No. 17893)
Evan Monod (Bar No. 30541)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland  21202
(410) 962-1030 (phone)

(410) 385-0869 (fax)
ehill@browngold.com
skw@browngold.com
jweber@browngold.com
emonod@browngold.com

Deborah M. Golden (Bar No. 18657)
The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332
dgolden@debgoldenlaw.com

*Attorneys for Plaintiff*

Date:   November 2, 2023

## <u>JURY  TRIAL DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs, by their counsel, hereby

demand a trial by jury on all claims so triable in this action.

Respectfully submitted,

*/s/ Eve L. Hill*

Eve L. Hill (Bar No. 19938)
Sharon Krevor-Weisbaum (Bar No. 04773)
Jessica P. Weber (Bar No. 17893)
Evan Monod (Bar No. 30541)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland  21202
(410) 962-1030 (phone)
(410) 385-0869 (fax)
ehill@browngold.com
skw@browngold.com
jweber@browngold.com
emonod@browngold.com

Deborah M. Golden (Bar No. 18657)
The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332
dgolden@debgoldenlaw.com

*Attorneys for Plaintiff*