1         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
2                 NORTHERN DIVISION

3   CHELSEA GILLIAM, et al.,        )
                        Plaintiffs,  )
4                                    )
                vs.                  )   CIVIL CASE NO.
5                                    )   1:23-cv-01047-MJM
    DEPARTMENT OF PUBLIC SAFETY &    )
6   CORRECTIONAL SERVICES, et al.,   )
                        Defendants.  )
7   _____ )   9:01 a.m.

8              WEDNESDAY, NOVEMBER 22, 2023
                    Courtroom 5C
9                 Baltimore, Maryland

10             TRANSCRIPT OF PROCEEDINGS
              ZOOM TRO HEARING - VOLUME II
11       BEFORE THE HONORABLE MATTHEW J. MADDOX

12

    For the Plaintiffs:
13
    Jessica P. Weber, Esquire
14  Deborah M. Golden, Esquire
    Lauren A. DiMartino, Esquire
15  Sharon Krevor Weisbaum, Esquire
    Evan Monod, Esquire
16   Brown Goldstein & Levy
     120 East Baltimore Street, Suite 2500
17   Baltimore, MD 21202

18

    For the Defendants:
19
    Merrilyn E. Ratliff, Esquire
20  Kelly Mullen Donoho, Esquire
     Office of Attorney General
21   6776 Reisterstown Road, Suite 313
     Baltimore, MD 21215
22   _____
          (Computer-aided Transcription of Stenotype Notes)
23
            Reported by: Amanda L. Longmore, RPR, FCRR
24              Federal Official Court Reporter
              101 W. Lombard Street, 4th Floor
25              Baltimore, Maryland  21201
                    410-962-4474

1                              I N D E X
               Grey, et al., versus DPSCS, et al.
2             TRO HEARING – VOL II – NOVEMBER 22, 2023

3                                                              PAGE
    COMMENCEMENT OF PROCEEDINGS............................  3
4

5    WITNESSES FOR THE DEFENSE:

6    KIMBERLY STEWART
        Continued Direct Examination by MS. RATLIFF...........   4
7        Cross-Examination by MS. GOLDEN......................  45
        Witness Excused.....................................  63
8

9    WITNESSES FOR THE PLAINTIFF:

10   DAN PACHOLKE
        Sworn...............................................  64
11       Direct Examination by MS. GOLDEN....................  64
        Cross-Examination by MS. DONOHO.....................  86
12       Witness Excused.....................................  94

13   PROCEEDINGS ADJOURNED................................. 101
14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (9:01 a.m.) |
| 3 | THE CLERK:  The United States District Court for the |
| 4 | District of Maryland is now in session.  The Honorable Matthew |
| 5 | J. Maddox presiding. |
| 6 | The matter now pending before this court is Civil Docket |
| 7 | Number MJM-23-1047, Chloe Grey versus Department of Public |
| 8 | Safety and Correctional Services, et al.  This matter now comes |
| 9 | before the Court for the continuance of the hearing for a |
| 10 | Temporary Restraining Order. |
| 11 | Counsel, please identify yourselves for the record. |
| 12 | MS. WEBER:  Good morning, Your Honor.  Jessica Weber |
| 13 | for the plaintiffs. |
| 14 | MS. GOLDEN:  Deborah Golden for the plaintiffs. |
| 15 | MS. DIMARTINO:  Good morning.  Lauren DiMartino for |
| 16 | the plaintiffs. |
| 17 | THE COURT:  Good morning to all of you. |
| 18 | MS. KREVOR WEISBAUM:  And I'm Sharon Krevor Weisbaum. |
| 19 | I'm also counsel of record. |
| 20 | MR. MONOD:  I'm Evan Monod for the plaintiff. |
| 21 | THE COURT:  Good morning to each of you. |
| 22 | MS. RATLIFF:  Good morning, Your Honor.  Assistant |
| 23 | Attorney General Merrilyn E. Ratliff on behalf of the |
| 24 | defendants. |
| 25 | MS. DONOHO:  And good morning, this is Kelly Donoho, |

TRO Hearing - Volume II - 11/22/23

```
 1   Assistant Attorney General, for the defendants.
 2              THE COURT:  All right.  Good morning to each of you.
 3         Counsel, is there anything for us to take up before we
 4   re-call Ms. Stewart to continue testimony?
 5              MS. RATLIFF:  Nothing from us, Your Honor.
 6              THE COURT:  Okay.  Ms. Weber?  You're on mute.
 7              MS. WEBER:  Apologies.  Not for the plaintiff.  Thank
 8   you.
 9              THE COURT:  Very good.  So Ms. Ratliff, you can
10   continue your examination of Ms. Stewart.
11         Ms. Stewart, do you understand that you're still under
12   oath?
13              THE WITNESS:  I do.
14              THE COURT:  Very good.  Your witness, Ms. Ratliff.
15              MS. RATLIFF:  Thank you, Your Honor.
16                   CONTINUED DIRECT EXAMINATION
17   BY MS. RATLIFF:
18   Q.   Good morning, Assistant Warden Stewart.
19   A.   Good morning.
20   Q.   Before we start with your testimony today, I wanted to ask
21   you, are you aware that Ms. Grey made some allegations of an
22   incident around I think it was 4:45 p.m. last evening?
23   A.   I am.
24   Q.   Okay.  And what, if anything, has occurred after that
25   event?
```

Continued Direct Examination - Kimberly Stewart

1   A.    So I was connected when the allegations were made on the

2   record, so immediately what I did was I had the officer that

3   was in the room at the time observing relieved.  It turns out

4   that the officer that we relieved was a female officer, so not

5   the officer alleged to have been involved.  We had her write a

6   report anyway.

7        After the hearing, I had Ms. Grey escorted up to the

8   Major's office to have the opportunity to write a statement.

9   We were able to identify one of the officers that she is

10  alleging that was involved.  That officer has written a

11  statement essentially stating that there was no, you know,

12  negative interaction or conversation that occurred.

13       We are still working to identify the second officer

14  involved.  Ms. Grey did not know their name or identity.  She's

15  been advised that if she sees them in the facility again to

16  immediately report it to staff.  The -- there were also two

17  case managers in the room yesterday the entirety of the

18  hearing.  Those case managers had left by the time I found that

19  out last night, so this morning I've asked them to write

20  written reports.

21       I've only spoke with one of them.  He has verbally told me

22  that he did not witness any negative interaction between staff,

23  that when Ms. Grey came out of the booth, she reported feeling

24  ill, that they made sure that there was a trash can near the

25  booth, but that was not as the result of any negative

Continued Direct Examination - Kimberly Stewart

1      interaction with staff that they observed in the courtroom, but
2      they did stay in the room and would not have been on the tier.
3          So the investigation is ongoing.  At this point we haven't
4      been able to substantiate anything but we will continue to
5      investigate.
6      Q.    Thank you.  So we're going to pick up on your testimony
7      from yesterday.  So did there come a time at Patuxent when
8      Ms. Grey was placed on administrative segregation?
9      A.    Yes, on October 13th.
10     Q.    Okay.  And what led to Ms. Grey's placement on admin seg?
11     A.    So I was the duty officer the month of October.  The Chief
12     of Security, myself, and the Warden rotate.  Any time there's
13     an incident going on in the facility the duty officer receives
14     a call.
15         I received a call that evening that a confidential
16     informant had approached the intel department saying that there
17     was a rumor going around the facility that Ms. Grey had engaged
18     in a sex act with another incarcerated individual, Mr. Carlton
19     Bell, that the sex act occurred during early setup for Muslim
20     service.  Carlton Bell is a Muslim inmate.  And that another
21     unidentified Muslim incarcerated individual had walked in on
22     them during the sex act, that the Muslim community was in an
23     uproar over the disrespect to their religion and to their
24     service.
25         Intel further advised me that Carlton Bell had recently

Continued Direct Examination - Kimberly Stewart

1    been released from disciplinary segregation for a physical

2    fight with a different Muslim individual and was already on the

3    outs with the Muslim community and that there was a concern

4    that the Muslim community may retaliate for this act of

5    disrespect against both Ms. Grey and Mr. Bell.

6        There was also a concern that if this rumor reached

7    Mr. Scott Brill, who has a history of being potentially

8    assaultive and he believed that the sex act had occurred, that

9    Ms. Grey and/or Mr. Bell could also possibly be in danger from

10   him as well.  So with all of that alleged and made, a decision

11   was made to place both of them on administrative segregation

12   pending the investigation.

13       In an initial conversation with Ms. Grey, she reported to

14   Sergeant Owens, she admitted to being in the area where the

15   alleged sex act occurred, so we knew all of that on October

16   13th that she admitted that she was in the area, she denied

17   there was a sex act, but this rumor, true or not, was being

18   talked about in the facility and believed by the majority of

19   the facility, and due to the potential safety risk she was --

20   they were both placed on administrative segregation.

21       We also initiated the two SIRs and PREA complaint.

22   Q.   So is placement on administrative segregation, when

23   something like that occurs, is that an ordinary response?

24   A.   Yes.  If there is any concern that an individual may be in

25   danger or that an individual poses a safety and security risk

Continued Direct Examination - Kimberly Stewart

1    to other people in general population, the immediate action is

2    to do the initial placement on administrative segregation.

3    That initial action is reviewed within 120 hours, and then a

4    decision is made from there whether or not to continue

5    administrative segregation, whether that's a temporary basis or

6    a permanent basis through a multidisciplinary team action.

7    Q.    And you said there were also investigations started?

8    A.    Yes.  So then the allegation was that there had been a sex

9    act.  At that time we're not going to know whether or not this

10   was a consensual sex act, not a consensual sex act, and whether

11   or not a sex act even occurred.

12        So after I received a call from intel, I called and

13   discussed the situation with the Warden.  We made the

14   determination that out of an abundance of caution that there

15   had been a nonconsensual sex act, we created two Serious

16   Incident Reports, one listing Ms. Grey as the alleged

17   perpetrator, one listing her as the victim and vice versa to

18   Mr. Carlton Bell.  We reported what we knew at that time to IID

19   and asked them to launch an independent investigation.

20   Q.    And what, if anything, did that investigation find

21   specifically?

22   A.    So when Ms. Grey was interviewed by IID, I know from their

23   investigative report she withdrew the investigation, which

24   effectively ended the investigation, that she did not want to

25   pursue any charges or give any statements about the matter,

Continued Direct Examination - Kimberly Stewart

1   essentially, so it is listed as unfounded.

2   Q.   And so this is as to the alleged sex act but did the

3   investigation look at anything else?

4   A.   No.   So IID was only concerned with whether or not there

5   would be criminal charges related to the matter.   So when we

6   got the results of the IID investigation, that still left the

7   facility needing to make a determination operationally on the

8   safety and security of Ms. Grey.

9   Q.   So was that investigation, I guess, proceeded, like did

10   it --

11   A.   Yes.   So that investigation was ongoing.   There was an

12   initial -- there was a -- so we have regular administrative

13   segregation meetings.   Again, this is a multidisciplinary team.

14   We have treatment staff there, custody staff there.   I

15   represent the administration.   We have intel and various

16   different departments that have input into the matter.

17        So there was a meeting held on October 17th.   At that

18   point, we did not have the completed IID investigation.   That

19   was still ongoing, but we knew that that was an investigation

20   into a criminal matter and that IID wasn't going to tell -- you

21   know, wasn't going to weigh in about operational concerns,

22   safety concerns.

23        The team met, we discussed Ms. Grey's entire history of

24   being at Patuxent.   She's repeatedly made allegations that

25   other inmates are harassing her, she has not given us

Continued Direct Examination - Kimberly Stewart

1    sufficient detail to launch investigations in most of those

2    cases, that she makes general allegations that staff don't do

3    enough to stop it, again, without listing any staff names,

4    dates, incidents.  Now we have this incident going on and a

5    decision was made at that point that she was not appropriate to

6    return to general population at Patuxent.

7    Q.    And so did anything -- did Ms. Grey make any additional

8    complaints around that time, October 17th, like specific

9    complaints?  I know you said there were general complaints.

10    A.    Yeah, no, not specific complaints.  She filed several ARPs

11    while being on administrative segregation saying that she was

12    safe to return to population, requesting to go back to D3, the

13    male Georgetown tier, saying that she would sign body waivers.

14    She wanted to return to population.

15          However, we have to look at the safety and security of the

16    facility as a whole and our staff.  So even if she's willing to

17    take a risk and return to general population, should there be a

18    security incident that's going to require an emergency response

19    from staff, potentially placing staff and other IIs,

20    incarcerated individuals, in danger as well.  So we have to

21    kind of look at things as a whole.

22          We definitely take into consideration the wishes of the

23    incarcerated individual, and of course it was a big decision

24    because we know that she's in a college program.  We had

25    still -- the team had still made a unanimous decision to

Continued Direct Examination - Kimberly Stewart

1    transfer her; however, I believe that it was because her
2    attorneys had contacted DPSCS through the AG's Office.  We were
3    asked to place that on hold, complete -- let IID complete their
4    investigation and then reconvene another administrative team
5    action review after we knew the results of the IID
6    investigation.
7    Q.    And so at that time, the IID investigation you're
8    referencing is the IID investigation into the potential threats
9    from the Muslim community and/or Mr. Brill?
10    A.    Right.  Now, again, so that was the initial report on
11    October 13th.  IID, again, started doing their investigation, I
12    want to say they interviewed her on October 20th but I would
13    have to refer to their time.  Again, the first admin seg
14    decision was October 17th.  I believe that IID was asked to
15    essentially speed up their investigation.  They have, you know,
16    longer to investigate.  They came out the 20th.  We did not
17    know until I believe it was November 3rd that we got the
18    results from IID that the investigation was unfounded due to
19    the withdraw.
20          Of course, during this time our internal intel department
21    is still investigating the matter.  They were at some point
22    able to determine if this was not a Muslim service but an AA/NA
23    service.  There is some responsibility, I think, that Ms. Grey
24    has into, you know, this rumor and situation even developing.
25    She alluded in her testimony yesterday that she did not have a

Continued Direct Examination - Kimberly Stewart

1    hard pass.  The significance of that, though, was not

2    explained.

3         At Patuxent, participation in religious services and

4    volunteer activities, whether it be a Muslim service, AA or NA

5    meetings, is preapproved ahead of time and cleared.  And the

6    individuals that are cleared to participate in those activities

7    are given a hard pass that they keep on purpose -- on person

8    and it's a standing pass to go.

9         She alleges that she was given kind of a soft pass, a

10   paper pass by the school officer.  She had permission to be in

11   the education building.  Passes are supposed to be given out by

12   the tier officer which is, you know, a daily practice that

13   Ms. Grey would be aware of.

14        We haven't been able to confirm that the school officer

15   gave her that soft pass to go to AA/NA service, but even if

16   they had, that would not have been following proper procedure.

17   So you know, Ms. Grey testified that she's aware of the hard

18   pass system.  She should not have been in Corridor N where this

19   sex act allegedly occurred in the first place.

20        We haven't been able to determine to a degree of certainty

21   to charge anyone for the sex act, but in the totality of the

22   circumstances intel has determined that the sex act likely did

23   occur but not rising to the level that would cause us to charge

24   her with rule violations.

25        However, with administrative segregation, that's why it's

Continued Direct Examination - Kimberly Stewart

1    different from disciplinary segregation anyway.  We still have

2    to consider the impact to safety and security of the facility.

3    But I say all that to say we were, at the next admin seg team,

4    both during the team and after in discussions with the Warden,

5    there was a serious consideration the week of November 6th with

6    us giving this one more chance and returning her to general

7    population.  Unfortunately, then some other incidents occurred

8    that took that possibility off the table, at least in the

9    immediate.

10   Q.   I want to back up just briefly to I think it was the first

11   segregation review meeting on October 17th.  Was -- did

12   Ms. Grey make additional complaints about a specific inmate, a

13   sanitation worker?

14   A.   Yes.  So I'm sorry, that actually happened I believe same

15   day.  So Amanda Decker, the initial social worker that had seen

16   her on September 26th, went to do a check-in on that same day.

17   And Ms. Grey made an allegation that the sanitation worker had

18   sexually propositioned her and when Ms. Grey had turned him

19   down, threw water on her and then she threw water back on him

20   in retaliation.  That incident also was ordered to be reported

21   to IID.  We did the Serious Incident Report.  And again, so

22   that, you know, is a factor that every time we turn around

23   there's something new happening.  There's a new allegation,

24   there's a new concern that there are safety issues in the

25   population at Patuxent.

Continued Direct Examination - Kimberly Stewart

1          So that investigation was also launched and pending at
2     that time as well, in addition to the Carlton Bell incident.
3     And I also don't believe -- we didn't have the results of the
4     WCI incident back either, so now at this point we have four
5     separate IID investigations out there open.
6     Q.    Are you aware of whether the IID investigation into the
7     incident with the sanitation worker came to a result?
8     A.    Ms. -- when we got the results of that investigation,
9     Ms. Grey had also signed a withdraw for that incident as well.
10    Q.    And while Ms. Grey is on administrative segregation, we
11    talked a little bit yesterday about the layout of the cells.
12    But was Ms. Grey provided with pens and paper?
13    A.    Yes.  So I looked into -- because we received a complaint
14    before that her writing materials were taken away.  During the
15    time she was on administrative segregation, she was given two
16    work packets from Georgetown that she turned in in a very fast
17    turnaround time period.  She filed at least 11 separate ARPs.
18    She had full tablet access from 10/13 to 11/10 with phone
19    dialer and testing abilities.  And then when she was
20    interviewed by Captain Carter she didn't report any issues with
21    access to writing materials.
22          I am not aware of any time that her access to writing
23    materials were interfered with at all, and I think the written
24    documents that we received from Ms. Grey show that she had
25    regular access to ARPs and writing materials.

Continued Direct Examination - Kimberly Stewart

1    Q.    To your knowledge, are all 11 of these ARPs being

2    investigated or have been investigated?

3    A.    Yes.

4    Q.    Was Ms. Grey provided with -- or does Ms. Grey have access

5    to razors when she's on administrative segregation?

6    A.    By policy, she would have access to razors while on

7    administrative segregation.  Despite the fact we received 11

8    separate complaints, that's not one of them.  So we haven't

9    been able -- there's been no investigation into whether or not

10   her access to razors has been unfairly interfered with because

11   that complaint was never lodged with the facility.  Yesterday

12   was the first time I became aware of that complaint.

13   Q.    Was there any -- what, if anything, do you plan to do in

14   relation to that complaint about the razors?

15   A.    Well, yesterday I called the Captain for the building and

16   I clarified that the policy is that admin seg can have access

17   to razors.  I did not ask about disciplinary segregation so

18   that may be an issue, but at least administrative segregation

19   she's able to order them from Commissary.  Keith is our

20   contractor.  If she's having problems getting that, she can

21   file a complaint on the case complaint form if they're not

22   being delivered to her.  She can also file an administrative

23   remedy complaint.  That would have to be -- she would have to

24   take that action to launch kind of a formal investigation.

25        I don't know the circumstances of her complaint.  Is she

Continued Direct Examination - Kimberly Stewart

1  saying that Keith delivered it and an officer stopped her, is

2  she saying that Keith won't deliver it, I don't know.  But in

3  the immediate, I made sure I clarified with my staff that they

4  are not to interfere with access for administrative

5  segregation.

6  Q.    And as an inmate or as an incarcerated individual on

7  administrative segregation, would Ms. Grey have been provided

8  with shower opportunities?

9  A.    Yes.  There are at least three shower opportunities per

10  week.

11  Q.    And we covered recreation access yesterday.

12  A.    Yes.

13  Q.    What about medical care, medical rounds?  What kind of

14  medical rounds occur on segregation?

15  A.    So there are regular rounds that occur, I believe we have

16  three medication times per 24-hour period that there would be

17  regular rounds on.  And then they also -- and an incarcerated

18  individual has an opportunity to turn in any sick call slips or

19  anything as to as the nurses doing their rounds.

20  Q.    Do you know what "KOP" and "DOT" mean?

21  A.    I know KOP is "keep on person."  I don't know what DOT

22  stands for.

23  Q.    What does "keep on person" mean?

24  A.    So medications that are authorized for keep on person

25  means that the incarcerated individual can keep those

Continued Direct Examination - Kimberly Stewart

1    medications on their person in a blister pack and

2    self-administer their medications daily.

3    Q.    Is that a -- do incarcerated individuals on admin seg have

4    their medications keep on person?

5    A.    No.  So once an individual is moved to administrative

6    segregation, all medications, even if they're keep on person

7    authorized in general pop, are confiscated and given to medical

8    for administration.  Of course, you know, there are a lot of

9    different reasons that somebody could be on administrative

10   segregation, but just for safety purposes, you know, it's a

11   stressful time for an incarcerated individual.  Just as a

12   policy we take all medication.

13   Q.    And as you said, the transfer to admin seg can be

14   stressful or there can be many considerations, and you

15   referenced before that there was -- there were meetings to

16   review placed on an admin seg.  How often is the formal

17   occurrence at those meetings?

18   A.    By pol -- so it's different and that's by my order, but by

19   policy, the initial placement is done kind of on an emergency

20   basis.  There's the initial review within 120 hours, and then

21   after that, if at the initial review the team decides to keep

22   the person on administrative segregation, there's a review

23   every 30 days.

24        However, at Patuxent, when I took over responsibility for

25   this function in January of 2023, I've been on a mission to

Continued Direct Examination - Kimberly Stewart

1    reduce our use of administrative segregation, so I have ordered

2    that my staff bring up every person on administrative

3    segregation at every weekly meeting.  So there's always been a

4    meeting every week but you only get docketed for that meeting

5    every 30 days.

6         Just under my authority and ability to order more frequent

7    reviews, I review everybody every week to see if there have

8    been any changes and if we can either move somebody out, put

9    them in general population at another facility, return them to

10   our general population, but with the aim to reduce our use of

11   administrative segregation.

12   Q.   Have you seen any results to that initiative to reduce the

13   use of segregation?

14   A.   When I took over this function in January of this year, we

15   had two full tiers of administrative segregations, Mary 3 and

16   Nancy 3.  In the last several, I would say six months, at

17   least, we have an average of six people or less on

18   administrative segregation.  I closed an entire tier and our

19   current admin seg tier stays mostly empty except for a handful

20   of individuals.

21   Q.   So you mentioned that Ms. Grey was part of -- or we know

22   that Ms. Grey was part of the Georgetown program.  Who is the

23   liaison between the institution and Georgetown?

24   A.   I am.

25   Q.   And you said that Ms. Grey was given multiple assignments,

Continued Direct Examination - Kimberly Stewart

1    right?

2    A.    Yes.  So Georgetown University obviously is a separate

3    organization.  They don't fall under the jurisdiction of DPSCS.

4    We have a Memorandum of Understanding, an MOU in place with

5    them to provide these service to the incarcerated individuals.

6    But as far as the educational programming, that is not directed

7    by me at all.  I'm essentially just the operational liaison to

8    facilitate the program operating in the facility.

9         So Georgetown University gave us two work packets, but

10   it's up to them whether or not they send her, you know,

11   busywork.  By policy, she is not assigned as an educational

12   student right now.  She's assigned to admin -- well, then

13   administrative segregation, now disciplinary segregation.  The

14   same day that Georgetown gave us work packets, we delivered

15   them to Ms. Grey without delay.

16   Q.    And is it ordinary for an incarcerated individual on

17   administrative segregation to participate in the Georgetown

18   program?

19   A.    So it is not ordinary for individuals on either

20   administrative segregation or disciplinary segregation to

21   continue to participate because it's supposed to be a temporary

22   action anyway.  We do have some DOC facilities that have

23   long-term admin seg placement that have procedures in place for

24   continued participation, but here at Patuxent, our goal is if

25   we can't return you to general population, we find another

Continued Direct Examination - Kimberly Stewart

1  facility where you can safely exist in general population

2  because, again, the goal is to reduce the use of restrictive

3  housing.  So it's supposed to be a very temporary basis anyway.

4      So again, prior to me taking over, it was not normal for

5  there to be any participation in the program.  However, both

6  with the Georgetown program and our GED program, education is

7  very important to me, my prior position was as a special

8  assistant to now-Secretary Scruggs, then Assistant Secretary

9  Scruggs over program services.  I know that education has the

10 biggest impact on institutional safety and security and on

11 recidivism.  So I have made arrangements to allow this to

12 happen.  I allow incarcerated individuals to take their

13 scheduled GED test even if they got put on lockup.  It's not a

14 right under policy but I think it's important for public safety

15 to encourage it as much as possible.

16 Q.   I'm going to skip back to I believe you said November 6th.

17 So Ms. Grey is -- had been reviewed multiple times on admin seg

18 and it had been determined, I think you've testified, that

19 perhaps the transfer was necessary.  Where was the transfer

20 considered to be to?

21 A.   She was actually -- before her attorneys reached out to

22 the AG's Office and there was a decision to hold, she was

23 actually scheduled at one point to transfer to JCI, which is

24 another facility with a college program.  University of

25 Baltimore operates out of JCI.  We can't direct that she be

Continued Direct Examination - Kimberly Stewart

1    placed in it.  It would be up to the University of Baltimore.

2    But that would have given the opportunity, one, for her to be

3    in general population; and two, to be at another facility with

4    a college program.

5    Q.    And so what, if anything, happened on November 6th?

6    A.    So November 6th was a Monday.  The next admin team meeting

7    was scheduled for the 7th and that we knew we were going to

8    take a serious look and see if there was any way possible that

9    we would feel comfortable returning her to general population.

10   Because again, that's the aim.  Is there any action that we can

11   take to safely return an individual to general population.

12        So I asked our intel department, write up an investigative

13   report, give me a summary, give the team a summary for the next

14   day.  On that November 6th, that Monday morning, intel came and

15   asked to speak with me.  They had been reviewing the phone

16   calls to determine, you know, of Ms. Grey, of other

17   incarcerated individuals to determine what was the threat level

18   and do an assessment on that.

19        In reviewing Ms. Grey's phone calls, a determination was

20   made that she believed that she has identified the confidential

21   informant who was ultimately responsible for her being placed

22   on administrative segregation in the first place and she had

23   made a statement to the effect of that she was going to get

24   back at that confidential informant.

25   Q.    And so that's information that IID received.  It wasn't

Continued Direct Examination - Kimberly Stewart

1    necessarily verified, it's just information that you make

2    determinations based on at that time, correct?

3    A.    So that wasn't through IID because IID is our independent

4    investigative agency.  That was through our internal intel

5    department and that was through a recorded phone call.

6    Q.    So what, if anything, happened on -- sorry, November 7th,

7    the day after?

8    A.    Yes.  So then on the 7th, we had the team meeting again.

9    Again, it was a unanimous recommendation by the team to myself

10   that Ms. Grey not be returned to general population, that there

11   was too much of a risk now not only to her safety, but now we

12   have the safety of the confidential informant to consider as

13   well.

14        So we took some steps, we went to the person that Ms. Grey

15   believed was the confidential informant and asked her to write

16   a statement saying whether or not, you know, there was any fear

17   for safety but, of course, what we can't do is tell that

18   individual the contents of the phone call over her by Ms. Grey.

19   She would not have a right to know about another, you know,

20   incarcerated individual's phone call.  So we did get a

21   statement, as far as I know, I have no problems.  But again,

22   that person did not have all of the information.

23        So then I was briefing the Warden about what we knew at

24   that point.  At this point we were pretty -- pretty confident

25   that there was not a high risk of threat from the Muslim

Continued Direct Examination - Kimberly Stewart

1    community.  We were very confident based on listening to

2    Mr. Brill's phone calls that he did not believe the rumor and

3    therefore he would not pose a risk to Ms. Grey.

4        However, we still have that there's been incident after

5    incident this vacillation from Ms. Grey between I'm horribly

6    harassed here and I want to stay here and, you know, I'm

7    signing body waivers and going back to D3 where I have no

8    problems and I'm safe.  So we don't have a consistent message

9    from Ms. Grey and now we have this potential threat to the

10   person that she believes was the confidential informant placing

11   her on admin seg.

12       With all of that, the team's recommendation to me was that

13   she not return to general population.  I then went and talked

14   to the Warden about it.  You know, we know the significant

15   impact that this decision is going to have on Ms. Grey, and

16   it's not a decision that we take lightly.  So he asked, go

17   back, you know, evaluate with the confidential informant,

18   evaluate with intel, get me as much information as you can.  At

19   this point, I operate as the Warden's designee.  I knew that

20   this was a significant decision and I had asked the Warden to

21   be the final reviewing signature on this.  I was going to make

22   a recommendation and I was going to ask the Warden to exercise

23   his authority as Warden to be the final reviewing signature.

24       So we went back to look at more information and that's

25   when we pulled the text messages and realize that there had

Continued Direct Examination - Kimberly Stewart

1    been multiple rule violations that we believed were committed

2    by Ms. Grey.

3    Q.    And what were the types of violations that you discovered?

4    A.    So first, the fact that Ms. Grey and Mr. Brill had been

5    using a third party to communicate essentially the equivalent

6    of a three-way phone call.  Ms. Grey would text, at that time

7    it was Mr. Brill's sister, Crystal Brill.  She would text the

8    sister, the sister would copy and paste the entirety of the

9    text to Mr. Brill.  Mr. Brill would read it, respond, and then

10   the same thing would happen going back towards Ms. Grey.

11        So that in and of itself right there, administrative

12   segregation is exactly that, it's supposed to be a segregation

13   from the general population and there's not supposed to be

14   physical contact or ongoing communication between individuals

15   on segregation and the general population.  So that was one

16   rule violation, just the fact that they were communicating.

17        Then when you read their text messages, it was obvious

18   they referred to, you know, kind of explicit language, talking

19   about, you know, "Can't wait to get my hands on juicy tits,"

20   "see that fat ass," things like that.  They referred to their

21   secret hideout place.  It was clear that they had been having

22   ongoing sexual liaisons by nature of being assigned on the same

23   tier.  So that was one rule violation.

24        Then a lot of the text messages were done in code and

25   talking about money transactions, and we have not deciphered

Continued Direct Examination - Kimberly Stewart

1    all of that code to this point but we have been able to

2    decipher that they are talking about various gang leaders

3    within the facility and the movement of money between gangs and

4    who's doing what, who's attending what.

5        Finally, yesterday there was talk of the 104 threatening

6    language Ms. Grey was not convicted of, that's the only charge

7    she was not convicted of, but Mr. Brill was.  The text message

8    came from Mr. Brill to Ms. Grey and was a reference to the

9    confidential informant and it was a message that "I saw that

10   individual, they're still breathing."

11       So that gave us some confirmation of our fear that this

12   alleged confidential informant may be -- their safety may be at

13   risk.  The reason Ms. Grey was not convicted of that charge was

14   because the text message came from Mr. Brill, but this was a

15   conversation they were having together which is why they were

16   both charged with that rule violation.

17   Q.   So if an incarcerated individual who was, say, currently

18   housed on general population had engaged in this type of

19   behavior and Patuxent discovered it, what would be the

20   response?

