# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

(Northern Division)

CHELSEA GILLIAM, *et al.*,

          Plaintiffs,

v.

DEPARTMENT OF PUBLIC SAFETY
AND CORRECTIONAL SERVICES, *et al.*,

          Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Civil Action No. 1:23-cv-1047

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION TO ENFORCE TEMPORARY RESTRAINING ORDER

Eve L. Hill (Bar No. 19938)
Sharon Krevor-Weisbaum (Bar No. 04773)
Jessica P. Weber (Bar No. 17893)
Evan Monod (Bar No. 30541)
Lauren A. DiMartino (Bar No. 22046)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
(410) 962-1030 (phone)
(410) 385-0869 (fax)
ehill@browngold.com
skw@browngold.com
jweber@browngold.com
emonod@browngold.com

Deborah M. Golden (Bar No. 18657)
The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332
dgolden@debgoldenlaw.com

*Attorneys for Plaintiff*

Dated: February 23, 2024

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

I.     Executive Directive OPS.131.0001 mandates an individualized assessment that "seriously consider[s] the inmate's opinion" regarding her own safety. ........................... 2

II.    PREA requires DPSCS to prioritize the health and safety of inmates in housing evaluations, and, rather than make a decision based solely on an inmate's genitalia, consider the inmate's physical build, gender identity, sexual orientation, history of sex offenses, and the inmate's own perception of vulnerability. ....................................... 3

III.   The Court's Order required DPSCS to conduct a housing assessment for Ms. Grey that complied with OPS.131.0001 and PREA, to ensure the correctional officer that assaulted Ms. Grey not have contact or access to her, and to provide facial hair inhibitor cream. ................................................................................................................. 4

ARGUMENT ...................................................................................................................... 4

I.     DPSCS did not meet with Ms. Grey for her evaluation and its consideration of her housing preference and perception of vulnerability to abuse was in name only. ............... 4

II.    DPSCS's "process of elimination" approach to Ms. Grey's housing placement is replete with fallacies and retaliation, and results in her indefinite isolation in administrative segregation. ................................................................................................. 6

III.   DPSCS's housing assessment is not individualized and thus does not comply with OPS.131.0001 or PREA................................................................................................... 13

IV.    DPSCS's focus on Ms. Grey's genitals is misinformed and does not comply with DPSCS policy, PREA, or federal case law as it effectively precludes the housing of almost any transgender woman with women inmates. ....................................................... 14

V.     DPSCS improperly gave too much weight to the hypothetical risk of Ms. Grey becoming a safety threat to other women while ignoring the very real and imminent threats to her own safety. .................................................................................................. 18

VI.    DPSCS's feigned concern about Ms. Grey's mental health needs is speculative, discriminatory, and illogical. ........................................................................................... 24

VII.   DPSCS has failed to provide Ms. Grey with facial hair inhibitor product and regular access to razors as ordered by this Court. ......................................................................... 27

CONCLUSION................................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*A.T. by & through Tillman v. Harder*,
  298 F. Supp. 3d 391 (N.D.N.Y. 2018) ......................................................... 26

*Bell v. Wolfish*,
  441 U.S. 520 (1979) .................................................................................... 23

*Booker v. S.C. Dep't of Corr.*,
  855 F.3d 533 (4th Cir. 2017) ......................................................................... 8

*Brown v. Washington Dep't of Corr.*,
  No. C13-5367 RBL-JRC, 2015 WL 4039322 (W.D. Wash. May 13, 2015) ........................... 26

*Davis v. Ayala*,
  576 U.S. 257, 135 S. Ct. 2187 (2015) ........................................................ 12

*Doe v. District of Columbia*,
  215 F. Supp. 3d 62 (D.D.C. 2016) ............................................................. 19

*Doe v. Washington State Dep't of Corr.*,
  No. 4:21-CV-5059-TOR, 2021 WL 2453099 (E.D. Wash. May 17, 2021) ..................... 19

*Farmer v. Brennan*,
  511 U.S. 825 (1994) ............................................................................. 2, 20

*Fletcher v. Foxwell*,
  Civil Action No. TDC-18-2720, 2019 U.S. Dist. LEXIS 185639 (D. Md. Oct. 25, 2019) ........ 8

*Hampton v. Baldwin*,
  No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730 (S.D. Ill. Nov. 7, 2018) ................. 5, 9, 13, 24

*Henderson v. Thomas*,
  913 F. Supp. 2d 1267 (M.D. Ala. 2012) ...................................................... 26

*Iglesias v. Fed. Bureau of Prisons*,
  No. 19-CV-415-NJR, 2021 WL 6112790 (S.D. Ill. Dec. 27, 2021) ................... 13, 26

*JJS v. Pliler*,
  No. 19CV02020VSBSN, 2022 WL 16578124 (S.D.N.Y. Aug. 3, 2022) ................... 18, 22, 23

*Martin v. Duffy*,
  858 F.3d 239 (4th Cir. 2017) ..................................................................... 8

*Olmstead v. L.C. ex rel. Zimring*,
  527 U.S. 581 (1999) ............................................................................. 26

*Powell v. Schriver*,
    175 F.3d 107 (2d Cir. 1999) ................................................................ 19

*Shelby v. Petrucci*,
    No. 19-CV-2020 (VSB), 2022 WL 16575766 (S.D.N.Y. Nov. 1, 2022) ................................ 18

*Shields v. Prince George's County, Md.*,
    2019 WL 3536800 (D. Md. 2019) ......................................................... 26

*Soneeya v. Mici*,
    No. CV 07-12325-DPW, 2024 WL 550171 (D. Mass. Feb. 12, 2024) ............................ *passim*

*Tay v. Dennison*,
    457 F. Supp. 3d 657 (S.D. Ill. 2020) ...................................................... *passim*

*Turner v. Safley*,
    482 U.S. 78 (1987) .......................................................................... 23

*Williams v. Kincaid*,
    45 F.4th 759 (4th Cir. 2022) ............................................................ 19

*Zollicoffer v. Livingston*,
    169 F. Supp. 3d 687 (S.D. Tex. 2016) .................................................... 19

## Regulations

28 C.F.R. § 115.41 ................................................................................ 9

28 C.F.R. § 115.42 ............................................................................ 9, 27

28 C.F.R. § 115.43 ............................................................................... 17

## Other Authorities

Paul Gendreau, N.L. Freedman, G.J.S. Wilde & G.D. Scott, *Changes in EEG Alpha*
    *Frequency and Evoked Response Latency During Solitary Confinement*,
    79 J. of Abnormal Psychol. 54 (1972) .................................................... 12

Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*,
    49 Crime & Delinq. 124 (2003) ........................................................... 11

Dr. Hernàn Reyes, *The Worst Scars Are in the Mind: Psychological Torture*,
    89 Int'l Rev. Red Cross 591 (2007) ...................................................... 10

Eric Lanes, *The Association of Administrative Segregation Placement and Other Risk*
    *Factors with the Self-Injury-Free Time of Male Prisoners*,
    48 J. of Offender Rehab. 529 (2009) .................................................... 11

Executive Directive OPS.131.0001 Identification, Treatment and Correctional
    Management of an Inmate Diagnosed with Gender Dysphoria ........................................ *passim*

Hans Toch, *Mosaic of Despair: Human Breakdown in Prison* (1992) ........................................ 11

Holly A. Miller & Glenn R. Young, *Prison Segregation: Administrative Detention
    Remedy or Mental health Problem?*,
    7 Crim. Behav. & Mental Health 85 (1997) ............................................................................ 11

Holly A. Miller, *Reexamining Psychological Distress in the Current Conditions
    of Segregation*,
    1 J. of Correctional Healthcare 39 (994) .................................................................................. 11

