# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

CHELSEA GILLIAM, *et al.*,          *

    Plaintiffs,                          *

v.                                              *          Civil Action No. 1:23-cv-1047

                                             *

DEPARTMENT OF PUBLIC SAFETY
AND CORRECTIONAL SERVICES, *et al.*,   *

    Defendants.                       *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **EXPERT DECLARATION OF DANIEL PACHOLKE**

I, Dan Pacholke, hereby declare and state as follows:

1. I am over the age of 18, of sound mind, and in all respects competent to testify.

2. I have been retained by counsel for Plaintiff Chloe Grey as an expert in connection with the above-captioned litigation.

3. I have actual knowledge of the matters stated herein. If called to testify in this matter, I will testify truthfully and based on my expert qualifications and opinions.

4. I am offering my expertise in support of Ms. Grey's claims against the Maryland Department of Public Safety and Correctional Services and its agents for failure to house Ms. Grey safely and reasonably accommodate her gender dysphoria by housing her at a women's institution.

5. In preparing this declaration, I have discussed this case with Ms. Grey's attorneys, reviewed the DPSCS gender dysphoria policy, and reviewed the recent DPSCS housing assessment of Ms. Grey detailed at ECF No. 85.

## BACKGROUND AND QUALIFICATIONS

6. I am a corrections professional with over 33 years of experience, starting as a Correctional Officer and retiring as Secretary of the Washington State Department of Corrections ("WADOC") in 2016.

7. Since 2018, I have served as a consultant in the field of corrections. I have testified as an expert in numerous cases regarding prisons and conditions of confinement. (See attachment 1-2).

8. I am known as a leader in segregation reform and violence reduction in prisons, with extensive experience in program development/implementation, facility management, and resource allocation in corrections. This effort is described in more detail in a United States Department of Justice (DOJ) policy paper I co-authored, "More than Emptying Beds: A systems approach to segregation reform." I have published several other articles related to corrections and segregation to include prison safety, restricted housing reform, crisis management and innovative programs.

9. Under my leadership, Washington State prisons saw a thirty-three percent (33%) reduction in violence and fifty-two percentage (52%) reduction in the use of segregated housing.

10. I have previously testified as an expert in this matter. I am being compensated at a rate of $100 per hour for preparation of expert declarations and reports, $200 per hour for travel, and $300 per hour for time spent conducting in-person work, such as giving deposition or trial testimony. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

11. A true and accurate copy of my Curriculum Vitae is attached hereto as Exhibit A. It

documents my education, training, research, and years of experience in this field.

## EXPERT OPINIONS

**A. Housing gender dysphoric inmates solely based on genitalia does not keep them safe.**

12. The DPSCS Gender Dysphoria Policy governs housing placements for gender dysphoric inmates in DPSCS custody. *See* Identification, Treatment and Correctional Management of an Inmate Diagnosed with Gender Dysphoria, OPS 131.0001 § .05(J) (2016) [hereinafter DPSCS Gender Dysphoria Policy].

13. The housing review is based upon various factors, including: "(a) [i]ntact external genitalia and secondary sex characteristics, such as pubic hair, chest hair, facial hair; and (b) Specific factors, such as partial completion of sex reassignment surgery, removal or augmentation of breasts, or removal of testicles." *Id.* § .05(J)(1)(a)–(b).

14. In its recent housing evaluation of Ms. Grey, Defendants acknowledged that Ms. Grey has gender dysphoria and "identifies and presents as female." ECF No. 85 at 2.

15. Defendants likewise acknowledged that Ms. Grey "minimizes her secondary sex characteristics such as body hair, wears her hair in a long and feminine style, and has developed breasts." *Id.* at 3.

16. Nevertheless, Defendants concluded that they could not house Ms. Grey at a women's prison because she is an "intact biological male." *Id.*

17. While genitalia may be a factor for determining a housing placement under DPSCS policy, it cannot be the only factor. DPSCS policy acknowledges that any decision on housing placement should "seriously consider[] the inmate's opinion regarding the inmate's safety[.]" DPSCS Gender Dysphoria Policy, *supra* § .05(J)(1).

18. While Defendants acknowledge Ms. Grey's preference to be housed in a women's

facility, there is no indication that they seriously considered that preference. ECF No. 85 at 2.

