# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

CHELSEA GILLIAM, *et al.*,

    Plaintiffs,

v.                                               Civil Action No. 1:23-cv-1047

DEPARTMENT OF PUBLIC SAFETY
AND CORRECTIONAL SERVICES, *et al.*,

    Defendants.

---

### **EXPERT DECLARATION OF DISTINGUISHED PROFESSOR VALERIE JENNESS**

I, Valerie Jenness, of Irvine, California, hereby declare and state as follows:

1. I am over the age of 18, of sound mind, and in all respects confident to testify.

2. Plaintiff Chloe Grey has retained me to review the facts of the case and provide expert opinion.

3. I provide this declaration from findings from the social science research that speak to the fact patterns presented from conversations with Ms. Grey's attorneys and the documents I have reviewed, which include the Department of Public Safety and Correctional Services (DPSCS) gender dysphoria and housing policies, the Amended Complaint filed on November 2, 2023, DPSCS Defendants' Status Report dated January 3, 2024, and the expert declarations of Dr. Isabel S. Lowell, M.D., M.B.A, and Daniel Pacholke.

4. Throughout this declaration, I use gender inclusive language, to the best of my ability, to refer to the parties involved in this matter. I do so to be respectful.

**QUALIFICATIONS, BACKGROUND, EXPERTISE**

5. I am a Distinguished Professor in the Department of Criminology, Law and Society at the University of California, Irvine (UCI). I have been a visiting professor at the University of California, Berkeley; the University of Michigan; the University of California, Santa Barbara; the University of California, Los Angeles; and Arizona State University. At UCI, I have served as the Interim Vice Provost for Academic Planning and Institutional Research, the Dean of the School of Social Ecology, and the Chair of the Department of Criminology, Law and Society.

6. Over the course of my career, I have produced award-winning research on different facets of the criminal justice system, including the ways in which it orients to and treats people who are gender nonconforming.

7. As part of my work in the field of sociology and criminology, I have conducted original research on prison violence, including sexual assault and other forms of victimization; the structure and operation of the prison grievance system and conditions of confinement more generally; and transgender women in prisons for men.

8. One of the central foci of this research is the vulnerabilities that transgender women in prisons for men face, including the comparatively high rate of harassment and sexual assault that these women experience while incarcerated, and the many ways they adapt to the threats that prison life presents to them as prisoners with non-normative gender identities and sexual orientations (i.e., gender and sexual minorities). My work along these lines has been recognized with numerous national awards, as indicated on my resume.

9. I was the lead researcher on a multi-site study of sexual and non-sexual violence in California prisons that was funded by the California Department of Corrections and

Rehabilitation (CDCR). A lengthy report that derives from this research as well as subsequent peer-reviewed publications, which reveal that transgender women are particularly vulnerable to sexual assault while incarcerated in prisons for men, has been used to inform prison policy and law enforcement and corrections practice (see Exhibit A).

10. I also conducted the first systematic empirical study focusing exclusively on transgender women in prisons for men. This research resulted in a landmark report to CDCR, numerous articles and book chapters published in highly regarded journals and edited volumes, and my sworn testimony before the California State Senate Committee on Public Safety and in courtrooms in multiple U.S. states (see Exhibit A).

11. Findings from this research have been considered by the courts. For example, one of my research reports was entered into evidence in federal court in Nebraska[1] and in a high-profile Superior Court trial in San Francisco.[2] Thereafter, the same report, a related report, and related publications have been used as authoritative sources of evidence in civil litigation in California, Michigan, Florida, and Georgia, and in a criminal sentencing in federal court in Nebraska. I have given sworn depositions for civil litigation in California, Michigan, and Florida and I have given testimony in court for civil litigation in California and Florida and criminal proceedings in Nebraska.

12. I also conducted a major study of the "inmate grievance system" in California prisons, which further reflects my expertise on conditions of confinement in prisons. The results of this research have been published in articles in top tier scholarly journals and as a

---

[1] *United States of America vs. Ronald D. Royer, Jr.*, Case No. 09-CR-3035.
[2] *Alexis Giraldo v. the California Department of Corrections and Rehabilitation*, Case No. CGC-07-461473.

book, *Appealing to Justice: Prisoner Grievances, Rights, and Carceral Logic*, published by the University of California Press.

