# EXHIBIT B



Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

*Annual Review of Criminology*

# The Structure and Operation of the Transgender Criminal Legal System Nexus in the United States: Inequalities, Administrative Violence, and Injustice at Every Turn

## Valerie Jenness and Alexis Rowland

Department of Criminology, Law and Society, University of California, Irvine, California, USA; email: jenness@uci.edu

Annu. Rev. Criminol. 2024. 7:283–309

First published as a Review in Advance on July 14, 2023

The *Annual Review of Criminology* is online at criminol.annualreviews.org

https://doi.org/10.1146/annurev-criminol-022222-040947

Copyright © 2024 by the author(s). This work is licensed under a Creative Commons Attribution 4.0 International License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited. See credit lines of images or other third-party material in this article for license information.

## ANNUAL REVIEWS CONNECT

### www.annualreviews.org

- Download figures
- Navigate cited references
- Keyword search
- Explore related articles
- Share via email or social media



## Keywords

transgender, LGBTQ+, queer theory, sex and gender, criminal legal system contact, transgender criminal legal system nexus

## Abstract

A growing body of research reveals that transgender people are disproportionately in contact with the criminal legal system, wherein they experience considerable discrimination, violence, and other harms. To better understand transgender people's involvement in this system, this article synthesizes research from criminology, transgender studies, and related fields as well as empirical findings produced outside of academe, to conceptualize a "transgender criminal legal system nexus." This article examines historical and contemporary criminalization of transgender people; differential system contact and attendant experiences associated with police contact, judicial decision-making, and incarceration; and pathways to system involvement for transgender people. The analytic focus is on cultural logics related to institutionalized conceptualizations of gender, discriminatory people-processing in various domains of the criminal legal system, and institutionally produced disparities for transgender people involved in the criminal legal system, especially transgender women of color. The article concludes with a discussion of

directions for future research, including a focus on administrative violence, organizational sorting, intersectionality, and measurement challenges.

## INTRODUCTION

Decades of grassroots activism, policy advocacy, and legal change have raised the visibility of transgender people[1] in the United States, including those who are differentially criminalized and policed, are judicially discriminated against, and suffer uniquely harrowing pains of imprisonment. As a recent report by the Prison Policy Initiative observed, "trans people are criminalized and discriminated against for simply being trans" (Herring & Widra 2022). This reality is increasingly recognized by politicians and policymakers. For example, the President of the United States, Joseph R. Biden, publicly committed to ensuring fair treatment of transgender people, including those who have contact with the criminal legal system (Bendery 2012; see also Jenness 2021). This and other expressed commitments to criminal justice reform in ways that attend to transgender people and their experiences with the criminal legal system coincide with a growing body of research that reveals the overrepresentation of LGBTQ+ (lesbian, gay, bisexual, transgender, queer and/or questioning plus) people in the criminal legal system and attendant disparities in treatment in the criminal legal system and calls for reform and abolition. It also comes at a time in which transgender people have become highly visible in culture wars, with most Americans favoring protecting transgender people from discrimination in jobs, housing, and other public spaces (Parker et al. 2022), despite a political backlash against judicial decisions and legislative victories for LGBTQ+ people. In this context, Panfil (2022) called on criminology and other social sciences to focus attention on sexual and gender minorities. Responding to this call, this article centers the experiences of transgender people in contact with the criminal justice system, emphasizing the importance of disaggregating the needs of transgender people from sexual minorities.

A series of reports released over the past few decades reveals that transgender people are disproportionately in contact with the criminal legal system and as a result face considerable discrimination and other types of harm (Cent. Am. Prog. & Mov. Adv. Proj. 2016, Grant et al. 2011). The findings in these reports and accompanying scholarly publications demonstrate how pervasive discrimination produces unique institutionalized pathways to incarceration for transgender people (Rogers & Rogers 2021, Stammen & Ghandnoosh 2022). They also reveal the ways in which these pathways to incarceration are raced and gendered, making it clear that transgender women of color, particularly Black transgender women, experience disproportionate violence compared to cisgender people in general and at the hands of the state more specifically. The violence experienced by transgender people is different from that which affects sexual minorities, and it varies by gender identity and race/ethnicity. As detailed in this article, there is a "transgender criminal legal system nexus" that is structured by White cisheteronormative assumptions that shape the structure and content of the criminalization of transgender bodies, people, and lives. This nexus is inextricably intertwined with the myriad ways state policy and actors orient to and construct

---

[1] Definitions of transgender abound, as meanings associated with the term shift over time (Schilt & Lagos 2017, Valentine 2007). For the purposes of this review, we use one of the most basic definitions in circulation in the United States, including in transgender studies: transgender individuals have a different gender identity than the gender to which they were assigned at birth (Schilt & Lagos 2017). This definition reflects the population to which the extant data generally speaks, recognizing that many of the studies we cite in this review rely on self-definition that may or may not align with this definition [see also Sutherland's (2023) work on the boundaries of transgender identity membership].

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

gender-nonconforming people as illegible, suspicious, and criminal. This begins with criminalization and results in transgender people coming disproportionately under the control of institutions not designed for them, often experiencing further violence.

From criminalization to reentry, what we refer to as the transgender criminal legal system nexus is coming into view as the fields of transgender studies in sociology (Schilt & Lagos 2017) and queer criminology (Buist & Lenning 2023) continue to examine transgender people's experiences in specific institutional contexts. Extant work reveals a transgender criminal legal nexus that is structured by and reproduces inequalities, informed by cultural logics related to gender as a binary (Radi 2019, Westbrook & Schilt 2014), and characterized by discriminatory people-processing in various domains of criminal justice systems (i.e., police, courts, and corrections) based on "what [alleged] offenders *have done* as well as *who they a*re [perceived to be]" (Lin et al. 2012, p. 352; italics in original). These logics and processes institutionally produce disparities for transgender people as they make contact with, and move through, the criminal legal system.

This article draws connections between the literature from multiple disciplines to paint a picture of the structure and workings of the transgender criminal legal system nexus and its corollary administrative violence—the systemic deprivation of opportunities and rights as a result of subjects' illegibility to the law (Spade 2015)—in the United States. Our focus is on component parts of this nexus, including (*a*) historical and contemporary criminalization of transgender people; (*b*) differential system contact and attendant experiences associated with police contact, judicial decision-making, and incarceration; and (*c*) structured pathways to system involvement for transgender people. We conclude with a discussion of directions for future research, including a focus on administrative violence, organizational sorting, intersectionality, and measurement challenges.

## THE CRIMINALIZATION OF TRANSGENDER PEOPLE

The criminalization of transgender people is a necessary corollary of the transgender criminal legal system nexus because it sets the stage for transgender people being seen as in need of regulation in general and policing in particular. Asquith et al. (2017, p. 168) explained the importance of criminalization by emphasizing "the shifting sands of what is and is not illegal over time" as it relates to "the under- and over policing, judgment, and incarceration of some people." More recently, Walker et al. (2018, p. 222) focused on criminalization by interrogating the ways in which transgender and nonbinary people are "punished for engaging in activities in which other groups engage without concern for criminal justice involvement."

An interdisciplinary body of literature examines the many ways transgender and gender-nonconforming[2] people come to be the subject of the criminal legal system and the ways they experience and must navigate systemic institutional and social exclusion because gender-nonconformity (and its correlates) are criminalized. Mogul, Ritchie, and Whitlock's book, *Queer (In)Justice: The Criminalization of LGBT People in the United States* illuminates the many ways queer lives are subject to state control via criminalization, surveillance, policing, and punishment (Mogul et al. 2011). They conclude that "the process of criminalization extends far beyond the processes of lawmaking, policing, court proceedings, and punishment" (Mogul et al. 2011, p. xvii). As Walker et al. (2018) observed, the criminalization of transgender people, especially transgender youth, transgender women of color, and transgender immigrants, is a social justice concern inextricably intertwined with transphobia and its related systems of exclusion. Rodgers et al. (2017, p. 3) point

---

[2]The use of gender nonconformity here is inspired by the work of Valentine (2007) and Beauchamp (2019), is not used interchangeably with transgender, and underscores instances in which those who do not identify as transgender but who may be externally assessed as deviating from gendered norms are impacted by the same social forces that subjugate transgender people.

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

to the role of cisnormativity—"the ideological framework that assumes the correspondence between the designated sex at birth and the legitimate, 'normal' or 'correct' gender aligned with that designation"—in the pathologizing of transgender bodies, people, and communities as a precursor to and product of criminalization.

Although inventorying the many specific ways transgender lives have been, are, and continue to be criminalized is beyond the scope of this article, it is useful to recognize three separate but mutually constitutive processes: cultural criminalization (Ferrell 1999), indirect criminalization (Terwindt 2014), and direct criminalization (Jenness 2004). Combined, these dimensions of criminalization account for the ways in which gender-nonconforming people often get pathologized and become associated with criminality. This institutionalized association shapes the modes and characteristics of criminalization as acts of lawmaking and law enforcement.

Cultural criminalization as it relates to the policing and subjugation of gender-nonconforming people predates the existence of the United States as a nation and was essential for the success of the US state-making project (Trexler 1995). US history is rife with examples of the law subjugating non-normative genders and sexualities as a means of achieving and maintaining a homogeneous national identity—linking race, sex, ethnicity, and citizenship—and its implied social order. For example, a series of late-nineteenth-century state and federal immigration laws prohibited "cross-dressing" and linked cultural narratives of "deceptive" gender benders and "lewd" Chinese women to prevent women from immigrating to the United States from China (Sears 2015). During the Jim Crow era, lawmakers and courts constructed and institutionalized a denigrated vision of Black nonwomanhood as a means of legitimizing the criminalization and subsequent re-enslavement of Black women as well as to justify the continuation of White colonial projects (Haley 2016).

In the modern moment, various configurations of class, gender identity, gender modality,[3] race, ethnicity, religion, and ability do not have equal access to White able-bodied cisheteronormativity nor its presumed innocence (Richie 2012). Since the mid-nineteenth century, legal, medical, and criminological discourses have produced a particular deviant image of gender nonconformity (Stryker 2017, Valentine 2007)—one that is sexually predacious, diseased/contagious, mentally ill, deceitful, and socially destabilizing (Beauchamp 2019, Mogul et al. 2011). This image and the cultural tropes that inform and sustain it have become deeply ingrained in the cultural psyche (Billard 2019), resulting in gender nonconformity's cultural criminalization (Ferrell 1999). This, in turn, shapes the ways in which transness is both indirectly and directly criminalized and punished by the state.

Transgender people experience indirect criminalization when the social positions they occupy and the survival strategies they must engage in as a result of gendered and racialized exclusions are made illegal (Walker et al. 2018). Analyses of transgender criminalization often focus on sex work, in which transgender people are overrepresented—an estimated 13% of transgender women engage in sex work at some point in their life, and as much as 44% of transgender women of color (Fitzgerald et al. 2015). Studies have consistently found this to be a strategy to survive conditions created by gendered discrimination in a range of institutional settings, including employment, housing, social services, and health care (Nadal et al. 2014). As a transgender woman summarized her own entry into criminalized work, "The reason why a lot of transsexuals are sex workers is because we have to do it. It's hard for us to go out in society and get jobs and not be discriminated against. We don't get jobs, so that makes us go into the street-working industry" (quoted in

---

[3]As Ashley (2022, p. 22) explained, "gender modality refers to how a person's gender identity stands in relation to their gender assigned at birth. It is an open-ended category which includes being trans and being cis and welcomes the elaboration of further terms which speak to the diverse experiences people may have of the relationship between their gender identity and gender assigned at birth."

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

Reisner et al. 2009, p. 379). In addition to sex work being a means for material survival—or perhaps because it is—it can also be a means for accessing social support, acting as a "rite of passage" for those who are transitioning,[4] particularly transgender youth of color (Sausa et al. 2007). It can also serve as a location of empowerment and agency in a culture that otherwise denies the validity of transgender identity (Capous-Desyllas & Loy 2020).

