# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| CHELSEA GILLIAM, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 1:23-cv-1047 |
| | * | |
| DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EXPERT DECLARATION OF DR. ISABEL S. LOWELL, M.D., M.B.A.

I, Isabel S. Lowell, M.D., M.B.A., hereby declare and state as follows:

1. I am over the age of 18, of sound mind, and in all respects competent to testify.

2. I have been retained by counsel for Plaintiff Chloe Grey as an expert in connection with the above-captioned litigation.

3. I have actual knowledge of the matters stated herein. If called to testify in this matter, I will testify truthfully and based on my expert qualifications and opinions.

4. I am offering my expertise in support of Ms. Grey's claims against the Maryland Department of Public Safety and Correctional Services (DPSCS) and its agents for injuries against her person resulting from the denial of medically necessary gender-affirming care in connection with her diagnosis of gender dysphoria.

5. In preparing this declaration, I have discussed this case with Ms. Grey's attorneys, reviewed the DPSCS gender dysphoria policy, and reviewed the recent DPSCS housing assessment of Ms. Grey detailed at ECF No. 85.

## BACKGROUND AND QUALIFICATIONS

1

6. I am the founder of and a provider at QMed, LLC and the attending hospitalist at Maine Medical Center and Family Medicine Residency Program. I am also an Adjunct Professor of Family Medicine at Emory University School of Medicine.

7. I received my medical degree from the University of Connecticut School of Medicine in 2010. I received my M.B.A. from the Goizueta Business School at Emory University in 2016. I completed my residency in Family Medicine in Lawrence, Massachusetts.

8. I have been licensed to practice medicine since 2010. I am currently licensed to practice in the following states: Georgia, Maine, Vermont, New Hampshire, Kentucky, Virginia, West Virginia, North Carolina, South Carolina, Tennessee, Florida, Alabama, and Texas. I have been Board Certified in Family Medicine since 2013.

9. I am a member of the American Academy of Family Physicians, the Georgia Academy of Family Physicians, the Gay and Lesbian Medical Association, and the World Professional Association for Transgender Health.

10. I have extensive experience working with patients with gender dysphoria. I have been treating patients with gender dysphoria since 2014.

11. I have presented as an expert in my field at more than a dozen professional conferences and have received numerous teaching and research awards while at Emory University. As part of my practice, I stay current on medical research relating to the care of transgender persons and people diagnosed with gender dysphoria. In 2023, I received the National Gay and Lesbian Medical Association Achievement award recognizing my commitment to providing gender-affirming care to underserved communities throughout the Southeastern United States.

12. I have previously testified as an expert in this matter. I am being compensated at

2

a rate of $300 per hour for preparation of expert declarations and reports, and $500 per hour for time spent conducting in-person work, such as giving deposition or trial testimony. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

13. A true and accurate copy of my Curriculum Vitae is attached hereto as Exhibit A. It documents my education, training, research, and years of experience in this field.

## EXPERT OPINIONS

### A. Hair Removal Is an Essential Part of Gender-Affirming Care

14. The World Professional Association for Transgender Health (WPATH) Standards of Care states that hair removal is an essential part of gender-affirming care for transgender women (*i.e.*, those transitioning to living as women). *See* E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People Version 8*, 23 Int'l. J. of Transgender Health S1, S258 (2022) [hereinafter WPATH Standards of Care].

15. Likewise, the University of San Franscisco Transgender Care and Treatment Guidelines state that "the management of unwanted hair is often a challenge for transgender people" and details several methods of safe and effective hair removal. Cecily Reeves et al., *Hair Removal*, UCSF Transgender Care (June 17, 2016) https://transcare.ucsf.edu/guidelines/hair-removal.

16. According to both of these well-established guidelines, first-line hair removal treatments include laser-hair removal and electrolysis. *See* WPATH Standards of Care at S258. Laser hair removal is an FDA-approved treatment for hair reduction. It uses light to selectively target dark hairs, destroy the hair follicle (root of the hair) and prevent hair growth. Treatments are most effective for dark hair, and typically needed every 4-8 weeks. Electrolysis uses an

3

electrical current to destroy hair follicles. It is effective for all hair colors and is typically needed weekly.

17. In the absence of these treatments, many over-the-counter products are readily available for purchase online.

18. While Defendants' housing assessment of Ms. Grey stated that Defendants could not find an over-the-counter facial hair inhibitor cream that is available under its property matrix, ECF No.85 at 5, treatment to remove Ms. Grey's facial hair is a critical component of her medical care for gender dysphoria. Such treatment is not optional for transgender women like Ms. Grey, since the presence of facial hair can cause significant dysphoria and is associated with discrimination and stigma against transgender women.

19. To accommodate and alleviate her gender dysphoria, Ms. Grey should have access to treatment for facial hair removal—ideally laser-hair removal or electrolysis, but at a minimum to an over-the-counter hair removal cream, which should be considered part of her medical treatment—not a non-medical item to be purchased alongside other items available to all other incarcerated individuals.

**B. Ms. Grey's Genitalia Should Not Form the Basis of a Housing Decision**

20. In their recent housing evaluation of Ms. Grey, Defendants acknowledged that Ms. Grey has gender dysphoria and "identifies and presents as female." ECF No. 85 at 2.

21. Defendants likewise acknowledged that Ms. Grey "minimizes her secondary sex characteristics such as body hair, wears her hair in a long and feminine style, and has developed breasts." ECF No. 85 at 3.

