**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CHELSEA GILLIAM, *at al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No.  1:23-cv-1047-MJM |
| DEPT. OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*

## DPSCS DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO ENFORCE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants, the Department of Public Safety and Correctional Services ("DPSCS" or "the Department"); Carolyn Scruggs, the Secretary of the Department; Sharon Baucom, the former Chief Medical Officer; David Wolinski, Prison Rape Elimination Act ("PREA") Coordinator; Orlando Johnson, former warden, Patuxent Institution; Kimberly Stewart, Assistant Warden of Patuxent Institution; April Peterson, PREA Compliance Manager at Patuxent,  and Michele Gardner, Americans with Disabilities Act ("ADA") Coordinator, (collectively "DPSCS Defendants"), by and through their attorneys, Anthony G. Brown, Attorney General, and Merrilyn E. Ratliff and Kelly M. Donoho, Assistant Attorneys General, hereby respond in opposition to the Motion to Enforce Temporary Restraining Order and Preliminary Injunction ("Motion to Enforce")

(ECF 95) filed by Plaintiff Chloe Grey a.k.a Chloe Scheibe ("Plaintiff" or "Ms. Grey"), and state:

## INTRODUCTION

Chloe Grey is an incarcerated individual who identifies as transgender female. On November 10, 2023, through her attorneys, she filed a Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion"), alleging multiple risks of irreparable harm related to her housing, risk management, and medical management at Patuxent Institution ("Patuxent") and seeking various forms of injunctive relief, including transfer to a women's correctional facility.

After three days of testimony and argument, this Court granted in part and denied in part the TRO Motion. *See* ECF 75. Of relevance to the instant Motion to Enforce, this Court ordered Defendants to "conduct an assessment of Plaintiff's housing placement consistent with Maryland DPSCS Executive Directive no. OPS.131.0001, titled 'Identification, Treatment and Correctional Management of an Inmate Diagnosed with Gender Dysphoria,' to determine whether to place Plaintiff in a facility designated for women"; and to "[p]rovide Plaintiff with any over-the-counter facial hair inhibitor product that is a reasonable replacement for the facial hair inhibitor cream Plaintiff has been prescribed, provided that any such over-the-counter facial hair inhibitor product is available to DPSCS." *Id.*

On December 8, 2023, DPSCS convened "a committee . . . in order to conduct a case-by-case housing analysis of the housing of Ms. Grey pursuant to Executive Directive OPS.131.0001 'Identification, Treatment, and Correctional Management of an Inmate

Diagnosed with Gender Dysphoria'" (hereinafter referred to as "the Policy"). *See* ECF 85-1. Based on this review, which seriously considered Ms. Grey's expressed preference for housing in a female institution as well as the other factors enumerated in the policy, the committee determined to transfer Ms. Grey to the North Branch Correctional Institution ("NBCI"). *See* ECF 85. As of the date of filing of this Opposition, DPSCS has not located an available "over the counter facial hair inhibitor product." *See* January 3, 2024, Affidavit of Cory Walker (ECF 85-3). *See also* March 8, 2024, Affidavit of Cory Walker, attached hereto as **Exhibit A, ¶ 17**; Affidavit of Dr. Oscar Jerkins, attached hereto as **Exhibit B, ¶¶ 7-9 .**

DPSCS has therefore complied with the Order and the relief Ms. Grey seeks is moot. Further, it is clear that the "Motion to Enforce" merely disagrees with the results of DPSCS's "assessment of Plaintiff's housing placement" and seeks to inappropriately *revisit* the TRO Motion and contradict this Court's Order. For these reasons, the Motion to Enforce should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

The case underlying this matter is an action brought under 42 U.S.C. 1983, Title II of the ADA, and Section 504 of the Rehabilitation Act by Plaintiffs Chelsea Gilliam, Kennedy Holland, and Ms. Grey. All plaintiffs identify as transgendered women who have been housed in male State correctional institutions. Ms. Grey is the sole Plaintiff currently confined in an institution of the DPSCS.[1]

---

[1] Ms. Gilliam and Ms. Holland have been, respectively, released from custody and released on mandatory supervision.

