IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

(Northern Division)

CHELSEA GILLIAM, *et al.*,

      \*

    Plaintiffs,

      \*

v.                                      Civil Action No. 1:23-cv-1047

      \*

DEPARTMENT OF PUBLIC SAFETY
AND CORRECTIONAL SERVICES, *et al.*,  \*

    Defendants.                  \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION
TO ENFORCE TEMPORARY RESTRAINING ORDER**

Eve L. Hill (Bar No. 19938)
Sharon Krevor-Weisbaum (Bar No. 04773)
Jessica P. Weber (Bar No. 17893)
Lauren A. DiMartino (Bar No. 22046)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
(410) 962-1030 (phone)
(410) 385-0869 (fax)
ehill@browngold.com
skw@browngold.com
jweber@browngold.com
ldimartino@browngold.com

Deborah M. Golden (Bar No. 18657)
The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332
dgolden@debgoldenlaw.com

*Attorneys for Plaintiff*

Dated: March 21, 2024

## **INTRODUCTION**

In its response to Plaintiff Chloe Grey's Motion to Enforce the Temporary Restraining Order, the Department of Public Safety and Correctional Services ("DPSCS") had the opportunity to provide valid support for the otherwise illogical and insufficient rationale it relied upon in Ms. Grey's housing evaluation, yet it ignored all of Ms. Grey's arguments and simply echoed its original conclusions. DPSCS's response doubles down on its policy of housing transgender inmates "according to physical genitalia," ECF 95-15, Md. Dep't of Pub. Safety & Corr. Svcs., *Treatment of Transgender Incarcerated Individuals* 6 (Nov. 2023), and, as a result, fails to comply with state and federal law in violation of this Court's December 4, 2023 Order.

By ignoring evidence that Ms. Grey is at risk of sexual victimization, while inventing evidence—where none exists—that she is at risk of becoming a sexual predator, DPSCS reveals its indifference to Ms. Grey's life, wellbeing, and legal rights. DPSCS has kept Ms. Grey in solitary confinement for three months at North Branch Correctional Institution ("NBCI") because it knows placing her in general population puts her in danger. As of March 13, 2024, however, DPSCS decided to place Ms. Grey in Housing Unit 2—a gang unit—with a random male inmate, stating she is to be "treated like every other man." Ex. 1, Decl. of Chloe Grey, March 19, 2024, ¶ 11.

Meanwhile, DPSCS continues to approach Ms. Grey's prescription for facial-hair inhibitor cream—and this Court's Order regarding that prescription—as though it is a vanity request and not a reasonable accommodation for her disability.

As a result of its "poor explanations [and] missteps" in handling Ms. Grey's health and safety, DPSCS has "forfeited the advantage of deference" and judicial intervention is required. *Battista v. Clarke*, 645 F.3d 449, 455 (1st Cir. 2011).

## **ADDITIONAL FACTS**

Ms. Grey was transferred to NBCI on December 18, 2023, ECF 105-3, Walker Aff. ¶ 4, just two weeks after this Court's Order mandating an individualized housing assessment and less than a month after DPSCS officers threatened to transfer her to a facility like NBCI to show her "what happens" when she complains, ECF 95-6, Grey Decl., Nov. 29, 2023, ¶¶ 14, 26. DPSCS has held

Ms. Grey in solitary confinement since her arrival[1] despite federal regulations that dictate transgender inmates shall not be held in segregated housing for more than 30 days. 28 C.F.R. § 115.43(c); ECF 95-6 ¶¶ 6-7.

On March 11, 2024, Case Manager McKenzie met with Ms. Grey and asked her to sign a statement about whether she would be comfortable in general population so that she may have access to programming and services that others have. Ex. 1, Grey Decl., ¶ 4. Ms. Grey pushed back. She stated she would not be safe in general population on a "regular tier," but instead would need to be housed in some type of specialized unit such as the honor tier. *Id.* ¶ 6. She confirmed that she would like access to programs or services but reiterated that she had concerns about her safety due to the threats she has been receiving from inmates and officers, and would need an individualized plan. *Id* ¶ 7. The case manager informed Ms. Grey that the prison would be reviewing her housing plan on March 13, 2024, at which time she would be informed of her placement. *Id.* ¶ 8. On the way back to her cell, the officer escorting Ms. Grey told her that in the discussions regarding her housing options, the Attorney General's representative dismissed the idea of placing her with a cellmate in administrative segregation because of the incorrect belief that Ms. Grey was "sexually promiscuous," *id.* ¶ 9, a position that is echoed in DPSCS's testimony, housing evaluation, and response to Ms. Grey's Motion to Enforce the TRO, *see, e.g.*, ECF 85, Def. Status Rep., at 3-4 (stating that Ms. Grey could not be placed on a women's tier because inmates there "often engage in sexual relationships" and raising Ms. Grey's sexual relationship with Scott Brill); Ex. 2, TRO Hearing Tr. Vol. II, Nov. 22, 2023, at 6:15-7:20 ("[S]he denied there was a sex act, but this rumor, true or not, was being talked about in the facility and believed by the majority of the facility . . ."); ECF 85-1, Dickens Aff. ¶ 9. As promised, on March 14, 2024, a committee—including Case Management Supervisor Cory Walker, mental health counselor Lauren Beitzel,[2] and Case Manager McKenzie—met to discuss Ms. Grey's

