# EXHIBIT 2

```
 1                IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MARYLAND
 2                          NORTHERN DIVISION

 3    CHELSEA GILLIAM, et al.,    )
                    Plaintiffs,   )
 4                                )
                 vs.              )   CIVIL CASE NO.
 5                                )   1:23-cv-01047-MJM
      DEPARTMENT OF PUBLIC SAFETY &)
 6    CORRECTIONAL SERVICES, et al.,)
                    Defendants.   )
 7    _____)   9:01 a.m.

 8                  WEDNESDAY, NOVEMBER 22, 2023
                           Courtroom 5C
 9                      Baltimore, Maryland

10                   TRANSCRIPT OF PROCEEDINGS
                   ZOOM TRO HEARING - VOLUME II
11            BEFORE THE HONORABLE MATTHEW J. MADDOX

12
      For the Plaintiffs:
13
      Jessica P. Weber, Esquire
14    Deborah M. Golden, Esquire
      Lauren A. DiMartino, Esquire
15    Sharon Krevor Weisbaum, Esquire
      Evan Monod, Esquire
16     Brown Goldstein & Levy
       120 East Baltimore Street, Suite 2500
17     Baltimore, MD 21202

18
      For the Defendants:
19
      Merrilyn E. Ratliff, Esquire
20    Kelly Mullen Donoho, Esquire
       Office of Attorney General
21     6776 Reisterstown Road, Suite 313
       Baltimore, MD 21215
22    _____
            (Computer-aided Transcription of Stenotype Notes)
23
                Reported by: Amanda L. Longmore, RPR, FCRR
24                    Federal Official Court Reporter
                       101 W. Lombard Street, 4th Floor
25                        Baltimore, Maryland  21201
                                410-962-4474
```

Continued Direct Examination - Kimberly Stewart

1 interaction with staff that they observed in the courtroom, but
2 they did stay in the room and would not have been on the tier.
3         So the investigation is ongoing. At this point we haven't
4 been able to substantiate anything but we will continue to
5 investigate.
6 Q.   Thank you. So we're going to pick up on your testimony
7 from yesterday. So did there come a time at Patuxent when
8 Ms. Grey was placed on administrative segregation?
9 A.   Yes, on October 13th.
10 Q.   Okay. And what led to Ms. Grey's placement on admin seg?
11 A.   So I was the duty officer the month of October. The Chief
12 of Security, myself, and the Warden rotate. Any time there's
13 an incident going on in the facility the duty officer receives
14 a call.
15         I received a call that evening that a confidential
16 informant had approached the intel department saying that there
17 was a rumor going around the facility that Ms. Grey had engaged
18 in a sex act with another incarcerated individual, Mr. Carlton
19 Bell, that the sex act occurred during early setup for Muslim
20 service. Carlton Bell is a Muslim inmate. And that another
21 unidentified Muslim incarcerated individual had walked in on
22 them during the sex act, that the Muslim community was in an
23 uproar over the disrespect to their religion and to their
24 service.
25         Intel further advised me that Carlton Bell had recently

Continued Direct Examination - Kimberly Stewart

1    been released from disciplinary segregation for a physical
2    fight with a different Muslim individual and was already on the
3    outs with the Muslim community and that there was a concern
4    that the Muslim community may retaliate for this act of
5    disrespect against both Ms. Grey and Mr. Bell.
6         There was also a concern that if this rumor reached
7    Mr. Scott Brill, who has a history of being potentially
8    assaultive and he believed that the sex act had occurred, that
9    Ms. Grey and/or Mr. Bell could also possibly be in danger from
10   him as well.  So with all of that alleged and made, a decision
11   was made to place both of them on administrative segregation
12   pending the investigation.
13        In an initial conversation with Ms. Grey, she reported to
14   Sergeant Owens, she admitted to being in the area where the
15   alleged sex act occurred, so we knew all of that on October
16   13th that she admitted that she was in the area, she denied
17   there was a sex act, but this rumor, true or not, was being
18   talked about in the facility and believed by the majority of
19   the facility, and due to the potential safety risk she was --
20   they were both placed on administrative segregation.
21        We also initiated the two SIRs and PREA complaint.
22   Q.   So is placement on administrative segregation, when
23   something like that occurs, is that an ordinary response?
24   A.   Yes.  If there is any concern that an individual may be in
25   danger or that an individual poses a safety and security risk

Direct Examination - Dan Pacholke

1   supervision and no video surveillance.
2           MS. DONOHO:  Your Honor, I would object and ask that
3   answer be stricken for speculation.  He doesn't know any of the
4   actual background and has been going off of speculation and it
5   also misconstrued the prior testimony of AW Stewart.
6           THE COURT:  The objection's overruled.
7   BY MS. GOLDEN:
8   Q.   Is it standard or accepted correctional practice to
9   acceptable to tell an inmate if she doesn't -- that she won't
10  be charged for throwing water if she drops the charges against
11  another inmate for throwing water?
12  A.   No.  That sounds very informal and outside the rules.
13  Q.   And in your experience just generally, why would any
14  inmate not want to pursue criminal charges?
15  A.   Well, there can be a variety of reasons, but Ms. Grey
16  presents as a slight build -- she presents as a woman, slight
17  build, not very tall, not much body weight who's serving a
18  very, very long sentence.  So part of it could be just doesn't
19  want to be labeled a snitch and doesn't want to spend her
20  entire sentence in segregation.
21          Part of it could be that someone either relayed
22  information, hey, you better not follow through on that.  But I
23  think a lot of it can tie back to how they're viewed by the
24  general population of the prison system when they're facing
25  very long sentences and, at least in her case, it appears to be

Direct Examination - Dan Pacholke

1   a person that would struggle to physically defend herself.
2   Q.   Can you say a little bit more about what it means to be
3   marked as a snitch?
4   A.   Well, it really depends on where you're at, I suppose, in
5   which state that you're residing in, but overall, you know,
6   there's a rule, they're not supposed to tell on each other and
7   to a certain degree there is an inmate code around that and
8   sanctions can be placed against you by either the person that
9   you informed on, or perhaps their colleagues or friends or
10  perhaps just someone that wants to make a name for themselves
11  by saying, hey, I heard you're a snitch, I don't want you on my
12  unit.  I mean, those things are real.
13  Q.   When you say there's a rule and sanctions, a prison --
14  official prison rule?
15  A.   It's more inmate culture, I would say, around informing in
16  general.
17  Q.   And does that same cultural taboo apply to disciplinary
18  charges?
19  A.   Can you please repeat that?
20  Q.   Sure.  Does that same taboo about snitching apply not just
21  to criminal charges but internal disciplinary charges?
22  A.   Yes.
23  Q.   Okay.  I'd like to talk about the incident I think you've
24  heard described that Ms. Grey was charged with a disciplinary
25  violation for in the yard.