# EXHIBIT 9

```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
 2                          NORTHERN DIVISION

 3   CHELSEA GILLIAM, et al.,     )
                    Plaintiffs,   )
 4                                )
                 vs.              )    CIVIL CASE NO.
 5                                )    1:23-cv-01047-MJM
     DEPARTMENT OF PUBLIC SAFETY & )
 6   CORRECTIONAL SERVICES, et al.,)
                    Defendants.   )
 7   _____)    1:28 p.m.

 8                    TUESDAY, NOVEMBER 21, 2023
                            Courtroom 5C
 9                       Baltimore, Maryland

10                     TRANSCRIPT OF PROCEEDINGS
                      ZOOM TRO HEARING - VOLUME I
11              BEFORE THE HONORABLE MATTHEW J. MADDOX

12
     For the Plaintiffs:
13
     Jessica P. Weber, Esquire
14   Deborah M. Golden, Esquire
     Lauren A. DiMartino, Esquire
15   Sharon Krevor Weisbaum, Esquire
     Evan Monod, Esquire
16    Brown Goldstein & Levy
      120 East Baltimore Street, Suite 2500
17    Baltimore, MD 21202

18
     For the Defendants:
19
     Merrilyn E. Ratliff, Esquire
20   Kelly Mullen Donoho, Esquire
      Office of Attorney General
21    6776 Reisterstown Road, Suite 313
      Baltimore, MD 21215
22   _____
              (Computer-aided Transcription of Stenotype Notes)
23
             Reported by: Amanda L. Longmore, RPR, FCRR
24                 Federal Official Court Reporter
                  101 W. Lombard Street, 4th Floor
25                   Baltimore, Maryland  21201
                            410-962-4474
```

Direct Examination - Chloe Grey

1   Q.   Okay.  At this time I'd like to pull up an exhibit.  I'm
2   not sure how to do that but we'd like to pull up Plaintiff's
3   Exhibit 1.
4          THE CLERK:  Counsel, the share screen is on, so you
5   should be able to pull it up yourself.
6          MS. WEBER:  I'm sorry, I don't think we realized we
7   needed to do it.  Okay.  I can keep going for now.
8          MS. DIMARTINO:  I can add my computer and share from
9   here.
10         MS. WEBER:  Okay.  We're going to add another
11  computer to the Zoom so we can share the documents that way.
12         THE CLERK:  Thank you.
13         MS. WEBER:  Okay.  I'll keep going and we'll come
14  back to the exhibit, then.
15  BY MS. WEBER:
16  Q.   Ms. Grey, what was it like to be housed with men at WCI
17  after you began your transition?
18  A.   It became increasingly terrifying.  When I initially began
19  to transition, I was forced by the staff to out myself to my
20  entire housing unit of men, which immediately put me in an
21  impossible situation.  I was ridiculed 24 hours a day.  I was
22  constantly propositioned for sex.  I was constantly pressured
23  and threatened for sex, and it became a struggle just to
24  survive day-to-day.
25  Q.   At any point -- you talked about threats, I believe.  Did

```
 1   any threats of sexual violence, in fact, become a reality?
 2   A.   Yes, ma'am.  There were several incidents, one of the most
 3   prominent of which WCI actually took it upon themselves to
 4   place me on protective custody in administrative segregation
 5   because male inmates had sent letters to me that were covered
 6   in semen, that told me that I was going to be raped and killed
 7   because I was a transgender female that wanted to wear bras and
 8   panties.
 9   Q.   And so you mentioned after that you were moved to
10   administrative segregation at WCI; is that right?
11   A.   Yes, ma'am.
12   Q.   And how long were you kept in administrative segregation
13   at WCI?
14   A.   I was on administrative segregation for a little over a
15   month, I believe.
16   Q.   And what led you to leaving administrative segregation at
17   WCI?
18   A.   Absolute terror and self-preservation.  I personally know
19   trans women that have been murdered in segregation at WCI and
20   recently with that time, and segregation is used for
21   retaliation against people as myself that file PREA complaints.
22   It's an extremely dangerous environment, especially for a
23   transgender woman.
24   Q.   And when you left administrative segregation, was that
25   your choice to do so or did WCI --
```

1        (Technical difficulty.)
2            MS. WEBER:  Sorry.  We have to mute both computers.
3    Apologies.  Let me repeat that.
4    BY MS. WEBER:
5    Q.   When you finally left administrative segregation at WCI,
6    was that your choice, was that the institution's choice?  How
7    did that come about?
8    A.   I was approached by a Lieutenant Forney at WCI who came
9    and told me that I had two choices.  I could either remain in
10   administrative segregation indefinitely, or I could sign what
11   they referred to as a body waiver, meaning I will take
12   responsibility for my own safety and return to general
13   population.  I signed that body waiver to escape the absolute
14   terror and mental health problems that I developed from being
15   in solitary confinement, and I took my chances in general
16   population rather than to suffer in solitary confinement.
17   Q.   Once you were transferred back to general population, did
18   you continue to experience any threats or actual sexual
19   violence upon your return?
20   A.   Yes, ma'am.  I immediately was placed in the cell with a
21   290-pound convicted sex offender who immediately physically
22   assaulted me and attempted to rape me within less than 20
23   minutes of being in the cell.
24        The only thing that saved me was that an officer happened
25   to walk by conducting counts and realized that there was a

physical fight occurring in that cell, at which time they simply removed me from the cell and put me on a tier right next to that tier I was assaulted on and didn't take any disciplinary action or security action against my rapist.

Q. And then you mentioned that you were transferred to Patuxent in 2023. Do you know why you were transferred to Patuxent?

A. I was transferred to Patuxent in 2023 because I had applied to and was accepted for the Georgetown bachelor's of liberal arts program at Patuxent.

Q. We'll talk about that in a minute. When you were transferred to Patuxent, did you tell anybody you wanted to be housed with women?

A. When I got to Patuxent, I had actually been led to believe there was a strong possibility I would have been housed at PIW. When I got there I was immediately informed that inmates such as myself were housed with men, and I immediately became concerned about whom they were going to try to put me in the cell with for my own physical and sexual safety. They told me that they were going to put me in a cell with a male inmate of their choosing, and I immediately requested that if that was going to be the way they were going to conduct things, that I was requesting to be housed by myself for my safety.

Q. And you mentioned PIW. Is that Patuxent Institution for Women?