```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF MARYLAND
 2                            NORTHERN DIVISION

 3      CHELSEA GILLIAM, et al.,        )
                          Plaintiffs,   )
 4                                      )
                        vs.             )    CIVIL CASE NO.
 5                                      )    1:23-cv-01047-MJM
        DEPARTMENT OF PUBLIC SAFETY &   )
 6      CORRECTIONAL SERVICES, et al.,  )
                          Defendants.   )
 7      _____ )    10:08 a.m.

 8                          FRIDAY, JUNE 28, 2024
                                Courtroom 5C
 9                           Baltimore, Maryland

10                        TRANSCRIPT OF PROCEEDINGS
                                MOTIONS HEARING
11              BEFORE THE HONORABLE MATTHEW J. MADDOX

12

        For the Plaintiffs:
13
        Lauren A. DiMartino, Esquire
14      Deborah M. Golden, Esquire
        Eve L. Hill, Esquire
15       Brown Goldstein & Levy
         120 East Baltimore Street, Suite 2500
16       Baltimore, MD 21202

17

        For the Defendants:
18
        Merrilyn E. Ratliff, Esquire
19      Kelly Mullen Donoho, Esquire
         Office of Attorney General
20       6776 Reisterstown Road, Suite 313
         Baltimore, MD 21215

21

22      _____
                  (Computer-aided Transcription of Stenotype Notes)
23
                    Reported by: Amanda L. Longmore, RPR, FCRR
24                      Federal Official Court Reporter
                        101 W. Lombard Street, 4th Floor
25                        Baltimore, Maryland  21201
                                410-962-4474
```

Motions Hearing 6/28/24

1              P R O C E E D I N G S

2       (10:08 a.m.)

3            THE COURT:  All right.  This is calling the case of

4  Chelsea Gilliam, et al., v. The Maryland Department of Public

5  Safety and Correctional Services, et al.  This is Civil Case

6  Number 23-1047.

7       Could I have plaintiff's counsel please identify

8  yourselves for the record?

9            MS. DIMARTINO:  Good morning, Your Honor.  Lauren

10  DiMartino with the plaintiffs.

11            THE COURT:  All right.  Good morning.

12            MS. HILL:  Eve Hill for the plaintiffs.

13            THE COURT:  Good morning.

14            MS. GOLDEN:  And Deborah Golden.

15            THE COURT:  I'm sorry, I missed that.

16            MS. GOLDEN:  Deborah Golden.

17            THE COURT:  And for the defendants?

18            MS. DONOHO:  Good morning, Your Honor.  Kelly Donoho

19  on behalf of defendants.

20            THE COURT:  All right.  Good morning.

21            MS. RATLIFF:  Good morning, Your Honor.  Merrilyn

22  Ratliff on behalf of defendants.

23            THE COURT:  All right.  Good morning to all of you,

24  and thank you for making yourselves available for this hearing.

25       So just to bring us up to speed on where we currently are,

1    following a three-day hearing last year in November and

2    December, the Court granted in part Plaintiff Chloe Grey's

3    Motion for a Temporary Restraining Order or Preliminary

4    Injunction.  And by the way, I think I've missed greeting

5    Ms. Grey.  Good morning, Ms. Grey.

6              MS. GREY:  Good morning, Judge Maddox.  Thank you.

7              THE COURT:  All right.  After that hearing I issued

8    an order at ECF Number 75 that directed the defendants to

9    determine Ms. Grey's housing placement in accordance with

10   Executive Directive Number OPS.131.0001 and to file a report

11   with the Court regarding their housing decision; to provide

12   consistent hormone medication as prescribed; and to provide any

13   over-the-counter facial inhibitor product available to the

14   Department and to provide razors for shaving if consistent with

15   Department policies, and to separate Ms. Grey from staff that

16   had allegedly been assaulting her.

17       The defendant submitted a status report following that

18   order at ECF Number 85 as directed regarding their compliance

19   with the directive and that they had made the housing determine

20   make for Ms. Grey and they supported that with several

21   exhibits.  Ultimately, the Department determined to place Ms.

22   Grey at North Branch Correctional Institution, or NBCI, a

23   facility designated for male prisoners but where other persons

24   with gender dysphoria had also been housed.

25       Ms. Grey subsequently filed a Motion to Enforce the

1    injunction at ECF Number 95 raising two primary issues.  One is

2    to challenge her housing placement and the decision that was

3    made to determine her housing placement; and other was the

4    Department's failure to provide hair removal cream.

5         Let me ask plaintiff's counsel whether I've adequately

6    summarized where we currently stand on that issue?

7              MS. DIMARTINO:  Yes, Your Honor.

8              THE COURT:  Okay.  So I'm going to inquire with you

9    about Ms. Grey's current status with respect to those two

10   issues, her housing placement and whether or not the facial

11   inhibitor cream -- facial hair inhibitor cream has been

12   provided to her.

13             MS. DIMARTINO:  Yes, Your Honor.  At this time, the

14   facial hair inhibitor has been provided to Ms. Grey.  I believe

15   it was approximately two weeks ago, and Ms. Grey is currently

16   in Administrative Segregation at NBCI.

17             THE COURT:  Has she been in Administrative

18   Segregation since the time you filed your motion?

19             MS. DIMARTINO:  Yes, Your Honor.

20             THE COURT:  And there's been no interruption in that

21   status?

22             MS. DIMARTINO:  There has not.

23             THE COURT:  Okay.  Let me turn to defense counsel.

24   Does that sound accurate from your perspective?

25             MS. DONOHO:  Yes, Your Honor.  That is accurate.

1    THE COURT:  I'm not sure if there's anything
2  additional that you all wanted to present in connection with
3  your motion at this point.  I mean, I'm up to date on what the
4  status is.  It doesn't sound like much has changed, other than
5  the fact that the facial hair inhibitor cream has been
6  provided; is that correct?
7    MS. DIMARTINO:  Yes, Your Honor.  We would like to
8  offer testimony from Ms. Grey to discuss the status of her --
9  what has occurred at NBCI since she's been housed there, and we
10  believe that the six-plus months that she's been in
11  Administrative Segregation is evidence that there is not a safe
12  alternative, there are no safe alternatives for Ms. Grey at
13  NBCI.
14    THE COURT:  Okay.  Does the defense wish to be heard
15  before Ms. Grey testifies?
16    MS. DONOHO:  Yes, Your Honor, because I believe that
17  line of questioning in our perspective is something that's not
18  relevant and out of the scope of the order because, as you
19  directed, the order was for us to do a housing assessment
20  according to our policy.  We submitted our housing assessment
21  that we did do according to our policy, so we believe that
22  these other allegations of just how she's been treated at North
23  Branch are just outside of what this order is directing.  Those
24  go more towards her larger claim in this complaint of wanting
25  injunctive relief.

1          As you noted in your order and when we went through the
2   TRO hearing, we already litigated this issue and your ruling
3   was that you don't find it to be, you know, immediate
4   irreparable harm if she's not immediately transferred to a
5   women's facility and it appears that that is going to be where
6   this line of testimony is going.
7          THE COURT:  Okay.  Let me hear from plaintiff's
8   counsel on that issue.
9          MS. DIMARTINO:  Yes, Your Honor.  We believe that the
10  testimony will go to the factors that are relevant to the
11  assessment that should have been evaluated and will further
12  exemplify why the assessment did not comply with the Court's
13  order.
14         THE COURT:  Okay.  How much time do you think that
15  you need to examine Ms. Grey?
16         MS. DIMARTINO:  Approximately 20 minutes.
17         THE COURT:  Okay.  I'll allow it for the reasons
18  plaintiff's counsel stated.
19         MS. DIMARTINO:  And Your Honor, should I do it from
20  my seat, the podium?  Is there a preference?
21         THE COURT:  Wherever you feel most comfortable is
22  fine with me.
23         MS. DIMARTINO:  Okay.
24         THE CLERK:  Judge, excuse me, would you like me to
25  put her under oath?

1    THE COURT:  Yes, please.

2    (Chloe Sasha Grey was duly sworn.)

3    THE CLERK:  Please state your full name for the

4    record.

5    MS. GREY:  My name is Chloe Sasha Grey.

6    THE CLERK:  Thank you.  Counsel?

7    DIRECT EXAMINATION

8    BY MS. DIMARTINO:

9    Q.    Good morning, Ms. Grey.

10    A.    Good morning, Ms. DiMartino.

11    Q.    Are you able to see me?

12    A.    No, ma'am.

13    MS. DIMARTINO:  Is there a position from which she

14    can --

15    THE CLERK:  We only have the camera on the Judge.

16    MS. DIMARTINO:  Okay.  Thank you.

17    BY MS. DIMARTINO:

18    Q.    So just let me know if you can't hear me.  There's no

19    camera on me.

20    A.    Yes.

21    Q.    I just would like to start back from before your transfer.

22    Was placing you at North Branch Correctional Institution

23    ever used as a threat in response to your complaints in this

24    lawsuit?

25    A.    Yes, ma'am.  Specifically, in late November and early

1    December on multiple occasions the intelligence staff,

2    specifically Sergeant Halsey and Sergeant Owens, who are IIE

3    staff (inaudible) a point person to the AW, as well as AW

4    Stewart on numerous occasions told me that I was going to --

5                MS. DIMARTINO:  Ms. Grey, one second.

6                THE COURT:   Okay.  Let me just pause right here for a

7    moment, Ms. Grey.  This is not your fault, but we're having

8    trouble hearing you on our end.  It may be helpful to me or the

9    court reporter specifically if you could speak a little bit

10   more slowly because that may minimize the risk that there are

11   certain interruptions in what we're hearing on our end.  So

12   just speak a little bit more slowly.

13               MS. GREY:  Yes, Your Honor.

14               THE COURT:  Let's see if that works.

15   BY MS. DIMARTINO:

16   Q.   I'm Ms. Grey, I'm going to ask you to start from the

17   beginning on this question.  Would you like me to repeat the

18   question?

19   A.   Yes, please.

20   Q.   Was placing you at North Branch Correctional Institution

21   NBCI, I'll refer to it, ever used as a threat in response to

22   your complaints in this lawsuit?

23   A.   Yes, ma'am.  Specifically in mid and late November and

24   earlier (inaudible) on numerous occasions, Sergeant Halsey from

25   Patuxent and Sergeant Owens from Patuxent specifically stated

1  to me that I was going to be (inaudible) to North Branch

2  Correctional Institute to be taught a lesson about snitching.

3      I was (inaudible) told the exact same thing.  I was told

4  by AW Stewart on one occasion in November that they're going to

5  teach me a lesson and I was going to North Branch Correctional

6  Institute.

7      And then specifically once the TRO hearings began, there

8  was the (inaudible) the housing when we came back, I was again

9  that I was going to be going to North Branch because they know

10 how to deal with people that (inaudible) file a lawsuit

11 by (inaudible) --

12         THE COURT REPORTER:  I need her to repeat that.

13         THE COURT:  If you could repeat the last sentence,

14 Ms. Grey.  We had trouble.  There were interruptions in that

15 sentence.

16         MS. GREY:  I was told in the break during the TRO

17 between the Thanksgiving holiday and I believe it was December

18 1st by the AW that I was going to be sent to North Branch

19 because that's where they put people that want to complain and

20 file lawsuits.

21         THE COURT:  We'll try that again, Ms. Grey.

22         MS. DIMARTINO:  Ms. Grey --

23         THE COURT:  We'll try that again, Ms. Grey.  If you

24 could position yourself a little further back away from the

25 microphone, that may be helpful.  We'll try that out.

1     So could you repeat that last sentence again?

2          MS. GREY:  Specifically, in the break between the

3     Thanksgiving holiday and the time when we reconvened the TRO, I

4     was again told by the Assistant Warden that I was going to

5     North Branch Correctional Institute because they know how to

6     deal with people that complain and file lawsuits.

7          THE COURT:  All right.  In case there was any

8     difficulty, what I think I heard was that Ms. Grey said that

9     between approximately Thanksgiving and during the time period

10    of the last hearing that there were staff at the facility where

11    she was housed that told her that she would be sent to North

12    Branch where she currently is by virtue of this litigation or

13    by pressing the claims here, and I think she characterized that

14    as a threat.

15    BY MS. DIMARTINO:

16    Q.    Ms. Grey, would you like to clarify?

17    A.    There was one additional occasion from Captain Tim Harter

18    at Patuxent who told me after the TRO hearing had begun that

19    there were high-level, the words he used, there were high-level

20    talks about me and what (inaudible) and that I was going to be

21    sent to North Branch Correctional Institution once the TRO

22    concluded.

23          MS. DIMARTINO:  Your Honor, I wonder if IT might be

24    able to help at all?  She was much clearer earlier.  I don't

25    know what has happened since then but I am concerned that --

1    I'm having trouble, I don't know what to ask next because I'm

2    having trouble hearing.

3            THE COURT:  So this was tested and there was no

4    problem during the earlier testing, is that what you're saying?

5            MS. DIMARTINO:  It seemed better earlier, but she

6    wasn't speaking as much.

7            THE CLERK:  We didn't do much testing.  I'm not sure

8    if this is the best connection we can get, but I can call IT

9    and maybe -- I'm just not sure about it.

10           THE COURT:  We can make the effort and if it doesn't,

11   then we'll figure out what to do and maybe you all can think

12   about a Plan B.

13           MS. DIMARTINO:  Yes.

14           THE COURT:  One thing that occurs to me is that

15   Ms. Grey did submit a written affidavit and I'm not sure

16   whether or not what you anticipate asking her about is already

17   covered in that affidavit.

18           MS. DIMARTINO:  Yeah, Your Honor, that was just the

19   preliminary questions that were covering what was in the

20   affidavit but the rest is are based on what has happened since

21   then.

22           THE COURT:  All right.  So we'll make the effort to

23   try to improve the connection here.

24           MS. DIMARTINO:  Okay.  Thank you so much.

25           THE CLERK:  Judge, IT's going to be coming up.  They

1    are not sure if there is anything else we can do with the

2    connection, but they are going to try to raise the volume to

3    see if that will help.  They're on their way.

4                  THE COURT:  Okay.  I'll remain on the bench until

5    then.

6              (Pause in Proceedings.)

7                  THE COURT:  So Ms. DiMartino, we'll take another shot

8    at this by turning the volume up and seeing if that helps.  If

9    that doesn't work, I'm wondering if the Department, do you have

10   the phone number where she can be accessed?

11                 MS. DONOHO:  We're trying to access at least someone

12   maybe who is in the room with her.

13                 THE COURT:  Thank you very much.  Ms. DiMartino?

14                 MS. DIMARTINO:  Thank you, Your Honor.

15   BY MS. DIMARTINO:

16   Q.   Okay.  I think we have an understanding of -- Ms. Grey,

17   can you hear me?

18   A.   Yes, ma'am.

19   Q.   Okay.  Great.  To move on to the next question, how long

20   after the hearing were you then transferred to North Branch

21   Correctional Institution?

22   A.   (Inaudible) the hearing dated on December 1st, I was

23   transferred during the morning on December 18th from Patuxent

24   to NBCI.

25   Q.   Great, thank you.  And we can hear you better, it seems.

Motions Hearing 6/28/24

1      Did anyone meet with you for your individualized

2  assessment regarding your preferences and safety concerns for

3  housing?

4  **A.**   No, ma'am.  At no time did anybody from DCS ever ask me

5  anything related to the housing assessment.  I was never

6  (inaudible).  My opinion was never communicated.  Literally no

7  one's discussed anything.

8  **Q.**   And if you had been consulted, what would you have told

9  them about your safety concerns for being placed at NBCI?

10  **A.**   Well, first and foremost, I would have felt that this is

11  the only Maximum II, max prison (inaudible) the worst men, the

12  worst sex crimes, worst murderers the State of Maryland has,

13  the most dangerous men in DCS housing.  I'm not dangerous.  I'm

14  not violent.  I'm 100 percent a transgender woman, and the way

15  that this also works in Maryland, I am (inaudible) --

16          THE COURT REPORTER:  I'm not able to understand.

17          MS. DIMARTINO:  Yeah.  No, I understand.

18          THE COURT:  All right.  We're going to pause again,

19  Ms. Grey, because we're having those issues again.  We're going

20  to see if we have a backup option in terms of scheduling or

21  arranging for a phone call to happen right now, so just please

22  stand by.

23          MS. DONOHO:  Your Honor, we're actually -- maybe if

24  Ms. Grey can maybe identify if there's an officer in the room

25  with her and if maybe they can identify themselves?

1    MS. GREY:  There are no officers in the room.  I'm

2  left by myself and chained to the desk.

3    THE COURT:  All right.  Well, perhaps in order to I

4  guess sort of make a reassessment of the need for the

5  testimony, perhaps counsel could proffer to me what they expect

6  Ms. Grey would testify about.

7    MS. DIMARTINO:  Yes, Your Honor.  I was just going to

8  offer that as a possible solution.

9    So I will say, some of the things that we would have liked

10  Ms. Grey to highlight is particularly her fears for being

11  placed at North Branch and an understanding of how LGBTQ

12  inmates are treated there, how she's been treated by the COs or

13  difficulty getting ARPs, the harassment she's received from

14  inmates.

15    She has not had any -- she does not have any privileges at

16  North Branch, which is a violation of PREA, so she's been there

17  for six-plus months, she's not able to work, she's had issues

18  getting mail out and received, and I can proffer that we have

19  not been able to receive some documents from her.

20    We would also like to discuss the size of her cell, the

21  fact that she's in her cell for at least 23 hours a day because

22  recreation -- she fears for her safety when she goes out to

23  recreation and receives further harassment.  She's not being

24  allowed to shower completely separate from other inmates, which

25  is a violation of PREA.  And solitary impact -- confinement has

1    had a serious and increasingly worse impact on her mental

2    health, particularly indefiniteness of it.  And she's had panic

3    attacks.  It has worsened her gender dysphoria.

4         And it's particularly in the showers -- yes, I wanted to

5    clarify, that there seems to be individual stalls, but the

6    curtains or whatever type of obstruction there is only waist

7    high, so she is being seen, but because she can only receive

8    razors when she showers, she feels like it's worth the tradeoff

9    because her gender dysphoria will worsen if she doesn't have

10   access to razors.

11        She was also going to testify to some of her fears about

12   being placed in general population at NBCI.  And another issue

13   we'd like to raise is she's had some tests that indicate her

14   hormone, her estrogen levels have dropped to a level that's

15   borderline pretransition and she has been requesting

16   opportunities to see doctors and has not been granted that

17   opportunity.

18             THE COURT:  So there hasn't been any interruption in

19   her receipt of the hormone treatment as currently prescribed;

20   it's just that she's having, I guess, a new medical issue that

21   she's seeking attention for?

22             MS. DIMARTINO:  Correct.  Her hormone treatment is

23   being kept on person and she has stated that there has been no

24   issues with getting that refilled on time and that's been --

25   that's been taken seriously, yes.

1         THE COURT:  All right.  So I'm going to turn to

2    defense counsel and ask for any proffer they have in response

3    to the topics that were laid out.  I know we don't have the

4    benefit of Ms. Grey's testimony on these points at this point.

5    I know that some of these topics were raised in her affidavit.

6    I just want to get in general from the Department a response to

7    your understanding of the facts as it relates to the issues

8    that Ms. DiMartino just listed.

9         MS. DONOHO:  Right, Your Honor.  We actually have

10   attached in Exhibit 1, which we have already submitted to

11   counsel and have given to the Clerk, and this Exhibit 1 is a

12   declaration from a case manager supervisor, Corey Walker.  He

13   was also the Assistant Warden at the time she initially arrived

14   at North Branch and was also the individual who gave the

15   affidavit in our other opposition to their Motion to Enforce.