21   A.   They would also be written a notice of rule violation,

22   access to the tablet would be locked down pending the hearing

23   due to the suspicion for the misuse of the tablet privilege,

24   and because -- so the misuse of the tablet itself is a Category

25   4 violation.  It was the content of the messages that led to

Continued Direct Examination - Kimberly Stewart

1    Category 1 rule violations being charged.  If another
2    individual that the content of their messages also
3    substantiated a Category 1 rule violation, they would be moved
4    to segregation pending the hearing as well.
5    Q.    So it's fair to say that if an incarcerated individual
6    violates rules that are subject to investigation, that II is
7    moved to administrative segregation?
8    A.    Yes.  For example, I can think of at least one other case
9    that we actually had here.  We read the content of the messages
10   and he was making a threat that he was going to beat his cell
11   buddy.  We moved him to segregation and charged him with Rule
12   104 for threatening language based on the content of the text
13   messages.
14   Q.    And let's see.  And you said Ms. Grey's tablet was
15   confiscated at that time, right?
16   A.    So the reason for the confiscation of the tablet, normally
17   we would have just shut down the tablet and left it in her
18   possession.  When we read the text messages, there's a profile
19   picture that the IIs can save to their profile, and the profile
20   picture of the tablet Ms. Grey had in her possession, the
21   profile picture was that of Scott Brill.
22       So when we had talked to staff that actually packed her up
23   when she was moved over to administrative segregation, they had
24   each other's property intermixed between their two cells.  So
25   the first concern and the reason why the tablet was confiscated

Continued Direct Examination - Kimberly Stewart

1    was because we thought that she might have the tablet that was

2    issued to Scott Brill, that they might have swapped.  Once we

3    confiscated it, which happens later in the day and we're able

4    to determine that this was just an issue with the profile

5    picture and not a swapping of tablets, we returned the tablet

6    but had the phone dialer locked down.

7    Q.    And why was that?

8    A.    Because we knew at that point that our investigation had

9    revealed that she was misusing and abusing her privilege of

10   having the tablet, which is a privilege and not a right, so we

11   locked it -- we made the decision she was going to be charged

12   with any applicable rule violations and pending the results of

13   the hearing, we will lock it down until she has that hearing.

14        I can tell you that our intent was to lock down both the

15   phone dialer and the text messages, but I can see from the

16   record of the text messages that some were still somehow going

17   through.

18   Q.    And so what, if anything, happens the next day, November

19   9th?

20   A.    So the next day -- If I can just refer to my notes for the

21   dates.

22   Q.    Did there come a time that there was an incident in the

23   recreation yard?

24   A.    Yes.  So that's what I was looking for was that, that day.

25        So my office and the Chief of Security's office is in a

Continued Direct Examination - Kimberly Stewart

1   hallway, and we are across the hall from the windows that

2   overlook the recreation yards for segregation in CMHCJ.  Across

3   the hall from me is the office of Lieutenant Gaskins, who is

4   our Environmental Safety Compliance Officer, and his assistant

5   who's our Fire and Safety Officer.  So Sergeant Ogboye and

6   Lieutenant Gaskins are in the offices that are directly across

7   the hall.

8        Apparently they observed behavior from Ms. Grey.  They

9   went and got the Chief of Security to come out and look out the

10  window and observe the behavior.  The Chief of Security came

11  across to my office and said, come look at this.  There were

12  reports written about some language that was observed by both

13  Lieutenant Gaskins and Sergeant Ogboye.  I did not witness the

14  solicitation of a sex act.

15       When I came out and into Lieutenant Gaskins' office,

16  Ms. Grey was looking up at the window -- so the yard is in --

17  it's a concrete -- a large concrete area, essentially, that is

18  in between the tiers.  It's bordered by the tiers.  So it's

19  basically this big square and on either side of the yard

20  looking up are the windows to the dayroom of all of the tiers

21  on our four floors above from the yard.

22       So she was looking up to the windows and communicating

23  with other incarcerated individuals that were out in the

24  dayroom.  What I saw her doing was sticking out her tongue with

25  both middle fingers up like in a playful way.  I mean, I don't

Continued Direct Examination - Kimberly Stewart

1    want to be disrespectful to the Court.  I can demonstrate, but

2    essentially she's got her tongue hanging out, she's got both of

3    her middle fingers up waving like this, smiling, laughing, and

4    talking to them.  But at that point is when Lieutenant Gaskins

5    had been calling the yard officer to remove her.

6    Q.    Did you witness any other actions by Ms. Grey?

7    A.    Yes.  So the yard officer called her over and signalled

8    for her to turn around to be handcuffed.  Again, we're a

9    maximum security institution.  Any individual on segregation,

10   administrative or disciplinary, is escorted in handcuffs

11   through the facility.

12        Before she turns around to comply with being handcuffed,

13   she put her hands down in her pants into the genital area, and

14   it looked like she had put something in her pants.  I did

15   witness it but so did Lieutenant Gaskins so he acted first.  He

16   called down to the -- when you exit the yard, you exit into

17   Corridor 1.  He called the Corridor 1 officer on the phone and

18   said to hold her there and not escort her back to her tier.

19   Then he made a phone call to have two female officers relieved

20   so that they could conduct a strip search to determine whether

21   or not she had been hiding contraband.

22   Q.    And was that strip search conducted?

23   A.    Yes.  Prior to the strip search being conducted, we have

24   reports from staff that before the female officers were even

25   there to conduct the strip search, Ms. Grey knew that she was

Continued Direct Examination - Kimberly Stewart

1    waiting for officers to arrive to search her, that she started

2    yelling that she was going to file a PREA on them.  So they did

3    come, the strip search did occur.  We had all of the officers

4    involved write reports.  Because Ms. Grey was saying that she

5    wanted to make a PREA complaint, we had Lieutenant Goldman

6    initiate those procedures as well.

7         In the middle of that, she ended up having an attorney

8    visit as well, but she was seen by medical -- I believe she was

9    seen by medical first.  We were alerted that her attorney was

10   there to visit her, allowed her to go on the attorney visit and

11   then brought her back up to interview her for a report and do

12   the SIR and the PREA report to IID.

13        THE COURT:  Let me just interrupt here briefly.

14        Ms. Stewart, could you lower the blinds behind you?  I'm

15   just having trouble seeing your face.

16        (Pause in Proceedings.)

17        THE COURT:  I can see your face for a time period but

18   then I think the movement of the sun was getting a little worse

19   there, so thank you for doing that.

20        THE WITNESS:  Got it.  No problem.

21   BY MS. RATLIFF:

22   Q.   And so the -- Assistant Warden Stewart, the SIR and the

23   PREA complaints that you referenced was being initiated on

24   November 9th.  What was your understanding of Ms. Grey's

25   complaints in those?

Continued Direct Examination - Kimberly Stewart

1    A.    So at that time on the 9th, she started to write an inmate

2    statement form, started to write the first sentence and then

3    stopped and refused to write anymore after that.

4         When Lieutenant Goldman interviewed her, she had verbally

5    stated that her complaint at that time was that the PREA

6    complaint was based on two things:  that the strip search was

7    ordered by a higher power, and the officers that strip searched

8    her were disrespectful.  So that was what was in the initial

9    preliminary SIR that was reported to IID.

10        The next day after some other things, there was an update

11   to that, but that is what the complaint was on the 9th.

12   Q.    So as of the 9th, did Ms. Grey make any -- to your

13   understanding, did Ms. Grey make any complaints about being

14   pushed down the stairs by an officer?

15   A.    None, not to custody or to medical, which she was seen by.

16   Q.    Let's talk about strip searches in Patuxent.  When would a

17   strip search be necessary or ordered?

18   A.    So there are a lot of different situations.  There are a

19   lot of routine strip searches that happen here, more so than at

20   other facilities with lower security levels.

21        So for example, we have a lot of individuals that are

22   strip searched as a matter of policy, just every time they

23   leave work, we strip search all of our dietary workers, all of

24   our maintenance workers, all of our MCE workers and any of our

25   sanitation workers that work off of the housing unit before

Continued Direct Examination - Kimberly Stewart

1    they can return into the general population facility.  We also

2    strip search all individuals returning from visits whether they

3    be attorney visits or personal visits or clergy visits.

4           There are also the situations like, for example, when she

5    was leaving the yard when there's some reason to have a

6    reasonable suspicion that there may be a possession of

7    contraband that can't be discovered on a normal pat search.  So

8    if circumstances dictate, there would be a strip search done as

9    well.

10   Q.   That's based on a reasonable probability, not certainty

11   that there's something being secreted, right?

12   A.   Correct.  There are a lot of times where we do a search

13   and there's either nothing there, sometimes it could be because

14   there never was anything there, sometimes it could be because

15   there is a delay in moving the person to, you know, a secure

16   and secluded area to do the strip search for privacy reasons

17   they're able to, you know, get rid of the contraband.

18   Q.   And you said -- so strip searches after visits includes

19   after attorney visits, right, I think you did say?

20   A.   Yes.

21   Q.   Okay.  And you said women officers performed at least the

22   search that you observed on Ms. Grey?

23   A.   Yes.  That's her -- by policy, individuals can go through

24   a process by which they indicate their preference on a card

25   that they're required to keep on person.  When I heard

Continued Direct Examination - Kimberly Stewart

1    Lieutenant Gaskins ordering that somebody strip her, I informed
2    him that I was aware that her preference card was female, which
3    is why he called for two female officers to be relieved.
4    Q.    So the policy that governs this exception card, does that
5    a hundred percent guarantee that the searches will be performed
6    by a female correctional officer if the II prefers a female
7    search?
8    A.    So the responsibility is on the incarcerated individual to
9    carry that preference card on them at all times and to produce
10   it ahead of the search.  The reason for that is, every staff
11   member here, the hundreds of staff members that we have here,
12   cannot be expected to know in advance who has what preference.
13         So first the incarcerated individual is required to keep
14   it on their person.  If they don't have the card on their
15   person, I would hope that my staff would take a minute if
16   circumstances allow and it's not an emergency to see if they
17   could double-check the case management records, but they're not
18   actually required to do so.
19         The other circumstance by which it may not happen is in an
20   emergency situation or exigent circumstances.  And that goes
21   with individuals that are born female as well.  If there is an
22   emergency circumstance, they are subject to being strip
23   searched by a male officer.  Of course, you know, I have not
24   experienced that in my career where we have not been able to
25   accommodate.

Continued Direct Examination - Kimberly Stewart

1    Q.    So let's move on to November 10th, which is the day after

2    the incident in the yard and Ms. Grey's attorney visit and the

3    strip search.  What, if anything, occurred on November 10th?

4    A.    So from the 7th, when we discovered the text messages, all

5    the way through the 9th, there was an investigation into the

6    text messages, there was a significant volume of text messages

7    to go through, and much of them were written in code.  So the

8    investigation was ongoing into what rule violations had been

9    committed.

10        On the 10th, that investigation had been completed, the

11   notice of inmate rule violations had been prepared and signed

12   off on by the reporting officer and by supervisors.  So on the

13   10th, an officer reported to Ms. Grey's cell to serve her with

14   two notice of rule violations; one regarding everything in the

15   text messages, and one based on the incident that had happened

16   prior -- on a prior day in the yard for her behavior there as

17   well.

18   Q.    What time of day was Ms. Grey served with those notices?

19   A.    I believe it was sometime in the morning.  I can pull up

20   the system to tell you if we need to know the exact time or are

21   you looking for the order of events?

22   Q.    Yes, that's what I'm getting at.

23   A.    Yes.

24   Q.    Yeah.  So what were the order of events, if anything else

25   occurred that day, what else occurred and in what order?

Continued Direct Examination - Kimberly Stewart

1    A.    So what started the events of November 10th was, again, I

2    believe it was Sergeant Owens had reported to her cell to serve

3    her the infraction.  Sergeant Owens is a member of the intel

4    department.  Immediately from the tier, she became hysterical

5    and was screaming, I need to file a PREA, I need to file a

6    PREA, your officers assaulted me, et cetera.

7         He reported it to supervision.  Lieutenant Goldman was

8    there that day as well.  Ms. Grey was escorted, they attempted

9    to have her seen by medical.  She refused to see medical staff

10   at the facility and refused to make a statement to custody

11   staff.  However, verbally, she was making allegations of a more

12   serious nature of a sex assault and a physical assault with

13   being pushed on the stairs.  For that reason, medical gave an

14   order for her to be transported to Mercy Hospital for a SAFE

15   evaluation that we normally have trained staff to do in the

16   facility when there's been a report of sexual assault, so she

17   was transported to Mercy.

18   Q.    And to your understanding, was Ms. Grey asserting that

19   this assault occurred that day on November 10th?

20   A.    No.  She was asserting that it had occurred the day before

21   prior to being placed in the yard.  Like even though she had

22   the opportunity to make a PREA complaint the day before, she

23   did not include that in the complaint on the 9th.

24   Q.    And are these allegations that Ms. Grey made on November

25   10th currently being investigated?

Continued Direct Examination - Kimberly Stewart

1   A.   Yes.  So what we did was we took the same Serious Incident

2   Report that we had submitted on the 9th, we called IID, let

3   them know the updated information that we received on the 10th.

4   We add that information onto the preliminary Serious Incident

5   Report from the 9th and reissued it to the whole distribution

6   list that we send these complaints to with the updated

7   information so that IID could include that in their

8   investigation.

9   Q.   So when an incarcerated individual is served with a

10  ticket, let's say that II is on general population, would that

11  II remain on general population having been served with a

12  ticket?

13  A.   So it depends on the seriousness of the ticket, but

14  because they were Category 1 violations, the incarcerated

15  individual would go to the segregation tier pending the

16  hearing.

17  Q.   And I think you mentioned that Mr. Brill was also charged

18  with some violations; is that correct?

19  A.   Correct.  So Ms. Grey had two separate tickets; one for

20  the yard incident and one related to the text messages.

21  Mr. Brill was charged, of course, only related to the text

22  messages.  He was charged with the same rule violations and he

23  was moved over to the segregation tier.

24  Q.   And do you know -- I'll strike that.  I'm sorry.

25       Did Mr. Brill remain on segregation after the 10th?

Continued Direct Examination - Kimberly Stewart

1    A.    Yes.  So both of them were served on the 10th and their
2    status changed -- well, both of their status changed, his from
3    general population to segregation pending adjustment;
4    Ms. Grey's from just straight admin seg to admin seg pending
5    adjustment.  They both had their hearing on November 14th.
6    Both were convicted of Category 1 violations and issued various
7    sanctions that included disciplinary segregation so then he
8    stayed there and the status changed to just straight
9    disciplinary segregation.
10   Q.    And to your knowledge, what access -- during this time
11   when Ms. Grey was on administrative segregation, I know we
12   talked about her tablet being taken at least once and returned
13   with the phone dialer shut off.  Do you -- to your knowledge
14   was Ms. Grey ever deprived of her tablet at any other time?
15   A.    No.  I reviewed the record of her text messages.  Prior to
16   her going on administrative segregation on October 13th, she
17   appears to have not used.  So I did a search from October 1st
18   through November 10th, and from before the 13th there were no
19   text messages at all.  From the 13th through November 10th --
20   or I'm sorry, it may have been the 9th whenever the tablet was
21   taken after we discovered the text messages, there were text
22   messages every day the month of October is what I checked
23   because yesterday there was an allegation that there were two
24   times when her tablet was taken, one in the month of October,
25   one in the month of November.

Continued Direct Examination - Kimberly Stewart

1    So I searched the whole month of October.  From the 13th

2    through October 31st, there is a text message sent and received

3    every single day, which indicated to me that she did have her

4    tablet the entire time.  I can say that despite previous

5    testimony, the only time I ordered her tablet confiscated was

6    after I saw Scott Brill's picture as her profile picture in

7    November.

8    Q.   And what about Ms. Grey's access to the phone, had that

9    ever been cut off or denied?

10   A.   No.  So on our segregation tier -- actually, we recently

11   got the tablets.  We were the last facility in the state to get

12   the tablets and it solved a problem for us that we don't have

13   telephones on the administrative segregation tier.  We had been

14   using the roller phone, which unfortunately a lot of

15   incarcerated individuals tamper with, especially on segregation

16   tiers.  So the tablet itself is a phone and she had that in the

17   cell.

18   Q.   Did Ms. Grey have access to pay phones or any other phone

19   access as well?

20   A.   There may be -- so now that we have the tablets, I believe

21   on the seg -- I would have to check and see what other phone

22   access there is on the segregation tier, but we really rely on

23   those tablets now.  They're the most reliable phones that our

24   segregation individuals have access to.

25   Q.   So at any time between -- at any time in November or

Continued Direct Examination - Kimberly Stewart

1    October did Ms. Grey request to transfer to Patuxent Institute

2    for Women?

3    A.    There has never been a request to my knowledge since she

4    has been at Patuxent to be housed on the female tier or in a

5    female building or at a female facility.

6    Q.    Does Patuxent Institute for Women have administrative

7    segregation and disciplinary segregation?

8    A.    No.  We have two temporary holding cells.  Those are there

9    in case of an emergency that, you know, something happens off

10   hours but if an individual needs to stay on administrative or

11   disciplinary segregation they are transferred back to MCIW.

12   Q.    So would you as the Assistant Warden be part of a decision

13   if an inmate did request -- if a transgendered female inmate

14   did request to be housed in a women's area?

15   A.    Yes.  So I would be part of the conversation and decision

16   but, again, that would be a multidisciplinary team where we

17   have to consider not only Ms. Grey's preferences and what's

18   best for her, but then also any potential threat to any other

19   individual that she may be housed with as well.

20          So we really have to look at operations as a whole and

21   make a decision on what is the best housing location.  But

22   that, again, would be a multidisciplinary team approach.  And

23   again, Patuxent Institution does not fall under the Division of

24   Corrections, so also especially if we're talking about MCIW,

25   this would likely be a decision that both facilities and the

Continued Direct Examination - Kimberly Stewart

1   headquarters staff would be involved in evaluating.

2   Q.   Would it be possible to transfer a transgendered female

3   inmate to a -- to be celled alone in Patuxent Institute for

4   Women?

5   A.   So again, our preference is not to cell alone.  We try and

6   double-cell whenever possible.  We also have designated tiers

7   for program versus nonprogram individuals.  We are actually

8   looking at potentially not admitting any other DOC females

9   because it impacts the housing of our statutory programs.  I

10  want to say there are two DOC females now.

11       But even if they were housed alone, there would still be a

12  lot of access in the dayroom, in the yard, in the visiting

13  room, et cetera.  So housing, whether they're a house alone in

14  a cell or not, we would have to be able to have regular routine

15  and sometimes not directly supervised contact between all

16  individuals housed in PIW.

17  Q.   And so you said that Ms. Grey had identified some

18  conflicts with other incarcerated individuals.  To your

19  experience would female incarcerated individuals have the same

20  incidence of disagreements with each other?

21  A.   If not more, actually.  You know, just the women tend to

22  argue more.  When that happens and one person can't get along

23  with another and we have to separate them, we transfer one or

24  both to MCIW.

25  Q.   And what do you typically do -- well, globally regardless

Continued Direct Examination - Kimberly Stewart

1  of gender or gender identity, what do you typically do if an

2  incarcerated individual alleges issues with other inmates or

3  issues with staff?

4  A.   So it really is a case-by-case basis.  So for example, if

5  we identify that two specific individuals are having problems

6  with each other and are enemies and can't be housed together,

7  we essentially will try and look at who is the most culpable

8  and remove the most culpable person because, of course, you

9  know, we don't want to unnecessarily remove a victim of bad

10  treatment from a program or whatever.

11       However, there are a lot of cases in a correctional

12  setting where an individual is having issues with either a mass

13  group of people or unidentified individuals that we can't then

14  target to be the one who transfers.  In that case, that's when

15  the person has to be placed on administrative segregation for

16  their own safety because we can't identify or take action

17  against, you know, the masses.  And we try and look at what we

18  can do for that individual that has the least impact, negative

19  impact on them.

20       So for example, if there's an issue unique to Patuxent

21  that an individual is not being successful in general

22  population but I could transfer them to another facility where

23  they're not going to have the same issues and be able to be in

24  general population, that's what we're going to do to limit our

25  use of restrictive housing.  We're going to try and find that

Continued Direct Examination - Kimberly Stewart

1    facility where they can be successful in general population in
2    the most least restrictive environment possible.
3        I can tell you specifically with Ms. Grey, from her very
4    arrival at Patuxent, any other individual would probably have
5    been placed on involuntary segregation much sooner.  I think
6    she signed probably at least five different body waivers and we
7    let her make that decision even though we weren't a hundred
8    percent comfortable with it.  She's saying that, you know,
9    these massive amount of inmates are harassing her.  We're
10   offering her the protection and she's signing a body waiver
11   saying she wants to stay in general population.  At some point,
12   though, we just have to make a decision in her best interest
13   and in the facility's best interest in case there is going to
14   be a security incident.
15   Q.   So is it fair to say that based on Ms. Grey's allegations
16   alone you would normally transfer her out and away from
17   Patuxent?
18   A.   Yes.  So now I'm hearing for the first time through this
19   hearing that her request is maybe she could go be housed at
20   PIW.  At this point now she's made multiple complaints that
21   multiple different staff members have physically, sexually, and
22   verbally assaulted and harassed her.  I don't understand how
23   you can then ask for a remedy to stay at a facility where you
24   are being physically and sexually abused.
25       The officers that work at Patuxent -- PIW is not a

1   separate facility, it's just a building.  An officer might be

2   working in PIW one day, in school the next, on a male tier the

3   next.  Any of the -- I don't have any reason to believe at that

4   point -- she has withdrawn all the IID complaints so they

5   weren't fully investigated, she hasn't given us sufficient

6   details up until this point with the exception of yesterday to

7   finally identifying an actual officer that we can investigate.

8   She hasn't given any specific details.

9        Even yesterday in the testimony, you know, there's no

10  names, there's no dates for us to look into.  I don't know who

11  these officers allegedly are.  There hasn't been a full,

12  complete investigation because we don't have all the details or

13  the complaints have been withdrawn or they're still pending.

14  Her complaint from the day of the yard incident is still

15  pending to my knowledge.  So I can't protect her from certain

16  staff members that she's making these allegations against.  I

17  do not believe that we would be doing our duty to continue to

18  house her at Patuxent Institution based on the nature of her

19  claims.

20  Q.   And to be clear, the allegations against these officers

21  are allegations and any completed investigations have not found

22  wrongdoing by the Patuxent officers, correct?

23  A.   Correct.  But what we would normally do in any normal

24  circumstance for any incarcerated individual, IID -- we have --

25  through COVR rights you have up to 90 days to issue

Continued Direct Examination - Kimberly Stewart

1    disciplinary action against a correctional officer.  IID has a
2    period of time for investigation.  When an incarcerated
3    individual makes allegations so serious that officers have
4    pushed them down the steps and sexually assaulted them by
5    grabbing private areas, we don't leave that person in the same
6    facility as their alleged attacker while the time frame for the
7    investigation plays out.  The only reason that Ms. Grey is
8    still here right now is because we knew we had an action
9    pending before the Court to restrain us from making any
10   movement on her.
11   Q.    And because Ms. Grey asked to remain at Patuxent?
12   A.    Correct.
13   Q.    And you said that the same officers are employed -- well,
14   Patuxent Institute for Women is not separate so the same
15   officers would be staffing all of the institutions at PIW?
16   A.    Correct.
17             MS. RATLIFF:  Okay.
18             THE COURT:  Ms. Ratliff, I just want to be mindful
19   about the time.  I think you indicated that you had a time
20   limitation today.
21             MS. RATLIFF:  Yes.  I did, Your Honor, and I
22   apologize, I am wrapping up.  I think I have one more question,
23   and I appreciate Your Honor's patience.
24   BY MS. RATLIFF:
25   Q.    Assistant Warden, are you familiar in your professional

1    role with the term solitary confinement?

2    A.    I am, and it does not exist within DPSCS and definitely

3    not within Patuxent Institution.

4              MS. RATLIFF:  Okay.  I have no further questions for

5    you at this time, Assistant Warden Stewart.  Thank you so much.

6              THE WITNESS:  Thanks.

7              THE COURT:  Cross-examination, Ms. Golden?

8                        CROSS EXAMINATION

9    BY MS. GOLDEN:

10   Q.    Thank you.  Good morning, Assistant Warden.

11   A.    Good morning.

12   Q.    Do women at Patuxent, cis women at Patuxent -- Patuxent

13   need a segregation, so why don't you put them in the

14   segregation cells that you used for the cis men?

15             THE CLERK:  Excuse me, Ms. Golden.  The court

16   reporter's having a hard time hearing you.

17             MS. GOLDEN:  I'm sorry.  I will speak up.  I

18   apologize.  Is that better?

19             THE CLERK:  Yes.  Thank you.

20             THE WITNESS:  They're not housing for females.

21             THE COURT:  Ms. Golden, could you just repeat the

22   question that you had asked?

23             MS. GOLDEN:  Of course, Your Honor.

24   BY MS. GOLDEN:

25   Q.    I had asked when cis women at PIW need restrictive

1   housing, whether it's administrative or disciplinary

2   segregation, why they aren't housed in a segregation unit that

3   exists for cis men?

4   A.   My understanding of DPSCS policy is to house people

5   consistent with their sex assigned at birth, and then with

6   transgendered individuals to consider that on a case-by-case

7   basis.  So a sis woman, a woman born female or born a woman at

8   birth would automatically be assigned for housing designated

9   for a female.  Any individual identified as a transgendered

10  individual would have to be decided on a case-by-case basis.

11  Q.   Okay.  And earlier you talked a little bit about soft

12  passes and hard passes.  Are soft passes a thing?  Do they

13  exist?

14  A.   They do.  They're not used for religious services or

15  volunteer services, kind of like regularly scheduled

16  activities.  They're used for, you know, today my case

17  manager's calling me, today I'm on the sick call list.  They're

18  also supposed to be issued from the tier officer to maintain

19  accountability for where all of the individuals assigned to

20  their tier are located.

21  Q.   And who is responsible for making sure that staff follows

22  rules?

23  A.   The whole chain of command up through the Warden, and I

24  note, though, that that is why Ms. Grey did not receive an

25  infraction for being out of bounds because we were not able to

Cross Examination - Kimberly Stewart

1  determine conclusively whether or not a soft pass was issued by
2  staff for her.  And of course, if that happened, that
3  responsibility would be on the officer for not following the
4  rules.
5  Q.   Are you aware that Ms. Grey requested to be housed with
6  sis women multiple times at WCI?
7  A.   I saw that ARP that was submitted to the Court yesterday.
8  That was the first time I had ever heard of that since she has
9  arrived at Patuxent which, again, falls under a different
10 appointing authority and chain of command.  There has never
11 been a request to be housed with sis women.
12 Q.   You mentioned earlier this morning that you clarified that
13 the segregation officer on the unit, I believe it's Nancy 3
14 we're talking about, that razors are allowed for people who are
15 held on administrative segregation?
16 A.   Correct.
17 Q.   But you didn't clarify that people on disciplinary
18 segregation are entitled to razors?
19 A.   No.  I did -- yesterday was the first time I heard that
20 allegation and, of course, this hearing came up very fast.  I
21 would have to look into what the policies are on disciplinary
22 segregation to confirm.  Off the top of my head, I believe that
23 they are issued them during shower and have to turn them back
24 in and not able to keep them on person, but I can't swear that
25 I am correct on my memory of policy for disciplinary

 1    segregation.

 2    Q.    You are the PREA designee, the Warden's PREA designee?

 3    A.    Correct.

 4    Q.    So you have training on PREA?

 5    A.    Correct.

 6    Q.    Do you know what PREA is generally?

 7    A.    Correct.  It's a set of federal laws designed to keep

 8    incarcerated individuals as safe from harm as possible.

 9    Q.    Okay.  Can we pull up Plaintiff's Exhibit 12?  This is the

10    PREA regulations.  You might have a copy in your office to

11    review?

12    A.    Not readily available.  I can try and pull them up.

13    Q.    All right.  We'll pull them up on the screen.

14          THE COURT:  Counsel, I think that -- okay, there we

15    go.

16          MS. GOLDEN:  Exhibit 12.

17    BY MS. GOLDEN:

18    Q.    Do you recognize this document, Assistant Warden?

19    A.    I do.

20    Q.    What is it?

21    A.    The Prison Rape Elimination Act, which is what we refer to

22    as PREA.

23    Q.    Okay.  Could we flip to Page 20, which is --

24          MS. RATLIFF:  Your Honor, I'm going to object as

25    beyond the scope of direct.

Cross Examination - Kimberly Stewart

1           THE COURT:  Let me just hear from Ms. Golden.

2       Ms. Golden, can you proffer what you are going to explore

3   here?

4           MS. GOLDEN:  Sure.  The Assistant Warden has

5   identified herself as the PREA officer or the PREA designee

6   responsible for implementing these regulations.

7           THE COURT:  All right.  Objection's overruled.

8   BY MS. GOLDEN:

9   Q.    Could we turn to Page -- I believe it's Page 20,

10  Subsection 115.42.  Are you able to see that, Assistant Warden?

11  I want to make sure this is big enough.

12  A.    I am, and I was able to pull it up on my computer as well.

13  Q.    Oh, okay.  Could you read to us Subsection C of .42 there

14  at the bottom?

15  A.    Sure.  "In deciding whether to assign a transgender or

16  intersex inmate to a facility for male or female inmates and in

17  making other housing and programming assignments, the agency

18  shall consider on a case-by-case basis whether a placement

19  would ensure that an inmate's health and safety and whether the

20  placement would present management or security problems."

21  Q.    Okay.  And Subsection E, please.

22  A.    "A transgender or intersex inmate's own views with respect

23  to his or her own safety shall be given serious consideration."

24  Q.    In your experience, has a transgender inmate ever been

25  assigned to be housed according to their gender identity?

Cross Examination - Kimberly Stewart

1    A.    I wouldn't have that knowledge for DPSCS statewide.

2    Q.    In your experience at Patuxent.

3    A.    I've only been at Patuxent since July of 2022.  It has not

4    happened since then.  We have also not had a request since

5    then.

6    Q.    But to clarify, you've had other transgender incarcerated

7    people?

8    A.    Correct, and none have made a request to be housed at PIW

9    or MCIW.

10   Q.    Okay.  In your experience, have you ever affirmatively

11   asked any of those individuals what their preference is?

12              MS. RATLIFF:  Objection.

13              THE COURT:  Overruled.

14              THE WITNESS:  So that would not be the procedure to

15   ask.  We would consider any request by any incarcerated

16   individual for any sort of housing issue.

17   BY MS. GOLDEN:

18   Q.    Okay.  So your interpretation is that an inmate's own

19   views, or what the department refers to as an incarcerated

20   individual's own views only come into play if that person

21   expresses them to you, you have no obligation to ask?

22   A.    More specifically, I would answer that Ms. Grey's views

23   were considered explicitly by me when we had a conversation

24   where she requested to be housed alone on D3, which I granted,

25   and where she has committed multiple ARP complaints asking to

1    go back to D3 after her placement on administrative

2    segregation.

3    Q.    I understand.  That's not exactly what I asked, though.

4          I'm just asking about the regulation and your

5    understanding as the PREA designee that an inmate's own views

6    only come into play if that inmate affirmatively asks?

7    A.    We can only consider their own views if they express them

8    to us, correct.

9    Q.    And you have no obligation to ask?

10              MS. RATLIFF:  Objection.  Asked and answered.

11              THE COURT:  Sustained.

12   BY MS. GOLDEN:

13   Q.    I want to go back to the incident -- I don't have the

14   exact date in my notes -- when Ms. Grey was on the segregation

15   unit and another worker, an inmate janitor or tier worker got

16   out, do you know the incident I'm talking about without the

17   exact date?

18   A.    I do.  It was reported on 10/17.  I don't know the date of

19   the alleged incident.

20   Q.    Okay.  How could somebody get out of their cell at that

21   time of night?

22   A.    We have sanitation workers assigned to clean the common

23   areas of the tier.  He didn't get out.  He was performing his

24   assigned duties to clean the general areas of the tier.