Metin Basoglu, et al., *Torture vs. Other Cruel, Inhuman and Degrading Treatment: Is the
    Distinction Real or Apparent?*
    64 Arch. of Gen. Psychiatry 277 (2007) .................................................................................. 10

Richard Korn, *The Effects of Confinement in the High Security Unit at Lexington*,
    15 Soc. Just. 8 (1988) .............................................................................................................. 11

Stanley L.  Brodsky & Forest R. Scogin, *Inmates in Protective Custody: First Data on
    Emotional Effects*,
    1 Forensic Rep. 267 (1988) ...................................................................................................... 11

Stuart Grassian, *Psychopathological Effects of Solitary Confinement*,
    140 Am. J. of Psychiatry 1450 (1983) ................................................................................ 10, 11

Valerie Jenness et al., *Violence in California Correctional Facilities: An Empirical
    Examination of Sexual Assault* 2, U.C. Irvine Ctr. For Ev.-Based Corrections (2007) ............ 19

## INTRODUCTION

After a three-day hearing that acknowledged Plaintiff Chloe Grey's diagnosis of Gender Dysphoria, her need for gender-affirming care, and the irreparable harm to her health and safety she was facing, the Court instructed the Maryland Department of Public Safety and Correctional Services ("DPSCS") to conduct an individualized assessment of Ms. Grey's housing to determine whether it was appropriate to place her in a facility designated for women. Critical to this assessment and Ms. Grey's welfare is the mandate that DPSCS follow its internal policy to "diagnose, treat and manage inmates diagnosed with gender dysphoria in a manner consistent with appropriate treatment, custody and security standards" (Executive Directive OPS.131.0001 Identification, Treatment and Correctional Management of an Inmate Diagnosed with Gender Dysphoria, § .03(A)) and follow the guidelines outlined in the Prison Rape Elimination Act of 2003 ("PREA"). *See* OPS.131.0001(K)(1).

The housing assessment DPSCS filed on January 4, 2024, however, disregarded its own policy, PREA, and federal law by neglecting to seriously consider Ms. Grey's needs and well-being in an individualized analysis. The assessment paid mere lip service to Ms. Grey's opinion on what is needed to keep her safe, too heavily weighed Ms. Grey's genitalia, and relied on misconceptions, stereotypes, and other criteria that federal courts have found improper in a housing assessment. Instead of seriously considering whether Ms. Grey should be housed in a women's facility, the assessment concluded that she should be punished for her request and moved to the most dangerous men's facility in the DPSCS system – North Branch Correctional Institution ("NBCI").

In June, it will have been thirty years since the Supreme Court found that housing a transgender inmate who "projects feminine characteristics" in general population "despite knowledge that the penitentiary had a violent environment and a history of inmate assaults" can

constitute deliberate indifference to the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 831, 847 (1994). DPSCS does not heed that warning in its housing evaluation of Ms. Grey, nor does it comply with its own policy or PREA in its recently self-reported practice of housing individuals "according to physical genitalia." Ex. 9, Md. Dep't of Pub. Safety & Corr. Svcs., *Treatment of Transgender Incarcerated Individuals* 5 (Nov. 2023). DPSCS further neglects to fully comply with the Court's mandate to ensure Ms. Grey is receiving the gender-affirming care that she was prescribed. Therefore, Ms. Grey asks this Court to enforce its December 4, 2023 order and determine that, based on the only legitimate factors cited in the DPSCS housing assessment, Ms. Grey should be housed in a women's facility, and to require DPSCS to provide Ms. Grey with hair removal cream.

## **BACKGROUND**

I.    **Executive Directive OPS.131.0001 mandates an individualized assessment that "seriously consider[s] the inmate's opinion" regarding her own safety.**

Under Executive Directive OPS.131.0001 Identification, Treatment and Correctional Management of an Inmate Diagnosed with Gender Dysphoria, the DPSCS is required to evaluate a "Gender Dysphoric inmate's housing placement" on a "case-by-case basis seriously considering the inmate's opinion regarding the inmate's safety." OPS.131.0001(J)(1). The evaluation should also consider the "inmate's biological gender presentation and appearance" which may be based on "[i]ntact external genitalia and secondary sex characteristics, such as pubic hair, chest hair, facial hair;" and "[s]pecific factors, such as partial completion of sex reassignment surgery, removal or augmentation of breasts, or removal of testicles." OPS.131.0001(J)(1)(a)–(b). The evaluation should involve "the facility's Security Chief and Case Management staff with support from the Director, Clinical Services and Deputy Director of Mental Health or specialty consultation considering safety, security, or operational issues," and

although "[m]ental health staff may provide input as to clinical recommendations," the ultimate

"determination regarding housing placement is the responsibility of the managing official."

OPS.131.0001(J)(2)–(3). The policy about custody issues mandates that "[a] Gender Dysphoric

inmate shall be confined in accordance with provisions established under the Prison Rape

Elimination Act of 2003 and all related Department policy and procedures."

OPS.131.0001(K)(1).

**II.     PREA requires DPSCS to prioritize the health and safety of inmates in housing evaluations, and, rather than make a decision based solely on an inmate's genitalia, consider the inmate's physical build, gender identity, sexual orientation, history of sex offenses, and the inmate's own perception of vulnerability.**

Relevant to the housing assignment of an inmate with Gender Dysphoria, DPSCS should

consider an inmate's risk of being sexually abused by other inmates by evaluating the following

criteria:

(1)     Whether the inmate has a mental, physical, or developmental disability;

(2)     The age of the inmate;

(3)     The physical build of the inmate;

(4)     Whether the inmate has previously been incarcerated;

(5)     Whether the inmate's criminal history is exclusively nonviolent;

(6)     Whether the inmate has prior convictions for sex offenses against an adult or child;

(7)     Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;

(8)     Whether the inmate has previously experienced sexual victimization;

(9)     The inmate's own perception of vulnerability; and

(10)    Whether the inmate is detained solely for civil immigration purposes.

28 C.F.R. § 115.42(a); 28 C.F.R. § 115.41(a), (d). A priority of the evaluation should be ensuring

the safety of each inmate. 28 C.F.R. § 115.42(b). Under PREA, "housing decisions should not be

made solely on the basis of genitals." *Tay v. Dennison*, 457 F. Supp. 3d 657, 681 (S.D. Ill. 2020).

**III.    The Court's Order required DPSCS to conduct a housing assessment for Ms. Grey that complied with OPS.131.0001 and PREA, to ensure the correctional officer that assaulted Ms. Grey not have contact or access to her, and to provide facial hair inhibitor cream.**

In ruling on Ms. Grey's Motion for a Temporary Restraining Order, this Court ordered

DPSCS to "conduct an assessment of Plaintiff's housing placement consistent with" DPSCS

Executive Directive no. OPS.131.0001 "to determine whether to place Plaintiff in a facility

designated for women." ECF No. 75 at 1. On its terms, any such assessment must comply with

PREA standards providing that "agencies must make individualized determinations about how to

ensure the safety of each inmate and to make determinations on a case-by-case basis whether a

placement at a facility designated for the transgender inmate's gender identity would ensure the

inmate's health and safety and whether such a placement would present management or security

problems." Ex. 1, Tr. of Proceedings, Motions Hearing Excerpt, Court's Ruling, Dec. 1, 2023, at

18:17-24. The Court further required DPSCS to "[e]nsure that the correctional officers identified

by Plaintiff as having allegedly assaulted Plaintiff on or about November 9, 2023, have no

contact with nor access to Plaintiff, until further order of the Court" and to provide Ms. Grey

with "any over-the-counter facial hair inhibitor product that is a reasonable replacement for the

facial hair inhibitor cream Plaintiff has been prescribed." ECF No. 75. at ¶¶ 4, 6.