19. DPSCS Gender Dysphoria Policy dodges the issue of housing in gender-specific facilities. It outlines a security review (OPS 131.0001 § .05(I)) in which a finding of "significant security, safety, or operational issues" will require a consultation with the Regional Treatment Team to determine if modifications to the treatment plan will "address the identified issues." *Id.* § .05(I)(2).

20. Though the policy specifies that an inmate will be "evaluated on a case-by-case basis" the "final determination regarding housing placement is the responsibility of the managing official." *Id.* § .05(J)(2)-(3).

21. WADOC Transgender, Intersex, and/or Non-Binary Individuals Policy 490.700 describes a process by which incarcerated people can request to be placed in a gender-affirming facility. From what I can tell, DPSCS does not have such a process.

22. State correctional officials should be focused on the security and safety of the people incarcerated in their institutions.

23. In WADOC, we develop strategies to enhance safety in prison. We had special units for people with cognitive disabilities, for those over 65 years of age, and safe harbor placements for people in the incarcerated population who were more vulnerable to victimization e.g., very old, very young, gang drop-outs, effeminate, trans, etc. The management and placement of these vulnerable people in a setting that provided greater safety allowed them to participate in programs and live with the lessened restrictions of a general population environment.

24. In Florida, for example, there is a unit in a male facility specifically for transwomen

who chose to live there and I have read about a similar unit being opened in Colorado. These placements offer specialized medical and mental health care and a measure of safety in an otherwise risky environment.

25. In my experience in WADOC and in my expert work around the country, I have toured women's facilities in Illinois and Massachusetts that successfully house transgender women.

26. Centering Ms. Grey's genitalia at the expense of her lived experience as a person with gender dysphoria is a huge security concern, as it fails to account for other criteria that would leave her at serious risk of harm and abuse.

27. Ms. Grey's slight build, visible breasts, minimal body hair, and long, feminine hairstyle are all markers that would put her at risk in a predominantly male institution. The misgendering and verbal abuse will likely start when she first enters a new prison. How and whether that escalates will depend on how local leadership manages her concerns to include cell assignment, double celling and the security level of the facility in which she is assigned.

28. I have not seen evidence that DPSCS has a unit in a male facility where Ms. Grey can live safely as a transgender woman without being subjected to isolating conditions and harassment.

29. Ms. Grey should be able to serve her sentence without being subject to abuse and harassment in conditions that are not unduly restrictive. To this end, DPSCS should give serious consideration to placing her at a facility designated to house women.

30. Failure to place Ms. Grey in a safe environment leaves her at further risk of physical and sexual assault and increased risk of self-harm.

**B. Gender dysphoric inmates like Ms. Grey are not safe at North Branch Correctional Institution.**

31. The risk to Ms. Grey is even greater at North Branch Correctional Institution ("NBCI"), a super-maximum security facility that is well-known for housing the most dangerous inmates in the state of Maryland.

32. I had the opportunity to tour NBCI as an expert on another case.

33. NBCI is a severe disciplinary camp. It is treated as the "end of the line" where inmates with the most severe behavioral issues are sent.

34. All inmates are assigned with a cellmate to double cells, and it is extremely difficult to see into the cells.

35. In an administrative segregation environment, double-celling can be worse than single-celling if a vulnerable inmate is housed with a cellmate that is predatory or abusive. Such segregation also increases the risk of suicide and self harm.

36. My observation of Ms. Grey is that she is a slight woman who may have difficulty defending herself, leaving her extremely vulnerable at NBCI. Long-term placement in this facility creates unnecessary risk to her safety and serves no security purpose.

37. This risk of victimization only increases with the lack of adequate mental health support staff and services at NBCI.

38. Placing Ms. Grey in indeterminate administrative segregation at NBCI is not a solution. It does not guarantee her safety and serves only to inflict further harm.

39. Also, her ability to participate in prison programming is vastly restricted in administrative segregation. This limits her ability to participate in programming that other similarly-situated inmates are able to participate in.

40. Placement in administrative segregation should only be as needed for safety and

security purposes. It should be a temporary placement while a person is stabilized and an appropriate placement can be identified.

41. It is the responsibility of a correctional agency to manage the population in their custody. Warehousing people in administrative segregation because they require greater case management and protection is not management. It is a dereliction of the agency's duty to protect.