13. Most recently, I published an article titled "The Structure and Operation of the Transgender Criminal Legal System Nexus in the U.S.: Inequalities, 'Administrative Violence,' and 'Injustice at Every Turn'" (with Alexis Rowland) in the *Annual Review of Criminology*, a top-ranked, peer-reviewed scholarly journal. I also co-edited a volume on *Transgender People Involved in Criminal Justice: International Perspectives* (see Exhibit A). With a decidedly international focus, this volume provides the first account of how gender diverse people are incarcerated and punished around the world *as well as* the institutional, cultural, and legal contexts that shape how this state-sanctioned punishment takes form.

14. The projects described briefly above, coupled with my academic training and expertise more generally, leave me well-suited to provide expert commentary on the case at hand because it involves a) the experience of transgender women in the custody of the state, b) allegations of sexual assault, c) internal efforts by the plaintiffs to address harm and victimizations, and d) housing decisions for transgender women in custody made by corrections officials. These important issues are situated in a larger context that includes the state's obligation to provide safe and secure spaces for those in custody, including transgender women.

15. A true, accurate, and complete copy of my Curriculum Vitae is attached as Exhibit A.

**EXPERT OPINIONS**

16. "The Structure and Operation of the Transgender Criminal Legal System Nexus in the U.S.: Inequalities, 'Administrative Violence,' and 'Injustice at Every Turn'" (Exhibit B),

which I coauthored with Alexis Rowland, provides a panoramic and detailed assessment of a transgender-criminal legal nexus that is inextricably intertwined with the ways state actors, including corrections officials, orient to gender-nonconforming people as problematic and are often ill-equipped to manage their custody and care in what are presumably sex-segregated organizations, including prisons. This nexus is structured by assumptions about gender as a binary and characterized by discriminatory practices in various domains of criminal justice systems, including corrections. A complete copy of the article documenting this nexus is attached as Exhibit B.

17. A series of empirical findings related to the structure and workings of this nexus include well-documented findings relevant to this case, including:

    - Transgender and gender nonconforming people are disproportionately in contact with the criminal legal system, wherein they experience considerable discrimination, violence, and other harms, including in jails and prisons.

    - There is an overrepresentation of transgender people in the criminal legal system, including in jails and prisons, and clear evidence of the disparate ways in which the criminal legal system treats gender nonconforming people (compared to those who are not gender nonconforming).

    - While in jails and prisons, transgender people are subject to: 1) disproportionate harassment and assault (sexual and otherwise) accompanied by problems associated with the use of the prisoner grievance systems to seek redress; 2) a disproportionate reliance on the use of restrictive housing to manage transgender people in custody, often justified with reference to protecting them from other people who are incarcerated; and 3) the denial of gender-affirming health care and routine

misgendering, which undermines transgender women's mental health in an environment in which they have higher rates of mental health concerns.

18. These well-documented trends in the research on transgender women in facilities for men resonate with the fact patterns described in the documents I have reviewed. That is, the allegations advanced by Ms. Grey are legible and credible through the lens of social science research, as described below.

**The disproportionate harassment and assault (sexual and otherwise) accompanied by problems associated with the use of the prisoner grievance system to seek redress**

19. In the United States it is common for correctional officials to rely on a genital-based assessment to make decisions about placing people who are incarcerated in facilities for men or facilities for women; when they do, transgender women are routinely placed in facilities for men where they endure unique "pains of imprisonment" (Sykes 1958).[3] One of the well-documented pains of imprisonment they experience is the multitude of ways state officials and other prisoners alike deny their gender identity and attendant self-expression, which in turn has considerable consequences for their daily routines as well as their welfare.