Also well-documented in the literature, systemic social and institutional exclusion results in higher rates of substance use among transgender people, especially sex workers. Research by Hughto et al. (2021) on substance use disorders among both transgender and cisgender adults estimates that the prevalence of polysubstance abuse among transgender people is greater than four times that of their cisgender counterparts. Scheim, Bauer, and Shokoohi's work on the correlates of substance abuse among transgender adults shows that sex work is correlated with nearly a fourfold greater prevalence (Scheim et al. 2017). Nuttbrock et al.'s (2014) three-year longitudinal analysis of the effect of transgender-related stigma and depression on substance use in transgender women finds a pervasive and moderate relationship between stigma, depression, and substance use. These interconnected factors are correlated with disproportionate rates of HIV within this population, especially sex workers, who have the highest prevalence worldwide (Aggarwal et al. 2021). Yarbrough's (2021, p. 156) study emphasizes that the ways these gendered and raced survival strategies are criminalized and policed result in a violent cycle in which "criminalization does not only govern, but also creates poverty and inequality."

In terms of direct criminalization, the years between sodomy laws being ruled unconstitutional (*Lawrence v. Texas* 2003) and marriage equality being recognized by the Court (*Obergefell v. Hodges* 2015) are instructive. These years are often presented by mainstream lesbian, gay, bisexual, transgender (LGBT) advocacy organizations as akin to emancipation, and during this time transgender rights in the form of nondiscrimination policies quietly expanded in nearly all states (Taylor et al. 2018). However, starting in 2015, these policies became the target of a backlash against the advancement of transgender rights, as those reacting framed rights expansion as a form of risk (Mezey 2020). In the case of bathroom access, one of the most high-profile sites of contestation to date, resistance was accomplished through the demonization of gender nonconformity by using advertisement campaigns that juxtaposed the social imaginings of transgender people as sexually predacious, mentally ill, deceitful, and socially disruptive against that of White female fragility (Mezey 2020). This tactic continues to occur despite research demonstrating that gender-inclusive bathrooms are not related to more crime in those spaces (Hasenbush et al. 2019).

Anti-trans politics sustained by conservative politicians and other moral entrepreneurs turned to preemptive policymaking, with states legislating and occasionally passing laws criminalizing the use of single-sex bathrooms by those who were not assigned that sex at birth. Since 2021, lawmakers in 48 states and the federal government have introduced more than 800 bills that would criminalize or otherwise restrict transgender rights, effectively seeking to eliminate nondiscrimination protections related to public appearance requirements, school/curriculum decisions, health-care provisions, integration in athletics, and identification requirements. By March 2023, 19 states signed or enacted more than 50 of these bills (Track Trans Legis. 2023).[5] As Henry Berg-Brousseau, a transgender person who supported transgender rights since he was in high

---

[4]Understandings of what it means for one to transition are evolving. However, it broadly refers to any intentional actions one takes to bring one's lived experience into alignment with one's gender identity. These may be psychological, social, physical, or legal, or any combination thereof, and do not necessarily reflect normative gender conceptualizations.

[5]The total number of anti-trans bills introduced and adopted in this time period varies according to source and inclusion criteria. Track Trans's Legislation's (2023) more conservative estimate places this at 715, whereas Trans Legislation Tracker (2023) cites 870.

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

school, explained in testimony before Kentucky lawmakers when he was 16 years old: "When somebody tells us that we're so different, that the only way to accommodate us is to create a special bathroom, the message is clear with this bill: that we don't belong" (quoted in Tumin 2022). Prior to dying by suicide at age 24, Henry told his mother "Mom, they say it gets better, but it is not getting better, it is getting worse, and I'm scared" (quoted in Tumin 2022).

Laws that restrict the rights of transgender people and otherwise curtail their full inclusion in institutional and social life (i.e., anti-trans laws) encapsulate the mutually reinforcing and cyclical nature of cultural criminalization and legal criminalization; they also result in more transgender people coming into criminal legal contact and being publicly harassed, surveilled, and scrutinized in the process. These practices, in turn, reinforce the unsubstantiated, taken-for-granted meanings associated with what it means to be transgender and thus enable its criminalization. As Beauchamp (2019, p. 106) succinctly explained in *Going Stealth*: *Transgender Politics and U.S. Surveillance Practices*, "The legislative positioning of transgender bodies as threats demands complicity in bathroom surveillance as part of nontransgender status, naturalizing the process that constructs some bodies as easily interpreted and inherently compliant." For Beauchamp, this and other surveillance practices authorized by the state, which hinge on the criminalization of transgender bodies and associated perceived threats, are part of a larger project to fortify a gender binary and produce gender conformity.

Central to the criminalization of transgender people is how the category of transgender has been produced in the negative image of exalted norms and outside the boundaries of citizenship (Currah 2022). This exclusion is routinely enacted via bureaucratic practices of gender marking, (*a*) through which incongruent markers render transgender people illegible to law and other state-sponsored resources and the opportunities they distribute, thus exposing gender-nonconforming people to administrative violence (Spade 2015), and (*b*) in which, especially post-9/11, transgender people living in or crossing the borders of the United States are rendered threats to the nation as well as communities within it. These security and surveillance logics and the bureaucratic infrastructures through which they are implemented assume any noncongruence—in gender markers and names across official forms of identity documentation as well as between those markers and the sex of the body as it is situationally assessed to be—is a failed attempt to assume a fraudulent identity for nefarious purposes.[6] This, in turn, works to produce and fortify a culturally bestowed image of transgender people as inherently duplicitous and concealing, often in ways that are harmful to others and entire communities and undermine policy efforts intended to protect transgender people within the criminal legal system (Rowland 2022). The effect is to legitimize criminalization of gender nonconformity and the law enforcement efforts it authorizes (Beauchamp 2019).

## CRIMINAL LEGAL SYSTEM CONTACT

A growing body of empirical work reveals that people who are transgender have differential contact with various regimes of state-sanctioned social control related to the criminal legal system, from police to prisons. In addition, research reveals that, especially in terms of arrest and incarceration, the rates of contact are even more disproportionate for transgender people of color (Grant et al. 2011) and youth (Jones 2021). This differential contact and the associated negative experiences are the cornerstones of an increasingly well-documented transgender criminal legal

---

[6]The work of cultural-legal logics related to the transgender criminal legal system nexus is on full display in so-called gender-fraud convictions—a sexual assault conviction predicated on the idea that gender nonconformity is, in and of itself, deceptive and violates consent. The underlying legal rationale presupposes the existence of a consistently and biologically marked "real" gender and understands noncongruent presentation as inherently deceitful (Ashley 2018b, Sharpe 2019).

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

system nexus as it manifests in three domains: police and law enforcement, the courts and judicial behavior, and punishment and corrections.

## Police and Law Enforcement

In a literature review on law enforcement and criminal justice personnel interactions with transgender people in the United States, Stotzer (2014, p. 264) observed that "due to the fact that most research on transgender populations has been funded through health mechanisms (e.g., HIV/AIDS funds, substance abuse funds), available research has asked little about the experiences with law enforcement and criminal justice." Stotzer's assessment of 33 studies reports a range of 35%–72% for the lifetime prevalence of arrest and 15%–29% for annual prevalence of arrest. According to Stotzer (2014), arrest rates were higher for sex workers who are transgender than for their cisgender counterparts, and existing studies reveal that "transgender people are targeted for abuse, illegal stops, and harassment by law enforcement in community settings" (Stotzer 2014). Furthermore, "the pernicious association that all transgender people are sex workers, and thus deserving of additional scrutiny, may underlie the high percentages of arrest, incarceration, and unjustified arrests and stops" (Stotzer 2014, p. 276).

Data from the National Transgender Discrimination Survey, the largest survey examining transgender experiences in a range of contexts, revealed a wide range of alarming experiences with the police reported by transgender and gender-nonconforming people (Grant et al. 2011). Based on surveys from 6,450 transgender and gender-nonconforming study participants from all 50 states, the District of Columbia, Puerto Rico, Guam, and the US Virgin Islands, this research finds that 54% of all respondents had interacted with the police as a transgender or gender-nonconforming person. Twenty-two percent of respondents who interacted with the police reported harassment by the police due to bias, with higher rates (23–38%) reported by respondents of color. Six percent reported physical assault and two percent reported sexual assault by police because they are transgender or gender nonconforming. Forty-six percent reported being uncomfortable seeking assistance from the police, with higher rates for people of color (Grant et al. 2011, pp. 158–59). The report concludes (Grant et al. 2011, p. 158):

> They [transgender and gender nonconforming people] are more likely to interact with police because they are more likely to be victims of violent crime, because they are more likely to be on the street due to homelessness and/or being unwelcome at home, because their circumstances often force them to work in the underground economy, and even because many face harassment and arrest simply because they are out in public while being transgender. Some transgender women report that police profile them as sex workers and arrest them for solicitation without cause; this is referred to as "Walking While Transgender."

More recently, Shields (2021) utilized focus group data collected in Newark, New Jersey, to identify and describe the negative experiences LGBTQ people have with law enforcement, from failure to respond to calls for help to being misgendered, harassed, and abused. In this study, transgender people reported generalized concerns about the police that were not specifically connected to their gender identity and expression as well as specific concerns that were clearly connected to being transgender. With regard to the latter, a transgender woman described an incident in which she was harassed by officers (Harmony, quoted in Shields 2021, p. 16):

> The cop that pulled me over, it was like, well, "why are you out here? You need to be in the house." You know, um "only people that's out is your kind." So I'm like "Well, what do you mean by my kind? Like specify that." So, he's like "Well, you know what I mean. Y'all he-she's," quote unquote.

Offering a more general comment, a 50-year-old transgender woman described the situation this way: "They don't perceive us as people, human beings, mammals of the earth, normal, you

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

know, everyday people going through life. They don't even see that. . . . All gay men, trans women: they're promiscuous, they're hookers. Uh, everything but human beings" (Charlene, quoted in Shields 2021, p. 14). In light of these and other comments made in the focus groups with LGBTQ people, Shields (2021, p. 27) concludes "it appeared transgender and gender-nonconforming participants had especially adverse experiences with insensitive or antagonistic officer behaviors, leading to a shared perception that officers are not safe to interact with, even when needed." Accordingly, they express a stance of avoidance, with their reasons for avoiding the police rooted in general concerns about policing and being overpoliced as well as specific concerns related to being targeted because they are transgender.

Additional empirical evidence related to these concerns is found in a report released by the Attorney General for the State of California in 2022, which reveals that police officers treat people whom they perceive as transgender in disparate ways. The Racial Identity and Profiling Act of 2015 mandates that official data be collected on all vehicle and pedestrian stops as well as citizen complaints alleging racial and identity profiling. These data reveal that from January 1, 2020 to December 31, 2020, reporting agencies made over 2.9 million stops, and the vast majority of individuals stopped were perceived to be Hispanic (40.4%), White (31.7%) or Black (16.5%) as well as cisgender males (72.7%) or cisgender females (27.0%) (Calif. Dep. Justice Civ. Rights Enforc. Sect. 2022). The most commonly reported reason for a police stop was a traffic violation (86.1%); however, police disproportionately indicate "reasonable suspicion" as the rationale for stopping people who are perceived by officers to be transgender. In addition, there are disparities related to whether officers took action and what type of action they took after making a stop. Officers are more likely to take action when they perceive the person stopped to be transgender; moreover, a higher proportion of people who are perceived as transgender were searched, detained curbside/patrol car, and/or handcuffed. As reported in the *San Francisco Chronicle*, "Transgender advocates and a Democratic state legislator say the data shows that, despite efforts to educate police about gender diversity in recent years, profiling of transgender people remains rampant across the state" (Gardiner 2022).

This report from the most populous state in the United States, along with testimony from transgender people, reveals that transgender people are differentially policed and thus subject to state control in disparate ways. Research documents that the population of adults who identify as transgender disproportionately comprises racial and ethnic minorities compared to the US general population (Flores et al. 2016), which, coupled with the well-documented disparate treatment of people of color in the criminal legal system, leads to disparate policing within the transgender population.

## Judicial Behavior and Legal Logics

In contrast to the research that reveals the contours of a transgender policing nexus and a transgender incarceration nexus, there is a paucity of criminological literature on a transgender court nexus (Buist & Stone 2014). Indeed, previously published work on the experiences of transgender people in contact with the criminal legal system does not directly address the criminal courts in a sustained way (Avalos 2022, Walker et al. 2018).[7] There is not, for example, a nascent body of work that focuses on systematically studying core processes like charging decisions and central outcomes like sentences and attendant disparities between transgender people and their cisgender

---

[7]Transgender litigants are discriminated against in civil procedures, whether bringing antidiscrimination cases (Currah et al. 2006), health-care claims (Kirkland et al. 2021), or claims related to family law (Baars 2019). Storrow (1997, p. 310) describes antitransgender court bias as "no matter how a transsexual frames her discrimination claim, it will fail."