22. Nevertheless, Defendants concluded that they could not house Ms. Grey at a women's prison because she is an "intact biological male." ECF No. 85 at 3. This follows from

DPSCS's gender dysphoria policy, which lists "[i]ntact external genitalia and secondary sex characteristics" as criteria for determining where a gender dysphoric inmate should be housed. *Identification, Treatment, and Correctional Management of an Inmate Diagnosed with Gender Dysphoria*, OPS.131.0001 § J(1)(a) (2016) [hereinafter DPSCS Gender Dysphoria Policy].

23. The term "intact biological male" is inaccurate, offensive, and is not a medical term.

24. Ms. Grey is a pre-operative transgender woman who has been unable to obtain vaginoplasty surgery.

25. It is important to note that Ms. Grey's gender is female, and not determined by her external genitalia.

26. For example, if a man lost his penis due to injury, cancer, or war, that person would not cease to be a man because of his external genitalia. Instead, he would remain a man because he would identify as such.

27. Moreover, vaginoplasty is relatively rare in the general population, as only 10% of transgender women have completed vaginoplasty surgery. S.E. James et al., *Report of the 2015 U.S. Transgender Survey* 102 (2015).

28. To my knowledge, Ms. Grey has requested gender-affirming surgeries such as vaginoplasty (the creation of a vaginal pouch) and orchiectomy (removal of the testicles) on several occasions, including her letter dated May 18, 2023. However, DPSCS has made no effort to get either of those surgeries for Ms. Grey, not even an initial consultation with a surgeon.

29. Ms. Grey clearly meets the criteria for both orchiectomy and vaginoplasty as outlined in the WPATH Standards of Care, as she has a stable diagnosis of gender dysphoria

and has been on hormone therapy treatment for greater than six months. *See* WPATH Standards of Care at S256.

30. Given the high cost of vaginoplasty outside of prison, the likelihood that an incarcerated transgender woman has had the procedure is low. However, I expect this will increase in the future, as many private insurance companies are now covering vaginoplasty. The procedure is also covered by Medicaid and Medicare when deemed medically necessary.

31. The WPATH Standards of Care likewise state that "institutional administrators, health care professionals, and other officials responsible for making housing decisions for [transgender and gender diverse] residents consider the individual's housing preference, gender identity and expression, and safety considerations, *rather than solely their anatomy or sex assignment at birth*." *Id.* at S108 (emphasis added).

32. By centering her anatomy at the expense of her housing preference and gender identity/expression, Defendants' Gender Dysphoria Policy and housing assessment of Ms. Grey violates the medical standards of care for transgender inmates. *See* ECF No. 85 at 3; DPSCS Gender Dysphoria Policy, § .05(J)(1)(a).

33. As a medical matter, Ms. Grey's genitalia alone should not form the basis of any housing decision.

### C. Ms. Grey's Hormone Treatment Renders her Genitalia Irrelevant to the Housing Assessment.

34. Ms. Grey has been receiving hormone treatment for over two years.

35. Defendants stated in their housing assessment that Ms. Grey has received her hormone treatment (Estadiol and Spironolactone) consistently and has been allowed to keep her medication on her person to take as prescribed. ECF No. 85 at 5.

36. Ms. Grey's long-term hormone treatment underlines the errors of Defendants'

position with respect to housing her.

37. If Ms. Grey is receiving appropriate treatment with hormone therapy, including her prescribed testosterone blocker in the amounts indicated by Defendants, *see* ECF No. 85-3, then her testosterone level should be fully suppressed and within the normal female range.

38. While Defendants have failed to provide a recent blood test, this simple method would confirm that Ms. Grey's testosterone level is within the female range.

39. If Ms. Grey's testosterone level is within the normal female range, she would not have the physiologic ability to obtain or maintain an erection, much less use her penis in a sexual encounter or assault. In sum, Ms. Grey's penis does not function to the same extent as a cisgender man. In sum, Ms. Grey's penis does not have any sexual function.

40. Given the long duration of her hormone replacement treatment, it is also unlikely that Ms. Grey can produce sperm.

41. Moreover, because Ms. Grey has been on hormone therapy for several years, her muscles have atrophied. Ms. Grey's strength, muscle mass, and body weight should now be similar to that of any other woman.

42. Thus, her hormone treatment further underscores that Ms. Grey's genitalia should not be the determining factor in any housing placement decision.

43. Likewise, because Ms. Grey is a woman with female hormone levels, she faces an extremely high risk of sexual assault if she is housed with men.

44. Incarcerated transgender people face high rates of physical and sexual assault by facility staff and other inmates. The 2015 Transgender Survey estimated that they are five times more likely to be sexually assaulted by facility staff and over nine times more likely to be assaulted by other inmates compared to rates of sexual assault in the general population. James,

7

*supra* at 15.

45. It is well known that gender affirming care leads to better mental health outcomes. To the extent that DPSCS cares about Ms. Grey's mental health, it should acknowledge that the greatest risk to her mental health is the continued abuse, isolation, and exacerbated gender dysphoria that comes from being housed with men and treated as a man in a men's prison.

46. In sum, given Ms. Grey's hormone regimen, her hormone levels should be the same as any cisgender woman rendering her virtually incapable of penetrative sexual assault or of causing pregnancy and she is at extremely high risk of sexual assault when housed in a male facility.

## CONCLUSION

47. To conclude, DPSCS's housing assessment and refusal to provide Ms. Grey facial hair removal treatment are inconsistent with the relevant medical guidelines and do not reflect Ms. Grey's biological reality and gender identity.

48. Not only is Ms. Grey being denied safe and affirming housing based on her external genitalia, which does not have anything to do with her gender, but she has been denied any medical or surgical treatments which could alter these physical conditions, including facial hair removal cream.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: _____

Isabel S. Lowell, M.D., M.B.A.

8