Ms. Grey has been incarcerated in DPSCS facilities since 2017 and is serving a life sentence for murder in the first degree and a concurrent 30-year sentence for second degree murder.[2] Ms. Grey is diagnosed as gender dysphoric, with comorbidities of borderline personality disorder and antisocial personality disorder, and currently receives hormone medication as part of her treatment for gender dysphoria. She is classified as maximum security and is currently confined at NBCI.

Prior to being confined at NBCI, Ms. Grey was confined at Patuxent, where she was transferred on September 7, 2023, in order to attend a prestigious educational program. Ms. Grey violated institutional conduct rules applicable to all Department incarcerated individuals and, as such, was transferred from general population to administrative segregation.[3] On November 10, 2023, eight days after she joined the Third Amended

---

[2] The convictions were imposed under Ms. Grey's previous legal name, Christopher Scheibe, as they were imposed before Ms. Grey's diagnosis with gender dysphoria in March 2021 and her legal name and gender change on July 23, 2023. *See* ECF 50-6. Both of Ms. Grey's victims were women and both were stabbed to death.

[3] Administrative segregation is housing used by DOC facilities to separate an incarcerated individual from general population for security and safety reasons such as: 1) the incarcerated individual is awaiting a hearing on a disciplinary violation; 2) the incarcerated individual expresses a fear for his or her safety; or 3) the incarcerated individual poses a danger to others in the institution. Due to the increased monitoring and security on administrative segregation housing, an incarcerated individual on administrative segregation may be unable to participate in certain activities, such as engaging in institutional jobs and attending some out-of-cell programs. However, incarcerated individuals on administrative segregation have access to outside recreation, to the day room, and are allowed showers three times a week. They have access to paper and writing instruments and a tablet that provides access to educational programs, entertainment material, and texting with family and friends, so long as the individual complies with institutional rules. Medical personnel also make rounds through the segregation unit and provide medication. *See* Affidavit of Kimberly Stewart (ECF 59-3). *See also* Walker Affidavit

Complaint, Ms. Grey filed the TRO Motion, alleging a "campaign of retaliation and harassment" against the Department related to her involvement in the above-captioned case and alleging multiple deprivations and harms.[4]  She sought a temporary restraining order and a preliminary injunction to "remove her from segregation, to allow her to participate in her educational program, to provide her with consistent hormone treatment and other gender-affirming care, to cease retaliating against her for exercising her legally protected rights, and to transfer her to the Patuxent Institution for Women in accordance with her gender identity." *See* Memorandum in Support of TRO Motion (ECF 50-1) at 11, 15. Defendants opposed the TRO Motion. *See* ECF 59.

The parties attended a virtual motions hearing over the course of three days: November 21, 2023, November 22, 2023, and December 1, 2023.  Ms. Grey testified for several hours and also called two expert witnesses, Dr. Isabel Lowell and Dan Pacholke. Defendants presented evidence from the Assistant Warden of Patuxent, Kimberly Stewart, and the Chief Medical Director, Dr. Oscar H. Jerkins.  At the conclusion of the arguments, this Court indicated it would grant the TRO Motion in part and deny the TRO Motion in part, and on December 4, 2023, issued an Order to that effect.  *See* ECF 75.

The Order mandated that the DPSCS Defendants: 1) conduct the aforementioned case-by-case housing analysis in accordance with the Policy within thirty (30) days of the

---

[4] Of particular relevance to this Motion to Enforce, Ms. Grey asserted that she had previously been prescribed a facial hair inhibitor cream, Vaniqua, for one month but her prescription was not refilled and the lack of access to the cream exacerbated her gender dysphoria.  *See, e.g.,* ECF 50-6, ¶¶ 33, 35.  Later testimony from Dr. Jerkins established that Vaniqua was no longer available in the United States.

Order; 2) file a status report with the Court after such analysis was completed;[5] 3) ensure Ms. Grey was consistently provided with her prescribed hormone medications, including recording the administration of her medications;[6] 4) provide Ms. Grey with "any over-the-counter facial hair inhibitor that is a reasonable replacement for the facial hair inhibitor cream Plaintiff has been prescribed" so long as "any such . . . product is available to DPSCS"; 5) ensure Ms. Grey has access to razors "consistent with DPSCS policies and procedures";[7] and 6) ensure that three correctional officers "have no contact with nor access to [Ms. Grey], until further order of the Court."[8] [9]

---

[5] DPSCS Defendants filed this status report on January 3, 2024. *See* ECF 85.