---

[1] Ms. Grey was held in disciplinary segregation until December 29, 2023, then placed in administrative segregation, but has been in solitary confinement since her arrival at NBCI.

[2] Lauren Beitzel is a mental health counselor and the point of contact for gender dysphoric inmates at NBCI. ECF 95-5 ¶ 26. Beitzel, however, has a history of participating in the mistreatment of

2

placement and called her into the meeting. Ex. 1, ¶ 10. There, Mr. Walker told Ms. Grey she was being placed in general population on Housing Unit 2 with a "random male inmate," and stated she would be treated like "every other man." *Id.* ¶ 11.

Because Housing Unit 2 is notorious for gang-affiliated inmates and other troublemakers,[3] this caused Ms. Grey to fear for her life. *Id.* ¶¶13-14; Ex. 3, Decl. of Christopher Miller, March 15, 2024, ¶ 3. She expressed her concerns to the committee about being raped and was told she would "have to figure that out," and that she was being "overdramatic." Ex. 1, Grey Decl. ¶ 14. The committee insisted she was "no different than any other man" at NBCI. *Id.* ¶ 16. DPSCS—in response to an email from Ms. Grey's attorneys—confirmed that it plans to place Ms. Grey in general population but that Ms. Grey "made some new claims and allegations of issues with other IIs and stated that she doesn't feel safe in general population." Ex. B to Ex. 4, Decl. of Eve Hill, March 15, 2024, at 1. For the time being, therefore, Ms. Grey remains in solitary confinement—where she has been for more than three months.

## ARGUMENT

**I.   DPSCS's assessment of Ms. Grey's housing placement did not comply with OPS.131.0001 as ordered by the Court and violated federal law.**

The Court's December Order did not merely require DPSCS to "conduct an assessment of Plaintiff's housing placement," it required DPSCS to conduct a housing assessment "consistent with Maryland DPSCS Executive Directive," on the "Identification, Treatment and Correctional Management of an Inmate Diagnosed with Gender Dysphoria." ECF 75 at 1. That Executive Directive requires that the assessment comply with federal law, including PREA.

---

transgender inmates at NBCI. *Id.* ¶ 27; *Canter v. Mamboob*, No. GJH-17-908, 2020 WL 1331894, at *4 (D. Md. Mar. 23, 2020) ("Beitzel informed Plaintiff that Beitzel 'had been instructed not to give a diagnosis of gender dysphoria to [Plaintiff] because [Plaintiff] was a nuisance due to her requests for help and evaluations.'").

[3] Prison gang, the Black Guerilla Family, has put out a statement that no LGBTQ inmates are allowed on the compound and have threatened to attack any LGBTQ inmate immediately upon entering the compound as a result of ongoing tensions between BGF and an LGBTQ gang. Ex. 1, ¶¶ 19, 12.

3

OPS.131.0001(K)(1). Because DPSCS's evaluation does not comply with the Executive Directive, it is in violation of the Court's Order.

### A. DPSCS admits that it will never truly consider Ms. Grey for housing in a women's tier until she undergoes surgery on her genitalia.

If a review of a housing evaluation policy "reveals that all transgender or intersex inmates in a facility are, in practice, housed according to their external genital status," that raises the inference that the agency is not in compliance with PREA and may not be "conducting truly individualized, case-by-case assessments for each transgender or intersex inmate." *See* U.S. Dep't of Just., PREA FAQs, Mar. 24, 2016.[4] The Court need not speculate whether DPSCS's policy results in the practical outcome of inmates being housed based on their genitalia alone—DPSCS has admitted that its practice is to house transgender inmates "according to physical genitalia." ECF 95-15 at 6. DPSCS does not respond to this documented violation of federal law.