16   So just to show that, you know, he's been there since her

17   entire time, has seen what has exactly happened and he can tell

18   from -- that she initially was transferred after the Court

19   order because of the assessment that occurred, and the

20   assessment was done October -- on December 18th after the

21   hearing and it was conducted by individuals that were not named

22   by Ms. Grey in terms of making these threats.  They are by the

23   individuals that are named within our policy who are supposed

24   to make that case-by-case analysis.

25        And we will have to concede we did not formally interview

1    Ms. Grey before asking her preference, but to be fair, Your

2    Honor, I believe there was a lot of litigation and a lot of

3    communications with Ms. Grey leading up to this assessment that

4    they believed they knew her preference in terms of she wanted

5    to be transferred to a women's facility.  So I think at that

6    point they needed to get this assessment done and this is right

7    before the holidays, I believe they knew her strong preference,

8    and so they forego that part of it.  But the assessment clearly

9    was outlined in -- of all the factors that are laid out in the

10   policy.

11              THE COURT:  Let me ask you, this Exhibit 1, I know

12   it's dated just a few days ago, is this the same affidavit that

13   was filed in connection with your opposition to the Motion to

14   Enforce?

15              MS. DONOHO:  Not exactly the same.  We made changes

16   accordingly if there were changes.  It's just that according to

17   the information that we received, just not much in her status

18   has changed.

19              THE COURT:  Okay.

20              MS. DONOHO:  As you can see, she has been on

21   Administrative Segregation since she arrived.  Partly that was

22   because she had prior adjustments from Patuxent so she needed

23   to serve those times that were already awarded.  And then

24   afterwards, they were trying to find her a place in general

25   population and every time they tried to move her in general

1    population, she would bring up some security issue, she felt at

2    risk, and so they would have to conduct an investigation, try

3    to find another route, and then every time they try to find a

4    general population placement for her, she rejects it.

5         So part of his affidavit is showing that they do do

6    administrative review and segregation reviews and they listen

7    to her needs and listen to what she wants and then they have

8    been trying, because North Branch also doesn't want her to be

9    in administrative seg for long term.  They've been trying to

10   place her in general population.  It's just that she's also

11   been pushing back.

12        THE COURT:  How often does this reassessment occur

13   with respect to keeping Ms. Grey in the Ad Seg?

14        MS. DONOHO:  At least 30 days, Your Honor.

15        THE COURT:  Meaning it could be more than 30 days or

16   it would be no more than 30 days?

17        MS. DONOHO:  Right.  I believe actually in North

18   Branch they do weekly segregation meetings.

19        THE COURT:  Okay.

20        MS. DONOHO:  It's just that it shouldn't be longer

21   than 30 days.

22        THE COURT:  Now, the plaintiffs are making the

23   argument that this runs afoul of PREA regulations, PREA

24   standards which seem to suggest that a person generally

25   shouldn't be kept in Ad Seg for more than 30 days.  It does

1    contemplate the reassessment along the lines of what you've

2    been describing, but it seems to highlight the fact that

3    keeping someone in Ad Seg for that period of time is

4    impermissible under those regulations.  What's your response to

5    that?

6         MS. DONOHO:  Our response is what I think I've kind

7    of already alluded to is that they've been trying to find her a

8    placement in general population.  It's just that when she keeps

9    on bringing up that she doesn't feel safe, she thinks that

10   there are people out there who are going to -- there's a

11   certain gang that she said was particularly targeted towards

12   LGBT individuals and she named some kind of "Versace" gang that

13   she stated that she believed she had with -- you know, fearful

14   of.  And so when, you know, our officials received that

15   information, they do try to do their due diligence and take

16   that into account.

17        You know, I feel like --

18        THE COURT:  And it sounds like they think that

19   there's some degree of credibility to those reports of safety,

20   because otherwise they wouldn't keep her in Ad Seg, would they

21   not?

22        In other words, if she had raised a safety concern that

23   the Department considered non-meritorious, they would just

24   transfer her to gen pop because they would say that that's not

25   a real concern.  You know, I'm speaking in rough terms, but do

1    you understand the question that I'm posing here?

2              MS. DONOHO:  I do.  I think part of the problem is

3    just because, we are in mid litigation here, they're just

4    worried that anything that they are going to do, if she says I

5    feel at risk for my safety, they transfer her out, that's just

6    going to be another thing that she then brings up.  It's

7    just --

8              THE COURT:  Well, she's asking to be transferred out,

9    is she not?

10             MS. DONOHO:  Well, when they talk to her, she says,

11   no, I don't feel safe, keep me here, keep me in Ad Seg.

12             THE COURT:  Okay.  I think we're talking about two

13   different things.  When I said transferred out, I meant

14   transferred to another facility.  You mean transferred to

15   general population.

16             MS. DONOHO:  Correct.

17             THE COURT:  What's the point at which the Department

18   starts considering whether to transfer her out of the facility?

19   If we have sort of a series of safety concerns that are causing

20   the Department to keep her in Ad Seg and we know generally

21   keeping someone in Ad Seg for this period of time is, at the

22   very least, frowned upon, perhaps starkly in violation of PREA

23   standards, what's the point at which the Department starts to

24   consider whether or not to transfer her out of the facility to

25   another facility where she may feel safer?

1          MS. DONOHO:  Your Honor, that is always actually what

2     they are thinking about.  I have been talking to North Branch

3     officials who even brought up if JCI would be a better fit.

4     And so there are always talks about where, you know, placement

5     is -- I wouldn't say it's definitely one of the top priorities,

6     especially for a case like this where they know she's been on

7     Ad Seg too long and there's been multiple issues.

8          You know, according to the assessment, part of the reason

9     she was transferred to North Branch instead of JCI was, in a

10    way, to get her out of the Jessup region.  They thought that

11    this would be a better fit for her at the time, they thought

12    there was better resources.

13         They were a little concerned about, since she had so many

14    issues with Patuxent, that being in the Jessup region might be

15    a problem because officers are often transferred within a

16    region.  It would be more likely that someone at Patuxent that

17    she's alleged something against would be, you know, maybe

18    reassigned or part-time working, might cover a shift at JCI and

19    run that risk, so that was another part of the reasoning of

20    sending her out west to North Branch, and -- but as you can see

21    in the assessment, JCI was never off the table.  They just said

22    at this time they believed that North Branch would be the best

23    option.

24         THE COURT:  Since you mentioned the previous

25    allegations of various forms of abuse that Ms. Grey made

1    against persons that are in the Jessup region, have those

2    investigations been conducted?  Have they been completed or

3    what's the status of those investigations?

4              MS. DONOHO:  Yes.  Actually, they just got approved

5    so I do have an Exhibit Number 2 showing the IAD report showing

6    that the allegations against those officers that she made,

7    according to the order, were unfounded.  And so those officers

8    have been released from those charges.

9              THE COURT:  All right.  So if it's the Department's

10   position that those allegations are unfounded, I believe

11   that -- or at least orally, I'm not sure if I put this in

12   writing, but I gave the Department option to be relieved that

13   part of my injunction --

14             MS. DONOHO:  That's correct.

15             THE COURT:  -- upon motion.

16             MS. DONOHO:  Correct.

17             THE COURT:  And I think what I was contemplating

18   there is that if you conducted an investigation and you

19   acquired evidence to show that these allegations were

20   unfounded, then there may be reason to relieve the Department

21   of its duty to keep Ms. Grey separate from those individuals.

22             MS. DONOHO:  That's right.  Yeah, this report

23   actually was just approved.

24             THE COURT:  Right.

25             MS. DONOHO:  So --

1          THE COURT:  Okay.  That's fine.  I just wanted to put

2     that out there as a way of responding to what you're saying in

3     terms of being restricted in where Ms. Grey could be housed.

4          MS. DONOHO:  Right.

5          THE COURT:  Because if it turns out that you are

6     relieved of that condition, then there shouldn't be any problem

7     to transfer her back to the Jessup region.

8          All right.  There was another thing in there that I wanted

9     today respond to.  You indicated that Ms. Grey's preference was

10    taken into account and that is reflected in Mr. Walker's

11    affidavit, but I don't read the directive as contemplating

12    serious consideration of the inmate or the prisoner's general

13    preference.  It's talking about their opinion with respect to

14    safety specifically, and if -- I don't think there's any

15    dispute that Ms. Grey didn't participate directly or indirectly

16    so she had no input in the process.

17         So I'm wondering -- and I'm not sure if you even know the

18    answer to this question, but what was the extent to which

19    specifically her safety concerns were considered in that

20    setting, or was it just the idea that she preferred to be in a

21    women's facility?

22         MS. DONOHO:  I think the main point, Your Honor, is

23    in the assessment.  They realized that North Branch does house

24    multiple incarcerated individuals with gender dysphoria, they

25    have been successful.  It appears that there wasn't any

1    widespread reason to believe that, you know, Ms. Grey would be

2    in any different.  It didn't seem like there was nothing that

3    would -- specific to her that would be a safety concern as

4    there had been other incarcerated individuals who were

5    transgender who thrived there.

6            THE COURT:  But how does the committee know that if

7    you didn't hear her out?  So in other words, she may have been

8    able to articulate something unique about her experience and

9    her views as to where she would feel safe versus where she

10   wouldn't, but if that wasn't considered, I'm not sure that that

11   followed the policy.

12           MS. DONOHO:  Well, I can say it just -- there was

13   only a couple institutions that she could reasonably be

14   assigned to given her security level.  And I know that they

15   couldn't send her to WCI because of enemies.  That have their

16   own internal list of who she's already had bad contact with,

17   who her listed enemies are, who -- they know what gangs are

18   around each prison, they -- in a way, they know the safety

19   threats.  She's never been at North Branch.  There would have

20   been no reason for her to believe that that facility had any

21   safety risk to her.  I just don't --

22           THE COURT:  North Branch wasn't ruled out.  WCI it

23   sounds like, based on what I'm hearing from you, was ruled out.

24           MS. DONOHO:  Yes.

25           THE COURT:  The affidavit specifically says that

1    MCIW, which is the women's facility, was ruled out.

2          MS. DONOHO:  Yes.

3          THE COURT:  Can you speak to whether or not MCIW is

4    consistent with her security level?

5          MS. DONOHO:  Yes.  I believe MCIW has to house all

6    security levels as it is basically our main women's facility.

7          THE COURT:  Is it a fair assumption that there are

8    currently inmates housed at MCIW who have been convicted of

9    seriously violent crimes such as murder?

10          MS. DONOHO:  Yes, that is fair, Your Honor.

11          THE COURT:  Okay.  So the point I was getting to is

12    that certain facilities were ruled out, others were not ruled

13    out, and the point I'm trying to make is, and if you were able

14    to hear Ms. Grey out as to her safety concerns, there may have

15    been additional facilities that you would have ruled out if you

16    had given serious consideration to those views.  But I don't

17    have an assurance based upon the report that was filed or the

18    affidavit that was filed that that was seriously considered.

19    It says that there was consideration made for her preference,

20    but I don't think that that's the same thing as opinion with

21    respect to safety.

22          MS. DONOHO:  Your Honor, maybe it's just that we

23    have -- we've read the policy a little bit different because

24    it's -- from our officials, they were reading it as considering

25    the inmate's opinion regarding their safety and -- but not that

1  they know specifically what the risk would be.

2        THE COURT:   So if inquiry had been made to Ms. Grey

3  about her safety concerns, it may be that she would bring to

4  light specific reasons why certain facilities were unsuitable,

5  perhaps her history of sexual assault.  There's probably

6  matters that she would have testified to if we had gotten the

7  technology to work that may have spoken to some of these

8  issues, and it's just not clear to me that any of that was

9  considered in the committee's determination.

10       It's clear that they were considered, as they are required

11  to, whether or not she has male genitalia and whether or not

12  she's had any surgery, and it's clear that that was considered,

13  but I recall there being testimony at the last hearing that her

14  male genitalia is no longer -- is not functional as a result

15  of -- as a result of her regiment of hormone treatment.

16       I'm not sure if that was considered.  I'm not sure if

17  there are records to even back that up.  There may be.  There

18  may not be.  There just seems to be a number of unknowns that

19  raise concerns for the Court as to whether or not the

20  Department complied with the injunction because the injunction

21  makes reference and incorporates by reference the directive

22  that seems to contemplate all these matters.

23       Do you have any response to that issue, the genitalia

24  issue specifically?

25       MS. DONOHO:  Right.  Your Honor, I do believe they

1    considered it and weren't -- because I think even the testimony

2    that was given at the TRO was that it's nonfunctioning but only

3    if the hormone was consistent, and then when she had maybe even

4    missed one dose, it was functioning again, which I guess is

5    kind of why that is even a factor to begin with in the policy

6    just because it can be so fluctuating.

7              THE COURT:   Sure, but the injunction also provided

8    that she was supposed to consistently receive hormone

9    treatment, so I would presume that that issue wouldn't arise as

10   long as all aspects of the injunction were being followed.

11             Let me ask another question.  There was -- one of the

12   reasons that I think MCIW was ruled out is if she had a mental

13   health crisis, I think is the way that it put it, then she

14   would have to be transferred to another facility, potentially,

15   because MCIW doesn't have the mental health treatment resources

16   that may be necessary to address that, and since MCIW is in I

17   guess generally the Jessup reason or vicinity, she would have

18   to be transferred back to Patuxent which had also been ruled

19   out.

20             MS. DONOHO:   Correct.

21             THE COURT:   I'm wondering -- well, first, let me get

22   confirmation that North Branch does from the Department's

23   perspective have the mental health treatment resources that

24   would respond to any sort of mental health crisis that Ms. Grey

25   might present.

1          MS. DONOHO:  Yes.

2          THE COURT:  Okay.  If she had -- does JCI have it,

3     too?  Let me ask about that.  I'm not sure if JCI has it.

4          MS. DONOHO:  JCI does have an infirmary.  I don't

5     know if they have a -- I think typically if it's a mental

6     health issue in the Jessup region they'll go to Patuxent.  If

7     it's more of a medical issue, JCI can handle it.

8          THE COURT:  But there are certain facilities I guess

9     in the system that if a person experienced a mental health

10    crisis along the lines that we're sort of talking about, then

11    they may have to be transferred to another facility.

12         MS. DONOHO:  Yes.

13         THE COURT:  All right.  Let's see.  Just going

14    through to see if there were any other questions that I had.

15         I wanted to give you an opportunity to respond to this

16    argument that although the Department cites to a history of

17    violence against women, it does not appear, I mean, it's been

18    proffered to me that the underlying offense for which

19    Ms. Grey's being incarcerated for is not a sexual violent act.

20    In other words, she's just -- she's similarly situated to

21    female inmates who may have committed similar crimes against

22    women, similar violent crimes against women.  So this issue was

23    raised in an objection to some of the representations made in

24    Mr. Walker's affidavit, and I wanted to give you a chance to

25    respond to that.

Motions Hearing 6/28/24

1           MS. DONOHO:  Thank you, Your Honor.

2       To be honest, I'm not fully aware of the facts underlying

3    her convictions.  I do know obviously that they were homicides.

4    There was something, I believe that when we talked to you --

5    that there was something sexual in nature about the underlying

6    charges.  It just wasn't actually -- like any sexual aspect

7    wasn't actually charged.  It was just --

8           MS. GREY:  No.

9           MS. DONOHO:  Of what I recall, there were some type

10    of sexual innuendo, aspects to the crime.

11           THE COURT:  All right.  Is there anything else that

12    you wanted to say before I turn back to Ms. DiMartino?

13           MS. DIMARTINO:  Yes, Your Honor.  Just a few points

14    I'd like to make.

15           THE COURT:  I just wanted to ask if there was

16    anything else.

17           MS. DIMARTINO:  I'm sorry.

18           THE COURT:  Was there anything else that you had that

19    you wanted to bring to my attention?

20           MS. DONOHO:  No, Your Honor.

21           THE COURT:  All right.  Ms. DiMartino?

22           MS. DIMARTINO:  My apologies, Your Honor, for

23    interrupting.  I misheard you.

24           THE COURT:  That's all right.

25           MS. DIMARTINO:  There are a few points I'd like to

1   make in response.  You know, we can have Ms. Grey submit an

2   affidavit with some of the things that we would have liked her

3   to testify and we can include in that the nonsexual nature of

4   her crimes.

5          But in regards to the other issues, I would like to point

6   the Court, as we did in our brief to DPSCS's report from

7   November, which states that all inmates are housed according to

8   genitalia and only trans women that have had gender-affirming

9   surgery could be transferred to a women's prison.  So it is not

10  speculative that they are not following PREA.

11         I would also like to address the ARP issue or the

12  complaint issue.  As Ms. Grey has testified in her declaration

13  and we've had other witnesses testify to this as well, that the

14  ARP process at NBCI is largely inaccessible and very difficult.

15  And to the extent that it has been available to Ms. Grey, in

16  response to Mr. Walker's declaration stating that she has not

17  submitted any complaints against individuals in her Motion to

18  Enforce, we have submitted the ARPs that she has submitted.

19  It's under ECF 108-8, so that is not accurate.

20         I'd also like to point out that I'd the -- there's a false

21  choice that Ms. Grey has been given.  Of course, when she is

22  faced with Administrative Segregation or the risk of bodily

23  harm or sexual assault or rape, she's choosing Administrative

24  Segregation while at NBCI because she does not feel that the

25  arrangements being made for her will protect her.

1      This is very analogous to a *Farmer versus Brennen*

2  situation, the US Supreme Court opinion that recognized that

3  prisons should know the risk of the harms that are faced by

4  trans women in men's prisons.

5      In regards to your points on safety, I would just like to

6  point out that security levels can be administratively adjusted

7  as necessary and, as Your Honor had alluded to, under PREA

8  115.42, a transgender inmate's own views with respect to his or

9  her own safety shall be given serious consideration.  So even

10  if it is not explicit in the executive order, the executive

11  order does state that PREA must be followed in the Department's

12  evaluations.

13      And finally, Your Honor, I would just like to point out

14  that the mental health concerns about Ms. Grey are speculative.

15  She has not had any mental health emergencies since her

16  transition.  She is no more at risk of a mental health crisis

17  than any other inmate in Administrative Segregation or

18  incarcerated in general.

19      And if there are no other questions, Your Honor --

20          THE COURT:  What is the citation to the policy that

21  you've referenced earlier that would make it impermissible for

22  the housing determination to be based solely on the inmate's

23  genitalia?

24          MS. DIMARTINO:  So that is under PREA, under -- well,

25  I can point you to the guidance given by DOJ for PREA that

1     states that even in practice, if an examination of a prison's

2     actual practices reveals all trans inmates are in practice or

3     housed according to genitalia, they are not compliant with the

4     law.  And that's the PREA FAQs listed March 14th [sic], 2016,

5     that are cited in our brief.

6               THE COURT:  And you're also citing I guess the

7     Department's policy with respect to treatment of transgender

8     incarcerated individuals for the proposition that their current

9     policy -- self-reported practice, rather, is housing an

10    individual according to physical genitalia, and I guess your

11    contention is that that practice is out of line with PREA?

12              MS. DIMARTINO:  That's correct, Your Honor.

13              THE COURT:  All right.

14              MS. DIMARTINO:  And also in reference to, if I may

15    add, the contention that NBCI inmates are housed successfully,

16    transgender inmates are being housed successfully at NBCI,

17    Ms. Grey was -- I can proffer that Ms. Grey was going to

18    testify to incidents that she's aware of where LGBTQ and trans

19    inmates were physically harmed immediately upon entering

20    general population.  And I'd also like to point Your Honor to a

21    case being brought that was just settled against NBCI for the

22    treatment of a trans woman that is being housed there.

23              THE COURT:  What is that?

24              MS. DIMARTINO:  That is -- it's Amber Canter is the

25    name, and it is referenced in -- my apologies, I have the cite.

Motions Hearing 6/28/24

1    It's in a footnote in the report and I could point Your Honor

2    to that momentarily.  My apologies for the delay.

3            THE COURT:  All right.

4            MS. DONOHO:  Your Honor, if I could object to that

5    for -- just to mention that it's just a settlement.  We don't

6    know if that's appropriate to bring up in terms of actually

7    saying if something indeed happened or if it was just settled.