25   Q.    And those duties occurred at 10 o'clock at night?

1    A.    Some.    Sanitation is 24/7 in a facility.

2    Q.    Okay.

3    A.    I'm sorry, I'm going to say just for the record I would

4    have to pull the reports.  I am not aware, personally aware

5    that it's alleged to have occurred at 10 o'clock at night, and

6    the incident also was not fully investigated by IID because of

7    the withdrawal form.

8    Q.    If I understood your testimony correctly yesterday and

9    today, IID investigates for possible criminal violations?

10   A.    No.  IID investigates for both criminal and administrative

11   and is the designated investigative agency for any PREA related

12   complaints, whether they be administrative or criminal.

13   Q.    And so if something is referred to IID you don't -- you

14   testified there's some internal investigatory ability inside

15   the facility but that is -- that does not happen if something

16   is referred to IID?

17   A.    The capability is very limited.  What they're going to be

18   investigating is more kind of institutional operational safety

19   and security matters.

20   Q.    You don't need a victim statement, though, to uphold a

21   disciplinary charge, right?

22   A.    Oftentimes we have no complaining witness or no witness

23   that can testify to acts occurred, we would not have enough to

24   charge on a disciplinary matter.  We would have to have some

25   sort of external evidence in order to charge.

Cross Examination - Kimberly Stewart

1   Q.   So you don't always need a victim statement?

2   A.   Not in all cases if there is some sort of objective

3   external evidence.

4   Q.   And you don't need a victim statement to find for the

5   sexual assault or other PREA allegation was considered

6   substantiated, correct?

7   A.   If the victim -- in that case if the victim is telling IID

8   that they're withdrawing the complaint, that is the

9   investigative agency.  We're talking about two different

10  things.  What the facility would do and what IID is assigned to

11  investigate the case are two different things.

12        In this case, if we have -- we didn't have any other

13  witnesses to this incident.  If there were other witnesses that

14  observed an assault from the sanitation worker on Ms. Grey, I

15  would have ordered that those officers write the report based

16  on their own observations.

17  Q.   And there are no cameras on the side where Mr. Grey is

18  housed?

19  A.   No, there are not.

20  Q.   Are there cameras on the other side of the unit?

21  A.   No, there are not.

22  Q.   Are there any cameras in the tiers of Patuxent generally?

23            MS. RATLIFF:  Beyond the scope.

24            THE WITNESS:  I will answer if I'm ordered.  I would

25  rather not answer that question for safety and security

1    reasons.

2                  THE COURT:   The objection's overruled.

3                  THE WITNESS:   So I do have to state on the record

4    what the recording capability in the facility is not relevant

5    to this case?

6    BY MS. GOLDEN:

7    Q.    I'm just asking generally, I'm not asking for the location

8    of the cameras.

9    A.    Unfortunately, due to maintenance issues Patuxent has very

10   limited camera capability.   We're a very old facility in 1955.

11   we are scheduled for an upgrade.   We do have some recording in

12   some locations, which I would rather not disclose which ones

13   work and don't work because incarcerated individuals just see a

14   camera there.   They don't know which ones are working versus

15   not.

16   Q.    There are logbooks on the units, right?

17   A.    I'm sorry, there are logbooks?   I'm sorry.

18   Q.    Yes.   My understanding is it's a standard practice?

19   A.    Yes.

20   Q.    And those record who comes into and out of the unit?

21   A.    Yes.

22   Q.    They record any serious incident?

23   A.    That are known, yes.

24   Q.    And there's a logbook for recreation, right?

25   A.    Yes, there should be.

Cross Examination - Kimberly Stewart

1    Q.    I haven't overlooked any logbooks or logs that have been

2    produced as part of the briefing in this hearing, have I?

3         MS. RATLIFF:  Objection.  I think this is beyond the

4    scope of direct.

5         THE COURT:  I think there was some testimony about

6    recreation access and I suspect that that's what Ms. Golden is

7    probing so I'm going to overrule the objection.

8         MS. RATLIFF:  Thank you, Your Honor.

9         THE WITNESS:  I have not been privy to the Court

10   filings other than the affidavit I signed or information I

11   submitted, so I'm not sure if there have been any logbooks

12   submitted.  I did not submit any.

13   BY MS. GOLDEN:

14   Q.    Okay.  Did you review any before your testimony?

15   A.    I was not aware that there was an allegation of not

16   getting recreation, so I did not prepare that to submit.  My

17   understanding that this case was about a temporary restraining

18   order from putting her on segregation.

19   Q.    I do want to make sure that I'm clear that I am not asking

20   you about any conversations with your attorneys about what this

21   TRO hearing was about.

22   A.    Correct.  I can just say that I would have no idea that

23   this would be relevant to today's discussion so I never

24   attempted to pull the logbooks or look into the recreation

25   issue.

Cross Examination - Kimberly Stewart

1    Q.    There are men at your institution who have been convicted
2    of sexual assault, correct?
3    A.    Yes.
4    Q.    And there are men at your institution who have been
5    convicted of murdering other men, right?
6    A.    Yes.
7    Q.    And I -- there are women who have been convicted of
8    murdering other women?
9    A.    Yes.  I would assume.  I don't know of a specific case but
10   I would assume.
11   Q.    When Ms. Grey was taken for the PREA exam or the SAFE exam
12   inside the institution on the 10th, were you aware that she was
13   offered an exam by a male nurse?
14   A.    That day -- I believe that would have been -- that was a
15   Friday, I believe it was a state holiday so I was not in the
16   facility at the time of.  I believed that I read a report
17   after.
18         First of all, my understanding is I'm not sure if there's
19   a physical component to a SAFE exam.  I think that it's an
20   educational component that a male nurse may have been offering,
21   but I also read a report that then when she did not want to see
22   the male nurse, a female nurse was offered.  That was still
23   declined.  But medical took -- undertook the effort for her
24   comfort level to then order the transport to Mercy.
25              MS. GOLDEN:  May I ask the Court's indulgence for a

Cross Examination - Kimberly Stewart

1  few minutes to consult with my co-counsel?

2           THE COURT:   You may, yes.

3        (Pause in Proceedings.)

4           MS. GOLDEN:   Thank you.

5  BY MS. GOLDEN:

6  Q.    I'm going to show you Plaintiff's Exhibit 18.  Could you

7  pop that one up?  Excuse me.  A little bit of technical --

8  okay.  You testified earlier that Ms. Grey had never complained

9  about a lack of razors.

10  A.    Correct, to my knowledge.

11  Q.    To your knowledge.  Have you seen this document before?

12  A.    I was -- again, I got to see if it's in the packet.  I was

13  asked for and received a copy of all ARPs that have been filed

14  and I received that about, I don't know, about 15 minutes

15  before the hearing started yesterday.  I'm trying to look.

16  What number is that?  I'm trying to see if it's in the packet I

17  received shortly before the hearing yesterday.

18        Yes, this ARP is in the packet that I received yesterday

19  that was filed November 4th.

20  Q.    You hadn't seen this before yesterday or perhaps right

21  now, but not earlier than that?

22  A.    The procedure would be for the ARP coordinator to receive

23  and accept the complaint for investigation.  At the completion

24  of the investigation, I would receive a copy of the case

25  summary investigative report in order to issue a decision.

1   Since this case was just received on November 6th and assigned
2   for investigation, that 30 days for the investigation, the time
3   frame would not be over to complete.
4   Q.   So when you are testifying about ARPs that you have seen
5   separately except for this large packet that you were given,
6   there's a 30-day lag period is what I'm understanding; is that
7   correct?
8   A.   For the official investigation, yes.  There would not be a
9   necessarily be a 30-day lag period, you know, for example
10  receiving mail.  I can -- I don't know if I'm allowed to say
11  what the conversation was with my Captain yesterday, but these
12  complaints can be communicated to any supervisor that would
13  have an immediate ability to fix the issue.  And to my
14  knowledge other than filing the ARP, which would go to a, you
15  know, sergeant assigned to investigate ARPs and they have a lag
16  time, there are other informal ways of addressing issues
17  faster.
18  Q.   But there is no way generally for a person who's in
19  segregation to informally address it to you unless you happen
20  to be on the tier, right?
21  A.   No.  I get mail all the time from segregation.
22  Q.   There's no lag time for the males in segregation but there
23  is for the ARPs?
24  A.   There may be, you know, a matter of days for the mail but
25  it wouldn't be 30 days.

Cross Examination - Kimberly Stewart

1    Q.    And I want to clarify a few other things and I'll be

2    quick.  I'm sorry, could we close the exhibit?  Thank you.

3          Ms. Grey was found not guilty of the threatening charge,

4    correct?

5    A.    That was one charge in one notice of rule violation.  She

6    was found guilty of other Category 1 violations related to both

7    incidents.

8    Q.    I understand that.  But the threatening she was found not

9    guilty?

10   A.    Correct.

11   Q.    And I want to understand your testimony about the 9th of

12   November.  That was the yard incident --

13   A.    Okay.

14   Q.    -- Ms. Grey received a charge for.  According to the

15   charges, it happened at 10 a.m.?

16   A.    Yes, I believe approximately 10 a.m.

17   Q.    Okay.  And a number you of you gathered to observe,

18   Ms. Grey was cuffed, transported, strip searched, dressed,

19   recuffed and transported to an attorney visit?

20   A.    So there's no, like, transport, you know, of a significant

21   time.

22   Q.    Why --

23   A.    I would say an average strip search takes less than five

24   minutes.

25   Q.    But all that -- I have the order correct?

Cross Examination - Kimberly Stewart

1    A.    She -- I know that she was removed from the yard and strip

2    searched.  I believe she might have walked upstairs to the

3    medical area first.  I don't know that for sure before she went

4    to an attorney visit.

5    Q.    And that attorney visit started at 10:20?

6    A.    I don't know where the 10:20 date -- time frame came from.

7    I know that the attorney, according to the logbook at the

8    front, entered the facility at 10 a.m., there is more of a

9    delay for processing, identification, waiting on an escort

10   officer, and that they -- the attorney I believe left, and I

11   just checked this verbally with the officer working out front

12   yesterday, at 11:35.

13   Q.    Okay.  I also want to confirm, your video seems to be

14   frozen but you can hear us okay?

15   A.    I can.

16   Q.    Okay.  No strip search of Ms. Grey has ever produced any

17   contraband, correct?

18   A.    Not to my knowledge.

19   Q.    Have you seen the pictures that Mercy Hospital took of

20   Ms. Grey's right breast?

21   A.    No.

22   Q.    Have you been informed what those pictures show?

23   A.    I was not informed what the pictures show.  I received a

24   report from Mercy that I -- first of all, there was at least a

25   24-hour delay, a day delay in reporting the incident, but Mercy

1    sent me a notice that said that they were giving us notice

2    about this incident because Ms. Grey made the allegation that

3    the facility was stopping her access to her attorneys or

4    police, which I know to be a false statement because she had an

5    attorney visit the day before, and every incident that I'm

6    aware of that would fall under IID's jurisdiction I have

7    ordered a complete and thorough investigation and we had

8    reported that PREA incident the day before despite the fact

9    that the verbal complaints do not actually meet the standards

10   for making a PREA complaint.

11   Q.    What I asked, though, is that had you been informed of

12   what those pictures show?

13   A.    No.

14         MS. GOLDEN:    Court's indulgence, please.

15   BY MS. GOLDEN:

16   Q.    Would the results of her SANE investigation and what the

17   pictures show be of interest to the facility?

18   A.    It would be the -- the results of that would go to the

19   assigned IID investigator.  The assigned IID investigator would

20   evaluate all of the evidence and creates findings of fact.

21         Based on those findings of fact, they would make a

22   recommendation into whether or not there were any charges under

23   the standards of conduct for any state employee.  They would

24   also make a recommendation, I believe, on a level of sanctions

25   and then it would be up to the appointing authority or designee

Cross Examination - Kimberly Stewart

```
 1    to based on their findings of fact order appropriate
 2    disciplinary action, if any, based on those findings of fact.
 3    So it would be of interest to me from the completed
 4    investigative report from IID.
 5    Q.    And if I understood your earlier testimony, that takes a
 6    number of weeks?
 7    A.    It can, which is why we would normally take immediate
 8    action to remove the alleged victim from access from the
 9    attackers.
10    Q.    But you didn't do that here?
11    A.    We were asked not to because of this case being filed.  It
12    was my understanding that there is an action before the Court
13    pending for a restraining order from removing her from Patuxent
14    and asking that she be returned to general population in
15    Patuxent.  We didn't want to skirt the Court's authority before
16    this hearing is held.  We are waiting until the results of this
17    hearing before we take action because, again, the PREA
18    standards, it requires us to consider her wishes.  Ms. Grey's
19    wishes are that she remain here at Patuxent.
20    Q.    And the officer, the accused officer is still working on
21    Ms. Grey's tier?
22    A.    I am not sure the identities of the accused officers from
23    that case.
24              MS. GOLDEN:  No further questions.
25              THE COURT:  Thank you.  Ms. Ratliff, do you have any
```

1   redirect?

2           MS. RATLIFF:  I do not, Your Honor.  Thank you so

3   much.

4           THE COURT:  All right.  Thank you.  Thank you,

5   Ms. Stewart.  I believe that our plan was to go back to the

6   plaintiff's side and present any additional witnesses that they

7   may have.  Ms. Golden or Ms. Weber?

8           MS. GOLDEN:  Yes.  We --

9           THE COURT:  But I think we've been going for a little

10  bit more than an hour and a half at this point so I think we'll

11  need to give a break to our court reporter.  So let's take a

12  10-minute break at this point and if anyone needs to use the

13  restroom, they have the ability to do that.  We'll come back at

14  10:50.  Ms. Grey looks like she has a question.

15          MS. GREY:  If I could just ask to speak to my

16  attorneys very briefly like one or two minutes, I would

17  appreciate that indulgence if it's possible.

18          THE COURT:  Ms. Moye, can you set up a breakout room

19  for Ms. Grey and her counsel?

20          THE CLERK:  Yes.

21          THE COURT:  Then counsel please hit the "ask for

22  help" button when you're ready to come back out of the breakout

23  room.  We'll resume at -- I'm sorry -- 10:50.

24          MS. GREY:  Thank you, Your Honor.

25          THE COURT:  Yes.

Direct Examination - Dan Pacholke

```
 1        (A recess was taken from 10:39 a.m. to 10:50 a.m.)
 2             THE COURT:  All right.  Ms. Golden?
 3             MS. GOLDEN:  I'm sorry, it looks like Ms. Grey is not
 4   back yet.
 5             THE COURT:  All right.  I mean, we can give her some
 6   time or I guess we could move on to the next witness unless
 7   there's something that she needs to be present for.
 8             MS. GOLDEN:  No, we could.  At this time we call Dan
 9   Pacholke.
10        (Dan Pacholke was duly sworn.)
11             THE CLERK:  Please state and spell your full name for
12   the record, please.
13             THE WITNESS:  My name is Dan, D-a-n, last name
14   Pacholke, P-a-c-h-o-l-k-e.
15             THE CLERK:  Thank you.
16             THE COURT:  Ms. Golden, your witness.
17             MS. GOLDEN:  Thank you.
18                          DIRECT EXAMINATION
19   BY MS. GOLDEN:
20   Q.   Mr. Pacholke, what's your current employment?
21   A.   I work for Dan Pacholke Consulting.  I do corrections work
22   around the country.
23   Q.   I am going to call up Plaintiff's Exhibit 5.  Do you
24   recognize this document?
25   A.   I do.  Looks my like my resumé, CV.
```

Direct Examination - Dan Pacholke

1  Q.    Okay.  Understanding that we are running short on time,
2  could you briefly summarize your career?
3  A.    Well, I worked for the Washington State Department of
4  Corrections for 33 years, four months.  Started as a
5  correctional officer.  I retired as the head of the agency.  I
6  was there briefly.  I was superintendant of three different
7  prisons.  I was deputy director in prison, director of prisons,
8  deputy secretary, and I worked all ranks from officer,
9  sergeant, lieutenant, and captain, six different prisons.
10       During my time with the department, I also did work for
11  the National Institute of Corrections doing training around the
12  country and also did work for Defense Technology Corporation.
13       When I retired, I went to work for New York University.
14  We're doing some innovative practices around prison and jail
15  operations, and since about 2018, I've primarily done
16  independent consulting work in the field of corrections,
17  published a number of articles related to the field, done work
18  both in the country and out of the country as well.
19  Q.    Okay.  Thank you.  Going down to some of your
20  publications, I'd like to talk about them.  Specifically the
21  third one down, can you tell us what that one was and describe
22  it for us?
23  A.    Yeah.  It would be, the policy brief itself was called
24  More Than Emptying Beds:   A Systems Approach To Segregation
25  Reform published in about 2016.

Direct Examination - Dan Pacholke

1        We, Washington State had done a lot of work on segregation

2   reform from the '90s all the way up through when I left in 2016

3   and kind of had a system around how you do that.  So we were

4   asked to author a policy brief which we did for DOJ and BJA

5   around how you reform the use of segregation.

6   Q.   And BJA is the Bureau of Justice Assistance for the US

7   Department of Justice?

8   A.   Yes, ma'am.

9   Q.   And I'll ask you if it's correct that in the forward, the

10  director of BJA noted that this paper formed the basis of

11  President Obama's announcement and principles about segregated

12  housing?

13  A.   Yes, ma'am.

14  Q.   Have you dealt -- have you had other professional

15  experience dealing with solitary confinement?

16  A.   I have.  I mean, I have served as an expert both in doing

17  investigations for DOJ, the Department of Justice Civil Rights

18  Division, and for a number of different law firms in looking at

19  segregation either from class action lawsuits or individual

20  lawsuits or, as an example, for DOJ through CRIPA

21  investigations.

22  Q.   Okay.  Have you been qualified as an expert before in

23  solitary confinement?

24  A.   Yes, ma'am.

25  Q.   Do you have a rough guess as to how many cases that's

Direct Examination - Dan Pacholke

1   happened?

2   A.   I'm not exactly sure.  I know I've testified 16, 17, 18

3   times, maybe, in deposition or courtroom.  Probably worked 40

4   cases, maybe.

5   Q.   Could we pull up Exhibit 6, Plaintiff's Exhibit 6.  Do you

6   recognize this document?

7   A.   I do.

8   Q.   And what is this?

9   A.   It's just supplemental information I usually provide that

10  shows the rate in which I'm compensated and the cases in which

11  I have either given a deposition or courtroom testimony.

12  Q.   And that rate's still accurate?  That's what we're paying

13  you today, right?

14  A.   Yes.

15  Q.   And can we just scroll down?  I'd just like you to tell me

16  if this was accurate for the number of cases.

17  A.   Yes.

18  Q.   Okay.  Thank you.  And we can close that.

19       In your professional experience, have you dealt with

20  transgender prisoners?

21  A.   I have.

22  Q.   Can you describe that experience?

23  A.   Well, I've probably done at least four cases in two

24  states, in Illinois and Arizona specifically, independent and

25  separate from Washington State and have looked at transgender

Direct Examination - Dan Pacholke

1  housing issues in, you know, another few jurisdictions.  So,
2  you know, oftentimes there's an intersection between
3  transgender and segregation transgender and some form of
4  retaliation or abusive environments, so it seems like it all
5  interacts with segregation at some point and mental health.
6  Q.    And in your career with the Washington Department of
7  Corrections, did you deal with transgender prisoners?
8  A.    I did.
9  Q.    Can you describe that a little bit?
10 A.    Well, I think we received our first PREA grant, I think it
11 was called something different in about 2002, and so very early
12 on, way before it was ever published and began to look at the
13 issue of safety in general for vulnerable populations.  Part of
14 that is documented in the policy brief on More Than Emptying
15 Beds.  It's how do you manage potential victims in a safe way.
16 Q.    And you mentioned PREA.  So you've had professional
17 experience dealing with PREA?
18 A.    Yes.
19 Q.    And that was both in your employment with Washington DOC
20 and since then?
21 A.    Yes.
22 Q.    Okay.  Can you describe that a little bit?
23 A.    Well, within Washington DOC, I think I was a deputy
24 director when the final law was passed.  I served as the
25 executive sponsor that was charged with implementation within

Direct Examination - Dan Pacholke

1   the prison system and work release and community corrections,

2   so that's kind of my official department involvement.

3       Certainly with -- I think I -- like I said, I've worked at

4   least I think four transgender cases involving at least two

5   states and reviewed units in at least two more, so, you know,

6   you have to reference PREA, you have to have some basic

7   understanding of it how the system works as you look at those

8   cases.

9   Q.   And have you dealt with prison discipline programs before

10  in your professional experience?

11  A.   I have.

12  Q.   Could you describe that a little bit?

13  A.   Well, as a lieutenant, probably in the late '80s I was a

14  hearings officer, and then as a superintendant we managed

15  discipline for the facility to include having I guess the final

16  intervention when it came to appeals and then certainly as a

17  deputy director and director in prison, we would do performance

18  reviews on disciplinary issues both within facilities and on a

19  statewide aggregated basis.

20  Q.   Are there generally accepted professional standards for

21  doing prison disciplinary systems in the corrections

22  profession?

23  A.   There are.

24  Q.   At this time we'd like to offer Mr. Pacholke as an expert

25  in corrections, solitary confinement, the management of

Direct Examination - Dan Pacholke

1    transgender prisoners, PREA, and his professional standards of

2    disciplinary processes.

3                    THE COURT:  Do you wish to be heard?

4                    MS. DONOHO:  No objection.

5                    THE COURT:  Okay.  The request will be granted.

6                    MS. GOLDEN:  Thank you.

7    BY MS. GOLDEN:

8    Q.    What did you prepare for today?

9    A.    I have read documents concerning the case at hand and I

10   have looked at some of the I guess restraining orders and just

11   different exhibits.  I listened in part of yesterday and part

12   of this morning on the deliberations in court so far.

13   Q.    Can you tell us what the accepted correctional definition

14   of solitary confinement is?

15   A.    Well, I mean, solitary confinement really is about

16   totality of conditions.  I mean, the characteristics of it are

17   oftentimes you're in a single cell.  When you leave the cell,

18   you're in restraints.  When it comes to basic things like

19   toilet paper or toothpaste or medication or access to forms,

20   these are things that come to cellfront to include meals and

21   typically that would also include eating in the cell alone.

22        So I think the characteristics of -- it's like a single

23   cell environment, most everything is delivered to the

24   cellfront, all movement is in restraints and typically they are

25   recreated alone.

Direct Examination - Dan Pacholke

1   Q.    Whether or not something is considered solitary depends on
2   the nature of the cell door?
3   A.    No, not necessarily.  You would have to look at the
4   conditions in total, not just the makeup of the cell door.
5   Q.    Okay.  And generally, what does the evidence show about
6   the effects of solitary confinement?
7   A.    I mean, based on my own experience and certainly looking
8   at the research for a very long period of time, you know,
9   physical harm occurs or physical deterioration can occur almost
10  immediately, within a day or so, and the likelihood of having
11  impact to your mental health and your mental wellbeing are
12  pretty dramatic and come pretty quick.
13  Q.    And what can be the outcome from those impacts?
14  A.    It's deterioration of people, whether it's physically
15  and/or mentally, which can result in different types of
16  behavior that can result in additional violations.  So
17  essentially the conditions itself can drive people to
18  deteriorate which can cause other types of abnormal behavior.
19  I mean, there's types of misconduct that occur that only occur
20  in these type of units, they just don't occur in general
21  population, as a byproduct of just being isolated for so long.
22  Q.    What kind of behavior is that?
23  A.    Well, I guess the example would be, you know, suicide,
24  self-harm would be a good example that, you know, almost
25  exclusively these types of behaviors happen in solitary

1    confinement units or units where -- I use the word solitary

2    confinement.  It could be other type of units that demonstrate

3    that same type of characteristics.  It could be the throwing of

4    water, it could be throwing the urine, it could be manipulation

5    of feces, it could even be exposure in the sense of

6    inappropriate exposure.  But these are the types of things that

7    I just listed that just don't occur in general population.  I

8    mean, they just don't happen.  And if they do, they're at such

9    a low base rate it's almost exclusively in these units where

10   people are held in isolation.

11            MS. RATLIFF:  Your Honor, I apologize for

12   interrupting.  It's come to my attention that Ms. Grey has made

13   an allegation or some comments about the case manager who is

14   currently sitting with her, I believe.

15            THE WITNESS:  No.  That's not true, Your Honor.  What

16   I --

17            THE COURT:  Hold on.  Let me just hear from

18   Ms. Ratliff.

19            MS. RATLIFF:  So I just wanted to bring it to the

20   Court's attention because the institution has asked if we could

21   briefly pause so we could switch out staff and start an

22   investigation and put it on the record.

23            MS. GREY:  Oh.

24            THE COURT:  All right.  We'll take a five-minute

25   break.

Direct Examination - Dan Pacholke

1          MS. RATLIFF:  Thank you, Your Honor.

2          THE COURT:  Let's complete the question and the

3    answer first.  I apologize, Ms. Golden.

4          MS. RATLIFF:  Certainly, and I apologize.

5          MS. GOLDEN:  Your Honor, could we briefly be put into

6    a breakout room with Ms. Grey?

7          THE COURT:  Yes.  I mean, Mr. Pacholke, did you

8    complete the answer to your last question?

9          MS. GOLDEN:  Oh, I'm sorry.

10         THE WITNESS:  I believe so.  I believe I did.

11         THE COURT:  All right.  Very good.

12         MS. RATLIFF:  I tried to wait, Your Honor.  But yes,

13   thank you.

14         THE COURT:  All right.  We'll take a five-minute

15   break.  If you could set up a breakout session with Ms. Grey

16   and her counsel, please.

17         THE CLERK:  Yes, Your Honor.

18         THE COURT:  Thank you.

19      (A recess was taken from 11:05 a.m. to 11:09 a.m.)

20         THE COURT:  Thank you, Ms. Moye.

21      Ms. Ratliff, has the facility had an opportunity -- I see

22   Ms. Grey here, but has the facility had an opportunity to do

23   what it needs to do?

24         MS. RATLIFF:  I believe so, Your Honor.  I spoke to

25   Assistant Warden very briefly.  She then received a call that

Direct Examination - Dan Pacholke

1    she said it's -- it indicated to me that it was taken care of.

2                THE COURT:  Okay.  We can resume, then.

3                MS. RATLIFF:  Thank you, Your Honor.

4                THE COURT:  Ms. Golden?

5    BY MS. GOLDEN:

6    Q.    Okay.  Mr. Pacholke, you mentioned that you had experience

7    as a corrections professional working with transgender

8    prisoners.

9    A.    Yes.

10   Q.    Can you -- are transgender women ever housed in women's

11   facilities?

12   A.    Yes.

13   Q.    Can you tell us about how common that is?

14   A.    Well, certainly in Washington State, where I live, anyhow,

15   you know, there are trans women inside the women's facility.

16   Another state, Illinois has a relatively significant amount of

17   trans women inside their women's facility.  Massachusetts,

18   their 2018 bill, Crime Bill that also impacted corrections

19   gives choice to trans women as far as where they're housed.

20         And I've certainly even seen specialized units.  Florida

21   is one of them that have units where a person could volunteer

22   and go to a trans unit.  It was in a male facility but there

23   were all trans women.  You know, certainly worked with the

24   issue in Arizona and have followed the issue in both California

25   and New York, so there's a number of states that have moved in

Direct Examination - Dan Pacholke

1  that direction I would say, you know, since the PREA law has

2  been passed, and it's becoming more common.

3  Q.    You just mentioned the PREA law.  Is that because of the

4  PREA?

5  A.    I believe that's part of it, yes.

6  Q.    Could you explain that a little bit more?

7  A.    Well, part of it is, for my own perspective and my own

8  background, it really is looking for safe places to put people

9  where they can do their incarceration free of abuse or physical

10  harm.

11         Independent and at the same time, PREA is probably the

12  most substantial, probably the only federal regulations out

13  there on how prisons operate and it does put into place some

14  mechanisms or rules, not unlike asking people what their

15  preference for housing is upon intake when they're trans.

16         Some form of sexual safety along with some preference

17  around housing, some trans women want to be in a women's

18  facility and some don't, but that's all part of what's taken

19  into consideration.  I think all this came after the PREA law

20  was put into effect.

21  Q.    So your understanding is that under PREA, you need to

22  affirmatively ask somebody where they want to be housed?

23  A.    I don't know else you get the information but, yes, my

24  experience has been that people are typically asked.

25  Q.    And how does it generally work out when trans women are

Direct Examination - Dan Pacholke

1    housed in a female facility?

2    A.    Well, I think that people that manage those facilities

3    would tell you the biggest struggle right off the bat will be

4    more so the staff than the offender population, that there is

5    some education that needs to occur around the impacts of, you

6    know, medications and hormone therapy over time and around, you

7    know, gender-affirming treatment and that sort of thing, but

8    oftentimes it's you've got a fairly big hill to climb with

9    staff and it takes a warden or superintendant that is committed

10   to standing behind that.

11        Other than that, I think, you know, women's facilities are

12   drastically different than male facilities.  I mean, the

13   problems often are, you know, relationship issues, mental

14   health issues, medical issues, much more so than there are like

15   fights, gangs, and violence which you see more out of men.  But

16   the benefit of it is because the environment is situated around

17   a female gender, whether it's in the programs they offer or how

18   the staff interact with them or how the incarcerated display

19   themselves on the unit, it seems like it's a good fit, that it

20   works.

21   Q.    Going back to the specifics of this matter, you said you

22   listened to some of the testimony yesterday and that you had to

23   log off and some this morning.

24        Did you hear the testimony that the defendants considered

25   the fact that Ms. Grey killed two women as a reason to evaluate

Direct Examination - Dan Pacholke

1  whether she should be housed in a men's or a women's facility?

2  A.    The challenge there is, you know, oftentimes women, their

3  pathway to prisons is very different than men.  Oftentimes it's

4  evolved around relationship issues of one sort or another, so

5  it's not uncommon to have a lot of women in for violent crimes

6  within the context of relationships.

7       So you know, in my experience anyhow, the last five, six,

8  seven years or so, I mean, the number of violent offenders in

9  prison has only risen more as prisons have began to downsize,

10  so I don't know how you would consider that.  I mean, there

11  are, you know, people in prison for all kinds of different

12  violent crimes that impact both their own gender and opposite

13  genders as well.

14       (Audio gap.)

15            THE CLERK:  Ms. Golden, we can't hear you.

16            MS. GOLDEN:   -- romantic partner?

17            THE WITNESS:  I would say that is incompetent and

18  negligent and certainly in contrast to federal law.

19            THE CLERK:  Ms. Golden, the court reporter didn't

20  hear your last question.