<u>**ARGUMENT**</u>

**I.    DPSCS did not meet with Ms. Grey for her evaluation and its consideration of her housing preference and perception of vulnerability to abuse was in name only.**

Under OPS.131.0001(J) and PREA, a transgender inmate's own views about their safety

should "be given serious consideration" in a housing evaluation. 28 C.F.R. § 115.42(e).

4

Although DPSCS states that "Ms. Grey has expressed a strong preference for being housed in a women's institution," and alleges that her preference "was seriously considered," Def. Status Rpt., ECF No. 85 at 3, nothing in DPSCS's approach or reasoning demonstrates that to be the case. Ex. 2, Decl. of Dan Pacholke, at ¶ 18.

First, no one from DPSCS met with Ms. Grey to understand her safety concerns or preferences. *Compare* Ex. 3, Decl. of Chloe Grey, at ¶ 4 (stating that no one from DPSCS met with Ms. Grey before submitting her housing evaluation) *with Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *12 (S.D. Ill. Nov. 7, 2018) (finding a housing evaluation insufficient because the Committee "never considered whether [plaintiff] felt safe or secure in a men's prison" and "never even interviewed [plaintiff] personally").

Second, DPSCS's disregard for Ms. Grey's view about her own safety is further evidenced by the fact that the evaluation mentions none of the actual risks and harm Ms. Grey faced and continues to face while housed with men. There is no mention of the sexual assault she experienced at WCI, *see* ECF No. 50–6 at ¶¶ 11–12, or by the correctional officer at Patuxent that left her with bruises on her breast, *see* ECF No. 50-6 Exs. A–C[1]; *see also* Ex. 7, TRO Hearing Tr. Vol. I, Nov. 21, 2023, at 59:3–60:24 (direct examination of Ms. Grey in which she describes the sexual assault at Patuxent). Nor do Defendants mention the threats Ms. Grey's fellow inmates made towards her. ECF No. 50–6 at ¶ 16.

Instead, of paying credence to the requirements outlined by DPSCS policy and federal law, DPSCS provides illogical—and, at times, illegal—justifications for a decision that was already made.

---

[1] These exhibits were sealed pursuant to the Court's order on December 12, 2023. ECF No. 79.

II.    **DPSCS's "process of elimination" approach to Ms. Grey's housing placement is replete with fallacies and retaliation, and results in her indefinite isolation in administrative segregation.**

DPSCS, in its post-hoc justification for the already-made decision to house Ms. Grey with men at NBCI, *see* Grey Decl.at ¶¶ 14, 6, explains "that [it] settled on NBCI through a process of elimination," Pacholke Decl. at ¶ 45; *see also* Ex. 4, Decl. of Valerie Jenness, at ¶ 50 (stating that DPSCS conducted "what appears to be a 'process of elimination' that eliminated th[e] option [to be housed with women] at least in part because of Ms. Grey's genitalia"). DPSCS's reasons, however, for wholly excluding Patuxent, Western Correctional Institute ("WCI"), Jessup Correctional Institution ("JCI"), and Maryland Correctional Institution – Women ("MCI-W") were illogical, discriminatory, and/or retaliatory.

According to DPSCS, Ms. Grey cannot be assigned to MCI-W because inmates there "often engage in sexual relationships." ECF No. 85 at 3.  By this logic, DPSCS unofficially tolerates sex between cis-women, but draws the line at sex between transwomen and cis-women. "If MCI-W is the only appropriate security facility for women that would otherwise fit the needs of Ms. Grey, DPSCS has an obligation and the ability to adequately secure the facility for all inmates—female and transgender." Pacholke Decl. at ¶ 51. As explained further below, *see infra* § III, this reasoning is not even applicable to Ms. Grey, whose sexual preference for men is well documented. *See id.* at ¶ 52 ("Since Ms. Grey has no sexual interest in women, the risk of her engaging in sex at a women's institution is much lower than it is keeping her at a male facility."); *see also id.* at ¶ 53 ("While enforcing policies prohibiting sexual contact between inmates is undoubtably difficult, this is no justification to send Ms. Grey to NBCI, where it is just as difficult to enforce those policies, and where the risk of sexual violence is higher because of the nature of the inmate population there."). Besides the obvious equal protection violation that this

reasoning creates, it is also based on misinformation and flouts Executive Directive OPS.131.0001, PREA, and the mandate of this Court.

DPSCS further alleges that it cannot house her at MCI-W because "if Ms. Grey experienced a mental health crisis at MCI-W, the only facility in the Jessup Region that is equipped to assist her is Patuxent, where she cannot be transferred." ECF 85 at 3. Yet Ms. Grey has not experienced any mental health crises since before her transition began and a lack of available mental health services "is not an excuse to not house an inmate at an otherwise safer institution." Pacholke Decl. at ¶ 50.

Next, DPSCS determined that Ms. Grey could not be housed at WCI because of two singular inmates housed at WCI: an inmate against whom Ms. Grey filed a PREA complaint, and Scott Brill. ECF 85 at 3-4. First, Ms. Grey's "history with Scott Brill . . . should not preclude her from a placement [at WCI]. While Mr. Brill is currently housed at WCI, staff there should be able to effectively separate two inmates." Pacholke Decl. at ¶¶ 47–48. Second, it is the abuser that should be removed from a situation during or as the result of an investigation of sexual assault, Ms. Grey—as the victim—should not be punished. *Cf.* Pacholke Decl. at ¶ 42. Reasoning that DPSCS has no choice but to place Ms. Grey in solitary confinement in a men's super-max prison because she exercised her rights under PREA to speak up about sexual assault is classic retaliation.

DPSCS then claims—for a similar reason—that "Ms. Grey could not remain at Patuxent, on either the male or female tier" because the staff members of whom Ms. Grey has filed complaints against "are prohibited from working near" her. ECF No. 85 at 2. But the Court's order does not state that Ms. Grey must not be in proximity of any staff member against whom Ms. Grey lodged a complaint, only that the correctional officer that sexually assaulted Ms. Grey

have no contact with nor access to her. Such a keep-away order should not prohibit Ms. Grey from remaining at Patuxent or being placed at MCI-W. Pacholke Decl. at ¶ 38.

Filing a grievance and raising issues to this Court are both solidly within the protection of the First Amendment. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017). Retaliation can be established if in response to the First Amendment activity, the prison takes actions that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (cleaned up).

Denying Ms. Grey access to the housing assignment that would be best for her safety and health because she has reported sexual abuse is retaliatory. *Cf. Fletcher v. Foxwell*, Civil Action No. TDC-18-2720, 2019 U.S. Dist. LEXIS 185639, at *13 (D. Md. Oct. 25, 2019) (refusing a prisoner dinner and placing him in lock up, stating "You know the fuck why," six months after filing a PREA claim stated a cause of action for retaliation). Certainly, no woman of ordinary firmness would complain about custodial sexual assault if she knew the complaint would mandate her transfer to a men's supermax facility. To comply with PREA, it is the abuser that should be removed from the situation during an investigation and punished should the accusations be found credible, not Ms. Grey. Pacholke Decl. at ¶ 42.[2]

Additionally, DPSCS complains that Ms. Grey "has received multiple rule violations at Patuxent within a relatively short time period." ECF 85 at 2. They fail to consider that in Ms.