42. DPSCS also states that Ms. Grey cannot be placed on the women's tier of Patuxent because the guard she accused of abuse is employed there. But it is the abuser that should be removed from the situation during an investigation and punished should the accusations be found credible, not Ms. Grey. It is of further concern that a correctional officer undergoing an investigation for sexual assault is working on the women's tier of Patuxent.

43. Likewise, DPSCS states that Ms. Grey could not be housed at Patuxent because of complaints she made against staff. But complaints alone do not and should not automatically lead to a transfer. Nor should they have prevented Ms. Grey from being housed at Patuxent on the women's tier. Complaints are meant to be handled through an adjudicative process, not through an automatic transfer.

44. There is a continuum of decisions DPSCS could make regarding Ms. Grey's housing—with placing her in a women's facility at one end and an end-of-the-line, maximum security prison like NBCI at the other. DPSCS is taking the most extreme position without any rational justification. In that regard, Ms. Grey's placement at NBCI appears to be punitive.

C. **Defendants do not offer sound arguments for why Ms. Grey should be housed at NBCI.**

45. Defendants acknowledge in their housing assessment that they settled on NBCI through a process of elimination. *See* ECF No. 85 at 2–3. None of their arguments make sense from a security standpoint.

46. Ms. Grey's history at Patuxent and this Court's order granting the Temporary Restraining Order should not preclude her from a long-term placement there.

47. Similarly, her history with Scott Brill at Western Correctional Institution (WCI-W), while troubling from a security standpoint, should not preclude her from a placement there.

48.  While Mr. Brill is currently housed at WCI, staff there should be able to effectively separate two inmates.

49. Defendants also argue that placement at MCI-W, a women's institution is inappropriate because of a lack of mental health services, and the potential for sex between Ms. Grey and female inmates at MCI-W.

50. While a lack of available mental health services is an indictment of DPSCS' handling of that area, it is not an excuse to not house an inmate at an otherwise safer institution. And all of this is based upon a hypothetical mental health crisis on the part of Ms. Grey.

51. If MCI-W is the only appropriate security facility for women that would otherwise fit the needs of Ms. Grey, DPSCS has an obligation and the ability to adequately secure the facility for all inmates—female and transgender.

52. Likewise, Defendants acknowledge that Ms. Grey has a preference for men and describes Mr. Brill as her "husband." Since Ms. Grey has no sexual interest in women, the risk of her engaging in sex at a women's institution is much lower than it is

keeping her at a male facility.

53. While enforcing policies prohibiting sexual contact between inmates is undoubtably difficult, this is no justification to send Ms. Grey to NBCI, where it is just as difficult to enforce those policies, and where the risk of sexual violence is higher because of the nature of the inmate population there.

D. **Washington and other states have safely housed transgender women in women's institutions.**

54. Having spent a career at WADOC, I am deeply familiar with its history, policies, and procedures.

55. WADOC has successfully housed transgender women in accordance with their gender identity at women's institutions, regardless of their genitalia, as have other state correctional agencies.

56. There have been significant advances in practice in the past decade as to the management and care of transgender prisoners. There are no shortage of advisors, guidance, and examples from other correctional systems from which DPSCS could advance their knowledge and practices.

## CONCLUSION

57. To conclude, DPSCS's housing assessment and subsequent failure to house Ms. Grey in a women's institution were not reasonable.

58. Focusing only on genitalia at the expense of other critical safety factors like height, build, gender presentation, and appearance does not keep transgender inmates safe from the known risk of sexual assault.

59. Transgender inmates like Ms. Grey are not safe at a facility like NBCI, which will have a higher number of violent offenders who may view a transgender woman as

    prey.

60. Defendants' arguments for why Ms. Grey cannot be housed at certain institutions do not make sense from a security standpoint. I feel certain that DPSCS, if they were motivated to do so, can find a smarter and safer placement for Ms. Grey in their system.

61. My home state of Washington has housed transgender women in women's institutions in a way that both preserves facility security and affirms an inmate's gender identity, as have other state correctional agencies. The remedy Ms. Grey seeks is not unworkable or outlandish in the field of corrections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:   February 14, 2024

                                                                                 Dan Pacholke