20. The incarceration of transgender people, particularly transgender women in men's prisons, has been fraught with challenges and difficulties born of ignorance, and resulting in abuse. Because of the historical rigidity around gender issues and a basic lack of concern for those on the societal margins because of their gender identity, transgender women who are incarcerated have served time in what some have observed to be akin to a war zone in which they are the perpetual target of scorn, harassment, and assault.[4]

---

[3] Sykes, Gresham. 1958. *The Society of Captives: A Study of a Maximum Security Prison.* Princeton, NJ: Princeton University Press.
[4] Stohr, Mary K. 2015. The Hundred Years' War: The Etiology and Status of Assaults on

P a g e  6 | 17

21. The "girls among men" (to use the terms I have heard transgender women in California prisons for men use) occupy a demeaned social status in carceral environments built for men. Often, transgender women are mistaken for homosexuals and held in contempt by their non-transgender counterparts and correctional staff alike. Transgender women in facilities for men are spoken of in disparaging terms by fellow prisoners (e.g., "dudes with breasts" and "chicks with wieners").

22. Sumner and Sexton (2016)[5] report the following exchange between male prisoners in a focus group in response to the question "How do you think transgender prisoners should be treated?": One person said "Like somebody with a mental disease" and another person said "Personally, I think [we should] open a big old oven and burn them" (p. 30). Other prisoners reported wanting staff to "keep them away from us" and "expose them" so other prisoners can know who they are and act accordingly (p. 32). In the same study, staff commented: "if you have a penis, *it's*[6] some kind of homosexual" (p. 25); accordingly, other prisoners call them "faggots" or "queers," to use the parlance found in prisons. The cultural milieu in which transgender prisoners live is not lost on them. They acknowledge they are "discriminated against—not only by the staff but by inmates who don't understand our lifestyle," "looked down upon," and "mistreated" (p. 30).

23. These findings reveal a hostile environment for transgender women in prisons and lend credibility to Ms. Grey's assertions about the hostilities she has faced while incarcerated, including threats of rape and having feces and semen thrown at her.

---

Transgender Women in Men's Prisons. *Women & Criminal Justice* 25: 120-129.
    [5] Sumner, Jennifer and Lori Sexton. 2016. Same Difference: The 'Dilemma of Difference' and the Incarcerstion of Transgender Prisoners. *Law & Social Inquiry* 41(3): 616-642.
    [6] The use of the word "it's" is easily read as referencing something (rather than someone) who is not legible as human.

24. Research consistently reveals that prisoners with non-normative identities (i.e., those who do not identify as heterosexual males), including gay men and transgender women in prisons for men, are considerably more vulnerable to sexual and non-sexual assault than other people who are incarcerated.

25. Based on my research regarding transgender women in prisons for men:

    - Sexual assault is 13 times more prevalent among transgender women in prisons for men. Fifty-nine percent of transgender women reported being sexually assaulted while in a California correctional facility versus only slightly more than 4% of 322 randomly selected people who are incarcerated.

    - Two different measures of rape—one that relies on the inmates' own assessment of incidents and one that relies on an operationalization of rape as "oral or anal penetration by force or threat of force"—reveal that 2% or 3% of randomly sampled inmates described at least one occurrence of rape, as did 41% or 50% of transgender sample inmates.

    - Inmates often described multiple events of sexual assault and many of these incidents occurred fairly recently (i.e., since 2000).[7]

26. In a second study, my colleagues and I corroborated this pattern:

    The prevalence rate for sexual assault for transgender inmates is 23.8% while living in their current housing unit; 58.5% during their entire incarceration history in California correctional facilities; and 41.7% outside of prison. When "sexual misconduct" is

---

[7] Jenness, Valerie, Cheryl L. Maxson, Kristy N. Matsuda, and Jennifer Macy Sumner. 2007. "Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault." Report to the California Department of Corrections and Rehabilitation. Sacramento, California.

included, the numbers increase to 34.6% in their current housing unit; 69.4% in their incarceration history in California; and 62.4% outside of prison.[8]

27. Several traits that make people who are incarcerated more vulnerable to sexual assault are being transgender and being small in stature, having mental health diagnoses, and reporting past experience as a victim of sexual assault.[9]

28. Because Ms. Grey is transgender, small in stature, reports having been a victim of sexual assault, and has experienced mental health problems, she is particularly vulnerable to sexual assault in a men's prison.

29. The table below summarizes some of the key findings from my research, including the finding that the victimization of transgender women in prisons for men is more likely to involve a weapon, less likely to receive medical attention (if needed), and more likely to involve a perpetrator with whom the victim is familiar.