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

counterparts. This absence is telling in light of the role courts have historically played in supporting the state's racial cisheteronormative project of "rehabilitating" sexual and gender minorities, especially Black queer youth. By doing so, the state has sponsored, or at least endorsed, the imposition of a gender binary and heterosexual normative framework on citizens (Ware 2015; see also Marksamer 2008). It is also telling in light of recent work that addresses the impact of gender- and sexual orientation–based bias in prosecutorial decision-making (Cox et al. 2022) and recent reports on the first execution of a transgender person in the United States (Salter 2023).

A series of reports based on data collected by nonprofit organizations sheds light on the experience transgender people have while engaging with the courts. For example, in 2011, *A Report on the National Transgender Discrimination Survey* (Grant et al. 2011) revealed that 12% of survey respondents, and 39% of those who identified as sex workers, reported being denied equal treatment or being harassed by judges or court officials. Thirteen percent reported that a court or judge stopped or limited their relationships with children because of their transgender identity or gender nonconformity, with Black, Asian, and multiracial respondents experiencing higher rates of court interference of this sort. It concluded that "it appears that partner and judicial biases towards transgender and gender-nonconforming parents often obstruct ties with children" (Grant et al. 2011, p. 108).

A few years later, Lambda Legal released a report that explored discrimination by police, courts, prisons, and school security against LGBT people and people living with HIV in the United States (Lambda Leg. 2015). Of the 2,376 survey respondents, 43% reported being involved in the court system as an attorney (19%), juror (44%), witness (19%), or party to a legal case (61%) in the previous five years. The report explains "there were significantly higher numbers of reports from members of the community who are more often targeted by police, including transgender or gender-nonconforming individuals, as well as those who, in addition to being LGBT or living with HIV, are people of color, low-income or have physical or learning disabilities" (Lambda Leg. 2015). Also, "transgender people must often deal with judges, attorneys and other court employees who refuse to acknowledge and respect their gender identity, do not use their preferred names and pronouns, and in the case of judges, may even make rulings that force transgender people to deny their true gender identity" (Lambda Leg. 2015). More recently, a report by the Center for American Progress & Movement Advancement Project (2016, p. 19) concludes that "court and legal staff, including their [transgender people's] own attorneys, may be unfamiliar with the issues facing transgender people, at best, and at worst may treat transgender people with disdain and hostility." The transgender legal and advocacy literature reports that this discrimination extends to case outcomes in the form of conviction and sentencing bias (Braunstein 2017).

A body of work on case processing and attendant outcomes for transgender litigants has yet to emerge in peer-reviewed outlets; however, research on homicide in general and when it involves the invocation of the so-called "trans panic defense" is informative. Momen & Dilks' (2020) exploratory study demonstrates that homicide cases in which the victim is a transgender woman, especially Black victims, are among the least likely to end in conviction. The "trans panic defense" in murder cases is described by Lee (2014, p. 77) this way:

> When a heterosexual man is charged with murdering a transgender woman with whom he has been sexually intimate, one defense strategy is to assert what has been called the trans panic defense. The defendant claiming this defense will say that the discovery that the victim was biologically male provoked him into a heat of passion causing him to lose self-control. If the jury finds that the defendant was actually and reasonably provoked, it can acquit him of murder and find him guilty of the lesser offense of voluntary manslaughter. The trans panic defense strategy is troubling because it appeals to stereotypes about transgender individuals as sexually deviant and abnormal.

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

As of 2021, this legal strategy was permissible in 35 states (Mov. Adv. Proj. 2023) and hinges on one of three extant legally recognizable arguments: a defense theory of provocation, diminished capacity, and/or self-defense (Woods et al. 2016). In essence, the legal argument is that the perpetrator was so disgusted by the victim that they were compelled to annihilate them (Kidd & Witten 2010; see also Wodda & Panfil 2015, Woods et al. 2016). According to Wodda & Panfil (2015, p. 933), these arguments are made possible "through dual means: the employment of the deception trope and a reliance upon a societal predilection towards dichotomous gender identities and roles." They conclude that "the trans* panic defense as a trial strategy has been largely ineffective in securing acquittals for perpetrators accused of murdering transgender and gender nonconforming people," but "has, in some instances, resulted in convictions on lesser charges or reduced sentences and, in very rare cases, has led to a determination that the defendant was not guilty" (Wodda & Panfil 2015, pp. 965–66). This legal strategy is not benign insofar as in some cases courts reduce charges or acquit based on trans panic defenses. In addition, the narrative of the trans panic defense reverberates through society much longer than the duration of a hearing, effectively creating and solidifying cultural tropes that devalue transgender bodies and lives.

There is a robust literature that devotes analytic attention to jurisprudential concerns and legal logics related to the law's treatment of transgender people. It illuminates how the law envisions what it means to be transgender and, by extension, how the courts impact the lives of transgender people. Currah & Minter (2000) review recurring semantic, often contradictory, manipulations of the law that place transgender bodies outside the law's protection. These manipulations include distinguishing between sex and change of sex; using pathologizing and bioessentialist[8] definitions of sex; defining gender nonconformity as mental illness; defining transgender people as existing outside the recognized sexes (and the attendant binary that delimits legibility); and defining them as nonhuman. Elaborating on this, Sharpe (2002, p. 14) argues that these cultural-legal justifications have been replaced with other discursive binaries—"preoperative/postoperative, act/identity, deserving/undeserving, visibility/invisibility, sexual/nonsexual"—that, although less concrete, are similarly rooted in gender essentialist ideology. As late as 2005, Lloyd (2005, p. 170) observed that transgender people are outside the criminal justice system's understanding of gender and instead are "strangers to the law [who are] legally nonexistent intermediaries" that "literally fall outside of the only categories the court recognizes as human" (see also Currah 2022).

## Punishment and Corrections

A relatively well-developed literature reveals a transgender imprisonment nexus in carceral spaces. This nexus begins with the overrepresentation of transgender people in jails and prisons. It then extends to an overreliance on the use of restrictive housing to "manage" transgender people in custody, disproportionate harassment and assault (sexual and otherwise), and denial of gender-affirming health care while in custody. As it draws upon and extends a view of the marginalization of transgender people who are subject to state power, the literature interrogates the many ways a single individual attribute—being trans—evokes social and institutional practices that manifest as gender policing.

Determining how many transgender people are incarcerated is difficult and estimates vary. Based on official data collected in 2016, the first time the Survey of Prison Inmates (SPI)

---

[8]Bioessentialism is the institutionalized belief that gender categories, particularly binary categories, reflect distinct immutably different constitutive essences that reflect categories of order found in nature (Zimman et al. 2014).

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

measured sexual orientation and gender identity, the Bureau of Justice Statistics (BJS) (Beatty & Snell 2021) estimated that less than 0.5% of the prison population is transgender,[9] with 1,970 state and federal prisoners (a weighted count) identifying as transgender and 1,894 state and federal prisoners (a weighted count) identifying with a gender that is different from their sex assigned at birth. The Prison Policy Initiative's analysis of these data found that the majority of transgender people surveyed were people of color, were under the age of 34 (younger than the average age of 39 in prison), and reported not finishing high school, being arrested for the first time when they were 18 or younger, and being excluded from educational and employment opportunities (Herring & Widra 2022). In a robust demographic assessment of transgender women incarcerated in California's prisons for men, Sexton et al. (2010) found that compared to the rest of the prison population, the transgender women in their study were disproportionately of color (35% Black and 28% Hispanic), had lower levels of education and employment, higher levels of mental health and substance abuse problems, higher rates of HIV, and higher levels of homelessness.

Other reports that rely on unofficial data or reexaminations of official data offer different estimates of the rate of incarceration and higher numbers of incarcerated trans people. Reporting for NBC News, Sosin (2020) estimated that "there are 4,890 transgender prisoners living in state prisons across the U.S." Data from the National Transgender Discrimination Survey reveal that transgender people who are Black, Indigenous, and people of color (BIPOC) have especially high lifetime rates of incarceration—nearly 50% for Black transgender women. Sixteen percent of respondents who had been to jail or prison reported being physically assaulted and 15% reported being sexually assaulted. Black respondents reported the highest rate of sexual assault in prison (34%). The Center for American Progress & Movement Advancement Project's (2016) report on transgender contact with the criminal legal system explained that 5% of all adults in the United States report spending time in prison or jail, compared to 10% of transgender men, 16% of transgender and gender-nonconforming people, and 21% of transgender women.

In a recent review on "Prison Culture, Management, and In-Prison Violence," Wooldredge (2020) identifies a "third era of prison studies" that focuses attention on the role of gender in prison life. Affirming gender as a central organizing principle of prison life, this observation is preceded by decades of work that characterizes penal institutions as "locations of magnified policing and punishment of sexual and gender nonconformity" (Mogul et al. 2011, p. 97), where those who transgress gender and sexuality norms are situated lower in the social status hierarchy and afforded less respect among prisoners and staff alike (Coggeshall 1988; Donaldson 2001; Fleisher & Krienert 2009; Jenness & Fenstermaker 2014, 2016; Jenness et al. 2019; Oparah 2012; Rodgers et al. 2017). To put it simply, "transgender prisoners are made more vulnerable by imprisonment processes" (Rodgers et al. 2017, p. 1). Research suggests this is particularly the case in terms of housing assignments, access to health care, and victimization.

Although peer-reviewed assessments of the degree to which transgender people are placed in restrictive housing at higher rates than others have yet to be published, research on LGBTQ people and a report by the Williams Institute suggest transgender people are disproportionately subject to solitary confinement and other forms of restrictive housing. The landmark *Coming Out of Concrete Closets* by Lydon et al. (2015), of the advocacy organization Black and Pink, collected survey data from 1,118 LGBTQ prisoners in the United States and found that 85% of LGBTQ

---

[9]Recent survey findings by the Pew Center report that 1.6% of US adults are transgender or nonbinary, and within that the percentage is higher among adults who are younger than 30 (Parker et al. 2022; see also Flores et al. 2016).

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

survey respondents reported being held in solitary confinement, and approximately half of respondents reported having spent two years or longer in restrictive housing.[10] According to the authors, the use of restrictive housing is "a routine practice used on LGBTQ prisoners" (Lydon et al. 2015, p. 35; see also Stammen & Ghandnoosh 2022). More recently, Meyer et al.'s (2017) analysis of the National Inmate Survey 2011–2012, a probability sample of people in US prisons and jails, finds that, when compared to their straight counterparts, sexual minorities are more likely to have experienced solitary confinement and other sanctions (see also Beck 2015). Related, Herman et al.'s (2016) analysis of data from the National Inmate Survey revealed a statistically significant disparity between the rates at which transgender people and cisgender people in prison report being placed in "solitary segregation."

Foster (2016) reviewed the literature on restrictive housing, identified issues and challenges, and concluded that more research on overlooked groups, including transgender people, is needed. This call for systematic research is advanced in a context in which Solitary Watch observes that (Manson 2019, p. 1)

> Transgender individuals often end up in solitary confinement for disciplinary reasons directly or indirectly related to their gender identity. Many prisons may categorize items used to express gender identity as contraband, the possession of which can lead to punitive isolation. [A] driving factor behind the overuse of protective custody is the rampant misclassification of transgender people entering jail or prison.

Restrictive housing, which Wildeman & Andersen (2020, p. 423) recently deemed "the most devastating experiences a human can endure" (see also Augustine et al. 2021), is used by prison officials to resolve the complications posed by the existence of noncisnormative bodies within a cisnormative institution; this is particularly the case as it relates to the violence and desire to which transgender people are subject (Sanders et al. 2023). Institutional procedures that are ostensibly intended to maintain safety and security and protect incarcerated transgender people "reiterate a legitimized incarcerated gender configuration" (Sanders et al. 2023, p. 752), effectively punishing transgender people for being potential victims. As Vogler & Rosales (2022, p. 698) conclude in their study of civil detention, "being classified as transgender can serve as a punishment itself" and transgender detainees are subject to "particularly gendered forms of punishment." This and other work reveal that jails, prisons, and civil detention facilities are gendered and cisgendered in ways that predictably inflict administrative violence on transgender people subject to state control (Robinson 2011, Rodgers et al. 2017, Stanley & Smith 2015, Vogler & Rosales 2022).