[6] This portion of the Order is not at issue in the Motion to Enforce. In any event, DPSCS video recorded Ms. Grey's medication administration at Patuxent in the morning and evening until her transfer to NBCI. At NBCI, she is permitted her medication as "Keep on Person," or "KOP," meaning she is given thirty days of her prescribed medication at a time and Ms. Grey is responsible for taking her daily prescribed doses until her next refill. Consistent with the Court's Order, NBCI records the administration of these refills via video. All videos have been provided to Ms. Grey's counsel.

      In the Motion to Enforce, Ms. Grey does not assert problems with timely access to her hormone medication at NBCI. Indeed, Ms. Grey acknowledges that she is "allowed to keep [her] hormone medications on [her] person." *See* ECF 95-5, ¶ 40. She asserts, without corroboration or further support, that "male inmates get their medications filled much more quickly" but has *not* claimed that she has missed any doses. *Id.* ¶ 41.

[7] Ms. Grey complains she "ha[s] not been allowed to keep razors on [her] person," *see* ECF 95-5 ¶ 9. However, she acknowledges that she is permitted access to razors three times per week during showers though she appears to object to being "treated the same as all other male inmates." *See* ECF 95-5 ¶ 9-10. The loan of razors during showers is consistent with DPSCS policy, which allows up to two (2) disposable razors to be "issued/loaned at [the] warden's discretion." *See* Appendix 1 to OPS.220.0004 (Allowable Inmate Property Matrix), attached hereto as Exhibit C.

[8] Ms. Grey's transfer from Patuxent to NBCI removed any likelihood of these officers coming into contact with her during the pendency of the Department's investigation into her allegations.

[9] The Court also requested a supplemental response concerning allegations of excessive heat in Ms. Grey's cell at Patuxent, which DPSCS Defendants filed on December 11, 2023. *See* ECF 78.

On December 8, 2023, a seven-member committee from the Department convened to "conduct a case-by-case housing analysis of the housing of Ms. Grey pursuant Executive Directive OPS.131.0001 'Identification, Treatment and Correctional Management of an Inmate Diagnosed with Gender Dysphoria.'" *See* ECF 85-1. The Policy requires a "case-by-case" evaluation of Ms. Grey's housing by "the facility's Security Chief and Case Management staff with support from the Director, Clinical Services and Deputy Director of Mental Health or specialty consultation considering safety, security, or operational issues." *See* OPS.131.0001J(2). In accordance with the Policy, present were: Keith Dickens, Deputy Commissioner of the Division of Correction; Winnie Mott, Security Chief of Patuxent; Douglas Dill, Patuxent Case Management Manager; Owodunni Adenji-Fashola, Patuxent Case Management Specialist and PREA Coordinator; Bevin Merles, Psy.D., DPSCS Deputy Director of Mental Health Services – Pretrial Complex; and Oscar Jerkins, M.D., DPSCS Chief Medical Director, Office of Clinical Services. ECF 85. Because the Court's Order also indicates the meeting should "determine whether to place Plaintiff in a facility designated for women," Geneva Holland, the warden of the Maryland Correctional Institution for Women ("MCI-W"),[10] also attended the meeting, although she was not part of the committee. The stated purpose of the meeting was to "determine whether Ms. Grey could remain at Patuxent,[11] and if not, the appropriate facility to accept Ms. Grey's transfer." *Id.*

---

[10] MCI-W is the only DPSCS correctional facility, other than Patuxent, that houses women in sentenced status.

[11] Patuxent has both male and female accommodations and houses both genders.

Because Ms. Grey's security classification is "maximum security," she could only be transferred to a maximum security institution. Therefore, the only DPSCS institutions that could be considered were Patuxent; NBCI; MCI-W; Western Correctional Institution ("WCI"); and Jessup Correctional Institution ("JCI"). After consideration of each of these institutions, the committee determined that NBCI, one of DPSCS's largest institutions with significant resources and staff, was the current best fit for managing Ms. Grey's safety, security, and anticipated needs.