DPSCS's Response demonstrates that, in practice, there was never a real possibility that Ms. Grey would be housed with women because of only one factor: that she has not had gender-affirming surgery. *See* ECF 95-15 at 6 ("All transgender individuals are housed according to physical genitalia. A male who has had sexual reassignment surgery can be housed with female individuals."). DPSCS lists the four factors it considered for Ms. Grey's placement: "While 'seriously considering [Ms. Grey's] opinion regarding [her] safety'. . . the committee nevertheless was also required to consider Ms. Grey's 'intact external genitalia and secondary sex characteristics' and 'specific factors' related to whether she has undergone any gender-affirming surgery . . . as well as 'safety, security, or operational issues.'" Def. Br. in Opp. to Pl. Mot. to Enforce TRO, ECF 105 at 12 (quoting OPS. 131.0001).

Factor one—Ms. Grey's opinion of her own safety—weighs heavily in favor of housing her with women. According to DPSCS, factor two—intact genitalia and secondary sex characteristics, which includes "pubic hair, chest hair, and facial hair"—could not weigh towards women's housing

---

[4]Available at: https://www.prearesourcecenter.org/frequently-asked-questions?keywords=&from=2016-03-24&to=2016-03-24&items_per_page=10.

4

despite her breasts, and head, pubic, chest, and facial hair having a feminine appearance because she doesn't meet the requirement of the third factor—having had gender-affirming surgery. *See* ECF 105 at 12 (quoting ECF 85-1, ¶ 9) ("[T]he committee noted that 'Ms. Grey minimizes her . . . body hair, wears her hair in a long and feminine style, and has developed breasts,' but also considered that "Ms. Grey still possesses external male genitalia and has not engaged in any gender affirming surgery or partial surgery.'") DPSCS further reasoned that the fourth factor—"safety, security, or operational issues"—also could not be weighed in favor of Ms. Grey being housed with women because, *again*, she has not had gender-affirming surgery. ECF 105 at 12 (quoting ECF 85-1, ¶ 9) ("In keeping with the Policy, the committee observed 'the general potential for harm to female [incarcerated individuals] at MCI-W from an *intact* biological male incarcerated individual]' as a 'factor[] weighing against transfer.'") (emphasis added). Under DPSCS's flawed reasoning, "possess[ing] external male genitalia," regardless of the feminizing impact of hormone therapy on Ms. Grey's genitalia, muscle mass, and strength, disqualifies her from women's housing under three of the four factors it claims to consider—consistent with DPSCS's stated policy in its report to the Maryland Senate and House budget committees in November, 2023. ECF 95-15 at 6.[5]

Rather than conducting an individualized housing assessment, DPSCS's assessment was based almost exclusively on Ms. Grey's genitalia, violating this Court's Order that DPSCS "conduct an assessment of Plaintiff's housing placement *consistent with*" Executive Directive OPS.131.0001. ECF 75 at 1 (emphasis added).

### B. DPSCS relies on an invalid and illogical rationale and demonstrates that it will not do the right thing without judicial intervention.

DPSCS affirms its reliance on extraneous and retaliatory factors in its housing evaluation and does not respond to the plethora of fallacies Ms. Grey has highlighted. Instead, its arguments

---

[5] DPSCS also claims that the committee considered that Ms. Grey is a "biological male" with a "specific history of violence towards women" in determining that her placement in women's housing was a security issue, ECF 105 at 13, but counter to DPSCS's implication, Ms. Grey does not have a history of sexual violence against women, and is no more a risk to security than other incarcerated women that have been charged with assault or murder.

5

underline DPSCS's incompetence when it comes to providing Ms. Grey with the accommodations her safety requires.

First, DPSCS claims that Ms. Grey was placed at NBCI because she needed to be "far removed from the Jessup Region." ECF 105 at 13, 17. There are no grounds for this. Ms. Grey, as an inmate, only has access to the people and items in her facility; other nearby facilities are irrelevant. Contrary to NBCI being a "fresh start," *id.* at 17, Ms. Grey was sexually assaulted last time she was in NBCI's region. Ex. 9, TRO Hearing Tr. Vol. I, Nov. 21, 2023, at 21:5-22:4; 19:16-20-8. In fact, the only relevant consideration about the geographic region in which Ms. Grey is placed is access to her legal team. Moving her to NBCI nearly tripled the distance her attorneys must travel to visit her for the necessities of litigation.