8            THE COURT:  Okay.  All I asked for was the citation,

9    but I take your point.

10           MS. DONOHO:  Sure.

11           MS. DIMARTINO:  On Page 9 of plaintiff's reply, it is

12   cited as Canter versus Mamboob, and it is Case Number

13   GJH-17-908.

14           THE COURT:  Okay.  Thank you.  Anything else,

15   Ms. DiMartino?

16           MS. DIMARTINO:  And I also believe there's a Ms. Levy

17   that is another case that is -- we're having some issues --

18   that is someone -- a trans woman at NBCI that is litigating an

19   issue.  I do not have a cite for that, thought, my apologies,

20   and I could provide that afterwards, more information

21   afterwards on that.

22           THE COURT:  Thank you.

23           MS. DONOHO:  If I could add maybe just one more

24   proffer just directly for that.  We have about 90 transgender

25   incarcerated individuals within our facilities, and we've

1    mentioned maybe about two, so...

2              THE COURT:  In NBCI specifically, do you know the

3    number there?

4              MS. DONOHO:  I would have to confer.

5              THE COURT:  That's fine.  I wanted to see what your

6    response is -- I'm sorry, Ms. DiMartino, was there something --

7              MS. DiMARTINO:  Yes, Your Honor.  In their report as

8    of November of 2023, there are only seven transgender

9    individuals at NBCI.

10             THE COURT:  All right.  Thank you.

11         Ms. Donoho, I meant to ask you this and it came up in

12   Ms. DiMartino's presentation just now, this tension between the

13   requirement in PREA that genitalia not be the only

14   consideration in determining housing in the policy that she

15   cited, or I'm not sure if it's a policy or it's just the

16   articulation of a practice that seems to indicate that that

17   determination is being made solely on the basis of genitalia.

18         Is there a real tension there, how do we resolve that

19   tension, or is there no tension between them at all?

20             MS. DONOHO:  And if I could clarify, do you mean in

21   terms of the December assessment according to Ms. Grey?  You

22   believe that that was --

23             THE COURT:  Not specifically Ms. Grey's case.  So the

24   plaintiff's have cited to a PREA requirement or prohibition

25   against basing housing of transgender inmates solely on the

1   basis of their genitalia, and then their citation made to a

2   document, a DPSCS document that suggests that inmates are

3   housed according to their genitalia, and these seem to be in

4   conflict.  And my guess was that PREA would trump whatever

5   policies the Department would prescribe for itself.

6           MS. DONOHO:  Right.  And I would agree with that,

7   Your Honor, but I just believe that they're mentioning one

8   factor that the Department considers.  Under PREA, what they

9   say is that this can't be the only factor.  You can't base it

10  solely on external genitalia.  Under our policy it's just a

11  factor that's considered.

12          THE COURT:  Okay.  I'm just trying to pull up my copy

13  of the document that I'm referring to.  It's not entirely clear

14  from the document that I'm talking about, and I'm referring to

15  DPCS document titled Treatment of Transgender Incarcerated

16  Individuals dated November of 2023.  It suggests that

17  transgender individuals are housed according to physical

18  genitalia.  I think that that's a direct quote, that phrase,

19  according to physical genitalia, which seems to at least be in

20  tension with the PREA requirement or prohibition, if not

21  outright contradicted.  I'm not sure if you've -- do you know

22  what I'm referring to?

23          MS. DONOHO:  Do you have maybe the actual directive

24  number?

25          THE COURT:  I don't have it but I'm not sure if

1    plaintiffs have it.

2             MS. DIMARTINO:  It's ECF 95-15.  It's the report

3    submitted to the State.

4             MS. DONOHO:  95-15.

5             MS. DIMARTINO:  Page 6.

6             MS. DONOHO:  I believe that tension could be

7    resolved, Your Honor, in terms of the other directives that

8    we've already been discussing, which is the directive under

9    OPS.131.0001 where they have a more fleshed out actual housing

10   assessment that has indicated that it needs to be a

11   case-by-case individualized assessment and, again, that

12   external genitalia is only one factor.

13            THE COURT:  Okay.

14            MS. DONOHO:  So this is more the policy that they

15   follow when talking about housing assignments.  Treatment is a

16   separate policy, Your Honor.

17            THE COURT:  All right.  The phrase that I'm -- I

18   guess the full sentence says, "All transgender individuals are

19   housed according to physical genitalia."  And that's the issue

20   that's being raised here, but I'm hearing from defendant's

21   counsel that genitalia is just one of several factors as

22   reflected in Mr. Walker's affidavit.

23            MS. DONOHO:  Correct, Your Honor.

24            THE COURT:  Okay.  Just give me one moment here,

25   please.

1          (Pause in Proceedings.)

2          THE COURT:  All right.  So currently pending before

3    the Court is a Motion to Enforce the injunctive relief this

4    Court ordered previously in an order issued in December of last

5    year.  Specifically, what's being challenged here in the Motion

6    to Enforce is Ms. Grey's housing placement as well as the

7    determination made in deciding Ms. Grey's current housing

8    placement.

9          There doesn't appear to be any dispute that -- with

10   respect to the decision-making process and the composition of a

11   committee formed to decide Ms. Grey's housing placement that

12   Ms. Grey did not participate in that process either directly or

13   indirectly.  The result of that process was that the decision

14   to transfer her to NBCI and that transfer was effectuated in

15   mid December 2023.

16         Initially, Ms. Grey was held on disciplinary segregation

17   due to disciplinary infractions that had occurred previously

18   but that was until December 29th of the same month, and then

19   after that she was placed into Administrative Segregation.

20         She alleges generally in her affidavit and also it's been

21   proffered to me that her testimony today would be that she

22   suffered various forms of abuse during the time that she's been

23   at NBCI, including misgendering, harassment, deprivation of

24   privileges, and other issues.  She also has indicated that her

25   efforts to make complaints and lodge grievances as a result of

1   her experiences have also been inhibited.  I learned today that

2   Ms. Grey has remained in Administrative Segregation since the

3   filing of the Motion to Enforce.

4       The policy that applies to the Department's housing

5   determination for Ms. Grey, as I noted earlier, is the

6   Executive Directive I mentioned earlier, OPS.131.0001.

7   Specifically, Part J talks about how the housing determination

8   must be made.

9       Among other things, it requires certain official

10  participates in the decision-making process.  It requires

11  serious consideration of the prisoner's biological gender

12  presentation and appearance to be taken into account, as well

13  as whether the prisoner had any gender-affirming surgical

14  procedures, and the policy requires serious consideration of

15  the prisoner's opinion regarding their safety.

16      Mr. Dickens, this Keith Dickens completed an affidavit

17  that the defendant's attached to their report, and there has

18  been a new affidavit that's been submitted as well that speaks

19  to the process that was undergone here.

20      Based on the affidavits, it appears that the right

21  Department officials were present for the meeting where

22  Ms. Grey's housing determination was discussed and made and

23  it's in accordance with the policy.  Additionally, the

24  committee clearly considered the fact that Ms. Grey has

25  external male genitalia.

1    Finally, the affiants note that Ms. Grey has expressed a

2    strong preference for being housed in a women's institute like

3    MCIW, and this presence -- this preference, rather, was

4    seriously considered.  There is no evidence, however, that the

5    committee considered, as it is required to do, Ms. Grey's

6    opinion specifically regarding her safety.  In the Court's

7    view, the Department should have not just considered Ms. Grey's

8    general preference, and not even just Ms. Grey's opinion as to

9    where she would feel safe, but also Ms. Grey's opinion about

10   where she would feel unsafe and why.

11   There's no dispute that Ms. Grey was not permitted or

12   given an opportunity to participate in the decision-making

13   process.  Given that and the fact that the affidavits do not

14   speak to Ms. Grey's opinion with respect to her safety, the

15   Court cannot be assured that the Department conducted the

16   housing determination in full compliance with the injunctive

17   order that I entered which referenced the Executive Directive

18   that I cited earlier.

19   The Court recognizes that with input from the Warden of

20   MCIW, the committee essentially ruled that facility out as an

21   option for housing Ms. Grey, but Ms. Grey's opinion as to her

22   safety, if seriously considered, could have resulted in other

23   options being ruled out as well, to include potentially ruling

24   out NBCI.

25   The Court has also considered the grounds asserted for

1    ruling out MCIW and has some concerns about the logical and
2    rational basis for those reasons.  For example, one of the
3    reasons cited for ruling out MCIW was the availability of
4    resources to treat Ms. Grey should she experience a mental
5    health crisis.  Apparently the only facility local to MCIW that
6    might have resources to treat Ms. Grey is Patuxent, and
7    Patuxent was ruled out as a place where she could be housed.

8        Oddly, however, one of the reasons given for why Ms. Grey
9    could not be housed at Patuxent was that she did not require
10   the treatment services available at that facility.  So it seems
11   to be that that fact, her lack of need for the treatment is
12   being cited as a reason to take her out of the Jessup region
13   but, at the same time, her potential need for mental health
14   treatment is being taken as a reason for why she can't be
15   housed in the Jessup region.  So that raises some concerns from
16   the Court about the seriousness with which the committee
17   considered the factors that are cited in the affidavits.

18       Another issue was the prevalence of sexual relationships
19   amongst inmates at MCIW and the difficulty of enforcement
20   against that.  The affidavit notes the fact that Ms. Grey has
21   external male genitalia but, as I indicated earlier, there was
22   testimony that that genitalia is essentially nonfunctional as a
23   result of consistent hormone treatment.

24       The Court has not been presented with any medical evidence
25   one way or the other, but it's not clear to me that the

Motions Hearing 6/28/24

1    department considered any such evidence in making its housing

2    determination and weighing so heavily the fact that Ms. Grey

3    currently has male genitalia.

4        It's been proffered to the Court, and credibly so, that

5    Ms. Grey is not sexually interested in women and is sexually

6    interested in men, so it's not clear that the Department

7    considered those facts either because the prevalence of sexual

8    activity among prisoners at MCIW would seem to be a lessened

9    concern for an individual who has no sexual interest in women

10   and the potential for illicit sexual activity to occur in the

11   male facility may be higher given Ms. Grey's stated

12   preferences.

13       Additionally, there have been facts that have been

14   proffered regarding Ms. Grey's history of violence.  I haven't

15   been presented with any evidence that any of that violence has

16   been sexual in nature and therefore doesn't separate Ms. Grey

17   from anyone else who may be housed at MCIW who is female but

18   may have committed violent acts in the past, including violent

19   acts against women.

20       The facilities that were not ruled out were NBCI and JCI,

21   with NBCI determined to be the best fit for Ms. Grey, but it's

22   unclear whether or not that determination was founded on the

23   policies that apply here because I am not assured that

24   Ms. Grey's opinion with respect to her safety was seriously

25   considered here.

1          Now, the Court recognizes that and it's well established
2     that absent the most extraordinary circumstance Federal Courts
3     are not to immerse themselves in the management of state
4     prisons or substitute their judgment for that of trained
5     penological authorities charged with the administration of such
6     facilities, and at this point the Court doesn't intend to
7     impose its will on the Department, but the Court will enter an
8     order that the Department comply with the previous order in
9     more specific terms, including some of the terms that I've
10    given reference to here today.
11         And specifically, that Ms. Grey's opinion specifically
12    with respect to her safety and any factual basis that she has
13    to support her opinion with respect to safety does get serious
14    consideration from the Department in making a reassessment of
15    her housing determination, and it will be required that the
16    Department submit a new report reflecting a reassessment of the
17    housing determination in the near term.
18         Now, that will be the order in general terms, and there
19    may be more specifics in there based upon my review and
20    consideration of some of the policies that have been cited
21    here.  There is concern that too much weight is being paid to
22    the genitalia if PREA regulations proscribe that consideration
23    as being the sole basis for housing determinations.
24         I'll take a closer look at that and if there is need to
25    include more specific terms in my order to direct the

1    Department's guidance in terms of determining a reassessment

2    for Ms. Grey's housing placement, then I'll place that in a

3    written order as well.  But for the time being, is there any

4    requests for clarification on this point?  Ms. DiMartino?

5              MS. DIMARTINO:  No, Your Honor.  I would just ask if

6    there was a timeline in mind and if there would be an

7    opportunity to respond.  Thank you.

8              THE COURT:  Well, the last time -- you mean

9    opportunity to respond to the report?

10             MS. DIMARTINO:  Yes.

11             THE COURT:  Okay.  Well, the timeline I gave last

12   time was 30 days and I don't see any reason to deviate from

13   that here.

14             MS. DONOHO:  The only thing I would ask for

15   clarification is in terms of the other aspects of the order,

16   are those still in effect or have -- she's conceded that she

17   has been receiving her medications on time, the report about

18   the other officers, I'm just -- are we -- is the order going to

19   be just tailored towards the assessment?

20             THE COURT:  No, the other order is still in effect.

21             MS. DONOHO:  Okay.

22             THE COURT:  The Department can ask for relief from

23   that order any time that you feel you have a basis to ask for

24   that relief, but since that request hasn't been made, that

25   order will remain in effect.

1          MS. DONOHO:  Got you.  Thank you.

2          THE COURT:   Anything else in terms of the Motion to

3      Enforce?

4          Okay.  Let's move on to the other motions.  I mean, as I

5      indicated, I don't expect to hear oral argument on those

6      motions but I do want to make sure that we're on the same page

7      procedurally about how things will go from here.

8          So this hearing was scheduled I think close to a month ago

9      and, since that time, about two weeks ago the plaintiffs filed

10     a motion for leave to amend, specifically to file a Fourth

11     Amended Complaint, and they've attached clean and redlined

12     versions of the proposed amendment.

13         Two days ago the defendants filed a response in opposition

14     to that motion well within the time frame that they had to do

15     that, and at this point the plaintiffs are entitled to a reply

16     and I assume that the plaintiffs will want an opportunity to

17     reply?

18         MS. HILL:  Yes, Your Honor.

19         MS. GOLDEN:  Yes, Your Honor.

20         THE COURT:   I also assume if I grant the motion

21     ultimately, the defendant's will want an opportunity to brief a

22     new Motion to Dismiss?

23         MS. DONOHO:  Yes, Your Honor.

24         THE COURT:   I mean, what I expect that you would do

25     is incorporate the same arguments that you made previously, but

1    there may be need for new arguments based on recent case law,

2    based on the new claims asserted in the Forth Amended

3    Complaint.

4              MS. DONOHO:  Correct.

5              THE COURT:   Recent case law, and I'll just name some

6    just to sort of prompt the parties to take these into

7    consideration, are Kadel v. Fowell, K-a-d-e-l v. F-o-w-e-l-l.

8    It's a recent Fourth Circuit case from April 29th of this year.

9    The appeal numbers are 22-1721 and 22-1927.

10             There's also B.P.J. v. West Virginia State Board of

11   Education, a Fourth Circuit decision from April 16th.  The

12   appeal numbers there are 23-1078 and 23-1130.

13             Now, both of those cases speak to the equal protection

14   issues with respect to transgendered or gender dysphoric

15   individuals.  There's also, as noted in the plaintiff's recent

16   Notice of Supplemental Authority, Johnson v. Robinette, Appeal

17   Number 22-7305, a Fourth Circuit decision from June 14th which

18   goes to the exhaustion issues.

19             So I think there may be some grounds for the legal

20   landscape here to have been shifted, so if ultimately the

21   Motion to Amend is granted, then I expect that the briefing on

22   these issues will be made in the course of the defendant's

23   Motion to Dismiss the Fourth Amended Complaint.

24             If I deny the Motion to Amend, I will consider what to do

25   at that point but there may be opportunities for the parties to

1    submit supplemental briefing on some of the recent case law on

2    those points.

3          But I just want to be clear that if I end up granting the

4    Motion to Amend, the currently pending Motion to Dismiss will

5    be moot, will it not?  If you could just say --

6               MS. DONOHO:  Yes.

7               THE COURT:  So it gets picked up on the transcript.

8          All right.  Just looking to see if there's anything else I

9    wanted to raise with the parties here.

10         Oh, so there is some questions that I have.  So part of

11   the defendant's currently pending Motion to Dismiss is an

12   alternative Motion for Summary Judgment that I think mainly

13   goes to the exhaustion issues in the case.  And I'm not sure

14   whose brief did it, but one party's brief made reference of

15   there being some precedent for limited discovery on exhaustion

16   issues.  I wanted to probe how that would work practically with

17   the parties.

18         It occurs to me that if I decide ultimately that discovery

19   is warranted on exhaustion issues and I'm focused mainly on

20   that because I wanted to give the defense an opportunity to

21   file a new Motion for Summary Judgment if they think that, you

22   know, a genuine dispute of material fact can't raised on those

23   points, is there a real practical way of separating discovery

24   on exhaustion issues versus general discovery that would need

25   to happen in the normal course of the case?

1        Is that Ms. Golden?

2            MS. GOLDEN:  Yes.  If I may, Your Honor.  Sorry.

3        The Fourth Circuit referenced this in the Neale versus

4   Hogan, which was a 2022 decision, and they referenced both the

5   Third Circuit's opinion in Small versus Camden County and the

6   Seventh Circuits decision in Pavey versus Conley.

7        The Seventh Circuit has particularly because that Pavey

8   was a 2008 decision, so they've been dealing with the results

9   of Pavey for a while, they have a very specific procedure for

10  dealing with exhaustion pre-full summary judgment, pre-full

11  discovery, and if you'd like supplemental briefing on it we can

12  provide it, but the Seventh Circuit has a detailed procedure

13  where they allow discovery only into issues that are relevant

14  to exhaustion and then conduct an evidentiary bench hearing.

15            THE COURT:  Okay.  And now, some of it may overlap

16  with discovery in general, some of it may not.  So an example

17  of something that occurs to me that may not overlap with the

18  discovery on the merits of the claims may be, you know, inquiry

19  with the grievances offices or the offices or divisions within

20  the Department that handle grievances, whereas that wouldn't

21  necessarily be relevant to the merits of the claim, you're just

22  really investigating whether or not complaints were made and

23  when they were made and what they were about and things like

24  that, so that might be something that would not necessarily

25  overlap with general discovery.

1              MS. GOLDEN:  Yes.

2              THE COURT:  But I assume the defendants in a case

3    like this would want to depose the plaintiffs and be able to

4    sort of cross-examine them on whether or not they made

5    complaints at different points in time.

6         Is it the idea that those depositions couldn't get into

7    the underlying merits of the case?  They could only really

8    investigate whether or not complaints were made and when and so

9    forth?

10             MS. GOLDEN:  That's my understanding of how it's

11   handled in both the Seventh and Third Circuits.

12             THE COURT:  Okay.

13             MS. GOLDEN:  That there was -- limited depositions

14   were necessary.  Of course, our position is going to be that

15   the Johnson versus Robinette decision makes this entire inquiry

16   irrelevant.

17             THE COURT:  Well, let me respond to that, then.  So I

18   understand your position on Johnson v. Robinette, but it

19   doesn't reach all the claims, does it?  In other words, I think

20   there's Count 5, which is the -- let me see.  Count 5 is not

21   listed in the --

22             MS. GOLDEN:  Yes, Your Honor, those are -- sorry to

23   interrupt.

24             THE COURT:  Oh, I was just going to say it's not

25   listed in your Notice of Supplemental Authority as one of the

1  cases -- or one of the claims for which exhaustion would not be

2  required under Johnson v. Robinette, and there may be other

3  claims like it.

4      It occurs to me that there may be PREA-related issues in

5  several of the counts that you do list in the Notice of

6  Supplemental Authority, but there are also aspects of those

7  claims that are not covered by PREA; in other words, not all of

8  those claims are about sexual misconduct.  They may be about

9  sexual misconduct in part but not another part.

10      So it does sound to me that there are likely claims even

11  if I deny their Motion to Dismiss in total, there are likely

12  claims that would have required exhaustion even from your

13  perspective; is that fair?