21            MS. GOLDEN:  I'm sorry.  I will --

22  BY MS. GOLDEN:

23  Q.    I believe what I said is, from the perspective of a

24  corrections professional who is concerned with safety of both

25  staff and inmate, is it proper to house someone or cell someone

Direct Examination - Dan Pacholke

```
 1    with a romantic or sexual partner?
 2          Could you just repeat your answer for the record?
 3              THE WITNESS:  I mean, that would be both negligent,
 4    incompetent, and certainly inconsistent with the PREA laws.
 5    BY MS. GOLDEN:
 6    Q.    What kind of problems would result?
 7    A.    Well, one, to a certain degree you're sanctioning sexual
 8    activity which, you know, institutions prohibit.  You're
 9    creating an intimate relationship which could wind up in
10    conflict with the partner against other people they perceive as
11    harassing or intimidating or even flirting to a certain degree.
12    It just creates, you know, additional problems that you don't
13    need.
14    Q.    What does it suggest to you as a correctional expert that
15    the department housed Ms. Grey with her partner at WCI?
16              MS. DONOHO:  Your Honor, objection.  WCI is not on
17    trial here.  It's about her conditions at Patuxent.
18              THE COURT:  Yeah, it's hard for me to see the
19    relevance for purposes of this hearing and the request for
20    injunctive relief at this stage given that she's housed at
21    Patuxent.
22          Ms. Golden, do you want to be heard on that?
23              MS. GOLDEN:  No.  I'll move on.
24              THE COURT:  Okay.  Objection's sustained.
25    BY MS. GOLDEN:
```

Direct Examination - Dan Pacholke

1  Q.    As a corrections professional, can you talk about how --
2  what the standard is for using confidential informants in
3  prison and how that is to be evaluated?
4  A.    Well, typically with confidential informants, there's some
5  scoring routine where it would be a form or a document or some
6  way to establish that there is credibility and reliability with
7  a person that's providing that information.  Typically, it's
8  used in conjunction with other information or evidence that you
9  might have.  If there were, you know, multiple offenders on the
10 scene, how many did you interview, what was their consistency
11 of the information with a confidential informant.  But
12 typically with a CI there's some way to grade them to say that
13 they're credible and reliable.
14 Q.    And were you present for the testimony about Ms. Grey's
15 removal to ad seg based on the testimony of a charge of a
16 confidential informant?
17 A.    I was.
18 Q.    What does it say to you that the charge was thrown out but
19 Ms. Grey was continued to be held in segregation?
20 A.    Well, it said that they didn't have enough information to
21 sustain a guilty verdict in a disciplinary hearing, a due
22 process hearing, and I guess in followup to that, they decided
23 they would keep her on administrative segregation, which is a
24 way to continue to maintain her in Ad-Seg without necessarily a
25 due process hearing.

Direct Examination - Dan Pacholke

1    Q.    I'd also like to talk about the incident that I think you

2    heard discussed where there was another inmate, an inmate

3    janitor who was out on the tier who exposed himself to

4    Ms. Grey.

5    A.    Yes.

6    Q.    Does it make sense from a correctional professional

7    standpoint that no one was charged with a rule violation?

8    A.    No.  It doesn't make sense that the issue was not

9    investigated and that nobody was charged with a rule violation,

10   but as significant to me is the fact that someone was allowed

11   on that tier at 10 o'clock at night which appears to be without

12   any supervision at all in what is described as an open barred

13   front situation.

14        So if you have a person that you know is vulnerable and if

15   you have a person that you know has had some complaints and

16   issues with being harassed, whether it's being called names or

17   having her bra stolen or whatever the case may be, why would

18   you put them in a unit without video surveillance and in the

19   middle of the night let out a janitor with no supervision.

20        I mean, it seems contrary to all their other practices

21   around handcuffing all movement and strip searching and the

22   restrictions on different property items and stuff they may

23   have, so it just feels incongruent.  Why would you not

24   investigate it and then more importantly, why was she there,

25   why was the janitor there at 10 o'clock at night with no

Direct Examination - Dan Pacholke

1    supervision and no video surveillance.

2         MS. DONOHO:  Your Honor, I would object and ask that

3    answer be stricken for speculation.  He doesn't know any of the

4    actual background and has been going off of speculation and it

5    also misconstrued the prior testimony of AW Stewart.

6         THE COURT:  The objection's overruled.

7    BY MS. GOLDEN:

8    Q.   Is it standard or accepted correctional practice to

9    acceptable to tell an inmate if she doesn't -- that she won't

10   be charged for throwing water if she drops the charges against

11   another inmate for throwing water?

12   A.   No.  That sounds very informal and outside the rules.

13   Q.   And in your experience just generally, why would any

14   inmate not want to pursue criminal charges?

15   A.   Well, there can be a variety of reasons, but Ms. Grey

16   presents as a slight build -- she presents as a woman, slight

17   build, not very tall, not much body weight who's serving a

18   very, very long sentence.  So part of it could be just doesn't

19   want to be labeled a snitch and doesn't want to spend her

20   entire sentence in segregation.

21        Part of it could be that someone either relayed

22   information, hey, you better not follow through on that.  But I

23   think a lot of it can tie back to how they're viewed by the

24   general population of the prison system when they're facing

25   very long sentences and, at least in her case, it appears to be

Direct Examination - Dan Pacholke

1    a person that would struggle to physically defend herself.

2    Q.    Can you say a little bit more about what it means to be

3    marked as a snitch?

4    A.    Well, it really depends on where you're at, I suppose, in

5    which state that you're residing in, but overall, you know,

6    there's a rule, they're not supposed to tell on each other and

7    to a certain degree there is an inmate code around that and

8    sanctions can be placed against you by either the person that

9    you informed on, or perhaps their colleagues or friends or

10   perhaps just someone that wants to make a name for themselves

11   by saying, hey, I heard you're a snitch, I don't want you on my

12   unit.  I mean, those things are real.

13   Q.    When you say there's a rule and sanctions, a prison --

14   official prison rule?

15   A.    It's more inmate culture, I would say, around informing in

16   general.

17   Q.    And does that same cultural taboo apply to disciplinary

18   charges?

19   A.    Can you please repeat that?

20   Q.    Sure.  Does that same taboo about snitching apply not just

21   to criminal charges but internal disciplinary charges?

22   A.    Yes.

23   Q.    Okay.  I'd like to talk about the incident I think you've

24   heard described that Ms. Grey was charged with a disciplinary

25   violation for in the yard.

Direct Examination - Dan Pacholke

1    A.    Yes.

2    Q.    Do you hear that testimony?

3    A.    I do.

4    Q.    Okay.  Could you talk to us a little bit about as a

5    corrections professional how you analyze that sort of

6    allegation?

7    A.    Well, I mean, it seems strange that people from a distance

8    away through office windows would be able to hear that level of

9    conversation, and certainly the deputy warden that spoke

10   earlier described it in great detail around how this, you know,

11   activity from this recreation yard to these other cells was

12   kind of portrayed.  So on the one hand, there's that, there's

13   just -- you know, it's kind of funny how staff happened to be

14   close enough to be able to listen to these things in the way in

15   which they did.  The timing of it it's kind of peculiar and

16   doesn't seem like there was much follow up.

17   Q.    What do you mean by not much follow up?

18   A.    I don't know what more was done to substantiate that

19   allegation but it does seem kind of bizarre that someone would

20   be in a recreation yard by themselves and administrative staff

21   that are a ways away from this event in their offices would be

22   able to pay that much attention and get that level of detail

23   concerning what someone might be saying from a segregation yard

24   if, in fact, they could hear it at all.

25   Q.    Is any of that affected by the fact there was an officer

Direct Examination - Dan Pacholke

1    on the yard?

2    A.    Well, if there's an officer on the yard, which there was,

3    I'm sure, but you would think at the first sign of misconduct

4    that they would intervene, right, that they would have removed

5    the person from the yard rather than let it carry on, I

6    suppose.

7    Q.    And I think you also were online to hear the conversation

8    about the disciplinary charge about the texting through a third

9    party.

10   A.    Yes.

11   Q.    Can you describe to us how you view that as a corrections

12   professional?

13   A.    Well, I mean, this is without seeing the substance of the

14   text messages, but information gets relayed.  I mean, whether

15   it's through a common phone number and people having

16   discussions and wanting someone that they, you know, want to

17   communicate with, whether it be a family member or someone

18   where there's more of a friendship or romantic relationship.  I

19   mean, they're going to do it through paper-based mail, they're

20   going to do it over the phone, they're going to do it through

21   text messaging, any number of ways that they can.  The question

22   is what is the quality of that communication, but it occurs.  I

23   mean, it goes on.  I mean, most of the rules center on, you

24   know, third-party telephone calls.  I guess there's an

25   application for text messaging.  But it, once again, would

Direct Examination - Dan Pacholke

1    depend on what the messages were because people do want to

2    relay information.

3    Q.    The last incident I want to talk about I think relative to

4    the testimony about Ms. Grey's allegations of being assaulted

5    by a CO in the stairwell on the way to the rec yard.  Did you

6    hear that testimony earlier?  Do I need to summarize it?

7    A.    No.  No, no, I heard it.  Yes.

8    Q.    Okay.  From your experience, would that be considered a

9    serious incident?

10   A.    It's a very serious incident.

11   Q.    And what would be the accepted professional response to

12   that sort of allegation?

13   A.    Well, I guess first off is I would expect the chain of

14   command to include the warden in the facility, deputy wardens,

15   to understand what happened immediately at that hospital and to

16   see the reports and to see the photos, because they are kind of

17   shocking.

18        And then based on that, you know, you need to take some

19   sort of administrative action, whether it be assigning the

20   staff members involved to home, pending investigation, whether

21   it be, you know, moving Ms. Grey as well, perhaps to the female

22   unit or somewhere other than where she is at today, but it's a

23   very serious charge and certainly the photos reflect that.

24   Q.    Are there -- are those things that would make sense to do

25   after reviewing that photographic evidence?

Cross Examination - Dan Pacholke

1    A.    Yes.  Yes.  I mean, you would want to take very quick

2    decisive actions when you get that kind of report from an

3    outside hospital.

4    Q.    And in your professional opinion, where's -- what kind of

5    living situation is Ms. Grey least likely to be a target for

6    abuse?

7    A.    Probably in a women's facility.

8    Q.    Has all of your testimony here been to a reasonable degree

9    of professional certainty?

10   A.    Yes.

11           MS. GOLDEN:  Thank you.  No further questions.

12           THE COURT:  All right.  Let me ask Ms. Ratliff and

13   Ms. Donoho, I believe you indicated you were looking to end

14   around this time.  Do you want to -- let me just check in with

15   you about that, whether that's still the case or not.

16       Ms. Donoho?

17           MS. DONOHO:  Thank you, Your Honor.  I appreciate

18   that.  I know it's 11:30, but just given, you know, his

19   availability and we're all here and you just heard the

20   testimony, I'm going to leave my cross be very short and I

21   think we could at least finish with this witness.

22           THE COURT:  All right.  Thank you.

23                      CROSS EXAMINATION

24   BY MS. DONOHO:

25   Q.    Good morning.  Excuse me.  So I believe you said the

Cross Examination - Dan Pacholke

1  solitary confinement, the totality of conditions should really

2  be taken into account.  So have you looked at the conditions at

3  Patuxent?

4  A.    I've looked at some of the -- I guess the plaintiff's

5  deposition or interrogatory but, no, I have not looked at the

6  conditions.

7  Q.    Have you evaluated any correctional facility in Maryland?

8  A.    No.

9  Q.    When you mention that, you know, transgender inmates they

10  can choose their housing, at least they, you know, can state

11  their preference to their housing that they want to be in the

12  women's or male's facility.  The facility should still conduct

13  a case-by-case analysis; is that right?

14  A.    Yes.  I believe that's what typically occurs.

15  Q.    And in a case-by-case analysis, there are other

16  considerations other than the incarcerated individual's

17  preference, correct?

18  A.    Yes.

19  Q.    And are some of those considerations operational

20  considerations, safety considerations, things of that nature?

21  A.    I think safety would be, you know, very high on that list.

22  Q.    And you mentioned that Florida has a trans unit.  Is there

23  anything that's actually a violation of PREA of housing

24  transgender inmates by themselves?

25  A.    You can't force them into some sort of segregated unit

Cross Examination - Dan Pacholke

1   where you can't mandate that they all go to a certain unit, no.

2   Q.   And are you aware that the plaintiff has not been deposed

3   or filled out any interrogatories in this case yet?

4   A.   I read something that looked like an interrogatory and,

5   no, I'm not aware of that.

6   Q.   And for administrative segregation, do you need to go

7   through a due process hearing before, you know, a facility can

8   assign an incarcerated individual to an administrative

9   segregation?

10   A.   I would say no, but administrative segregation is reserved

11   for people that have some demonstrated threat of harm to self

12   or others or to the orderly operation of the facility.  So to

13   the degree in which you can tie it represents a significant

14   risk of harm to self or others or the orderly operation of the

15   institutions, that would be a qualifier to go on administrative

16   segregation.

17   Q.   And so it's correct that there's a multitude of reasons

18   why a certain incarcerated individual would be assigned to

19   administrative segregation?

20   A.   There can be, but they fall under those two kind of

21   umbrella statements I've just made about, you know, some risk

22   of harm or significant risk to the order of operation of the

23   facility.

24   Q.   And if there was a credible report from a reliable CI

25   about a threat to an incarcerated individual's safety, would

Cross Examination - Dan Pacholke

1  that suffice?

2  A.    Perhaps.  I mean, I would be curious to know what the

3  other evidence was and would not necessarily place someone on

4  administrative segregation because one person said they

5  represented a threat.

6  Q.    So you mentioned that the communications between

7  incarcerated individuals are more important than just the fact

8  that they are having communications.  Is it fair to say that

9  individuals having conversations that are sexual in nature,

10  that that would be problematic?

11  A.    Well, I suppose it could be.

12  Q.    Because didn't you earlier in your testimony say that

13  housing inmates together who have a sexual relationship that

14  that's improper?

15  A.    That is improper.

16  Q.    Right.  So if they were having communications that were

17  sexual in nature, would that not also be improper?

18  A.    It could be, I mean, but those conversations go on.  I

19  mean, they go on between men and women, you know, their family

20  on the outside, they go in the visit room, they go on in

21  housing units.  So I guess I would have to know more about that

22  because those kind of conversations do occur.

23  Q.    Well, I guess I mean conversations between inmates, so an

24  inmate is talking to another inmate and those conversations are

25  sexual.  Not that they're having --

1    A.    I would probably just need more context.  I mean, it could

2    be problematic and it could be humor in some ways.  I mean,

3    prison has its own set of that, too.  It's very different than

4    the outside world.

5    Q.    But would it be fair if the communications were in the

6    sense soliciting sex acts of that nature, would that be

7    problematic?

8    A.    It could be.  Once again, I mean, it's hard for me to draw

9    a hard line like that without knowing more.

10    Q.    So going back to your testimony about the recreation yard,

11    there were corrections officers on the yard so there was

12    supervision conducted there.  How is that odd that they would

13    be able to see what was going on?

14    A.    It's just a level of detail that I suppose the Assistant

15    Warden -- she seemed to know in tremendous -- in a tremendous

16    level of detail and in contrast to that knew little to nothing

17    about the person being evaluated by Mercy Hospital, so that to

18    me was odd.

19    Q.    Would it not be odd if, as you testified, that she

20    personally saw the acts that were happening in the yard?

21    A.    Well, one, I think it is odd that a deputy warden and a

22    lieutenant and others would have that kind of time at the

23    window.  Second to that, if the behavior was as described, then

24    why did not the officers end it when it first started?  I mean,

25    why didn't they, you know, terminate that yard or intervene in

Cross Examination - Dan Pacholke

1    that conflict?  How could it go onto the point where -- I don't

2    know how many floors away they were but they were floors away

3    through windows, how could they see and hear that to that great

4    level of detail rather than just intervene when it first

5    occurred and say, hey, you know, she's yelling up to these

6    people on this wing, we're going to cancel her yard.  I mean,

7    that, to me, would have been an appropriate intervention.  If

8    you let it go on, it's almost as if you're asking to see more

9    so you can to a certain degree justify more discipline.

10   Q.    I believe, though, that you mentioned that incarcerated

11   individuals sometimes joke with each other on some things and

12   not always sinister, correct?

13   A.    I did.

14   Q.    So you mentioned -- but now you're think that any kind of

15   her sort of her acting out they should have cracked down

16   immediately?

17   A.    I mean, as the way it's described in testimony, it just,

18   to me, if that was occurring, if you've got someone down there,

19   you know, whatever, giving you two fingers and cussing or

20   yelling up, it would have seemed like they would have

21   intervened and said, you got to knock that off, you know, we're

22   going to end your yard.

23   Q.    And do you know how long it took for them to intervene?

24   A.    I don't, but what I do know is, you know, both a

25   lieutenant and whoever works for him and then a deputy warden

Cross Examination - Dan Pacholke

1   were able to I guess witness or hear from some distance away at
2   a fairly great level of detail.
3   Q.    But then they did intervene once they heard, correct?
4   A.    I guess.  I mean, yes, they did intervene eventually.  I'm
5   just not sure why it took so long.
6   Q.    And in terms of the I guess the November 10th sexual
7   assault that caused her to go to Mercy -- and by "her" I mean
8   Ms. Grey -- isn't it true that your testimony is that there is
9   a current investigation underway and that actually Patuxent
10  officials would have transferred Ms. Grey out of the
11  institution but for this litigation?
12                  MS. GOLDEN:  Objection.
13                  THE COURT:  I'm not sure the basis for the objection.
14                  MS. GOLDEN:  That misstates the testimony, I believe.
15                  THE COURT:  Hold on one second.
16          Overruled.  You can answer, Mr. Pacholke.
17                  THE WITNESS:  Oh.  I mean, part of what I'm saying
18  here is this is a very serious allegation where there is some
19  physical evidence, at least photos like this from an outside
20  credible source being a hospital.  That would be something that
21  you would intervene in literally immediately.  It would be akin
22  to saying somebody escaped but we're not going to do anything
23  until we complete our investigation.  I mean, I don't know how
24  you could be running an institution, I certainly -- it wouldn't
25  happen on my watch that you could be running an institution,

1    get a report like that in from an outside hospital and say, oh,

2    well, we'll let that go through an investigative process, we're

3    not going to do anything, doesn't make sense.

4    BY MS. DONOHO:

5    Q.    But isn't it true that they are investigating, so it's not

6    that they're not doing anything; is that correct?

7    A.    I assume they're investigating but, you know, it's to not

8    understand and see the photos and understand the reports that

9    come from an outside credible source on physical abuse but yet

10   at the same time you can hear foul conduct in a recreation

11   yard, I mean, it doesn't make sense that that wouldn't rise to

12   the highest level in that institution immediately.

13   Q.    But isn't it not true, again, that testimony was that they

14   would have moved Ms. Grey but for this action?

15   A.    Well, I'm not suggesting that would be the immediate

16   action that you would take because you might remove those two

17   officers or three or however many there were.  That might be

18   the initial action in order to ensure that there's no

19   retaliation, there's no intimidation, that you have a fair and

20   open investigation, that to a certain degree you protected her

21   from further harm.  So that's what I don't hear.  All I hear

22   about is her and not looking at the credibility of the

23   information, the credibility of the evidence and how do we

24   protect her from harm.

25   Q.    I do believe that -- is it correct that you did testify,

Cross Examination - Dan Pacholke

1  though, that transferring Ms. Grey would be an appropriate

2  response?

3  A.   I don't know that I understood that.  Can you please say

4  that one more time?

5  Q.   Did you testify that transferring Ms. Grey was the

6  appropriate response?

7  A.   I think it would.  I mean, if there is a women's unit

8  inside that institution, then why could you not transfer her?

9  It's not like -- I guess you're not interfering with whatever

10 the Court proceeding is today.  You're saying it's the same

11 institution, we're giving a different housing assignment.

12           MS. DONOHO:  Correct.  Court's indulgence.  I have no

13 further questions for you.

14           THE COURT:  Thank you.  Any redirect?

15           MS. GOLDEN:  No, Your Honor.

16           THE COURT:  Thank you.  Thank you, Mr. Pacholke.

17 You're released from this proceeding.  Thank you.

18      So I'm checking back in with Ms. Ratliff and Ms. Donoho

19 about, I guess, moving forward from here.  I understand that

20 you have two more witnesses; is that correct?

21           MS. DONOHO:  That is correct.

22           THE COURT:  And we still have the time constraints

23 that we discussed yesterday; you all need to leave?

24           MS. DONOHO:  Right.

25           MS. RATLIFF:  Yes, Your Honor.

TRO Hearing - Volume II - 11/22/23

1          THE COURT:  I think we'll need to discuss scheduling,

2    completion of the presentation of evidence and with an eye

3    towards providing time for the parties to make any oral

4    arguments they want to make, with the understanding that you've

5    already briefed the issue.  And in planning your oral argument,

6    I wouldn't focus on things that you've already said in your

7    briefs, you know, just to keep the amount of time that we need

8    to spend on that reasonably limited.

9          From my -- I have a trial beginning on Monday, our court

10   is closed the next couple days for the holiday, so that trial

11   is slated to be three days long.  At first I was contemplating

12   perhaps ending one of those trial days early to accommodate an

13   hour or so of oral argument but if we need two more witnesses,

14   I think we're going to need more than an hour certainly, so I

15   think that the first day that I'm available for an extended

16   period of time would be next Thursday.  So I want to hear from

17   plaintiff's counsel first about their suggestions or

18   availability for rescheduling and then I'll turn to defense

19   counsel.

20          MS. WEBER:  Thank you, Your Honor.  Plaintiff's

21   counsel is available Thursday and we would just ask if anything

22   opens up in your schedule sooner, the sooner we could get back

23   in the better but we appreciate you accommodating us.

24          THE COURT:  Okay.  Ms. Ratliff and Ms. Donoho?

25          MS. RATLIFF:  Your Honor, I am available before 2:00

1    p.m. on Thursday and -- Ms. Donoho is not available on

2    Thursday.

3            MS. DONOHO:   I'm not available on Thursday or Friday.

4    I need to go to different facilities for different litigation.

5            THE COURT:   What about Monday through Wednesday?

6            MS. WEBER:   Your Honor, if I may?

7            THE COURT:   Yes.

8            MS. WEBER:   Certainly I understand that we have

9    multiple counsel but my understanding is Ms. Ratliff can send

10   leads from the Attorney General's Office, I would think they

11   have at large staff at the Attorney General's Office, we'd ask

12   that as long as one of them could be available since time is of

13   the essence, that we proceed.

14           MS. RATLIFF:   Your Honor --

15           THE COURT:   I still want to hear about Monday through

16   Wednesday because if Ms. Ratliff is not -- it sounds like Ms.

17   Ratliff or Ms. Donoho is available after 2:30, 2:30 next

18   Thursday.   That's going to put a limit on how much time we

19   could spend next Thursday because I have a sentencing scheduled

20   for that morning, so there are other time constraints so I

21   still want to hear where they're at on Monday through

22   Wednesday.

23           MS. DONOHO:   I am available Monday through Wednesday.

24           THE COURT:   Okay.

25           MS. RATLIFF:   I am as well, Your Honor.   I have a

TRO Hearing - Volume II - 11/22/23

1    brief status conference on Monday but I'm sure I can have
2    somebody cover it if necessary.
3              THE COURT:  Okay.  What about the plaintiff's
4    counsel?
5              MS. GOLDEN:  Monday, Wednesday, not Tuesday.
6              MS. WEBER:  We could be available -- I'm sorry, Your
7    Honor.  We could be available Monday and Wednesday but not
8    Tuesday, the 4th and the 6th.
9              THE COURT:  Right.  No, no, we're talking about the
10   27th and the 29th.
11             MS. WEBER:  Oh, I'm sorry.  Okay.  This coming Monday
12   and Wednesday.  So plaintiffs are available Monday and Tuesday,
13   Wednesday before 1 p.m., although if the only possibility is
14   Wednesday after 1 p.m. some combination of us will make it
15   work.
16             THE COURT:  Okay.  You said Monday and Tuesday?  I'm
17   sorry.
18             MS. WEBER:  Yes.  Monday the 27th and Tuesday the
19   28th are completely open.  And then our preference would be if
20   it's Wednesday the 29th, before 1 p.m. but if needed to go
21   later we would find a way to make it work.
22             THE COURT:  Okay.  One second here.  What about next
23   Friday?
24             MS. WEBER:  Plaintiff's counsel we're available
25   Friday, December 1st.

1          THE COURT:   Sounds like Ms. Ratliff's available but
2     not Ms. Donoho.
3          MS. RATLIFF:   That's right.
4          THE COURT:   I think we'll go ahead and tentatively
5     set it for next Friday to begin at 9:30.   If I can get earlier
6     availability I'll take into account the fact that everyone's
7     available on Monday or Tuesday and before 1 p.m. on Wednesday.
8     I don't think Thursday's going to work just given the
9     unavailability of counsel.   But we'll go ahead and set it
10    tentatively for Friday and if earlier availability opens up and
11    I'll alert the parties.
12         MS. RATLIFF:   So we're talking about the Friday
13    December 1st?
14         THE COURT:   December 1st, yes.
15         MS. RATLIFF:   Okay.   And Ms. Donoho is not available
16    that day.
17         THE COURT:   Correct.
18         MS. RATLIFF:   I mean, okay.   I understand, Your
19    Honor.   We did divide the work differently, but I understand
20    Your Honor's concern.
21         THE COURT:   I'm not sure what you mean by dividing
22    the work.
23         MS. RATLIFF:   I'm sorry.   Between our offices,
24    Ms. Donoho.
25         THE COURT:   I'm sorry.   I was looking at the wrong

1    screen.  It's Ms. Ratliff speaking.  You were covering one
2    witness and she was covering another; is that --
3            MS. RATLIFF:  Ms. Donoho is covering the two
4    remaining witnesses and has prepared them but I mean, I also
5    understand the time constraints with the Court and parties are
6    under.  My preference would be for both counsel to be
7    available.
8            THE COURT:  I'd like to get this done before next
9    week so that's the reason why I'm pushing forward.  So I think
10   defense counsel need to be prepared to shift that witness.
11           MS. RATLIFF:  Okay.  I understand, Your Honor.
12           THE COURT:  Who are the other two witnesses, can you
13   tell me?
14           MS. RATLIFF:  Yes.  It will be Jason Cleise.  He is
15   the case management supervisor at the Western Correctional
16   Institution.  And it's going to be Dr. Oscar Jerkins who is the
17   Chief Medical Director for DPSCS.  He also prepared an
18   affidavit that was attached to the defendant's opposition.
19           THE COURT:  Why do we need to hear from Mr. Cleise?
20   I'm not sure I understand.
21           MS. RATLIFF:  We had prepared him -- Your Honor, we
22   may not actually call him.  I have to review our notes but it
23   may not be that his testimony is specifically relevant
24   especially given some of Your Honor's observations, so we may
25   not call Mr. Cleise.

1          THE COURT:  I mean, if you feel like there's

2    something that I may be missing, I'll hear you out on it, but

3    if you make the assessment that given the issues presented in

4    the motion that, you know, his testimony wouldn't be relevant,

5    then I guess we don't need to -- we don't need to call him.  So

6    we're focused on Mr. Jerkins then, and how much time do you

7    anticipate needing Mr. Jerkins on direct examination?

8          MS. DONOHO:  We anticipated about 30 minutes on

9    direct, Your Honor.

10          THE COURT:  Okay.  That's going to be helpful to me

11    in terms of scheduling, and if we can fit this in earlier in

12    the week, I'll advise the parties on early next week about

13    that, but for now we'll just plan for next Friday at 9:30.

14          MS. WEBER:  No, Your Honor, if I may with respect to

15    Dr. Jerkins, one thing that might speed up that testimony, it

16    sounded initially like it's defendants were planning to call

17    Mr. Jerkins as an expert witness which we will challenge.  His

18    declaration as far as when I read it I don't see any expert

19    opinion.  I just see his own personal knowledge.  So if you're

20    able to resolve the expert issue earlier that would save us

21    time but I just wanted to highlight that.

22          THE COURT:  Is that the plan, Ms. Ratliff, to have

23    him offer expert opinion?

24          MS. RATLIFF:  No, Your Honor.  He will be testifying

25    to personal knowledge and -- yeah, personal knowledge, Your

1    Honor.

2              THE COURT:  Okay.  That's 30 minutes of testimony on

3    direct examination, so I guess that answers that, Ms. Weber.

4              MS. WEBER:  Yes.  Thank you.

5              THE COURT:  All right.  Unless there's anything else

6    for us to address before we adjourn, is there anything from

7    plaintiff's counsel?

8              MS. WEBER:  No.  Thank you, Your Honor.

9              THE COURT:  All right.  Anything from the defense?

10             MS. RATLIFF:  No, Your Honor.

11             THE COURT:  I hope you all enjoy the holiday, and

12   I'll see you next week.

13             MS. RATLIFF:  Same to you, Your Honor.

14             MS. DONOHO:  Thank you.

15             MS. WEBER:  Thank you, Your Honor.

16             MS. GOLDEN:  Thank you.

17        (The proceedings adjourned at 11:54 a.m.)

18                 CERTIFICATE OF OFFICIAL REPORTER

19        I, Amanda L. Longmore, Registered Professional Reporter
     and Federal Certified Realtime Reporter, in and for the United
20   States District Court for the District of Maryland, do hereby
     certify, pursuant to 28 U.S.C. § 753, that the foregoing is a
21   true and correct transcript of the stenographically-reported
     proceedings held in the above-entitled matter and that the
22   transcript page format is in conformance with the regulations
     of the Judicial Conference of the United States.