---

[2] Further, DPSCS claims that Ms. Grey cannot be placed on the women's tier of Patuxent because the staff members who harassed and sexually assaulted her continue to work there. It is of concern that a correctional officer undergoing an investigation for sexual assault is working on the women's tier of Patuxent. ECF No. 85, at 2; *See also* Ex. 8, TRO Hearing Tr. Vol. II, Nov. 22, 2023, at 42:18–43:3, 44:12–16 (Direct examination of Assistant Warden Stewart explaining that Patuxent Institution for Women has the same staff at Patuxent because it is not a separate institution, and that Ms. Grey would therefore still be in contact with staff who sexually harassed and assaulted her.).

Grey's eight years in Maryland correctional institutions, she never received a rule violation until she arrived at Patuxent and began to exercise her rights. *Compare* Grey Decl. at ¶ 52 *with Hampton*, 2018 WL 5830730 at *11-12 (stating that Defendants' reliance on the plaintiff's aggression towards staff when evaluating a housing placement ignored the fact that plaintiff's violations did not occur until after plaintiff's motion for preliminary injunction had been filed, "indicating it may be a forbidden *post hoc* justification created in response to litigation"). In a housing assessment, disciplinary agencies should consider "whether [plaintiff]'s conduct leading to her discipline [was] a result of misgendering and the staff's general ignorance of transgender issues, such as ... calling her names and then disciplining her for acting out in response to the harassment." *Hampton*, 2018 WL 5830730 at *17 n. 5. Ms. Grey is not the problem at Patuxent.[3]

Of most importance, DPSCS's "process of elimination" should have eliminated NBCI because it is inappropriate to place her in a "super-maximum security facility" intended for male inmates with the most extreme behavioral issues. Pacholke Decl. at ¶ 31-33; *see also id.* ("There is a continuum of decisions DPSCS could make regarding Ms. Grey's housing—with placing her in a women's facility at one end and an end-of-the-line, maximum security prison like NBCI at the other. DPSCS is taking the most extreme position without any rational justification. In that regard, Ms. Grey's placement at NBCI appears to be punitive."). All housing at NBCI is double-

---

[3] Nonetheless, it is unsurprising that Ms. Grey would receive rule violations in response to being housed in a men's prison—"a predatory environment that deprives [her] of liberty, incites fear, and compromises safety." Jenness Decl. at ¶ 35. In a men's prison, transgender women "are left to manage hostile and dangerous environments on their own and often do so in ways that violate the rules and regulations of prisons. Predictably, they turn to proactive and reactive coping strategies, sometimes in the form of . . . participation in a survival economy, as a form of conflict resolution that makes sense to them in a prison environment." *Id.*

celled and the risk of Ms. Grey experiencing abuse there is significantly higher than in other facilities in Maryland.[4] *Id.* at ¶ 34-36; *see also* Grey Decl. at ¶¶ 18–22, 41-44.

As a result of the danger imposed upon Ms. Grey at NBCI, to date, and apparently for the long term, NBCI is holding Ms. Grey in solitary confinement or administrative segregation. Grey Decl. at ¶¶ 7-8, 46, 51. She is held in a cell roughly the size of a parking space, with no windows nor a meaningful means of connection to the rest of the human world. In that cell, she eats, sleeps, urinates, and defecates. Solitary confinement or administrative segregation cannot be a long-term solution for Ms. Grey's safety. Pacholke Decl. at ¶¶ 35-40 (stating that "[p]lacing Ms. Grey in indeterminate administrative segregation at NBCI...serves only to inflict further harm" and "increases the risk of suicide and self harm"); Jenness Decl. at ¶¶ 40-41 (explaining that restrictive housing "has been deemed 'the most devastating experiences a human can endure,'" particularly for transgender women in prisons for men, and, as a result "[h]ousing Ms. Grey in administrative segregation is not a feasible long-term solution and would be devastating to her well-being"). Research shows that some of the clinical impacts of isolation can be similar to those of physical torture.[5] People subjected to solitary confinement exhibit a variety of negative physiological and psychological reactions, including hypersensitivity to stimuli;[6] perceptual

---

[4] This risk is increased because NBCI has made it nearly impossible to file complaints. Grey Decl. at ¶¶ 32–34.

[5] Dr. Hernàn Reyes, *The Worst Scars Are in the Mind: Psychological Torture*, 89 Int'l Rev. Red Cross 591, 607 (2007), Metin Basoglu, et al., *Torture vs. Other Cruel, Inhuman and Degrading Treatment: Is the Distinction Real or Apparent?* 64 Arch. of Gen. Psychiatry 277 (2007).

[6] Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. of Psychiatry 1450, 1452 (1983).

distortions and hallucinations;[7] increased anxiety and nervousness;[8] revenge fantasies, rage, and irrational anger;[9] fears of persecution;[10] lack of impulse control;[11] severe and chronic depression;[12] appetite loss and weight loss;[13] heart palpitations;[14] withdrawal;[15] blunting of affect and apathy;[16] talking to oneself;[17] headaches;[18] problems sleeping; confusing thought processes;[19] nightmares;[20] dizziness;[21] self-mutilation;[22] and lower levels of brain function,

---

[7] *Id*.; Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 130 (2003); *see generally* Richard Korn, *The Effects of Confinement in the High Security Unit at Lexington*, 15 Soc. Just. 8 (1988).

[8] Grassian, *supra* n. 6, at 1452-53; Haney, *supra* n. 7, at 130, 133; Holly A. Miller, *Reexamining Psychological Distress in the Current Conditions of Segregation*, 1 J. of Corr. Healthcare 39, 448 (994); *see generally* Stanley L. Brodsky & Forest R. Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, 1 Forensic Rep. 267 (1988).

[9] Grassian, *supra* n. 6, at 1453; Holly A. Miller & Glenn R. Young, *Prison Segregation: Administrative Detention Remedy or Mental health Problem?*, 7 Crim. Behav. & Mental Health 85, 91 (1997); Haney, *supra* n. 7, at 130, 134; *see generally* Hans Toch, *Mosaic of Despair: Human Breakdown in Prison* (1992).

[10] Grassian, *supra* n. 6, at 1453.

[11] *Id*., Miller & Young, *supra* n. 9, at 92.

[12] Grassian, *supra* n. 6, at 1453; Miller & Young, *supra* n. 9, at; Haney, *supra* n. 7, at 131.

[13] Haney, *supra* n. 7, at 130; *see generally* Korn, *supra* n. 7.

[14] Haney, *supra* n. 7, at 131.

[15] Miller & Young, *supra* n. 9, at 91; *see generally* Korn, *supra* n. 7.

[16] Miller & Young, *supra* n. 9, at 91; see generally Korn, *supra* n. 7.

[17] Haney, *supra* n. 7, at 134; *see generally* Brodsky & Scogin, *supra* n. 8.

[18] Haney, *supra* n. 7, at 133.

[19] Haney, *supra* n. 7, at 137; *see generally* Brodsky & Scogin, *supra* n. 8.

[20] Haney, *supra* n. 7, at 133.

[21] *Id*.

[22] Grassian, *supra* n. 6, at 1453; Eric Lanes, *The Association of Administrative Segregation Placement and Other Risk Factors with the Self-Injury-Free Time of Male Prisoners*, 48 J. of Offender Rehab. 529, 539-40 (2009).

including a decline in EEG activity after only seven days in solitary confinement.[23] "Solitary confinement [is a] regime that will bring you to the edge of madness, perhaps to madness itself." *Davis v. Ayala*, 576 U.S. 257, 288, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J, concurring).