**TABLE 2.** Select differences between the random and transgender samples (%)

| Variable | Random sample | Transgender sample |
|---|---|---|
| Prevalence of sexual assault | 4.4 | 59.0 |
| Prevalence of undesirable sexual acts | 1.3 | 48.3 |
| Weapon actually used if involved | 20.0 | 75.0 |
| Officer aware of the incident | 60.6 | 29.3 |
| Provision of medical attention (if needed) | 70.0 | 35.7 |
| Racial composition (% of incidents interracial) | 17.2 | 63.9 |
| Relational distance | Evenly distributed | Skewed toward familiarity |

*Source*: Jenness, Valerie, Cheryl L. Maxson, Kristy N. Matsuda and Jennifer Macy Sumner. 2007. Violence in California correctional facilities: An empirical examination of sexual assault. Report to the California

---

[8] Jenness, Valerie, Lori Sexton, and Jennifer Macy Sumner. 2011. "Transgender Inmates in California's Prisons: An Empirical Study of a Vulnerable Population." Report submitted to the California Department of Corrections and Rehabilitation. Sacramento, California.

[9] Testimony presented at the California State Senate Committee on Public Safety for the State of California hearing on Assembly Bill 382 (LGBT Prisoner Safety Act) on December 11, 2008. Sacramento, California.

Department of Corrections and Rehabilitation, State of California. Sacramento, California.

30. A growing body of research based on unofficial and official data, including research done by the Bureau of Justice Statistics (BJS),[10] confirms the differential vulnerability of sexual and gender minorities in general and transgender people in particular on a national scale. The table below reveals findings reported by BJS:

TABLE 1. Sexual victimization in prisons and jails by inmates, 2011-12

| Sexual victimization | All inmates | All heterosexual | All non-heterosexual | Non-heterosexual males | Non-heterosexual females | *Transgender inmates (SE) |
|---|---|---|---|---|---|---|
| Prison & jail inmate-on-inmate | | | | 11.9% | 9.4% | |
| Prison & jail staff sexual misconduct | | | | 6.1% | 3.0% | |
| Prison all types | 4.0% | | | | | 39.9% (7.3) |
| Prison inmate-on-inmate | 2.0% | 1.2% | 12.2% | | | 33.2% (5.2) |
| Prison staff sexual misconduct | 2.4% | 2.1% | 5.4% | | | 15.2% (5.2) |
| Jail all types | 3.2% | | | | | 26.8% (6.4) |
| Jail inmate-on-inmate | 1.6% | 1.2% | 8.5% | | | 15.8% (4.4) |
| Jail staff sexual misconduct | 1.8% | 1.7% | 4.3% | | | 18.3% (5.1) |

Source: Bureau of Justice Statistics, National Inmate Survey, 2011-12.
*Source: Bureau of Justice Statistics, National Inmate Survey, 2007, 2008-09, and 2011-12.
Notes: Non-heterosexual data was combined when reported by gender due to the small numbers of respondents. Therefore, we can't directly compare rates for non-heterosexual by gender with rates for transgender respondents.

Clearly, non-heterosexual prisoners and transgender prisoners are differentially vulnerable to sexual assault, despite the passage of the Prison Rape Elimination Act (PREA) in 2003 and the obligations it imposes on corrections officials. Indeed, I am

---

[10] See, for example, BJS's report on "Sexual Victimization in Prisons and Jails Reported by Inmates," including "Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates." Washington, D.C., 2015.

unaware of a single study that finds otherwise.

31. These findings, which confirm the differential vulnerability of gender non-conforming prisoners, are corroborated with regard to non-sexual assault, too. For example, more than one third (37.1%) of the people in our random sample reported never being involved in violence of any type while incarcerated in a California correctional facility. In sharp contrast, only 13.2% of the transgender women reported escaping violence entirely while incarcerated.[11]

32. My research on the sexual victimization experienced by transgender women in California's prisons for men reveals that the range of victimization they experience includes, on one end of a continuum, being grabbed, groped, and fondled against their will and, on the other end of a continuum, being "pimped out" (to use their language) by other people who are incarcerated (i.e., men) who "sell" transgender women to other prisoners for valued commodities in prison. My understanding is that Ms. Grey has reported experiencing both.