In this context, transgender people face considerable discrimination, abuse, and sexual assault while incarcerated. An overview article, tellingly titled "The Hundred Years' War: The Etiology and Status of Assaults on Transgender Women in Men's Prisons," Stohr (2015, p. 127) observed that

> The incarceration of transgender inmates, particularly transgender women in men's prisons, has been fraught with difficulties, missteps, ignorance, and abuse. Because of the historical rigidity around gender issues and a basic lack of concern for those on the societal margins because of their gender identity, transgender women and men have existed in what must at times seem like a war zone in which they are the perpetual target of scorn, harassment, and assault.

---

[10]For comparison, Beck (2015, p. 1) finds that "on an average day in 2011–12, up to 4.4% of state and federal inmates and 2.7% of jail inmates were held in administrative segregation or solitary confinement. Nearly 20% of prison inmates and 18% of jail inmates had spent time in restrictive housing, including disciplinary or administrative segregation or solitary confinement, in the past 12 months or since coming to their current facility, if shorter. Approximately 10% of all prison inmates and 5% of jail inmates had spent 30 days or longer in restrictive housing."

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

Consistent with this description, Lyseggen's (2015) book on the experiences of transgender women in one of California's most famous prisons is poignantly titled *The Women of San Quentin: Soul Murder of Transgender Women in Male Prisons*.

Both unofficial and official data demonstrate that transgender people in prison are especially vulnerable to sexual assault. Jenness et al.'s (2007, p. 3) study of sexual assault in men's prisons in California found that approximately 4% of randomly selected prisoners reported being sexually assaulted while in a California correctional facility, compared to 59% of the transgender women in prisons for men. This study also found that the victimization of transgender women in prisons for men is more likely to involve a weapon, less likely to receive warranted medical attention, and more likely to involve a perpetrator with whom the victim is familiar (Jenness et al. 2007). Nadal et al. (2014, p. 170) emphasize the devastating consequences, beyond being life-threatening, that these "intense personal trauma[s]" have on transgender prisoners over the course of their lives, including a "spectrum of mental health issues, including depression, anxiety, and posttraumatic stress disorder."

In a follow-up study, Jenness et al. (2019) report similarly high rates of sexual victimization. Specifically, the prevalence rate of sexual assault for transgender women is 23.8% while living in their current housing unit and 58.5% during their incarceration history in California correctional facilities. To explain these rates, they advanced a mixed-methods analysis that emphasizes the social status of transgender women in prison, sexual victimization in the context of "consensual" sexual relationships with male prisoners, and the workings of gender in prison as a total institution organized around heteronormativity. Accordingly, they argue that the sexual victimization of transgender women in prisons for men can be understood as a form of gendered violence: violence against gender-variant women in the context of sex-segregated prisons that assume and organize around a (seemingly inviolable) gender binary.

Research conducted by the BJS (Beck 2014) confirms that transgender prisoners are differentially vulnerable to sexual assault: More than one-third of transgender prisoners had been sexually assaulted in the past year, and approximately 4% of all prisoners experienced sexual victimization during that same time (Beck 2014). Transgender people report the highest rates of sexual victimization while in jails and prisons, and these high rates are especially pronounced for inmate-on-inmate sexual assaults in prisons of all types. The same year, findings were released by Black and Pink in the report cited above that reveal an increasingly uncontested fact: "A higher percentage of transgender women prisoners experience sexual violence" (Lydon et al. 2015, p. 44). As Dolovich (2011, p. 3) concluded in her study of the strategic segregation program employed by the Los Angeles County Jail aimed at protecting vulnerable people from sexual victimization while locked up, "gay men and trans women are not the only people vulnerable to sexual victimization in men's prisons and jails. But their assigned place in the prison sexual hierarchy makes them almost automatic targets for such abuse."

The dangers associated with being gender-nonconforming, including transgender, in jails and prisons are borne of a variety of factors. The experience of transgender people in carceral spaces is shaped by their demeaned social status in a hypermasculine prison/jail culture in which masculinity is valorized and femininity is subordinated and disdained. It is also shaped by the social organization of prison politics, the ways in which heterosexism and homophobia manifest in prisons and jails, and the failure of corrections officials to enforce zero-tolerance policies for assault (sexual or otherwise) (Carrillo 2022, Donaldson 2001, Kunzel 2008, Stanley & Smith 2015). Undergirding these contextual features of carceral spaces, a gender binary that assumes that there are two (and only two) sex categories (i.e., male and female) and two (and only two) genders (i.e., men and women) positions transgender people as either illegible or legible in ways that leave them vulnerable to discrimination, violence, and other harms (Jenness & Fenstermaker 2014, 2016; Rodgers

Annu. Rev. Criminol. 2024.7:283–309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

et al. 2017). Indeed, the carceral state relies heavily on sex segregation in the form of men's prisons/jails and women's prisons/jails and privileges a genital-based assignment to each type of facility (Macy et al. 2023, Routh et al. 2017).[11] As Abby, a 28-year-old transgender woman explained, "Because I'm still physically male, and in the eyes of the [state] if you're physically male, you're gonna be put on the men's side, even if you identify as female" (quoted in Hughto et al. 2018, p. 8).

Transgender people in prison experience higher rates of mental health concerns and are often denied gender-affirming care, with studies revealing that a quarter of transgender people who are incarcerated report being denied access to health care during imprisonment (McCauley et al. 2018). Based on their recent assessment of the distribution of mental health conditions among incarcerated transgender and gender-diverse people (TGD), Rogers et al. (2023, p. 44) conclude that "incarcerated TGD individuals have poorer mental health, were more likely to be diagnosed with mental health disorders during their lifetime, and were more likely to receive treatment for mental health conditions." In a recently published first-person account of health care challenges for transgender people in prison, Ruth Utnage (2023, p. 17), a transgender woman, described her situation this way: "When I chose to finally seek medical help (hormone replacement therapy, or HRT), I followed a protocol established by the prison system for transgender individuals. When I first told my classification counselor that I wanted to pursue HRT, she threatened me with segregation 'for my own protection'."

The work on transgender women in prison in particular is telling insofar as it reveals that transgender women experience pervasive stigma both inside and outside of jails and prisons, are typically housed in sex-segregated facilities according to their genitalia, and "may need access to physical and mental health services to meet their preventative, chronic, and urgent health care needs" (Hughto et al. 2018, p. 70). Research identifies psychological, interpersonal, structural, and institutional barriers to receiving health care, especially that which is gender-affirming care, for example, hormone therapy and medical confirmation surgery (Hughto et al. 2018, Sevelius & Jenness 2017). Taylor, a transgender woman who experienced homelessness prior to being incarcerated, described the challenges she faced when trying to ensure continuity in hormone therapy: "I told them 'please, I need my hormones.' Nope, no hormones. 'You gotta get a letter from your doctor'. How am I gonna get letters? How am I gonna call my doctor? I don't have nobody to call. My parents are dead. I didn't have no information…no numbers…I didn't have nothing" (quoted in Hughto et al. 2018, pp. 74–75). The challenges Black transgender women in prison face when accessing adequate health care are particularly pronounced (Motley et al. 2023).

The result of this denial of gender-affirming care for transgender people in carceral spaces is clear: deleterious health effects (Hughto et al. 2018, Sevelius & Jenness 2017). The pervasive denial of gender recognition by corrections staff through misgendering and "deadnaming" (Clark et al. 2017; see also Rodgers et al. 2017)—the incorrect use of pronouns or the address of individuals by decommissioned legal names—similarly undermines mental health and can lead to "substance abuse and eating disorders, reduced relationship quality, ineffective coping and lower levels of self-esteem, and increased risk of attempted suicide" (Drabish & Theeke 2022, p. 111). After reviewing state statutes and the policies of multiple departments of corrections concerning transgender people in prisons, Routh et al. (2017, p. 645) conclude that "there is a shortage of guidance dealing with medical issues related to being transgender."

---

[11]Related, California's governor signed into law The Transgender Respect, Agency, and Dignity Act (SB 132). This law, which mandates a "safe, humane, respectful and rehabilitative environment" for transgender, nonbinary, and intersex people in the custody of the California Department of Corrections and Rehabilitation, allows incarcerated transgender, nonbinary, and intersex people to be housed in a manner consistent with their gender identity.

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

The pains of imprisonment for transgender people, especially women, are rapidly coming into view. As empirical analyses emerge, so too do critical analyses of the structures that create and sustain the conditions of confinement for transgender people. Richie's (2005) important work on the heteronormative imperatives that are intersectionally structured by gender, sexuality, and race in prisons has been followed by work that, to quote Vitulli (2013, p. 112), has "begun to explore the multiple and complex ways that queerness pervades the U.S. prison system and the effects of criminalization on the incarceration of queer, gender-, and sexual-nonconformity, and LGBTQ people." This work on transgender people in carceral spaces, then, is part of a larger discussion in critical prison studies, queer criminology, and feminist thought on how the prison system is racialized, gendered, and classed. Understood in these terms, the transgender criminal legal nexus necessarily implicates pathways to system contact that are organized around systemic inequalities.

## PATHWAYS TO SYSTEM INVOLVEMENT

As revealed in the above sections, compared to cisgender people, transgender people experience involvement with the criminal legal system at disproportionately high rates and are subject to differential treatment. This fact is not in dispute. To understand the factors associated with this reality, research increasingly focuses on the relationship between the many challenges associated with being trans and the specific pathways to criminal legal contact and associated consequences.

Ezie & Saenz (2020) use the term "discrimination-to-incarceration pipeline" to "describe the ways that bias and discrimination in housing, employment, education, and policing thrust transgender people into the criminal justice system at disproportionate rates." Research shows that trans people face both subtle and overt forms of hostility and discrimination in diverse institutional settings, including the family, educational arenas, the workplace, medical care organizations, housing and public accommodations, and the religious sector (James et al. 2016). Policies and practices in these and other social arenas result in both interpersonal and institutional discrimination that contributes to negative life outcomes. Related to criminal legal system contact, these criminogenic factors include mental health issues, engaging in risky behaviors such as substance abuse, and experiencing a lack of social support, including from family and in terms of access to housing, education, and medical care.

Reports and academic publications reveal many factors that make up the connective tissue between being trans and the discrimination-to-incarceration pipeline. A report by the Center for American Progress & Movement Advancement Project (2016) emphasizes the ways transgender people experience family rejection and homelessness; unsafe schools and unfair disciplinary policies; and pervasive discrimination in other areas of life, including employment, housing, identity documentation, and health care. The criminalization of things like HIV, drugs, and sex work, as well as policing strategies that target the transgender community, effectively push transgender people into the criminal justice system in patterned ways.

Recent academic work on system involvement for transgender people draws inspiration from decades of criminological research that speaks to pathways and turning points (Sampson & Laub 1993). In a landmark article, Rogers & Rogers (2021) draw on 15 semistructured interviews with previously incarcerated transgender men to understand "Trans Men's Pathways to Incarceration." Informed by work done by feminist criminologists who have advanced our understanding of the gendered nature of pathways to crime and incarceration as well as more recent work by queer criminologists, Rogers & Rogers (2021, p. 121) focus analytic attention on these men's experiences that precede incarceration and find that "victimization and offending often overlap creating blurred boundaries;" "there are complicated pathways to incarceration for trans men that often involve child abuse, victimization experiences, and homelessness;" and these experiences often occur

Annu. Rev. Criminol. 2024.7:283–309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

in the context of lack of social support and negative coping mechanisms as important factors that precede engagement in crime and system contact (e.g., engaging in "offender behavior" to cope with trauma associated with gender identity). Rogers & Rogers (2021, p. 129) succinctly describe pathways:

> Feminist pathways perspective provides a framework for understanding how early trauma, such as child abuse and sexual victimization, leads to survival strategies and coping mechanisms, such as running away, homelessness, and drug use. It is ultimately these negative coping mechanisms that lead to crime and increased drug use. Of the traditional pathways to incarceration in the literature for cis women, substance abuse was less common among the trans men in this study and homelessness emerged as a prominent pathway to incarceration for these men.

These empirical findings and attendant insights advance pathways research such that it can (begin to) account for diversity in gender identities.