Ms. Grey transferred to NBCI on December 18, 2023. She was provided all property permitted under the Allowable Property Matrix, including feminine clothing and products, and her hormone medications were dispensed KOP. *See* ECF 85-2. However, she was not provided an "over the counter facial hair inhibitor cream" because no such cream had been located that would be available under the Allowable Property Matrix. *Id.* *See also* Exhibit B to ECF 85-2; ECF 75. As of the date of this Motion, no suitable "over the counter facial hair inhibitor cream" has been found and is available to DPSCS. *See* Walker Affidavit, ¶ 17; Jerkins Affidavit, ¶¶ 7-9.

Additional facts will be supplied in the Argument portion of this Opposition.

## ARGUMENT

I.    **Ms. Grey's "Motion to Enforce" is Moot Because DPSCS Has Conducted the Ordered "Assessment of [Ms. Grey's] Housing Placement" and Has Attempted to Locate A Replacement Over the Counter Facial Hair Inhibitor Product.**

DPSCS Defendants have complied with this Court's December 4, 2023, Order, requiring that DPSCS (1) "conduct an assessment of Plaintiff's housing placement

consistent with [DPSCS] Executive Directive no. OPS.131.0001, titled 'Identification, Treatment and Correctional Management of an Inmate Diagnosed with Gender Dysphoria,' to determine whether to place Plaintiff in a facility designated for women" and (2) "[p]rovide Plaintiff with any over-the-counter facial hair inhibitor product that is a reasonable replacement for the facial hair inhibitor cream Plaintiff has been prescribed, provided that any such over-the-counter facial hair inhibitor product is available to DPSCS."[12]  *See* ECF 75.

Addressing the second point first, DPSCS has made significant efforts to locate an "over-the-counter facial hair inhibitor product" that is a "reasonable replacement for the facial hair inhibitor Plaintiff [was] prescribed" for one month in 2023.  *See* Walker Affidavit, ¶ 17; Jerkins Affidavit, ¶¶ 7-9. However, such an "over-the-counter facial hair inhibitor product" is not "available" for three reasons.  First, the facial hair inhibitor product that Ms. Grey was prescribed, Vaniqa, has no over the counter equivalent. *Id.* This is sufficient information alone to moot Ms. Grey's arguments.  Second, although a prescription-based alternative to Vaniqa exists, it is only sold in the United Kingdom and would require ordering through a Canadian pharmacy.  *Id.* Even if Ms. Grey was eligible to be prescribed this cream, DPSCS could not guarantee that supply chain interruptions or other considerations would not interfere with its consistent supply to Ms. Grey.  *Id.* Third, and perhaps most importantly, facial hair inhibitor creams and related (but not equivalent) depilatory creams, such as Nair, are not permitted property under the Inmate Property

---

[12] Ms. Grey has not challenged DPSCS Defendants' compliance with any other portion of the Order.  *See* ECF 95-1 at 28.

Matrix.  *Id.*  These creams contain caustic chemicals and present potential safety and security concerns to their users and to the other incarcerated individuals in the institution. Walker Affidavit, ¶ 17.[13]

As to the housing assessment ordered by this Court, on December 8, 2023, DPSCS conducted an evaluation "consistent with [the Policy]" in order "to determine whether to place Plaintiff in a facility designated for women." ECF 75.  DPSCS has only two facilities that are designated for women: Patuxent, which has both a male and female correctional population, and MCI-W.