Second, DPSCS claims that it could not keep Ms. Grey in Jessup facilities because there are "at least 15 staff members being prohibited to work near her during the required investigations" of the complaints Ms. Grey made. ECF 105 at 11. DPSCS fails to respond to prison security expert Dan Pacholke's assertion that "[c]omplaints are meant to be handled through an adjudicative process, not through an automatic transfer," and "it is the abuser that should be removed from the situation during an investigation and punished should the accusations be found credible, not Ms. Grey." ECF 95-3, Pacholke Decl., Feb. 14, 2024, ¶¶ 42-43. DPSCS continues to claim that the Court's Order requires them to separate Ms. Grey from every staff member that she has ever complained about, but the Order directs that Ms. Grey not have contact *only* with her "alleged abusers, meaning the correctional staff who are alleged to have assaulted her and to have groped her for which there is medical evidence to support and substantiate her claims." Ex. 5, TRO Hearing Tr., Court's Ruling, Dec. 1, 2023, at 34:3-14. There is no logical reason to read the Order so broadly other than to retaliate against her and create a post-hoc reason to send her to NBCI. *See* Pl. Mot. to Enforce TRO, ECF 95-1 at 7-9; *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) ("The filing of an inmate grievance is protected conduct."); *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017).

Third, DPSCS still provides no support for its alleged concerns over Ms. Grey's mental health. *See* ECF 95-1 at 24-26. Other than the isolation and depression she is experiencing as a result

6

of solitary confinement and the fear of being stabbed or raped if placed in general population, Ms. Grey's recent history gives no cause for concern over her mental health. Instead, DPSCS points to arbitrary and speculative concerns about Ms. Grey developing issues with her "'psychological wellbeing' if she were to experience problems at MCI-W with other female inmates, including 'sexual relationships,'" ECF 105 at 13. But there is no evidence Ms. Grey, who is not attracted to women, would engage in sexual relationships with women, *see* ECF 95-1 at 13-14, or, if she did, that her psychological wellbeing would be more at risk than other female inmates doing the same. *Cf. Tay v. Dennison*, 457 F. Supp. 3d 657, 681 (S.D. Ill. 2020); *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *11 (S.D. Ill. Nov. 7, 2018).

Fourth, DPSCS contends that Ms. Grey "immediately began to clash with fellow incarcerated individuals" at Patuxent "and act in inappropriate ways, including violating several disciplinary rules." ECF 105 at 11. Notably, Ms. Grey was found not guilty of the majority of the charges Patuxent brought against her, *see* ECF 59-3, Stewart Aff., Nov. 15, 2023, ¶ 20; ECF 64-2 at 4, and never even received a rule violation until she arrived at Patuxent and began to exercise her legal rights. ECF 95-5, Grey Decl., Feb. 23, 2024, ¶ 53. Moreover, her "clashes with fellow incarcerated individuals" consisted of harassment based on her gender identity and occur at every male facility where she is placed, including NBCI. Ex. 1, Grey Decl. ¶ 12; Ex. 9 at 19:16-20-8.

DPSCS has no response to this point. Instead, it contends that Ms. Grey now "has the ability to have her complaints and concerns documented and addressed" at NBCI but that Ms. Grey "has not submitted any complaints" regarding the issues she identified. ECF 105-3 ¶¶ 13-14. However, Ms. Grey is being prevented from filing complaints at NBCI. Ex. 1, Grey Decl. ¶ 3. Despite his affidavit, it is not readily apparent that Mr. Walker has personal knowledge of whether officers are preventing Ms. Grey from submitting ARPs, and ignores both the difficulty of submitting complaints at NBCI, *see* Ex. 1, Grey Decl. ¶ 3 ("The officers at NBCI make it challenging to receive the forms to make complaints, so I have been unable to document all of the harassment that I've experienced."); Ex. 3, Miller Decl. ¶¶ 6-9 ("The Administrative Remedy Process at NBCI is difficult to use. . . . Officers are often unwilling to provide ARP forms to inmates."); Ex. 10, Decl. of

7

David L. Mills, Mar. 19, 2024, ¶¶ 5-11 (explaining that the ARP process at NBCI is much more difficult than at other prisons—not every officer will give inmates forms and inmates have to make many requests before receiving a form, and more requests for a continuation form; it is then difficult to get an officer to turn the form in); ECF 95-5 ¶¶ 33-35, and the risks to an inmate like Ms. Grey for submitting complaints against officers, *id.* ¶ 43; Ex. 2, 81:13-82:22 (testimony from prison security expert Dan Pacholke regarding the danger of someone like Ms. Grey being labeled as a snitch); ECF 95-7, Jenness Decl., Feb. 20, 2024, ¶ 36.[6]

It *is* apparent, though, that Mr. Walker and the rest of Ms. Grey's administrative segregation review committee are completely in the dark about or indifferent to the complaints Ms. Grey *has* raised. Ms. Grey has submitted complaints about her harassment since arriving at NBCI, Ex. 6, Grey NBCI Req. for Admin. Remedy, and included those concerns in a declaration stating that "inmates on [her] housing tier have repeatedly threatened to rape [her] and murder [her] because [she is] a transgender woman," and that officers have "started conversations with other officers and inmates on [her] breast size, commented on [her] backside, rubbed against [her] buttocks, and propositioned [her] for oral sex"[7] and suggested that Ms. Grey offer sexual favors to inmates. ECF 95-5 ¶¶ 20, 43-44. Yet Mr. Walker and DPSCS feign ignorance of Ms. Grey's concerns and intended to move ahead with placing her in general population on a tier known for gang activity. Ex. 4-B; Ex. 3, Miller Decl. ¶ 3; *see also Tay*, 457 F. Supp. 3d at 683 (stating that "[p]risoners and correctional officers call[ing] [plaintiff] derogatory names such as 'fag,' . . . and threaten[ing] her with rape and sexual assault" plus "constantly misgender[ing]" her "rises to the level of a constitutional violation").