14          MS. GOLDEN:  I -- I understand Your Honor's point and

15  also your desire not to turn this into an argument on this

16  issue, but --

17          THE COURT:  Right.

18          MS. GOLDEN:  -- it is our contention that since the

19  department has said in response to Ms. Grey's briefing and in

20  their policies that medical issues that involve the medical

21  contractor are not grievable.  And the Fourth Circuit's recent

22  decision that says the Department's regulations on sexual

23  misconduct are worded in such a way that it includes any

24  official's acts or failures to act that could lead toward

25  sexual assault, not itself inherently sexual, that that

1    actually does dispose of everything.

2         THE COURT:  Okay.

3         MS. GOLDEN:  But obviously, if we get to briefing, we

4    will expand on that.

5         THE COURT:  Okay.  I understand.  Did you have any

6    response to that, Ms. Donoho, on any of the issues I just

7    raised, I guess specifically your view on the feasibility of

8    separating out discovery on exhaustion issues from general

9    discovery in this case?

10        MS. DONOHO:  Yes.  Your Honor, I can see it

11   happening.  I know it would be a little difficult, especially

12   when maybe some of their arguments are a lot about availability

13   and availability sometimes they are taking about, you know, the

14   actions of officers and that can get kind of melded with the

15   merits of, you know, how our officials are treating them.

16        THE COURT:  Right.

17        MS. DONOHO:  And so it might be difficult to really

18   have it so, you know, distinguished and then we would kind of

19   have to go and depose them again.

20        THE COURT:  Right.

21        MS. DONOHO:  It's one of those things that I don't

22   know if it would actually make things more efficient.

23        THE COURT:  Okay.  All right.  Well, I invite the

24   parties to brief it, to brief that question and any additional

25   briefing.  I'm not sure that I got the parties' preferences one

1    way or the other if I was inclined to order or find that

2    discovery was warranted on these issues what your preferences

3    are with respect to whether it should be segregated from

4    general discovery or whether it should just be incorporated

5    into general discovery in this case, so perhaps the parties

6    could address that in any further briefing.

7                MS. DONOHO:  Thank you, Your Honor.

8                THE COURT:  Is there anything else that we should

9    address here today from the plaintiff's perspective?

10               MS. GOLDEN:  Ms. Grey seems to have something she'd

11   like to raise.

12               THE COURT:  Do you want to speak privately with your

13   counsel, Ms. Grey, or is there something you wanted to address

14   to the Court?

15               MS. GREY:  Please.  Yep.

16               THE COURT:  Okay.  I'm not sure how we're going to --

17               MS. GOLDEN:  I'm sorry, I --

18               MS. DONOHO:  We can step out.

19               MS. GOLDEN:  I know that that would be quite an ask

20   but given our technological situation, could I ask for

21   courtroom privacy for a moment?

22               THE COURT:  Well, let me think about this.  We don't

23   know a way to -- we don't have a way of -- that counsel could

24   access her either through a telephone, maybe there's another

25   room that she could go to?

 1          MS. DONOHO:  We're trying to look into that, Your

 2     Honor.

 3          THE COURT:  Okay.  So what I'll do here is call a

 4     recess and then hopefully within that recess, plaintiff's

 5     counsel would have an opportunity to confer privately with

 6     Ms. Grey and then I'll come back and address whatever the issue

 7     is.

 8          MS. GOLDEN:  Thank you, Your Honor.

 9       (A recess was taken from 11:19 a.m. to 11:52 a.m.)

10          THE COURT:  Ms. DiMartino, was there anything else

11     that you wanted to bring to the Court's attention?

12          MS. DIMARTINO:  Ms. Golden is going to --

13          THE COURT:  Okay.

14          MS. GOLDEN:  Your Honor, thank you for allowing us

15     the time to talk to Ms. Grey, and we need to make an oral

16     motion for Your Honor to order her moved to a safer facility

17     immediately.

18          On the way up to this hearing, she was first told she had

19     to change out of her women's clothes and change into men's

20     uniform.  She was then brought up and, on the way up, she only

21     knows one of the names of one of the officers who brought her,

22     Officer Shaffer, who said, "You are gonna pay the price when

23     this court stuff is over."

24          They called her -- excuse my language but I want to quote

25     what she said to me, that she is "a fucking bitch-ass faggot

1    and a fucking sick fuckboy and no one believes her."

2         And then, "We could open up the cells up and say it was an

3    accident.  It happens all the time, you fucking fairy.  We

4    should let these N-words out and wear your fucking ass out, you

5    fucking fairy.  That's what you want, and you're just a faggot

6    and no one believes you."

7         At this point she's terrified and staff is directly

8    interfering with her ability to testify at this hearing.  She

9    wasn't able to because the technology malfunctioned, but she's

10   on the phone in the jury room and we have to ask Your Honor to

11   do -- to issue an emergency order under the All Writs Act to

12   move her to JCI or through the Interstate Compact to another

13   jurisdiction where officers aren't threatening to allow her to

14   be gang raped.

15        THE COURT:  All right.  Thank you, Ms. Golden.

16   Does the state wish to respond?

17        MS. RATLIFF:  Yes, Your Honor, and this is Merrilyn

18   Ratliff on behalf of the defendants.

19        Ms. Grey did not mention anything about this until, you

20   know, hearing the outcome of this hearing.  She didn't mention

21   anything about this until today.  I understand there's been

22   other allegations of, you know, statements made but nothing

23   this specific and -- nothing this specific.

24        Further, Your Honor, we are willing to investigate this.

25   We have one name of the alleged officer.  I believe there were

1    other potential officers, I don't know.  But we did obtain one

2    name from Ms. Grey's counsel.  Ms. Grey is on Administrative

3    Segregation.  That's the safest place that she has in NBCI, and

4    with regard to any requests to transfer her via ICC or

5    otherwise, I mean, that has to be evaluated after that

6    investigation is performed.

7        As to the men's uniform requirement, incarcerated

8    individuals are required to wear state-issued clothing,

9    including the uniform, and I do want to note for Your Honor

10   that Ms. Grey was allowed to wear makeup, which is against the

11   policy of the Department.  I don't know anything more about

12   that but just visually you could see that she was allowed to

13   express herself in that way.

14       So we would oppose any emergency motion to transfer her

15   somewhere immediately.  You know, we are willing to investigate

16   and make a determination based on that investigation.

17               THE COURT:  Thank you.

18               MS. RATLIFF:  Thank you.

19               THE COURT:  Any rebuttal?

20               MS. GOLDEN:  This happened this morning.  I'm not

21   sure when Ms. Grey was supposed to talk to me until she was

22   able to talk to me because we were able to set up a

23   confidential communication with her during the recess.  She

24   told us as soon as she could and asked us for legal advice.

25               THE COURT:  Okay.  I think the point that Ms. Ratliff

1    was trying to make was that this sort of startling event, you

2    know, as described, sounds kind of outrageous.  I think she

3    was just -- the point she was trying to make was that Ms. Grey

4    didn't make any mention of it before the ruling.

5        Is that basically your point, Ms. Ratliff?

6            MS. RATLIFF:  Yes, Your Honor, and --

7            THE COURT:   In effort to call into question I guess

8    the credibility of it, but I can't make any factual

9    determinations one way or the other about this.  I'm receiving

10   this information secondhand.  I know it has to be that way in

11   this circumstance, but this is not in the nature of testimony

12   or any affidavit or anything like that.  So I'm not sure that I

13   have a factual basis to satisfy the elements that need to be

14   satisfied to warrant such extraordinary relief as ordering a

15   prisoner to be redesignated to another facility and overriding

16   the security concerns and other legitimate penological concerns

17   that the Department may have.  I think I need more than what

18   I've been presented.

19           MS. GOLDEN:  Your Honor, of course.  Ms. Grey is on

20   the phone.  We were able to set up a phone line.  She's on the

21   phone with my cell phone.  She could either call into the Court

22   so that you could hear her directly or I could have my phone

23   brought in here.  I don't know if that works with your

24   technology but my co-counsel is on the phone with her in the

25   jury room right now.  We're happy to have you hear from her.

1    Unfortunately, the video is just not working.

2          THE COURT:   But even if I heard from Ms. Grey about

3    it, I would be -- what you're asking me to do is override the

4    Department's processes.  The process is for them to investigate

5    it and then take any corrective action that they deem is

6    appropriate, and if you have a challenge to that, then you

7    could seek Court intervention potentially in the form of an

8    injunction, but that's -- I don't feel it's appropriate for me

9    to take that at this stage on such a limited evidentiary record

10   even if that record would include this testimony from Ms. Grey.

11         While we're on that point, reference was made to the

12   testimony that she did give today.  I have to strike that

13   testimony because I'm not sure that we could generate a

14   reliable transcript from it.  It's not dispositive on the

15   ruling that I made on the Motion to Enforce, and the defense

16   didn't get an opportunity to cross-examine her, so I just

17   wanted to make that clear for the record.

18         But I don't think that the basis for such extraordinary

19   relief even on an emergency basis has been satisfied here.  And

20   if the -- that's obviously without prejudice to the plaintiffs

21   making a written submission in the form of an emergency motion

22   for injunctive relief and giving the State an opportunity to

23   respond to it.  I could even order an abbreviated briefing

24   schedule if the parties -- if the plaintiffs request it and set

25   out the reasons why it's necessary in this case, but I don't

1    have enough in front of me to order such extraordinary relief.
2    But I understand you had to make the request given the
3    circumstances.
4              MS. GOLDEN:  Your Honor, may I make a fallback
5    request that you order that there be absolutely no retaliation
6    against Ms. Grey for her participation in this hearing or this
7    lawsuit and that that be communicated to the staff of NBCI that
8    is consistent with the regulations, but it's been my experience
9    that many people take things more seriously when there's a
10   Court order.
11             THE COURT:  Okay.  That's fine.  I can do that.  I
12   think I said this at the last hearing, retaliation in the form
13   that's being described here is illegal anyway and I voiced some
14   hesitation about putting that in the order.  But at this point
15   we have a series of allegations of retaliation coming from
16   Ms. Grey and to add additional enforcement mechanisms to
17   address any potential retaliation that may be occurring or may
18   occur in the future, I can include in my order on the Motion to
19   Enforce that no retaliation should result from her
20   participation in this litigation.
21        Will that suffice?
22             MS. GOLDEN:  Your Honor, if I may ask that that be
23   directly communicated to the staff at NBCI.
24             THE COURT:  In order that the -- yes.  Yes.
25             MS. GOLDEN:  Thank you.

 1          THE COURT:  Was there anything else that the

 2    plaintiffs wanted to present today?

 3          MS. GOLDEN:  Is it possible to do her housing review

 4    in less than 30 days?

 5          THE COURT:  I think it's probably practicable.  In

 6    fact, I was thinking about that during the recess, and thank

 7    you for raising that issue.  Let me turn to the State.

 8          MS. RATLIFF:  Your Honor, I don't know a particular

 9    number of days that I would recommend to Your Honor.  I think

10    we could probably do it within 21, 25?

11          MS. DONOHO:  21 might be --

12          MS. RATLIFF:  21 days, I think.  Any less than that,

13    and it's a matter of assembling all of the required personnel

14    together and schedules are difficult, so...

15          THE COURT:  I think if -- I'm sorry, go ahead,

16    Ms. Donoho.

17          MS. DONOHO:  I was just going to mention because it

18    is 4th of July and summer, that was just the only thing I was

19    going to bring up.  Sometimes it gets hard to bring everyone

20    who needs to be there together.

21          THE COURT:  Okay.  I'm sorry, go ahead, Ms. Golden.

22          MS. GOLDEN:  I'd just point out that it took them 18

23    days last time, Christmas and --

24          THE COURT:  That was before Christmas, though, I

25    think.

Motions Hearing 6/28/24

1          MS. DONOHO:  Yes.

2          MS. GOLDEN:  The Christmas season, the December

3     season.  As I understand the regulations, they could all be

4     present by Zoom or telephone.  I don't know that my reading of

5     the regulation requires them to be physically in the same room.

6          THE COURT:  I'm balancing the need for urgency on

7     this point with the need for the Department to satisfy the

8     requirements of the regulation and to satisfy potential

9     requirements that my order may specifically highlight.

10          It may require consideration of medical records and things

11     like this that I think would give the Court greater confidence

12     in the decision that's ultimately reached, so I'll do the 21

13     days at this point considering what I just said, as well as the

14     fact that we have an intervening holiday here.

15          MS. RATLIFF:  Thank you.

16          MS. GOLDEN:  Thank you, Your Honor.

17          THE COURT:  But this is without -- if the plaintiffs

18     feel the need to file an emergency motion on this issue,

19     because I think, just to be clear and I think I've sort of

20     implied this but I want to be clear, this request to have her

21     transported and I think that the State suggested this as well,

22     is asking for additional injunctive relief.  I didn't order

23     that last time.  I ordered them to do an assessment.  They did

24     an assessment.  I found that I'm not assured -- I'm not sure

25     it's sufficient.  So now I'm granting the Motion to Enforce in

Motions Hearing 6/28/24

1    the form of asking them to do a reassessment.

2        In terms of asking for redesignation, that's a new motion

3    in my view, so if you want that you can ask for it, they can

4    respond, but that's not -- I don't consider that something

5    within the scope of the order I've already entered.

6        All right.  Is there anything else from the defense?  I'm

7    sorry, go ahead, Ms. Golden.

8            MS. GOLDEN:  I was going to say, Your Honor, I do

9    realize it was a new motion and a new issue, but thank you.

10            THE COURT:  Great.  Ms. Donoho?

11            MS. DONOHO:  Nothing from the defense, Your Honor.

12            THE COURT:  All right.  Well, thank you all.  I'll

13   issue a written order granting the Motion to Enforce.

14        (The proceedings concluded at 12:03 p.m.)

15                 CERTIFICATE OF OFFICIAL REPORTER

16        I, Amanda L. Longmore, Registered Professional Reporter
     and Federal Certified Realtime Reporter, in and for the United
17   States District Court for the District of Maryland, do hereby
     certify, pursuant to 28 U.S.C. § 753, that the foregoing is a
18   true and correct transcript of the stenographically-reported
     proceedings held in the above-entitled matter and that the
19   transcript page format is in conformance with the regulations
     of the Judicial Conference of the United States.

20

21                         Dated this 29th day of July 2024
                               -S-
22                         _____

                           AMANDA L. LONGMORE, RPR, FCRR
                           FEDERAL OFFICIAL COURT REPORTER
23

24

25

**1** [3] - 16:10; 17:11
**100** [1] - 13:14
**108-8** [1] - 30:19
**10:08** [1] - 2:2
**115.42** [1] - 31:8
**11:19** [1] - 52:9
**11:52** [1] - 52:9
**12:03** [1] - 60:14
**14th** [2] - 32:4; 45:17
**16th** [1] - 45:11
**18** [1] - 58:22
**18th** [2] - 12:23; 16:20
**1st** [2] - 9:18; 12:22
**2** [1] - 22:5
**20** [1] - 6:16
**2008** [1] - 47:8
**2016** [1] - 32:4
**2022** [1] - 47:4
**2023** [3] - 34:8; 35:16; 37:15
**2024** [1] - 60:20
**21** [4] - 58:10-12; 59:12
**22-1721** [1] - 45:9
**22-1927** [1] - 45:9
**22-7305** [1] - 45:17
**23** [1] - 14:21
**23-1047** [1] - 2:6
**23-1078** [1] - 45:12
**23-1130** [1] - 45:12
**25** [1] - 58:10
**28** [1] - 60:17
**29th** [3] - 37:18; 45:8; 60:20
**30** [7] - 18:14-16, 21, 25; 43:12; 58:4
**4th** [1] - 58:18
**5** [2] - 48:20
**6** [1] - 36:5
**75** [1] - 3:8
**753** [1] - 60:17
**85** [1] - 3:18
**9** [1] - 33:11
**90** [1] - 33:24
**95** [1] - 4:1
**95-15** [2] - 36:2, 4
**a.m** [3] - 2:2; 52:9
**abbreviated** [1] - 56:23
**ability** [1] - 53:8
**able** [12] - 7:11;

10:24; 13:16; 14:17, 19; 24:8; 25:13; 48:3; 53:9; 54:22; 55:20
**above-entitled** [1] - 60:18
**absent** [1] - 42:2
**absolutely** [1] - 57:5
**abuse** [2] - 21:25; 37:22
**access** [3] - 12:11; 15:10; 51:24
**accessed** [1] - 12:10
**accident** [1] - 53:3
**accordance** [2] - 3:9; 38:23
**according** [13] - 5:20; 17:16; 21:8; 22:7; 30:7; 32:3, 10; 34:21; 35:3, 17, 19; 36:19
**accordingly** [1] - 17:16
**account** [3] - 19:16; 23:10; 38:12
**accurate** [3] - 4:24; 30:19
**acquired** [1] - 22:19
**act** [2] - 28:19; 49:24
**Act** [1] - 53:11
**action** [1] - 56:5
**actions** [1] - 50:14
**activity** [2] - 41:8, 10
**acts** [3] - 41:18; 49:24
**actual** [3] - 32:2; 35:23; 36:9
**ad** [2] - 18:13; 20:20
**Ad** [6] - 18:25; 19:3, 20; 20:11, 21; 21:7
**add** [3] - 32:15; 33:23; 57:16
**additional** [6] - 5:2; 10:17; 25:15; 50:24; 57:16; 59:22
**additionally** [2] -

38:23; 41:13
**address** [7] - 27:16; 30:11; 51:6, 9, 13; 52:6; 57:17
**adequately** [1] - 4:5
**adjusted** [1] - 31:6
**adjustments** [1] - 17:22
**administration** [1] - 42:5
**Administrative** [9] - 4:16; 5:11; 17:21; 30:22; 31:17; 37:19; 38:2; 54:2
**administrative** [1] - 4:17; 18:6, 9
**administratively** [1] - 31:6
**advice** [1] - 54:24
**affiants** [1] - 39:1
**affidavit** [18] - 11:15, 17, 20; 16:5, 15; 17:12; 18:5; 23:11; 24:25; 25:18; 28:24; 30:2; 36:22; 37:20; 38:16, 18; 40:20; 55:12
**affidavits** [3] - 38:20; 39:13; 40:17
**affirming** [2] - 30:8; 38:13
**afoul** [1] - 18:23
**afterwards** [3] - 17:24; 33:20
**ago** [5] - 4:15; 17:12; 44:8, 13
**agree** [1] - 35:6
**ahead** [3] - 58:15, 21; 60:7
**al** [2] - 2:4
**allegations** [7] - 5:22; 21:25; 22:6, 10, 19; 53:22; 57:15
**alleged** [2] - 21:17; 53:25
**allegedly** [1] - 3:16
**alleges** [1] - 37:20
**allow** [3] - 6:17; 47:13; 53:13
**allowed** [3] - 14:24; 54:10, 12

**allowing** [1] - 52:14
**alluded** [2] - 19:7; 31:7
**alternative** [2] - 5:12; 46:12
**alternatives** [1] - 5:12
**Amanda** [1] - 60:16
**AMANDA** [1] - 60:22
**Amber** [1] - 32:24
**amend** [4] - 44:10; 45:21, 24; 46:4
**Amended** [3] - 44:11; 45:2, 23
**amendment** [1] - 44:12
**analogous** [1] - 31:1
**analysis** [1] - 16:24
**answer** [1] - 23:18
**anticipate** [1] - 11:16
**anyway** [1] - 57:13
**apologies** [4] - 29:22; 32:25; 33:2, 19
**appeal** [2] - 45:9, 12
**Appeal** [1] - 45:16
**appear** [2] - 28:17; 37:9
**appearance** [1] - 38:12
**applies** [1] - 38:4
**apply** [1] - 41:23
**appropriate** [2] - 33:6; 56:6, 8
**approved** [2] - 22:4, 23
**April** [2] - 45:8, 11
**argument** [4] - 18:23; 28:16; 44:5; 49:15
**arguments** [3] - 44:25; 45:1; 50:12
**arise** [1] - 27:9
**ARP** [2] - 30:11, 14
**ARPs** [2] - 14:13; 30:18
**arrangements** [1] - 30:25
**arranging** [1] -