23
                          Dated this 8th day of February 2024
24                        -S-
                          _____
25                        AMANDA L. LONGMORE, RPR, FCRR
                          FEDERAL OFFICIAL COURT REPORTER

**'**

'80s [1] - 69:13
'90s [1] - 66:2

**1**

1 [11] - 26:1, 3; 29:17; 36:14; 37:6; 59:6; 97:13, 20; 98:7
10 [7] - 51:25; 52:5; 59:15; 60:8; 80:11, 25
10-minute [1] - 63:12
10/13 [1] - 14:18
10/17 [1] - 51:18
101 [1] - 2:13
104 [2] - 25:5; 26:12
10:20 [2] - 60:5
10:39 [1] - 64:1
10:50 [3] - 63:14, 23; 64:1
10th [14] - 34:1, 3, 10, 13; 35:1, 19, 25; 36:3, 25; 37:1, 18-19; 56:12; 92:6
11 [3] - 14:17; 15:1, 7
11/10 [1] - 14:18
115.42 [1] - 49:10
11:05 [1] - 73:19
11:09 [1] - 73:19
11:30 [1] - 86:18
11:35 [1] - 60:12
11:54 [1] - 101:17
12 [2] - 48:9, 16
120 [2] - 8:3; 17:20
13th [7] - 6:9; 7:16; 11:11; 37:16, 18-19; 38:1
14th [1] - 37:5
15 [1] - 57:14
16 [1] - 67:2
17 [1] - 67:2
17th [4] - 9:17; 10:8; 11:14; 13:11
18 [2] - 57:6; 67:2
1955 [1] - 54:10
1st [4] - 37:17; 97:25; 98:13

**2**

20 [2] - 48:23; 49:9
2002 [1] - 68:11
2016 [2] - 65:25; 66:2
2018 [2] - 65:15; 74:18
2022 [1] - 50:3
2023 [2] - 2:2; 17:25
2024 [1] - 101:23
20th [2] - 11:12, 16
22 [1] - 2:2
24-hour [2] - 16:16; 60:25
24/7 [1] - 52:1
26th [1] - 13:16
27th [2] - 97:10, 18
28 [1] - 101:20
28th [1] - 97:19
29th [2] - 97:10, 20
2:00 [1] - 95:25
2:30 [1] - 96:17

**3**

3 [4] - 2:3; 18:15; 47:13
30 [6] - 17:23; 18:5; 58:2, 25; 100:8; 101:2
30-day [2] - 58:6, 9
31st [1] - 38:2
33 [1] - 65:4
3rd [1] - 11:17

**4**

4 [2] - 2:6; 25:25
40 [1] - 67:3
42 [1] - 49:13
45 [1] - 2:7
4:45 [1] - 4:22
4th [2] - 57:19; 97:8

**5**

5 [1] - 64:23

**6**

6 [2] - 67:5
63 [1] - 2:7

**64** [2] - 2:10
**6th** [7] - 13:5; 20:16; 21:5, 14; 58:1; 97:8

**7**

753 [1] - 101:20
7th [4] - 21:7; 22:6, 8; 34:4

**8**

86 [1] - 2:11
8th [1] - 101:23

**9**

90 [1] - 43:25
94 [1] - 2:12
9:01 [1] - 3:2
9:30 [2] - 98:5; 100:13
9th [11] - 27:19; 30:24; 31:1, 11-12; 34:5; 35:23; 36:2, 5; 37:20; 59:11

**A**

a.m [9] - 3:2; 59:15; 60:8; 64:1; 73:19; 101:17
AA [1] - 12:4
AA/NA [2] - 11:22; 12:15
abilities [1] - 14:19
ability [4] - 18:6; 52:14; 58:13; 63:13
able [23] - 5:9; 6:4; 11:22; 12:14, 20; 15:9, 19; 25:1; 27:3; 32:17; 33:24; 40:14; 41:23; 46:25; 47:24; 49:10, 12; 83:8, 14, 22; 90:13; 92:1; 100:20
abnormal [1] - 71:18
above-entitled [1] - 101:21
abundance [1] - 8:14
abuse [3] - 75:9;

86:6; 93:9
abused [1] - 42:24
abusing [1] - 27:9
abusive [1] - 68:4
accept [1] - 57:23
acceptable [1] - 81:9
accepted [4] - 69:20; 70:13; 81:8; 85:11
access [22] - 14:18, 21-22, 25; 15:4, 6, 10, 16; 16:4, 11; 25:22; 37:10; 38:8, 18-19, 22, 24; 40:12; 55:6; 61:3; 62:8; 70:19
accommodate [2] - 33:25; 95:12
accommodating [1] - 95:23
according [3] - 49:25; 59:14; 60:7
account [2] - 87:2; 98:6
accountability [1] - 46:19
accurate [2] - 67:12, 16
accused [2] - 62:20, 22
act [17] - 6:18, 22; 7:4, 8, 15, 17; 8:9-11, 15; 9:2; 12:19, 21-22; 28:14
Act [1] - 48:21
acted [1] - 29:15
acting [1] - 91:15
action [19] - 8:1, 3, 6; 11:5; 15:24; 19:22; 21:10; 41:16; 44:1, 8; 62:2, 8, 12, 17; 66:19; 85:19; 93:14, 16, 18
actions [2] - 29:6; 86:2
activities [3] - 12:4, 6; 46:16
activity [2] - 78:8; 83:11
acts [3] - 52:23; 90:6, 20
actual [2] - 43:7;

81:4
ad [1] - 79:15
Ad [1] - 79:24
Ad-Seg [1] - 79:24
add [1] - 36:4
addition [1] - 14:2
additional [5] - 10:7; 13:12; 63:6; 71:16; 78:12
address [2] - 58:19; 101:6
addressing [1] - 58:16
adjourn [1] - 101:6
adjourned [1] - 101:17
ADJOURNED..... ......................... .... [1] - 2:13
adjustment [2] - 37:3, 5
admin [15] - 6:10; 11:13; 13:3; 15:16; 17:3, 13, 16; 18:19; 19:12, 23; 20:17; 21:6; 23:11; 37:4
administer [1] - 17:2
administration [2] - 9:15; 17:8
administrative [54] - 6:8; 7:11, 20, 22; 8:2, 5; 9:12; 10:11; 11:4; 12:25; 14:10, 15; 15:5, 7, 18, 22; 16:4, 7; 17:5, 9, 22; 18:1, 11, 15, 18; 19:13, 17, 20; 21:22; 24:11; 26:7, 23; 29:10; 37:11, 16; 38:13; 39:6, 10; 41:15; 46:1; 47:15; 51:1; 52:10, 12; 79:23; 83:20; 85:19; 88:6, 8, 10, 15, 19; 89:4
admitted [2] - 7:14, 16
admitting [1] - 40:8
advance [1] - 33:12

advise [1] - 100:12
advised [2] - 5:15; 6:25
affected [1] - 83:25
affidavit [2] - 55:10; 99:18
affirmatively [3] - 50:10; 51:6; 75:22
affirming [1] - 76:7
AG's [2] - 11:2; 20:22
agency [5] - 22:4; 49:17; 52:11; 53:9; 65:5
aggregated [1] - 69:19
ahead [4] - 12:5; 33:10; 98:4, 9
aim [2] - 18:10; 21:10
akin [1] - 92:21
al [3] - 2:1; 3:8
alert [1] - 98:11
alerted [1] - 30:9
allegation [13] - 8:8; 13:17, 23; 37:23; 47:20; 53:5; 55:15; 61:2; 72:13; 83:6, 19; 85:12; 92:18
allegations [12] - 4:21; 5:1; 9:24; 10:2; 35:11, 24; 42:15; 43:16, 20-21; 44:3; 85:4
alleged [10] - 5:5; 7:10, 15; 8:16; 9:2; 25:12; 44:6; 51:19; 52:5; 62:8
allegedly [2] - 12:19; 43:11
alleges [2] - 12:9; 41:2
alleging [1] - 5:10
allow [3] - 20:11; 33:16
allowed [4] - 30:10; 47:14; 58:10; 80:10
alluded [1] - 11:25
almost [4] - 71:9, 24; 72:9; 91:8

**alone** [8] - 40:3, 5,
11, 13; 42:16;
50:24; 70:21, 25
**AMANDA** [1] -
101:25
**Amanda** [2] -
13:15; 101:19
**amount** [3] - 42:9;
74:16; 95:7
**analysis** [2] -
87:13, 15
**analyze** [1] - 83:5
**announcement**
[1] - 66:11
**answer** [8] -
50:22; 53:24;
73:3, 8; 78:2;
81:3; 92:16
**answered** [1] -
51:10
**answers** [1] -
101:3
**anticipate** [1] -
100:7
**anticipated** [1] -
100:8
**anyhow** [2] -
74:14; 77:7
**anyway** [4] - 5:6;
13:1; 19:22;
20:3
**apologies** [1] -
4:7
**apologize** [5] -
44:22; 45:18;
72:11; 73:3
**appeals** [1] -
69:16
**applicable** [1] -
27:12
**application** [1] -
84:25
**apply** [2] - 82:17,
20
**appointing** [2] -
47:10; 61:25
**appreciate** [4] -
44:23; 63:17;
86:17; 95:23
**approach** [2] -
39:22; 65:24
**approached** [1] -
6:16
**appropriate** [5] -
10:5; 62:1; 91:7;
94:1, 6
**area** [7] - 7:14, 16;
28:17; 29:13;
32:16; 39:14;
60:3

**areas** [3] - 44:5;
51:23
**argue** [1] - 40:22
**argument** [2] -
95:5, 13
**arguments** [1] -
95:4
**Arizona** [2] -
67:24; 74:24
**ARP** [5] - 47:7;
50:25; 57:18,
22; 58:14
**ARPs** [8] - 10:10;
14:17, 25; 15:1;
57:13; 58:4, 15,
23
**arrangements** [1]
- 20:11
**arrival** [1] - 42:4
**arrive** [1] - 30:1
**arrived** [1] - 47:9
**articles** [1] -
65:17
**ass** [1] - 24:20
**assault** [8] -
35:12, 16, 19;
53:5, 14; 56:2;
92:7
**assaulted** [4] -
35:6; 42:22;
44:4; 85:4
**assaultive** [1] -
7:8
**asserting** [2] -
35:18, 20
**assessment** [2] -
21:18; 100:3
**assign** [2] - 49:15;
88:8
**assigned** [15] -
19:11; 24:22;
46:5, 8, 19;
49:25; 51:22,
24; 53:10; 58:1,
15; 61:19; 88:18
**assigning** [1] -
85:19
**assignment** [1] -
94:11
**assignments** [2] -
18:25; 49:17
**Assistance** [1] -
66:6
**Assistant** [14] -
3:22; 4:1, 18;
20:8; 30:22;
39:12; 44:25;
45:5, 10; 48:18;
49:4, 10; 73:25;
90:14

**assistant** [2] -
20:8; 28:4
**assume** [2] - 56:9;
93:7
**attached** [1] -
99:18
**attacker** [1] - 44:6
**attackers** [1] -
62:9
**attempted** [2] -
35:8; 55:24
**attending** [1] -
25:4
**attention** [3] -
72:12, 20; 83:22
**Attorney** [4] -
3:23; 4:1; 96:10
**attorney** [12] -
30:7, 9-10;
32:3, 19; 34:2;
59:19; 60:4, 7,
10; 61:5
**attorneys** [5] -
11:2; 20:21;
55:20; 61:3;
63:16
**audio** [1] - 77:14
**author** [1] - 66:4
**authority** [5] -
18:6; 23:23;
47:10; 61:25;
62:15
**authorized** [2] -
16:24; 17:7
**automatically** [1]
- 46:8
**availability** [4] -
86:19; 95:18;
98:6, 10
**available** [17] -
48:12; 95:15,
21, 25; 96:1, 3,
12, 17, 23; 97:6,
12, 24; 98:1, 7,
15; 99:7
**average** [2] -
18:17; 59:23
**AW** [1] - 81:5
**aware** [15] - 4:21;
12:13, 17; 14:6,
22; 15:12; 33:2;
47:5; 52:4;
55:15; 56:12;
61:6; 88:2, 5

**B**

**background** [2] -
75:8; 81:4
**bad** [1] - 41:9

**Baltimore** [2] -
20:25; 21:1
**barred** [1] - 80:12
**base** [1] - 72:9
**based** [16] - 22:2;
23:1; 26:12;
31:6; 32:10;
34:15; 42:15;
43:18; 53:15;
61:21; 62:1;
71:7; 79:15;
84:19; 85:18
**basic** [2] - 69:6;
70:18
**basis** [11] - 8:5;
17:20; 20:3;
41:4; 46:7, 10;
49:18; 66:10;
69:19; 92:13
**bat** [1] - 76:3
**beat** [1] - 26:10
**became** [2] -
15:12; 35:4
**becoming** [1] -
75:2
**beds** [1] - 65:24
**Beds** [1] - 68:15
**began** [2] - 68:12;
77:9
**begin** [1] - 98:5
**beginning** [1] -
95:9
**behalf** [1] - 3:23
**behavior** [8] -
25:19; 28:8, 10;
34:16; 71:16,
18, 22; 90:23
**behaviors** [1] -
71:25
**behind** [2] -
30:14; 76:10
**believes** [1] -
23:10
**Bell** [7] - 6:19, 25;
7:5, 9; 8:18;
14:2
**benefit** [1] - 76:16
**best** [4] - 39:18,
21; 42:12
**better** [3] - 45:18;
81:22; 95:23
**between** [14] -
5:22; 18:23;
23:5; 24:14;
25:3; 26:24;
28:18; 38:25;
40:15; 68:2;
89:6, 19, 23;
98:23
**beyond** [3] -

48:25; 53:23;
55:3
**big** [4] - 10:23;
28:19; 49:11;
76:8
**biggest** [2] -
20:10; 76:3
**bill** [2] - 74:18
**birth** [2] - 46:5, 8
**bit** [10] - 14:11;
46:11; 57:7;
63:10; 68:9, 22;
69:12; 75:6;
82:2; 83:4
**bizarre** [1] - 83:19
**BJA** [3] - 66:4, 6,
10
**blinds** [1] - 30:14
**blister** [1] - 17:1
**body** [5] - 10:13;
23:7; 42:6, 10;
81:17
**booth** [2] - 5:23,
25
**bordered** [1] -
28:18
**born** [3] - 33:21;
46:7
**bottom** [1] - 49:14
**bounds** [1] -
46:25
**bra** [1] - 80:17
**break** [4] - 63:11;
41; 72:25; 73:15
**breakout** [4] -
63:18, 22; 73:6,
15
**breast** [1] - 60:20
**breathing** [1] -
25:10
**brief** [4] - 65:23;
66:4; 68:14;
97:1
**briefed** [1] - 95:5
**briefing** [2] -
22:23; 55:2
**briefly** [8] - 13:10;
30:13; 63:16;
65:2, 6; 72:21;
73:5, 25
**briefs** [1] - 95:7
**Brill** [14] - 7:7;
11:9; 24:4, 7, 9;
25:7, 14; 26:21;
27:2; 36:17, 21,
25
**Brill's** [3] - 23:2;
24:7; 38:6
**bring** [2] - 18:2;
72:19

**brought** [1] -
30:11
**buddy** [1] - 26:11
**build** [2] - 81:16
**building** [4] -
12:11; 15:15;
39:5; 43:1
**Bureau** [1] - 66:6
**busywork** [1] -
19:11
**button** [1] - 63:22
**BY** [22] - 4:17;
30:21; 44:24;
45:9, 24; 48:17;
49:8; 50:17;
51:12; 54:6;
55:13; 57:5;
61:15; 64:19;
70:7; 74:5;
77:22; 78:5, 25;
81:7; 86:24;
93:4
**byproduct** [1] -
71:21

**C**

**California** [1] -
74:24
**camera** [2] -
54:10, 14
**cameras** [4] -
53:17, 20, 22;
54:8
**cancel** [1] - 91:6
**cannot** [1] - 33:12
**capability** [3] -
52:17; 54:4, 10
**Captain** [2] -
14:20; 58:11
**captain** [2] -
15:15; 65:9
**card** [5] - 32:24;
33:2, 4, 9, 14
**care** [2] - 16:13;
74:1
**career** [3] - 33:24;
65:2; 68:6
**Carlton** [5] - 6:18,
20, 25; 8:18;
14:2
**carry** [2] - 33:9;
84:5
**Carter** [1] - 14:20
**case** [38] - 5:17;
15:21; 26:8;
33:17; 39:9;
41:4, 14; 42:13;
46:6, 10, 16;
49:18; 53:7,

TRO Hearing - Volume II - 11/22/23

11-12; 54:5;
55:17; 56:9;
57:24; 58:1;
62:11, 23; 70:9;
72:13; 80:17;
81:25; 86:15;
87:13, 15; 88:3;
99:15
**case-by-case** [6] -
41:4; 46:6, 10;
49:18; 87:13, 15
**cases** [10] - 10:2;
41:11; 53:2;
66:25; 67:4, 10,
16, 23; 69:4, 8
**Category** [2] -
25:24; 59:6
**category** [4] -
26:1, 3; 36:14;
37:6
**caused** [1] - 92:7
**caution** [1] - 8:14
**cell** [15] - 26:10;
34:13; 35:2;
38:17; 40:5, 14;
51:20; 70:17,
21, 23; 71:2, 4;
77:25
**celled** [1] - 40:3
**cellfront** [2] -
70:20, 24
**cells** [5] - 14:11;
26:24; 39:8;
45:14; 83:11
**center** [1] - 84:23
**certain** [8] -
43:15; 78:7, 11;
82:7; 88:1, 18;
91:9; 93:20
**certainly** [14] -
69:3, 16; 71:7;
73:4; 74:14, 20,
23; 77:18; 78:4;
83:9; 85:23;
92:24; 95:14;
96:8
**certainty** [3] -
12:20; 32:10;
86:9
**CERTIFICATE** [1]
- 101:18
**Certified** [1] -
101:19
**certify** [1] -
101:20
**cetera** [2] - 35:6;
40:13
**chain** [3] - 46:23;
47:10; 85:13
**challenge** [2] -

77:2; 100:17
**chance** [1] - 13:6
**changed** [3] -
37:2, 8
**changes** [1] -
18:8
**characteristics**
[3] - 70:16, 22;
72:3
**charge** [14] -
12:21, 23; 25:6,
13; 52:21,
24-25; 59:3, 5,
14; 79:15, 18;
84:8; 85:23
**charged** [12] -
25:16; 26:1, 11;
27:11; 36:17,
21-22; 68:25;
80:7, 9; 81:10;
82:24
**charges** [9] -
8:25; 9:5; 59:15;
61:22; 81:10,
14; 82:18, 21
**check** [4] - 13:16;
33:17; 38:21;
86:14
**check-in** [1] -
13:16
**checked** [2] -
37:22; 60:11
**checking** [1] -
94:18
**Chief** [2] - 6:11;
28:10
**chief** [3] - 27:25;
28:9; 99:17
**Chloe** [1] - 3:7
**choice** [1] - 74:19
**choose** [1] -
87:10
**CI** [2] - 79:12;
88:24
**circumstance** [3]
- 33:19, 22;
43:24
**circumstances**
[5] - 12:22;
15:25; 32:8;
33:16, 20
**cis** [4] - 45:12, 14,
25; 46:3
**Civil** [1] - 66:17
**civil** [1] - 3:6
**claims** [1] - 43:19
**clarified** [3] -
15:16; 16:3;
47:12
**clarify** [3] - 47:17;

50:6; 59:1
**class** [1] - 66:19
**clean** [2] - 51:22,
24
**clear** [3] - 24:21;
43:20; 55:19
**cleared** [2] - 12:5
**Cleise** [3] - 99:14,
19, 25
**clergy** [1] - 32:3
**CLERK** [3] -
45:15, 19;
63:20; 64:11,
15; 73:17;
77:15, 19
**climb** [1] - 76:8
**close** [3] - 59:2;
67:18; 83:14
**closed** [2] - 18:18;
95:10
**CMHCJ** [1] - 28:2
**CO** [1] - 85:5
**co** [1] - 57:1
**co-counsel** [1] -
57:1
**code** [4] - 24:24;
25:1; 34:7; 82:7
**colleagues** [1] -
82:9
**college** [3] -
10:24; 20:24;
21:4
**combination** [1] -
97:14
**comfort** [1] -
56:24
**comfortable** [2] -
21:9; 42:8
**coming** [1] -
97:11
**command** [3] -
46:23; 47:10;
85:14
**COMMENCEME
NT** [1] - 2:3
**comments** [1] -
72:13
**commissary** [1] -
15:19
**committed** [4] -
24:1; 34:9;
50:25; 76:9
**common** [4] -
51:22; 74:13;
75:2; 84:15
**communicate** [2]
- 24:5; 84:17
**communicated**
[1] - 58:12
**communicating**

[2] - 24:16;
28:22
**communication**
[2] - 24:14;
84:22
**communication
s** [4] - 89:6, 8,
16; 90:5
**community** [6] -
6:22; 7:3; 11:9;
23:1; 69:1
**compensated** [1]
- 67:10
**complained** [1] -
57:8
**complaining** [1] -
52:22
**complaint** [19] -
7:21; 14:13;
15:11, 14, 21,
23, 25; 30:5;
31:5, 11; 35:22;
43:14; 53:8;
57:23; 61:10
**complaints** [18] -
10:8-10; 13:12;
15:8; 30:23, 25;
31:13; 36:6;
42:20; 43:4, 13;
50:25; 52:12;
58:12; 61:9;
80:15
**complete** [8] -
11:3; 43:12;
58:3; 61:7; 73:2,
8; 92:23
**completed** [4] -
9:18; 34:10;
43:21; 62:3
**completely** [1] -
97:19
**completion** [2] -
57:23; 95:2
**compliance** [1] -
28:4
**comply** [1] -
29:12
**component** [2] -
56:19
**computer** [1] -
49:12
**concern** [6] - 7:3,
6, 24; 13:24;
26:25; 98:20
**concerned** [2] -
9:4; 77:24
**concerning** [2] -
70:9; 83:23
**concerns** [2] -
9:21

**conclusively** [1] -
47:1
**concrete** [2] -
28:17
**conditions** [7] -
70:16; 71:4, 17;
78:17; 87:1, 6
**conduct** [5] -
59:20, 25;
61:23; 87:12;
93:10
**conducted** [3] -
29:22; 90:12
**conference** [1] -
97:1
**Conference** [1] -
101:22
**confident** [2] -
22:24; 23:1
**confidential** [13] -
6:15; 21:20, 24;
22:12, 15;
23:10, 17; 25:9,
12; 79:2, 4, 11,
16
**confinement** [10]
- 45:1; 66:15,
23; 69:25;
70:14; 71:6;
72:1; 87:1
**confirm** [3] -
12:14; 47:22;
60:13
**confirmation** [1] -
25:11
**confiscated** [5] -
17:7; 26:15, 25;
27:3; 38:5
**confiscation** [1] -
26:16
**conflict** [2] -
78:10; 91:1
**conflicts** [1] -
40:18
**conformance** [1]
- 101:22
**conjunction** [1] -
79:8
**connected** [1] -
5:1
**consensual** [2] -
8:10
**consider** [9] -
13:2; 22:12;
39:17; 46:6;
49:18; 50:15;
51:7; 62:18;
77:10
**consideration** [4]
- 10:22; 13:5;

49:23; 75:19
**considerations**
[5] - 17:14;
87:16, 19
**considered** [6] -
20:20; 50:23;
53:5; 71:1;
76:24; 85:8
**consistency** [1] -
79:10
**consistent** [2] -
23:8; 46:5
**constraints** [3] -
94:22; 96:20;
99:5
**consult** [1] - 57:1
**Consulting** [1] -
64:21
**consulting** [1] -
65:16
**contact** [2] -
24:14; 40:15
**contacted** [1] -
11:2
**contemplating** [1]
- 95:11
**content** [4] -
25:25; 26:2, 9,
12
**contents** [1] -
22:18
**context** [2] - 77:6;
90:1
**continuance** [1] -
3:9
**continue** [7] - 4:4,
10; 6:4; 8:4;
19:21; 43:17;
79:24
**continued** [2] -
19:24; 79:19
**Continued** [1] -
2:6
**CONTINUED** [1] -
4:16
**contraband** [4] -
29:21; 32:7, 17;
60:17
**contractor** [1] -
15:20
**contrary** [1] -
80:20
**contrast** [2] -
77:18; 90:16
**conversation** [8] -
5:12; 7:13;
25:15; 39:15;
50:23; 58:11;
83:9; 84:7
**conversations** [6]

- 55:20; 89:9, 18, 22

**convicted** [7] - 25:6, 13; 37:6; 56:1, 5, 7

**coordinator** [1] - 57:22

**copy** [4] - 24:8; 48:10; 57:13, 24

**Corporation** [1] - 65:12

**correct** [36] - 22:2; 32:12; 36:18; 43:22; 44:12, 16; 47:16, 25; 48:3, 5, 7; 50:8; 51:8; 53:6; 55:22; 56:2; 57:10; 58:7; 59:4, 10, 25; 60:17; 66:9; 87:17; 88:17; 91:12; 92:3; 93:6, 25; 94:12, 20-21; 98:17; 101:21

**correctional** [9] - 33:6; 41:11; 44:1; 65:5; 70:13; 78:14; 80:6; 81:8; 87:7

**Correctional** [2] - 3:8; 99:15

**Corrections** [4] - 39:24; 65:4, 11; 68:7

**corrections** [12] - 64:21; 65:16; 69:1, 21, 25; 74:7, 18; 77:24; 79:1; 83:5; 84:11; 90:11

**correctly** [1] - 52:8

**Corridor** [3] - 12:18; 29:17

**counsel** [18] - 3:11, 19; 4:3; 48:14; 57:1; 63:19, 21; 73:16; 95:17, 19, 21; 96:9; 97:4, 24; 98:9; 99:6, 10; 101:7

**country** [4] - 64:22; 65:12, 18

**couple** [1] - 95:10

**course** [10] - 10:23; 11:20; 17:8; 22:17;

---

33:23; 36:21; 41:8; 45:23; 47:2, 20

**COURT** [77] - 3:17, 21; 4:2, 6, 9, 14; 30:13, 17; 44:18; 45:7, 21; 48:14; 49:1, 7; 50:13; 51:11; 54:2; 55:5; 57:2; 62:25; 63:4, 9, 18, 21, 25; 64:2, 5, 16; 70:3, 5; 72:17, 24; 73:2, 7, 11, 14, 18, 20; 74:2, 4; 78:18, 24; 81:6; 86:12, 22; 92:13, 15; 94:14, 16, 22; 95:1, 24; 96:5, 7, 15, 24; 97:3, 9, 16, 22; 98:1, 4, 14, 17, 21, 25; 99:8, 12, 19; 100:1, 10, 22; 101:2, 5, 9, 11, 25

**Court** [10] - 3:3, 9; 29:1; 44:9; 47:7; 55:9; 62:12; 94:10; 99:5; 101:20

**court** [6] - 3:6; 45:15; 63:11; 70:12; 77:19; 95:9

**Court's** [3] - 56:25; 62:15; 72:20

**court's** [2] - 61:14; 94:12

**courtroom** [3] - 6:1; 67:3, 11

**cover** [1] - 97:2

**covered** [1] - 16:11

**covering** [3] - 99:1

**COVR** [1] - 43:25

**cracked** [1] - 91:15

**created** [1] - 8:15

**creates** [2] - 61:20; 78:12

**creating** [1] - 78:9

**credibility** [3] - 79:6; 93:22

**credible** [4] - 79:13; 88:24;

---

92:20; 93:9

**crime** [1] - 74:18

**crimes** [2] - 77:5, 12

**criminal** [7] - 9:5, 20; 52:9, 12; 81:14; 82:21

**CRIPA** [1] - 66:20

**cross** [2] - 45:7; 86:20

**Cross** [2] - 2:7, 11

**CROSS** [2] - 45:8; 86:23

**Cross-Examination** [2] - 2:7, 11

**cross-examination** [1] - 45:7

**Crystal** [1] - 24:7

**cuffed** [1] - 59:18

**culpable** [2] - 41:7

**cultural** [1] - 82:17

**culture** [1] - 82:15

**curious** [1] - 89:2

**current** [3] - 18:19; 64:20; 92:9

**cussing** [1] - 91:19

**custody** [3] - 9:14; 31:15; 35:10

**cut** [1] - 38:9

**CV** [1] - 64:25

## D

**D3** [4] - 10:12; 23:7; 50:24; 51:1

**daily** [2] - 12:12; 17:2

**DAN** [2] - 2:10; 64:13

**Dan** [2] - 64:8, 10, 13, 21

**danger** [3] - 7:9, 25; 10:20

**date** [4] - 51:14, 17-18; 60:6

**Dated** [1] - 101:23

**dates** [3] - 10:4; 27:21; 43:10

**dayroom** [3] - 28:20, 24; 40:12

**days** [9] - 17:23; 18:5; 43:25;

---

58:2, 24-25; 95:10

**deal** [1] - 68:7

**dealing** [2] - 66:15; 68:17

**dealt** [3] - 66:14; 67:19; 69:9

**Deborah** [1] - 3:14

**December** [3] - 97:25; 98:13

**decided** [2] - 46:10; 79:22

**decides** [1] - 17:21

**deciding** [1] - 49:15

**decipher** [1] - 25:2

**deciphered** [1] - 24:25

**decision** [18] - 7:10; 8:4; 10:5, 23, 25; 11:14; 20:22; 23:15, 20; 27:11; 39:12, 15, 21, 25; 42:7, 12; 57:25

**decisive** [1] - 86:2

**Decker** [1] - 13:15

**declaration** [1] - 100:18

**declined** [1] - 56:23

**defend** [1] - 82:1

**defendant's** [1] - 99:18

**defendants** [4] - 3:24; 4:1; 76:24; 100:16

**DEFENSE** [1] - 2:5

**defense** [3] - 95:18; 99:10; 101:9

**Defense** [1] - 65:12

**definitely** [2] - 10:22; 45:2

**definition** [1] - 70:13

**degree** [8] - 12:20; 78:7, 11; 82:7; 86:8; 88:13; 91:9; 93:20

**delay** [5] - 19:15; 32:15; 60:9, 25

**deliberations** [1] -

---

70:12

**deliver** [1] - 16:2

**delivered** [4] - 15:22; 16:1; 19:14; 70:23

**demonstrate** [2] - 29:1; 72:2

**demonstrated** [1] - 88:11

**denied** [2] - 7:16; 38:9

**department** [9] - 6:16; 11:20; 21:12; 22:5; 35:4; 50:19; 65:10; 69:2; 78:15

**Department** [5] - 3:7; 65:3; 66:7, 17; 68:6

**departments** [1] - 9:16

**deposed** [1] - 88:2

**deposition** [3] - 67:3, 11; 87:5

**deprived** [1] - 37:14

**deputy** [8] - 65:7; 68:23; 69:17; 83:9; 85:14; 90:21; 91:25

**describe** [6] - 65:21; 67:22; 68:9, 22; 69:12; 84:11

**described** [5] - 80:12; 82:24; 83:10; 90:23; 91:17

**designated** [3] - 40:6; 46:8; 52:11

**designed** [1] - 48:7

**designee** [6] - 23:19; 48:2; 49:5; 51:5; 61:25

**despite** [3] - 15:7; 38:4; 61:8

**detail** [7] - 10:1; 83:10, 22; 90:14, 16; 91:4; 92:2

**details** [3] - 43:6, 8, 12

**deteriorate** [1] - 71:18

**deterioration** [2] -

---

71:9, 14

**determination** [3] - 8:14; 9:7; 21:19

**determinations** [1] - 22:2

**determine** [7] - 11:22; 12:20; 21:16; 27:4; 29:20; 47:1

**determined** [2] - 12:22; 20:18

**developing** [1] - 11:24

**dialer** [4] - 14:19; 27:6, 15; 37:13

**dictate** [1] - 32:8

**dietary** [1] - 31:23

**different** [25] - 7:2; 9:16; 13:1; 17:9, 18; 31:18; 42:6, 21; 47:9; 53:9, 11; 65:6, 9; 66:18; 68:11; 70:11; 71:15; 76:12; 77:3, 11; 80:22; 90:3; 94:11; 96:4

**differently** [1] - 98:19

**DIMARTINO** [1] - 3:15

**DiMartino** [1] - 3:15

**DIRECT** [2] - 4:16; 64:18

**Direct** [2] - 2:6, 11

**direct** [6] - 20:25; 48:25; 55:4; 100:7, 9; 101:3

**directed** [1] - 19:6

**direction** [1] - 75:1

**directly** [2] - 28:6; 40:15

**director** [7] - 65:7; 66:10; 68:24; 69:17; 99:17

**disagreements** [1] - 40:20

**disciplinary** [26] - 7:1; 13:1; 15:17; 19:13, 20; 29:10; 37:7, 9; 39:7, 11; 44:1; 46:1; 47:17, 21, 25; 52:21, 24; 62:2; 69:18, 21; 70:2; 79:21; 82:17, 21, 24;

84:8
discipline [3] -
69:9, 15; 91:9
disclose [1] -
54:12
discovered [5] -
24:3; 25:19;
32:7; 34:4;
37:21
discuss [1] - 95:1
discussed [4] -
8:13; 9:23; 80:2;
94:23
discussion [1] -
55:23
discussions [2] -
13:4; 84:16
display [1] - 76:18
disrespect [2] -
6:23; 7:5
disrespectful [2] -
29:1; 31:8
distance [2] -
83:7; 92:1
distribution [1] -
36:5
District [4] - 3:3;
101:20
divide [1] - 98:19
dividing [1] -
98:21
Division [2] -
39:23; 66:18
DOC [5] - 19:22;
40:8, 10; 68:19,
23
Docket [1] - 3:6
docketed [1] -
18:4
document [5] -
48:18; 57:11;
64:24; 67:6;
79:5
documented [1] -
68:14
documents [2] -
14:24; 70:9
DOJ [3] - 66:4, 17,
20
done [9] - 17:19;
24:24; 32:8;
65:15, 17; 66:1;
67:23; 83:18;
99:8
DONOHO [11] -
3:25; 70:4;
78:16; 81:2;
86:17, 24; 93:4;
94:12, 21, 24;
96:3, 23; 100:8;