By placing Ms. Grey in an institution where she must be segregated to remain safe, DPSCS has violated PREA, 28 C.F.R. § 115.43, and put Ms. Grey at risk *see also* E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23 Int'l J. of Transgender Health S1, S108 (2022), https://www.wpath.org/publications/soc (calling for transgender inmates not to be segregated or isolated because "isolation can cause severe psychological harm and gross disturbances of functioning. National prison standards organizations as well as the United Nations consider isolation longer than 15 days to be torture"); *Soneeya v. Mici,* No. CV 07-12325-DPW, 2024 WL 550171, at *3 (D. Mass. Feb. 12, 2024) ("The World Professional Association of Transgender Health's Standards of Care [ ] are governing standards of care for transgender individuals."); Pacholke Decl. at ¶ 31-32; *see also* Grey Decl. at ¶¶ 46-51. "It is the responsibility of a correctional agency to manage the population in their custody. Warehousing people in administrative segregation because they require greater case management and protection is not management. It is a dereliction of the agency's duty to protect." Pacholke Decl. at ¶ 41.

That DPSCS placed Ms. Grey at NBCI for retaliatory reasons is not post-hoc speculation. In a handwritten declaration executed on November 29, 2023, Ms. Grey averred that Captain Carter told her there were "high level talks re[garding] [Ms. Grey's] disposition" after the TRO hearing, and that Assistant Warden Stuart was pushing for NBCI to "show [her] what happens"

---

[23] Paul Gendreau, N.L. Freedman, G.J.S. Wilde & G.D. Scott, *Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement*, 79 J. of Abnormal Psy.54, 57-58 (1972).

when you complain. Grey Decl., Ex. A. at ¶¶ 14, 26. DPSCS's so-called individualized housing

assessment papers over the fact that the Department had already planned to punish Ms. Grey by

sending her to the most punitive Maryland prison, where her only hope of avoiding sexual

assault is to live alone in solitary confinement.

III.    **DPSCS's housing assessment is not individualized and thus does not comply with OPS.131.0001 or PREA.**

According to DPSCS, Ms. Grey cannot be assigned to a women's tier because inmates

housed on the women's tier "often engage in sexual relationships," and that NBCI is a proper

placement for Ms. Grey because it "successfully houses several other gender dysphoric IIs." ECF

No. 85 at 3-4. Such generalized reasoning is not an appropriate individualized assessment. *Tay*,

457 F. Supp. 3d at 681; *Iglesias v. Fed. Bureau of Prisons*, No. 19-CV-415-NJR, 2021 WL

6112790, at *24 (S.D. Ill. Dec. 27, 2021), *modified*, 598 F. Supp. 3d 689 (S.D. Ill. 2022) (holding

that generalized concerns about safety for women inmates when only two instances of

difficulties with housing transgender women with women "falls far short of an individualized

determination"). This reasoning fails to evaluate *Ms. Grey's* likelihood of engaging in sexual

relationships with women, neglects to individually compare Ms. Grey's situation with those of

the other transgender inmates housed at NBCI,[24] and, as a result, is "the precise kind of

generalized concern[] for prison security that courts routinely object." *Tay*, 457 F. Supp. 3d at

681; *see also Hampton*, 2018 WL 5830730 at *11 ("The State has presented no evidence that

---

[24] In addition to DPSCS's reliance on NBCI "successfully" housing other transgender inmates being facially invalid in an individualized assessment, DPSCS fails to provide information on what "successfully housing" looks like or the type of victimization the other transgender inmates are susceptible to. ECF No. 85 at 4. Regardless, the reasoning is improper under federal law. *Iglesias*, 2021 WL 6112790 at *24 (rejecting the Bureau of Prison's reliance on the experience of other transgender inmates in a housing assessment because those experiences "had nothing to do" with the plaintiff).

transgender inmates generally pose a greater security threat than cisgender inmates, and anyway, generalized concerns for prison security are insufficient to meet the demanding burden placed on the State to justify sex-based classifications.") (internal quotations omitted).

A truly individualized assessment of Ms. Grey would reflect *her* personal likelihood of engaging in a sexual relationship with another woman. *Tay*, 457 F. Supp. 3d at 681 (finding a housing evaluation was insufficient where the agency failed to consider that "Plaintiff testified that she identifies as female, but she is not sexually attracted to women" when evaluating whether to place the inmate in a women's facility). Indeed, PREA requires that agencies ask about an at-risk inmate's sexual orientation when conducting a housing assessment. U.S. Dep't of Just., PREA FAQs, Oct. 21, 2016, https://www.prearesourcecenter.org/frequently-asked-questions?keywords=&from=2016-10-21&to=2016-10-21&items_per_page=10 (stating that facilities must affirmatively inquire of the inmate's sexual orientation). As DPSCS tangentially acknowledged by their concern about placing Ms. Grey in the same facility at her "husband," Scott Brill, Ms. Grey's sexual orientation is to cisgendered men. Had DPSCS reviewed Ms. Grey's medical records, it would have confirmed that orientation. Ex. 5, Chloe Grey WCI Medical Records at 11 (noting that Ms. Grey is "attracted to men."). Thus, there is more evidence to suggest that Ms. Grey would engage in sexual acts on a men's tier than she would on a women's. Pacholke Decl. at ¶ 52. DPSCS's assumption that Ms. Grey would engage in sexual encounters with women inmates simply because she is what it refers to as a "intact biological male" is inaccurate, offensive, and steeped in stereotype.

**IV.    DPSCS's focus on Ms. Grey's genitals is misinformed and does not comply with DPSCS policy, PREA, or federal case law as it effectively precludes the housing of almost any transgender woman with women inmates.**

Despite the PREA requirement that housing assessments "not be made solely on the basis of genitals," *Tay*, 457 F. Supp. 3d at 681, DPSCS's reasoning for keeping Ms. Grey housed with

14

men is based almost exclusively on the fact that Ms. Grey has not undergone vaginoplasty and orchiectomy.[25] This is not only implied from DPSCS's housing evaluation for Ms. Grey, it is explicitly spelled out in a recent DPSCS report. Ex. 9, Md. Dep't of Pub. Safety & Corr. Svcs., *Treatment of Transgender Incarcerated Individuals* 5 (Nov. 2023) ("All transgender individuals are housed according to physical genitalia. A male who has had sexual reassignment surgery can be housed with female individuals.").

As a result of Ms. Grey being denied surgery on her genitals, DPSCS says Ms. Grey cannot be assigned to a women's tier because inmates housed on the women's tier "often engage in sexual relationships." ECF No. 85 at 4. DPSCS's concern about the hypothetical risk of Ms. Grey engaging in sexual acts with other women inmates because she is an "intact biological male" is not informed by facts. *See* Ex. 6, Decl. of Dr. Isabel S. Lowell, at ¶ 23 ("The term "intact biological male" is inaccurate, offensive, and not a medical term."). A person's gender cannot be determined solely by external genitalia. *Id.* ¶¶ 25–26 ("For example, if a man lost his penis due to injury, cancer, or war, that person would not cease to be a man because of his external genitalia. Instead, he would remain a man because he would identify as such."); Ex. 7, TRO Hearing Tr. Vol. I, Nov. 21, 2023, at 96:25-97:4 ("Q. Ms. Grey, isn't it true that you still have male genitalia? A. I wouldn't refer to it as that because my body has been dramatically altered by hormone replacement therapy and it's not what I would refer to as male genitalia.").

According to Dr. Lowell, if Ms. Grey is receiving the appropriate treatment with hormone therapy—which DPSCS claims she is—"then her testosterone level should be fully suppressed and within the normal female range." Lowell Decl. at ¶ 37. As such, she does not

---

[25] A vaginoplasty is defined as "the creation of a vaginal pouch." Ex. 6, Decl. of Dr. Isabel Lowell, at ¶ 28. Orchiectomy is defined as the surgical "removal of the testicles." *Id.*

have the physiological ability to obtain or maintain an erection, much less use her penis in a sexual encounter or assault. *Id.* at ¶ 39; *see also Tay*, 457 F. Supp. 3d at 681 (stating that if the plaintiff were able to participate in hormone therapy, the agency's "concern about her functioning male anatomy would no longer be an issue"). To the extent that DPSCS is worried about pregnancy, it is also unlikely that Ms. Grey can produce sperm given how long that she has been undergoing hormone replacement treatment. Lowell Decl. at ¶ 40.