33. In many cases, the victimization of transgender women implicates other prisoners with whom they form both wanted and unwanted sexual, romantic, and marriage-like[12] relationships. Statistically speaking, when controlling for features of the people who are incarcerated and features of the prisons in which they are incarcerated, the most consistently powerful predictor is an interactional variable: whether transgender women

---

[11] Jenness, Valerie, Cheryl L. Maxson, Kristy N. Matsuda, and Jennifer Macy Sumner. 2007. "Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault." Report to the California Department of Corrections and Rehabilitation. Sacramento, California.

[12] Although not married in a legal sense, the women we interviewed commonly referred to their romantic and sexual partners in prison as their "husbands."

report having been in a sexual relationship with another prisoner (and most do). This feature of prison life approximately triples the odds of victimization both narrowly and broadly construed (i.e., sexual assault and sexual victimization).[13] This finding does not serve as evidence of consent, which is a slippery concept in general and especially in the context of prison life. Rather, the sexual victimization of transgender women in prisons for men can be understood as a form of gendered violence: violence against gender variant women in the context of sex-segregated prisons that assume and organize around a gender binary.

34. My research and the research of others reveal that the dangers associated with being transgender in prison are a predictable outcome of a variety of factors, including the demeaned social status of "girls among men" (to use their terms) in a hypermasculine prison culture, the social organization of prison politics, the ways in which heterosexism and homophobia manifest in prison, and the failure of corrections officials to enforce zero tolerance policies for assault (sexual or otherwise). For all these reasons, it is understandable why the transgender prisoners that I and members of my research team interviewed for the purposes of research cited the refrain "fight or fuck" to reference the dangerous situations in which they find themselves and the options they have for managing these dangerous situations. It is a short-hand acknowledgment of a "lose-lose" situation insofar as transgender women perceive choices, but no choice leads to a net gain in terms of personal safety.

35. To "fight or fuck" is easily seen as a "secondary adjustment" to prison life. The structure

---

[13] Transgender prisoners who are involved in "marriage-like" relationships while incarcerated are also more likely to have experienced sexual victimization than those who are not (42% compared to 23%, respectively).

and operation of gender in prison life requires transgender women to manage a predatory environment that deprives them of liberty, incites fear, and compromises safety. In the main, they are left to manage hostile and dangerous environments on their own and often do so in ways that violate the rules and regulations of prisons. Predictably, they turn to proactive and reactive coping strategies, sometimes in the form of violence and/or participation in a survival economy, as a form of conflict resolution that makes sense to them in a prison environment (but makes no sense outside of that environment).

36. Transgender women in prison often report fear of retaliation from other people who are incarcerated and corrections officials alike for reporting situations in which threats are imagined, imminent, and/or materialized, even when using the officially endorsed mechanism for resolving conflicts in prison (i.e., the prison grievance system, sometimes called "the inmate appeals system"). In general, people who are incarcerated do not perceive the grievance system as a credible venue for resolving conflicts born of conditions of confinement.[14] They perceive the grievance system as rigged because corrections officials serve as the judge, jury, and defendant. [15]

**The disproportionate reliance on the use of restrictive housing to manage transgender people in custody**

37. Transgender people in prison are disproportionately subject to solitary confinement and other forms of restrictive housing.

38. As Lydon et al. (2015), authors of a landmark report, explained, the use of restrictive

---

[14] Calavita, Kitty and Valerie Jenness. 2015. *Appealing to Justice: Prisoner Grievances, Rights, and Carceral Logic.* Berkeley, California: University of California Press.

[15] The vast majority (over 90%) of grievances filed by prisoners are denied by the CDCR, which suggest the grievance system is not a viable route to seek and secure redress even as utilizing it is required to "exhaust all internal remedies" before seeking redress from the courts.

Page 13 | 17

housing is "a routine practice used on LGBTQ prisoners" (Lydon et al. 2015, p. 35; see also Stammen & Ghandnoosh 2022). Herman et al.'s (2016) analysis of data from the National Inmate Survey revealed a statistically significant disparity between the rate at which transgender people and cisgender people in prison report being placed in "solitary segregation."

39. As Solitary Watch observes: "Transgender individuals often end up in solitary confinement for disciplinary reasons directly or indirectly related to their gender identity. Many prisons may categorize items used to express gender identity as contraband, the possession of which can lead to punitive isolation. [A] driving factor behind the overuse of protective custody is the rampant misclassification of transgender people entering jail or prison" (Manson 2019, p. 1).