Hereth et al. (2021) examined the ways in which young transgender women's life experiences relate to involvement in the criminal legal system. Utilizing data from Project LifeSkills and Latent Class Analysis, they focus analytic attention on a plethora of variables, including interpersonal violence; exclusion from institutions and systems such as education, housing and other social services, and employment; social exclusion in the form of overt and subtle forms of prejudice and discrimination; and resilience-related factors such as employment, social support, and gender-specific coping mechanisms. This focus enables them to identify a three-class model of risk resilience and arrest. They find that "young transgender women who indicated a less feminine gender expression were less likely to be in the 'Moderate Violence and Exclusion/High Arrest' class than the 'Low Arrest' class," and "women who identified as Black had over 4 times greater odds of being in the 'Moderate Violence and Exclusion/High Arrest' than the 'Low Arrest' class" (Hereth et al. 2021, p. 68). They conclude that "overall, women in the sample reported high levels of violence and marginalization, including homelessness and engagement in sex work" (Hereth et al. 2021, p. 69). This work speaks to the development of a pathways approach insofar as it reveals ways in which transgender women's experiences align with and depart from those of cisgender women in terms of their system contact and experiences.

A growing body of empirical literature on transgender pathways includes both disparity studies and studies that assess specific life experiences that act as turning points in pathways, especially for youth (Asquith et al. 2017, Winters 2022). Studies reveal that transgender people have comparatively high rates of experiencing homelessness, engaging in sex work, and being denied access to support provided by families, educational institutions, and workplaces (Asquith et al. 2017, Cent. Am. Prog. & Mov. Adv. Proj. 2016, Hereth 2022, Hereth et al. 2021, Herring & Widra 2022). Likewise, research shows that the lack of access to resources, including education and family support, as well as high rates of discrimination and social exclusion, serve as pathways to system involvement for transgender people who have contact with the juvenile justice system (Asquith et al. 2017, Hunt & Moodie-Mills 2012, James et al. 2022, Mountz 2020). Related, transgender people are frequently incarcerated for poverty-related offenses, e.g., theft and survival sex work, and "walking while trans"—the systemic profiling of transgender women as sex workers, or as Edelman (2014, p. 176) writes, "the 'crime' trans women of color 'commit' of visibility."

Winters (2022) provides a compelling overview of how the pathways-to-crime literature has evolved from a focus on men's pathways to crime to a focus on how women's pathways are similar and different and finally to how pathways for queer people converge and diverge from their counterparts. Winters (2022, p. 32) observes that "the legacy of criminology paints the views of cisgender heterosexual white men in broad strokes as the de facto perspective" and describes how feminist criminology has, over decades, inserted the experiences of (presumably) cisgender women

Annu. Rev. Criminol. 2024.7:283–309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

into the empirical picture and attendant theorizing, and now queer criminology is highlighting the ways sexuality, sexual identity, and gender identity are part of larger configurations of pathways and the institutional contexts in which they are experienced by LGBTQ+ people. The nascent literature reveals that these pathways are shaped by an array of historical, structural, and cultural realities that structure the operation of the criminal legal system. Accordingly, Asquith et al. (2017, p. 175) conclude that "the queer criminal career is an alternative pathway into and out of crime."

Greene's (2019) ethnographic work on reentry hardship experienced by formerly incarcerated transgender people illuminates how pathways and turning points extend beyond prison. Greene (2019, p. 548) begins with a generally accepted observation related to reentry: "Housing can mean the difference between setting up a new life and reincarceration" and then identifies the challenges transgender people face when trying to secure housing and facing "categorical exclusions." This work reveals three things that create barriers to successful reentry for transgender people, especially Black transgender women: (*a*) biology-based definitions of sex and gender, (*b*) racialized binary gender categorization processes, and (*c*) the social organization of gender and its attendant gender rules. As a result of these dynamic factors, transgender men can stay in housing options for women, but the exclusion of transgender women from the category woman results in them being excluded from these women's spaces (i.e., housing for women). To quote Greene (2019, p. 549), "Black trans women experience high levels of gender sanctioning in comparison to white trans women and transgender men, which leads to heightened material deprivation."

The recognition that transgender people are differently situated in the criminal legal system because they present a challenge to a taken-for-granted gender binary and the ways cisnormativity is institutionally enforced reveals different configurations of turning points and attendant trajectories. Winters (2022, p. 32) explains that by exploring queer pathways, including those experienced by transgender people, "queer criminology can shed new light on the ways that gendered social structures affect the victimization and offending of people who are not queer vis-à-vis their relationships with gender performance. This will help with the establishment of a queer criminology that is rooted in but not dependent on a study of LGBTQ+ people and their experience (Ball et al. 2014)." It takes seriously that the life experiences, turning points, and pathways are distinct for transgender people when compared to cisgender people (Asquith et al. 2017). Accordingly, current work brings queer perspectives into life course criminology, with a focus on queer turning points (e.g., the coming out process, family acceptance/rejection, and establishing a chosen family) (S. Morgan, unpublished results).

## CONCLUSION: DIRECTIONS FOR FUTURE RESEARCH

Most of the research on the transgender criminal legal system nexus emerged after the turn of the twenty-first century, and much of it is in the past decade. The literature is largely descriptive; focused on documenting the lived experience of transgender people, in particular transgender women, in contact with the criminal legal system; and documents myriad disparities between transgender and cisgender people in the context of criminal legal contact. The literature is more developed in the realm of policing and punishment compared to the judicial decision-making domain. Situating the study of transgender system contact in the context of the emergence of queer criminology—a recent development in criminology itself—Panfil (2018, p. 1) rightly describes this line of work as "young and unafraid" and with "unbounded potential," noting that it exists at the intersection of activism and scholarship. Indeed, the research that reveals and interrogates the transgender criminal legal system nexus is found in reports produced by advocates as well as peer-reviewed publications by academic researchers.

The research makes it clear that transgender people are overrepresented at every stage of the criminal justice system, beginning with juvenile justice system involvement, and this is especially

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

true for transgender youth and transgender people of color. Taking these basic findings seriously, the literature reviewed here delineates what is known about the parameters of a transgender criminal legal system nexus. This nexus is borne of the criminalization of transgender bodies, identities, and behaviors; manifests in policing, judicial decision-making, and punishment and corrections; and is the product of institutionalized pathways from marginalization to imprisonment and reentry. Rodgers et al. (2017, p. 9) succinctly identified the underlying concerns across these domains by observing that "transgender offenders constitute a relatively small subpopulation of prisoners, but barriers encountered by these prisoners before, during, and after imprisonment offer a stark example of the circuitous relationship between vulnerability, cisnormativity, pathologisation, and criminalisation."

In each of the domains of the criminal legal system reviewed here—police, courts, and corrections—there is evidence of administrative violence. According to Spade (2015), administrative violence is the systemic deprivation of opportunities and rights as a result of subjects' incoherence to the law. As such, the harm it produces derives from "the purportedly banal and innocuous daily administration of programs, policies, and institutions" (Spade 2015, p. 74). The state-authorized and enacted production of disparities in system contact and the harms described in this article are inextricably tied to the distribution of life chances under social programs and legal practices. This kind of violence directed at transgender people is a product of transphobia, institutional and social exclusion, and a legal system that, to quote Levitt (2013), "cannot fathom their existence."

The routine operations of the criminal legal system, in effect, treat transgender bodies and identities as largely invisible, incoherent, illegible, and "justifiably" excluded from the most taken-for-granted social categories used to sort and classify people who come into contact with and are subject to the criminal legal system's processing apparatuses. Underscoring Stryker & Whittle's (2006, p. 8) claim that "epistemological concerns lie at the heart of the transgender critique," legal and administrative assessment of sex and gender—and their underlying categorical logics studied by scholars of transgender legal studies—emphasizes the ways in which the universalizing logics of the criminal legal system, especially judicial reasoning, in effect police gender-nonconforming people through unshakeable normative assessments of gender. These do violence by either trapping transgender people in incorrect and untenable categories or in between legal categories. As Asquith et al. (2017, p. 169) surmised, "queers in the criminal processing system necessarily thwart the heteronormative and cisnormative functioning of the criminal processing system."

The work presented in this article has been accompanied by—and in some cases served as a catalyst for—calls for reform and abolition (Dangaran 2021, Martins & Coelho 2022, Reed 2022). These calls are often based on arguments about the ways gender normativity and antiqueer violence are central logics of the prison-industrial complex (Stanley & Smith 2015) and critiques of the usefulness of legal reform strategies in general and of the neoliberal project of transgender rights expansion in particular (Spade 2015). Critics of liberal legal reform question whether following the civil rights and equality strategies of lesbian and gay rights organizations will result in meaningful material and social change under the law (Pérez & Radi 2020). They observe that the liberal project of rights expansion and continued investments in punitive interventions, such as antidiscrimination and hate crime laws, have failed to prevent antitransgender violence while legitimating the carceral apparatus (Ashley 2018a, Meyer 2014, Vipond 2015). Snorton & Haritaworn (2022), for example, posit that such interventions reflect a refusal by reformers to acknowledge the structural, racialized nature of antitransgender violence as they engage in a "trans necropolitics"— described by Snorton & Haritaworn (2022, p. 66) as "systematic forms of often deadly violence experienced by trans people of color" that motivates investment in rights advancement through the spectacle of racial suffering.

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

As the debates about how to understand and respond to the realities of the transgender criminal legal system nexus continue to unfold, identifying and counting transgender people present many methodological and ethical challenges for researchers (Rohrer 2015, Schilt & Lagos 2017). Future research that advances the field in new and fruitful directions will be well-served by continuing to attend to conceptual and measurement issues relevant to capturing "transgender." Understanding what is—and is not—included in both official and unofficial data associated with diverse institutional contexts, including the criminal legal system, is crucial for next-generation research.

There is disagreement on how to define, operationalize, and measure transgender. As a recent report by the National Academies of Science (NAS) explained: "The growing visibility of transgender and intersex populations, as well as efforts to improve the measurement of sex and gender across many scientific fields, has demonstrated the need to reconsider how sex, gender, and the relationship between them are conceptualized" (Bates et al. 2022, p. 1; see also Worthen 2021). The picture gets more complicated in light of ongoing discussions about how transgender relates to other important identities and analytic categories, such as gender nonconforming, nonbinary, gender-fluid, and gender diverse.

With rare exceptions, the literature presented in this article relies on self-definitions and the so-called "two-step method" proposed by the NAS. In 2016, the BJS used the two-step approach in the SPI, which includes asking about sex assigned at birth and current gender identity and comparing responses to these questions to determine who is transgender. According to BJS, "the main advantage of the two-step approach is that it allows for transgender respondents who identify as male or female, but not transgender, to identify as such and still be coded as transgender for analyses" (Beatty & Snell 2021, p. 4). Complicating the picture, recent analyses by NORC (Hansen & Viox 2022) and V. Jenness & S. Vogler (unpublished results) reveal variability in statistics based on what approach to measurement is used to capture transgender. And, as Schilt & Lagos (2017, p. 435) explained, "transgender as a category does not fully capture gender differences between trans men and trans women's experiences, or the diversity of noncisgender identities."

A more thorough understanding of the transgender criminal legal system nexus requires addressing key questions that are inextricably related to how transgender is conceptualized and measured. These key questions include: How does it come into being and how is it evolving in the current historical moment? How does it manifest in the context of a larger criminal legal system? How are diverse populations of people processed through it and with what consequences for them, their communities, the system, and society? How can we account for the variation that accompanies patterns and trends associated with answers to these questions? And how does all this take shape when we move beyond the confines of the United States?[12] To address these questions requires more work designed to capture the structure and workings of the transgender criminal legal system nexus from an intersectional point of view, as initiated by Avalos (2022). We know transgender women of color have particularly adverse interactions with the system because of multiple identities associated with structural marginalization, and we need to know more about how others in the transgender community—for example, those with varying class standings, (dis)abilities, and immigration statuses—fare. We also need more research that focuses on transmasculine, nonbinary, and intersex people per se.

---

[12]This review focuses on the United States because space limitations do not allow for a systematic assessment of this nexus in other places. However, research from around the globe reveals considerable variability in the structure and functioning of the transgender criminal legal system nexus as well as how gender variance is conceptualized, measured, and rendered empirically legible by researchers, policymakers, and, most importantly, members of diverse impacted communities.