Pursuant to the Policy, the committee was required to "evaluate[] [Ms. Grey's housing placement] on a case-by-case basis . . . considering safety, security, or operational issues."  OPS. 131.0001J(2).  The Policy provides that the placement evaluation "shall be made on a case-by-case basis seriously considering the [incarcerated individual]'s opinion regarding the [their] safety" as well as "the [incarcerated individual]'s biological gender presentation and appearance considering" two factors: (1) [i]ntact external genitalia and secondary sex characteristics, such as pubic hair, chest hair, facial hair" and (2) "[s]pecific factors, such as partial completion of sex reassignment surgery, removal or augmentation of breasts, or removal of testicles." *See Id.* at J(1). Although "[m]ental health staff may provide input" as part of the gender dysphoric incarcerated individual's individualized treatment plan, the "final determination regarding housing placement is the responsibility

---

[13] Although it is evident Ms. Grey was prescribed and received Vaniqua for one month, this fact alone does not establish that access to such a product was allowable in accordance with the Property Matrix.

of the managing official," and "[i]f mental health staff input and recommendations and a managing official's decision on placement of a Gender Dysphoric incarcerated individual conflict, the final decision shall be made by the Deputy Secretary for Operations, or a designee." *Id.* at J(3), (4).

As explained in Defendants' Opposition to the Motion for TRO (ECF 59), Ms. Grey transferred from WCI to Patuxent in September 2023 to attend the Georgetown educational program, but almost immediately began to clash with fellow incarcerated individuals and act in inappropriate ways, including violating several disciplinary rules. *See, e.g.,* ECF 59-3. Ms. Grey also engaged in a seeming pattern of filing complaints against staff and withdrawing or denying many of them later. *Id.* However, Ms. Grey maintained a few of these complaints, which led to at least 15 staff members being prohibited to work near her during the required investigations. *See* ECF 85 at 2. Although Patuxent offers numerous special programs, it is primarily a treatment facility for the incarcerated mental health population and long-term placement of Ms. Grey would not be appropriate.[14] *Id.* Based on these facts, as well as Ms. Grey's apparent decompensation after being transferred from WCI to Patuxent, all of which was well-known to the committee after the pendency of the Motion for TRO, the committee determined that Ms. Grey should not remain at Patuxent in *any* gendered housing. *Id.* at 2-3.

---

[14] Ms. Grey transferred to Patuxent to attend the Georgetown University educational program; however her disciplinary infractions led to her November 15, 2023, placement on disciplinary segregation for thirty (30) days, which rendered her ineligible for the program at Patuxent. *See* ECF 59-3.

The committee then considered placement of Ms. Grey at MCI-W, with the added input of the warden of MCI-W, Geneva Holland. *Id.* at 3. All committee members and Ms. Holland were on notice of Ms. Grey's Motion for TRO requesting transfer to women's housing at Patuxent. Therefore, all were aware that Ms. Grey "has expressed a strong preference to be housed in a women's institution like MCI-W," and this preference was "seriously considered" in accordance with the Policy. ECF 85-1, ¶¶ 3, 9. *See also* OPS.131.0001J(1). While "seriously considering [Ms. Grey's] opinion regarding [her] safety" pursuant to Section J(1) of the Policy, the committee nevertheless was also *required* to consider Ms. Grey's "intact external genitalia and secondary sex characteristics" and "specific factors" related to whether she has undergone any gender-affirming surgery ("partial completion of sex reassignment surgery, removal or augmentation of breasts, or removal of testicles"), *see* OPS.131.0001J(1)(b), as well as "safety, security, or operational issues." OPS. 131.0001J(2).

In a process consistent with the Policy, the committee noted that "Ms. Grey minimizes her secondary sex characteristics such as body hair, wears her hair in a long and feminine style, and has developed breasts," but also considered that "Ms. Grey still possesses external male genitalia and has not engaged in any gender affirming surgery or partial surgery." ECF 85-1, ¶ 9. In keeping with the Policy, the committee observed "the general potential for harm to female [incarcerated individuals] at MCI-W from an intact biological male incarcerated individual]" as a "factor[] weighing against transfer." *Id. See Sabbats v. Clarke*, 2022 WL 4134771, *8 (W.D. Va. Sept. 12, 2022) (determining that housing policy appropriately considered a transgender incarcerated individual's *"gender at*

birth, her current genitalia, or her other physical characteristics" as well as her "adoption of a female name and acquisition of female-name documentation," the individual's "past history of sexual violence and other assaultive actions," and "her recent actions that are rightfully considered in assessing her level of overall mental and emotional stability and self-control").