---

[6] Notably all 48 of the ARPs initiated by transgender inmates at NBCI since 2021 have been dismissed (21), dismissed for procedural reasons (19, including two for "Assault by Staff"), or withdrawn at the inmate's request (8). Not a single complaint has been found meritorious. ECF 95-15 at 25-27; *see also Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (stating that "a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance").

[7] Ms. Grey has identified the name of the officer identified in paragraph 43 of her February 22, 2024 declaration but still fears reporting him officially. Ex. 4-A at 2.

8

Nor does DPSCS's argument regarding the housing of other transgender inmates at NBCI weigh in favor of housing Ms. Grey there. DPSCS claims it has "successfully" housed transgender women at NBCI but is currently settling a case with one such inmate, Amber Maree Canter, because it mishandled her needs as a transgender woman. *Canter v. Mamboob*, No. GJH-17-908, 2020 WL 1331894, at *4 (D. Md. Mar. 23, 2020); Ex. 7, Dan Belson, *State recommends $92,000 settlement for lawsuit filed by transgender inmate against Maryland officials*, Balt. Sun, Feb. 6, 2023. Moreover, stating that Ms. Grey can be "successfully" housed in general population at NBCI, simply because DPSCS believes it has done so with other transgender inmates, falls short of the individualized assessment required under OPS.131.0001 and PREA, *see* ECF 95-1 at 13-14. Nor has DPSCS shown that other transgender inmates are comparable in size or femininity to Ms. Grey. Ex. 1, Grey Decl. ¶ 15.

## II. DPSCS is improperly treating Ms. Grey as a perpetrator of sexual violence rather than as a victim of it.

DPSCS misdirects the Court by alluding to Ms. Grey as having a history of sexual violence no less than six times in its Response. *See* ECF 105 at 13, 16. But Ms. Grey has never once perpetrated sexual assault, and DPSCS points to no evidence to the contrary. Instead, DPSCS continues to dodge the fact that Ms. Grey has been the *victim* of sexual assault in DPSCS custody[8]—which makes her more likely to be assaulted if housed in male facilities. ECF 95-7 ¶¶ 27-28. Ms. Grey has never exhibited an interest in sexual relationships with women—a point to which DPSCS does not respond. *See* ECF 95-1 at 13-14. DPSCS's concerns about any sexual threat from Ms. Grey are based in nothing more than stereotypes and fallacies.

DPSCS's only source of support for its pretense of a housing evaluation, *Sabbats v. Clarke*, No. 7:21CV00198, 2022 WL 4134771, at *13 (W.D. Va. Sept. 12, 2022), is nothing like this case. In *Sabbats*, the inmate plaintiff had "a history of committing violent crimes, including sexual assault"

---

[8] As additional evidence of the risks Ms. Grey faces while housed with men, inmate Christopher Miller attests to the sexual harassment Ms. Grey experienced while housed in administrative segregation at Patuxent, and recounts the evening that an inmate was allowed out on the tier and subsequently exposed himself to Ms. Grey. Ex. 3, Miller Decl. ¶¶ 10-13. Despite Ms. Grey's calls for help, no officers responded to the assault for about twenty minutes. *Id.* ¶ 13.

9

against a woman. *Id.* There, the committee considered the inmate's history of sexual violence, concrete evidence that she was lacking "mental and emotional stability and self-control," and the fact the plaintiff presented no evidence to substantiate fears for her safety. *Id.* at *8 (denying motion for a preliminary injunction because plaintiff did "not describe any past harm she has suffered").