13:21
**arrived** [2] - 16:13; 17:21
**articulate** [1] - 24:8
**articulation** [1] - 34:16
**aspect** [1] - 29:6
**aspects** [4] - 27:10; 29:10; 43:15; 49:6
**ass** [2] - 52:25; 53:4
**assault** [3] - 26:5; 30:23; 49:25
**assaulting** [1] - 3:16
**assembling** [1] - 58:13
**asserted** [2] - 39:25; 45:2
**assessment** [20] - 5:19; 6:11; 13:2, 5; 16:19; 17:3, 6, 8; 21:8, 21; 23:23; 34:21; 36:10; 43:19; 59:23
**assigned** [1] - 24:14
**assignments** [1] - 36:15
**assistant** [1] - 16:13
**Assistant** [1] - 10:4
**assume** [3] - 44:16, 20; 48:2
**assumption** [1] - 25:7
**assurance** [1] - 25:17
**assured** [3] - 39:15; 41:23; 59:24
**attached** [3] - 16:10; 38:17; 44:11
**attacks** [1] - 15:3
**attention** [3] - 15:21; 29:19; 52:11
**authorities** [1] - 42:5
**authority** [1] - 45:16
**Authority** [2] - 48:25; 49:6
**availability** [3] - 40:3; 50:12

**available** [4] - 2:24; 3:13; 30:15; 40:10
**AW** [4] - 8:3; 9:4, 18
**awarded** [1] - 17:23
**aware** [2] - 29:2; 32:18
**B.P.J** [1] - 45:10
**backup** [1] - 13:20
**bad** [1] - 24:16
**balancing** [1] - 59:6
**base** [1] - 35:9
**based** [9] - 11:20; 24:23; 25:17; 31:22; 38:20; 42:19; 45:1; 54:16
**basing** [1] - 34:25
**basis** [9] - 34:17; 35:1; 40:2; 42:12, 23; 43:23; 55:13; 56:18
**began** [1] - 9:7
**begin** [1] - 27:5
**beginning** [1] - 8:17
**begun** [1] - 10:18
**behalf** [3] - 2:19, 22; 53:18
**believes** [2] - 53:1, 6
**bench** [2] - 12:4; 47:14
**benefit** [1] - 16:4
**best** [3] - 11:8; 21:22; 41:21
**better** [5] - 11:5; 12:25; 21:3, 11
**between** [5] - 9:17; 10:2, 9; 34:12, 19
**biological** [1] - 38:11
**bit** [3] - 8:9, 12; 25:23
**bitch** [1] - 52:25
**bitch-ass** [1] - 52:25
**Board** [1] - 45:10
**bodily** [1] - 30:22
**borderline** [1] - 15:15
**Branch** [25] - 3:22; 5:23; 7:22; 8:20; 9:1, 5, 9,

18; 10:5, 12, 21;
12:20; 14:11,
16; 16:14; 18:8,
18; 21:2, 9, 20,
22; 23:23;
24:19, 22; 27:22
**break** [2] - 9:16;
10:2
**Brennen** [1] -
31:1
**brief** [7] - 30:6;
32:5; 44:21;
46:14; 50:24
**briefing** [8] -
45:21; 46:1;
47:11; 49:19;
50:3, 25; 51:6;
56:23
**bring** [8] - 2:25;
18:1; 26:3;
29:19; 33:6;
52:11; 58:19
**bringing** [1] - 19:9
**brings** [1] - 20:6
**brought** [5] -
21:3; 32:21;
52:20; 55:23
**BY** [5] - 7:8, 17;
8:15; 10:15;
12:15
**Camden** [1] - 47:5
**camera** [2] - 7:15,
19
**cannot** [1] - 39:15
**Canter** [2] - 32:24;
33:12
**Captain** [1] -
10:17
**case** [22] - 2:3;
10:7; 16:12, 24;
21:6; 32:21;
33:17; 34:23;
36:11; 45:1, 5,
8; 46:1, 13, 25;
48:2, 7; 50:9;
51:5; 56:25
**Case** [2] - 2:5;
33:12
**case-by-case** [2] -
16:24; 36:11
**cases** [2] - 45:13;
49:1
**causing** [1] -
20:19
**cell** [3] - 14:20;
55:21
**cells** [1] - 53:2
**certain** [6] - 8:11;
19:11; 25:12;
26:4; 28:8; 38:9

12
**clarification** [2] -
43:4, 15
**clarify** [3] - 10:16;
15:5; 34:20
**clean** [1] - 44:11
**clear** [10] - 26:8,
10, 12; 35:13;
40:25; 41:6;
46:3; 56:17;
59:19
**clearer** [1] - 10:24
**clearly** [2] - 17:8;
38:24
**CLERK** [6] - 6:24;
7:3, 6, 15; 11:7,
25
**Clerk** [1] - 16:11
**close** [1] - 44:8
**closer** [1] - 42:24
**clothes** [1] -
52:19
**clothing** [1] - 54:8
**co** [1] - 55:24
**co-counsel** [1] -
55:24
**comfortable** [1] -
6:21
**coming** [2] -
11:25; 57:15
**committed** [2] -
28:21; 41:18
**committee** [6] -
24:6; 37:11;
38:24; 39:5, 20;
40:16
**committee's** [1] -
26:9
**communicated**
[3] - 13:6; 57:7,
23
**communication**
[1] - 54:23
**communication**
**s** [1] - 17:3
**Compact** [1] -
53:12
**complain** [2] -
9:19; 10:6
**complaint** [2] -
5:24; 30:12
**Complaint** [3] -
44:11; 45:3, 23
**complaints** [7] -
7:23; 8:22;
30:17; 37:25;
47:22; 48:5, 8
**completed** [2] -
22:2; 38:16
**completely** [1] -

14:24
**compliance** [2] -
3:18; 39:16
**compliant** [1] -
32:3
**complied** [1] -
26:20
**comply** [2] - 6:12;
42:8
**composition** [1] -
37:10
**concede** [1] -
16:25
**conceded** [1] -
43:16
**concern** [5] -
19:22, 25; 24:3;
41:9; 42:21
**concerned** [2] -
10:25; 21:13
**concerns** [12] -
13:2, 9; 20:19;
23:19; 25:14;
26:3, 19; 31:14;
40:1, 15; 55:16
**concluded** [2] -
10:22; 60:14
**condition** [1] -
23:6
**conduct** [2] -
18:2; 47:14
**conducted** [4] -
16:21; 22:2, 18;
39:15
**confer** [2] - 34:4;
52:5
**Conference** [1] -
60:19
**confidence** [1] -
59:11
**confidential** [1] -
54:23
**confinement** [1] -
14:25
**confirmation** [1] -
27:22
**conflict** [1] - 35:4
**conformance** [1] -
60:19
**Conley** [1] - 47:6
**connection** [5] -
5:2; 11:8, 23;
12:2; 17:13
**consider** [3] -
20:24; 45:24;
60:4
**consideration**
[12] - 23:12;
25:16, 19; 31:9;
34:14; 38:11,

14; 42:14, 20,
22; 45:7; 59:10
**considered** [20] -
19:23; 23:19;
24:10; 25:18;
26:9, 12, 16;
27:1; 35:11;
38:24; 39:4, 7,
22, 25; 40:17;
41:1, 7, 25
**considering** [3] -
20:18; 25:24;
59:13
**considers** [1] -
35:8
**consistent** [6] -
3:12, 14; 25:4;
27:3; 40:23;
57:8
**consistently** [1] -
27:8
**consulted** [1] -
13:8
**contact** [1] -
24:16
**contemplate** [2] -
19:1; 26:22
**contemplating** [1]
- 22:17; 23:11
**contention** [3] -
32:11, 15; 49:18
**contractor** [1] -
49:21
**contradicted** [1] -
35:21
**convicted** [1] -
25:8
**convictions** [1] -
29:3
**copy** [1] - 35:12
**Corey** [1] - 16:12
**correct** [10] - 5:6;
15:22; 20:16;
22:14, 16;
27:20; 32:12;
36:23; 45:4;
60:18
**correctional** [1] -
10:5
**Correctional** [8] -
2:5; 3:22; 7:22;
8:20; 9:2, 5;
10:21; 12:21
**corrective** [1] -
56:5
**COs** [1] - 14:12
**counsel** [15] - 2:7;
4:5, 23; 6:8, 18;
7:6; 14:5; 16:2,
11; 36:21;

51:13, 23; 52:5;
54:2; 55:24
**Count** [2] - 48:20
**counter** [1] - 3:13
**counts** [1] - 49:5
**County** [1] - 47:5
**couple** [1] - 24:13
**course** [5] -
30:21; 45:22;
46:25; 48:14;
55:19
**Court** [22] - 3:11;
16:18; 26:19;
30:6; 31:2; 37:3;
39:15, 19, 25;
40:16, 24; 41:4;
42:1, 6-7;
51:14; 55:21;
56:7; 57:10;
59:11; 60:17
**COURT** [135] -
2:3, 11, 13, 15,
17, 20, 23; 3:7;
4:8, 17, 20, 23;
5:1, 14; 6:7, 14,
17, 21; 7:1; 8:6,
14; 9:12, 21, 23;
10:7; 11:3, 10,
14, 22; 12:4, 7,
13; 13:16, 18;
14:3; 15:18;
16:1; 17:11, 19;
18:12, 15, 19,
22; 19:18; 20:8,
12, 17; 21:24;
22:9, 15, 17, 24;
23:1, 5; 24:6,
22, 25; 25:3, 7,
11; 26:2; 27:7,
21; 28:2, 8, 13;
29:11, 15, 18,
21, 24; 31:20;
32:6, 13, 23;
33:3, 8, 14, 22;
34:2, 5, 10, 23;
35:12, 25;
36:13, 17, 24;
37:2; 43:8, 11,
20, 22; 44:2, 20,
24; 45:5; 46:7;
47:15; 48:2, 12,
17, 24; 49:17;
50:2, 5, 16, 20,
23; 51:8, 12, 16,
22; 52:3, 10, 13;
53:15; 54:17,
19, 25; 55:7;
56:2; 57:11, 24;
58:1, 5, 15, 21,
24; 59:6, 17;

**CERTIFICATE** [1]
- 60:15
**Certified** [1] -
60:16
**certify** [1] - 60:17
**chained** [1] - 14:2
**challenge** [2] -
4:2; 56:6
**challenged** [1] -
37:5
**chance** [1] - 28:24
**change** [2] -
52:19
**changed** [2] - 5:4;
17:18
**changes** [2] -
17:15
**characterized** [1]
- 10:13
**charged** [2] -
29:7; 42:5
**charges** [2] -
22:8; 29:6
**Chelsea** [1] - 2:4
**Chloe** [3] - 3:2;
7:2, 5
**choice** [1] - 30:21
**choosing** [1] -
30:23
**Christmas** [3] -
58:23; 59:2
**Circuit** [6] - 45:8,
11, 17; 47:3, 7,
12
**Circuit's** [2] -
47:5; 49:21
**Circuits** [2] - 47:6;
48:11
**circumstance** [2]
- 42:2; 55:11
**circumstances**
[1] - 57:3
**citation** [3] -
31:20; 33:8;
35:1
**cite** [2] - 32:25;
33:19
**cited** [9] - 32:5;
33:12; 34:15,
24; 39:18; 40:3,
12, 17; 42:20
**cites** [1] - 28:16
**citing** [1] - 32:6
**Civil** [1] - 2:5
**claim** [2] - 5:24;
47:21
**claims** [10] -
10:13; 45:2;
47:18; 48:19;
49:1, 3, 7-8, 10,

60:10, 12, 22
**court** [3] - 3:2;
8:9; 52:23
**Court's** [3] - 6:12;
39:6; 52:11
**courtroom** [1] -
51:21
**courts** [1] - 42:2
**cover** [1] - 21:18
**covered** [2] -
11:17; 49:7
**covering** [1] -
11:19
**cream** [4] - 4:4,
11; 5:5
**credibility** [2] -
19:19; 55:8
**credibly** [1] - 41:4
**crime** [1] - 29:10
**crimes** [5] -
13:12; 25:9;
28:21; 30:4
**crisis** [5] - 27:13,
24; 28:10;
31:16; 40:5
**cross** [2] - 48:4;
56:16
**cross-examine**
[2] - 48:4; 56:16
**current** [3] - 4:9;
32:8; 37:7
**curtains** [1] - 15:6
**dangerous** [2] -
13:13
**date** [1] - 5:3
**Dated** [1] - 60:20
**dated** [3] - 12:22;
17:12; 35:16
**days** [13] - 17:12;
18:14-16, 21,
25; 43:12;
44:13; 58:4, 9,
12, 23; 59:13
**DCS** [2] - 13:4, 13
**deal** [2] - 9:10;
10:6
**dealing** [2] - 47:8,
10
**Deborah** [2] -
2:14, 16
**December** [11] -
3:2; 8:1; 9:17;
12:22; 16:20;
34:21; 37:4, 15,
18; 59:2
**decide** [2] - 37:11;
46:18
**deciding** [1] -
37:7
**decision** [14] -

3:11; 4:2; 37:10,
13; 38:10;
39:12; 45:11,
17; 47:4, 6, 8;
48:15; 49:22;
59:12
**decision-making**
[3] - 37:10;
38:10; 39:12
**declaration** [3] -
16:12; 30:12, 16
**deem** [1] - 56:5
**defendant** [1] -
3:17
**defendant's** [5] -
36:20; 38:17;
44:21; 45:22;
46:11
**defendants** [7] -
2:17, 19, 22;
3:8; 44:13; 48:2;
53:18
**defense** [7] -
4:23; 5:14; 16:2;
46:20; 56:15;
60:6, 11
**definitely** [1] -
21:5
**degree** [1] - 19:19
**delay** [1] - 33:2
**deny** [2] - 45:24;
49:11
**Department** [18] -
2:4; 16:6; 19:23;
20:17, 20, 23;
22:20; 26:20;
28:16; 35:5, 8;
42:7, 16; 43:22;
47:20; 54:11;
55:17
**department** [13] -
3:14, 21; 12:9;
22:12; 38:21;
39:7, 15; 41:1,
6; 42:14; 49:19;
59:7
**Department's** [4]
- 27:22; 43:1;
49:22; 56:4
**department's** [5] -
4:4; 22:9; 31:11;
32:7; 38:4
**depose** [2] - 48:3;
50:19
**depositions** [2] -
48:6, 13
**deprivation** [1] -
37:23
**described** [2] -
55:2; 57:13

**describing** [1] -
19:2
**designated** [1] -
3:23
**desire** [1] - 49:15
**desk** [1] - 14:2
**detailed** [1] -
47:12
**determination**
[13] - 26:9;
31:22; 34:17;
37:7; 38:5, 7,
22; 39:16; 41:2,
22; 42:15, 17;
54:16
**determinations**
[2] - 42:23; 55:9
**determine** [3] -
3:9, 19; 4:3
**determined** [2] -
3:21; 41:21
**determining** [2] -
34:14; 43:1
**deviate** [1] - 43:12
**dickens** [1] -
38:16
**Dickens** [1] -
38:16
**different** [4] -
20:13; 24:2;
25:23; 48:5
**difficult** [4] -
30:14; 50:11,
17; 58:14
**difficulty** [3] -
10:8; 14:13;
40:19
**diligence** [1] -
19:15
**DIMARTINO** [44] -
2:9; 4:7, 13, 19,
22; 5:7; 6:9, 16,
19, 23; 7:8, 13,
16-17; 8:5, 15;
9:22; 10:15, 23;
11:5, 13, 18, 24;
12:14; 13:17;
14:7; 15:22;
29:13, 17, 22,
25; 31:24;
32:12, 14, 24;
33:11, 16; 34:7;
36:2, 5; 43:5,
10; 52:12
**DiMartino** [11] -
2:10; 7:10; 12:7,
13; 16:8; 29:12,
21; 33:15; 34:6;
43:4; 52:10
**DiMartino's** [1] -

34:12
**DIRECT** [1] - 7:7
**direct** [2] - 35:18;
42:25
**directed** [3] - 3:8,
18; 5:19
**directing** [1] -
5:23
**directive** [8] -
3:10, 19; 23:11;
26:21; 35:23;
36:8; 38:6;
39:17
**directives** [1] -
36:7
**directly** [6] -
23:15; 33:24;
37:12; 53:7;
55:22; 57:23
**disciplinary** [2] -
37:16
**discovery** [14] -
46:15, 18,
23-24; 47:11,
13, 16, 18, 25;
50:8; 51:2, 4
**discuss** [2] - 5:8;
14:20
**discussed** [2] -
13:7; 38:22
**discussing** [1] -
36:8
**dismiss** [5] -
44:22; 45:23;
46:4, 11; 49:11
**dispose** [1] - 50:1
**dispositive** [1] -
56:14
**dispute** [4] -
23:15; 37:9;
39:11; 46:22
**distinguished** [1]
- 50:18
**District** [2] - 60:17
**divisions** [1] -
47:19
**doctors** [1] -
15:16
**document** [5] -
35:2, 13
**documents** [1] -
14:19
**DOJ** [1] - 31:25
**done** [2] - 16:20;
17:6
**DONOHO** [64] -
2:18; 4:25; 5:16;
12:11; 13:23;
16:9; 17:15, 20;
18:14, 17, 20;

19:6; 20:2, 10,
16; 21:1; 22:4,
14, 16, 22, 25;
23:4, 22; 24:12,
24; 25:2, 5, 10,
22; 26:25;
27:20; 28:1, 4,
12; 29:1, 9, 20;
33:4, 10, 23;
34:4, 20; 35:6,
23; 36:4, 6, 14,
23; 43:14, 21;
44:1, 23; 45:4;
46:6; 50:10, 17,
21; 51:7, 18;
52:1; 58:11, 17;
59:1; 60:11
**Donoho** [5] -
2:18; 34:11;
50:6; 58:16;
60:10
**dose** [1] - 27:4
**DPCS** [1] - 35:18,
23-24; 47:11,
**DPSCS** [1] - 35:2
**DPSCS's** [1] -
30:6
**dropped** [1] -
15:14
**due** [2] - 19:15;
37:17
**duly** [1] - 7:2
**during** [7] - 9:16;
10:9; 11:4;
12:23; 37:22;
54:23; 58:6
**duty** [1] - 22:21
**dysphoria** [4] -
3:24; 15:3, 9;
23:24
**dysphoric** [1] -
45:14
**early** [1] - 7:25
**ECF** [5] - 3:8, 18;
4:1; 30:19; 36:2
**Education** [1] -
45:11
**effect** [3] - 43:16,
20, 25
**effectuated** [1] -
37:14
**efficient** [1] -
50:22
**effort** [3] - 11:10,
22; 55:7
**efforts** [1] - 37:25
**either** [4] - 37:12;
41:7; 51:24;
55:21
**elements** [1] -
55:13

**emergencies** [1] -
31:15
**emergency** [5] -
53:11; 54:14;
56:19, 21; 59:18
**end** [3] - 8:8, 11;
46:3
**enemies** [2] -
24:15, 17
**Enforce** [7] - 37:6;
38:3; 44:3;
56:15; 57:19;
59:25; 60:13
**enforce** [5] - 3:25;
16:15; 17:14;
30:18; 37:3
**enforcement** [2] -
40:19; 57:16
**enter** [1] - 42:7
**entered** [2] -
39:17; 60:5
**entering** [1] -
32:19
**entire** [1] - 16:17;
48:15
**entirely** [1] -
35:13
**entitled** [2] -
44:15; 60:18
**equal** [1] - 45:13
**especially** [2] -
21:6; 50:11
**essentially** [2] -
39:20; 40:22
**established** [1] -
42:1
**estrogen** [1] -
15:14
**et** [2] - 2:4
**evaluated** [2] -
6:11; 54:5
**evaluations** [1] -
31:12
**Eve** [1] - 2:12
**event** [1] - 55:1
**evidence** [6] -
5:11; 22:19;
39:4; 40:24;
41:1, 15
**evidentiary** [2] -
47:14; 56:9
**exact** [1] - 9:3
**exactly** [2] -
16:17; 17:15
**examination** [1] -
32:1
**EXAMINATION**
[1] - 7:7
**examine** [3] -
6:15; 48:4;