101:14
Donoho [11] -
3:25; 86:13, 16;
94:18; 95:24;
96:1, 17; 98:2,
15, 24; 99:3
DONOHO..........
.......... [1] - 2:11
door [2] - 71:2, 4
DOT [2] - 16:20
double [2] -
33:17; 40:6
double-cell [1] -
40:6
double-check [1]
- 33:17
down [15] - 13:19;
25:22; 26:17;
27:6, 13-14;
29:13, 16;
31:14; 44:4;
65:19, 21;
67:15; 91:15, 18
downsize [1] -
77:9
DPSCS [7] - 2:1;
11:2; 19:3; 45:2;
46:4; 50:1;
99:17
dramatic [1] -
71:12
drastically [1] -
76:12
draw [1] - 90:8
dressed [1] -
59:18
drive [1] - 71:17
drops [1] - 81:10
due [7] - 7:19;
11:18; 25:23;
54:9; 79:21, 25;
88:7
duly [1] - 64:10
during [8] - 6:19,
22; 11:20; 13:4;
14:14; 37:10;
47:23; 65:10
duties [2] - 51:24
duty [3] - 6:11,
13; 43:17

E

early [4] - 6:19;
68:11; 95:12;
100:12
eating [1] - 70:21
education [4] -

12:11; 20:6, 9;
76:5
educational [3] -
19:6, 11; 56:20
effect [2] - 21:23;
75:20
effectively [1] -
8:24
effects [1] - 71:6
effort [1] - 56:23
either [10] - 14:4;
18:8; 19:19;
28:19; 32:13;
41:12; 66:19;
67:11; 81:21;
82:8
Elimination [1] -
48:21
emergency [6] -
10:18; 17:19;
33:16, 20, 22;
39:9
employed [1] -
44:13
employee [1] -
61:23
employment [2] -
64:20; 68:19
empty [1] - 18:19
emptying [1] -
65:24
Emptying [1] -
68:14
encourage [1] -
20:15
end [3] - 86:13;
90:24; 91:22
ended [2] - 8:24;
30:7
ending [1] - 95:12
enemies [1] - 41:6
engaged [2] -
6:17; 25:18
enjoy [1] - 101:11
ensure [2] -
49:19; 93:18
entered [1] - 60:8
entire [4] - 9:23;
18:18; 38:4;
81:20
entirety [2] - 5:17;
24:8
entitled [2] -
47:18; 101:21
environment [3] -
42:2; 70:23;
76:16
environmental [1]
- 28:4
environments [1]

- 68:4
equivalent [1] -
24:5
escaped [1] -
92:22
escort [2] - 29:18;
60:9
escorted [5] - 5:7;
29:10; 35:8
especially [3] -
38:15; 39:24;
99:24
essence [1] -
96:13
essentially [9] -
5:11; 9:1; 11:15;
19:7; 24:5;
28:17; 29:2;
41:7; 71:17
establish [1] -
79:6
et [5] - 2:1; 3:8;
35:6; 40:13
evaluate [4] -
23:17; 61:20;
76:25
evaluated [3] -
79:3; 87:7;
90:17
evaluating [1] -
40:1
evaluation [1] -
35:15
Evan [1] - 3:20
evening [2] -
4:22; 6:15
event [2] - 4:25;
83:21
events [3] - 34:21,
24; 35:1
eventually [1] -
92:4
evidence [10] -
52:25; 53:3;
61:20; 71:5;
79:8; 85:25;
89:3; 92:19;
93:23; 95:2
evolved [1] - 77:4
exact [3] - 34:20;
51:14, 17
exactly [3] -
24:12; 51:3;
67:2
exam [4] - 56:11,
13, 19
Examination [4] -
2:6, 11
EXAMINATION
[4] - 4:16; 45:8;

64:18; 86:23
examination [4] -
4:10; 45:7;
100:7; 101:3
example [9] -
26:8; 31:21;
32:4; 41:4, 20;
58:9; 66:20;
71:23
except [2] - 18:19;
58:5
exception [2] -
33:4; 43:6
exclusively [2] -
71:25; 72:9
excuse [3] -
45:15; 57:7;
86:25
Excused...........
.........................
[2] - 2:7, 12
executive [1] -
68:25
exercise [1] -
23:22
exhibit [1] - 59:2
Exhibit [6] - 48:9,
16; 57:6; 64:23;
67:5
exhibits [1] -
70:11
exigent [1] -
33:20
exist [3] - 20:1;
45:2; 46:13
exists [1] - 46:3
exit [2] - 29:16
expect [1] - 85:13
expected [1] -
33:12
experience [15] -
40:19; 49:24;
50:2, 10; 66:15;
67:19, 22;
68:17; 69:10;
71:7; 74:6;
75:24; 77:7;
81:13; 85:8
experienced [1] -
33:24
expert [8] - 66:16,
22; 69:24;
78:14; 100:17,
20, 23
explain [1] - 75:6
explained [1] -
12:2
explicit [1] - 24:18
explicitly [1] -
50:23

explore [1] - 49:2
exposed [1] -
80:3
exposure [2] -
72:5
express [1] - 51:7
expresses [1] -
50:21
extended [1] -
95:15
external [2] -
52:25; 53:3
eye [1] - 95:2

F

face [2] - 30:15,
17
facilitate [1] -
19:8
facilities [9] -
19:22; 31:20;
39:25; 69:18;
74:11; 76:2,
11-12; 96:4
facility [53] - 5:15;
6:13, 17; 7:18;
9:7; 10:16; 13:2;
15:11; 18:9;
19:8; 20:1, 24;
21:3; 25:3;
29:11; 32:1;
35:10, 16;
38:11; 39:5;
41:22; 42:1, 23;
43:1; 44:6;
49:16; 52:1, 15;
53:10; 54:4, 10;
56:16; 60:8;
61:3, 17; 69:15;
73:21; 74:15,
17, 22; 75:18;
76:1; 77:1;
85:14; 86:7;
87:7, 12; 88:7,
12, 23
facility's [1] -
42:13
facing [1] - 81:24
fact [14] - 15:7;
24:4, 16; 61:8,
20-21; 62:1;
76:25; 80:10;
83:24; 89:7;
98:6
factor [1] - 13:22
fair [5] - 26:5;
42:15; 89:8;
90:5; 93:19
fairly [2] - 76:8;

92:2
**fall** [4] - 19:3;
39:23; 61:6;
88:20
**falls** [1] - 47:9
**false** [1] - 61:4
**familiar** [1] -
44:25
**family** [2] - 84:17;
89:19
**far** [5] - 19:6;
22:21; 70:12;
74:19; 100:18
**fast** [2] - 14:16;
47:20
**faster** [1] - 58:17
**fat** [1] - 24:20
**FCRR** [1] - 101:25
**fear** [2] - 22:16;
25:11
**February** [1] -
101:23
**feces** [1] - 72:5
**Federal** [1] -
101:19
**federal** [3] - 48:7;
75:12; 77:18
**FEDERAL** [1] -
101:25
**female** [21] - 5:4;
29:19, 24; 33:2,
6, 21; 39:4, 13;
40:2, 19; 46:7,
9; 49:16; 56:22;
76:1, 17; 85:21
**females** [3] - 40:8,
10; 45:20
**few** [3] - 57:1;
59:1; 68:1
**field** [2] - 65:16
**fight** [1] - 7:2
**fights** [1] - 76:15
**file** [5] - 15:21;
30:2; 35:5
**filed** [5] - 10:10;
14:17; 57:13,
19; 62:11
**filing** [1] - 58:14
**filings** [1] - 55:10
**filled** [1] - 88:3
**final** [4] - 23:21,
23; 68:24; 69:15
**finally** [2] - 25:5;
43:7
**findings** [4] -
61:20; 62:1
**fingers** [3] -
28:25; 29:3;
91:19
**finish** [1] - 86:21

**fire** [1] - 28:5
**firms** [1] - 66:18
**first** [26] - 11:13;
12:19; 13:10;
15:12; 21:22;
24:4; 26:25;
29:15; 30:9;
31:2; 33:13;
42:18; 47:8, 19;
56:18; 60:3, 24;
68:10; 73:3;
84:3; 85:13;
90:24; 91:4;
95:11, 15, 17
**fit** [2] - 76:19;
100:11
**five** [5] - 42:6;
59:23; 72:24;
73:14; 77:7
**five-minute** [2] -
72:24; 73:14
**fix** [1] - 58:13
**flip** [1] - 48:23
**flirting** [1] - 78:11
**floors** [3] - 28:21;
91:2
**Florida** [2] -
74:20; 87:22
**focus** [1] - 95:6
**focused** [1] -
100:6
**follow** [3] - 81:22;
83:16
**followed** [1] -
74:24
**following** [2] -
12:16; 47:3
**follows** [1] - 46:21
**followup** [1] -
79:22
**FOR** [2] - 2:5, 9
**force** [1] - 87:25
**foregoing** [1] -
101:20
**form** [6] - 15:21;
31:2; 52:7; 68:3;
75:16; 79:5
**formal** [2] - 15:24;
17:16
**format** [1] -
101:22
**formed** [1] - 66:10
**forms** [1] - 70:19
**forward** [1] - 66:9;
94:19; 99:9
**foul** [1] - 93:10
**four** [5] - 14:4;
28:21; 65:4;
67:23; 69:4
**frame** [1] - 44:6;

58:3; 60:6
**free** [1] - 75:9
**frequent** [1] - 18:6
**Friday** [8] - 56:15;
96:3; 97:23, 25;
98:5, 10, 12;
100:13
**friends** [1] - 82:9
**friendship** [1] -
84:18
**front** [3] - 60:8,
11; 80:13
**frozen** [1] - 60:14
**full** [4] - 14:18;
18:15; 43:11;
64:11
**fully** [2] - 43:5;
52:6
**function** [2] -
17:25; 18:14
**funny** [1] - 83:13

## G

**gang** [1] - 25:2
**gangs** [2] - 25:3;
76:15
**gap** [1] - 77:14
**Gaskins** [6] -
28:3, 6, 13;
29:4, 15; 33:1
**Gaskins'** [1] -
28:15
**gathered** [1] -
59:17
**GED** [2] - 20:6, 13
**gender** [6] - 41:1;
49:25; 76:7, 17;
77:12
**gender-
affirming** [1] -
76:7
**genders** [1] -
77:13
**General** [2] - 3:23;
4:1
**general** [34] - 8:1;
10:2, 6, 9, 17;
13:6; 17:7; 18:9;
19:25; 20:1;
21:3, 9, 11;
22:10; 23:13;
24:13, 15;
25:18; 32:1;
36:10; 37:3;
41:21, 24; 42:1,
11; 51:24;
62:14; 68:13;
71:20; 72:7;
81:24; 82:16

**General's** [2] -
96:10
**generally** [8] -
48:6; 53:22;
54:7; 58:18;
69:20; 71:5;
75:25; 81:13
**genital** [1] - 29:13
**Georgetown** [9] -
10:13; 14:16;
18:22; 19:2, 9,
14, 17; 20:6
**given** [18] - 9:25;
12:7, 9, 11;
14:15; 17:7;
18:25; 21:2;
43:5, 8; 49:23;
58:5; 67:11;
78:20; 86:18;
98:8; 99:24;
100:3
**globally** [1] -
40:25
**goal** [2] - 19:24;
20:2
**GOLDEN** [42] -
3:14; 45:9, 17,
23-24; 48:16;
49:4, 8; 50:17;
51:12; 54:6;
55:13; 56:25;
57:4; 61:14;
62:24; 63:8;
64:3, 8, 17, 19;
70:6; 73:5, 9;
74:5; 77:16,
21-22; 78:5, 23,
25; 81:7; 86:11;
92:12, 14;
94:15; 97:5;
101:16
**Golden** [15] -
3:14; 45:7, 15,
21; 49:1; 55:6;
63:7; 64:2, 16;
73:3; 74:4;
77:15, 19; 78:22
**GOLDEN............
......... [1] - 2:11
**GOLDEN.
........... [1] - 2:7
**Goldman** [3] -
30:5; 31:4; 35:7
**governs** [1] - 33:4
**grabbing** [1] -
44:5
**grade** [1] - 79:12
**grant** [1] - 68:10
**granted** [2] -
50:24; 70:5

**great** [3] - 83:10;
91:3; 92:2
**Grey** [102] - 2:1;
3:7; 4:21; 5:7,
14, 23; 6:8, 17;
7:5, 9, 13; 8:16,
22; 9:8; 10:7;
11:23; 12:13,
17; 13:12,
17-18; 14:9, 12,
24; 15:4; 16:7;
18:21, 25;
19:15; 20:17;
21:16; 22:10,
14, 18; 23:3, 5,
9, 15; 24:2, 4, 6,
10; 25:6, 8, 13;
26:20; 28:8, 16;
29:6, 25; 30:4;
31:12; 32:22;
34:18; 35:8, 18,
24; 36:19;
37:11, 14;
38:18; 39:1;
40:17; 42:3;
44:7, 11; 46:24;
47:5; 51:14;
53:14, 17;
56:11; 57:8;
59:3, 14, 18;
60:16; 61:2;
63:14, 19; 64:3;
72:12; 73:6, 15,
22; 76:25;
78:15; 79:19;
80:4; 81:15;
82:24; 85:21;
86:5; 92:8, 10;
93:14; 94:1, 5
**GREY** [3] - 63:15,
24; 72:23
**Grey's** [17] - 6:10;
9:23; 21:19;
26:14; 30:24;
34:2, 13; 37:4;
38:8; 39:17;
42:15; 50:22;
60:20; 62:18,
21; 79:14; 85:4
**group** [1] - 41:13
**guarantee** [1] -
33:5
**guess** [19] - 9:9;
64:6; 66:25;
69:15; 70:10;
71:23; 79:22;
84:24; 85:13;
87:4; 89:21, 23;
92:1, 4, 6; 94:9,
19; 100:5; 101:3

**guilty** [4] - 59:3,
6, 9; 79:21

## H

**half** [1] - 63:10
**hall** [3] - 28:1, 3, 7
**hallway** [1] - 28:1
**hand** [2] - 70:9;
83:12
**handcuffed** [2] -
29:8, 12
**handcuffing** [1] -
80:21
**handcuffs** [1] -
29:10
**handful** [1] -
18:19
**hands** [2] - 24:19;
29:13
**hanging** [1] - 29:2
**harassed** [3] -
23:6; 42:22;
80:16
**harassing** [3] -
9:25; 42:9;
78:11
**hard** [8] - 12:1, 7,
17; 45:16;
46:12; 78:18;
90:8
**harm** [9] - 48:8;
71:9, 24; 75:10;
88:11, 14, 22;
93:21, 24
**head** [2] - 47:22;
65:5
**headquarters** [1]
- 40:1
**health** [4] - 49:19;
68:5; 71:11;
76:14
**hear** [21] - 49:1;
60:14; 72:17;
76:24; 77:15,
20; 83:2, 8, 24;
84:7; 85:6; 91:3;
92:1; 93:10, 21;
95:16; 96:15,
21; 99:19; 100:2
**heard** [11] - 32:25;
47:8, 19; 70:3;
78:22; 80:2;
82:11, 24; 85:7;
86:19; 92:3
**HEARING** [1] -
2:2
**hearing** [24] - 3:9;
5:7, 18; 25:22;
26:4; 27:13;

36:16; 37:5;
42:18; 45:16;
47:20; 55:2, 21;
57:15, 17;
62:16; 78:19;
79:21, 25; 88:7
**hearings** [1] -
69:14
**held** [6] - 9:17;
47:15; 62:16;
72:10; 79:19;
101:21
**help** [1] - 63:22
**helpful** [1] -
100:10
**hereby** [1] -
101:20
**herself** [2] - 49:5;
82:1
**hideout** [1] -
24:21
**hiding** [1] - 29:21
**high** [2] - 22:25;
87:21
**higher** [1] - 31:7
**highest** [1] -
93:12
**highlight** [1] -
100:21
**hill** [1] - 76:8
**himself** [1] - 80:3
**history** [2] - 7:7;
9:23
**hit** [1] - 63:21
**hold** [5] - 11:3;
20:22; 29:18;
72:17; 92:15
**holding** [1] - 39:8
**holiday** [3] -
56:15; 95:10;
101:11
**home** [1] - 85:20
**Honor** [40] - 3:12,
22; 4:5, 15;
44:21; 45:23;
48:24; 55:8;
63:2, 24; 72:11,
15; 73:1, 5, 12,
17, 24; 74:3;
78:16; 81:2;
86:17; 94:15,
25; 95:20, 25;
96:6, 14, 25;
97:7; 98:19;
99:11, 21;
100:9, 14, 24;
101:1, 8, 10, 13,
15
**Honor's** [3] -
44:23; 98:20;

99:24
**Honorable** [1] -
3:4
**hope** [2] - 33:15;
101:11
**hormone** [1] -
76:6
**horribly** [1] - 23:5
**hospital** [4] -
85:15; 86:3;
92:20; 93:1
**Hospital** [3] -
35:14; 60:19;
90:17
**hour** [3] - 63:10;
95:13
**hours** [3] - 8:3;
17:20; 39:10
**house** [4] - 40:13;
43:18; 46:4;
77:25
**housed** [22] -
25:18; 39:4, 14,
19; 40:11, 16;
41:6; 42:19;
46:2; 47:5, 11;
49:25; 50:8, 24;
53:18; 74:10,
19; 75:22; 76:1;
77:1; 78:15, 20
**housing** [21] -
20:3; 31:25;
39:21; 40:9, 13;
41:25; 45:20;
46:1, 8; 49:17;
50:16; 66:12;
68:1; 75:15, 17;
87:10, 23;
89:13, 21; 94:11
**humor** [1] - 90:2
**hundred** [2] -
33:5; 42:7
**hundreds** [1] -
33:11
**hysterical** [1] -
35:4

## I

**idea** [1] - 55:22
**identification** [1] -
60:9
**identified** [4] -
21:20; 40:17;
46:9; 49:5
**identify** [5] - 3:11;
5:9, 13; 41:5, 16
**identifying** [1] -
43:7
**identities** [1] -

62:22
**identity** [3] - 5:14;
41:1; 49:25
**II** [5] - 2:2; 26:6;
33:6; 36:10
**IID** [36] - 8:18, 22;
9:4, 6, 18, 20;
11:3, 5, 7-8, 11,
14, 18; 13:21;
14:5; 21:25;
22:3; 30:12;
31:9; 36:2, 7;
43:4, 24; 44:1;
52:6, 9-10, 13,
16; 53:7, 10;
61:19; 62:4
**IID's** [1] - 61:6
**IIs** [2] - 10:19;
26:19
**ill** [1] - 5:24
**Illinois** [2] - 67:24;
74:16
**immediate** [6] -
8:1; 13:9; 16:3;
58:13; 62:7;
93:15
**immediately** [8] -
5:2, 16; 35:4;
71:10; 85:15;
91:16; 92:21;
93:12
**impact** [7] - 13:2;
20:10; 23:15;
41:18; 71:11;
77:12
**impacted** [1] -
74:18
**impacts** [3] -
40:9; 71:13;
76:5
**implementation**
[1] - 68:25
**implementing** [1]
- 49:6
**important** [3] -
20:7, 14; 89:7
**importantly** [1] -
80:24
**improper** [3] -
89:14, 17
**inappropriate** [1]
- 72:6
**incarcerated** [39]
- 6:18, 21;
10:20, 23; 16:6,
17, 25; 17:3, 11;
19:5, 16; 20:12;
21:17; 22:20;
25:17; 26:5;
28:23; 33:8, 13;

36:9, 14; 38:15;
40:18; 41:2;
43:24; 44:2;
48:8; 50:6, 15,
19; 54:13;
76:18; 87:16;
88:8, 18, 25;
89:7; 91:10
**incarceration** [1]
- 75:9
**incidence** [1] -
40:20
**Incident** [2] -
8:16; 13:21
**incident** [35] -
4:22; 6:13; 10:4,
18; 13:20; 14:2,
4, 7, 9; 23:4;
27:22; 34:2, 15;
36:1, 4, 20;
42:14; 43:14;
51:13, 16, 19;
52:6; 53:13;
54:22; 59:12;
60:25; 61:2, 5,
8; 80:1; 82:23;
85:3, 9
**incidents** [3] -
10:4; 13:7; 59:7
**include** [6] -
35:23; 36:7;
69:15; 70:20;
85:14
**included** [1] -
37:7
**includes** [1] -
32:18
**incompetent** [2] -
77:17; 78:4
**incongruent** [1] -
80:23
**inconsistent** [1] -
78:4
**independent** [5] -
8:19; 22:3;
65:16; 67:24;
75:11
**indicate** [1] -
32:24
**indicated** [4] -
38:3; 44:19;
74:1; 86:13
**individual** [38] -
6:18, 21; 7:2,
24-25; 10:23;
16:6, 18, 25;
17:5, 11; 19:16;
21:11; 22:18;
25:10, 17; 26:2,
5; 29:9; 33:8,

13; 36:9, 15;
39:10, 19; 41:2,
12, 18, 21; 42:4;
43:24; 44:3;
46:9; 50:16;
66:19; 88:8, 18
**individual's** [4] -
22:20; 50:20;
87:16; 88:25
**individuals** [30] -
10:20; 12:6;
17:3; 18:20;
19:5, 19; 20:12;
21:17; 24:14;
28:23; 31:21;
32:2, 23; 33:21;
38:15, 24; 40:7,
16, 18-19; 41:5,
13; 46:6, 19;
48:8; 50:11;
54:13; 89:7, 9;
91:11
**indulgence** [4] -
56:25; 61:14;
63:17; 94:12
**informal** [2] -
58:16; 81:12
**informally** [1] -
58:19
**informant** [11] -
6:16; 21:21, 24;
22:12, 15;
23:10, 17; 25:9,
12; 79:11, 16
**informants** [2] -
79:2, 4
**information** [19] -
21:25; 22:1, 22;
23:18, 24; 36:3,
7; 55:10; 67:9;
75:23; 79:7, 11,
20; 81:22;
84:14; 85:2;
93:23
**informed** [5] -
33:1; 60:22;
61:11; 82:9
**informing** [1] -
82:15
**infraction** [2] -
35:3; 46:25
**initial** [11] - 7:13;
8:2; 9:12; 11:10;
13:15; 17:19-21;
31:8; 93:18
**initiate** [1] - 30:6
**initiated** [2] -
7:21; 30:23
**initiative** [1] -
18:12

**injunctive** [1] -
78:20
**inmate** [22] - 6:20;
13:12; 16:6;
31:1; 34:11;
39:13; 40:3;
49:16, 24; 51:6,
15; 77:25; 80:2;
81:9, 11, 14;
82:7, 15; 89:24
**inmate's** [4] -
49:19, 22;
50:18; 51:5
**inmates** [8] -
9:25; 41:2; 42:9;
49:16; 87:9, 24;
89:13, 23
**innovative** [1] -
65:14
**input** [1] - 9:16
**inside** [5] - 52:14;
56:12; 74:15,
17; 94:8
**institute** [1] - 39:1
**Institute** [4] -
39:6; 40:3;
44:14; 65:11
**institution** [12] -
18:23; 29:9;
56:1, 4, 12;
72:20; 92:11,
24-25; 93:12;
94:8, 11
**Institution** [4] -
39:23; 43:18;
45:3; 99:16
**institutional** [2] -
20:10; 52:18
**institutions** [3] -
44:15; 78:8;
88:15
**intake** [1] - 75:15
**intel** [11] - 6:16,
25; 8:12; 9:15;
11:20; 12:22;
21:12, 14; 22:4;
23:18; 35:3
**intent** [1] - 27:14
**interact** [1] -
76:18
**interaction** [3] -
5:12, 22; 6:1
**interacts** [1] -
68:5
**interest** [4] -
42:12; 61:17;
62:3
**interfere** [1] - 16:4
**interfered** [2] -
14:23; 15:10

TRO Hearing - Volume II - 11/22/23

interfering [1] - 94:9
intermixed [1] - 26:24
internal [4] - 11:20; 22:4; 52:14; 82:21
interpretation [1] - 50:18
interrogatories [1] - 88:3
interrogatory [2] - 87:5; 88:4
interrupt [1] - 30:13
interrupting [1] - 72:12
intersection [1] - 68:2
intersex [2] - 49:16, 22
intervene [7] - 84:4; 90:25; 91:4, 23; 92:3, 21
intervened [1] - 91:21
intervention [2] - 69:16; 91:7
interview [2] - 30:11; 79:10
interviewed [4] - 8:22; 11:12; 14:20; 31:4
intimate [1] - 78:9
intimidating [1] - 78:11
intimidation [1] - 93:19
investigate [6] - 6:5; 11:16; 43:7; 53:11; 58:15; 80:24
investigated [6] - 15:2; 35:25; 43:5; 52:6; 80:9
investigates [2] - 52:9
investigating [4] - 11:21; 52:18; 93:5, 7
investigation [45] - 6:3; 7:12; 8:19, 23-24; 9:3, 6, 9, 11, 18-19; 11:4, 6-8, 11, 15, 18; 14:1, 6, 8; 15:9, 24; 26:6; 27:8; 34:5, 8, 10;

36:8; 43:12; 44:2, 7; 57:23; 58:2, 8; 61:7, 16; 72:22; 85:20; 92:9, 23; 93:20
investigations [6] - 8:7; 10:1; 14:5; 43:21; 66:17, 21
investigative [8] - 8:23; 21:12; 22:4; 52:11; 53:9; 57:25; 62:4; 93:2
investigator [2] - 61:19
investigatory [1] - 52:14
involuntary [1] - 42:5
involved [6] - 5:5, 10, 14; 30:4; 40:1; 85:20
involvement [1] - 69:2
involving [1] - 69:4
isolated [1] - 71:21
isolation [1] - 72:10
issue [14] - 15:18; 27:4; 41:20; 43:25; 50:16; 55:25; 57:25; 58:13; 68:13; 74:24; 80:8; 95:5; 100:20
issued [5] - 27:2; 37:6; 46:18; 47:1, 23
issues [16] - 13:24; 14:20; 41:2, 12, 23; 54:9; 58:16; 68:1; 69:18; 76:13; 77:4; 80:16; 100:3
items [1] - 80:22
itself [5] - 24:11; 25:24; 38:16; 65:23; 71:17

**J**

jail [1] - 65:14
janitor [4] - 51:15; 80:3, 19, 25
January [2] -

17:25; 18:14
Jason [1] - 99:14
JCI [2] - 20:23, 25
Jerkins [5] - 99:16; 100:6, 15, 17
Jessica [1] - 3:12
joke [1] - 91:11
Judicial [1] - 101:22
juicy [1] - 24:19
July [1] - 50:3
jurisdiction [2] - 19:3; 61:6
jurisdictions [1] - 68:1
Justice [3] - 66:6, 17
justify [1] - 91:9

**K**

keep [14] - 12:7; 16:21, 23-25; 17:4, 6, 21; 32:25; 33:13; 47:24; 48:7; 79:23; 95:7
Keith [3] - 15:19; 16:1
Kelly [1] - 3:25
killed [1] - 76:25
KIMBERLY [1] - 2:6
kind [23] - 10:21; 12:9; 15:24; 16:13; 17:19; 24:18; 46:15; 52:18; 66:3; 69:2; 71:22; 78:6; 83:12, 15, 19; 85:16; 86:2, 4; 88:20; 89:22; 90:22; 91:14
kinds [1] - 77:11
knock [1] - 91:21
knowing [1] - 90:9
knowledge [13] - 15:1; 37:10, 13; 39:3; 43:15; 50:1; 57:10; 58:14; 60:18; 100:19, 25
known [1] - 54:23
KOP [2] - 16:20
KREVOR [1] - 3:18
Krevor [1] - 3:18

**L**

labeled [1] - 81:19
lack [1] - 57:9
lag [4] - 58:6, 9, 12
language [4] - 24:18; 25:6; 26:12; 28:12
large [3] - 28:17; 58:5; 96:11
last [9] - 4:22; 5:19; 18:16; 38:11; 64:13; 73:8; 77:7, 20; 85:3
late [1] - 69:13
laughing [1] - 29:3
launch [3] - 8:19; 10:1; 15:24
launched [1] - 14:1
Lauren [1] - 3:15
law [6] - 66:18; 68:24; 75:1, 3, 19; 77:18
laws [2] - 48:7; 78:4
lawsuits [2] - 66:19
layout [1] - 14:11
leaders [1] - 25:2
leads [1] - 96:10
least [21] - 13:8; 14:17; 15:18; 16:9; 18:17; 26:8; 32:21; 37:12; 41:18; 42:2, 6; 60:24; 67:23; 69:4; 81:25; 86:5, 21; 87:10; 92:19
leave [5] - 31:23; 44:5; 70:17; 86:20; 94:23
leaving [1] - 32:5
led [2] - 6:10; 25:25
left [5] - 5:18; 9:6; 26:17; 60:10; 66:2
less [2] - 18:17; 59:23
level [11] - 12:23; 21:17; 56:24; 61:24; 83:8, 22; 90:14, 16; 91:4; 92:2; 93:12
levels [1] - 31:20

liaison [2] - 18:23; 19:7
liaisons [1] - 24:22
lieutenant [5] - 30:5; 65:9; 69:13; 90:22; 91:25
Lieutenant [9] - 28:3, 6, 13, 15; 29:4, 15; 31:4; 33:1; 35:7
lightly [1] - 23:16
likelihood [1] - 71:10
likely [3] - 12:22; 39:25; 86:5
limit [2] - 41:24; 96:18
limitation [1] - 44:20
limited [3] - 52:17; 54:10; 95:8
line [1] - 90:9
list [3] - 36:6; 46:17; 87:21
listed [2] - 9:1; 72:7
listen [1] - 83:14
listened [2] - 70:11; 76:22
listening [1] - 23:1
listing [3] - 8:16; 10:3
literally [1] - 92:21
litigation [2] - 92:11; 96:4
live [1] - 74:14
living [1] - 86:5
located [1] - 46:20
location [2] - 39:21; 54:7
locations [1] - 54:12
lock [1] - 27:13
locked [3] - 25:22; 27:6, 11
lockup [1] - 20:13
lodged [1] - 15:11
log [1] - 76:23
logbook [2] - 54:24; 60:7
logbooks [5] - 54:16; 55:1, 11, 24
logs [1] - 55:1

long-term [1] - 19:23
Longmore [1] - 101:19
LONGMORE [1] - 101:25
look [17] - 9:3; 10:15, 21; 21:8; 23:24; 28:9, 11; 39:20; 41:7, 17; 43:10; 47:21; 55:24; 57:15; 68:12; 69:7; 71:3
looked [8] - 14:13; 29:14; 67:25; 70:10; 87:2, 4-5; 88:4
looking [12] - 27:24; 28:16, 20, 22; 34:21; 40:8; 66:18; 71:7; 75:8; 86:13; 93:22; 98:25
looks [3] - 63:14; 64:3, 25
low [1] - 72:9
lower [2] - 30:14; 31:20

**M**

ma'am [3] - 66:8, 13, 24
Maddox [1] - 3:5
mail [4] - 58:10, 21, 24; 84:19
maintain [2] - 46:18; 79:24
maintenance [2] - 31:24; 54:9
major's [1] - 5:8
majority [1] - 7:18
makeup [1] - 71:4
male [9] - 10:13; 33:23; 43:2; 49:16; 56:13, 20, 22; 74:22; 76:12
male's [1] - 87:12
males [1] - 58:22
manage [2] - 68:15; 76:2
managed [1] - 69:14
management [4] - 33:17; 49:20; 69:25; 99:15
manager [1] -