As evidence that Ms. Grey's genitalia is an improper consideration for inmate safety and security, many other states conduct PREA-approved housing assessments that do not rely on external genitalia and have resulted in the successful placement of transwoman inmates in women's tiers. *See, e.g.*, Pacholke Decl. at ¶¶ 55-56 (stating that Washington state "has successfully housed transgender women in accordance with their gender identity at women's institutions, regardless of their genitalia, as have other state correctional agencies" and that "[t]here have been significant advances in practice in the past decade as to the management and care of transgender prisoners" that can serve as "advisors, guidance, and examples" for DPSCS to "advance their knowledge and practices").

Rather than solving for a security concern, by "[c]entering Ms. Grey's genitalia at the expense of her lived experience as a person with gender dysphoria," DPSCS is creating one. Pacholke Decl. at ¶ 26. As Valerie Jenness—an expert on prison violence and the experiences of gender-non-conforming inmates—explains, "the demeaned social status" of transgender women in men's prisons often results in what transgender inmates have referred to as "fight or fuck" situations—a way of describing predatory environments that result in a "lose-lose" situations. Jenness Decl. at ¶¶ 34-35.

DPSCS has—or should have—the ability to handle any security concerns. Pacholke Decl. at ¶¶ 46-53. The U.S. District Court of Massachusetts recently ordered that a transgender-woman inmate be transferred to a women's facility despite the Department of Corrections "security concerns," stating that "where MCI-Framingham is the only medium security facility for women, the DOC must as an operational obligation, and does as a matter of fact, have the capability of adequately managing and securing the inmate population that is committed to MCI-Framingham, including female and male transgender inmates." *Soneeya,* 2024 WL 550171 at *3 (relying on the opinion of plaintiff's security expert). Similarly, security expert Dan Pacholke believes that DPSCS's explanations for why Ms. Grey could not be housed at a women's institution "do not make sense from a security standpoint," and "if [DPSCS] were motivated to do so, [it] [could] find a smarter and safer placement for Ms. Grey in their system." Pacholke Decl. at ¶ 60; *see* Jenness Decl., at ¶¶ 16-17.

Finally, DPSCS's reliance on the fact that Ms. Grey has not undergone gender-affirming surgery on her genitalia effectively precludes the placement of almost any transgender woman on a women's tier—circumventing the requirement that the housing placement of transgender women be considered on an individual basis. *See* Jenness Decl. ¶ 19 (stating that policies that consider genitalia results in "transgender women [being] routinely placed in facilities for men where they endure unique 'pains of imprisonment'"). Despite Ms. Grey's eligibility and requests for gender-affirming surgeries such as vaginoplasty and orchiectomy, ECF No. 87–7 at 3–5; Lowell Decl. at ¶ 29, DPSCS has denied Ms. Grey's requests and stated that—as a policy—they do not perform such surgeries. ECF No. 87-7 at 6.  The weight DPSCS places on the presence of male genitalia thus means that a woman that has transitioned while in custody could never be placed in a women's facility, and that few who had transitioned before arrest could either. Only

17

10% of trans women have undergone vaginoplasty surgery, often because the procedure is cost prohibitive. Lowell Decl. ¶ 27. As a result, the likelihood of a woman in prison having had gender-affirming surgery is very low. *Id.* at 30. This, combined with DPSCS's practice housing "transgender individuals . . . according to physical genitalia" and housing transgender women "with female individuals" only once she "has had sexual reassignment surgery," Ex. 9 at 5, automatically precludes the vast majority of trans inmates from being housed with other inmates of the same gender, and thus violates both DPSCS policy and PREA. *See* U.S. Dep't of Just., PREA FAQs, Mar. 24, 2016, (explaining that "[a] PREA auditor must examine a facility or agency's *actual practices* in addition to reviewing official policy" because an "audit that reveals that all transgender or intersex inmates in a facility are, in practice, housed according to their external genital status raises the possibility of non-compliance" and raises the inference that the facility may not be "conducting truly individualized, case-by-case assessments for each transgender or intersex inmate").

**V.    DPSCS improperly gave too much weight to the hypothetical risk of Ms. Grey becoming a safety threat to other women while ignoring the very real and imminent threats to her own safety.**

Despite the evidence that Ms. Grey has been a victim of physical sexual assault and continues to be at risk of further harm while housed with men, *see* Jenness Decl. at ¶ 28; Grey Decl. at ¶¶ 18-22, DPSCS is concerned only with the imaginary threat that Ms. Grey poses to women inmates. There is nothing to support such a concern, and "[a] theoretical risk of sexual assault by [Ms. Grey], without more, cannot support [DPSCS]'s position. *JJS v. Pliler*, No. 19CV02020VSBSN, 2022 WL 16578124, at *20 (S.D.N.Y. Aug. 3, 2022), *report and recommendation adopted sub nom. Shelby v. Petrucci*, No. 19-CV-2020 (VSB), 2022 WL 16575766 (S.D.N.Y. Nov. 1, 2022) (citing *Bout*, 860 F. Supp. 2d at 310). "[T]he *hypothetical* concern that [Ms. Grey] will hurt someone must be counter-balanced by the *actual* evidence that

she has been assaulted and harassed in a men's facility." *Id.* (emphasis added) ("A theoretical risk of sexual assault by Petitioner, without more, cannot support the BOP's position."). An agency fails to genuinely "consider[ ] the likelihood of abuse" to a transgender woman inmate when it neglects to consider the fact that the inmate's "hormone levels are consistent with a woman's," that "women are considered by BOP to be less likely to commit sexual assault," and that "during [the inmate's] incarceration, she has had no incidents of violence or assault where she was the perpetrator (only the victim)." *Id.* at *18.

By now, it is indisputable that housing transgender women in men's prisons poses significant risk of sexual assault to transgender women. *Williams v. Kincaid*, 45 F.4th 759, 778 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414, 216 L. Ed. 2d 1270 (2023) ("[A] policy that houses transgender inmates based solely on their genitalia puts transgender inmates at further risk of harm. The safety risks of housing transgender women in men's prisons are by now well-recognized.") (citing *Powell v. Schriver*, 175 F.3d 107, 115 (2d Cir. 1999); *Tay*, 457 F. Supp. 3d at 682; *Doe v. District of Columbia*, 215 F. Supp. 3d 62, 76 (D.D.C. 2016); Valerie Jenness et al., Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault 2, U.C. Irvine Ctr. For Ev.-Based Corrections (2007)). Studies show that fifty-nine percent of transgender inmates in men's prisons are sexually assaulted, compared to about four percent of the general prison population. Jenness Decl. at ¶25; *see also Doe v. Washington State Dep't of Corr.*, No. 4:21-CV-5059-TOR, 2021 WL 2453099, at *5 (E.D. Wash. May 17, 2021) ("Plaintiffs are transgender individuals and are, therefore, at an increased risk of abuse while incarcerated. Thus, Plaintiffs are likely to succeed as to the first element of their Eighth Amendment claim."); *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 696 (S.D. Tex. 2016) (same).