40. These findings are particularly disturbing because the use of restrictive housing has been deemed "the most devastating experiences a human can endure" (Wildeman and Andersen 2020, p. 423). This is particularly the case for transgender women in prisons for men insofar as it relates to the violence and desire to which transgender people are subject (Sanders et al. 2022).

41. Housing Ms. Grey in administrative segregation is not a feasible long-term solution and would be devastating to her well-being.

**The denial of gender-affirming health care and routine misgendering, which undermines transgender women's mental health in an environment in which they have higher rates of mental health concerns**

42. Transgender people in prison experience higher rates of mental health concerns and are often denied gender-affirming care, with studies revealing that a quarter of transgender people who are incarcerated report being denied access to health care during

imprisonment (McCauley et al. 2018). Research identifies psychological, interpersonal, structural, and institutional barriers to receiving gender-affirming care, including hormone therapy and medical confirmation surgery (Hughto et al. 2018; Sevelius & Jenness 2017).

43. The denial of gender-affirming care for transgender people in carceral spaces produces deleterious health effects (Hughto et al. 2018; Sevelius & Jenness 2017).

44. The same is true of routine misgendering. The pervasive denial of gender recognition by corrections staff through misgendering—the incorrect use of pronouns—and "deadnaming" (Clark et al. 2017; see also Rodgers et al. 2017) similarly undermines mental health and can lead to "substance abuse and eating disorders, reduced relationship quality, ineffective coping and lower levels of self-esteem, and increased risk of attempted suicide" (Drabish & Theeke 2022, p. 111).

45. Ms. Grey's complaints of misgendering are unsurprising and, unfortunately, not overstated. The harm imposed upon transgender women by persistent misgendering has been clearly supported by research.

## CONCLUSION

46. Corrections officials and researchers alike generally understand that gender and sexual minorities are vulnerable in prison and other carceral environments. Research and professional knowledge confirming the differential vulnerability of transgender women in custody in men's facilities is widespread among researchers and corrections officials alike, at least in part because of the enactment and implementation of PREA and a growing body of research that documents this vulnerability and the ways in which transgender women respond

to it.

47. The DPSCS policy recognizes that being transgender in prison is a risk factor for sexual assault and that the "inmate's own perception of vulnerability" should be used "to objectively assess an inmate's risk of sexual victimization" (DPSCS Sexual Victimization Policy).

48. Ms. Grey is a transgender woman who continues to be incarcerated in facilities for men. As a white transgender woman with a disability, she was diagnosed with gender dysphoria and began hormone therapy in 2021. She legally changed her name in 2023.

49. As a transgender woman in prisons for men, Ms. Grey, is differentially vulnerable to sexual victimization in prison. This vulnerability is compounded because of her small stature, past mental health issues, and reports of previously being a victim of sexual assault.

50. Ms. Grey expressed a strong preference to be housed in a facility for women. Through what appears to be a "process of elimination" that eliminated that option at least in part because of Ms. Grey's genitalia, they denied this request and continue the practice of housing Ms. Grey in housing for men.

51. Corrections officials denied Ms. Grey's requests for safe/safer housing that aligns with her gender identity (i.e., her expressed preference to be housed in a facility for women), in part by claiming that placing a transgender woman in a facility for cisgender women would, in effect, render cisgender women vulnerable to abuse by transgender women.

52. To the best of my knowledge, there is not a single systematic peer-reviewed social science study, that leads to this conclusion.

53. Upon arrival at NBCI, Ms. Grey has been housed in administrative segregation, which raises concerns about an overreliance on the use of restrictive housing and, relatedly, her mental health if this arrangement continues.

54. The well-documented trends in the research on transgender women in facilities for men, including what is presented in this declaration, resonate with the fact patterns associated with this case. From my point of view, the allegations advanced by Ms. Grey are consistent with the social science research on transgender women in prisons for men.

I declare that the foregoing is true and correct to the best of my knowledge. Executed this 20th day of February in 2024.

Valerie Jenness, Ph.D.
Distinguished Professor
University of California, Irvine