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

Likewise, there is much to be learned about how the criminal legal system reflects and reproduces—and occasionally challenges and disrupts—hegemonic and nonhegemonic formations of gender. As Meadow (2010, p. 814) argued, "Gender is perhaps the most pervasive, fundamental, and universally accepted way we separate and categorize human beings." Cultural logics about gender—as an individual attribute, social designation, organizational marker, and institutional feature of social life—undergird systems that trouble the criminal legal system's understanding of transgender or render it illegible entirely. In short, the ongoing study of the transgender criminal legal system nexus described here is the study of the structure and working of gender in the context of the law and the criminal legal system.

Researchers need to recognize this reality and the attendant challenges to future research as they paint a more nuanced, layered, and complicated picture of the structure and functioning of the transgender criminal legal system nexus. As this nexus is more fully understood, questions about how similar and/or different it is from other kinds of axes of social differentiation proximate to the criminal legal system can be addressed. Ideally, they can be addressed in ways that take seriously the perilous consequences of conflating transness exclusively with vulnerability and attendant harm. Doing so paints a one-dimensional portrait that erroneously reduces transgender people, especially transgender women of color, to victims defined by their relationship to vulnerability (Westbrook 2020). That said, the vulnerabilities and attendant harms inventoried in this article are part and parcel of the transgender criminal legal system nexus that is at once structured, dynamic, and fluid. Continuing to research and theorize this nexus will contribute to larger discussions about inequality and the criminal legal system and may also help reduce the kinds of violence this particular nexus enacts.

## DISCLOSURE STATEMENT

The authors are not aware of any affiliations, memberships, funding, or financial holdings that might be perceived as affecting the objectivity of this review.

## ACKNOWLEDGMENTS

In the title of this article, we borrow the term "administrative violence" from Dean Spade (2015) and the phrase "at every turn" from the title of a landmark report, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, released by the National Center for Transgender Equality and the National Gay and Lesbian Task Force in 2011. We thank the *Annual Review of Criminology* editors as well as colleagues who have contributed to the development of this article by engaging in consequential conversations, contributing to our assessment of the field along the lines described in this article, and/or reading and commenting on previous versions of this article, including Swethaa Ballakrishnen, Kitty Calavita, Sarah Fenstermaker, Shanon Fitzpatrick, Hank Fradella, Todd Fuist, Jordan Grasso, Kathy Kenney, Jennifer Macy, Ilan Meyer, Jennifer Orthwein, Vanessa Panfil, Lori Sexton, Stefan Vogler, and Tina Walton. Also, we appreciate the contributions to the article made by the many transgender people who have participated in research that has, in turn, helped us understand the transgender criminal legal system nexus. This article is based on a body of work that is made possible by their willingness to share the details of their lives, question the nature of our findings, and otherwise advance an important dialogue about the very inequalities revealed in this article.

## LITERATURE CITED

Aggarwal NK, Consavage KE, Dhanuka I, Clement KW, Shahbazian K, Bouey JH. 2021. Health and health care access barriers among transgender women engaged in sex work: a synthesis of U.S.-based studies published 2005–2019. *LGBT Health* 8(1):11–25

Ashley F. 2018a. Don't be so hateful: the insufficiency of anti-discrimination and hate crime laws in improving trans well-being. *Univ. Tor. Law J.* 68(1):1–36

Ashley F. 2018b. Genderfucking non-disclosure: sexual fraud, transgender bodies, and identities. *Dalhousie Law J.* 41(2):339–77

Ashley F. 2022. "Trans" is my gender modality: a modest terminological proposal. In *Trans Bodies*, *Trans Selves*: *A Resource by and for Transgender Communities*, ed. L Erickson-Schroth, pp. 22–24. New York: Oxford Univ. Press. 2nd ed.

Asquith NL, Dwyer A, Simpson P. 2017. A queer criminal career. *Curr. Issues Crim. Justice* 29(2):167–80

Augustine D, Barragan M, Chesnut K, Pifer NA, Reiter K, Strong JD. 2021. Window dressing: possibilities and limitations of incremental changes in solitary confinement. *Health Justice* 9(1):21

Avalos S. 2022. The trans experience with the criminal legal system. *Crime Delinquency*. In press. **https://doi.org/10.1177/00111287221134914**

Baars G. 2019. Queer cases unmake gendered law, or, fucking law's gendering function. *Aust. Fem. Law J.* 45(1):15–62

Ball M, Buist CL, Woods JB. 2014. Introduction to the special issue on queer/ing criminology: new directions and frameworks. *Crit. Criminol.* 22(1):1–4

Bates N, Chin M, Becker T, eds. 2022. *Measuring Sex*, *Gender Identity*, *and Sexual Orientation*. Washington, DC: Natl. Acad. Press

Beatty LG, Snell TL. 2021. *Profile of prison inmates*, *2016*. Bur. Justice Stat. Rep. NCJ 255037, US Dep. Justice, Washington, DC. **https://bjs.ojp.gov/content/pub/pdf/ppi16.pdf**

Beauchamp T. 2019. *Going Stealth*: *Transgender Politics and U.S. Surveillance Practices*. Durham, NC: Duke Univ. Press

Beck A. 2014. *Sexual victimization in prisons and jails reported by inmates 2011–2012*: *supplemental tables*: *prevalence of sexual victimization among transgender adult inmates*. Bur. Justice Stat. Rep. NCJ 241399, US Dep. Justice, Washington, DC. **https://bjs.ojp.gov/redirect-legacy/content/pub/pdf/svpjri1112_st.pdf**

Beck A. 2015. *Use of restrictive housing in U.S. prisons and jails*, *2011–12*. Bur. Justice Stat. Rep. NCJ 249209, US Dep. Justice, Washington, DC. **https://bjs.ojp.gov/content/pub/pdf/urhuspj1112_sum.pdf**

Bendery J. 2012. Joe Biden: transgender discrimination is 'the civil rights issue of our time.' *HuffPost*, Oct. 31. **https://www.huffpost.com/entry/joe-biden-transgender-rights_n_2047275**

Billard TJ. 2019. "Passing" and the politics of deception: transgender bodies, cisgender aesthetics, and the policing of inconspicuous marginal identities. In *The Palgrave Handbook of Deceptive Communication*, ed. T Docan-Morgan, pp. 463–77. New York: Springer

Braunstein M. 2017. The five stages of LGBTQ discrimination and its effects on mass incarceration. *Univ. Miami Race Soc. Justice Law Rev.* 7(1):1–29

Buist CL, Lenning E. 2023. *Queer Criminology*. London: Routledge. 2nd ed.

Buist CL, Stone C. 2014. Transgender victims and offenders: failures of the United States criminal justice system and the necessity of queer criminology. *Crit. Criminol.* 22(1):35–47

Calif. Dep. Justice Civ. Rights Enforc. Sect. 2022. *Racial & identity profiling advisory board*: *annual report 2022*. Rep., Calif. Dep. Justice Civ. Rights Enforc. Sect., Sacramento, CA. **https://oag.ca.gov/system/files/media/ripa-board-report-2022.pdf**

Capous-Desyllas M, Loy V. 2020. Navigating intersecting identities, self-representation, and relationships: a qualitative study with trans sex workers living and working in Los Angeles, CA. *Sociol. Inq.* 90:339–70

Carrillo A. 2022. "PREA is a joke": a case study of how trans PREA standards are(n't) enforced. In *Queering Criminology in Theory and Praxis*: *Reimagining Justice in the Criminal Legal System and Beyond*, ed. CL Buist, LK Semprevivo, pp. 70–82. Bristol, UK: Bristol Univ. Press

Cent. Am. Prog., Mov. Adv. Proj. 2016. *Unjust*: *how the broken criminal justice system fails transgender people*. Rep., Mov. Adv. Proj., Boulder, CO. **https://www.lgbtmap.org/policy-and-issue-analysis/criminal-justice-trans**

Clark KA, Hughto JMW, Pachankis JE. 2017. "What's the right thing to do?" correctional healthcare providers' knowledge, attitudes and experiences caring for transgender inmates. *Soc. Sci. Med.* 193:80–89

Coggeshall JM. 1988. "Ladies" behind bars: a liminal gender as cultural mirror. *Anthropol. Today* 4(4):6–8

Cox J, Daquin JC, Neal TMS. 2022. Discretionary prosecutorial decision-making: gender, sexual orientation, and bias in intimate partner violence. *Crim. Justice Behav.* 49(11):1699–719

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

Currah P. 2022. *Sex Is as Sex Does*: *Governing Transgender Identity*. New York: NYU Press

Currah P, Juang RM, Minter S. 2006. *Transgender Rights*. Minneapolis, MN: Univ. Minn. Press

Currah P, Minter S. 2000. Unprincipled exclusions: the struggle to achieve judicial and legislative equality for transgender people. *William Mary J. Women Law* 7(1):37–66

Dangaran D. 2021. Abolition as lodestar: rethinking prison reform from a trans perspective. *Harv. J. Law Gend.* 44(1):161–216

Dolovich S. 2011. Strategic segregation in the modern prison. *Am. Crim. Law Rev.* 48(1):1–110

Donaldson S. 2001. A million jockers, punks, and queens. In *Prison Masculinities*, ed. DF Sabo, TA Kupers, W London, pp. 118–126. Philadelphia: Temple Univ. Press

Drabish K, Theeke LA. 2022. Health impact of stigma, discrimination, prejudice, and bias experienced by transgender people: a systematic review of quantitative studies. *Issues Ment. Health Nurs.* 43(2):111–18

Edelman E. 2014. 'Walking while transgender': necropolitical regulations of trans feminine bodies of colour in the US nation's capital. In *Queer Necropolitics*, ed. J Haritaworn, A Kuntsman, S Posocco, pp. 172–90. Abingdon, UK: Routledge

Ezie C, Saenz R. 2020. Abuse and neglect of transgender people in prisons and jails: a lawyer's perspective. *PLI Chron*. **https://plus.pli.edu/Details/Details?fq=id%3A(315011-ATL3)**

Ferrell J. 1999. Cultural criminology. *Annu. Rev. Sociol.* 25:395–418

Fitzgerald E, Patterson SE, Hickey D, Biko C, Tobin HJ. 2015. *Meaningful work*: *transgender experiences in the sex trade*. Rep., Natl. Cent. Transgender Equal., Best Pract. Policy Proj., Red Umbrella Proj. **https://transequality.org/sites/default/files/Meaningful%20Work-Full%20Report_FINAL_3.pdf**

Fleisher MS, Krienert JL. 2009. *The Myth of Prison Rape*: *Sexual Culture in American Prisons*. Lanham, MD: Rowman & Littlefield Publ.