Nevertheless, the *first* factors noted and discussed by the committee in evaluating Ms. Grey's potential placement at MCI-W were individualized factors concerning Ms. Grey's mental health and safety from physical or sexual assault as well as operational issues specific to her. *See* OPS. 131.0001J(2) (committee must "evaluate[] [Ms. Grey's housing placement] on a case-by-case basis . . . considering safety, security, or operational issues."). The committee considered Ms. Grey's "psychological wellbeing" if she were to experience problems at MCI-W with other female inmates, including "sexual relationships." ECF 85-1, ¶ 9. The discussion determined that it was better to place her at NBCI, which has significant mental health resources that could provide "individualized attention" to Ms. Grey, and is located far removed from the Jessup Region (which also includes Patuxent). *See* ECF 85-1, ¶¶ 9-11. The committee also determined that Ms. Grey, a "biological male," has a "specific history of violence towards women," a clear operational and security issue that implicates both the women at MCI-W and Ms. Grey's own psychological health. *See Sabbats*, 2022 WL 4134771, *8 (finding no equal protection violation arising from a transgender female individual's assignment to a male prison based on a "case-by-case, multifactored evaluation of appropriate housing" that considered, *inter alia*, "her past history of sexual violence and other assaultive actions.").

Therefore, DPSCS clearly complied with the "case-by-case" evaluation required by both this Court's Order and OPS.131.0001J, because the December 8, 2023, evaluation "seriously considered" Ms. Grey's "opinion regarding [her] safety" but also considered her "intact external genitalia and secondary sex characteristics" as well as "specific factors" concerning gender transition and relevant "safety, security, and operational issues." OPS.131.0001J(1),(2).   There is no further relief available to Ms. Grey by "enforcement" of this Court's Order, because the Order was effectuated.

## II.    Ms. Grey Is Not Entitled to Additional Relief.[15]

The "Motion to Enforce" purportedly seeks to implement the December 4, 2023, Order of this Court requiring the aforementioned housing placement review per the Policy, but in fact seeks an order directing her transfer to a women's facility.  In essence, Ms. Grey seeks a decision that is more to her satisfaction.  Ms. Grey therefore asks this Court for relief this Court has already considered and denied.

Significantly, when ruling on the TRO Motion, the Court indicated that "the plaintiff has failed to establish the likelihood of irreparable harm that would result if she is not transferred to a facility designated for women."  ECF 95-2, lines 4-6.  The Court cited Ms. Grey's "claimed [] need for social transition in the form of a transfer to a women's facility as a sort of treatment for gender dysphoria" and the testimony of Dr. Lowell, and noted that these arguments and testimony did "not persuade[]" the Court.  *Id.* at lines 7-11.

---

[15] Defendants reserve the right to raise any additional applicable defenses or arguments at a later time, including but not limited to, a failure to exhaust administrative remedies under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e.

However, the Court found "credible and compelling" the Department's gender dysphoria policy indicating "that gender dysphoria as a diagnosis calls for individualized treatment, based upon consultation with the inmate's treating psychiatrist and other service providers." *See Id*. at lines 12-16.  Further, the Court observed that "agencies must make individualized determinations about how to ensure the safety of each inmate" and consider "on a case-by-case basis whether a placement at a facility designated for the transgender inmate's gender identity would ensure the inmate's health and safety" and acknowledged a specific evaluation of "whether such a placement would present management or security problems." *Id.* at lines 18-24.

This is *precisely* what DPSCS accomplished on December 8, 2023, when it consulted with managing officials, case management personnel, and the PREA coordinator from Patuxent (where Ms. Grey was housed at the time) as well as mental health staff and service providers to conduct a personalized, individualized, case-by-case consideration of Ms. Grey's housing assignment in accordance with the Policy.  *See* ECF 85-1; ECF 95. Following the contours of OPS.131.0001J, the committee considered Ms. Grey's gender identity, gender transition status, and biological characteristics *as well as* factors concerning her physical health, mental health, case management history, and future correctional opportunities.  Far from "hous[ing] transgender [incarcerated individuals] based solely on their genitalia" and therefore "put[ting] [them] at *further* risk of harm," *Williams v. Kincaid*, 45 F. 4th 759, 778 (4th Cir. 2022), the committee's decision was nuanced and properly customized to the considerations applicable to Ms. Grey and the other incarcerated individuals in DOC custody.