Here, the opposite is true. Ms. Grey has *no* history of perpetrating sexual violence, DPSCS has not presented any credible evidence suggesting Ms. Grey is unstable or lacks self-control, and, instead, Ms. Grey has presented a plethora of evidence substantiating the fears for her own safety. This case is therefore much more like *Soneeya v. Mici*, No. CV 07-12325-DPW, 2024 WL 550171, at *7 (D. Mass. Feb. 12, 2024). Ms. Grey "is isolated because some of the inmates do not accept her as female. She is treated as an outsider, made the subject of derision, and excluded from inmate activities. She does not feel safe . . . because she has secondary female characteristics that attract attention from other inmates, who stare at her breasts and make sexual comments." *Id.* Additionally, "[t]here is simply no evidence in the record that she poses a risk of predatory or other inappropriate behavior in a female correctional setting." *Id.* ("Nothing in her conduct . . . has suggested that latent sexualized criminal tendencies against women will be a part of the identity she has been fashioning for herself . . ..."). Rather, Ms. Grey has been a victim of sexual assault by inmates and officers and is at risk of further victimization. *See* ECF 95-7 ¶ 28; ECF 95-5 ¶¶ 18-22.

Ms. Grey has been held in solitary confinement for more than three months because there are no safe alternatives for her at NBCI.[9] In his affidavit, Mr. Walker stated that Ms. Grey remains on administrative segregation because of concerns for her safety if transferred to general population, but that staff are "working to find a suitable placement for her within general population." ECF 105-3 ¶ 7. DPSCS's continued segregation of Ms. Grey is both deliberately indifferent to her mental health, *see* ECF 85 at 10-12, and a violation of the law, *see id.* at 12 (citing 28 C.F.R. § 115.43).[10] The

---

[9] DPSCS has placed a transgender person in administrative segregation 83 times in 2023—a 400% increase from 2021 despite the number of transgender inmates only increasing 11%. ECF 95-15 at 8.

[10] Under PREA, if an inmate is placed in segregated housing because of her high risk for sexual victimization, they are still required to "have access to programs, privileges, education, and work

"suitable placement" that it took DPSCS three months to come up with is throwing Ms. Grey into general population on a notoriously violent tier, with no consideration about who would be best suited as her cellmate. Ex. 4-B. DPSCS's delay, back-and-forth thinking, and rigidity makes one thing clear: there is no safe option for Ms. Grey at NBCI.

### III. Ms. Grey's request for facial hair inhibitor/removal cream is a request for a reasonable modification of DPSCS policies to accommodate her disability and does not pose an undue burden on DPSCS.

Facial hair removal—of which hair inhibitor cream is one option—is an essential treatment for Ms. Grey's disability. DPSCS's contention that there are no alternatives to the product originally prescribed for Ms. Grey is patently false. Ex. 8, Decl. of Dr. Lowell, Mar. 17, 2024, ¶ 10 (stating that "there are many over-the-counter depilatory (hair removal) products available"); *id.* ¶ 13 (explaining that facial hair inhibitor is available through compounding pharmacies); *see also* ECF 95-11, Lowell Decl., Feb. 23, 2024, ¶¶ 16-17. To the extent that there are products available, but they are not permitted in DPSCS facilities, Ms. Grey must be provided access to such products as a reasonable modification of DPSCS's policies under the ADA and Section 504.

Under the ADA, a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R § 35.130(b)(7); *Jarboe v. Maryland Dep't of Pub. Safety & Corr. Servs.*, No. 12-572, 2013 WL 1010357, at *4 (D. Md. Mar. 13, 2013) ("The term 'reasonable accommodations'. . . is essentially synonymous with the term 'reasonable modifications to rules, policies, or practices . . ..")."). Facial hair removal—of which hair inhibitor cream is one option—is an essential treatment for Ms. Grey's disability. Ex. 8 ¶¶ 7-10 (stating that laser hair removal is the "best option for transgender women," followed by electrolysis and epilation, but in the absence of those treatments, depilatory creams are recommended); *see also*

---

opportunities to the extent possible." 28 C.F.R. § 115.43 (b). Ms. Grey has no access to programs, privileges, education, or work opportunities, *see* ECF 95-5 ¶¶ 47-49, and DPSCS has not documented the reasons for such limitations as is required under PREA. 28 C.F.R. § 115.43 (b).

11

ECF 95-11 ¶¶ 14, 19. Indeed, it was the medical staff at DPSCS who prescribed it in the first place. ECF 60, Jerkins Aff. ¶ 16.