56:16
**example** [2] - 40:2; 47:16
**excuse** [2] - 6:24; 52:24
**executive** [5] - 3:10; 31:10; 38:6; 39:17
**exemplify** [1] - 6:12
**exhaustion** [10] - 45:18; 46:13, 15, 19, 24; 47:10, 14; 49:1, 12; 50:8
**Exhibit** [4] - 16:10; 17:11; 22:5
**exhibits** [1] - 3:21
**expand** [1] - 50:4
**expect** [4] - 14:5; 44:5, 24; 45:21
**experience** [3] - 24:8; 40:4; 57:8
**experienced** [1] - 28:9
**experiences** [1] - 38:1
**explicit** [1] - 31:10
**express** [1] - 54:13
**expressed** [1] - 39:1
**extent** [2] - 23:18; 30:15
**external** [4] - 35:10; 36:12; 38:25; 40:21
**extraordinary** [4] - 42:2; 55:14; 56:18; 57:1
**F-o-w-e-l-l** [1] - 45:7
**faced** [2] - 30:22; 31:3
**facial** [5] - 3:13; 4:10, 14; 5:5
**facilities** [7] - 25:12, 15; 26:4; 28:8; 33:25; 41:20; 42:6
**facility** [20] - 3:23; 6:5; 10:10; 17:5; 20:14, 18, 24-25; 23:21; 24:20; 25:1, 6; 27:14; 28:11; 39:20; 40:5, 10; 41:11; 52:16; 55:15

**fact** [11] - 5:5; 14:21; 19:2; 38:24; 39:13; 40:11, 20; 41:2; 46:22; 58:6; 59:14
**factor** [5] - 27:5; 35:8, 11; 36:12
**factors** [4] - 6:10; 17:9; 36:21; 40:17
**facts** [4] - 16:7; 29:2; 41:7, 13
**factual** [3] - 42:12; 55:8, 13
**faggot** [2] - 52:25; 53:5
**failure** [1] - 4:4
**failures** [1] - 49:24
**fair** [4] - 17:1; 25:7, 10; 49:13
**fairy** [2] - 53:3, 5
**fallback** [1] - 57:4
**false** [1] - 30:20
**FAQs** [1] - 32:4
**Farmer** [1] - 31:1
**fault** [1] - 8:7
**FCRR** [1] - 60:22
**fearful** [1] - 19:13
**fears** [3] - 14:10, 22; 15:11
**feasibility** [1] - 50:7
**federal** [1] - 42:2
**Federal** [1] - 60:16
**FEDERAL** [1] - 60:22
**felt** [2] - 13:10; 18:1
**female** [2] - 28:21; 41:17
**few** [3] - 17:12; 29:13, 25
**figure** [1] - 11:11
**file** [7] - 3:10; 9:10, 20; 10:6; 44:10; 46:21; 59:18
**filed** [7] - 3:25; 4:18; 17:13; 25:17; 44:9, 13
**filing** [1] - 38:3
**finally** [2] - 31:13; 39:1
**fine** [4] - 6:22; 23:1; 34:5; 57:11
**first** [3] - 13:10;

27:21; 52:18
**fit** [3] - 21:3, 11; 41:21
**fleshed** [1] - 36:9
**fluctuating** [1] - 27:6
**focused** [1] - 46:19
**follow** [1] - 36:15
**followed** [3] - 24:11; 27:10; 31:11
**following** [3] - 3:1, 17; 30:10
**footnote** [1] - 33:1
**forego** [1] - 17:8
**foregoing** [1] - 60:17
**foremost** [1] - 13:10
**form** [4] - 56:7, 21; 57:12; 60:1
**formally** [1] - 16:25
**format** [1] - 60:19
**formed** [1] - 37:11
**forms** [2] - 21:25; 37:22
**forth** [1] - 48:9
**Forth** [1] - 45:2
**founded** [1] - 41:22
**Fourth** [6] - 45:8, 11, 17, 23; 47:3; 49:21
**fourth** [1] - 44:10
**Fowell** [1] - 45:7
**frame** [1] - 44:14
**front** [1] - 57:1
**frowned** [1] - 20:22
**fuckboy** [1] - 53:1
**fucking** [5] - 52:25; 53:1, 3
**full** [5] - 7:3; 36:18; 39:16; 47:10
**fully** [1] - 29:2
**functional** [1] - 26:14
**functioning** [1] - 27:4
**future** [1] - 57:18
**gang** [3] - 19:11; 53:14
**gangs** [1] - 24:17
**gen** [1] - 19:24
**gender** [8] - 3:24; 15:3, 9; 23:24; 30:8; 38:11, 13;

45:14
**gender-affirming** [2] - 30:8; 38:13
**general** [19] - 15:12; 16:6; 17:24; 18:4, 10; 19:8; 20:15; 23:12; 31:18; 32:20; 39:8; 42:18; 46:24; 47:16, 25; 50:8; 51:4
**generally** [4] - 18:24; 20:20; 27:17; 37:20
**generate** [1] - 56:13
**genitalia** [22] - 26:11, 14, 23; 30:8; 31:23; 32:3, 10; 34:13, 17; 35:1, 3, 10, 18-19; 36:12, 19, 21; 38:25; 40:21; 41:3; 42:22
**genuine** [1] - 46:22
**Gilliam** [1] - 2:4
**given** [14] - 16:11; 24:14; 25:16; 27:2; 30:21; 31:9, 25; 39:12; 40:8; 41:11; 42:10; 51:20; 57:2
**GJH-17-908** [1] - 33:13
**GOLDEN** [26] - 2:14, 16; 44:19; 47:2; 48:1, 10, 13, 22; 49:14, 18; 50:3; 51:10, 17, 19; 52:8, 14; 54:20; 55:19; 57:4, 22, 25; 58:3, 22; 59:2, 16; 60:8
**Golden** [2] - 2:14, 16; 47:1; 52:12; 53:15; 58:21; 60:7
**gonna** [1] - 52:22
**grant** [1] - 44:20
**granted** [3] - 3:2; 15:16; 45:21
**granting** [3] - 46:3; 59:25; 60:13

**great** [3] - 12:19, 25; 60:19
**greater** [1] - 59:11
**greeting** [1] - 3:4
**Grey** [80] - 3:5, 15, 20, 22, 25; 4:14; 5:8, 12, 15; 6:15; 7:2, 5, 9; 8:5, 7, 16; 9:14, 21-23; 10:8, 16; 11:15; 12:16; 13:19, 24; 14:6, 10; 16:22; 17:1, 3; 18:13; 21:25; 22:21; 23:3, 15; 24:1; 25:14; 26:2; 27:24; 30:1, 12, 15, 21; 31:14; 32:17; 34:21; 37:12, 16; 38:2, 5, 24; 39:1, 11, 21; 40:4, 6, 8, 20; 41:2, 5, 16, 21; 51:10, 13; 52:6, 15; 53:19; 54:2, 10, 21; 55:3, 19; 56:2, 10; 57:6, 16
**GREY** [8] - 3:6; 7:5; 8:13; 9:16; 10:2; 14:1; 29:8; 51:15
**Grey's** [24] - 3:2, 9; 4:9; 16:4; 23:9; 28:19; 34:23; 37:6, 11; 38:22; 39:5, 7-9, 14, 21; 41:11, 14, 24; 42:11; 43:2; 49:19; 54:2
**grievable** [1] - 49:21
**grievances** [3] - 37:25; 47:19
**grounds** [2] - 39:25; 45:19
**guess** [11] - 14:4; 15:20; 27:4, 17; 28:8; 32:6, 10; 35:4; 36:18; 50:7; 55:7
**guidance** [2] - 31:25; 43:1
**hair** [4] - 4:4, 11, 14; 5:5
**Halsey** [2] - 8:2, 24

**handle** [2] - 28:7; 47:20
**handled** [1] - 48:11
**happy** [1] - 55:25
**harassment** [3] - 14:13, 23; 37:23
**hard** [1] - 58:19
**harm** [2] - 6:4; 30:23
**harmed** [1] - 32:19
**harms** [1] - 31:3
**Harter** [1] - 10:17
**health** [12] - 15:2; 27:13, 15, 23-24; 28:6, 9; 31:14-16; 40:5, 13
**hear** [9] - 6:7; 7:18; 12:17, 25; 24:7; 25:14; 44:5; 55:22, 25
**heard** [5] - 5:14; 10:8; 56:2
**hearing** [23] - 2:24; 3:1, 7; 6:2; 8:8, 11; 10:10, 18; 11:2; 12:20, 22; 16:21; 24:23; 26:13; 36:20; 44:8; 47:14; 52:18; 53:8, 20; 57:6, 12
**hearings** [1] - 9:7
**heavily** [1] - 41:2
**held** [2] - 37:16; 60:18
**help** [2] - 10:24; 12:3
**helpful** [2] - 8:8; 9:25
**helps** [1] - 12:8
**hereby** [1] - 60:17
**herself** [1] - 54:13
**hesitation** [1] - 57:14
**high** [3] - 10:19; 15:7
**high-level** [2] - 10:19
**higher** [1] - 41:11
**highlight** [3] - 14:10; 19:2; 59:9
**HILL** [2] - 2:12; 44:18
**Hill** [1] - 2:12
**history** [3] - 26:5;

28:16; 41:14
**Hogan** [1] - 47:4
**holiday** [3] - 9:17;
10:3; 59:14
**holidays** [1] -
17:7
**homicides** [1] -
29:3
**honest** [1] - 29:2
**Honor** [66] - 2:9,
18, 21; 4:7, 13,
19, 25; 5:7, 16;
6:9, 19; 8:13;
10:23; 11:18;
12:14; 13:23;
14:7; 16:9; 17:2;
18:14; 21:1;
23:22; 25:10,
22; 26:25; 29:1,
13, 20, 22; 31:7,
13, 19; 32:12,
20; 33:1, 4;
34:7; 35:7; 36:7,
16, 23; 43:5;
44:18, 23; 47:2;
48:22; 50:10;
51:7; 52:2, 8,
14, 16; 53:10,
17, 24; 54:9;
55:6, 19; 57:4,
22; 58:8; 59:16;
60:8, 11
**Honor's** [1] -
49:14
**hopefully** [1] -
52:4
**hormone** [8] -
3:12; 15:14, 19,
22; 26:15; 27:3,
8; 40:23
**hours** [1] - 14:21
**house** [2] - 23:23;
25:5
**housed** [18] -
3:24; 5:9; 10:11;
23:3; 25:8; 30:7;
32:3, 15-16, 22;
35:3, 17; 36:19;
39:2; 40:7, 9,
15; 41:17
**housing** [32] -
3:9, 11, 19; 4:2,
10; 5:19; 9:8;
13:3, 5, 13;
31:22; 32:9;
34:14, 25; 36:9,
15; 37:6, 11;
38:4, 7, 22;
39:16, 21; 41:1;
42:15, 17, 23;

43:2; 58:3
**IAD** [1] - 22:5
**ICC** [1] - 54:4
**idea** [2] - 23:20;
48:6
**identify** [3] - 2:7;
13:24
**II** [1] - 13:11
**IIE** [1] - 8:2
**illegal** [1] - 57:13
**illicit** [1] - 41:10
**immediate** [1] -
6:3
**immediately** [4] -
6:4; 32:19;
52:17; 54:15
**immerse** [1] -
42:3
**impact** [2] -
14:25; 15:1
**impermissible** [2]
- 19:4; 31:21
**implied** [1] -
59:20
**impose** [1] - 42:7
**improve** [1] -
11:23
**inaccessible** [1] -
30:14
**inaudible** [11] -
8:3, 24; 9:1, 3,
8, 10-11; 10:20;
12:22; 13:11, 15
**inaudible)** [1] -
13:6
**incarcerated** [8] -
23:24; 24:4;
28:19; 31:18;
32:8; 33:25;
35:15; 54:7
**incidents** [1] -
32:18
**inclined** [1] - 51:1
**include** [5] - 30:3;
39:23; 42:25;
56:10; 57:18
**includes** [1] -
49:23
**including** [4] -
37:23; 41:18;
42:9; 54:9
**incorporate** [1] -
44:25
**incorporated** [1] -
51:4
**incorporates** [1] -
26:21
**increasingly** [1] -
15:1
**indeed** [1] - 33:7

**indefiniteness** [1]
- 15:2
**indicate** [2] -
15:13; 34:16
**indicated** [5] -
23:9; 36:10;
37:24; 40:21;
44:5
**indirectly** [2] -
23:15; 37:13
**individual** [4] -
15:5; 16:14;
32:10; 41:9
**individualized**
- 13:1; 36:11
**individuals** [15] -
16:21, 23;
19:12; 22:21;
23:24; 24:4;
30:17; 32:8;
33:25; 34:9;
35:16; 36:18;
45:15; 54:8
**infirmary** [1] -
28:4
**information** [4] -
17:17; 19:15;
33:20; 55:10
**infractions** [1] -
37:17
**inherently** [1] -
49:25
**inhibited** [1] -
38:1
**inhibitor** [5] -
3:13; 4:11, 14;
5:5
**injunction** [8] -
3:4; 4:1; 22:13;
26:20; 27:7, 10;
56:8
**injunctive** [5] -
5:25; 37:3;
39:16; 56:22;
59:22
**inmate** [2] -
23:12; 31:17
**inmate's** [1] -
25:25; 31:8, 22
**inmates** [13] -
14:12, 14, 24;
25:8; 28:21;
30:7; 32:2,
15-16, 19;
34:25; 35:2;
40:19
**innuendo** [1] -
29:10
**input** [2] - 23:16;
39:19

**inquire** [1] - 4:8
**inquiry** [3] - 26:2;
47:18; 48:15
**instead** [1] - 21:9
**institute** [2] -
10:5; 39:2
**Institute** [2] - 9:2,
6
**Institution** [5] -
3:22; 7:22; 8:20;
10:21; 12:21
**institutions** [1] -
24:13
**intelligence** [1] -
8:1
**intend** [1] - 42:6
**interest** [1] - 41:9
**interested** [2] -
41:5
**interfering** [1] -
53:8
**internal** [1] -
24:16
**interrupt** [1] -
48:23
**interrupting** [1] -
29:23
**interruption** [2] -
4:20; 15:18
**interruptions** [2] -
8:11; 9:14
**Interstate** [1] -
53:12
**intervening** [1] -
59:14
**intervention** [1] -
56:7
**interview** [1] -
16:25
**investigate** [4] -
48:8; 53:24;
54:15; 56:4
**investigating** [1] -
47:22
**investigation** [4] -
18:2; 22:18;
54:6, 16
**investigations** [2]
- 22:2
**invite** [1] - 50:23
**involve** [1] - 49:20
**irrelevant** [1] -
48:16
**irreparable** [1] -
6:4
**issue** [24] - 4:6;
6:2, 8; 15:12,
20; 18:1; 26:23;
27:9; 28:6, 22;
30:11; 33:19;

36:19; 40:18;
49:16; 52:6;
53:11; 58:7;
59:18; 60:9, 13
**issued** [3] - 3:7;
37:4; 54:8
**issues** [25] - 4:1,
10; 13:19;
14:17; 15:24;
16:7; 21:7, 14;
26:8; 30:5;
33:17; 37:24;
45:14, 18, 22;
46:13, 16, 19,
24; 47:13; 49:4,
20; 50:6, 8; 51:2
**IT** [2] - 10:23; 11:8
**itself** [2] - 35:5;
49:25
**JCI** [10] - 21:3, 9,
18, 21; 28:2-4,
7; 41:20; 53:12
**Jessup** [8] -
21:10, 14; 22:1;
23:7; 27:17;
28:6; 40:12, 15
**Johnson** [4] -
45:16; 48:15,
18; 49:2
**judge** [3] - 6:24;
7:15; 11:25
**Judge** [1] - 3:6
**judgment** [4] -
42:4; 46:12, 21;
47:10
**Judicial** [1] -
60:19
**July** [2] - 58:18;
60:20
**June** [1] - 45:17
**jurisdiction** [1] -
53:13
**jury** [2] - 53:10;
55:25
**Kadel** [1] - 45:7
**KADEL** [1] - 45:7
**keep** [5] - 19:20;
20:11, 20; 22:21
**keeping** [3] -
18:13; 19:3;
20:21
**keeps** [1] - 19:8
**Keith** [1] - 38:16
**Kelly** [1] - 2:18
**kept** [2] - 15:23;
18:25
**kind** [6] - 19:6, 12;
27:5; 50:14, 18;
55:2
**knows** [1] - 52:21

**lack** [1] - 40:11
**laid** [2] - 16:3;
17:9
**landscape** [1] -
45:20
**language** [1] -
52:24
**largely** [1] - 30:14
**larger** [1] - 5:24
**last** [11] - 3:1;
9:13; 10:1, 10;
26:13; 37:4;
43:8, 11; 57:12;
58:23; 59:23
**late** [2] - 7:25;
8:23
**Lauren** [1] - 2:9
**law** [4] - 32:4;
45:1, 5; 46:1
**lawsuit** [4] - 7:24;
8:22; 9:10; 57:7
**lawsuits** [1] -
9:20; 10:6
**lead** [1] - 49:24
**leading** [1] - 17:3
**learned** [1] - 38:1
**least** [6] - 12:11;
14:21; 18:14;
20:22; 22:11;
35:19
**leave** [1] - 44:10
**left** [1] - 14:2
**legal** [2] - 45:19;
54:24
**legitimate** [1] -
55:16
**less** [2] - 58:4, 12
**lessened** [1] -
41:8
**lesson** [2] - 9:2, 5
**level** [5] - 10:19;
15:14; 24:14;
25:4
**levels** [3] - 15:14;
25:6; 31:6
**levy** [1] - 33:16
**LGBT** [1] - 19:12
**LGBTQ** [2] -
14:11; 32:18
**light** [1] - 26:4
**likely** [3] - 21:16;
49:10
**limited** [3] -
46:15; 48:13;
56:9
**line** [4] - 5:17; 6:6;
32:11; 55:20
**lines** [2] - 19:1;
28:10
**list** [2] - 24:16;