72:13

**manager's** [1] - 46:17

**managers** [2] - 5:17

**mandate** [1] - 88:1

**manipulation** [1] - 72:4

**marked** [1] - 82:3

**Mary** [1] - 18:15

**Maryland** [3] - 3:4; 87:7; 101:20

**mass** [1] - 41:12

**Massachusetts** [1] - 74:17

**masses** [1] - 41:17

**massive** [1] - 42:9

**materials** [4] - 14:14, 21, 23, 25

**matter** [12] - 3:6, 8; 8:25; 9:5, 16, 20; 11:21; 31:22; 52:24; 58:24; 76:21; 101:21

**matters** [1] - 52:19

**Matthew** [1] - 3:4

**maximum** [1] - 29:9

**MCE** [1] - 31:24

**MCIW** [4] - 39:11, 24; 40:24; 50:9

**meals** [1] - 70:20

**mean** [45] - 16:20, 23; 28:25; 64:5; 66:16; 70:15; 71:7, 19; 72:8; 73:7; 76:12; 77:8, 10; 78:3; 80:20; 82:12; 83:7, 17; 84:13, 19, 23; 86:1; 89:2, 18-19, 23; 90:1, 8, 24; 91:6, 17; 92:4, 7, 17, 23; 93:11; 94:7; 98:18, 21; 99:4; 100:1

**means** [2] - 16:25; 82:2

**mechanisms** [1] - 75:14

**medical** [14] - 16:13; 17:7; 30:8; 31:15;

35:9, 13; 56:23; 60:3; 76:14; 99:17

**medication** [3] - 16:16; 17:12; 70:19

**medications** [6] - 16:24; 17:1, 4, 6; 76:6

**meet** [1] - 61:9

**meeting** [7] - 9:17; 13:11; 18:3; 21:6; 22:8

**meetings** [4] - 9:13; 12:5; 17:15, 17

**member** [3] - 33:11; 35:3; 84:17

**members** [4] - 33:11; 42:21; 43:16; 85:20

**memorandum** [1] - 19:4

**memory** [1] - 47:25

**men** [8] - 45:14; 46:3; 56:1, 4-5; 76:15; 77:3; 89:19

**men's** [1] - 77:1

**mental** [4] - 68:5; 71:11; 76:13

**mentally** [1] - 71:15

**mention** [1] - 87:9

**mentioned** [10] - 18:21; 36:17; 47:12; 68:16; 74:6; 75:3; 87:22; 89:6; 91:10, 14

**Mercy** [8] - 35:14, 17; 56:24; 60:19, 24-25; 90:17; 92:7

**Merrilyn** [1] - 3:23

**message** [5] - 23:8; 25:7, 9, 14; 38:2

**messages** [22] - 23:25; 24:17, 24; 25:25; 26:2, 9, 13, 18; 27:15; 34:4, 6, 15; 36:20, 22; 37:15, 19, 21-22; 84:14; 85:1

**messaging** [2] -

84:21, 25

**met** [1] - 9:23

**middle** [4] - 28:25; 29:3; 30:7; 80:19

**might** [10] - 27:1; 43:1; 48:10; 60:2; 79:9; 83:23; 93:16; 100:15

**mindful** [1] - 44:18

**minute** [3] - 33:15; 72:24; 73:14

**minutes** [6] - 57:1, 14; 59:24; 63:16; 100:8; 101:2

**misconduct** [2] - 71:19; 84:3

**misconstrued** [1] - 81:5

**missing** [1] - 100:2

**mission** [1] - 17:25

**misstates** [1] - 92:14

**misuse** [2] - 25:23

**misusing** [1] - 27:9

**MJM-23-1047** [1] - 3:7

**Monday** [15] - 21:6, 14; 95:9; 96:5, 15, 21, 23; 97:1, 5, 7, 11-12, 16, 18; 98:7

**money** [2] - 24:25; 25:3

**MONOD** [1] - 3:20

**Monod** [1] - 3:20

**month** [5] - 6:11; 37:22, 24-25; 38:1

**months** [2] - 18:16; 65:4

**morning** [19] - 3:12, 15, 17, 21-22, 25; 4:2, 18-19; 5:19; 21:14; 34:19; 45:10; 47:12; 70:12; 76:23; 86:25; 96:20

**most** [8] - 10:1; 38:23; 41:7; 42:2; 70:23;

75:12; 84:23

**mostly** [1] - 18:19

**motion** [1] - 100:4

**MOU** [1] - 19:4

**move** [4] - 18:8; 34:1; 64:6; 78:23

**moved** [6] - 17:5; 26:3, 7, 11, 23; 36:23; 74:25; 93:14

**movement** [5] - 25:3; 30:18; 44:10; 70:24; 80:21

**moving** [3] - 32:15; 85:21; 94:19

**Moye** [2] - 63:18; 73:20

**MR** [1] - 3:20

**MS** [117] - 2:6, 11; 3:12, 14-15, 18, 22, 25; 4:5, 7, 15, 17; 30:21; 44:17, 21, 24; 45:4, 9, 17, 23-24; 48:16, 24; 49:4, 8; 50:12, 17; 51:10, 12; 53:23; 54:6; 55:3, 8, 13; 56:25; 57:4; 61:14; 62:24; 63:2, 8, 15, 24; 64:3, 8, 17, 19; 70:4, 6-7; 72:11, 19, 23; 73:1, 4-5, 9, 12, 24; 74:3, 5; 77:16, 21-22; 78:5, 16, 23, 25; 81:2, 7; 86:11, 17, 24; 92:12, 14; 93:4; 94:12, 15, 21, 24-25; 95:20, 25; 96:3, 6, 8, 14, 23, 25; 97:5, 11, 18, 24; 98:3, 12, 15, 18, 23; 99:3, 11, 14, 21; 100:8, 14, 24; 101:4, 8, 10, 13

**multidisciplinary** [4] - 8:6; 9:13; 39:16, 22

**multiple** [9] - 18:25; 20:17;

24:1; 42:20; 47:6; 50:25; 79:9; 96:9

**multitude** [1] - 88:17

**murdering** [2] - 56:5, 8

**Muslim** [11] - 6:19-22; 7:2-4; 11:9, 22; 12:4; 22:25

**mute** [1] - 4:6

---

**N**

---

**NA** [1] - 12:4

**name** [5] - 5:14; 64:11, 13; 82:10

**names** [3] - 10:3; 43:10; 80:16

**Nancy** [2] - 18:16; 47:13

**National** [1] - 65:11

**nature** [8] - 24:22; 35:12; 43:18; 71:2; 87:20; 89:9, 17; 90:6

**near** [1] - 5:24

**necessarily** [5] - 22:1; 58:9; 71:3; 79:24; 89:3

**necessary** [3] - 20:19; 31:17; 97:2

**need** [25] - 34:20; 35:5; 45:13, 25; 52:20; 53:1, 4; 63:11; 75:21; 78:13; 85:6, 18; 88:6; 90:1; 94:23; 95:1, 7, 13-14; 96:4; 99:10, 19; 100:5

**needed** [1] - 97:20

**needing** [2] - 9:7; 100:7

**needs** [5] - 39:10; 63:12; 64:7; 73:23; 76:5

**negative** [4] - 5:12, 22, 25; 41:18

**negligent** [2] - 77:18; 78:3

**never** [6] - 15:11; 32:14; 39:3; 47:10; 55:23; 57:8

**New** [2] - 65:13; 74:25

**new** [3] - 13:23

**next** [19] - 13:3; 21:6, 13; 27:18, 20; 31:10; 43:2; 64:6; 95:10, 16; 96:17, 19; 97:22; 98:5; 99:8; 100:12; 101:12

**night** [7] - 5:19; 51:21, 25; 52:5; 80:11, 19, 25

**nobody** [1] - 80:9

**nonconsensual** [1] - 8:15

**none** [2] - 31:15; 50:8

**nonprogram** [1] - 40:7

**normal** [2] - 20:4; 32:7; 43:23

**normally** [5] - 26:16; 35:15; 42:16; 43:23; 62:7

**note** [1] - 46:24

**noted** [1] - 66:10

**notes** [3] - 27:20; 51:14; 99:22

**nothing** [3] - 4:5; 32:13; 90:16

**notice** [6] - 25:21; 34:11, 14; 59:5; 61:1

**notices** [1] - 34:18

**NOVEMBER** [1] - 2:2

**November** [24] - 11:17; 13:5; 20:16; 21:5, 14; 22:6; 27:18; 30:24; 34:1, 3; 35:1, 19, 24; 37:5, 18-19, 25; 38:7, 25; 57:19; 58:1; 59:12; 92:6

**now-Secretary** [1] - 20:8

**number** [10] - 57:16; 59:17; 62:6; 65:17; 66:18; 67:16; 74:25; 77:8; 84:15, 21

**Number** [1] - 3:7

**nurse** [4] - 56:13,

20, 22
**nurses** [1] - 16:19

## O

**o'clock** [4] -
51:25; 52:5;
80:11, 25
**oath** [1] - 4:12
**Obama's** [1] -
66:11
**object** [2] - 48:24;
81:2
**objection** [8] -
50:12; 51:10;
55:3, 7; 70:4;
78:16; 92:12
**objection's** [4] -
49:7; 54:2;
78:24; 81:6
**objective** [1] -
53:2
**obligation** [2] -
50:21; 51:9
**observations** [2] -
53:16; 99:24
**observe** [2] -
28:10; 59:17
**observed** [5] -
6:1; 28:8, 12;
32:22; 53:14
**observing** [1] -
5:3
**obvious** [1] -
24:17
**obviously** [1] -
19:2
**occur** [11] - 12:23;
16:14; 30:3;
71:9, 19-20;
72:7; 76:5;
89:22
**occurred** [17] -
4:24; 5:12; 6:19;
7:8, 15; 8:11;
12:19; 13:7;
34:3, 25; 35:19;
51:25; 52:5, 23;
91:5
**occurrence** [1] -
17:17
**occurring** [1] -
91:18
**occurs** [4] - 7:23;
71:9; 84:22;
87:14
**October** [16] - 6:9,
11; 7:15; 9:17;
10:8; 11:11, 14;
13:11; 37:16,

22, 24; 38:1;
39:1
**odd** [4] - 90:12,
18-19, 21
**OF** [2] - 2:3;
101:18
**offender** [1] - 76:4
**offenders** [2] -
77:8; 79:9
**offer** [3] - 69:24;
76:17; 100:23
**offered** [2] -
56:13, 22
**offering** [2] -
42:10; 56:20
**Office** [2] - 20:22;
96:10
**office** [10] - 5:8;
11:2; 27:25;
28:3, 11, 15;
48:10; 83:8;
96:11
**officer** [38] - 5:2,
4-5, 10, 13;
6:11, 13; 12:10,
12, 14; 16:1;
28:4; 29:5, 7,
17; 31:14; 33:6,
23; 34:12; 43:1,
7; 44:1; 46:18;
47:3, 13; 49:5;
60:10; 62:20;
65:5, 8; 69:14;
83:25; 84:2
**officers** [21] - 5:9;
29:19, 24; 30:1,
3; 31:7; 32:21;
33:3; 35:6;
42:25; 43:11,
20, 22; 44:3, 13,
15; 53:15;
62:22; 90:11,
24; 93:17
**offices** [3] - 28:6;
83:21; 98:23
**OFFICIAL** [2] -
101:18, 25
**official** [3] - 58:8;
69:2; 82:14
**officials** [1] -
92:10
**often** [2] - 17:16;
76:13
**oftentimes** [6] -
52:22; 68:2;
70:17; 76:8;
77:2
**Ogboye** [2] - 28:5,
13
**old** [1] - 54:10

**once** [6] - 17:5;
27:2; 37:12;
84:25; 90:8;
92:3
**one** [42] - 5:9, 21;
8:16; 13:6; 15:8;
20:23; 21:2;
24:15, 23; 26:8;
34:14; 36:19;
37:24; 40:22;
41:14; 43:2;
44:22; 57:7;
59:5; 63:16;
65:21; 74:21;
77:4; 78:7; 80:7;
83:12; 89:4;
90:21; 92:15;
94:4; 95:12;
96:12; 97:22;
99:1; 100:15
**ones** [2] - 54:12,
14
**ongoing** [6] - 6:3;
9:11, 19; 24:14,
22; 34:8
**online** [1] - 84:7
**open** [4] - 14:5;
80:12; 93:20;
97:19
**opens** [2] - 95:22;
98:10
**operate** [2] -
23:19; 75:13
**operates** [1] -
20:25
**operating** [1] -
19:8
**operation** [3] -
88:12, 14, 22
**operational** [4] -
9:21; 19:7;
52:18; 87:19
**operationally** [1] -
9:7
**operations** [2] -
39:20; 65:15
**opinion** [3] - 86:4;
100:19, 23
**opportunities** [2]
- 16:8
**opportunity** [6] -
5:8; 16:18; 21:2;
35:22; 73:21
**opposite** [1] -
77:12
**opposition** [1] -
99:18
**oral** [3] - 95:3, 5,
13
**order** [16] - 15:19;

17:18; 18:6;
34:21, 24-25;
35:14; 52:25;
55:18; 56:24;
57:25; 59:25;
62:1, 13; 88:22;
93:18
**Order** [1] - 3:10
**ordered** [8] -
13:20; 18:1;
31:7, 17; 38:5;
53:15, 24; 61:7
**ordering** [1] -
33:1
**orderly** [2] -
88:12, 14
**orders** [1] - 70:10
**ordinary** [3] -
7:23; 19:16, 19
**organization** [1] -
19:3
**Oscar** [1] - 99:16
**outcome** [1] -
71:13
**outs** [1] - 7:3
**outside** [7] -
81:12; 86:3;
89:20; 90:4;
92:19; 93:1, 9
**overall** [1] - 82:5
**overlook** [1] -
28:2
**overlooked** [1] -
55:1
**overrule** [1] - 55:7
**overruled** [5] -
49:7; 50:13;
54:2; 81:6;
92:16
**Owens** [3] - 7:14;
35:2
**own** [14] - 41:16;
49:22; 50:18,
20; 51:5, 7;
53:16; 71:7;
75:7; 77:12;
90:3; 100:19

## P

**P-a-c-h-o-l-k-e** [1]
- 64:14
**p.m** [6] - 4:22;
96:1; 97:13, 20;
98:7
**Pacholke** [10] -
64:9, 14, 20-21;
69:24; 73:7;
74:6; 92:16;
94:16

**PACHOLKE** [1] -
2:10
**pack** [1] - 17:1
**packed** [1] - 26:22
**packet** [4] - 57:12,
16, 18; 58:5
**packets** [3] -
14:16; 19:9, 14
**page** [1] - 101:22
**Page** [3] - 48:23;
49:9
**PAGE** [1] - 2:3
**pants** [1] - 29:13
**paper** [5] - 12:10;
14:12; 66:10;
70:19; 84:19
**paper-based** [1] -
84:19
**part** [14] - 18:21;
39:12, 15; 55:2;
68:13; 70:11;
75:5, 7, 18;
81:18, 21; 92:17
**participate** [3] -
12:6; 19:17, 21
**participation** [3] -
12:3; 19:24;
20:5
**parties** [4] - 95:3;
98:11; 99:5;
100:12
**partner** [4] -
77:16; 78:1, 10,
15
**party** [3] - 24:5;
84:9, 24
**pass** [4] - 12:1,
7-10, 15, 18;
47:1
**passed** [2] -
68:24; 75:2
**passes** [4] -
12:11; 46:12
**paste** [1] - 24:8
**pat** [1] - 32:7
**pathway** [1] - 77:3
**patience** [1] -
44:23
**Patuxent** [38] -
6:7; 9:24; 10:6;
12:3; 13:25;
17:24; 19:24;
25:19; 31:16;
39:1, 4, 6, 23;
40:3; 41:20;
42:4, 17, 25;
43:18, 22;
44:11, 14; 45:3,
12; 47:9; 50:2;
53:22; 54:9;

62:13, 15, 19;
78:17, 21; 87:3;
92:9
**pause** [1] - 72:21
**Pause** [2] - 30:16;
57:3
**pay** [2] - 38:18;
83:22
**paying** [1] - 67:12
**peculiar** [1] -
83:15
**pending** [14] -
3:6; 7:12; 14:1;
25:22; 26:4;
27:12; 36:15;
37:3; 43:13, 15;
44:9; 62:13;
85:20
**pens** [1] - 14:12
**people** [21] - 8:1;
18:17; 41:13;
46:4; 47:14, 17;
50:7; 71:14, 17;
72:10; 75:8, 14,
24; 76:2; 77:11;
78:10; 83:7;
84:15; 85:1;
88:11; 91:6
**per** [2] - 16:9, 16
**perceive** [1] -
78:10
**percent** [2] - 33:5;
42:8
**performance** [1] -
69:17
**performed** [2] -
32:21; 33:5
**performing** [1] -
51:23
**perhaps** [7] -
20:19; 57:20;
82:9; 85:21;
89:2; 95:12
**period** [8] - 14:17;
16:16; 30:17;
44:2; 58:6, 9;
71:8; 95:16
**permanent** [1] -
8:6
**permission** [1] -
12:10
**perpetrator** [1] -
8:17
**person** [32] - 12:7;
16:21, 23-24;
17:1, 4, 6, 22;
18:2; 22:14, 22;
23:10; 32:15,
25; 33:14;
40:22; 41:8, 15;

44:5; 47:24;
50:20; 58:18;
74:21; 79:7;
80:14; 82:1, 8;
84:5; 89:4;
90:17
**personal** [4] -
32:3; 100:19, 25
**personally** [2] -
52:4; 90:20
**perspective** [2] -
75:7; 77:23
**phone** [20] -
14:18; 21:15,
19; 22:5, 18, 20;
23:2; 24:6; 27:6,
15; 29:17, 19;
37:13; 38:8, 14,
16, 18, 21;
84:15, 20
**phones** [2] -
38:18, 23
**photographic** [1]
- 85:25
**photos** [4] -
85:16, 23;
92:19; 93:8
**physical** [9] - 7:1;
24:14; 35:12;
56:19; 71:9;
75:9; 92:19;
93:9
**physically** [4] -
42:21, 24;
71:14; 82:1
**pick** [1] - 6:6
**picture** [6] -
26:19-21; 27:5;
38:6
**pictures** [5] -
60:19, 22-23;
61:12, 17
**PIW** [7] - 40:16;
42:20, 25; 43:2;
44:15; 45:25;
50:8
**place** [9] - 7:11;
11:3; 12:19;
19:4, 23; 21:22;
24:21; 75:13;
89:3
**placed** [9] - 6:8;
7:20; 17:16;
21:1, 21; 35:21;
41:15; 42:5;
82:8
**placement** [8] -
6:10; 7:22; 8:2;
17:19; 19:23;
49:18, 20; 51:1

**places** [1] - 75:8
**placing** [2] -
10:19; 23:10
**plaintiff** [4] - 3:20;
4:7; 88:2; 95:20
**PLAINTIFF** [1] -
2:9
**plaintiff's** [6] -
63:6; 87:4;
95:17; 97:3, 24;
101:7
**Plaintiff's** [4] -
48:9; 57:6;
64:23; 67:5
**plaintiffs** [4] -
3:13, 16; 97:12
**plan** [4] - 15:13;
63:5; 100:13, 22
**planning** [2] -
95:5; 100:16
**play** [2] - 50:20;
51:6
**playful** [1] - 28:25
**plays** [1] - 44:7
**point** [20] - 6:3;
9:18; 10:5;
11:21; 14:4;
20:23; 22:24;
23:19; 25:1;
27:8; 29:4;
42:11, 20; 43:4,
6; 63:10, 12;
68:5; 91:1
**pol** [1] - 17:18
**police** [1] - 61:4
**policies** [1] -
47:21
**policy** [14] - 15:6,
16; 17:12, 19;
19:11; 20:14;
31:22; 32:23;
33:4; 46:4;
47:25; 65:23;
66:4; 68:14
**pop** [2] - 17:7;
57:7
**population** [32] -
8:1; 10:6, 12,
14, 17; 13:7, 25;
18:9; 19:25;
20:1; 21:3, 9,
11; 22:10;
23:13; 24:13,
15; 25:18; 32:1;
36:10; 37:3;
41:22, 24; 42:1,
11; 62:14;
71:21; 72:7;
76:4; 81:24
**populations** [1] -

68:13
**portrayed** [1] -
83:12
**pose** [1] - 23:3
**poses** [1] - 7:25
**position** [1] - 20:7
**possession** [3] -
26:18, 20; 32:6
**possibility** [2] -
13:8; 97:13
**possible** [8] -
20:15; 21:8;
40:2, 6; 42:2;
48:8; 52:9;
63:17
**possibly** [1] - 7:9
**potential** [5] -
7:19; 11:8; 23:9;
39:18; 68:15
**potentially** [3] -
7:7; 10:19; 40:8
**power** [1] - 31:7
**practice** [3] -
12:12; 54:18;
81:8
**practices** [2] -
65:14; 80:20
**PREA** [37] - 7:21;
30:2, 5, 12, 23;
31:5; 35:5, 22;
48:2, 4, 6, 10,
22; 49:5; 51:5;
52:11; 53:5;
56:11; 61:8, 10;
62:17; 68:10,
16-17; 69:6;
70:1; 75:1, 3-4,
11, 19, 21; 78:4;
87:23
**preapproved** [1] -
12:5
**preference** [12] -
32:24; 33:2, 9,
12; 40:5; 50:11;
75:15; 87:11,
17; 97:19; 99:6
**preferences** [1] -
39:17
**prefers** [1] - 33:6
**preliminary** [2] -
31:9; 36:4
**prepare** [2] -
55:16; 70:8
**prepared** [5] -
34:11; 99:4, 10,
17, 21
**present** [4] -
49:20; 63:6;
64:7; 79:14
**presentation** [1] -

95:2
**presented** [1] -
100:3
**presents** [2] -
81:16
**President** [1] -
66:11
**presiding** [1] - 3:5
**pretty** [4] - 22:24;
71:12
**previous** [1] -
38:4
**primarily** [1] -
65:15
**principles** [1] -
66:11
**prison** [13] - 65:7,
14; 69:1, 9, 17,
21; 77:9, 11;
79:3; 81:24;
82:13; 90:3
**Prison** [1] - 48:21
**prisoners** [4] -
67:20; 68:7;
70:1; 74:8
**prisons** [6] - 65:7,
9; 75:13; 77:3, 9
**privacy** [1] - 32:16
**private** [1] - 44:5
**privilege** [3] -
25:23; 27:9
**privy** [1] - 55:9
**probability** [1] -
32:10
**probing** [1] - 55:7
**problem** [2] -
30:20; 38:12
**problematic** [3] -
89:10; 90:2, 7
**problems** [8] -
15:20; 22:21;
23:8; 41:5;
49:20; 76:13;
78:6, 12
**procedure** [3] -
12:16; 50:14;
57:22
**procedures** [2] -
19:23; 30:6
**proceed** [1] -
96:13
**proceeded** [1] -
9:9
**proceeding** [2] -
94:10, 17
**proceedings** [2] -
101:17, 21
**Proceedings** [2] -
30:16; 57:3
**PROCEEDINGS**

[1] - 2:13
**PROCEEDINGS.**
.........................
**..** [1] - 2:3
**process** [5] -
32:24; 79:22,
25; 88:7; 93:2
**processes** [1] -
70:2
**processing** [1] -
60:9
**produce** [1] - 33:9
**produced** [2] -
55:2; 60:16
**profession** [1] -
69:22
**Professional** [1] -
101:19
**professional** [16]
- 44:25; 66:14;
67:19; 68:16;
69:10, 20; 70:1;
74:7; 77:24;
79:1; 80:6; 83:5;
84:12; 85:11;
86:4, 9
**proffer** [1] - 49:2
**profile** [6] - 26:18,
21; 27:4; 38:6
**program** [12] -
10:24; 18:22;
19:8, 18; 20:5,
9, 24; 21:4;
40:7; 41:10
**programming** [2]
- 19:6; 49:17
**programs** [3] -
40:9; 69:9;
76:17
**prohibit** [1] - 78:8
**proper** [2] - 12:16;
77:25
**property** [2] -
26:24; 80:22
**propositioned** [1]
- 13:18
**protect** [2] -
43:15; 93:24
**protected** [1] -
93:20
**protection** [1] -
42:10
**provide** [2] - 19:5;
67:9
**provided** [3] -
14:12; 15:4;
16:7
**providing** [2] -
79:7; 95:3
**public** [1] - 20:14

**Public** [1] - 3:7
**publications** [1] -
65:20
**published** [3] -
65:17, 25; 68:12
**pull** [8] - 34:19;
48:9, 12-13;
49:12; 52:4;
55:24; 67:5
**pulled** [1] - 23:25
**purpose** [1] - 12:7
**purposes** [2] -
17:10; 78:19
**pursuant** [1] -
101:20
**pursue** [2] - 8:25;
81:14
**pushed** [3] -
31:14; 35:13;
44:4
**pushing** [1] - 99:9
**put** [12] - 18:8;
20:13; 29:13;
45:13; 72:22;
73:5; 75:8, 13,
20; 80:18; 96:18
**putting** [1] - 55:18

**Q**

**qualified** [1] -
66:22
**qualifier** [1] -
88:15
**quality** [1] - 84:22
**questions** [4] -
45:4; 62:24;
86:11; 94:13
**quick** [3] - 59:2;
71:12; 86:1

**R**

**ranks** [1] - 65:8
**Rape** [1] - 48:21
**rate** [2] - 67:10;
72:9
**rate's** [1] - 67:12
**rather** [4] - 53:25;
54:12; 84:5;
91:4
**RATLIFF** [39] -
3:22; 4:5, 15,
17; 30:21;
44:17, 21, 24;
45:4; 48:24;
50:12; 51:10;
53:23; 55:3, 8;
63:2; 72:11, 19;
73:1, 4, 12, 24;

74:3; 94:25;
95:25; 96:14,
25; 98:3, 12, 15,
18, 23; 99:3, 11,
14, 21; 100:24;
101:10, 13
**Ratliff** [15] - 3:23;
4:9, 14; 44:18;
62:25; 72:18;
73:21; 86:12;
94:18; 95:24;
96:9, 16-17;
99:1; 100:22
**Ratliff's** [1] - 98:1
**RATLIFF..........**
[1] - 2:6
**razors** [8] - 15:5,
10, 14, 17;
47:14, 18; 57:9
**re** [1] - 4:4
**re-call** [1] - 4:4
**reached** [2] - 7:6;
20:21
**read** [10] - 24:9,
17; 26:9, 18;
49:13; 56:16,
21; 70:9; 88:4;
100:18
**readily** [1] - 48:12
**ready** [1] - 63:22
**real** [1] - 82:12
**realize** [1] - 23:25
**really** [7] - 38:22;
39:20; 41:4;
70:15; 75:8;
82:4; 87:1
**Realtime** [1] -
101:19
**reason** [10] -
25:13; 26:16,
25; 32:5; 33:10;
35:13; 43:3;
44:7; 76:25;
99:9
**reasonable** [3] -
32:6, 10; 86:8
**reasonably** [1] -
95:8
**reasons** [5] -
17:9; 32:16;
54:1; 81:15;
88:17
**rec** [1] - 85:5
**receive** [3] -
46:24; 57:22, 24
**received** [17] -
6:15; 8:12;
14:13, 24; 15:7;
21:25; 36:3;
38:2; 57:13,

17-18; 58:1;
59:14; 60:23;
68:10; 73:25
**receives** [1] - 6:13
**receiving** [1] -
58:10
**recently** [2] -
6:25; 38:10
**recess** [2] - 64:1;
73:19
**recidivism** [1] -
20:11
**recognize** [3] -
48:18; 64:24;
67:6
**recommendatio
n** [5] - 22:9;
23:12, 22;
61:22, 24
**reconvene** [1] -
11:4
**record** [12] - 3:11,
19; 5:2; 27:16;
37:15; 52:3;
54:3, 20, 22;
64:12; 72:22;
78:2
**recorded** [1] -
22:5
**recording** [2] -
54:4, 11
**records** [1] -
33:17
**recreated** [1] -
70:25
**recreation** [11] -
16:11; 27:23;
28:2; 54:24;
55:6, 16, 24;
83:11, 20;
90:10; 93:10
**recuffed** [1] -
59:19
**redirect** [2] - 63:1;
94:14
**reduce** [4] - 18:1,
10, 12; 20:2
**refer** [3] - 11:13;
27:20; 48:21
**reference** [2] -
25:8; 69:6
**referenced** [2] -
17:15; 30:23
**referencing** [1] -
11:8
**referred** [4] -
24:18, 20;
52:13, 16
**refers** [1] - 50:19
**reflect** [1] - 85:23

**reform** [3] - 65:25;
66:2, 5
**refused** [1] - 31:3;
35:9
**regarding** [1] -
34:14
**regardless** [1] -
40:25
**Registered** [1] -
101:19
**regular** [5] - 9:12;
14:25; 16:15,
17; 40:14
**regularly** [1] -
46:15
**regulation** [1] -
51:4
**regulations** [4] -
48:10; 49:6;
75:12; 101:22
**reissued** [1] -
36:5
**related** [6] - 9:5;
36:20; 52:11;
59:6; 65:17
**relation** [1] -
15:14
**relationship** [5] -
76:13; 77:4;
78:9; 84:18;
89:13
**relationships** [1] -
77:6
**relative** [1] - 85:3
**relatively** [1] -
74:16
**relay** [1] - 85:2
**relayed** [2] -
81:21; 84:14
**release** [1] - 69:1
**released** [2] - 7:1;
94:17
**relevance** [1] -
78:19
**relevant** [4] -
54:4; 55:23;
99:23; 100:4
**reliability** [1] -
79:6
**reliable** [3] -
38:23; 79:13;
88:24
**relief** [1] - 78:20
**relieved** [4] - 5:3;
29:19; 33:3
**religion** [1] - 6:23
**religious** [2] -
12:3; 46:14
**rely** [1] - 38:22
**remain** [4] -

36:11, 25;
44:11; 62:19
**remaining** [1] -
99:4
**remedy** [2] -
15:23; 42:23
**removal** [1] -
79:15
**remove** [5] - 29:5;
41:8; 62:8;
93:16
**removed** [2] -
60:1; 84:4
**removing** [1] -
62:13
**repeat** [3] - 45:21;
78:2; 82:19
**repeatedly** [1] -
9:24
**report** [20] - 5:6,
16; 8:23; 11:10;
14:20; 21:13;
30:11; 35:16;
36:2, 5; 53:15;
56:16, 21;
57:25; 60:24;
62:4; 86:2;
88:24; 93:1
**Report** [1] - 13:21
**reported** [11] -
5:23; 7:13; 8:18;
13:20; 31:9;
34:13; 35:2, 7;
51:18; 61:8;
101:21
**REPORTER** [2] -
101:18, 25
**reporter** [2] -
63:11; 77:19
**Reporter** [2] -
101:19
**reporter's** [1] -
45:16
**reporting** [2] -
34:12; 60:25
**reports** [7] - 5:20;
28:12; 29:24;
30:4; 52:4;
85:16; 93:8
**Reports** [1] - 8:16
**represent** [1] -
9:15
**represented** [1] -
89:5
**represents** [1] -
88:13
**request** [11] -
39:1, 3, 13-14;
42:19; 47:11;
50:4, 8, 15;

70:5; 78:19
**requested** [2] -
47:5; 50:24
**requesting** [1] -
10:12
**require** [1] - 10:18
**required** [3] -
32:25; 33:13, 18
**requires** [1] -
62:18
**rescheduling** [1] -
95:18
**research** [1] -
71:8
**reserved** [1] -
88:10
**residing** [1] - 82:5
**resolve** [1] -
100:20
**respect** [2] -
49:22; 100:14
**respond** [1] - 24:9
**response** [6] -
7:23; 10:18;
25:20; 85:11;
94:2, 6
**responsibility** [4]
- 11:23; 17:24;
33:8; 47:3
**responsible** [3] -
21:21; 46:21;
49:6
**restrain** [1] - 44:9
**restraining** [3] -
55:17; 62:13;
70:10
**Restraining** [1] -
3:10
**restraints** [2] -
70:18, 24
**restrictions** [1] -
80:22
**restrictive** [4] -
20:2; 41:25;
42:2; 45:25
**restroom** [1] -
63:13
**result** [5] - 5:25;
14:7; 71:15;
78:6
**results** [10] - 9:6;
11:5, 18; 14:3,
8; 18:12; 27:12;
61:16, 18; 62:16
**resume** [2] -
62:23; 74:2
**resumé** [1] -
64:25
**retaliate** [1] - 7:4
**retaliation** [3] -