The risk to Ms. Grey is not hypothetical: Ms. Grey has been sexually assaulted both by inmates and correctional officers. *See* ECF No. 50–6 at ¶¶ 11–12, Exs. A–C; Ex. 4 at 59:3–60:24. DPSCS does not seriously consider this threat—and in fact, barely mentions it in its housing evaluation. *See* Pacholke Decl. at ¶ 18. Although "[p]rison conditions may be restrictive and even harsh, . . . gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective." *Farmer*, 511 U.S. at 833; *see also Soneeya,* 2024 WL 550171 at *15.

Further, reasoning that Ms. Grey cannot be housed with other women because she had been convicted for non-sexual crimes of violence against women is illogical and discriminatory. *See Tay*, 457 F. Supp. 3d at 681-82 ("Although Plaintiff has been convicted of violent crimes, the same is true for a significant number of cisgender women currently housed at [the women's prison]. Accordingly, Defendants will likely not be able to establish that Plaintiff's placement in a men's prison is substantially related to an important government interest."). DPSCS does not dispute that the women's prisons in Maryland house women that have been violent against—or even murdered—other women, or that men housed in men's prisons have harmed other men or even committed sexual assaults. Ex. 8, TRO Hearing Tr. Vol. II, Nov. 22, 2023, at 56:1–9. To confirm whether such justification is logical or discriminatory, one should ask: "[I]f a [cis-gender] female had an issue at a women's facility—whether that was a physical fight or an inappropriate or illegal sexual act—would [DPSCS] consider a transfer of that individual to a men's facility?" *Tay*, 457 F. Supp. 3d at 681-82. They would not. *Cf. Soneeya,* 2024 WL 550171 at *19 (finding the "security" concerns about housing plaintiff with women because the plaintiff had murdered two women was not "within the realm of reason and made in good faith" because the women's tier in question "houses the most serious female criminal offenders in

Massachusetts, including women who have murdered other women or committed domestic violence against female partners").

In determining whether Ms. Grey is at risk of being sexually abusive, DPSCS's own policies require it to consider: "(a) Previous acts of sexual abuse; (b) Prior convictions for violence or sexual abuse; and (c) History of institutional violence or sexual abuse." OSP.200.006.05(A)(2). DPSCS's housing evaluation failed to acknowledge the complete absence of any of these factors in Ms. Grey's history since her incarceration in 2016. *See* Grey Decl. at ¶ 52. Moreover—according to a counselor in the Office of Inmate Health Services—Ms. Grey had become less aggressive, hostile, angry, and irritable, and more stable and cooperative after being formally diagnosed with Gender Dysphoria and beginning her transition. Ex. 5 at 3, 11. Indeed, Ms. Grey confessed—and her counselor validated the genuineness of the confession—that she believes much of her former aggression and violence stemmed from suppressing her desire to live as a woman and feeling the need to respond to conflict in a "masculine" way. *Id.* at 1, 11. Ms. Grey's history in the DPSCS system is replete with evidence that she does not pose a threat to other inmates.

Finally, DPSCS fails to recognize that Ms. Grey's physical stature makes her more of a target than a threat—even in a woman's facility. *See* Pacholke Decl. at ¶ 27; Jenness Decl. at ¶¶ 27 ("Several traits that make people who are incarcerated more vulnerable to sexual assault are being transgender and being small in stature, having mental health diagnoses, and reporting past experience as a victim of sexual assault."). Ms. Grey weighs less than 120 pounds, and "because Ms. Grey has been on hormone therapy for several years, her muscles have atrophied" and her "strength, muscle mass, and body weight should now be similar to that of any other woman." Lowell Decl. at ¶ 41. Despite PREA's requirement that Ms. Grey's physical build be

considered, 28 C.F.R. § 115.42 (1)(3), DPSCS fails to consider her petite size. "Because Ms. Grey is transgender, small in stature, reports having been a victim of sexual assault, and has experienced mental health problems, she is particularly vulnerable to sexual assault in a men's prison." Jenness Decl. at ¶ 28.

Indeed, officers and inmates have subjected Ms. Grey to an array of sexual violence since she has been placed at NBCI. Inmates have thrown semen and feces at her, Grey Decl. at ¶¶ 18-19, and threatened to rape or murder her, *id.* at ¶ 20. Officers have incited public discussions about Ms. Grey's breasts, *id.* at ¶ 43, commented on the appearance of her backside, *id.,* propositioned her for oral sex, *id.*, and attempted to make arrangements for Ms. Grey to perform sexual favors on inmates, *id.* at ¶ 44. According to prison violence expert Jenness, this behavior is common against transgender women housed in men's prisons. Jenness Decl. at ¶¶ 23, 32. What makes this behavior increasingly alarming is that Ms. Grey does not have a way to safely report or prevent the behavior. Some officers have refused to take her PREA complaints, Grey Decl. at ¶¶ 33, 38-39, inmates have warned Ms. Grey against filing PREA complaints against certain officers because of the likelihood of retaliation, *id.* at ¶ 43, and officers are listening in to her legal calls and mocking her while she attempts to report their conduct to her attorneys, *id.* at 45. *See* Jenness Decl. at ¶ 36 ("Transgender women in prison often report fear of retaliation from other people who are incarcerated and corrections officials alike for reporting situations in which threats are imagined, imminent, and/or materialized, even when using the officially endorsed mechanism for resolving conflicts in prison.")

On the other hand, DPSCS has no evidence of any violent behavior on Ms. Grey's behalf since she has been in custody, and "puts forth no evidence...that she poses a greater threat to women than that posed by any other prisoner." *JJS*, 2022 WL 16578124 at *20. Besides, DPSCS

"has other measures to monitor prisoners and discipline inappropriate conduct short of exclusion from a housing designation that aligns with Petitioner's gender." *Id.* Although true that some prison decisions which impede a person's constitutional rights are "'valid if it is reasonably related to legitimate penological interests[,]' [t]he operative question is whether the decision is reasonably related to those objectives 'or whether it represents an exaggerated response' to them." *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). DPSCS is not only exaggerating the likelihood that Ms. Grey could be a threat to other incarcerated women, it is exaggerating the magnitude of such a threat were it to occur. As held in *Soneeya*, where an inmate has been on a "regimen of feminizing hormones" affecting her strength, has no history of sexual violence, and the corrections department is able to adjust housing protocols, concerns about "security" are "essentially a robotic pretext untethered to a practical and reliable assessment of the actual state of security concerns about" Ms. Grey. 2024 WL 550171 at *14. Indeed, there are no known studies showing that cisgender women are vulnerable to abuse by transgender women. Jenness Decl. at ¶¶ 51-52. Further, DPSCS' solution for keeping Ms. Grey out of danger at NBCI – administrative segregation – would be just as available if Ms. Grey, in fact, posed any danger at a women's facility.

"The overwhelming evidence suggests that [DPSCS]'s decision to deny [Ms. Grey] a transfer to a women's facility is based on bias and fear and not evidence. It is not reasonably related to the legitimate penological interest of protecting prisoners." *JJS*, 2022 WL 16578124 at *21 (overturning a correctional agency's decision not to transfer a transgender female inmate to a women's facility because the factors outlined in the agency's policy "support[ed] her transfer, as [did] the evidence submitted by [agency] staff," and, as a result, "the denial of Petitioner's

transfer [could not] be excused as an appropriate exercise of [the agency]'s discretion"). For these reasons, DPSCS failed to conduct a proper housing assessment for Ms. Grey.

## VI.    DPSCS's feigned concern about Ms. Grey's mental health needs is speculative, discriminatory, and illogical.

In DPSCS's attempt to appear as though it has conducted an assessment that takes Ms. Grey's well-being into consideration, it alleges that it cannot house her at MCI-W because "if Ms. Grey experienced a mental health crisis at MCI-W, the only facility in the Jessup Region that is equipped to assist her is Patuxent, where she cannot be transferred." ECF No. 85 at 3. As explained above, *see supra* § II, this concern is not supported by the facts and is not a reason to preclude Ms. Grey from housing that would otherwise keep her safer.