Flores A, Brown T, Herman J. 2016. *Race and ethnicity of adults who identify as transgender in the United States*. Rep., Williams Inst., UCLA Sch. Law, Los Angeles. **https://williamsinstitute.law.ucla.edu/wp-content/uploads/Race-Ethnicity-Trans-Adults-US-Oct-2016.pdf**

Foster H. 2016. *Conditions of confinement in restrictive housing*. Bur. Justice Stat. Rep. NCJ 250318, US Dep. Justice, Washington, DC. **https://www.ojp.gov/ncjrs/virtual-library/abstracts/conditions-confinement-restrictive-housing**

Gardiner D. 2022. Police much more likely to stop transgender people in California for "reasonable suspicion." *San Francisco Chronicle*, July 31. **https://www.sfchronicle.com/politics/article/Transgender-California-police-LGBTQ-stop-report-17337333.php**

Grant J, Mottet LA, Tanis J, Harrison J, Herman JL, Mara K. 2011. *Injustice at Every Turn*: *A Report of the National Transgender Survey*. Rep., Natl. Cent. Transgender Equal. Natl. Gay Lesbian Task Force, Washington, DC. **https://transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf**

Greene JT. 2019. Categorical exclusions: how racialized gender regulation reproduces reentry hardship. *Soc. Probl.* 66(4):548–63

Haley S. 2016. *No Mercy Here*: *Gender*, *Punishment*, *and the Making of Jim Crow Modernity*. Chapel Hill, NC: UNC Press

Hansen C, Viox M. 2022. *Should you be re-asking sexual orientation and gender identity in your surveys?* Rep., NORC, Univ. Chic., Chicago. **https://www.norc.org/Blog/Pages/sparks-post.aspx?BlogID=138**

Hasenbush A, Flores AR, Herman JL. 2019. Gender identity nondiscrimination laws in public accommodations: a review of evidence regarding safety and privacy in public restrooms, locker rooms, and changing rooms. *Sex Res. Soc. Policy* 16(1):70–83

Hereth J. 2022. *Overrepresentation of people who identify as LGBTQ+ in the criminal legal system*. Saf. Justice Chall. Rep., MacArthur Found., Chicago. **https://safetyandjusticechallenge.org/wp-content/uploads/2022/05/LQBTQOverrepresentationReport-1.pdf**

Hereth J, Garthe RC, Garofalo R, Reisner SL, Mimiaga MJ, Kuhns LM. 2021. Examining patterns of interpersonal violence, structural and social exclusion, resilience, and arrest among young transgender women. *Crim. Justice Behav.* 48(1):54–75

Herman JL, Brown TNT, Wilson BDM, Meyer IH, Flores AR. 2016. *Prevalence*, *characteristics*, *and sexual victimization of incarcerated transgender people in the United States*: *results from the National Inmate Survey* (*NIS-3*). Rep., Williams Inst., UCLA Sch. Law, Los Angeles. **https://williamsinstitute.law.ucla.edu/infographics/incarcerated-trans-us/**

Annu. Rev. Criminol. 2024.7:283–309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

Herring T, Widra E. 2022. What the Survey of Prison Inmates tells us about trans people in state prison. *Prison Policy Initiative*. **https://www.prisonpolicy.org/blog/2022/03/31/transgender_incarceration/#:~:text=Trans%20people%20outside%20of%20prison,experiences%20happen%20behind%20bars%2C%20too**. **https://www.prisonpolicy.org/blog/2022/03/31/transgender_incarceration**

Hughto JMW, Clark KA, Altice FL, Reisner SL, Kershaw TS, Pachankis JE. 2018. Creating, reinforcing, and resisting the gender binary: a qualitative study of transgender women's healthcare experiences in sex-segregated jails and prisons. *Int. J. Prison. Health* 14(2):69–88

Hughto JMW, Quinn EK, Dunbar MS, Rose AJ, Shireman TI, Jasuja GK. 2021. Prevalence and co-occurrence of alcohol, nicotine, and other substance use disorder diagnoses among US transgender and cisgender adults. *JAMA Netw. Open* 4(2):e2036512

Hunt J, Moodie-Mills AC. 2012. *The unfair criminalization of gay and transgender youth: an overview of the experiences of LGBT youth in the juvenile justice system*. Rep., Cent. Am. Prog., Washington, DC. **https://www.americanprogress.org/article/the-unfair-criminalization-of-gay-and-transgender-youth/**

James E, Herman L, Rankin S, Keisling M, Anafi M. 2016. *The report of the 2015 U.S. Transgender Survey*. Rep., Natl. Cent. Transgender Equal., Washington, DC. **https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf**

James J, Brennan DJ, Peck R, Nussbaum N. 2022. Family nonsupport of young trans people, experiences of legal problems, and access to the legal system. *J. LGBT Youth* 20:248–64

Jenness V. 2004. Explaining criminalization: from demography and status politics to globalization and modernization. *Annu. Rev. Sociol.* 30:147–71

Jenness V. 2021. The social ecology of sexual victimization against transgender women who are incarcerated: a call for (more) research on modalities of housing and prison violence. *Criminol. Public Policy* 20(1):3–18

Jenness V, Fenstermaker S. 2014. Agnes goes to prison: gender authenticity, transgender inmates in prisons for men, and pursuit of "the real deal." *Gend. Soc.* 28(1):5–31

Jenness V, Fenstermaker S. 2016. Forty years after Brownmiller: prisons for men, transgender inmates, and the rape of the feminine. *Gend. Soc.* 30(1):14–29

Jenness V, Maxson C, Matsuda K, Sumner J. 2007. *Violence in California correctional facilities: an empirical examination of sexual assault*. Rep., Cent. Evid.-Based Correct., Univ. Calif. Irvine, CA. **https://ucicorrections.seweb.uci.edu/files/2013/06/BulletinVol2Issue2.pdf**

Jenness V, Sexton L, Sumner J. 2019. Sexual victimization against transgender women in prison: consent and coercion in context. *Criminology* 57(4):603–31

Jones A. 2021. Visualizing the unequal treatment of LGBTQ people in the criminal justice system. *Prison Policy Initiative*. **https://www.prisonpolicy.org/blog/2021/03/02/lgbtq/**

Kidd J, Witten T. 2010. Transgender and transsexual identities: the next strange fruit—hate crimes, violence and genocide against the global trans communities. *J. Hate Stud.* 6(3):31–63

Kirkland A, Talesh S, Perone AK. 2021. Health insurance rights and access to health care for trans people: the social construction of medical necessity. *Law Soc. Rev.* 55(4):539–62

Kunzel R. 2008. *Criminal Intimacy: Prison and the Uneven History of Modern American Sexuality*. Chicago: Univ. Chicago Press

Lambda Leg. 2015. *Protected and served?* Rep., Lambda Leg., New York. **https://legacy.lambdalegal.org/sites/default/files/publications/downloads/ps_executive-summary.pdf**

*Lawrence v. Texas*, 529 U.S. 558 (2003)

Lee C. 2014. The trans panic defense: masculinity, heteronormativity, and the murder of transgender women. *Hastings Law J.* 66(1):77–132

Levitt R. 2013. Review of *Normal Life: Administrative Violence, Critical Trans Politics, and the Limits of Law by Dean Spade*, by R Levitt. *QED J. GLBTQ Worldmak.* 1(1):215–17

Lin J, Grattet R, Petersilia J. 2012. Justice by other means: venue sorting in parole revocation. *Law Policy* 34(4):349–72

Lloyd A. 2005. Defining the human: Are transgender people strangers to the law? *Berkeley J. Gend. Law Justice* 20(1):150–95

Annu. Rev. Criminol. 2024.7:283–309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

Lydon J, Carrington K, Low H, Miller R, Yazdy M. 2015. *Coming out of concrete closets: a report on Black & Pink's National LGBTQ Prisoner Survey*. Rep., Black Pink, Omaha, NE. **https://www.blackandpink.org/wp-content/uploads/2020/03/Coming-Out-of-Concrete-Closets-incorcporated-Executive-summary102115.pdf**

Lyseggen KS. 2015. *The Women of San Quentin: Soul Murder of Transgender Women in Male Prison*. Clearwater, FL: SFINX Publ.

Macy J, Brown J, Jenness V. 2023. Judicial interventions and the proliferation of transgender prisoner policies: from sex, to gender, to the promise of policy implementation. In *The Handbook of LGBT Communities, and Justice*, ed. D Peterson, V Panfil. New York: Springer. 2nd ed. In press

Manson J. 2019. *Transgender women of color face crushing rates of incarceration, solitary confinement, and abuse*. Rep., Solitary Watch, Washington, DC. **https://solitarywatch.org/2019/07/22/transgender-women-of-color-face-crushing-rates-of-incarceration-solitary-confinement-and-abuse/**

Marksamer J. 2008. And by the way, do you know he thinks he's a girl? The failures of law, policy and legal representation for transgender youth in juvenile delinquency courts. *Sex Res. Soc. Policy* 5(1):72–92

Martins A, Coelho CM. 2022. Notes on the (im)possibilities of an anti-colonial queer abolition of the (carceral) world. *GLQ J. Lesbian Gay Stud.* 28(2):207–26

McCauley E, Eckstrand K, Desta B, Bouvier B, Brockmann B, Brinkley-Rubinstein L. 2018. Exploring health-care experiences for incarcerated individuals who identify as transgender in a Southern jail. *Int. J. Transgender Health* 3(1):34–41

Meadow T. 2010. "A rose is a rose": on producing legal gender classifications. *Gend. Soc.* 24(6):814–37

Meyer D. 2014. Resisting hate crime discourse: queer and intersectional challenges to neoliberal hate crime laws. *Crit Crim*. 22(1):113–25

Meyer IH, Flores AR, Stemple L, Romero AP, Wilson BDM, Herman JL. 2017. Incarceration rates and traits of sexual minorities in the United States: National Inmate Survey, 2011–2012. *Am. J. Public Health* 107(2):267–73

Mezey SG. 2020. Transgender policymaking: the view from the states. *Publius J. Fed.* 50(3):494–517

Mogul JL, Ritchie AJ, Whitlock K. 2011. *Queer (In)Justice: The Criminalization of LGBT People in the United States*. Boston: Beacon Press

Momen RE, Dilks LM. 2020. Examining case outcomes in US transgender homicides: an exploratory investigation of the intersectionality of victim characteristics. *Sociol. Spectr*. 41(1):53–79

Motley DN, Forberg F, Pagkas-Bather J, Bouris A, Schneider J. 2023. From trauma to transformation: the role of the trauma surgeon in the care of black transgender women. *Curr. Trauma Rep.* **https://doi.org/10.1007/s40719-023-00254-8**

Mountz S. 2020. Remapping pipelines and pathways: listening to queer and transgender youth of color's trajectories through girls' juvenile justice facilities. *Affilia* 35(2):177–99

Mov. Adv. Proj. 2023. *Equality maps: panic defense bans*. Rep., Mov. Adv. Proj., Boulder, CO. **https://www.lgbtmap.org/equality-maps/panic_defense_bans**

Nadal KL, Davidoff KC, Fujii-Doe W. 2014. Transgender women and the sex work industry: roots in systemic, institutional, and interpersonal discrimination. *J. Trauma Dissociation* 15(2):169–83

Nuttbrock L, Bockting W, Rosenblum A, Hwahng S, Mason M, et al. 2014. Gender abuse, depressive symptoms, and substance use among transgender women: a 3-year prospective study. *Am. J. Public Health* 104(11):2199–206

*Obergefell v. Hodges*, 576 U.S. 644 (2015)

Oparah JC. 2012. Feminism and the (trans)gender entrapment of gender nonconforming prisoners. *UCLA Women's Law J*. 18(2):239–71

Panfil VR. 2018. Young and unafraid: queer criminology's unbounded potential. *Palgrave Commun*. 4(1):1–5

Panfil VR. 2022. Queer criminology and ethnography. In *The Oxford Handbook of Ethnographies of Crime and Criminal Justice*, ed. S Bucerius, K Haggerty, L Berandi, pp. 269–87. New York: Oxford Univ. Press

Parker K, Horowitz J, Brown A, Arditi T. 2022. America's complex views on gender identity and transgender issues. *Pew Research Center*. **https://www.pewresearch.org/social-trends/2022/06/28/americans-complex-views-on-gender-identity-and-transgender-issues/**

Pérez M, Radi B. 2020. Gender punitivism: queer perspectives on identity politics in criminal justice. *Criminol. Crim. Justice* 20(5):523–36

Radi B. 2019. On Trans* epistemology: critiques, contributions, and challenges. *TSQ Transgender Stud. Q.* 6(1):43–63

Reed AR. 2022. "We're here! We're queer! Fuck the banks!": on the affective lives of abolition. *GLQ J. Lesbian Gay Stud.* 28(2):227–47

Reisner SL, Mimiaga MJ, Bland S, Mayer KH, Perkovich B, Safren SA. 2009. HIV risk and social networks among male-to-female transgender sex workers in Boston, Massachusetts. *J. Assoc. Nurses AIDS Care* 20(5):373–86

Richie B. 2005. Queering antiprison work: African American lesbians in the juvenile justice system. In *Global Lockdown: Race, Gender, and the Prison-Industrial Complex*, ed. JC Oparah, pp. 73–85. New York: Routledge

Richie B. 2012. *Arrested Justice: Black Women, Violence, and America's Prison Nation*. New York: NYU Press

Robinson RK. 2011. Masculinity as prison: sexual identity, race, and incarceration. *Calif. Law Rev.* 99(5):1309–408

Rodgers J, Asquith N, Dwyer A. 2017. Cisnormativity, criminalisation, vulnerability: transgender people in prisons. *TILES Brief. Pap.* 12:1–13

Rogers E, Krajewski A, Shuster S. 2023. The disproportionate mental health burden among incarcerated transgender and gender diverse people. *J. Correct. Health Care* 29(1):39–46

Rogers SA, Rogers BA. 2021. Trans men's pathways to incarceration. *Sociol. Spectr.* 41(1):115–34