In *Sabbats v. Clarke*, the district court considered an equal protection challenge to the assignment of a transgender individual to male housing pursuant to a Virginia Department of Corrections policy mandating "periodic reviews" on a "case-by-case" basis, considering "many factors about the inmate: transgender status, sexual assault risk (the risks of being a sexual assault victim or perpetrator), criminal history (including particular violent or sexual crimes), institutional adjustment, institutional needs and bed space, and personal safety."  2022 WL 4134771, at *8.  The court determined that consideration of the transgender individual's "collection of documentation in her female name and her intended future gender" and status as "a biological male with a history of violent behavior" were appropriate for the "case-by-case, multi-factored evaluation." *Id.*  Specifically, the Court observed that "[i]n considering the possibility of placing [a transgender incarcerated individual] in a female prison, the Committee must consider safe and appropriate housing for [the individual], but also the safety of female [incarcerated individuals] among whom she would be housed at a female facility," especially because "[m]ost female VDOC [incarcerated individuals] are not incarcerated for violent sexual crimes, and many of them have been victims of sexual violence."  *Id.*

Just as in *Sabbats*, the analysis by DPSCS did not determine to house Ms. Grey in a male institution "based only on [her] gender at birth, her current genitalia, or her other physical characteristics," because the analysis considered numerous other appropriate factors.  On December 8, 2023, the committee reviewed "not only [Ms. Grey's] adoption of a female name and acquisition of female-name documentation," but also her "past history of sexual violence and other assaultive actions," and her "recent actions that are

rightfully considered in assessing her level of overall mental and emotional stability and self-control," factors which are appropriate and necessary both under relevant case law and under the Policy. *Id.* (also noting the appropriateness of considering the period of time since a transgender individual began the "complex transition from male to female"). The consensus under the factors enumerated in the Policy was that for Ms. Grey's "health and safety" *and* in observation of potential or likely "management or security problems," at *this* time, Ms. Grey was best suited for placement at NBCI as this placement both removed her from the Jessup Region and allowed her a fresh start with significant support and resources, should she require them. *See* ECF 85-1, ¶¶ 10-11.

Contrary to Ms. Grey's statements, NBCI is not the "end of the line" or "a 'super-maximum security facility' intended for male incarcerated individuals with the most extreme behavioral issues" as characterized by Mr. Pacholke. ECF 95-1 at 9. NBCI is indeed a male facility, but it houses multiple gender dysphoric incarcerated individuals, along with all security levels, and provides significant resources to its incarcerated individuals, including programming, educational facilities, and work programs. *See* Walker Affidavit, ¶ 5. Further, a placement at NBCI was the best situation for Ms. Grey as evaluated by the committee at the snapshot moment of December 8, 2023, and if necessary, she will undergo another evaluation pursuant to the Policy and could be placed in other institutions based on her needs at that potential future date. *See* ECF 85-1, ¶ 10 (noting that "JCI could be a potentially good fit").[16]

---

[16] The committee also observed that Ms. Grey had previously been housed at WCI and, while at Patuxent, filed a PREA complaint against another incarcerated individual

Moreover, Ms. Grey's Motion to Enforce seeks to not only question this Court's Order, but also to inappropriately challenge, second-guess, and nullify DPSCS's well-established discretion in managing its institutions. *See, e.g.* ECF 95-1 at 9 ("DPSCS . . . *should* have eliminated NBCI") (emphasis added); *Id.* at 2, 28 (asking "this Court to . . . determine that . . . Ms. Grey *should* be housed in a women's facility.") (emphasis added). As explained in the Policy, "final determination regarding housing placement is the responsibility of the managing official," *not* the Court or the incarcerated individual's attorneys. *Id.* § J(3). *See also* Md. Code, Corr. Servs., § 9-103(b)(1) ("Each individual sentenced to the jurisdiction of the Division . . . shall be held by, confined in, assigned to, or transferred to a correctional facility in the Division, *as the Division orders*.") (emphasis added); Corr. Servs. § 4-202.