When "a disabled prisoner requests a non-frivolous accommodation, the accommodation should not be denied without an individualized inquiry into its reasonableness." *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 78 (2d Cir. 2016). Defendants may only refuse to accommodate this medical necessity if they can prove that doing so would either fundamentally alter the nature of its programs or that it would pose an undue financial or administrative burden. *See* 28 C.F.R. § 35.130(b)(1)(7)(i); *Colorado Cross Disability Coalition v. Hermanson Fam. Ltd. P'ship I*, 264 F.3d 999, 1002-03 (10th Cir. 2001); *Johnson v. Gambrinus*, 116 F.3d 1052, 1058-60 (5th Cir. 1997). DPSCS has argued neither. Generalized concerns about the weaponization of an ingredient in the cream are insufficient defenses under the ADA and Section 504. A prison cannot rely on "general safety and administrative concerns unconnected to [the requesting inmate's] specific situation," and failure to evaluate the inmate's specific needs and individual circumstances is a violation of the ADA. *Id.* (defendant failed to show that plaintiff's request would impose an undue burden because it failed to modify its policy precluding motorized wheelchairs without considering the features of the plaintiff's actual wheelchair, or "an appraisal of [the plaintiff] himself, i.e. there was no examination of his propensity to commit acts of violence"); *see also Konitzer v. Frank*, 711 F. Supp. 2d 874, 911 (E.D. Wis. 2010) (defendants did not provide sufficient security reasons to deny a transgender inmate hair removal cream and that denying plaintiff makeup "because he could use it to disguise his appearance and identity and escape from the institution" was a "poor reason" because plaintiff's risk assessment "indicate[d] a low rating for escape history").

Similarly, here, Ms. Grey was prescribed a facial-hair inhibitor cream as a medical necessity for her disability. Although Vaniqua is no longer available, other options are. Ex. 8, Lowell Decl. ¶ 13. DPSCS cannot make a general statement about declining to provide her over-the-counter products because they are a safety concern without considering (1) the actual product to be provided and (2) the fact that Ms. Grey's disciplinary history—plus desperate desire to use the cream as prescribed— does not indicate a likelihood to use the cream as "a weapon." ECF 105-3 ¶ 17. Thus

12

DPSCS's refusal to provide Ms. Grey with a reasonable modification to its personal property policy violates the ADA and Section 504. Recent actions by the U.S. Department of Justice confirm this. U.S. Dep't of Just., *Justice Department Finds Utah Prison System Discriminated Against Incarcerated Individual Based on Gender Dysphoria*, Mar. 12, 2024, https://www.justice.gov/opa/pr/justice-department-finds-utah-prison-system-discriminated-against-incarcerated-individual. If DPSCS is concerned about the misuse of an over-the-counter facial hair inhibitor, it may administer doses of the cream like it does other inmate medications. *See* Ex. 8, Lowell Decl. ¶ 11 ("Given the short duration and frequency of treatment, Ms. Grey may only need access to the product for 5 minutes every 3-5 days."). The cream is a Court-ordered accommodation for a disability, not a vanity request. It should be treated as such.

**IV.     The deference afforded to corrections administrators is not without limits and DPSCS's failure to act in good faith requires judicial intervention.**

Although there is a "preternatural deference with which courts are generally directed to treat decisions by corrections administrators," that deference is not without limits. *Soneeya*, 2024 WL 550171 at *16. DPSCS has "forfeited the advantage of deference" as a result of "a composite of delays, poor explanations, missteps, changes in position and rigidities." *Battista*, 645 F.3d at 455 (explaining that deference to the prison was not warranted because it did not take plaintiff's hormone therapy seriously, created post-hoc security justifications based on inaccurate data, miscounted incidents, and thought in black-and-white terms).

DPSCS provides some reasons for its decision to deny Ms. Grey what is best for her physical and mental health, but "[w]hen formally articulated, they are exposed as unjustified." *Soneeya*, 2024 WL 550171 at *16. DPSCS's positions are nonsensical. First, there is no valid reason for DPSCS's concerns about Ms. Grey's mental health other than the current conditions DPSCS is forcing upon her. Its reasoning is illogical: it contends Ms. Grey cannot be housed at Patuxent because it is intended for inmates with mental health needs, but at the same time, she cannot be housed at MCI-W because she has mental health needs. Second, Ms. Grey has female secondary-sex characteristics, a small frame, and a feminine appearance. As a result, she has been the victim of sexual assault and rape threats while housed in a men's facility. But according to DPSCS's black-or-

13

white thinking, the mere existence of Ms. Grey's genitalia—although drastically changed as a result of her hormone therapy, ECF 95-11, Decl. of Dr. Lowell, Feb. 23, 2024, ¶¶ 34-42—negates her appearance and the safety concerns resulting from it. Third, Ms. Grey does not pose a security risk to women inmates because she has no history of sexual violence, no sexual interest in women, and a small frame and hormone treatment that decreases the possibility that rape could occur even without gender-affirming surgery. *See Wright*, 831 F.3d at 79 (declining to exercise judicial restraint because prison administration's "proffered security concerns" were "overstated" and administrators ignored the fact that the inmate had no history of behavioral problems while in custody"); ECF 95-11 ¶¶ 39-41. Because DPSCS's evaluation is replete with "insufficient or illogical explanations, changes in position, and rigidities," the Court may decline to provide it the deference typically afforded. *Id.*

Granting deference in this case "would be enabling the DOC as a prison administration with sufficient skill, sophistication, and experience in obfuscation to avoid consequences for deliberate indifference to Ms. [Grey's] individual circumstances." *Id.*; *see also Lareau v. Manson,* 507 F. Supp. 1177, 1190 (D. Conn. 1980), *aff'd in part, modified in part and remanded*, 651 F.2d 96 (2d Cir. 1981) (where the record is devoid of rational or legitimate justifications for a prison's decision, and the conditions at issue have "serious effects" on detainees' welfare, judicial intervention is appropriate). DPSCS has no support for its overbroad and offensive conclusions.