49:5

**listed** [5] - 16:8; 24:17; 32:4; 48:21, 25

**listen** [2] - 18:6

**literally** [1] - 13:6

**litigated** [1] - 6:2

**litigating** [1] - 33:18

**litigation** [4] - 10:12; 17:2; 20:3; 57:20

**local** [1] - 40:5

**lodge** [1] - 37:25

**logical** [1] - 40:1

**Longmore** [1] - 60:16

**LONGMORE** [1] - 60:22

**look** [2] - 42:24; 52:1

**looking** [1] - 46:8

**ma'am** [5] - 7:12, 25; 8:23; 12:18; 13:4

**Maddox** [1] - 3:6

**mail** [1] - 14:18

**main** [2] - 23:22; 25:6

**makeup** [1] - 54:10

**male** [7] - 3:23; 26:11, 14; 38:25; 40:21; 41:3, 11

**malfunctioned** [1] - 53:9

**Mamboob** [1] - 33:12

**management** [1] - 42:3

**manager** [1] - 16:12

**March** [1] - 32:4

**Maryland** [4] - 2:4; 13:12, 15; 60:17

**material** [1] - 46:22

**matter** [2] - 58:13; 60:18

**matters** [2] - 26:6, 22

**max** [1] - 13:11

**Maximum** [1] - 13:11

**MCIW** [15] - 25:1, 3, 5, 8; 27:12, 15-16; 39:3, 20; 40:1, 3, 5, 19;

---

41:8, 17

**mean** [8] - 5:3; 20:14; 28:17; 34:20; 43:8; 44:4, 24; 54:5

**meaning** [1] - 18:15

**meant** [2] - 20:13; 34:11

**mechanisms** [1] - 57:16

**medical** [6] - 15:20; 28:7; 40:24; 49:20; 59:10

**medication** [1] - 3:12

**medications** [1] - 43:17

**meet** [1] - 13:1

**meeting** [1] - 38:21

**meetings** [1] - 18:18

**melded** [1] - 50:14

**men** [3] - 13:11, 13; 41:6

**men's** [3] - 31:4; 52:19; 54:7

**mental** [12] - 15:1; 27:12, 15, 23-24; 28:5, 9; 31:14-16; 40:4, 13

**mention** [5] - 33:5; 53:19; 55:4; 58:17

**mentioned** [3] - 21:24; 34:1; 38:6

**mentioning** [1] - 35:7

**meritorious** [1] - 19:23

**merits** [4] - 47:18, 21; 48:7; 50:15

**Merrilyn** [2] - 2:21; 53:17

**microphone** [1] - 9:25

**mid** [3] - 8:23; 20:3; 37:15

**might** [8] - 10:23; 21:14, 18; 27:25; 40:6; 47:24; 50:17; 58:11

**mind** [1] - 43:6

**minimize** [1] -

---

8:10

**minutes** [1] - 6:16

**misconduct** [3] - 49:8, 23

**misgendering** [1] - 37:23

**misheard** [1] - 29:23

**missed** [3] - 2:15; 3:4; 27:4

**moment** [3] - 8:7; 36:24; 51:21

**momentarily** [1] - 33:2

**month** [2] - 37:18; 44:8

**months** [2] - 5:10; 14:17

**moot** [1] - 46:5

**morning** [13] - 2:9, 11, 13, 18, 20-21, 23; 3:5; 7:9; 12:23; 54:20

**most** [3] - 6:21; 13:13; 42:2

**motion** [28] - 3:3, 25; 4:18; 5:3; 16:15; 17:13; 22:15; 30:17; 37:3; 44:10, 14, 20, 22; 45:21, 23-24; 46:4, 11-12, 21; 49:11; 52:16; 54:14; 56:21; 59:18; 60:2, 9

**Motion** [7] - 37:5; 38:3; 44:2; 56:15; 57:18; 59:25; 60:13

**motions** [2] - 44:4, 6

**move** [2] - 12:19; 17:25; 44:4; 53:12

**moved** [1] - 52:16

**MS** [151] - 2:9, 12, 14, 16, 18, 21; 3:6; 4:7, 13, 19, 22, 25; 5:7, 16; 6:9, 16, 19, 23; 7:5, 8, 13, 16-17; 8:5, 13, 15; 9:16, 22; 10:2, 15, 23; 11:5, 13, 18, 24; 12:11, 14-15; 13:17, 23; 14:1, 7; 15:22; 16:9;

---

17:15, 20; 18:14, 17, 20; 19:6; 20:2, 10, 16; 21:1; 22:4, 14, 16, 22, 25; 23:4, 22; 24:12, 24; 25:2, 5, 10, 22; 26:25; 27:20; 28:1, 4, 12; 29:1, 8-9, 13, 17, 20, 22, 25; 31:24; 32:12, 14, 24; 33:4, 10-11, 16, 23; 34:4, 7, 20; 35:6, 23; 36:2, 4-6, 14, 23; 43:5, 10, 14, 21; 44:1, 18-19, 23; 45:4; 46:6; 47:2; 48:1, 10, 13, 22; 49:14, 18; 50:3, 10, 17, 21; 51:7, 10, 15, 17-19; 52:1, 8, 12, 14; 53:17; 54:18, 20; 55:6, 19; 57:4, 22, 25; 58:3, 8, 11-12, 17, 22; 59:1, 15-16; 60:8, 11

**multiple** [3] - 8:1; 21:7; 23:24

**murder** [1] - 25:9

**murderers** [1] - 13:12

**must** [2] - 31:11; 38:8

**N-words** [1] - 53:4

**name** [6] - 7:3, 5; 32:25; 45:5; 53:25; 54:2

**named** [3] - 16:21, 23; 19:12

**names** [1] - 52:21

**nature** [4] - 29:5; 30:3; 41:16; 55:11

**NBCI** [24] - 3:22; 4:16; 5:9, 13; 8:21; 12:24; 13:9; 15:12; 30:14, 24; 32:15, 21; 33:18; 34:2, 9; 37:14, 23; 39:24; 41:20; 54:3; 57:7, 23

**Neale** [1] - 47:3

**near** [1] - 42:17

---

**necessarily** [2] - 47:21, 24

**necessary** [4] - 27:16; 31:7; 48:14; 56:25

**need** [14] - 6:15; 9:12; 14:4; 40:11, 13; 42:24; 45:1; 46:24; 52:15; 55:13, 17; 59:6, 18

**needed** [2] - 17:6, 22

**needs** [3] - 18:7; 36:10; 58:20

**never** [4] - 13:5; 21:21; 24:19

**new** [1] - 15:20; 38:18; 42:16; 44:22; 45:1; 46:21; 60:2, 9

**next** [2] - 11:1; 12:19

**non** [1] - 19:23

**non-meritorious** [1] - 19:23

**nonfunctional** [1] - 40:22

**nonfunctioning** [1] - 27:2

**nonsexual** [1] - 30:3

**normal** [1] - 46:25

**North** [25] - 3:22; 5:22; 7:22; 8:20; 9:1, 5, 9, 18; 10:5, 11, 21; 12:20; 14:11, 16; 16:14; 18:8, 17; 21:2, 9, 20, 22; 23:23; 24:19, 22; 27:22

**note** [2] - 39:1; 54:9

**noted** [3] - 6:1; 38:5; 45:15

**notes** [1] - 40:20

**nothing** [4] - 24:2; 53:22; 60:11

**Notice** [2] - 48:25; 49:5

**notice** [1] - 45:16

**November** [7] - 3:1; 7:25; 8:23; 9:4; 30:7; 34:8; 35:16

**number** [6] - 3:10; 12:10; 26:18; 34:3; 35:24;

---

58:9

**Number** [7] - 2:6; 3:8, 18; 4:1; 22:5; 33:12; 45:17

**numbers** [2] - 45:9, 12

**numerous** [2] - 8:4, 24

**oath** [1] - 6:25

**object** [1] - 33:4

**objection** [1] - 28:23

**obstruction** [1] - 15:6

**obtain** [1] - 54:1

**obviously** [3] - 29:3; 50:3; 56:20

**occasion** [2] - 9:4; 10:17

**occasions** [3] - 8:1, 4, 24

**occur** [3] - 18:12; 41:10; 57:18

**occurred** [3] - 5:9; 16:19; 37:17

**occurring** [1] - 57:17

**occurs** [4] - 11:14; 46:18; 47:17; 49:4

**October** [1] - 16:20

**oddly** [1] - 40:8

**OF** [1] - 60:15

**offense** [1] - 28:18

**offer** [2] - 5:8; 14:8

**officer** [2] - 13:24; 53:25

**Officer** [1] - 52:22

**officers** [9] - 14:1; 21:15; 22:6; 43:18; 50:14; 52:21; 53:13; 54:1

**offices** [2] - 47:19

**official** [1] - 38:9

**OFFICIAL** [2] - 60:15, 22

**official's** [1] - 49:24

**officials** [5] - 19:14; 21:3; 25:24; 38:21; 50:15

**often** [2] - 18:12; 21:15

**once** [2] - 9:7; 10:21
**one** [28] - 4:1; 8:5; 9:4; 10:17; 11:14; 21:5; 27:4, 11; 33:23; 35:7; 36:12, 21, 24; 40:2, 8, 25; 46:14; 48:25; 49:1; 50:21, 25; 52:21; 53:1, 6, 25; 54:1; 55:9
**one's** [1] - 13:7
**open** [1] - 53:2
**opinion** [15] - 13:6; 23:13; 25:20, 25; 31:2; 38:15; 39:6, 8-9, 14, 21; 41:24; 42:11, 13; 47:5
**opportunities** [2] - 15:16; 45:25
**opportunity** [11] - 15:17; 28:15; 39:12; 43:7, 9; 44:16, 21; 46:20; 52:5; 56:16, 22
**oppose** [1] - 54:14
**opposition** [3] - 16:15; 17:13; 44:13
**OPS.131.0001** [3] - 3:10; 36:9; 38:6
**option** [4] - 13:20; 21:23; 22:12; 39:21
**options** [1] - 39:23
**oral** [2] - 44:5; 52:15
**orally** [1] - 22:11
**Order** [1] - 3:3
**order** [38] - 3:8, 18; 5:18, 23; 6:1, 13; 14:3; 16:19; 22:7; 31:10; 37:4; 39:17; 42:8, 18, 25; 43:3, 15, 18, 20, 23, 25; 51:1; 52:16; 53:11; 56:23; 57:1, 5, 10, 14, 18, 24; 59:9, 22; 60:5, 13
**ordered** [2] - 37:4;

59:23
**ordering** [1] - 55:14
**otherwise** [2] - 19:20; 54:5
**outcome** [1] - 53:20
**outlined** [1] - 17:9
**outrageous** [1] - 55:2
**outright** [1] - 35:21
**outside** [1] - 5:23
**over-the-counter** [1] - 3:13
**overlap** [3] - 47:15, 17, 25
**override** [1] - 56:3
**overriding** [1] - 55:15
**Owens** [2] - 8:2, 25
**own** [3] - 24:16; 31:8
**p.m** [1] - 60:14
**Page** [2] - 33:11; 36:5
**page** [2] - 44:6; 60:19
**paid** [1] - 42:21
**panic** [1] - 15:2
**part** [12] - 3:2; 17:8; 18:5; 20:2; 21:8, 18-19; 22:13; 38:7; 46:10; 49:9
**part-time** [1] - 21:18
**participate** [3] - 23:15; 37:12; 39:12
**participates** [1] - 38:10
**participation** [2] - 57:6, 20
**particular** [1] - 58:8
**particularly** [5] - 14:10; 15:2, 4; 19:11; 47:7
**parties** [7] - 45:6, 25; 46:9, 17; 50:24; 51:5; 56:24
**parties'** [1] - 50:25
**partly** [1] - 17:21
**party's** [1] - 46:14
**past** [1] - 41:18

**Patuxent** [12] - 8:25; 10:18; 12:23; 17:22; 21:14, 16; 27:18; 28:6; 40:6, 9
**Pause** [2] - 12:6; 37:1
**pause** [2] - 8:6; 13:18
**Pavey** [3] - 47:6, 9
**pay** [1] - 52:22
**pending** [3] - 37:2; 46:4, 11
**penological** [2] - 42:5; 55:16
**people** [5] - 9:10, 19; 10:6; 19:10; 57:9
**percent** [1] - 13:14
**performed** [1] - 54:6
**perhaps** [5] - 14:3, 5; 20:22; 26:5; 51:5
**period** [3] - 10:9; 19:3; 20:21
**permitted** [1] - 39:11
**person** [4] - 8:3; 15:23; 18:24; 28:9
**personnel** [1] - 58:13
**persons** [2] - 3:23; 22:1
**perspective** [5] - 4:24; 5:17; 27:23; 49:13; 51:9
**phone** [9] - 12:10; 13:21; 53:10; 55:20-22, 24
**phrase** [2] - 35:18; 36:17
**physical** [4] - 32:10; 35:17, 19; 36:19
**physically** [2] - 32:19; 59:5
**picked** [1] - 46:7
**place** [6] - 3:21; 17:24; 18:10; 40:7; 43:2; 54:3
**placed** [4] - 13:9; 14:11; 15:12; 37:19
**placement** [11] - 3:9; 4:2, 10;

18:4; 19:8; 21:4; 37:6, 8, 11; 43:2
**placing** [2] - 7:22; 8:20
**plaintiff** [1] - 3:2
**plaintiff's** [9] - 2:7; 4:5; 6:7, 18; 33:11; 34:24; 45:15; 51:9; 52:4
**plaintiffs** [12] - 2:10, 12; 18:22; 36:1; 44:9, 15-16; 48:3; 56:20, 24; 58:2; 59:17
**Plan** [1] - 11:12
**plus** [2] - 5:10; 14:17
**podium** [1] - 6:20
**point** [31] - 5:3; 8:3; 16:4; 17:6; 20:17, 23; 23:22; 25:11, 13; 30:5, 20; 31:6, 13, 25; 32:20; 33:1, 9; 42:6; 43:4; 44:15; 45:25; 49:14; 53:7; 54:25; 55:3, 5; 56:11; 57:14; 58:22; 59:7, 13
**points** [7] - 16:4; 29:13, 25; 31:5; 46:2, 23; 48:5
**policies** [5] - 3:15; 35:5; 41:23; 42:20; 49:20
**policy** [19] - 5:20; 16:23; 17:10; 24:11; 25:23; 27:5; 31:20; 32:7, 9; 34:14; 35:10; 36:14, 16; 38:4, 14, 23; 54:11
**pop** [1] - 19:24
**population** [8] - 15:12; 17:25; 18:1, 4, 10; 19:8; 20:15; 32:20
**posing** [1] - 20:1
**position** [5] - 7:13; 9:24; 22:10; 48:14, 18
**possible** [2] - 14:8; 58:3
**potential** [5] -

40:13; 41:10; 54:1; 57:17; 59:8
**potentially** [3] - 27:14; 39:23; 56:7
**practicable** [1] - 58:5
**practical** [1] - 46:23
**practically** [1] - 46:16
**practice** [5] - 32:1, 9, 11; 34:16
**practices** [1] - 32:2
**pre** [2] - 47:10
**pre-full** [2] - 47:10
**PREA** [20] - 14:16, 25; 18:23; 20:22; 30:10; 31:7, 11, 24-25; 32:4, 11; 34:13, 24; 35:4, 8, 20; 42:22; 49:4, 7
**PREA-related** [1] - 49:4
**precedent** [1] - 46:15
**preference** [10] - 6:20; 17:1, 4, 7; 23:9, 13; 25:19; 39:2, 8
**preferences** [4] - 13:2; 41:12; 50:25; 51:2
**preferred** [1] - 23:20
**prejudice** [1] - 56:20
**preliminary** [2] - 3:3; 11:19
**prescribe** [1] - 35:5
**prescribed** [2] - 3:12; 15:19
**presence** [1] - 39:3
**present** [5] - 5:2; 27:25; 38:21; 58:2; 59:4
**presentation** [2] - 34:12; 38:12
**presented** [3] - 40:24; 41:15; 55:18
**pressing** [1] - 10:13
**presume** [1] -

27:9
**pretransition** [1] - 15:15
**prevalence** [2] - 40:18; 41:7
**previous** [2] - 21:24; 42:8
**previously** [3] - 37:4, 17; 44:25
**price** [1] - 52:22
**primary** [1] - 4:1
**priorities** [1] - 21:5
**prison** [3] - 13:11; 24:18; 30:9
**prison's** [1] - 32:1
**prisoner** [2] - 38:13; 55:15
**prisoner's** [3] - 23:12; 38:11, 15
**prisoners** [2] - 3:23; 41:8
**prisons** [3] - 31:3; 42:4
**privacy** [1] - 51:21
**privately** [2] - 51:12; 52:5
**privileges** [2] - 14:15; 37:24
**probe** [1] - 46:16
**problem** [4] - 11:4; 20:2; 21:15; 23:6
**procedurally** [1] - 44:7
**procedure** [2] - 47:9, 12
**procedures** [1] - 38:14
**proceedings** [2] - 60:14, 18
**Proceedings** [2] - 12:6; 37:1
**process** [9] - 23:16; 30:14; 37:10, 12-13; 38:10, 19; 39:13; 56:4
**processes** [1] - 56:4
**product** [1] - 3:13
**Professional** [1] - 60:16
**proffer** [5] - 14:5, 18; 16:2; 32:17; 33:24
**proffered** [4] - 28:18; 37:21; 41:4, 14
**prohibition** [2] -

34:24; 35:20
**prompt** [1] - 45:6
**proposed** [1] - 44:12
**proposition** [1] - 32:8
**proscribe** [1] - 42:22
**protect** [1] - 30:25
**protection** [1] - 45:13
**provide** [6] - 3:11, 14; 4:4; 33:20; 47:12
**provided** [4] - 4:12, 14; 5:6; 27:7
**Public** [1] - 2:4
**pull** [1] - 35:12
**pursuant** [1] - 60:17
**pushing** [1] - 18:11
**put** [5] - 6:25; 9:19; 22:11; 23:1; 27:13
**putting** [1] - 57:14
**questioning** [1] - 5:17
**questions** [4] - 11:19; 28:14; 31:19; 46:10
**quite** [1] - 51:19
**quote** [2] - 35:18; 52:24
**raise** [5] - 12:2; 15:13; 26:19; 46:9; 51:11
**raised** [6] - 16:5; 19:22; 28:23; 36:20; 46:22; 50:7
**raises** [1] - 40:15
**raising** [2] - 4:1; 58:7
**rape** [1] - 30:23
**raped** [1] - 53:14
**rather** [2] - 32:9; 39:3
**rational** [1] - 40:2
**RATLIFF** [7] - 2:21; 53:17; 54:18; 55:6; 58:8, 12; 59:15
**Ratliff** [4] - 2:22; 53:18; 54:25; 55:5
**razors** [3] - 3:14; 15:8, 10
**reach** [1] - 48:19

reached [1] - 59:12
**read** [2] - 23:11; 25:23
**reading** [2] - 25:24; 59:4
**real** [3] - 19:25; 34:18; 46:23
**realize** [1] - 60:9
**realized** [1] - 23:23
**really** [3] - 47:22; 48:7; 50:17
**Realtime** [1] - 60:16
**reason** [8] - 21:8; 22:20; 24:1, 20; 27:17; 40:12, 14; 43:12
**reasonably** [1] - 24:13
**reasoning** [1] - 21:19
**reasons** [7] - 6:17; 26:4; 27:12; 40:2, 8; 56:25
**reassessment** [7] - 14:4; 18:12; 19:1; 42:14, 16; 43:1; 60:1
**reassigned** [1] - 21:18
**rebuttal** [1] - 54:19
**receipt** [1] - 15:19
**receive** [3] - 14:19; 15:7; 27:8
**received** [4] - 14:13, 18; 17:17; 19:14
**receives** [1] - 14:23
**receiving** [2] - 43:17; 55:9
**recent** [6] - 45:1, 5, 8, 15; 46:1; 49:21
**recess** [5] - 52:4, 9; 54:23; 58:6
**recognized** [1] - 31:2
**recognizes** [2] - 39:19; 42:1
**recommend** [1] - 58:9
**reconvened** [1] - 10:3
**record** [5] - 2:8;

7:4; 56:9, 17
**records** [2] - 26:17; 59:10
**recreation** [2] - 14:22
**redesignated** [1] - 55:15
**redesignation** [1] - 60:2
**redlined** [1] - 44:11
**refer** [1] - 8:21
**reference** [6] - 26:21; 32:14; 42:10; 46:14; 56:11
**referenced** [5] - 31:21; 32:25; 39:17; 47:3
**referring** [3] - 35:13, 22
**refilled** [1] - 15:24
**reflected** [2] - 23:10; 36:22
**reflecting** [1] - 42:16
**regard** [1] - 54:4
**regarding** [7] - 3:11, 18; 13:2; 25:25; 38:15; 39:6; 41:14
**regards** [2] - 30:5; 31:5
**regiment** [1] - 26:15
**region** [8] - 21:10, 14, 16; 22:1; 23:7; 28:6; 40:12, 15
**Registered** [1] - 60:16
**regulation** [2] - 59:5, 8
**regulations** [7] - 18:23; 19:4; 42:22; 49:22; 57:8; 59:3; 60:19
**rejects** [1] - 18:4
**related** [2] - 13:5; 49:4
**relates** [1] - 16:7
**relationships** [1] - 40:18
**released** [1] - 22:8
**relevant** [4] - 5:18; 6:10; 47:13, 21
**reliable** [1] -