13:20; 68:4;
93:19
**retired** [2] - 65:5,
13
**return** [9] - 10:6,
12, 14, 17; 18:9;
19:25; 21:11;
23:13; 32:1
**returned** [4] -
22:10; 27:5;
37:12; 62:14
**returning** [3] -
13:6; 21:9; 32:2
**revealed** [1] - 27:9
**review** [10] - 11:5;
13:11; 17:16,
20-22; 18:7;
48:11; 55:14;
99:22
**reviewed** [4] - 8:3;
20:17; 37:15;
69:5
**reviewing** [5] -
21:15, 19;
23:21, 23; 85:25
**reviews** [2] - 18:7;
69:18
**rid** [1] - 32:17
**Rights** [1] - 66:17
**rights** [1] - 43:25
**rise** [1] - 93:11
**risen** [1] - 77:9
**rising** [1] - 12:23
**risk** [10] - 7:19,
25; 10:17;
22:11, 25; 23:3;
25:13; 88:14, 21
**role** [1] - 45:1
**roller** [1] - 38:14
**romantic** [3] -
77:16; 78:1;
84:18
**room** [8] - 5:3, 17;
6:2; 40:13;
63:18, 23; 73:6;
89:20
**rotate** [1] - 6:12
**rough** [1] - 66:25
**rounds** [5] -
16:13-15, 17, 19
**routine** [3] -
31:19; 40:14;
79:5
**RPR** [1] - 101:25
**rule** [19] - 12:24;
24:1, 16, 23;
25:16, 21; 26:1,
3; 27:12; 34:8,
11, 14; 36:22;
59:5; 80:7, 9;

82:6, 13
**Rule** [1] - 26:11
**rules** [6] - 26:6;
46:22; 47:4;
75:14; 81:12;
84:23
**rumor** [5] - 6:17;
7:6, 17; 11:24;
23:2
**running** [3] - 65:1;
92:24

## S

**safe** [5] - 10:12;
23:8; 48:8;
68:15; 75:8
**SAFE** [3] - 35:14;
56:11, 19
**safely** [2] - 20:1;
21:11
**Safety** [1] - 3:8
**safety** [27] - 7:19,
25; 9:8, 22;
10:15; 13:2, 24;
17:10; 20:10,
14; 22:11, 17;
25:12; 28:4;
41:16; 49:19,
23; 52:18;
53:25; 68:13;
75:16; 77:24;
87:20; 88:25
**sanctioning** [1] -
78:7
**sanctions** [4] -
37:7; 61:24;
82:8, 13
**SANE** [1] - 61:16
**sanitation** [7] -
13:13, 17; 14:7;
31:25; 51:22;
52:1; 53:14
**save** [2] - 26:19;
100:20
**saw** [5] - 25:9;
28:24; 38:6;
47:7; 90:20
**scene** [1] - 79:10
**schedule** [1] -
95:22
**scheduled** [6] -
20:13, 23; 21:7;
46:15; 54:11;
96:19
**scheduling** [2] -
95:1; 100:11
**school** [3] -
12:10, 14; 43:2
**scope** [3] - 48:25;

53:23; 55:4
**scoring** [1] - 79:5
**Scott** [4] - 7:7;
26:21; 27:2;
38:6
**screaming** [1] -
35:5
**screen** [2] -
48:13; 99:1
**scroll** [1] - 67:15
**Scruggs** [2] - 20:8
**search** [21] -
29:20, 22-23,
25; 30:1, 3;
31:6, 17, 23;
32:2, 7-8, 12,
16, 22; 33:7, 10;
34:3; 37:17;
59:23; 60:16
**searched** [6] -
31:7, 22; 33:23;
38:1; 59:18;
60:2
**searches** [4] -
31:16, 19;
32:18; 33:5
**searching** [1] -
80:21
**secluded** [1] -
32:16
**second** [4] - 5:13;
90:23; 92:15;
97:22
**secret** [1] - 24:21
**Secretary** [2] -
20:8
**secretary** [1] -
65:8
**secreted** [1] -
32:11
**secure** [1] - 32:15
**Security** [2] -
6:12; 28:10
**security** [13] -
7:25; 9:8; 10:15,
18; 13:2; 20:10;
28:9; 29:9;
31:20; 42:14;
49:20; 52:19;
53:25
**security's** [1] -
27:25
**see** [26] - 18:7;
21:8; 24:20;
26:14; 27:15;
30:17; 33:16;
35:9; 38:21;
49:10; 54:13;
56:21; 57:12,
16; 73:21;

76:15; 78:18;
85:16; 90:13;
91:3, 8; 93:8;
100:18; 101:12
**seeing** [2] - 30:15;
84:13
**seem** [2] - 83:16,
19
**sees** [1] - 5:15
**seg** [15] - 6:10;
11:13; 13:3;
15:16; 17:3, 13,
16; 18:19;
19:23; 20:17;
23:11; 37:4;
38:21; 79:15
**Seg** [1] - 79:24
**segregated** [2] -
66:11; 87:25
**segregation** [93] -
6:8; 7:1, 11, 20,
22; 8:2, 5; 9:13;
10:11; 12:25;
13:1, 11; 14:10,
15; 15:5, 7,
17-18; 16:5, 7,
14; 17:6, 10, 22;
18:1, 3, 11, 13,
18; 19:13, 17,
20; 21:22;
24:12, 15; 26:4,
7, 11, 23; 28:2;
29:9; 36:15, 23,
25; 37:3, 7, 9,
11, 16; 38:10,
13, 15, 22, 24;
39:7, 11; 41:15;
42:5; 45:13;
46:2; 47:13, 15,
18, 22; 48:1;
51:2, 14; 55:18;
58:19, 21-22;
65:24; 66:1, 5,
19; 68:3, 5;
79:19, 23;
81:20; 83:23;
88:6, 9-10, 16,
19; 89:4
**segregations** [1] -
18:15
**self** [4] - 17:2;
71:24; 88:11, 14
**self-administer**
[1] - 17:2
**self-harm** [1] -
71:24
**send** [3] - 19:10;
36:6; 96:9
**sense** [7] - 72:5;
80:6, 8; 85:24;

90:6; 93:3, 11
**sent** [2] - 38:2;
61:1
**sentence** [3] -
31:2; 81:18, 20
**sentences** [1] -
81:25
**sentencing** [1] -
96:19
**separate** [9] -
14:5, 17; 15:8;
19:2; 36:19;
40:23; 43:1;
44:14; 67:25
**separately** [1] -
58:5
**September** [1] -
13:16
**Sergeant** [5] -
7:14; 28:5, 13;
35:2
**sergeant** [2] -
58:15; 65:9
**serious** [12] -
13:5; 21:8;
35:12; 36:1, 4;
44:3; 49:23;
54:22; 85:9, 23;
92:18
**Serious** [2] - 8:15;
13:21
**seriousness** [1] -
36:13
**serve** [2] - 34:13;
35:2
**served** [6] - 34:18;
36:9, 11; 37:1;
66:16; 68:24
**service** [7] - 6:20,
24; 11:22; 12:4,
15; 19:5
**Services** [1] - 3:8
**services** [4] -
12:3; 20:9;
46:14
**serving** [1] -
81:17
**session** [2] - 3:4;
73:15
**set** [6] - 48:7;
63:18; 73:15;
90:3; 98:5, 9
**setting** [1] - 41:12
**setup** [1] - 6:19
**seven** [1] - 77:8
**several** [2] -
10:10; 18:16
**sex** [19] - 6:18, 22;
7:8, 15, 17; 8:8,
10-11, 15; 9:2;

12:19, 21-22;
28:14; 35:12;
46:5; 90:6
**sexual** [12] -
24:22; 35:16;
53:5; 56:2;
75:16; 78:1, 7;
89:9, 13, 17, 25;
92:6
**sexually** [4] -
13:18; 42:21,
24; 44:4
**shall** [2] - 49:18,
23
**Sharon** [1] - 3:18
**shift** [1] - 99:10
**shocking** [1] -
85:17
**short** [2] - 65:1;
86:20
**shortly** [1] - 57:17
**show** [7] - 14:24;
57:6; 60:22;
61:12, 17; 71:5
**shower** [3] - 16:8;
47:23
**shows** [1] - 67:10
**shut** [2] - 26:17;
37:13
**sick** [2] - 16:18;
46:17
**side** [4] - 28:19;
53:17, 20; 63:6
**sign** [2] - 10:13;
84:3
**signalled** [1] -
29:7
**signature** [2] -
23:21, 23
**signed** [4] - 14:9;
34:11; 42:6;
55:10
**significance** [1] -
12:1
**significant** [8] -
23:14, 20; 34:6;
59:20; 74:16;
80:10; 88:13, 22
**signing** [2] - 23:7;
42:10
**single** [3] - 38:3;
70:17, 22
**sinister** [1] -
91:12
**SIR** [3] - 30:12,
22; 31:9
**SIRs** [1] - 7:21
**sis** [3] - 46:7;
47:6, 11
**sister** [3] - 24:7

**sitting** [1] - 72:14
**situated** [1] -
76:16
**situation** [5] -
8:13; 11:24;
33:20; 80:13;
86:5
**situations** [2] -
31:18; 32:4
**six** [4] - 18:16;
65:9; 77:7
**skip** [1] - 20:16
**skirt** [1] - 62:15
**slated** [1] - 95:11
**slight** [2] - 81:16
**slips** [1] - 16:18
**smiling** [1] - 29:3
**snitch** [3] - 81:19;
82:3, 11
**snitching** [1] -
82:20
**social** [1] - 13:15
**soft** [5] - 12:9, 15;
46:11; 47:1
**solicitation** [1] -
28:14
**soliciting** [1] -
90:6
**solitary** [11] -
45:1; 66:15, 23;
69:25; 70:14;
71:1, 6, 25;
72:1; 87:1
**solved** [1] - 38:12
**someone** [11] -
77:25; 80:10;
81:21; 82:10;
83:19, 23;
84:16; 89:3;
91:18
**sometime** [1] -
34:19
**sometimes** [4] -
32:13; 40:15;
91:11
**somewhere** [1] -
85:22
**sooner** [3] - 42:5;
95:22
**sorry** [18] - 13:14;
22:6; 36:24;
37:20; 45:17;
52:3; 54:17;
59:2; 63:23;
64:3; 73:9;
77:21; 97:6, 11,
17; 98:23, 25
**sort** [10] - 50:16;
52:25; 53:2;
76:7; 77:4; 83:5;

85:12, 19;
87:25; 91:15
**sounded** [1] -
100:16
**sounds** [3] -
81:12; 96:16;
98:1
**source** [2] -
92:20; 93:9
**speaking** [1] -
99:1
**special** [1] - 20:7
**specialized** [1] -
74:20
**specific** [6] - 10:8,
10; 13:12; 41:5;
43:8; 56:9
**specifically** [6] -
8:21; 42:3;
50:22; 65:20;
67:24; 99:23
**specifics** [1] -
76:21
**speculation** [2] -
81:3
**speed** [2] - 11:15;
100:15
**spell** [1] - 64:11
**spend** [3] - 81:19;
95:8; 96:19
**sponsor** [1] -
68:25
**square** [1] - 28:19
**staff** [35] - 5:16,
22; 6:1; 9:14;
10:2, 16, 19;
16:3; 18:2;
26:22; 29:24;
33:10, 15; 35:9,
11, 15; 40:1;
41:3; 42:21;
43:16; 46:21;
47:2; 72:21;
76:4, 9, 18;
77:25; 83:13,
20; 85:20; 96:11
**staffing** [1] -
44:15
**stage** [1] - 78:20
**stairs** [2] - 31:14;
35:13
**stairwell** [1] - 85:5
**standard** [3] -
54:18; 79:2;
81:8
**standards** [5] -
61:9, 23; 62:18;
69:20; 70:1
**standing** [2] -
12:8; 76:10

**standpoint** [1] -
80:7
**stands** [1] - 16:22
**start** [2] - 4:20;
72:21
**started** [10] - 8:7;
11:11; 30:1;
31:1; 35:1;
57:15; 60:5;
65:4; 90:24
**state** [9] - 38:11;
54:3; 56:15;
61:23; 64:11;
67:25; 74:16;
82:5; 87:10
**State** [3] - 65:3;
66:1; 74:14
**statement** [11] -
5:8, 11; 21:23;
22:16, 21; 31:2;
35:10; 52:20;
53:1, 4; 61:4
**statements** [2] -
8:25; 88:21
**states** [3] - 67:24;
69:5; 74:25
**States** [3] - 3:3;
101:20, 22
**statewide** [2] -
50:1; 69:19
**stating** [1] - 5:11
**status** [4] - 37:2,
8; 97:1
**statutory** [1] -
40:9
**stay** [5] - 6:2;
23:6; 39:10;
42:11, 23
**stayed** [1] - 37:8
**stays** [1] - 18:19
**stenographicall
y** [1] - 101:21
**stenographicall
y-reported** [1] -
101:21
**steps** [2] - 22:14;
44:4
**Stewart** [9] - 4:4,
10-11, 18;
30:14, 22; 45:5;
63:5; 81:5
**STEWART** [1] -
2:6
**sticking** [1] -
28:24
**still** [23] - 4:11;
5:13; 9:6, 19;
10:25; 11:21;
13:1; 23:4;
25:10; 27:16;

40:11; 43:13;
44:8; 56:22;
62:20; 67:12;
86:15; 87:12;
94:22; 96:15, 21
**stolen** [1] - 80:17
**stop** [1] - 10:3
**stopped** [2] -
16:1; 31:3
**stopping** [1] -
61:3
**straight** [2] - 37:4,
8
**strange** [1] - 83:7
**stressful** [2] -
17:11, 14
**stricken** [1] - 81:3
**strike** [1] - 36:24
**strip** [24] - 29:20,
22-23, 25; 30:3;
31:6, 16-17, 19,
22-23; 32:2, 8,
16, 18; 33:1, 22;
34:3; 59:18, 23;
60:1, 16; 80:21
**struggle** [2] -
76:3; 82:1
**student** [1] -
19:12
**stuff** [1] - 80:22
**subject** [2] - 26:6;
33:22
**submit** [2] -
55:12, 16
**submitted** [4] -
36:2; 47:7;
55:11
**Subsection** [3] -
49:10, 13, 21
**substance** [1] -
84:13
**substantial** [1] -
75:12
**substantiate** [2] -
6:4; 83:18
**substantiated** [2] -
26:3; 53:6
**successful** [2] -
41:21; 42:1
**suffice** [1] - 89:1
**sufficient** [2] -
10:1; 43:5
**suggest** [1] -
78:14
**suggesting** [1] -
93:15
**suggestions** [1] -
95:17
**suicide** [1] - 71:23
**summarize** [2] -

65:2; 85:6
**summary** [3] -
21:13; 57:25
**sun** [1] - 30:18
**superintendent**
[3] - 65:6; 69:14;
76:9
**supervised** [1] -
40:15
**supervision** [5] -
35:7; 80:12, 19;
81:1; 90:12
**supervisor** [2] -
58:12; 99:15
**supervisors** [1] -
34:12
**supplemental** [1]
- 67:9
**suppose** [4] -
82:4; 84:6;
89:11; 90:14
**supposed** [7] -
12:11; 19:21;
20:3; 24:12;
46:18; 82:6
**surveillance** [2] -
80:18; 81:1
**suspect** [1] - 55:6
**suspicion** [2] -
25:23; 32:6
**sustain** [1] -
79:21
**sustained** [2] -
51:11; 78:24
**swapped** [1] -
27:2
**swapping** [1] -
27:5
**swear** [1] - 47:24
**switch** [1] - 72:21
**sworn** [1] - 64:10
**Sworn...................**
**.........................**
**.........** [1] - 2:10
**system** [6] -
12:18; 34:20;
66:3; 69:1, 7;
81:24
**systems** [2] -
65:24; 69:21

---

**T**

---

**table** [1] - 13:8
**tablet** [19] - 14:18;
25:22-24; 26:14,
16-17, 20, 25;
27:1, 5, 10;
37:12, 14, 20,
24; 38:4, 16

**tablets** [5] - 27:5;
38:11, 20, 23
**taboo** [2] - 82:17,
20
**tall** [1] - 81:17
**tamper** [1] - 38:15
**target** [2] - 41:14;
86:5
**team** [14] - 8:6;
9:13, 23; 10:25;
11:4; 13:3;
17:21; 21:6, 13;
22:8; 39:16, 22
**team's** [1] - 23:12
**technical** [1] -
57:7
**Technology** [1] -
65:12
**telephone** [1] -
84:24
**telephones** [1] -
38:13
**Temporary** [1] -
3:10
**temporary** [5] -
8:5; 19:21; 20:3;
39:8; 55:17
**tend** [1] - 40:21
**tentatively** [2] -
98:4, 10
**term** [2] - 19:23;
45:1
**terminate** [1] -
90:25
**terms** [2] - 92:6;
100:11
**test** [1] - 20:13
**testified** [6] -
12:17; 20:18;
52:14; 57:8;
67:2; 90:19
**testify** [3] - 52:23;
93:25; 94:5
**testifying** [2] -
58:4; 100:24
**testimony** [32] -
4:4, 20; 6:6;
11:25; 38:5;
43:9; 52:8; 55:5,
14; 59:11; 62:5;
67:11; 76:22,
24; 79:14; 81:5;
83:2; 85:4, 6;
86:8, 20; 89:12;
90:10; 91:17;
92:8, 14; 93:13;
99:23; 100:4,
15; 101:2
**testing** [1] - 14:19
**text** [26] - 23:25;

24:6, 9, 17, 24;
25:7, 14; 26:12,
18; 27:15; 34:4,
6, 15; 36:20;
37:15, 19, 21;
38:2; 84:14, 21,
25
**texting** [1] - 84:8
**THE** [101] - 2:5, 9;
3:3, 17, 21; 4:2,
6, 9, 13-14;
30:13, 17, 20;
44:18; 45:6, 15,
19-21; 48:14;
49:1, 7; 50:13;
51:11; 53:24;
54:2; 55:5, 9;
57:2; 62:25;
63:4, 9, 18,
20-21, 25; 64:2,
5, 11, 13,
15-16; 70:3, 5;
72:15, 17, 24;
73:2, 7, 10-11,
14, 17-18, 20;
74:2, 4; 77:15,
17, 19; 78:3, 18,
24; 81:6; 86:12,
22; 92:13, 15,
17; 94:14, 16,
22; 95:1, 24;
96:5, 7, 15, 24;
97:3, 9, 16, 22;
98:1, 4, 14, 17,
21, 25; 99:8, 12,
19; 100:1, 10,
22; 101:2, 5, 9,
11
**themselves** [4] -
76:19; 82:10;
83:20; 87:24
**therapy** [1] - 76:6
**therefore** [1] -
23:3
**third** [4] - 24:5;
65:21; 84:8, 24
**third-party** [1] -
84:24
**thorough** [1] -
61:7
**threat** [8] - 21:17;
22:25; 23:9;
26:10; 39:18;
88:11, 25; 89:5
**threatening** [4] -
25:5; 26:12;
59:3, 8
**threats** [1] - 11:8
**three** [6] - 16:9,
16; 24:6; 65:6;

93:17; 95:11
**three-way** [1] -
24:6
**threw** [2] - 13:19
**throwing** [4] -
72:3; 81:10
**thrown** [1] - 79:18
**Thursday** [7] -
95:16, 21;
96:1-3, 18
**Thursday's** [1] -
98:8
**ticket** [3] - 36:10,
12
**tickets** [1] - 36:19
**tie** [2] - 81:23;
88:13
**tier** [24] - 6:2;
10:13; 12:12;
18:18; 24:23;
29:18; 35:4;
36:15, 23;
38:10, 13, 22;
39:4; 43:2;
46:18, 20;
51:15, 23-24;
58:20; 62:21;
80:3, 11
**tiers** [7] - 18:15;
28:18, 20;
38:16; 40:6;
53:22
**timing** [1] - 83:15
**tits** [1] - 24:19
**today** [9] - 4:20;
44:20; 46:16;
52:9; 67:13;
70:8; 85:22;
94:10
**today's** [1] - 55:23
**together** [3] -
25:15; 41:6;
89:13
**toilet** [1] - 70:19
**tongue** [2] -
28:24; 29:2
**took** [9] - 13:8;
17:24; 18:14;
22:14; 36:1;
56:23; 60:19;
91:23; 92:5
**toothpaste** [1] -
70:19
**top** [1] - 47:22
**total** [1] - 71:4
**totality** [3] -
12:21; 70:16;
87:1
**towards** [2] -
24:10; 95:3

**trained** [1] - 35:15
**training** [2] - 48:4;
65:11
**trans** [9] - 74:15,
17, 19, 22-23;
75:15, 17, 25;
87:22
**transactions** [1] -
24:25
**transcript** [2] -
101:21
**transfer** [11] -
11:1; 17:13;
20:19, 23; 39:1;
40:2, 23; 41:22;
42:16; 94:8
**transferred** [2] -
39:11; 92:10
**transferring** [2] -
94:1, 5
**transfers** [1] -
41:14
**transgender** [15] -
49:15, 22, 24;
50:6; 67:20, 25;
68:3, 7; 69:4;
70:1; 74:7, 10;
87:9, 24
**transgendered**
[4] - 39:13; 40:2;
46:6, 9
**transport** [2] -
56:24; 59:20
**transported** [4] -
35:14, 17; 59:18
**trash** [1] - 5:24
**treatment** [3] -
9:14; 41:10;
76:7
**tremendous** [2] -
90:15
**trial** [4] - 78:17;
95:9, 12
**tried** [1] - 73:12
**TRO** [2] - 2:2;
55:21
**trouble** [1] - 30:15
**true** [6] - 7:17;
72:15; 92:8;
93:5, 13; 101:21
**try** [5] - 40:5;
41:7, 17, 25;
48:12
**trying** [2] - 57:15
**Tuesday** [6] -
97:5, 8, 12, 16,
18; 98:7
**turn** [6] - 13:22;
16:18; 29:8;
47:23; 49:9;

95:18
**turnaround** [1] -
14:17
**turned** [2] - 13:18;
14:16
**turns** [2] - 5:3;
29:12
**two** [31] - 5:16;
7:21; 8:15;
14:15; 18:15;
19:9; 21:3;
26:24; 29:19;
31:6; 33:3;
34:14; 36:19;
37:23; 39:8;
40:10; 41:5;
53:9, 11; 63:16;
67:23; 69:4;
76:25; 88:20;
91:19; 93:16;
94:20; 95:13;
99:3, 12
**type** [4] - 25:18;
71:20; 72:2
**types** [6] - 24:3;
71:15, 18-19,
25; 72:6
**typically** [9] -
40:25; 41:1;
70:21, 24;
75:24; 79:4, 7,
12; 87:14

## U

**U.S.C** [1] - 101:20
**ultimately** [1] -
21:21
**umbrella** [1] -
88:21
**unanimous** [2] -
10:25; 22:9
**unavailability** [1]
- 98:9
**uncommon** [1] -
77:5
**under** [11] - 4:11;
18:6; 19:3;
20:14; 39:23;
47:9; 61:6, 22;
75:21; 88:20;
99:6
**understood** [3] -
52:8; 62:5; 94:3
**undertook** [1] -
56:23
**underway** [1] -
92:9
**unfairly** [1] -
15:10

**unfortunately** [3]
- 13:7; 38:14;
54:9
**unfounded** [2] -
9:1; 11:18
**unidentified** [2] -
6:21; 41:13
**unique** [1] - 41:20
**unit** [15] - 31:25;
46:2; 47:13;
51:15; 53:20;
54:20; 74:22;
76:19; 80:18;
82:12; 85:22;
87:22, 25; 88:1;
94:7
**United** [3] - 3:3;
101:19, 22
**units** [10] - 54:16;
69:5; 71:20;
72:1, 9; 74:20;
89:21
**University** [5] -
19:2, 9; 20:24;
21:1; 65:13
**unless** [3] - 58:19;
64:6; 101:5
**unlike** [1] - 75:14
**unnecessarily** [1]
- 41:9
**up** [43] - 4:3; 5:7;
6:6; 11:15;
13:10; 18:2;
19:10; 21:1, 12;
26:22; 28:16,
20, 22, 25; 29:3;
30:7, 11; 34:19;
43:6, 25; 44:22;
45:17; 46:23;
47:20; 48:9,
12-13; 49:12;
57:7; 61:25;
63:18; 64:23;
66:2; 67:5;
73:15; 78:9;
83:16; 91:5, 20;
95:22; 98:10;
100:15
**update** [1] - 31:10
**updated** [2] -
36:3, 6
**upgrade** [1] -
54:11
**uphold** [1] - 52:20
**uproar** [1] - 6:23
**upstairs** [1] - 60:2
**urine** [1] - 72:4
**US** [1] - 66:6

## V

**vacillation** [1] -
23:5
**variety** [1] - 81:15
**various** [3] - 9:15;
25:2; 37:6
**verbal** [1] - 61:9
**verbally** [5] - 5:21;
31:4; 35:11;
42:22; 60:11
**verdict** [1] - 79:21
**verified** [1] - 22:1
**versa** [1] - 8:17
**versus** [4] - 2:1;
3:7; 40:7; 54:14
**vice** [1] - 8:17
**victim** [8] - 8:17;
41:9; 52:20;
53:1, 4, 7; 62:8
**victims** [1] - 68:15
**video** [3] - 60:13;
80:18; 81:1
**view** [1] - 84:11
**viewed** [1] - 81:23
**views** [6] - 49:22;
50:19, 22; 51:5,
7
**violates** [1] - 26:6
**violation** [11] -
24:16, 23;
25:16, 21, 25;
26:3; 59:5; 80:7,
9; 82:25; 87:23
**violations** [15] -
12:24; 24:1, 3;
26:1; 27:12;
34:8, 11, 14;
36:14, 18, 22;
37:6; 52:9; 59:6;
71:16
**violence** [1] -
76:15
**violent** [3] - 77:5,
8, 12
**visit** [9] - 30:8, 10;
34:2; 59:19;
60:4; 61:5;
89:20
**visiting** [1] -
40:12
**visits** [6] - 32:2,
18
**VOL** [1] - 2:2
**volume** [1] - 34:6
**volunteer** [3] -
12:4; 46:15;
74:21
**vulnerable** [2] -
68:13; 80:14

## W

**wait** [2] - 24:19;
73:12
**waiting** [3] - 30:1;
60:9; 62:16
**waiver** [1] - 42:10
**waivers** [3] -
10:13; 23:7;
42:6
**walked** [2] - 6:21;
60:2
**wants** [2] - 42:11;
82:10
**warden** [7] - 8:13;
13:4; 76:9; 83:9;
85:14; 90:21;
91:25
**Warden** [18] -
4:18; 6:12;
22:23; 23:14,
20, 22-23;
30:22; 39:12;
44:25; 45:5, 10;
46:23; 48:18;
49:4, 10; 73:25;
90:15
**Warden's** [2] -
23:19; 48:2
**wardens** [1] -
85:14
**Washington** [7] -
65:3; 66:1;
67:25; 68:6, 19,
23; 74:14
**watch** [1] - 92:25
**water** [5] - 13:19;
72:4; 81:10
**waving** [1] - 29:3
**ways** [4] - 58:16;
83:21; 84:21;
90:2
**WCI** [4] - 14:4;
47:6; 78:15
**WEBER** [13] -
3:12; 4:7; 95:20;
96:6, 8; 97:6,
11, 18, 24;
100:14; 101:4,
8, 15
**Weber** [4] - 3:12;
4:6; 63:7; 101:3
**Wednesday** [11] -
96:5, 16, 22-23;
97:5, 7, 12-14,
20; 98:7
**week** [8] - 13:5;
16:10; 18:4, 7;
99:9; 100:12;
101:12

**weekly** [1] - 18:3
**weeks** [1] - 62:6
**weigh** [1] - 9:21
**weight** [1] - 81:17
**WEISBAUM** [1] - 3:18
**Weisbaum** [1] - 3:18
**wellbeing** [1] - 71:11
**Western** [1] - 99:15
**whole** [6] - 10:16, 21; 36:5; 38:1; 39:20; 46:23
**willing** [1] - 10:16
**wind** [1] - 78:9
**window** [3] - 28:10, 16; 90:23
**windows** [5] - 28:1, 20, 22; 83:8; 91:3
**wing** [1] - 91:6
**wish** [1] - 70:3
**wishes** [3] - 10:22; 62:18
**withdraw** [2] - 11:19; 14:9
**withdrawal** [1] - 52:7
**withdrawing** [1] - 53:8
**withdrawn** [2] - 43:4, 13
**withdrew** [1] - 8:23
**WITNESS** [14] - 4:13; 30:20; 45:6, 20; 50:14; 53:24; 54:3; 55:9; 64:13; 72:15; 73:10; 77:17; 78:3; 92:17
**Witness** [2] - 2:7, 12
**witness** [14] - 4:14; 5:22; 28:13; 29:6, 15; 52:22; 64:6, 16; 86:21; 92:1; 99:2, 10; 100:17
**witnesses** [7] - 53:13; 63:6; 94:20; 95:13; 99:4, 12
**WITNESSES** [2] - 2:5, 9
**woman** [4] - 46:7; 81:16

**Women** [3] - 39:6; 40:4; 44:14
**women** [21] - 32:21; 39:2; 40:21; 45:12, 25; 47:6, 11; 56:7; 74:10, 15, 17, 19, 23; 75:17, 25; 76:25; 77:2, 5; 89:19
**women's** [10] - 39:14; 74:10, 15, 17; 75:17; 76:11; 77:1; 86:7; 87:12; 94:7
**word** [1] - 72:1
**worker** [7] - 13:13, 15, 17; 14:7; 51:15; 53:14
**workers** [5] - 31:23-25; 51:22
**works** [3] - 69:7; 76:20; 91:25
**world** [1] - 90:4
**worse** [1] - 30:18
**wrapping** [1] - 44:22
**write** [10] - 5:5, 8, 19; 21:12; 22:15; 30:4; 31:1-3; 53:15
**writing** [4] - 14:14, 21-22, 25
**written** [6] - 5:10, 20; 14:23; 25:21; 28:12; 34:7
**wrongdoing** [1] - 43:22

## Y

**yard** [31] - 27:23; 28:16, 19, 21; 29:5, 7, 16; 32:5; 34:2, 16; 35:21; 36:20; 40:12; 43:14; 59:12; 60:1; 82:25; 83:11, 20, 23; 84:1, 5; 85:5; 90:10, 20, 25; 91:6, 22; 93:11
**yards** [1] - 28:2
**year** [1] - 18:14
**years** [2] - 65:4;

77:8
**yelling** [3] - 30:2; 91:5, 20
**yesterday** [23] - 5:17; 6:7; 11:25; 14:11; 15:11, 15; 16:11; 25:5; 37:23; 43:6, 9; 47:7, 19; 52:8; 57:15, 17-18, 20; 58:11; 60:12; 70:11; 76:22; 94:23
**York** [2] - 65:13; 74:25
**yourselves** [1] - 3:11

## §

**§** [1] - 101:20