Had DPSCS actually been concerned about Ms. Grey's mental health, it would have acknowledged that the greatest risk to Ms. Grey's mental health is the continued abuse, isolation, and exacerbated gender dysphoria as a result of being housed with men and treated as a man. Lowell Decl. at ¶ 45 ("It is well known that gender affirming care leads to better mental health outcomes.  To the extent that DPSCS cares about Ms. Grey's mental health, it should acknowledge that the greatest risk to her mental health is the continued abuse, isolation, and exacerbated gender dysphoria that comes from being housed with and treated as a man in a male prison."); *see also supra* § II; Jenness Decl. at ¶¶ 17, 53; *Hampton*, 2018 WL 5830730 at *15 (finding the plaintiff was not in a safe environment because her "mental health [was] at risk of degrading further" due to "the verbal harassment and discrimination she endures daily from prison staff caus[ing] her to feel depressed, disrespected, and humiliated"). Indeed, Ms. Grey cannot sustain the type of treatment she is being subjected to at NBCI. Grey Decl. at ¶ 13-49; *see also* Jenness Decl. at ¶¶ 44-45 (stating that the denial of gender-affirming care includes

misgendering by prison staff and can have deleterious effects on transwoman such as substance abuse, eating disorders, and an increased risk of attempted suicide).

Further, as discussed above, there is no basis for the claim that Ms. Grey could not be transferred to Patuxent if she were to have a mental health crisis. DPSCS argues that Ms. Grey's complaints against Patuxent staff prohibit her placement there. But this simply cannot be true, given that inmates presumably complain about multiple staff on a routine basis and doing so does not lead to their transfer. Pacholke Decl. at ¶ 43. If complaining about staff automatically led to transfers, inmates would certainly be making use of that rule to arrange their own transfers on a regular basis. Nor is this Court's keepaway order a basis for keeping Ms. Grey out of Patuxent. Further, DPSCS claims that Ms. Grey cannot be placed on the women's tier of Patuxent because the staff members who harassed and sexually assaulted her continue to work there. In fact, only two guards are the subject of this Court's keepaway order. ECF No. 75 at 2; *see* also Ex. 4 at 59:3–60:18 (testimony of Ms. Grey describing one officer who assaulted her and another officer who was nearby). A keepaway order regarding two guards should not make an entire facility off-limits for Ms. Grey's placement.

Finally, to fail to house Ms. Grey in a safe placement because of her perceived mental health disability is itself a violation of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"). DPSCS argues that because of Ms. Grey's mental health diagnoses, she must be excluded from less restrictive housing options outside of NBCI. *See* ECF No. 85 at 3–4. DPSCS is depriving Ms. Grey of her right to enjoy less restrictive placements by failing to offer the services that would be necessary for her to be placed in such housing, and they are assuming—without asking Ms. Grey—that she needs on-site mental health services because of what they perceive her disability to be. This is a violation of the ADA and

Section 504. *See Shields v. Prince George's County, Md.*, 2019 WL 3536800 (D. Md. 2019) (finding that a jury could reasonably conclude that the prison violated the ADA when they put a schizophrenic inmate into administrative segregation instead of giving him mental health treatment); *Brown v. Washington Dep't of Corr*., No. C13-5367 RBL-JRC, 2015 WL 4039322, at *11 (W.D. Wash. May 13, 2015), *report and recommendation adopted*, No. C13-05367 RBL, 2015 WL 4039270 (W.D. Wash. July 2, 2015) (citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999) (finding that "a reasonable jury could conclude that [the Department of Corrections] [ ] discriminat[ed] against plaintiff on the basis of his mental illness" by placing him in solitary confinement instead of accommodating the illness with appropriate treatment); *A.T. by & through Tillman v. Harder*, 298 F. Supp. 3d 391, 417 (N.D.N.Y. 2018) (finding that plaintiffs were likely to succeed on the merits of ADA and Section 504 claims because defendants "routinely plac[ed] juveniles with disabilities in solitary confinement without ever conducting the type of 'individualized assessment' of their disability" and stating that "a correctional facility cannot categorically deny an inmate with a disability access to available programs, services and benefits without first performing an individualized assessment"); *Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1295 (M.D. Ala. 2012) (holding that depriving HIV-positive prisoners of more integrated housing was a violation of the ADA and the prison must provide reasonable accommodations that allowed such prisoners to be housed outside of segregated housing).

Finally, the fact that this is the first time DPSCS has raised concerns about Ms. Grey's mental health when deciding where to house her is evidence that such reasoning could be a "*post hoc* justification created in response to litigation." *Iglesias*, 2021 WL 6112790 at *25.

**VII.    DPSCS has failed to provide Ms. Grey with facial hair inhibitor product and regular access to razors as ordered by this Court.**

On December 4, 2023, this Court ordered defendants to "[p]rovide Plaintiff with any over-the-counter facial hair inhibitor product that is a reasonable replacement for the facial hair inhibitor cream Plaintiff has been prescribed," ECF 75 at ¶ 4, and to "[p]rovide razors to Plaintiff for shaving, to the extent consistent with DPSCS policies and procedures," *id.* at ¶ 5. As of the date this Motion was filed, Ms. Grey has still not been provided with facial hair inhibitor, and, in fact, was informed by a nurse that she was stopped by DPSCS when she sought to order the product for Ms. Grey. Grey Decl. at ¶ 11-12. Ms. Grey has been unable to keep a razor on her person, is not given a razor often enough to prevent stubble from growing, and has been taunted by being forced to choose between a shower and razor or meeting with legal counsel. *Id.* at ¶¶ 9-10, 13; Lowell Decl. at ¶¶ 16-17 (stating that in the absence of the WPATH recommended treatments of laser hair removal and electrolysis, "many over-the-counter products are readily available for purchase online"). "Hair removal is an essential part of gender-affirming care for transgender women," Lowell Decl. at ¶ 14, and Defendants must comply with this Court's order to provide Ms. Grey with such care.

## CONCLUSION

DPSCS's housing evaluation of Ms. Grey follows its policies and PREA mandate in lip service only, and disregards this Court's directive. Although courts typically treat decisions by corrections administrators with "preternatural deference," DPSCS's failure to truly consider Ms. Grey's safety, its miscalculation of her likelihood of posing a threat to other inmates, and its stereotyped, catch-22 argument about Ms. Grey's failure—albeit at the hands of DPSCS—to have had sexual reassignment surgery, show that DPSCS's "resistance [is] an embrace of perceived bureaucratic privilege unworthy of deference." *Soneeya*, 2024 WL 550171 at *16. Ms.

27

Grey respectfully requests that this Court enforce its December 4, 2023 order by requiring DPSCS provide Ms. Grey with facial hair inhibitor and determine that, based on the only legitimate factors cited in the DPSCS housing assessment, Ms. Grey should be housed in a women's facility.

Dated:  February 23, 2024                    Respectfully submitted,

_____/s/_____
Eve L. Hill (Bar No. 19938)
Sharon Krevor-Weisbaum (Bar No. 04773)
Jessica P. Weber (Bar No. 17893)
Evan Monod (Bar No. 30541)
Lauren A. DiMartino (Bar No. 22046)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland  21202
(410) 962-1030 (phone)
(410) 385-0869 (fax)
ehill@browngold.com
skw@browngold.com
jweber@browngold.com
emonod@browngold.com
ldimartino@browngold.com

Deborah M. Golden (Bar No. 18657)
The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332 (phone)
dgolden@debgoldenlaw.com

*Attorneys for Plaintiff*