Rohrer MM. 2015. The ethical case for undercounting trans individuals. *TSQ Transgender Stud. Q.* 2(1):175–78

Routh D, Abess G, Makin D, Stohr MK, Hemmens C, Yoo J. 2017. Transgender inmates in prisons: a review of applicable statutes and policies. *Int. J. Offender Ther. Comp. Criminol.* 61(6):645–66

Rowland A. 2022. *The carceral production of transgender categorical precarity*. Paper presented at the Annual Meeting of the Law and Society Association, Lisbon

Salter J. 2023. Transgender Missouri inmate executed for fatal stabbing. *Associated Press News*, Jan. 4. **https://apnews.com/article/crime-legal-proceedings-missouri-st-louis-capital-punishment-b45a31029fa42d9eb67b5b4e1f6a6ffe**

Sampson RJ, Laub JH. 1993. *Crime in the Making: Pathways and Turning Points Through Life*. Cambridge, MA: Harvard Univ. Press

Sanders T, Gildersleeve J, Halliwell S, du Plessis C, Clark KA, et al. 2023. Trans architecture and the prison as archive: "Don't be a queen and you won't be arrested." *Punishm. Soc.* 25:742–65

Sausa LA, Keatley J, Operario D. 2007. Perceived risks and benefits of sex work among transgender women of color in San Francisco. *Arch. Sex. Behav.* 36(6):768–77

Scheim AI, Bauer GR, Shokoohi M. 2017. Drug use among transgender people in Ontario, Canada: disparities and associations with social exclusion. *Addict. Behav.* 72:151–58

Schilt K, Lagos D. 2017. The development of transgender studies in sociology. *Annu. Rev. Sociol.* 43:425–43

Sears C. 2015. *Arresting Dress: Cross-Dressing, Law, and Fascination in Nineteenth-Century San Francisco*. Durham, NC: Duke Univ. Press

Sevelius J, Jenness V. 2017. Challenges and opportunities for gender-affirming healthcare for transgender women in prison. *Int. J. Prison. Health* 13(1):32–40

Sexton L, Jenness V, Sumner J. 2010. Where the margins meet: a demographic assessment of transgender inmates in men's prisons. *Justice Q.* 27:835–66

Sharpe A. 2002. *Transgender Jurisprudence: Dysphoric Bodies of Law*. London: Cavendish Publ.

Sharpe A. 2019. *Sexual Intimacy and Gender Identity Fraud: Reframing the Legal and Ethical Debate*. Abingdon, UK: Routledge

Shields DM. 2021. Stonewalling in the Brick City: perceptions of and experiences with seeking police assistance among LGBTQ citizens. *Soc. Sci.* 10(1):16

Snorton CR, Haritaworn J. 2022. Trans necropolitics: a transnational reflection on violence, death, and the trans of color afterlife. In *The Transgender Studies Reader Remix*, ed. S Stryker, B Blackston, pp. 66–78. New York: Routledge

Sosin K. 2020. Trans, imprisoned—and trapped. *NBC News*, Febr. 26. **https://www.nbcnews.com/feature/nbc-out/transgender-women-are-nearly-always-incarcerated-men-s-putting-many-n1142436**

Spade D. 2015. *Normal Life: Administrative Violence, Critical Trans Politics, and the Limits of Law*. Durham, NC: Duke Univ. Press. Rev. expand. ed.

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

Stammen E, Ghandnoosh N. 2022. Incarcerated LGBTQ+ adults and youth. *The Sentencing Project*. **https://www.sentencingproject.org/app/uploads/2022/10/Incarcerated-LGBTQ-Youth-and-Adults.pdf**

Stanley E, Smith N, eds. 2015. *Captive Genders*: *Trans Embodiment and the Prison Industrial Complex*. Edinburgh: AK Press. 2nd ed.

Stohr MK. 2015. The hundred years' war: the etiology and status of assaults on transgender women in men's prisons. *Women Crim. Justice* 25(1–2):120–29

Storrow R. 1997. Naming the grotesque body in the "nascent jurisprudence of transsexualism." *Mich. J. Gend. Law* 4(2):275–334

Stotzer RL. 2014. Law enforcement and criminal justice personnel interactions with transgender people in the United States: a literature review. *Aggress. Violent Behav.* 19(3):263–77

Stryker S. 2017. *Transgender History*: *The Roots of Today's Revolution*. Berkeley: Seal Press. 2nd ed.

Stryker S, Whittle S, eds. 2006. *The Transgender Studies Reader*. New York: Routledge

Sutherland DK. 2023. "Trans enough": examining the boundaries of transgender-identity management. *Soc. Probl.* 70(1):71–86

Taylor JK, Haider-Markel DP, Lewis DC. 2018. *The Remarkable Rise of Transgender Rights*. Ann Arbor, MI: Univ. Mich. Press

Terwindt C. 2014. Criminalization of social protest: future research. *Oñati Socio-Leg. Ser.* 4(1):161–69

Track Trans Legis. 2023. 2023 Anti-trans legislation. *Track Trans Legislation*. **www.tracktranslegislation.com**. Accessed on March 24, 2023

Trans Legis. Tracker. 2023. The rise of anti-trans bills. *Trans Legislation Tracker*. **https://translegislation.com**. Accessed on March 24, 2023

Trexler RC. 1995. *Sex and Conquest*: *Gendered Violence*, *Political Order*, *and the European Conquest of the Americas*. Ithaca, NY: Cornell Univ. Press

Tumin R. 2022. Kentucky lawmaker speaks out about transgender son's suicide. *New York Times*, Dec. 23. **https://www.nytimes.com/2022/12/23/us/henry-berg-brousseau-transgender-activist-dead.html**

Utnage R. 2023. Trans and living in prison: a first-person perspective. *J. Correct. Health Care* 29:16–18

Valentine D. 2007. *Imagining Transgender*: *An Ethnography of a Category*. Durham, NC: Duke Univ. Press

Vipond E. 2015. Trans rights will not protect us: the limits of equal rights discourse, antidiscrimination laws, and hate crime legislation. *West. J. Leg. Stud.* 6(1):3

Vitulli EW. 2013. Queering the carceral: intersecting queer/trans studies and critical prison studies. *GLQ J. Lesbian Gay Stud.* 19(1):111–23

Vogler S, Rosales R. 2022. Classification and coercion: the gendered punishment of transgender women in immigration detention. *Soc. Probl.* **https://doi.org/10.1093/socpro/spac022**

Walker A, Sexton L, Valcore J, Macy J, Wodda A. 2018. Transitioning to social justice: transgender and non-binary individuals. In *Routledge Handbook of Social*, *Economic*, *and Criminal Justice*, ed. C Roberson, pp. 220–33. New York: Routledge

Ware W. 2015. "Rounding up the homosexuals": the impact of juvenile court on queer and trans/gender non-conforming youth. In *Captive Genders*: *Trans Embodiment and the Prison Industrial Complex*, ed. E Stanley, N Smith, pp. 97–104. Edinburgh: AK Press. 2nd ed.

Westbrook L. 2020. *Unlivable Lives*: *Violence and Identity in Transgender Activism*. Berkeley: Univ. Calif. Press

Westbrook L, Schilt K. 2014. Doing gender, determining gender: transgender people, gender panics, and the maintenance of the sex/gender/sexuality system. *Gend. Soc.* 28(1):32–57

Wildeman C, Andersen LH. 2020. Long-term consequences of being placed in disciplinary segregation. *Criminology* 58(3):423–53

Winters MK. 2022. Queer pathways. In *Queering Criminology in Theory and Praxis*: *Reimagining Justice in the Criminal Legal System and Beyond*, ed. C Buist, L Semprevivo, pp. 32–44. Bristol, UK: Bristol Univ. Press

Wodda A, Panfil VR. 2015. "Don't talk to me about deception": the necessary erosion of the trans-panic defense. *Albany Law Rev*. 78(3):927–71

Woods JB, Sears B, Mallory C. 2016. *Model legislation for eliminating the gay and trans panic defenses*. Rep., Williams Inst., UCLA Sch. Law, Los Angeles. **https://williamsinstitute.law.ucla.edu/wp-content/uploads/Gay-Trans-Panic-Apr-2021.pdf**

Wooldredge J. 2020. Prison culture, management, and in-prison violence. *Annu. Rev. Criminol.* 3:165–88

Worthen MGF. 2021. Categorically queer? An exploratory study of identifying queer in the USA. *Sex Res. Soc. Policy* 19(3):1090–113

Yarbrough D. 2021. The carceral production of transgender poverty: how racialized gender policing deprives transgender women of housing and safety. *Punishm. Soc.* 25(1):141–61

Zimman L, Davis J, Raclaw J, eds. 2014. *Queer Excursions: Retheorizing Binaries in Language, Gender, and Sexuality*. New York: Oxford Univ. Press

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.



**Annual Review
of Criminology**

Volume 7, 2024

# Contents

Annu. Rev. Criminol. 2024 7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.

## The Discipline

Joan Petersilia: A Life and Legacy of Academic and Practical Impact
*Jodi Lane* ............................................................................... 1

## Criminological Theory and Research

*Code of the Street* 25 Years Later: Lasting Legacies, Empirical Status,
and Future Directions
*Jamie J. Fader and Kenneth Sebastian León* .................................................19

Group Threat and Social Control: Who, What, Where, and When
*Matt Vogel and Steven F. Messner* ...........................................................39

The Sixty-Year Trajectory of Homicide Clearance Rates: Toward a
Better Understanding of the Great Decline
*Philip J. Cook and Ashley Mancik* ...........................................................59

Desistance as an Intergenerational Process
*Christopher Wildeman and Robert J. Sampson* .............................................85

History, Linked Lives, Timing, and Agency: New Directions
in Developmental and Life-Course Perspective on Gangs
*David C. Pyrooz, John Leverso, Jose Antonio Sanchez, and James A. Densley* ........... 105

Cultural Criminology: A Retrospective and Prospective Review
*Lynn S. Chancer* ............................................................................. 129

Challenges and Prospects for Evidence-Informed Policy
in Criminology
*Thomas G. Blomberg, Jennifer E. Copp, and Jillian J. Turanovic* ....................... 143

Hybrid Interpersonal Violence in Latin America: Patterns and Causes
*Abigail Weitzman, Mónica Caudillo, and Eldad J. Levy* .................................. 163

Terrorism, Political Extremism, and Crime and Criminal Justice
*Joshua D. Freilich, Steven M. Chermak, Rachael A. Arietti, and Noah D. Turner* ..... 187

## Punishment and the Criminal Legal System

Punishment in Modern Societies: The Prevalence and Causes
of Incarceration Around the World
*John Clegg, Sebastian Spitz, Adaner Usmani, and Annalena Wolcke* .................... 211

How Does Structural Racism Operate (in) the Contemporary US
Criminal Justice System?
*Hedwig Lee* ............................................................................................... 233

Homelessness, Offending, Victimization, and Criminal Legal
System Contact
*Bill McCarthy and John Hagan* ................................................................. 257

The Structure and Operation of the Transgender Criminal Legal
System Nexus in the United States: Inequalities, Administrative
Violence, and Injustice at Every Turn
*Valerie Jenness and Alexis Rowland* ........................................................... 283

Clemency
*Rachel E. Barkow and Mark Osler* ............................................................. 311

Responding to the Trauma That Is Endemic to the Criminal Legal
System: Many Opportunities for Juvenile Prevention, Intervention,
and Rehabilitation
*Micere Keels* ............................................................................................. 329

The Transformative Potential of Restorative Justice:
What the Mainstream Can Learn from the Margins
*Meredith Rossner and Helen Taylor* .......................................................... 357

Stereotypes, Crime, and Policing
*Brendan O'Flaherty and Rajiv Sethi* .......................................................... 383

Parental Legal Culpability in Youth Offending
*Colleen Sbeglia, Imani Randolph, Caitlin Cavanagh, and Elizabeth Cauffman* ......... 403

## Errata

An online log of corrections to *Annual Review of Criminology* articles may be found at
http://www.annualreviews.org/errata/criminol

Annu. Rev. Criminol. 2024.7:283-309. Downloaded from www.annualreviews.org
Access provided by 2603:8001:a600:ca69:e1d3:51a:8614:356b on 01/26/24. See copyright for approved use.