"The difficulties of operating a detention center must not be underestimated by the courts." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326, (2012) (citing *Turner v. Safley,* 482 U.S. 78, 84–85 (1987). "Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have

---

concerning alleged events at WCI. That incarcerated individual was still incarcerated at WCI, and another incarcerated individual with whom Ms. Grey acknowledged a sexual relationship also is currently at WCI. Based on these considerations, the committee determined that for Ms. Grey's protection and in the preservation of institutional safety and security, WCI was "not an appropriate placement" *at the time. See Sabbats*, 2022 WL 4134771, at *9 (approving of assignment of transgender female to men's facility based on a case-by-case analysis for many reasons, including that the analysis "[left] open the possibility of a future transfer to a female prison facility or other housing arrangement."

substantial discretion to devise reasonable solutions to the problems they face," *id.,* including balancing needs of protection, security, and best practices for *all* of the individuals in their custody with the preferences of an incarcerated individual who holds very different ideas about how she should be best managed and housed.  Moreover, "[f]ederal courts have [] reason to show deference to the decisions of prison authorities, where a state penal institution is involved" because "[t]he realities of running a penal institution are complex and unique to the prison environment" and "[i]t is impossible for the judiciary to predict the ramifications" of the transfer of an incarcerated individual." *Wetzel v. Edwards*, 635 F.2d 283, 288 (4th Cir. 1980).  Accordingly, "decisions made by prison administrators in their informed discretion have been accorded 'wide-ranging deference' by the federal courts" and "[f]ederal courts have traditionally been reluctant to interfere in the problems of prison administration."   *See id.* (quoting *Jones v. North Carolina Prisoner's Union*, 433 U.S. 119, 126 (1977)). *See also Procunier v. Martinez*, 416 U.S. 396, 405 (1974) ("[W]here state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.").

Moreover, allowing Ms. Grey to essentially ask this Court to reconsider its Order and grant her the ultimate resolution of a change to housing in a female facility would both usurp the ongoing litigation process and be inconsistent with a preliminary injunction's purpose to preserve the status quo pending resolution of the litigation.  "Were the Court to make the findings of fact and conclusions of law that deciding the Motion to Enforce would appear to necessitate," such a determination "would presumably resolve or narrow issues presented by the Amended Complaint without the benefit of the record and briefing that

litigating the Amended Complaint would entail." *J.O.P. v. U.S. Dep't of Homeland Sec.*, No. GJH-19-1944, 2020 WL 2932922, at *12 (D. Md. June 3, 2020). As in *J.O.P*, "instead of findings premised on an abbreviated record, a resolution of the new claims on their merits will most effectively address Plaintiffs' objections" to her housing status and other claims. *Id.* In addition, "[m]andatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Wetzel*, 635 F.2d at 286. This Court has already determined that Ms. Grey is entitled only to the relief provided for in the December 4, 2023, Order.

Because DPSCS has complied with this Order in accordance with the Policy, and made its best efforts to comply with the Order concerning an "over the counter facial hair inhibitor product," Ms. Grey cannot properly ask for additional relief, under the guise of "enforcement" or otherwise.

## CONCLUSION

For the above stated reasons, Ms. Grey's Motion to Enforce Temporary Restraining Order and Preliminary Injunction should be denied.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

 */s/ Merrilyn E. Ratliff*
MERRILYN E. RATLIFF
Assistant Attorney General
Federal Bar No. 30034
6776 Reisterstown Road, Suite 313
Baltimore, Maryland  21215
(410) 585-3947 (Telephone)
(410) 484-5939 (Telefax)

E-mail:  merrilyn.ratliff@maryland.gov

*/s/ Kelly M. Donoho*
KELLY M. DONOHO
Federal Bar No. 30786
Assistant Attorney General
Department of Public Safety and
Correctional Services
6776 Reisterstown Road, Suite 313
Baltimore, Maryland 21215
Tel: (410) 585-3544
Fax: (410) 484-5939
Email:kelly.donoho@maryland.gov
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of March, 2024, a copy of the foregoing DPSCS Defendants' Opposition to Plaintiff's Motion to Enforce Temporary Restraining Order and Preliminary Injunction was served via the electronic filing system on counsel for all parties.

*/s/ Merrilyn E. Ratliff*
MERRILYN E. RATLIFF