Where, as here, courts afford prisons the opportunity to right their wrongs, and, subsequently, they relinquish that responsibility or act in bad faith, judicial intervention is justifiable. *Hutto v. Finney*, 437 U.S. 678, 687, n. 9 (1978); *Brown v. Plata*, 563 U.S. 493, 511 (2011); *Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). Even under this Court's eye, DPSCS continues to risk the safety and wellbeing of Ms. Grey. When given the opportunity by the Court to conduct an evaluation according to state and federal policy, DPSCS provided a spurious assessment with post-hoc justification for a decision already made—to transfer Ms. Grey to an even more dangerous male facility. ECF 85. When given another opportunity to provide valid and complete explanations for its decision and to respond to the concerns raised by Ms. Grey, DPSCS simply parroted back the status report and further demonstrated that its decision relied almost exclusively on genitalia. ECF 105.

Courts are increasingly acting to prevent the now well-accepted harms caused by placing transgender women in men's prisons or depriving them of gender-affirming care. *See, e.g.*, *JJS v. Pliler*, No. 19CV02020VSBSN, 2022 WL 16578124, at *21 (S.D.N.Y. Aug. 3, 2022), *report and recommendation adopted sub nom. Shelby v. Petrucci*, No. 19-CV-2020, 2022 WL 16575766 (S.D.N.Y. Nov. 1, 2022) ("The overwhelming evidence suggests that BOP's decision to deny Petitioner a transfer to a women's facility is based on bias and fear and not evidence. It is not reasonably related to the legitimate penological interest of protecting prisoners. . . . Accordingly, . . . the denial of Petitioner's transfer cannot be excused as an appropriate exercise of BOP's discretion."); *Iglesias v. Fed. Bureau of Prisons*, No. 19-CV-415-NJR, 2021 WL 6112790, at *25 (S.D. Ill. Dec. 27, 2021), *modified*, 598 F. Supp. 3d 689 (S.D. Ill. 2022) ("Iglesias has made a strong showing that the BOP's decision to house Iglesias in male facilities was not based on any legitimate penological purpose. Assignment to a female facility not only affirms Iglesias's gender identity, but continues to place Iglesias in an atmosphere where she is protected from ongoing sexual assault and harassment."); Moe K. Clark, *Colorado legal settlement would raise care and housing standards for trans women inmates*, CBS News, Feb. 1, 2024, https://www.cbsnews.com/news/colorado-lawsuit-settlement-trans-women-inmates/ (discussing a Colorado court entering a consent decree[11] in class-action lawsuit *Raven v. Polis* mandating the creation of a safe and separate housing unit for transgender women because of the high risk of sexual assault when placed with men). Because DPSCS's decision to house Ms. Grey in a situation that places her in danger is based on illogical rationale, fails to acknowledge the real harms Ms. Grey faces in a men's prison, and overstates concerns with no factual bases, the Court's intervention is necessary and justified to prevent Ms. Grey from irreparable harm including sexual assault, bodily injury, or possible death. The risk of waiting until harm is done to Ms. Grey is too great a risk to bear. *See Tay*, 457 F. Supp.3d at 685-86.

---

[11] Joint Motion for Preliminary Approval of Class Action Consent Decree, *Raven v. Polis*, No. 2019-CV-34492 (Colo. Sept. 27, 2023), available at https://www.documentcloud.org/documents/24367375-consent-decree-proposed-1.

Dated:  March 22, 2024                    Respectfully submitted,

_____/s/_____
Eve L. Hill (Bar No. 19938)
Sharon Krevor-Weisbaum (Bar No. 04773)
Jessica P. Weber (Bar No. 17893)
Lauren A. DiMartino (Bar No. 22046)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland  21202
(410) 962-1030 (phone)
(410) 385-0869 (fax)
ehill@browngold.com
skw@browngold.com
jweber@browngold.com
ldimartino@browngold.com

Deborah M. Golden (Bar No. 18657)
The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332 (phone)
dgolden@debgoldenlaw.com

*Attorneys for Plaintiff*