56:14
**relief** [9] - 5:25; 37:3; 43:22, 24; 55:14; 56:19, 22; 57:1; 59:22
**relieve** [1] - 22:20
**relieved** [2] - 22:12; 23:6
**remain** [2] - 12:4; 43:25
**remained** [1] - 38:2
**removal** [1] - 4:4
**repeat** [4] - 8:17; 9:12; 10:1
**reply** [3] - 33:11; 44:15, 17
**report** [13] - 3:10, 17; 22:5, 22; 25:17; 30:6; 33:1; 34:7; 36:2; 38:17; 42:16; 43:9, 17
**reported** [2] - 32:9; 60:18
**reporter** [1] - 8:9
**Reporter** [2] - 60:16
**REPORTER** [4] - 9:12; 13:16; 60:15, 22
**reports** [1] - 19:19
**representations** [1] - 28:23
**request** [5] - 43:24; 56:24; 57:2, 5; 59:20
**requesting** [1] - 15:15
**requests** [2] - 43:4; 54:4
**require** [2] - 40:9; 59:10
**required** [7] - 26:10; 39:5; 42:15; 49:2, 12; 54:8; 58:13
**requirement** [4] - 34:13, 24; 35:20; 54:7
**requirements** [2] - 59:8
**requires** [4] - 38:9, 14; 59:5
**resolve** [1] - 34:18
**resolved** [1] - 36:7
**resources** [5] - 21:12; 27:15, 23; 40:4, 6

respect [13] - 4:9; 18:13; 23:13; 25:21; 31:8; 32:7; 37:10; 39:14; 41:24; 42:12; 45:14; 51:3
**respond** [10] - 23:9; 27:24; 28:15, 25; 43:7, 9; 48:17; 53:16; 56:23; 60:4
**responding** [1] - 23:2
**response** [13] - 7:23; 8:21; 16:2, 6; 19:4, 6; 26:23; 30:1, 16; 34:6; 44:13; 49:19; 50:6
**rest** [1] - 11:20
**Restraining** [1] - 3:3
**restricted** [1] - 23:3
**result** [6] - 26:14; 37:13, 25; 40:23; 57:19
**resulted** [1] - 39:22
**results** [1] - 47:8
**retaliation** [5] - 57:5, 12, 15, 17, 19
**reveals** [1] - 32:2
**review** [3] - 18:6; 42:19; 58:3
**reviews** [1] - 18:6
**risk** [9] - 8:10; 18:2; 20:5; 21:19; 24:21; 26:1; 30:22; 31:3, 16
**Robinette** [4] - 45:16; 48:15, 18; 49:2
**room** [7] - 12:12; 13:24; 14:1; 51:25; 53:10; 55:25; 59:5
**rough** [1] - 19:25
**route** [1] - 18:3
**RPR** [1] - 60:22
**ruled** [12] - 24:22; 25:1, 12, 15; 27:12, 18; 39:20, 23; 40:7; 41:20
**ruling** [6] - 6:2; 39:23; 40:1, 3;

55:4; 56:15
**run** [1] - 21:19
**runs** [1] - 18:23
**safe** [6] - 5:11; 19:9; 20:11; 24:9; 39:9
**safer** [2] - 20:25; 52:16
**safest** [1] - 54:3
**Safety** [1] - 2:5
**safety** [25] - 13:2, 9; 14:22; 19:19, 22; 20:5, 19; 23:14, 19; 24:3, 18, 21; 25:14, 21, 25; 26:3; 31:5, 9; 38:15; 39:6, 14, 22; 41:24; 42:12
**Sasha** [2] - 7:2, 5
**satisfied** [2] - 55:14; 56:19
**satisfy** [3] - 55:13; 59:7
**schedule** [1] - 56:24
**scheduled** [1] - 44:8
**schedules** [1] - 58:14
**scheduling** [1] - 13:20
**scope** [2] - 5:18; 60:5
**season** [2] - 59:2
**seat** [1] - 6:20
**second** [1] - 8:5
**secondhand** [1] - 55:10
**security** [6] - 18:1; 24:14; 25:4, 6; 31:6; 55:16
**see** [15] - 7:11; 8:14; 12:3; 13:20; 15:16; 17:20; 21:20; 28:13; 34:5; 43:12; 46:8; 48:20; 50:10; 54:12
**seeing** [1] - 12:8
**seek** [1] - 56:7
**seeking** [1] - 15:21
**seem** [4] - 18:24; 24:2; 35:3; 41:8
**seg** [3] - 18:9, 13; 20:20
**Seg** [6] - 18:25;

19:3, 20; 20:11,
21; 21:7
**segregated** [1] -
51:3
**Segregation** [9] -
4:16; 5:11;
17:21; 30:22,
24; 31:17;
37:19; 38:2;
54:3
**segregation** [4] -
4:18; 18:6, 18;
37:16
**self** [1] - 32:9
**self-reported** [1] -
32:9
**send** [1] - 24:15
**sending** [1] -
21:20
**sent** [3] - 9:18;
10:11, 21
**sentence** [4] -
9:13, 15; 10:1;
36:18
**separate** [5] -
3:15; 14:24;
22:21; 36:16;
41:16
**separating** [2] -
46:23; 50:8
**Sergeant** [4] - 8:2,
24
**series** [2] - 20:19;
57:15
**serious** [7] - 15:1;
23:12; 25:16;
31:9; 38:11, 14;
42:13
**seriously** [7] -
15:25; 25:9, 18;
39:4, 22; 41:24;
57:9
**seriousness** [1] -
40:16
**serve** [1] - 17:23
**Services** [1] - 2:5
**services** [1] -
40:10
**set** [3] - 54:22;
55:20; 56:24
**setting** [1] - 23:20
**settled** [2] -
32:21; 33:7
**settlement** [1] -
33:5
**seven** [1] - 34:8
**Seventh** [4] -
47:6, 12; 48:11
**several** [3] - 3:20;
36:21; 49:5

**sex** [1] - 13:12
**sexual** [16] - 26:5;
28:19; 29:5, 10;
30:23; 40:18;
41:7, 9-10, 16;
49:8, 22, 25
**sexually** [2] - 41:5
**Shaffer** [1] - 52:22
**shall** [1] - 31:9
**shaving** [1] - 3:14
**shift** [1] - 21:18
**shifted** [1] - 45:20
**shot** [1] - 12:7
**show** [2] - 16:16;
22:19
**shower** [1] -
14:24
**showers** [2] -
15:4, 8
**showing** [3] -
18:5; 22:5
**sic** [1] - 32:4
**sick** [1] - 53:1
**similar** [2] - 28:21
**similarly** [1] -
28:20
**situated** [1] -
28:20
**situation** [2] -
31:2; 51:20
**six** [2] - 5:10;
14:17
**six-plus** [2] -
5:10; 14:17
**size** [1] - 14:20
**slowly** [2] - 8:10,
12
**small** [1] - 47:5
**snitching** [1] - 9:2
**so..** [2] - 34:1;
58:14
**sole** [1] - 42:23
**solely** [4] - 31:22;
34:17, 25; 35:10
**solitary** [1] -
14:25
**solution** [1] - 14:8
**someone** [5] -
12:11; 19:3;
20:21; 21:16;
33:18
**sometimes** [2] -
50:13; 58:19
**somewhere** [1] -
54:15
**soon** [1] - 54:24
**sorry** [9] - 2:15;
29:17; 34:6;
47:2; 48:22;
51:17; 58:15,

21; 60:7
**sort** [8] - 14:4;
20:19; 27:24;
28:10; 45:6;
48:4; 55:1;
59:19
**sound** [3] - 4:24;
5:4; 49:10
**sounds** [3] -
19:18; 24:23;
55:2
**speaking** [2] -
11:6; 19:25
**speaks** [1] - 38:18
**specific** [7] - 24:3;
26:4; 42:9, 25;
47:9; 53:23
**specifically** [22] -
7:25; 8:2, 9, 23,
25; 9:7; 10:2;
23:14, 19;
24:25; 26:1, 24;
34:2, 23; 37:5;
38:7; 39:6;
42:11; 44:10;
50:7; 59:9
**specifics** [1] -
42:19
**speculative** [2] -
30:10; 31:14
**speed** [1] - 2:25
**spoken** [1] - 26:7
**staff** [7] - 3:15;
8:1, 3; 10:10;
53:7; 57:7, 23
**stage** [1] - 56:9
**stalls** [1] - 15:5
**stand** [2] - 4:6;
13:22
**standards** [2] -
18:24; 20:23
**starkly** [1] - 20:22
**start** [2] - 7:21;
8:16
**startling** [1] - 55:1
**starts** [2] - 20:18,
23
**State** [6] - 13:12;
36:3; 45:10;
56:22; 58:7;
59:21
**state** [5] - 7:3;
31:11; 42:3;
53:16; 54:8
**state-issued** [1] -
54:8
**statements** [1] -
53:22
**states** [2] - 30:7;
32:1

**States** [2] - 60:17,
19
**stating** [1] - 30:16
**status** [7] - 3:17;
4:9, 21; 5:4, 8;
17:17; 22:3
**stenographicall
y** [1] - 60:18
**stenographicall
y-reported** [1] -
60:18
**step** [1] - 51:18
**Stewart** [2] - 8:4;
9:4
**still** [2] - 43:16, 20
**strike** [1] - 56:12
**strong** [2] - 17:7;
39:2
**stuff** [1] - 52:23
**submission** [1] -
56:21
**submit** [4] -
11:15; 30:11;
42:16; 46:1
**submitted** [8] -
3:17; 5:20;
16:10; 30:17;
36:3; 38:18
**subsequently** [1]
- 3:25
**substitute** [1] -
42:4
**successful** [1] -
23:25
**successfully** [2] -
32:15
**suffered** [1] -
37:22
**suffice** [1] - 57:21
**sufficient** [1] -
59:25
**suggest** [1] -
18:24
**suggested** [1] -
59:21
**suggests** [2] -
35:2, 16
**summarized** [1] -
4:6
**summary** [3] -
46:12, 21; 47:10
**summer** [1] -
58:18
**supervisor** [1] -
16:12
**Supplemental** [2]
- 48:25; 49:6
**supplemental** [3]
- 45:16; 46:1;
47:11

**support** [1] -
42:13
**supported** [1] -
3:20
**supposed** [3] -
16:23; 27:8;
54:21
**Supreme** [1] -
31:2
**surgery** [2] -
26:12; 30:9
**surgical** [1] -
38:13
**sworn** [1] - 7:2
**system** [1] - 28:9
**table** [1] - 21:21
**tailored** [1] -
43:19
**talks** [3] - 10:20;
21:4; 38:7
**targeted** [1] -
19:11
**taught** [1] - 9:2
**teach** [1] - 9:5
**technological** [1]
- 51:20
**technology** [3] -
26:7; 53:9;
55:24
**telephone** [2] -
51:24; 59:4
**Temporary** [1] -
3:3
**tension** [6] -
34:12, 18-19;
35:20; 36:6
**term** [2] - 18:9;
42:17
**terms** [16] - 13:20;
16:22; 17:4;
19:25; 23:3;
33:6; 34:21;
36:7; 42:9, 18,
25; 43:1, 15;
44:2; 60:2
**terrified** [1] - 53:7
**tested** [1] - 11:3
**testified** [2] -
26:6; 30:12
**testifies** [1] - 5:15
**testify** [6] - 14:6;
15:11; 30:3, 13;
32:18; 53:8
**testimony** [13] -
5:8; 6:6, 10;
14:5; 16:4;
26:13; 27:1;
37:21; 40:22;
55:11; 56:10, 12
**testing** [2] - 11:4,

7
**tests** [1] - 15:13
**Thanksgiving** [3]
- 9:17; 10:3, 9
**THE** [140] - 2:3,
11, 13, 15, 17,
20, 23; 3:7; 4:8,
17, 20, 23; 5:1,
14; 6:7, 14, 17,
21, 24; 7:1, 3, 6,
15; 8:6, 14;
9:12, 21, 23;
10:7; 11:3, 7,
10, 14, 22, 25;
12:4, 7, 13;
13:16, 18; 14:3;
15:18; 16:1;
17:11, 19;
18:12, 15, 19,
22; 19:18; 20:8,
12, 17; 21:24;
22:9, 15, 17, 24;
23:1, 5; 24:6,
22, 25; 25:3, 7,
11; 26:2; 27:7,
21; 28:2, 8, 13;
29:11, 15, 18,
21, 24; 31:20;
32:6, 13, 23;
33:3, 8, 14, 22;
34:2, 5, 10, 23;
35:12, 25;
36:13, 17, 24;
37:2; 43:8, 11,
20, 22; 44:2, 20,
24; 45:5; 46:7;
47:15; 48:2, 12,
17, 24; 49:17;
50:2, 5, 16, 20,
23; 51:8, 12, 16,
22; 52:3, 10, 13;
53:15; 54:17,
19, 25; 55:7;
56:2; 57:11, 24;
58:1, 5, 15, 21,
24; 59:6, 17;
60:10, 12
**themselves** [2] -
13:25; 42:3
**therefore** [1] -
41:16
**they've** [4] - 18:9;
19:7; 44:11;
47:8
**thinking** [2] -
21:2; 58:6
**thinks** [1] - 19:9
**Third** [2] - 47:5;
48:11
**threat** [3] - 7:23;

Motions Hearing 6/28/24

8:21; 10:14
**threatening** [1] - 53:13
**threats** [2] - 16:22; 24:19
**three** [1] - 3:1
**three-day** [1] - 3:1
**thrived** [1] - 24:5
**Tim** [1] - 10:17
**timeline** [2] - 43:6, 11
**titled** [1] - 35:15
**today** [8] - 23:9; 37:21; 38:1; 42:10; 51:9; 53:21; 56:12; 58:2
**together** [2] - 58:14, 20
**took** [1] - 58:22
**top** [1] - 21:5
**topics** [2] - 16:3, 5
**total** [1] - 49:11
**toward** [1] - 49:24
**towards** [3] - 5:24; 19:11; 43:19
**tradeoff** [1] - 15:8
**trained** [1] - 42:4
**trans** [6] - 30:8; 31:4; 32:2, 18, 22; 33:18
**transcript** [4] - 46:7; 56:14; 60:18
**transfer** [10] - 7:21; 19:24; 20:5, 18, 24; 23:7; 37:14; 54:4, 14
**transferred** [15] - 6:4; 12:20, 23; 16:18; 17:5; 20:8, 13-14; 21:9, 15; 27:14, 18; 28:11; 30:9
**transgender** [11] - 13:14; 24:5; 31:8; 32:7, 16; 33:24; 34:8, 25; 35:15, 17; 36:18
**transgendered** [1] - 45:14
**transition** [1] - 31:16
**transported** [1] - 59:21
**treat** [2] - 40:4, 6
**treated** [3] - 5:22;

14:12
**treating** [1] - 50:15
**treatment** [14] - 15:19, 22; 26:15; 27:9, 15, 23; 32:7, 22; 35:15; 36:15; 40:10, 14, 23
**tried** [1] - 17:25
**TRO** [7] - 6:2; 9:7, 16; 10:3, 18, 21; 27:2
**trouble** [4] - 8:8; 9:14; 11:1
**true** [1] - 60:18
**trump** [1] - 35:4
**try** [8] - 9:21, 23, 25; 11:23; 12:2; 18:2; 19:15
**trying** [10] - 12:11; 17:24; 18:8; 19:7; 25:13; 35:12; 52:1; 55:1, 3
**turn** [5] - 4:23; 16:1; 29:12; 49:15; 58:7
**turning** [1] - 12:8
**turns** [1] - 23:5
**two** [7] - 4:1, 9, 15; 20:12; 34:1; 44:9, 13
**type** [2] - 15:6; 29:9
**typically** [1] - 28:5
**U.S.C** [1] - 60:17
**ultimately** [5] - 3:21; 44:21; 45:20; 46:18; 59:12
**unclear** [1] - 41:22
**under** [11] - 6:25; 19:4; 30:19; 31:7, 24; 35:8, 10; 36:8; 49:2; 53:11
**undergone** [1] - 38:19
**underlying** [4] - 28:18; 29:2, 5; 48:7
**unfortunately** [1] - 56:1
**unfounded** [3] - 22:7, 10, 20
**uniform** [3] - 52:20; 54:7, 9
**unique** [1] - 24:8

**United** [2] - 60:16, 19
**unknowns** [1] - 26:18
**unsafe** [1] - 39:10
**unsuitable** [1] - 26:4
**up** [23] - 2:25; 5:3; 11:25; 12:8; 17:3; 18:1; 19:9; 20:6; 21:3; 26:17; 33:6; 34:11; 35:12; 46:3, 7; 52:18, 20; 53:2; 54:22; 55:20; 58:19
**urgency** [1] - 59:6
**US** [1] - 31:2
**various** [2] - 21:25; 37:22
**Versace** [1] - 19:12
**versions** [1] - 44:12
**versus** [8] - 24:9; 31:1; 33:12; 46:24; 47:3, 5-6; 48:15
**via** [1] - 54:4
**vicinity** [1] - 27:17
**video** [1] - 56:1
**view** [3] - 39:7; 50:7; 60:3
**views** [2] - 24:9; 25:16; 31:8
**violation** [3] - 14:16, 25; 20:22
**violence** [3] - 28:17; 41:14
**violent** [6] - 13:14; 25:9; 28:19, 22; 41:18
**Virginia** [1] - 45:10
**virtue** [1] - 10:12
**visually** [1] - 54:12
**voiced** [1] - 57:13
**volume** [2] - 12:2, 8
**waist** [1] - 15:6
**Walker** [1] - 16:12
**walker's** [4] - 23:10; 28:24; 30:16; 36:22
**wants** [1] - 18:7
**Warden** [2] - 10:4; 39:19
**warden** [1] - 16:13

**warrant** [1] - 55:14
**warranted** [2] - 46:19; 51:2
**WCI** [2] - 24:15, 22
**wear** [3] - 53:4; 54:8, 10
**weekly** [1] - 18:18
**weeks** [2] - 4:15; 44:9
**weighing** [1] - 41:2
**weight** [1] - 42:21
**West** [1] - 45:10
**west** [1] - 21:20
**whereas** [1] - 47:20
**widespread** [1] - 24:1
**willing** [2] - 53:24; 54:15
**wish** [2] - 5:14; 53:16
**witnesses** [1] - 30:13
**woman** [3] - 13:14; 32:22; 33:18
**women** [8] - 28:17, 22; 30:8; 31:4; 41:5, 9, 19
**women's** [8] - 6:5; 17:5; 23:21; 25:1, 6; 30:9; 39:2; 52:19
**wonder** [1] - 10:23
**wondering** [3] - 12:9; 23:17; 27:21
**worded** [1] - 49:23
**words** [7] - 10:19; 19:22; 24:7; 28:20; 48:19; 49:7; 53:4
**works** [3] - 8:14; 13:15; 55:23
**worried** [1] - 20:4
**worse** [1] - 15:1
**worsen** [1] - 15:9
**worsened** [1] - 15:3
**worst** [3] - 13:11
**worth** [1] - 15:8
**writing** [1] - 22:12
**Writs** [1] - 53:11
**written** [4] - 11:15; 43:3;

56:21; 60:13
**year** [3] - 3:1; 37:5; 45:8
**yourself** [1] - 9:24
**yourselves** [2] - 2:8, 24
**Zoom** [1] - 59:4
**§** [1] - 60:17