**IN THE UNITED STATES DISTRICT COURT**
<u>**FOR THE DISTRICT OF MARYLAND**</u>

|  |  |  |
|---|---|---|
| | * | |
| **CHELSEA GILLIAM, *et al.*,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civ. No. MJM-23-1047** |
| **v.** | * | |
| | * | |
| **DEPARTMENT OF PUBLIC** | * | |
| **SAFETY AND CORRECTIONAL** | * | |
| **SERVICES, *et al.*,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Chelsea Gilliam, Kennedy Holland, and Chloe Grey (collectively, "Plaintiffs") are three transgender women who were previously or are presently incarcerated in correctional facilities operated by the Maryland Department of Public Safety and Correctional Services ("DPSCS"). Plaintiffs filed this civil action against DPSCS and several department officials and employees (collectively, "DPSCS Defendants"), as well as a healthcare contractor, alleging violations of various federal constitutional and statutory rights and asserting state tort claims. *See* Fourth Amended Complaint, ECF 124 ("4AC"). In sum, Plaintiffs present claims for disability and sex discrimination, failure to protect, cruel and unusual punishment, denial of medical care, negligence, and intentional infliction of emotional distress.

This matter is before the Court on DPSCS Defendants' Motion to Dismiss Fourth Amended Complaint or, in the Alternative, Motion for Summary Judgment, ECF 132. The motion is fully

briefed and ripe for disposition. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, Defendants' motion shall be granted in part and denied in part.[1]

## I.    FACTUAL BACKGROUND[2]

Plaintiffs Gilliam, Holland, and Grey are three transgender women who have been incarcerated in Maryland correctional facilities. 4AC ¶¶ 1, 3–5, 7–11. Gilliam and Holland began to transition before their incarceration, while Grey began her transition while incarcerated. *Id.* ¶¶ 44–46, 51–53, 62–64. All three Plaintiffs have been diagnosed with gender dysphoria and have undergone hormone therapy. 4AC ¶¶ 44, 46, 51, 62. Gender Dysphoria is a condition "marked by a significant incongruence between one's experienced/expressed gender and the gender assigned at birth, lasting at least 6 months, and associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* ¶¶ 3–6. Gilliam and Holland have been released from custody, and Grey remains incarcerated. *Id.* ¶¶ 9-11.

### A.  Chelsea Gilliam

Gilliam was a pretrial detainee at Baltimore City Correctional Center ("BCCC") and Maryland Reception, Diagnostic, and Classification Center ("MRDCC") between December 17, 2021, and May 13, 2022, and is now on probation. *Id.* ¶¶ 7–8. She was diagnosed with gender dysphoria in approximately 2003, at age 17, and began hormone treatment around that time. *Id.* ¶¶ 44, 46. Gilliam legally changed her name to Chelsea in 2009 and maintains a feminine appearance. *Id.* ¶ 45.

---

[1]      Defendants have also filed a motion for leave to exceed page limitations, ECF 131, which shall be granted.

[2]      The following facts are drawn from allegations contained in the Fourth Amended Complaint. Additional facts relevant to the Court's analysis of the issues presented in DPSCS Defendants' motion will be described in Part IV of this Memorandum Opinion.

In contravention of DPSCS policies, DPSCS officials placed Gilliam with male inmates at BCCC without assessing the risk that she would be sexually victimized or asking for her views as to a safe housing placement. *Id.* ¶¶ 48, 71–75, 105–06. She was forced to shower with male inmates, and a male inmate physically and sexually assaulted her in the shower. *Id.* ¶¶ 47–49, 124–26, 133–135. Gilliam reported the assault, but no action was taken. *Id.* ¶¶ 49, 126–27. Correctional staff promised to accommodate Gilliam during her incarceration, including with separate showering facilities, but these promises were not honored. *Id.* ¶¶ 47, 129–31. Staff at BCCC and MRDCC also misgendered Gilliam and denied her hormone treatment. *Id.* ¶ 47.

DPSCS transferred Gilliam to MRDCC in February 2022. *Id.* ¶ 185. Gilliam was kept in administrative segregation at MRDCC for about three months, until her release from custody. *Id.* ¶¶ 50, 185–86. During this time, she was only allowed to be out of her cell for an hour a day and was not allowed to leave her cell at all on weekends. *Id.* ¶ 50. Despite having no disciplinary infractions, she was shackled any time she left her cell, including in the shower. *Id.* ¶¶ 50, 187. DPSCS officials would not release Gilliam to general population unless she signed a waiver releasing the department of liability, which she refused to do. *Id.* ¶¶ 50, 189–193. Gilliam feels that she was punished while in administrative segregation for refusing to sign the waiver. *Id.*

**B. Chloe Grey**

Grey has been incarcerated at DPSCS facilities since 2016. *Id.* ¶ 10. She was incarcerated at Western Correctional Institution ("WCI") between 2016 and 2023 and was transferred to Patuxent Institution ("Patuxent") in 2023. *Id.*[3] Grey was diagnosed with gender dysphoria in March 2021 and began hormone therapy in December 2021. *Id.* ¶¶ 51–52. She changed her name

---

[3]    Following a housing placement assessment conducted in response to the Court's Order granting preliminary injunctive relief, *see* ECF 75, DPSCS transferred Grey to North Branch Correctional Institution, *see* ECF 85, 95. Plaintiff has since been transferred back to WCI. *See* ECF 140.

and gender identity in 2023. *Id.* ¶ 51. Grey's hormone therapy was consistently delayed or denied at both WCI and Patuxent. *Id.* ¶ 52.

Grey continued to be housed with men after transitioning and has been sexually assaulted by male inmates on multiple occasions. *Id.* ¶¶ 54, 136, 138. Grey's housing placement was made in violation of DPSCS policies, without assessing the risk that she would be sexually victimized or asking for her views as to a safe housing placement. *Id.* ¶ 113. Prison staff responded to Grey's complaints of victimization and harassment by placing her in administrative segregation. *Id.* ¶ 55. Grey has felt "punished" for being transgender and her experience in administration segregation made her feel depressed and isolated. *Id.* ¶ 56.

Upon her removal from administrative segregation, Grey was forced to share a cell with an inmate "known for raping his cellmates," and this cellmate did in fact attempt to rape Grey. *Id.* ¶¶ 57–58, 141. An officer intervened, but the cellmate was not disciplined. *Id.* When Grey attempted to file a complaint, a psychologist at WCI discouraged and prevented her from doing so, and the same cellmate attempted to rape her again. *Id.* ¶¶ 59, 142–43.

Prison staff and inmates have routinely ridiculed and misgendered Grey and referred to her by slurs. *Id.* ¶¶ 53, 135. She has been called "it," told a "pig with lipstick on is still a pig," and that she was "trying to start a 'culture war.'" *Id.* ¶ 135.

WCI officials removed Grey from her prison job as an education aide after she was diagnosed with gender dysphoria and began hormone treatment. *Id.* ¶¶ 207–09. She was told this decision was made due to concerns that she "would be sexually promiscuous on the job." *Id.* ¶ 209.

Grey was transferred to Patuxent in September 2023. *Id.* ¶ 105. On or about October 15, 2023, following an incident where Grey was sexually harassed by a male inmate, Grey was placed in administrative segregation at Patuxent. *Id.* ¶¶ 151–53.

### C. Kennedy Holland

Holland was incarcerated at BCCC from August 2019 to August 2023, and she is now on supervised parole. *Id.* ¶ 13. She was previously incarcerated at Eastern Correctional Institution ("ECI"), Maryland Correctional Institution–Hagerstown ("MCIH"), Maryland Correctional Institution–Jessup ("MCIJ"), and MRDCC. *Id.* Holland began transitioning in 2003 and was formally diagnosed with gender dysphoria in 2010. *Id.* ¶ 62. She has a feminine appearance, helped in part by hormone therapy, which she began receiving prior to her incarceration. *Id.* ¶¶ 62–63.

Her hormone treatment was often inconsistent and delayed while she was incarcerated. *Id.* ¶¶ 64, 182. Although Holland was prescribed to receive oral hormone treatment every day and injections every two weeks, she had to wait up to two months for oral hormone treatment and up to one month for injections. *Id.* ¶¶ 63–65, 183–84.

Holland was initially detained at MRDCC, where the Prison Rape Elimination Act ("PREA") Coordinator assured Holland she would not be put in an "open housing facility" because of the risk of sexual assault. *Id.* ¶ 115. Nonetheless, Holland was housed with men and was strip-searched by male officers. *Id.* ¶ 67. She was promised that she would not be housed with men and that she would have a private shower at ECI, but neither promise was honored. *Id.* ¶¶ 65–66. At MCIJ, two male inmates attempted to rape Holland. *Id.* ¶¶ 162–63. Prison officials did not take any action in response, and Holland continued to live in the cell next to her would-be assailants until her transfer to MCIH. *Id.* ¶ 164. At MCIH, a male correctional officer once opened the stall door while Holland was showering, attempting to expose her to male inmates in the showers, and

invited the male inmates to "come and watch it [Holland] shower." *Id.* ¶¶ 165–66. When Holland complained to the PREA Coordinator, the incident was dismissed as "not a big deal." *Id.* ¶ 167.

The only option prison officials gave Holland when she complained of being housed with men at ECI was administrative segregation, where she was placed between late June and early August 2023. *Id.* ¶¶ 68, 199. In administrative segregation, she was permitted to be out of her cell for as little as 45 minutes at a time, and only every other day. *Id.* ¶¶ 69, 200. She felt this to be a punishment, even though she had entered administrative segregation for protection. *Id.* ¶ 69. Holland was also strip searched by male correctional officers and regularly referred to as a man by prison staff. *Id.* ¶¶ 67, 161, 200.

Holland interviewed for a prison job for which she was qualified but was denied the position because of her gender identity. *Id.* ¶ 210–11. She was told that prison staff believed transgender persons to be "sexually promiscuous" in situations where security was relaxed. *Id.* ¶ 212.

## II.    PROCEDURAL BACKGROUND

Plaintiffs filed their original Complaint on April 18, 2023, ECF 1, and filed an Amended Complaint on May 1, 2023, ECF 13. The Court granted leave for Plaintiffs to file a Second Amended Complaint on July 21, 2023. ECF 30 (Order); ECF 31 (Second Amended Complaint). After DPSCS Defendants filed a motion to dismiss the Second Amended Complaint or, in the alternative, motion for summary judgment, ECF 41, Plaintiffs moved again to amend their pleading, ECF 44, and the Court granted the motion, ECF 45. The Third Amended Complaint was docketed on November 2, 2023. ECF 46.

Thereafter, plaintiff Chloe Grey filed a motion for preliminary injunctive relief against DPSCS Defendants, ECF 50, and these defendants opposed the motion, ECF 59. The Court

conducted a hearing on the motion on three dates in November and December 2023, and entered an Order granting the motion in part and denying it in part, ECF 75.

On January 16, 2024, DPSCS Defendants moved to dismiss, or for summary judgment on, the Third Amended Complaint. ECF 87. In February 2023, Plaintiffs filed an opposition to the motion, ECF 94, and Grey filed a motion to enforce the preliminary injunction, ECF 95, which DPSCS Defendants opposed, ECF 105. Following a hearing on the matter, the Court later granted in part, and denied in part, Grey's motion to enforce. ECF 119.

On June 14, 2024, Plaintiffs filed a motion for leave to file a Fourth Amended Complaint, ECF 114, and, after briefing, the Court granted the motion in part, pursuant to the liberal standard for amending pleadings. ECF 123. The Court directed docketing of the Plaintiffs' proposed Fourth Amended Complaint but found the amendment to Count X to be futile and ordered it stricken. *Id.*

The Fourth Amended Complaint was docketed on July 18, 2024. ECF 124 ("4AC"). In the Fourth Amended Complaint, Plaintiffs assert claims against DPSCS; Carolyn Scruggs, Secretary of DPSCS; J. Philip Morgan, Commissioner of Corrections; Damilare Adisa-Thomas, Administrator of BCCC; Nurudeen Matti, Warden of MRDCC; William Bailey, Warden of ECI; Christopher Smith, Warden of MCIJ; Gregory Werner, Warden of MCIH; Orlando Johnson, Acting Warden of Patuxent;[4] Kimberly Stewart, Assistant Warden of Patuxent; Ronald Weber, Warden of WCI; Michele Gardner, DPSCS Coordinator for the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"); Sharon Baucom, Chief Medical Officer of DPSCS; David Wolinski, PREA Coordinator for DPSCS; April Peterson, PREA Compliance Manager at

---

[4]    Orlando Johnson was no longer Acting Warden when the Fourth Amended Complaint was filed. *See* ECF 132-4. He is sued in this action in his official capacity. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Johnson's successor shall substitute him as a party in this action. For present purposes, however, the Court will refer to the Warden of Patuxent as "Johnson."

Patuxent;[5] Betsy Nwosu, PREA Compliance Manager at MRDCC; Fateema Mobley, PREA Compliance Manager at MCIJ; Kelly Partlow, PREA Compliance Manager at MCIH; and Donald Gallagher, PREA Compliance Manager at ECI; unnamed DPSCS correctional officers and staff ("Housing Does" and "Custody Does"), and medical providers and staff ("Health Care Does");[6] and YesCare Corporation ("YesCare").[7]

Plaintiffs allege failure to protect, failure to provide medical care, cruel and unusual punishment, and sex discrimination under the Eighth and Fourteenth Amendments to the U.S. Constitution (Counts I through VII). Plaintiffs next allege discrimination on the basis of disability under Title II of the ADA and Section 504 of the RA (Counts VIII and IX). Finally, plaintiffs allege negligence and intentional infliction of emotional distress under Maryland law (Counts X, XI, and XII).[8] Plaintiffs seek declaratory and injunctive relief, as well as an award of compensatory and punitive damages.

YesCare filed an Answer to the Fourth Amended Complaint on August 15, 2024. ECF 130. On the same date, DPSCS Defendants filed a Motion to Dismiss Fourth Amended Complaint, or

---

[5]    The Court notes that the Fourth Amended Complaint states "[o]n information and belief, Assistant Warden Stewart also serves as the PREA Compliance Manager at Patuxent." 4AC ¶ 22.

[6]    The Fourth Circuit "recognize[s] the necessity for allowing John Doe suits in the federal courts," and counsels dismissal of John and Jane Doe suits without prejudice only where it does not appear that an unidentified party's true name can be ascertained through discovery or court intervention. *Schiff v. Kennedy*, 691 F.2d 196, 198 (4th Cir. 1982).

[7]    Scruggs, Morgan, Adisa-Thomas, Matti, Bailey, Smith, Werner, Johnson, Weber, and Gardner are each sued in their official capacity. Stewart, Baucom, Wolinski, Peterson, Nwosu, Mobley, Partlow, Gallagher, Housing Does, Custody Does, and Health Care Does are each sued in their individual and official capacities. DPSCS and all named defendant DPSCS officials and staff are referred to herein as "DPSCS Defendants."

[8]    Plaintiffs Gilliam, Holland, and Grey share the sex discrimination, disability discrimination, negligence, and intentional infliction of emotional distress claims, although their claims are asserted against different sets of defendants (Counts VII through XII). Holland and Grey share all Eighth Amendment claims, although their claims are asserted against different sets of defendants (Counts IV through VI). Gilliam's claims for failure to protect, failure to provide medical care, and cruel and unusual punishment are unique to her (Counts I through III).

in the Alternative, Motion for Summary Judgment. ECF 132. Plaintiffs filed a response in opposition to the motion, ECF 138, and a notice of supplemental authority, ECF 141. DPSCS Defendants filed a reply in support of the motion. ECF 142.

## III.    STANDARD OF REVIEW

### A.  Motion to Dismiss

A defendant may challenge a court's subject matter jurisdiction over a case by filing a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. The plaintiff bears the burden of proving that the court indeed has jurisdiction over the matter. *Demetres v. E.W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015) (citing *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999)).

A motion to dismiss under Rule 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need not include "detailed factual allegations," but it must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."

*Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted). Federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (cleaned up).

When considering a Rule 12(b)(6) motion to dismiss, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). At the same time, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56[,]" but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

The U.S. Court of Appeals for the Fourth Circuit "has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: (1) notice and (2) a reasonable opportunity for discovery." *Canty v. Corcoran*, Civ. No. GLR-18-1404, 2022 WL 899278, at *4 (D. Md. Mar. 28, 2022) (citing *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013)). Converting a motion to dismiss to a summary judgment motion is not appropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. Du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448. The party opposing

conversion may file a declaration pursuant to Rule 56(d)[9] explaining the reasons why "it cannot present facts essential to justify its opposition" without discovery. Fed. R. Civ. P. 56(d); *see also Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244–45 (4th Cir. 2002). Generally, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. 5 Wright & Miller, Fed. Prac. & Proc. § 1366 (3d ed. 2004).

### B. Motion for Summary Judgment

A court may grant a party's summary judgment motion under Rule 56 if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis removed). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue as to material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). The court must view all

---

[9]    Rule 56(d) of the Federal Rules of Civil Procedure provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

the facts, including reasonable inferences drawn from them, in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But the court is not permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts. *Anderson*, 477 U.S. at 249.

## IV.     ANALYSIS

### A.  Conversion to a Motion for Summary Judgment

DPSCS Defendants styled their motion to dismiss alternatively as one for summary judgment and attached exhibits for the Court's consideration, thereby placing Plaintiff on notice that the motion could be disposed of under Rule 56. *See, e.g.*, *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 178 n.2 (4th Cir. 2018) ("[Plaintiff] was on notice that the motion could be converted to one for summary judgment because [defendants] styled it in the alternative, and [plaintiff] similarly submitted an opposition brief in the alternative."). They argue they are entitled to summary judgment on the claims asserted by Holland and Grey because these plaintiffs failed to exhaust their administrative remedies. ECF 132-2 at 6–11. In support of their exhaustion argument, DPSCS Defendants present as attachments to their motion certain inmate grievance records and affidavits from DPSCS records custodians. *See* ECF 132-4 through 132-8.

In response to DPSCS Defendants' prior motion to dismiss, Plaintiffs submitted the affidavit of one of their attorneys, Eve L. Hill, pursuant to Rule 56(d), ECF 94-1, as well as copies of administrative remedy forms submitted by Grey and Holland while incarcerated, supported by a declaration from each of these plaintiffs, ECF 94-2 through 94-11. In her Rule 56(d) affidavit, Attorney Hill articulates a need for access to the inmate grievance process employed at each relevant DPSCS facility and at the DPSCS Inmate Grievance Office, as well as Grey's and Holland's administrative remedy files, which would be available through the discovery tools of

document requests, interrogatories, and depositions. Hill Aff. ¶¶ 15–20. In addition, in their respective declarations, Grey and Holland each explain in detail how the administrative remedy process was either restricted or unavailable to her at certain times when she sought to pursue her administrative remedies. *See* ECF 94-2 (Grey Declaration); ECF 94-6 (Holland Declaration).

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. §]  1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines."  *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). Although the PLRA requires the prisoner to exhaust available remedies, "an administrative remedy is not considered to have been available if a prisoner, through no fault of [her] own, was prevented from availing [her]self of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

Notably, however, DPSCS has exempted claims falling under the Prison Rape Elimination Act ("PREA") from the exhaustion requirement. *See Johnson v. Robinette*, 105 F.4th 99, 109 (4th Cir. 2024) ("[DPSCS] does not permit the use of an informal resolution process . . . to resolve complaints of rape, sexual assault, sexual harassment, sexual abuse, sexual misconduct, [or] inmate on inmate sexual conduct . . . .") (citation omitted). Indeed, "[DPSCS] inmates [bringing sexual abuse allegations] may proceed directly to court." *Id.* at *2 (citing *National Standards To Prevent, Detect, and Respond to Prison Rape*, 77 Fed. Reg. 37106-01, at 37109).

Here, Attorney Hill's affidavit specifies the need for particular forms of discovery on matters bearing on whether Grey and Holland properly exhausted their administrative remedies and whether the administrative remedy process was available to each of them when needed. *See*

Hill Aff. ¶¶ 15–20. Grey's and Holland's declarations suffice to raise genuine questions as to whether the administrative remedy process was consistently available to each of them such that proper exhaustion of their claims was practicable. *See generally* Grey Decl. & Holland Decl. For these reasons, the Court finds that it would be premature and improper to assess the merits of DPSCS Defendants' administrative exhaustion defense without first providing a reasonable opportunity for discovery. Defendants may re-raise the exhaustion issue, if appropriate, at a later stage of the litigation.[10]

### B. Counts I through VI: Eighth Amendment and Due Process Violations

In Counts I through VI, Plaintiffs assert claims under 42 U.S.C. § 1983 against certain DPSCS Defendants in either their official or individual capacities for alleged violations of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. DSPSC Defendants challenge Plaintiffs' official-capacity claims in these counts on grounds of immunity under the Eleventh Amendment and for failure to state a claim. ECF 132-2 at 11–32.

### 1. Eleventh Amendment Immunity and the *Ex Parte Young* Doctrine

The Eleventh Amendment to the U.S. Constitution generally bars claims brought in federal court under 42 U.S.C. § 1983 against a State, its departments and agencies, or state officials in their official capacity. *See Quern v. Jordan*, 440 U.S. 332, 338–45 (1979); *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *id.* at 120 ("[I]f a § 1983 action alleging a constitutional claim is brought directly

---

[10]    The Court has considered whether to order limited discovery on the issue of administrative exhaustion and declines to do so. Review of the Fourth Amended Complaint indicates that Plaintiffs' PREA-based claims, which do not require administrative exhaustion, are closely related to claims that may require administrative exhaustion. Full discovery as to all remaining claims is likely necessary to determine whether any of them are ultimately subject to dismissal for failure to exhaust.

against a State, the Eleventh Amendment bars a federal court from granting any relief on that claim."); *Kitchen v. Upshaw*, 286 F.3d 179, 183 (4th Cir. 2002) ("The Eleventh Amendment[ ] limits the Article III jurisdiction of the federal courts to hear cases against States and state officers acting in their official capacities.") (footnote omitted); *Lawson v. Union Cnty. Clerk of Ct.*, 828 F.3d 239, 250 (4th Cir. 2016) (states and state agencies alike are protected from federal suit by the Eleventh Amendment) (citations omitted); *Gregory v. Currituck Cnty.*, No. 21-1363, 2022 WL 1598961, at *2 (4th Cir. May 20, 2022) (per curiam) ("[C]laims for damages brought under § 1983 can only be brought against 'persons' acting under color of state law, and neither states nor state officials acting in their official capacities are considered 'persons' under § 1983.") (citation omitted).

The *Ex Parte Young* doctrine provides an exception to Eleventh Amendment immunity in cases where a plaintiff seeks injunctive relief against state officials for violations of federal rights. *See Ex Parte Young*, 209 U.S. 123 (1908). This exception "allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute." *Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 163 (4th Cir. 2023) (citing *Ex Parte Young*, 209 U.S. at 159). The *Ex Parte Young* exception "rests on the [legal fiction] that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011). The doctrine does not apply when the state is the real party-in-interest, such as when the relief sought "would expend itself on the public treasury . . . or interfere with public administration." *Id.* at 255 (cleaned up). But the doctrine "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury."

*Antrican v. Odom*, 290 F.3d 178, 185–86 (4th Cir. 2002) (quoting *Milliken v. Bradley*, 433 U.S. 267, 289 (1977)). Thus, in determining whether the *Ex Parte Young* exception applies, the court's inquiry must focus "not on whether the injunctive relief sought would have an impact on the State treasury," but must focus instead on "whether the injunctive relief sought is prospective or retroactive in nature." *Id.* at 186. "[A] court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Dobson*, 68 F.4th at 163–64 (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)).

In Counts I through VI, Plaintiffs assert claims under § 1983 against various DPSCS officials in their official capacity for alleged violations of federal constitutional rights. These official-capacity claims are barred by Eleventh Amendment immunity, unless they are based on ongoing federal violations for which prospective relief is sought such that the *Ex Parte Young* doctrine applies. Importantly, Gilliam and Holland have each been released from DPSCS custody; Gilliam is on supervised probation, 4AC ¶ 9, and Holland is on supervised parole, *id.* ¶¶ 11, 114. Plaintiffs do not allege that the violations of Gilliam's and Holland's rights are ongoing, and these plaintiffs cannot plausibly obtain prospective injunctive relief. Because any claims for prospective injunctive relief for Gilliam and Holland are now moot, these plaintiffs' official-capacity claims in Counts I through VI are subject to dismissal. *See Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there.").

Plaintiffs contend that Gilliam and Holland are at an increased risk of re-incarceration due to their supervision status and, on this basis, argue that the alleged violations of their rights are "capable of repetition, yet evading review." ECF 138 at 11 (quoting *Spencer v. Kemna*, 523 U.S.

1, 17 (1998)). The Court is not persuaded. The "capable-of-repetition" exception to the mootness doctrine "applies only in exceptional situations," *Spencer*, 523 U.S. at 17 (citation omitted), where "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again[,]" *United States v. Sanchez-Gomez*, 584 U.S. 381, 391 (2018) (quoting *Turner v. Rogers*, 564 U.S. 431, 439–440 (2011)). Gilliam's and Holland's supervision statuses are inadequate support for any "reasonable expectation" that either plaintiff will re-enter DPSCS custody and will be subject to the same violations alleged in the Fourth Amended Complaint. Drawing an inference that either Gilliam or Holland will be re-incarcerated may call for the Court to "forecast bad behavior" by these plaintiffs without any basis for doing so. *Incumaa v. Ozmint*, 507 F.3d 281, 289 (4th Cir. 2007). The Court instead presumes that Gilliam and Holland will comply with the terms of their supervision and will not be subject to the same violations by DPSCS and its officials alleged in the Fourth Amended Complaint. *See Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 249 (4th Cir. 2005) (finding the lack of a reasonable probability that a former pretrial detainee would be subject to pretrial detention again in the future). Therefore, the "capable-of-repetition" exception does not apply to their official-capacity claims in Counts I through VI for prospective injunctive relief, and these claims must be dismissed.

Grey, on the other hand, remains in DPSCS custody and alleges in Counts IV through VI that, at two separate facilities, DPSC Defendants have failed to provide her with her prescribed hormone therapy, failed to make reasonable modifications to her housing placement, failed to protect her from male inmates, and improperly placed her in administrative segregation. 4AC ¶¶ 241–69. Grey alleges that this conduct is ongoing and seeks a prospective injunction against it. *Id.* at 60. The foregoing allegations support a reasonable expectation the alleged violations of Grey's

rights will continue regardless of the particular facility in which she is placed. Accordingly, the *Ex Parte Young* doctrine provides an exception to DPSCS Defendants' Eleventh Amendment immunity from Grey's official-capacity § 1983 claims in Counts IV through VI.

### 2. Legal Background for Eighth Amendment and Due Process Claims (Counts I through VI)

In Counts I through VI, Plaintiffs assert that certain DPSCS Defendants violated their rights under the Eighth and Fourteenth Amendments in failing to protect them when housing them with male inmates (Counts I and IV), failing to provide adequate medical care (Counts II and V), and subjecting them to cruel and unusual punishment (Counts III and VI). Plaintiffs seek remedies against DPSCS Defendants in both their individual and official capacities for the alleged constitutional violations pursuant to 42 U.S.C. § 1983.[11] DPSCS Defendants argue that all six counts should be dismissed because Plaintiffs fail to state any plausible claim for relief against them under § 1983. ECF 132-2 at 26–32.

To sustain an action under 42 U.S.C. § 1983, a plaintiff must demonstrate that: (1) she suffered a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States; and (2) the act or omission causing the deprivation was committed by a person acting under color of law. *West v. Atkins*, 487 U.S. 42, 45 n.3 (1988). A defendant's own action— or inaction—is required for liability under § 1983. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). There is no respondeat superior liability under § 1983. *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Supervisors may be found liable only if the plaintiffs show they "acted personally in the deprivation of the plaintiffs' rights." *Vinnedge*, 550 F.2d at 928 (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md. 1973), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)). To state

---

[11]    As explained in Part IV.B.1 *supra*, Gilliam's and Holland's official-capacity claims in Counts I through VII are subject to dismissal for lack of subject-matter jurisdiction, but they also seek relief in these counts against certain DPSCS Defendants in their individual capacities. *See* 4AC at 38–46.

a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) the supervisor had actual or constructive knowledge that a subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread[,]" and plaintiffs must show that the offending conduct "has been used on several different occasions." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw*, 13 F.3d at 799).

The Eighth Amendment's guarantee against cruel and unusual punishment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). This protection against cruel and unusual punishment is incorporated by the Due Process Clause of the Fourteenth Amendment and enforced against state governments. *See Robinson v. California*, 370 U.S. 660, 666–67 (1962). In addition to protecting post-conviction detainees from cruel and unusual punishment, the Fourteenth Amendment Due Process Clause "protects pretrial detainees from being punished at all." *Short v. Hartman*, 87 F.4th 593, 606 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024) (citing *Bell v. Wolfish*, 441 U.S. 520, 535–37 & n.16 (1979)). Thus, governmental conduct that violates the Eighth Amendment guarantee also violates the Fourteenth Amendment's protection against conditions of pretrial detention that "amount to punishment." *Id.* at 606, 608.

The Fourth Circuit has observed that "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319–20 (1986)). In general, the deliberate indifference standard applies to claims that prison officials have failed to safeguard the inmate's health and safety, maintained inhumane conditions of confinement, or failed to render medical assistance or to provide medical care. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson*, 878 F.3d at 97.

To establish constitutional liability for deliberate indifference, a plaintiff in custody to serve a sentence must satisfy a two-part inquiry with objective and subjective components. *See Raynor*, 817 F.3d at 127. Objectively, the prisoner "must establish a serious deprivation of [her] rights in the form of a serious or significant physical or emotional injury" or substantial risk of serious injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014). The Court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). As to the subjective component, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires either actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and that the inference was actually drawn. *Id.* at 837. This standard may be satisfied circumstantially with a showing that a substantial risk of harm to the plaintiff was "so obvious that it had to have been known" and that a prison official subjectively disregarded the risk. *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019), *as amended* (May 6, 2019) (quoting

20

*Makdessi v. Fields*, 789 F.3d 126, 136 (4th Cir. 2015), and citing *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011)). Still, "a showing of mere negligence" will not satisfy this standard. *Grayson v. Peed*, 195 F.3d 692, 695–96 (4th Cir. 1999). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Id*.

Importantly, "pretrial detainees can state a claim under the Fourteenth Amendment, based on a purely objective standard, for prison officials' deliberate indifference to excessive risks of harm." *Short*, 87 F.4th at 604–05. "The Fourteenth Amendment Due Process Clause protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" *Id.* at 608–09 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)) (citations omitted). "[I]t is enough that the plaintiff show that the defendant acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* at 611 (citations omitted). However, it is "not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." *Id.* at 611–12.

With the foregoing legal background, the Court proceeds to assess the sufficiency of Plaintiffs' pleading of Eighth and Fourteenth Amendment violations in Counts I through VI.

### 3.  Failure to Protect (Counts I and IV)

In Counts I and IV, Plaintiffs allege that DPSCS officials and staff violated their Eighth and Fourteenth Amendment rights by improperly housing them with male inmates, disregarding the risk they would be sexually assaulted, and failing to protect them from sexual assault and threats of physical violence. 4AC ¶¶ 213–23, 241–51. Count I is asserted by Gilliam for alleged violations of the Fourteenth Amendment while she was in pretrial detention. *Id.* ¶¶ 213–23. Count

IV is asserted by Holland and Grey for alleged violations of the Eighth Amendment while they were in post-conviction incarceration. *Id.* ¶¶ 241–51.

For a prisoner to demonstrate an Eighth Amendment violation based on a prison official's failure to protect her, she must show (1) that the failure was "objectively, sufficiently serious" and (2) that the official "subjectively recognized a substantial risk of harm" and his response was "inappropriate in light of that risk." *Ford v. Hooks*, 108 F.4th 224, 230 (4th Cir. 2024). As a pretrial detainee, Gilliam need only satisfy an objective test to establish a Fourteenth Amendment violation. *See Short*, 87 F.4th at 611. Specifically, a pretrial detainee must "allege sufficient facts to show that the defendant's action or inaction was 'objectively unreasonable' in that 'the defendant acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Olumakinde v. Baltimore Cnty. Det. Ctr.*, Civ. No. TDC-24-0943, 2024 WL 5007456, at *3 (D. Md. Dec. 6, 2024) (quoting *Short*, 87 F.4th at 611); *see also Carmona v. Martin*, No. 23-6930, 2024 WL 4490695, at *2 (4th Cir. Oct. 15, 2024) (unpub.) (holding that pretrial detainee must show that the prison official "exposed [the plaintiff] to an objectively substantial risk of serious harm[]" that "a reasonable official in [his] position would have appreciated") (quoting *Younger v. Crowder*, 79 F.4th 373, 382 (4th Cir. 2023)).

Despite their feminine gender presentation, Plaintiffs were each housed with male inmates at various DPSCS facilities and forced to share showers with men. 4AC ¶¶ 48–54, 57, 65–66, 122–26, 133–34, 145–47. In making these housing placements, DPSCS officials did not take Plaintiffs' feminine appearance, their risk of sexual victimization, their views about their safety, or their medical needs into account, *id.* ¶¶ 104–06, 113, 117, as required by DPSCS policy, *id.* ¶¶ 70–76.

Gilliam was housed alongside male inmates at BCCC and made to use communal toilets and showers. *Id.* ¶¶ 48–49, 122–26. She was threatened and then assaulted by a male inmate while

in the shower at BCCC after she refused the assailant's sexual advances and initially tried to avoid him. *Id.* ¶¶ 49, 124–25. Gilliam made two separate reports about her rape, but DPSCS officials "took no action." *Id.* ¶¶ 49, 126–27. Promises to accommodate Gilliam by allowing her to shower and go to recreation alone were not honored. *Id.* ¶¶ 49, 130–31.

Holland was housed with male inmates at MCIJ and ECI, notwithstanding her feminine presentation. *Id.* ¶ 65. At MCIJ, a male inmate attempted to sexually assault Holland, and DPSCS staff took no action in response. *Id.* ¶¶ 162–64. Additionally, a correctional officer at MCIH actively encouraged other inmates' derision and harassment of Holland by attempting to expose her in the shower and inviting male inmates to watch. *Id.* ¶¶ 165–66. When Holland reported the incident to a PREA Coordinator at MCIH, he dismissed it as "not a big deal." *Id.* ¶ 167.

Grey was also housed with male inmates at WCI. *Id.* ¶¶ 54–55. In April or May 2022, a male inmate sexually assaulted Grey while a prison official looked away. 4AC ¶¶ 54, 136. When the sexual assault was reported to a housing manager, he declined to file a PREA complaint. *Id.* ¶ 137. In addition, Grey was regularly raped by a male cellmate at WCI but "put up with it because she was terrified of being placed in administrative segregation if she complained." *Id.* ¶ 138. When Grey complained about the assaults, she was placed in administrative segregation for a month. *Id.* ¶ 139. Upon her return, she was placed in a cell with another male inmate "known for raping his cellmates," who did attempt to rape Grey. *Id.* ¶¶ 57–58, 140–41. A correctional officer intervened in this assault but did not discipline the cellmate. *Id.* ¶ 141. Grey tried to lodge a PREA complaint when the cellmate attempted to rape her again, but the psychologist at WCI refused to accept the complaint and told her not to file it. *Id.* ¶¶ 58–59, 141–42. Grey was eventually moved to a single cell on a different tier but still received violent threats and demands for sex from male inmates, particularly if she went to the communal shower, and prison staff would not let her shower by

herself. *Id.* ¶¶ 144–49. After Grey was transferred to Patuxent, a male inmate attempted to proposition sex from her, and correctional officers refused to allow her to file a PREA complaint. *Id.* ¶¶ 150–53. The rules of the tier at Patuxent where Grey was placed did not allow inmates to be out of their cells without handcuffs and an escort, but the inmate who sexually harassed Grey had neither and was able to go to Grey's cell, expose his penis, and demand oral sex. *Id.* ¶¶ 150–51.

The Court finds the foregoing facts sufficient to support a reasonable inference that, due to Plaintiffs' housing placement and subsequent inaction by DPSCS officials, each Plaintiff suffered injuries and a substantial risk of further injuries serious enough to violate contemporary standards of decency. *See Helling*, 509 U.S. at 36. Drawing reasonable inferences in Plaintiffs' favor, an unjustifiably high risk of harm to each Plaintiff either was known or should have been obvious to the DPSCS officials involved in her housing placement and responsible for her safety. "The vulnerability of transgender prisoners to sexual abuse is no secret." *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 691 (S.D. Tex. 2016); *see also Tay v. Dennison*, 457 F. Supp. 3d 657, 684–85 (S.D. Ill. 2020) (citing various cases for the proposition that a feminine-presenting transgender inmate in a male prison is at serious risk of sexual assault). DPSCS has recognized transgender status as a risk factor for sexual assault. 4AC ¶ 70; *Assessment for Risk of Sexual Victimization and Abusiveness*, OPS.200.0006, § .05(g) (2018). The Fourth Amended Complaint cites, among other reports, a 2013 study by the Department of Justice in which it estimated that 35% of transgender inmates in state and federal prisons were sexually assaulted between 2007 and 2012, nearly ten times the rate for prisoners as a whole. 4AC ¶ 118 n.22; U.S. Dep't of Justice Off. of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12* (2014), https://www.ojp.gov/library/publications/sexual-victimization-prisons-and-jails-reported-

inmates-2011-12. The rate of sexual assault reported by transgender inmates in jails and detention centers was around the same as for those in prisons. *Id.*

Furthermore, Plaintiffs have alleged sufficient facts to support a reasonable inference that Housing and Custody Does acted with a culpable state of mind amounting to deliberate indifference to Holland's and Grey's safety. Specifically, at least one correctional officer attempted to expose Holland to male inmates while she was showering, notwithstanding her heightened risk of sexual assault as a feminine-presenting transgender inmate. When Holland complained to the PREA Coordinator at MCIH, he was dismissive and, the Court infers, took no action. As to Grey, a Housing Doe "looked the other way" when Grey was being sexually assaulted by a male inmate. 4AC ¶ 136. When she was vocal about the threats and assaults she endured, DPSCS Defendants prevented and discouraged her from seeking relief.

For the foregoing reasons, Plaintiffs' failure-to-protect claims against Housing and Custody Does in their individual capacities will proceed. Grey's official-capacity claims will also proceed because she plausibly seeks prospective injunctive relief with respect to her housing placements.

In Count IV, Holland and Grey also assert individual-capacity claims against defendants Peterson, Mobley, and Partlow, PREA compliance managers at Patuxent, MCIJ and MCIH, respectively. But Plaintiffs do not plead specific facts to indicate that any of these defendants were personally involved in the alleged constitutional violations. Plaintiffs allege that "Defendants knew of, but disregarded, the risk by housing Ms. Grey and Ms. Holland with male inmates[,]"4AC ¶

248, do not state any facts to raise above the speculative level any claim that Peterson, Mobley, or Partlow[12] personally disregarded the risks to Holland's or Grey's safety.

Plaintiffs' individual-capacity claim against Stewart also fails for insufficient pleading. Plaintiffs do not allege that Stewart was personally responsible for placing Grey with male inmates with deliberate indifference to her risk of victimization. They allege that, when Grey complained to Stewart about sexual harassment and threats she suffered from male inmates, Stewart was dismissive, blamed Grey's feminine appearance, and threatened to place her with a male inmate, to remove her from her educational program, and to transfer her from Patuxent to WCI. For present purposes, these facts suffice to establish that Stewart became aware that Grey's housing placement posed a risk to Grey. But Plaintiffs do not allege Stewart responded in a way that showed deliberate indifference to the risk or tacit authorization of the housing placement that created the risk. To the contrary, Plaintiffs allege that Grey was placed in a single cell after she complained to Stewart. 4AC ¶ 112. Therefore, Plaintiffs' allegations fall short of stating a plausible claim that Stewart was personally involved in the alleged violation of Grey's rights or that she is liable as a supervisor. *See Vinnedge*, 550 F.2d at 928 (holding that liability under § 1983 "will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights") (citation omitted); *Timpson*, 31 F.4th at 257 (holding that supervisory liability under § 1983 requires a response "so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices") (citation omitted); *Love-Lane*, 355 F.3d at 782 ("[T]here is no respondeat superior liability under § 1983.") (citation omitted).

---

[12]    Partlow is identified as "the PREA Compliance Manager at MCIH." 4AC ¶ 29. Plaintiffs allege that Holland attempted to lodge a PREA complaint with an unnamed PREA Coordinator at MCIH, *id.* ¶ 167, but there are no facts to support a reasonable inference that Partlow was aware of this complaint. The Fourth Amended Complaint indicates that PREA Compliance Manager and PREA Coordinator are separate and distinct positions within DPSCS. *See id.* ¶¶ 25, 26, 27.

Accordingly, DPSCS Defendants' motion will be granted in part and denied in part as to Plaintiffs' claims in Counts I and IV. Gilliam's official-capacity claims in Count I and Holland's official-capacity claims in Count IV will be dismissed without prejudice for reasons explained in Part IV.B.1 *supra*. Holland's individual-capacity claims against Mobley and Partlow and Grey's individual-capacity claims against Stewart and Peterson in Count IV will be dismissed without prejudice for inadequate pleading. Grey's official-capacity claims in Count IV, and all Plaintiffs' individual-capacity claims against Custody and Housing Does in both Counts I and IV, will proceed.

### 4.   Failure to Provide Adequate Medical Care (Counts II and V)

In Counts II and V, Plaintiffs allege that DPSCS medical providers and staff violated their Fourteenth Amendment rights by failing to provide them adequate medical care for gender dysphoria, including denial and delay of hormone therapy. 4AC ¶¶ 224–33, 252–61.  Count II is asserted by Gilliam for alleged violations of the Fourteenth Amendment while she was in pretrial detention. *Id.* ¶ 226. Count V is asserted by Holland and Grey for alleged violations of the Eighth Amendment while they were in post-conviction incarceration. *Id.* ¶ 252.

Pretrial detainees, like Gilliam, need only satisfy an objective test to present a viable claim for deliberate indifference to a medical need in violation of the Fourteenth Amendment. *See Short*, 87 F.4th at 611. "To state a claim for deliberate indifference to a medical need, . . . a pretrial detainee must plead that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed." *Id.* A pretrial

detainee may also present a viable claim by satisfying the standard that applies to prisoners in post-conviction incarceration under the Eighth Amendment, like Holland and Grey. *See id.* at 611–12. An inmate in post-conviction incarceration must demonstrate that she had an objectively serious medical condition and that the defendant prison official "had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* at 612 (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)). "A condition is objectively serious if it is 'diagnosed by a physician as mandating treatment' or is 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)).

In *De'lonta v. Johnson*, the Fourth Circuit recognized the World Professional Association for Transgender Health's ("WPATH") Standards of Care for the Health of Transgender and Gender Diverse People ("Standards of Care") as "the generally accepted protocols for the treatment of [gender identity disorder]" and that hormone therapy is one of the three pillars of its treatment process. 708 F.3d 520, 522–23 (4th Cir. 2013); *see also* 4AC ¶¶ 86–89. Plaintiffs cite two versions of WPATH's Standards of Care in the Fourth Amended Complaint. *See id.* ¶¶ 86–100. The Standards of Care apply "irrespective of [the transgender person's] housing situation." *Id.* ¶ 89 (citation omitted). The seventh version of the Standards of Care was in effect during Gilliam's period of detention. *Id.* ¶ 87. It provided that "[p]eople who enter an institution on an appropriate regimen of hormone therapy should be continued on the same, or similar, therapies and monitored according to the [Standards of Care]. . . ." *Id.* ¶ 95. The seventh version noted that "[t]he consequences of abrupt withdrawal of hormones . . . include a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality." *Id.* (citation omitted). The eighth version of WPATH's Standards of Care went into

effect in September 2022. *Id.* ¶ 87. It characterized hormone therapy as "a lifesaving intervention" in many cases and recommended hormone therapy "due to its demonstrated improvement in psychosocial functioning and quality of life." *Id.* ¶ 99. Consistent with WPATH's Standards of Care, DPSCS policy requires continuation of prescribed hormonal therapy for inmates with gender dysphoria who are under an established and verified treatment plan, unless the contracted medical services provider determines that the treatment regimen is contraindicated. 4AC ¶ 67; *Identification, Treatment, & Correctional Management of an Inmate Diagnosed with Gender Dysphoria*, OPS 131.0001.05, §§ F(1), (1)(a)–(1)(a)(i) (2016) ("DPSCS Gender Dysphoria Policy").

Gilliam was diagnosed with gender dysphoria in 2003. *Id.* ¶¶ 44, 46, 228. By the time she was in DPSCS custody in 2021 and 2022, Gilliam had been undergoing hormone therapy for several years, and she had a distinctly feminine appearance. *Id.* She was prescribed to receive hormone treatment on a weekly basis. *Id.* ¶¶ 46, 228. Gilliam "told Defendants since her arrival at BCCC in December 2021 that she needed weekly hormone treatment." *Id.* ¶ 170. Nevertheless, she was "denied hormone treatment for the majority of her incarceration." *Id.* ¶¶ 47, 229–32. Plaintiffs suggest that "Defendants . . . began to take [Gilliam's request for hormone therapy] seriously after [she] was sexually assaulted[,]" but hormone treatment was not approved for her until February 2022. *Id.* ¶¶ 170–71. In the absence of hormone therapy, male characteristics began to re-emerge for Gilliam, which caused her to become depressed, gender dysphoric, and suicidal. *Id.* ¶¶ 96, 232.

Holland was diagnosed with gender dysphoria in 2010. 4AC ¶ 62. She received hormone treatment consistently prior to her incarceration and is prescribed to receive oral hormone treatment every day and hormone injections every two weeks. *Id.* ¶ 63. DPSCS officials were

informed of Holland's need for hormone therapy upon her arrival at MRDCC. *Id.* ¶ 182. Notwithstanding, Holland's hormone treatment while in DPSCS custody was inconsistent; she would go up to a month at a time for without receiving a hormone injection and up to two months without her oral hormone treatments. *Id.* ¶¶ 64, 182–84. As a result, Holland perceived that her appearance began to look more masculine, she felt "stalled" in her transition, and she experienced depression and anxiety. *Id.* ¶¶ 97, 259.

Grey was diagnosed with gender dysphoria in 2021, while incarcerated at WCI. *Id.* ¶¶ 52, 172. Although she has been prescribed oral hormone treatment since December 2021, her treatment was delayed between December 2021 and May 2023. *Id.* Grey has gone weeks without receiving the hormones that she is prescribed to take twice daily. *Id.* ¶ 173. While Grey was in administrative segregation, Health Care Does have repeatedly "forgotten" to refill her hormone treatment. *Id.* ¶ 178. As a result of the inconsistent hormone treatment, Grey experienced feelings of depression and anxiety. *Id.* ¶ 259. Grey made complaints regarding her inconsistent hormone treatment, but "nothing was done," and her treatment remained inconsistent at Patuxent. *Id.* ¶ 178. In addition, Health Care Does "denied a medical order for electrolysis hair removal . . . ." *Id.* ¶ 177.

The Court finds the foregoing facts sufficient to state plausible claims that Health Care Does were deliberately indifferent to each Plaintiff's serious medical needs. Each Plaintiff was diagnosed with gender dysphoria, was prescribed hormone therapy, and presented with a feminine appearance. Drawing reasonable inferences in Plaintiffs' favor, the Court finds their gender dysphoria to constitute an objectively serious medical condition. In each case, DPSCS officials and medical providers were made aware of the plaintiff's prescription and need for hormone therapy as a vital treatment for gender dysphoria but, thereafter, failed to provide this treatment to

the Plaintiff on a consistent basis. Plaintiffs plausibly allege that this failure constituted a violation of DPSCS policy and WPATH's Standards of Care. The fact that each Plaintiff was provided hormone treatment for part of her incarceration does not by itself defeat her claim to having been denied constitutionally adequate medical care. *See De'lonta*, 708 F.3d at 526 ("[J]ust because Appellees have provided De'lonta with *some* treatment consistent with [WPATH's] Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment."). Drawing all reasonable inferences from Plaintiffs' allegations in their favor, the denial, delay, and inconsistent provision of hormone therapy while they were in DPSCS custody resulted in substantial risks and harms to each Plaintiff, including depression, anxiety, and suicidality. Prison officials have the duty to give inmates access to necessary mental health treatment, *see DePaola v. Clarke*, 884 F.3d 481, 488 (4th Cir. 2018), and to protect inmates from self-harm, *see De'lonta*, 708 F.3d at 525 (citing *Lee v. Downs*, 641 F.3d 1117, 1121 (4th Cir. 1981)).

Accordingly, DPSCS Defendants' motion will be denied as to Gilliam's individual-capacity claims against Health Care Does in Count II, Holland's individual-capacity claims against Health Care Does in Count V, and all of Grey's claims in Count V. Gilliam's and Holland's official-capacity claims in these counts will be dismissed without prejudice for reasons explained in Part IV.B.1 *supra*. In all other respects, Plaintiffs' inadequate-medical-treatment claims will proceed.

### 5. Conditions of Confinement (Counts III and VI)

In Counts III and VI, Plaintiffs allege that DPSCS officials and staff subjected them to cruel and unusual punishment by placing them in administrative segregation for extended periods of time. 4AC ¶¶ 234–40, 262–69. Count III is asserted by Gilliam for alleged violations of the

Fourteenth Amendment while she was in pretrial detention. *Id.* ¶¶ 234-40. Count V is asserted by Holland and Grey for alleged violations of the Eighth Amendment while they were in post-conviction incarceration. *Id.* ¶¶ 252-61.

"[T]o establish that she has been subjected to cruel and unusual punishment, a prisoner must prove (1) that the deprivation of [a] basic human need was *objectively* sufficiently serious, and (2) that *subjectively* the officials act[ed] with a sufficiently culpable state of mind." *De'lonta*, 708 F.3d at 525 (citation omitted). To be sufficiently serious, the deprivation must result in, or present a substantial risk of, a "serious or significant physical or emotional injury . . . ." *Id.* (citation omitted). As a pretrial detainee, Gilliam need only show the objective component to establish a Fourteenth Amendment violation. *See Short*, 87 F.4th at 611. As persons in post-conviction incarceration, Holland and Grey must show that the defendant prison officials "actually kn[e]w of and disregard[ed] an objectively serious condition . . . ." *De'lonta*, 708 F.3d at 525 (quoting *Farmer*, 511 U.S. at 837).

In the Fourth Amended Complaint, Plaintiffs cite scholarly literature describing the severe harms isolated housing can exact upon prisoners' mental health and functioning, 4AC ¶ 205, and note that rules set by the United Nations General Assembly "forbid the use of solitary confinement for more than 15 days[,]" *id.* ¶¶ 101, 204 (citation omitted). Plaintiffs allege that "[a]dministrative segregation is not substantively different from punitive segregation" and that this form of isolation has "catastrophic consequences . . . on human beings' basic mental stability, health, and ability . . . ." 4AC ¶¶ 201, 205 (citation omitted). Transgender inmates in administrative segregation, they allege, "suffer from 'intense anxiety, confusion, lethargy, panic, impaired memory, psychotic behavior, hallucinations and perceptual distortions, difficulty eating, inability

to communicate, hypersensitivity to external stimuli, violent fantasies, and reduced impulse control.'" *Id.* ¶ 205 (citation omitted).

The Fourth Amended Complaint further outlines restrictions that PREA regulations and DPSCS policy place on the use of administrative segregation. *Id.* ¶¶ 78–85. PREA regulations forbid "[i]nmates at high risk for sexual victimization" from being "placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers." 28 C.F.R. § 115.43(a). The assessment must be conducted immediately or within 24 hours of placement in segregated housing. *Id.* Assignment to segregated housing "shall not ordinarily exceed a period of 30 days[,]" and it should only last "until an alternative means of separation from likely abusers can be arranged[.]" *Id.* § 115.43(c). The inmate in segregated housing should retain "access to programs, privileges, education, and work opportunities to the extent possible." *Id.* § 115.43(b). Every 30 days, an assessment must be made as to the continuing need for segregated housing. *Id.* § 115.43(e). Likewise DPSCS policy requires prison staff to consider "available alternatives" to administrative segregation, give the inmate "the opportunity to respond to the reasons stated for being in administrative segregation[,]" and to review the placement with prescribed frequency. 4AC ¶¶ 80–81.

Gilliam was placed in administrative segregation upon transfer to MRDCC in February 2022 and remained in segregation for about three months. *Id.* ¶¶ 50, 186, 193, 237. During that time, she permitted to leave her cell for only one hour per day on weekdays and not permitted to leave her cell at all on weekends. *Id.* ¶ 50. Whenever allowed to leave her cell, she was restrained in a three-piece shackle, including when using the shower. *Id.* ¶¶ 50, 187. During this time, DPSCS officials denied Gilliam access to programming that would have been available to her if she had

not been in administrative segregation. *Id.* ¶ 188. DPSCS officials did not solicit or consider Gilliam's views regarding her personal safety and housing, did not review her placement in administrative segregation, and did not consider alternatives to administrative segregation, all of which Plaintiffs contend violated DPSCS policy. *Id.* ¶¶ 189–91. Placement in general population of the men's prison was eventually offered on the condition that Gilliam sign a document releasing DPSCS of liability if she were harmed in general population, and she refused to sign the release. *Id.* ¶¶ 50, 192–93. Gilliam felt as if she was being punished, although she had "no write-ups or disciplinary infractions." *Id.* ¶ 50. She claims that her period of segregation placed her "at a substantial risk of serious harm" and resulted in "pain and suffering[;] emotional, psychological, and physical distress," including "anxiety and depression"; "violation of dignity"; and other losses. *Id.* ¶¶ 206, 238, 240.

The Court finds the foregoing facts sufficient to state a plausible claim in Count III that Gilliam's Fourteenth Amendment due process rights were violated during her extended period of segregation. Drawing reasonable inferences from Plaintiffs' allegations in their favor, Gilliam's several months in administrative segregation objectively placed her at substantial risk of, and resulted in, serious psychological harm.

In *Porter v. Clarke*, the Fourth Circuit affirmed summary judgment in favor of a group of death row inmates on their Eighth Amendment conditions-of-confinement claim. 923 F.3d 348, 368 (4th Cir. 2019). The plaintiffs in *Porter* were permitted to be out of their cell for only one hour a day, five days a week, and had limited access to recreation. 923 F.3d at 353–54. The court held that the challenged conditions of confinement "deprived inmates of the basic human need for meaningful social interaction and positive environmental stimulation" And "posed a substantial risk of serious psychological and emotional harm[,]" to which the defendant prison officials were

"deliberately indifferent[.]" *Id.* at 368 (cleaned up). The court determined that the Virginia Department of Corrections policy against putting non-death row inmates in solitary confinement for more than thirty days at a time "constitute[d] unrebutted evidence of State Defendants' awareness 'that extended stays in segregation can have harmful emotional and psychological effects.'" *Id.* at 361 (citation omitted). *See also Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015) ("Prolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after [s]he is resocialized.").

In so holding, the court acknowledged two of its prior decisions that rejected constitutional challenges to similar conditions of confinement. *See id.* at 358–59 (examining *Sweet v. S.C. Dep't of Corr.*, 529 F.2d 854 (4th Cir. 1975) (en banc), and *Mickle v. Moore*, 174 F.3d 464 (4th Cir. 1999). The court declined to apply these cases, noting intervening developments in both Supreme Court precedent and scientific understanding of "the harmful psychological and emotional effects of prolonged solitary confinement."[13] *Id. See also id.* at 355 (4th Cir. 2019) ("In recent years, advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions . . . .").

Likewise, here, Plaintiffs have alleged serious enough risks and harms associated with extended periods of segregation to support Gilliam's claim for unconstitutional conditions of confinement.

---

[13]     *Mickle* was also factually distinguishable in that the plaintiffs, identified as "Five Percenters," had been "placed in segregation based on their *in-prison conduct* and were removed from segregation if they renounced their membership with group[,]" *Porter*, 923 F.3d at 359, which was classified as "a security threat[,]" *Mickle*, 174 F.3d at 466. Here, in contrast, according to Plaintiffs, they were not placed in administrative segregation as punishment for anything they did but were placed in these restrictive conditions because of their transgender status.

As to Holland's and Grey's conditions-of-confinement claims in Count VI, the Court does not find their relevant allegations adequate to state plausible claims for relief. Holland was placed in administrative segregation at ECI from late June to early August of 2022. 4AC ¶¶ 68–69, 199. In administrative segregation, she was only permitted to be out of her cell for as little as 45 minutes at a time, and only every other day. *Id.* ¶¶ 69, 200. Grey was placed in administrative segregation at WCI for one month in response to her complaints about being sexually assaulted, harassed, and threatened. *Id.* ¶¶ 55, 194. She was also placed in administrative segregation at Patuxent, apparently in response to her complaints of harassment and threats by male inmates. *Id.* ¶¶ 61, 110–12, 196–97.

The Court will assume without deciding that Holland's and Grey's periods in administrative segregation were (like Gilliam's) sufficient to satisfy the objective component of their claims. But, because Holland and Grey (unlike Gilliam) assert claims under the Eighth Amendment standard, they must allege facts to suggest that DPSCS Defendants were subjectively aware of, but disregarded, the substantial risks associated with the particular circumstances of their assignments to administrative segregation. *See Farmer*, 511 U.S. at 834, 837; *De'lonta*, 708 F.3d at 525; *Porter*, 923 F.3d at 361; *Short*, 87 F.4th at 611. On this point, the Fourth Amended Complaint falls short. Unlike with Gilliam, Plaintiffs do not plausibly allege that DPSCS violated its own policies in assigning Holland and Grey to administrative segregation, and they do not otherwise allege any facts to suggest that the DPSCS officials responsible for these placements knew about any risks of harm these placements created.

Accordingly, DPSCS Defendants' motion will be denied as to Gilliam's individual-capacity claims in Count III against Housing and Custody Does, and the motion will be granted as to Holland's and Grey's claims in Count VI. Gilliam's official-capacity claims in Count III will

be dismissed without prejudice for reasons explained in Part IV.B.1 *supra*. Count VI will be dismissed without prejudice for failure to state a plausible claim.

### C. Count VII: Equal Protection Violations

In Count VII, Plaintiffs allege that DPSCS officials and staff discriminated against them based on their transgender status and gender identity in violation of their Fourteenth Amendment rights. 4AC ¶¶ 273–80. Specifically, Plaintiffs allege that DPSCS Defendants housed them with male inmates, place them at risk of sexual assault, failed to respond appropriately to instances in which they were assaulted, subjected them to harassment and/or ridicule, denied medical treatment, placed Gilliam in administrative segregation, and deprived Holland and Grey of certain job opportunities.

The Equal Protection Clause of the Fourteenth Amendment "provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Fisher v. King*, 232 F.3d 391, 399 (4th Cir. 2000) (quoting U.S. Const. amend. XIV, § 1). It prohibits "governmental decisionmakers from treating differently persons who are in all relevant respects alike[.]" *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). To state an equal protection claim, "a plaintiff must plausibly allege first 'that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Id.* (citation omitted). Additionally, the plaintiff must "plausibly allege that the disparity was not justified under the appropriate level of scrutiny." *Id.* (citation omitted).

As the Fourth Circuit held in *Grimm v. Gloucester County School Board*, equal protection claims based upon transgender status or gender identity warrant intermediate scrutiny—"a form of heightened scrutiny"—of the challenged governmental action. 972 F.3d 586, 608–13 (4th Cir.

2020). *See also Kadel v. Folwell,* 100 F.4th 122, 143 (4th Cir. 2024) (en banc) (reiterating *Grimm*'s holdings that "gender identity is a protected characteristic under the Equal Protection Clause" and "discrimination on the basis of gender identity is subject to heightened scrutiny"); *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 556 (4th Cir. 2024) ("[A] facial classification based on gender identity . . . trigger[s] intermediate scrutiny.") (citing *Grimm*, 972 F.3d at 610–13); *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023) ("In part because of the long history of discrimination against transgender people, we have held that intermediate scrutiny applies to laws that discriminate against them.") (citing *Grimm*, 972 F.3d at 610). Governmental action that discriminates on the basis of sex, transgender status, or gender identity must be found unconstitutional "unless [it is] substantially related to a sufficiently important governmental interest." *Grimm*, 972 F.3d at 608 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985)). "To survive intermediate scrutiny, the state must provide an 'exceedingly persuasive justification' for its classification." *Id.* (citation omitted).

When equal protection challenges arise in the prison context, courts must apply rational basis review so as to give prison officials the space necessary to act in ways "reasonably related to legitimate penological interests." *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)). This principle applies even to conduct that would warrant higher scrutiny in other contexts, though the court should not ignore "the concerns that [otherwise] justify application of a heightened standard." *Id.* A plaintiff must ultimately "allege facts sufficient to overcome the presumption of reasonableness applied to prison policies." *Id.*

The reasonableness of a challenged prison policy, practice, or action is examined through factors identified by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89–91 (1989). "Three of the four *Turner* factors are relevant to an equal protection claim[:]" (1) whether there is a valid and

rational connection between the action and the legitimate penological interest proffered to justify it; (2) the impact accommodation of the asserted right will have on other prisoners, correctional officers, and the allocation of prison resources; and (3) whether there are "ready alternatives . . . ." *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) (cleaned up); *see also Firewalker-Fields v. Lee*, 58 F.4th 104, 115 (4th Cir. 2023) (applying *Turner* to detention center policies).

Plaintiffs state plausible equal protection claims premised on harassment and ridicule by DPSCS staff and housing placements with male inmates. Plaintiffs' placements with male inmates are plausibly alleged to have put them at risk of sexual assault, and resulted in sexual harassment and sexual assaults against Gilliam and Grey, as well as an attempted sexual assault against Holland. Furthermore, some DPSCS Defendants were aware of the sexual harassment, assaults, and threats Plaintiffs suffered from male inmates but "looked the other way" or were otherwise dismissive when Plaintiffs complained about it. 4AC ¶¶ 59, 136–37, 142, 167. Additionally, DPSCS staff are alleged to have themselves subjected Plaintiffs to various forms of harassment, ridicule, and humiliation based on their transgender status. These actions by DPSCS Defendants include an attempt to expose Holland to male inmates while she was showering, refusing to allow Gilliam to shower separately from male inmates, forcing Grey to come out as gender dysphoric to her housing unit at WCI, and leveling "slurs" at, and "routinely misgender[ing,]" Holland and Grey. *Id.* ¶¶ 53, 109, 165–66, 273–78.  Plaintiffs allege sufficient facts to support a reasonable inference that, in housing Plaintiffs with male prisoners and subjecting them to sex-based harassment and the risk of sexual assault, DPSCS Defendants have intentionally treated Plaintiffs, as transgender women, differently than they have treated similarly situated cisgender female prisoners.

No legitimate penological interest in the foregoing transgender-based classifications and disparate treatment is apparent from the face of the Fourth Amended Complaint. To the contrary, DPSCS Defendants violated departmental policies by making Plaintiffs' housing placements without "seriously considering [each Plaintiff's] opinion regarding [her] safety and [each Plaintiff's] biological gender presentation and appearance . . . ." 4AC ¶¶ 72–73, 106, 113, 117; *see also* DPSCS Gender Dysphoria Policy, *supra*, §§ .05(C)(4), .05(J)(1). DPSCS policy and federal prison regulations also specifically required DPSCS Defendants to determine whether Plaintiffs' housing placements would ensure their health and safety, to consider their risk of sexual victimization in making housing decisions, and to allow them to shower separately from other inmates. *Id.* ¶¶ 72–73, 76, 83–84.[14]

Additionally, DPSCS Defendants placed Gilliam in administrative segregation for a prolonged period of time based on her transgender status, which plausibly exacted psychological injury and placed her at risk of further injury. *Id.* ¶¶ 186, 201–06, 275–76. DPSCS Defendants violated departmental policies by failing to make a periodic review of her placement in administrative segregation and denying her an opportunity to respond to reasons for her placement.

---

[14]    Courts across the country have addressed the issue of prison housing of transgender inmates, though there is little uniformity to be found among their decisions. *See Griffith v. El Paso Cnty.*, No. 21-CV-00387-CMA-NRN, 2023 WL 2242503, *11 (D. Colo. Feb. 27, 2023), *report and recommendation adopted*, No. 21-CV-00387-CMA-NRN, 2023 WL 3099625 (D. Colo. Mar. 27, 2023) (granting prison officials' motion to dismiss because they had a rational basis for housing transgender women with male inmates, while noting that this policy would likely fail intermediate review); *Sabbats v. Clarke*, No. 7:21CV00198-JPJ, 2022 WL 4134771, at *9 n.9 (W.D. Va. Sept. 12, 2022) ("If I were to apply the intermediate scrutiny standard to the equal protection claim [for housing a transgender woman prisoner with male inmates] . . . I would [still] find for the [defendant prison officials.]") (granting summary judgment); *Tay*, 457 F. Supp. 3d at 682 ("Based on the evidence, [the] decision to house [the transgender woman plaintiff] in a men's facility is not based on any legitimate penological purpose.") (granting in part preliminary injunction); *Doe v. Mass. Dep't of Corr.*, No. CV 17-12255-RGS, 2018 WL 2994403, at *10 (D. Mass. June 14, 2018) (policy of housing transgender women with male inmates does not pass intermediate scrutiny at the motion to dismiss stage). Although the *Griffith* decision is most apposite, a key distinction in the instant case is that DPSCS Defendants' housing placements are alleged in the Fourth Amended Complaint to *contravene DPSCS's own policies*.

*Id.* ¶¶ 79–82, 190. The Court recognizes DPSCS's interest in protecting Plaintiffs—as feminine-presenting transgender women—from sexual assault and harassment. The need to protect Gilliam from these harms may have served as a legitimate reason for placing her in administrative segregation rather than in general population with male prisoners. But, according to Plaintiffs, DPSCS Defendants violated departmental policy by failing to consider available alternatives to administrative segregation for Gilliam—such as placement at a women's facility—that may have avoided the risks associated with both an extended period of isolation and placement among male prisoners. *Id.* ¶¶ 191–92.

Plaintiffs also assert equal protection claims based DPSCS denying Holland and Grey certain job opportunities. *Id.* ¶¶ 277–78. After coming out as transgender at WCI, Grey was removed from her position as an education aide, a job she held for three years, because, she was told, she would be "too distracting for the male students" and based on concerns that, "as a transgender woman[,] she would be sexually promiscuous on the job." *Id.* ¶¶ 60, 207–09. Holland similarly alleges that she interviewed for a job as a clerk in the metal shop at MCIH, a position for which she was qualified, but she was denied the position because, she was told, "transgender community will be sexually promiscuous in situations where the security is not as high[.]" *Id.* ¶¶ 210–12. These allegations suffice to support reasonable inferences that Holland's and Grey's job opportunities were restricted in ways that DPSCS Defendants did not apply to non-transgender inmates. Furthermore, the comments made to Holland and Grey about the reasons they were denied positions for which they were qualified reflect discriminatory animus toward transgender inmates. And there is no indication that Holland and Grey were offered alternative work assignments.

At this early stage of the litigation, and without the benefit of an evidentiary record, the Court cannot make findings that bear on all of the *Turner* factors relevant to all of Plaintiffs' equal

protection claims. Instead, it must assume the facts alleged in the Fourth Amended Complaint to be true and draw all reasonable inferences in Plaintiffs' favor. *See Iqbal*, 556 U.S. at 678; *King*, 825 F.3d at 212. Furthermore, the Court must give due consideration to the equal protection concerns that, outside the prison context, would warrant application of intermediate scrutiny. *See Veney*, 293 F.3d at 732. In doing so, the Court finds that Plaintiffs have alleged enough facts to suggest that DPSCS Defendants' transgender-based disparate treatment of each Plaintiff was not related to legitimate penological interests and was, in some instances, violative of prison policies and regulations. In short, Plaintiffs allegations suggest that DPSCS Defendants lacked a rational basis for their alleged discriminatory conduct. Accordingly, DPSCS Defendants' motion will be denied as to Plaintiffs' claims in Count VII against Housing and Custody Does.

The Court notes, however, that Plaintiffs assert equal protection claims against various named DPSCS officials in their individual capacity without alleging any facts to suggest their personal involvement in any equal protection violations. For this reason, Count VII will be dismissed as to defendants Adisa-Thomas, Matt, Baucom, Wolinski, Nwosu, Smith, Werner, Bailey, Mobley, Partlow, Gallagher,[15] Johnson, Stewart, Weber, and Peterson.

Plaintiffs also assert equal protection claims against Health Care Does and others based on the denial of medical treatment. As examined in Part IV.B.1 *supra*, Plaintiffs allege that each of them was either denied prescribed hormone therapy or that such treatment was delayed at certain times during their incarceration. But they do not allege any facts to suggest that similarly situated non-transgender inmates were treated differently. Plaintiffs allege that they were deprived of medical treatment "based on [their] gender identity[,]" 4AC ¶¶ 273, 277, 278, but offer no factual

---

[15]    Plaintiffs allege that Gallagher removed certain feminine and gender-affirming products from the commissary at ECI, making them unavailable to "transgender prisoners like Ms. Holland . . . , thereby exacerbating their gender dysphoria." 4AC ¶¶ 168–69. But they do not allege any facts to suggest that similarly situated cisgender female prisoners were not similarly deprived of such products.

support for this conclusory allegation. Accordingly, their equal protection claims based on denial of medical treatment are not plausible and must be dismissed.

In sum, DPSCS Defendants' motion will be granted in part and denied in part as to Count VII. This count will proceed against Housing and Custody Does but will be dismissed as to the other defendants.

### D.  Counts VIII and IX: Disability Discrimination

In Counts VIII and IX, Plaintiffs allege that DPSCS and department officials and staff subjected them to discrimination on the basis of disability in violation of Title II of the ADA and Section 504 of the RA. 4AC ¶¶ 282–333. The allegedly discriminatory conduct included subjecting Plaintiffs to harassment and ridicule, failing to accommodate their gender dysphoria, placing them in administrative segregation, and denying them access certain services, programs, and activities at DPSCS facilities, including medical treatment, safe housing, and certain job opportunities. *Id.* In these disability discrimination counts, DPSCS Defendants are sued in their official capacities.[16]

In support of their motion, DPSCS Defendants argue that they are entitled to Eleventh Amendment immunity[17] from these counts because, in the prison context, Congress has not abrogated sovereign immunity for ADA Title II claims based upon the discriminatory conduct alleged in this case. ECF 132-2 at 14–20. DPSCS Defendants further contend that Plaintiffs have failed to state a plausible constitutional violation in their disability discrimination counts and failed a state a plausible claim for relief under ADA Title II and Section 504 of the RA. *Id.* at 15–19, 36–37.

---

[16]    *See Barnes v. Young*, 565 F. App'x 272, 273 (4th Cir. 2014) (ADA Title II does not allow individual-capacity suits); *Garcia v. State Univ. Of N.Y. Health Scis. Ctr.*, 280 F.3d 98, 107 (2d Cir. 2001) (individual-capacity suits against state officials cannot be brought under ADA Title II or RA Section 504).

[17]    As explained in Part IV.B.1 *supra*, "[t]he Eleventh Amendment[ ] limits the Article III jurisdiction of the federal courts to hear cases against States and state officers acting in their official capacities." *Kitchen*, 286 F.3d at 183 (footnote omitted).

### 1. Abrogation of State Sovereign Immunity

Congress is empowered by § 5 of the Fourteenth Amendment to abrogate state sovereign immunity, so long as the means are congruent and proportional to the injuries that Congress intends to prevent or remedy. *Allen v. Cooper*, 589 U.S. 248, 260–61 (2020) (citing *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)). Where a state has not consented to suit, Eleventh Amendment immunity may only be abrogated by a clear legislative statement (1) indicating Congress's intent to abrogate the immunity and (2) made pursuant to a valid exercise of its power. *Id.* at 255; *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55–56 (1996) (citations omitted).

Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Title II authorizes suits by private citizens for money damages against public entities that violate § 12132." *United States v. Georgia*, 546 U.S. 151, 154 (2006).

"In enacting Title II of the ADA, Congress made it specifically applicable to the States and state entities . . . ." *Fauconier v. Clarke*, 966 F.3d 265, 280 (4th Cir. 2020). Although "the States are generally immune from private damage actions by reason of the Eleventh Amendment, the Supreme Court in *United States v. Georgia* held that 'insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.'" *Id.* (quoting *Georgia*, 546 U.S. at 159). *Georgia* directs lower courts, when faced with Title II claims against a state entity, to determine "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth

Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." 546 U.S. at 159.

Here, Plaintiffs have alleged violations of ADA Title II that are also plausible violations of the Fourteenth Amendment. As explained in Part IV.B.1 *supra*, Plaintiffs have stated plausible claims for various constitutional violations based on DPSCS Defendants making housing placements that put Plaintiffs' health and safety at risk, as well as denying Plaintiffs certain medical treatment and job opportunities. Because the conduct alleged to violate ADA Title II largely overlaps and corresponds with conduct alleged to violate the Fourteenth Amendment, the Court finds that ADA Title II abrogates DPSCS Defendants' immunity to Plaintiffs' disability discrimination claims. At this early stage of the litigation, the Court need not proceed to the third step of the *Georgia* test.

### 2. Disability Discrimination (Counts VIII and IX)

DPSCS Defendants argue that Counts VIII and IX should be dismissed because Plaintiffs fail to state plausible claims for disability discrimination under Title II of the ADA and Section 504 of the RA. ECF 132-2 at 15–18, 36–37.

As noted *supra*, ADA Title II forbids a public entity from discriminating against qualified persons with disabilities, such as by excluding them from participation in the public entity's services, programs, and activities, or denying them the benefits of such services, programs, and activities. *See* 42 U.S.C. § 12132. The public entity is required to make "'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 159–60 (2017) (quoting 28 C.F.R. § 35.130(b)(7) (2016)); *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 488 (4th Cir. 2005) ("Title II . . . imposes an affirmative obligation to make 'reasonable modifications to rules,

policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services' to enable disabled persons to receive services or participate in programs or activities.") (quoting 42 U.S.C. § 12131(2)). "Reasonable modifications" or "reasonable accommodations" are those "that are 'necessary' to provide a disabled individual with 'full and equal enjoyment' of the facility's services." *Canter v. Maryland*, Civ. No. ELH-22-2267, 2023 WL 5804285, at *19 (D. Md. Sept. 6, 2023) (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012)). An accommodation is not reasonable when it "either imposes undue financial and administrative burdens . . . or requires a fundamental alteration in the nature of the program." *Halpern*, 669 F.3d at 464 (quoting *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987)).

To prevail on a claim of discrimination under ADA Title II, a plaintiff must show that she: (1) has a disability or is regarded as having a disability; (2) is qualified to participate in or to receive the benefits of a public service, program, or activity; and (3) was denied such participation or benefits, "or otherwise discriminated against," based on her disability. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502–03 (4th Cir. 2016); *see also Fauconier*, 966 F.3d at 276. To establish a disability, a plaintiff must show "(1) that [she] has a physical or mental impairment, (2) that this impairment implicates at least one major life activity, and (3) that the limitation is substantial." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 254 (4th Cir. 2006) (citing 42 U.S.C. § 12102(2)(A)).

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Courts in the Fourth Circuit may analyze ADA

Title II and RA Section 504 claims together, given their substantial similarity. *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1267 n.9 (4th Cir. 1995).

ADA Title II and RA Section 504 claims may be pursued on three distinct grounds: "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *Brown v. DPSCS*, 383 F. Supp. 3d 519, 551–52 (D. Md. 2019) (quoting *A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008)).

Plaintiffs allege that gender dysphoria involves a substantial impairment or limitation "in social, occupational, and other important areas of functioning[,]" implicating major life activities, 4AC ¶¶ 3–6, and therefore constitutes a disability under the ADA. *See Williams*, 45 F.4th at 769–74 (holding that plaintiff alleged sufficient facts to support inference that gender dysphoria is protected by the ADA).

DPSCS, as a state department of correction, "fall[s] squarely within [ADA Title II's] statutory definition of 'public entity,'" *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998), and, because it "receives federal funding[,]" 4AC ¶ 317, it is also subject to the anti-discrimination provisions of RA Section 504. Plaintiffs allege that they qualify for certain services and programs available to Maryland prison inmates, including safe housing and facilities for recreation and showering, educational programs, and certain job opportunities. 4AC ¶¶ 282–308. Plaintiffs further allege that they were denied access to such services and programs based on their transgender status, *id.*, which was connected to their gender dysphoria, *id.* ¶¶ 1, 6. *See also Kadel*, 100 F.4th at 149 ("[G]ender dysphoria, a diagnosis inextricable from transgender status, is a proxy for transgender identity."). Specifically, as recounted in Part IV.C *supra*, Holland and Grey were denied certain jobs for which they were qualified, 4AC ¶¶ 210–12, 277–78; Gilliam was placed in administrative segregation for an extended period of time, *id.* ¶ 186; and all three

Plaintiffs were subjected to abuse, harassment, and ridicule, ¶¶ 50, 53, 65; all on account of their transgender status and, by extension, gender dysphoria. *See Kadel*, 100 F.4th at 146 (characterizing "gender dysphoria and transgender status" as "inextricable categories"). While placed in administrative segregation, Gilliam was subjected to isolation and attendant injuries and risks to her psychological well-being, and was denied access to certain jail programs. 4AC ¶¶ 185–293. Plaintiffs further allege that DPSCS Defendants denied them reasonable modification of department practices to accommodate their gender dysphoria, such being allowed to shower and go to recreation separately from male inmates, which placed them at risk of further sexual abuse and harassment. *Id.* ¶¶ 49, 130–31, 191, 247, 293, 298–99, 305, 323, 330. The Court finds these facts sufficient to state plausible ADA Title II and RA Section 504 violations.

However, insofar, as Plaintiffs seek to assert disability discrimination claims based solely on the denial and delay of treatment for their gender dysphoria, *see* 4AC ¶ 296, the Court finds their allegations insufficient to state plausible claims. Title II "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners[,] where [n]o discrimination is alleged[.]" *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996), *cited in Spencer v. Easter*, 109 F. App'x 571, 573 (4th Cir. 2004), *and Miller v. Hinton*, 288 F. App'x 901, 903 (4th Cir. 2008); *see also Baxley v. Jividen*, 508 F. Supp. 3d 28, 60 (S.D.W.Va. 2020) ("[C]ourts have repeatedly found that the 'a prisoner may not state a claim under the ADA for a lack of medical treatment.'") (quoting *Mondowney v. Balt. Cty. Det. Ctr.*, Civ. No. ELH-17-1538, 2019 WL 3239003, at *21 (D. Md. July 18, 2019) (citing cases)). Here, Plaintiffs do not allege that they were denied medical treatment for gender dysphoria *because* they have gender dysphoria. To the extent Plaintiffs seek to assert disability discrimination claims based on medical providers and staff denying or delaying treatment, the Court finds their allegations inadequate to support such claims.

DPSCS Defendants point out that a stricter causation standard applies to claims under RA Section 504 than ADA Title II claims and argue that Plaintiffs' Section 504 claims should be dismissed for insufficient pleading of causation. ECF 132-2 at 36–37. DPSCS Defendants are correct that, while "[t]he ADA and Rehabilitation Act generally are construed to impose the same requirements," their causation standards are "significantly dissimilar." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 n.17 (4th Cir. 2005) (quoting *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999)). While an ADA Title II claim requires only proof that "disability 'played a motivating role' in the adverse action," a claim under RA Section 504 of the Rehabilitation Act requires a showing that "the defendants' discriminatory conduct was 'solely by reason' of the plaintiff's disability." *Id.* (quoting *Baird*, 192 F.3d at 469–70). Still, the Court finds Plaintiffs' allegations adequate to render plausible Plaintiffs' claims, for instance, that they were subjected to harassment and ridicule, denied certain job opportunities, and placed in administrative segregation and thereby deprived of certain programming and medical care, solely because they are transgender and gender dysphoric.

Accordingly, DPSCS Defendants' motion will be denied as to Counts VIII and XI. These disability discrimination claims will proceed, except insofar as they are based on any denial or delay in medical treatment. Plaintiffs' disability discrimination claims based on inadequate medical treatment shall be dismissed with prejudice. In all other respects, Counts VIII and XI will proceed.

### E. Counts X through XII: Common Law Torts

In Counts X, XI, and XII, Plaintiffs assert Maryland common-law tort claims for negligence and intentional infliction of emotional distress ("IIED") against DPSCS Defendants. 4AC ¶¶ 334–53. Count X asserts negligence claims against DPSCS Defendants in their official

capacities, Count XI asserts negligence claims against them in their individual capacities, and Count XII asserts IIED claims against them in their individual capacities. DPSCS Defendants argue that these counts should be dismissed because they are entitled to sovereign immunity that is not waived for these claims in federal court, and Plaintiffs do not plausibly allege gross negligence or malice. ECF 132-2 at 37–39. The Court will address each of these arguments in turn.

### 1. Sovereign Immunity from Tort Claims in Federal Court

A state's sovereign immunity "bars all claims by private citizens against state governments and their agencies, except where Congress has validly abrogated that immunity or the state has waived it." *Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019); *see also Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011) ("Sovereign immunity is the privilege of the sovereign not to be sued without its consent."). It operates as "a jurisdictional bar." *Pevia v. Hogan*, 443 F. Supp. 3d 612, 631 (D. Md. 2020). "[A] court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." *Id.* (quoting *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018)).

The question of whether Maryland has waived its sovereign immunity "by a state constitutional provision or statute is a matter of state law, 'as to which the decision of the [state's highest court] is controlling.'" *Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244, 249 (4th Cir. 2012) (quoting *Palmer v. Ohio*, 248 U.S. 32, 34 (1918)). Maryland's highest court has "adopted a two-part test to determine whether sovereign immunity applies in a specific case:" (1) whether the entity invoking sovereign immunity qualifies; and (2) whether the state legislature waived the immunity. *Dennard v. Towson Univ.*, 62 F. Supp. 3d 446, 450 (D. Md. 2014) (citing *Stern v. Bd. of Regents, Univ. Sys. of Maryland*, 846 A.2d 996, 1001 (Md. 2004)). The Maryland

50

Supreme Court has "strictly construed such waivers in favor of the sovereign." *Bd. of Educ. of Baltimore Cnty. v. Zimmer-Rubert*, 973 A.2d 233, 240 (Md. 2009) (citations omitted).

DPSCS, as an arm of the state, and department officials, in their official capacities, are covered by the state's sovereign immunity. *See* Md. Code Ann., Corr. Servs. § 2-101; *Clark v. Md. Dep't of Pub. Safety & Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009) ("[T]he Maryland Department of Public Safety and Correctional Services is undoubtedly an arm of the state."). The Maryland Tort Claims Act ("MTCA") states that, subject to certain statutory exclusions and limitations, "the immunity of the State and of its units is waived as to a tort action, in a court of the State." Md. Code Ann., State Gov't § 12-104(a)(1). But the MTCA does not waive the state's immunity from tort suits in federal court. *See, e.g.*, *Davenport v. Maryland*, 38 F. Supp. 3d 679, 691 (D. Md. 2014) (citing Md. Code Ann., State Gov't § 12-103(2)); *Sanders v. Callender*, Civ. No. DKC 17-1721, 2018 WL 337756, at *8 (D. Md. Jan. 9, 2018). Accordingly, Count X is subject to dismissal. DPSCS Defendants' motion shall be granted as to Count X.

The MTCA expressly provides that Maryland state employees are immune from liability in tort for tortious acts or omissions that are made within the scope of their employment, unless made with malice or gross negligence. Md. Code Ann., State Gov't § 12-105 (incorporating Md. Code Ann., Cts. & Jud. Proc. § 5-522(b)). "If . . . the State employee has acted with malice or gross negligence, or the State employee has acted outside the scope of his or her employment, the State is immune from suit and the injured party may only bring a viable tort claim against the State employee." *Ford v. Baltimore City Sheriff's Off.*, 814 A.2d 127, 134 (Md. Ct. Spec. App. 2002) (citation omitted). "[S]tate personnel are not immune from suit and liability in tort when the plaintiff's complaint *sufficiently* alleges malice or gross negligence." *Barbre v. Pope*, 935 A.2d 699, 714 (Md. 2007).

In sum, although DPSCS Defendants are immune from having Plaintiffs' official-capacity negligence claims in Count X adjudicated in federal court, they are not immune from negligence claims brought against them in their individual capacities insofar as the alleged negligent acts or omissions were made with malice or gross negligence.[18] DPSCS Defendants argue that Plaintiffs do not plausibly allege malice or gross negligence and, therefore, Plaintiffs' tort claims should be dismissed. The Court will address the sufficiency of Plaintiffs' pleading of individual-capacity tort claims below.

### 2. Negligence (Count XI)

In Count XI, each Plaintiff asserts negligence claims against certain DPSCS officials and staff in their individual capacities. 4AC ¶¶ 339–46. Gilliam's negligence claims are asserted against Baucom, Wolinski, Nwosu, and Housing, Health Care, and Custody Does. Holland's negligence claims are asserted against Scruggs, Morgan, Gardner, Smith, Werner, and Bailey. Grey's negligence claims are asserted against Scruggs, Morgan, Gardner, Johnson, Stewart, and Weber. Plaintiffs allege that these defendants failed to comply with professional standards of care and departmental policies in various ways that resulted in injuries. *Id.*

To establish a negligence claim under Maryland law, a plaintiff must set forth "(1) a duty or obligation under which the defendant is to protect the plaintiff from injury, (2) breach of that duty, and (3) actual loss or injury to the plaintiff proximately resulting from the breach." *Bobo v. State*, 346 Md. 706, 714 (Md. 1997)).

Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another,[ ] and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Newell v. Runnels*,

---

[18]     Plaintiffs allege that "Defendants' negligent conduct was committed within the scope of their employment." 4AC ¶¶ 337, 342.

967 A.2d 729, 764 (Md. 2009) (citation and footnote omitted). "A government official commits gross negligence 'only when he or she inflicts injury intentionally or is so utterly indifferent to the rights of others that he or she acts as if such rights did not exist.'" *Nero v. Mosby*, 890 F.3d 106, 128 (4th Cir. 2018) (quoting *Cooper v. Rodriguez*, 118 A.3d 829, 846 (Md. 2015)).

For purposes of the MTCA, "malice is 'conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Nero*, 890 F.3d at 127 (quoting *Barbre*, 935 A.2d at 714). "To establish malice, a plaintiff must show that the government official 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Id.* (quoting *Bord v. Baltimore County*, 104 A.3d 948, 964 (Md. Ct. Spec. App. 2014)).

Citing WPATH's Standards of Care and DPSCS policies, *see* 4AC ¶¶ 86–89, Plaintiffs plausibly allege that DPSCS Defendants had a duty to provide reasonable health care and a duty to take reasonable measures to protect them from foreseeable harms, including harm by other inmates. *See Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015) ("Prison officials are . . . obligated to take reasonable measures to guarantee inmate safety."); *State v. Johnson*, 670 A.2d 1012, 1017 (Md. Ct. Spec. App. 1996) (holding that "the State owes a duty to provide reasonable health care to its prisoners" and that a negligence action can be maintained based on an injurious breach of that duty). Plaintiffs also plausibly allege that DPSCS Defendants breached these duties in various ways, such as improperly housing them with male inmates, which resulted in sexual assaults and injuries. Plaintiffs additionally allege sufficient facts to support a reasonable inference that at least some DPSCS Defendants acted with gross negligence or malice under Maryland law. For instance, Plaintiffs allege that Gilliam was subjected to harassment and ridicule by prison staff. *Id.* ¶¶ 133, 273. Drawing reasonable inferences in Plaintiffs' favor, such allegations

plausibly reflect thoughtless disregard for the consequences of the defendants' breach of duties owed to Gilliam and indifference to her rights.

The Court notes, however, that Plaintiffs do not allege any conduct by Scruggs, Morgan, Gardner, Smith, Werner, Bailey, Johnson, Stewart Weber, Baucom, Wolinski, Nwosu, or any Health Care Doe to support a reasonable inference that any of them did anything negligent that amounted to gross negligence or was done with malice.[19] Plaintiffs' claims against these state employees cannot be sustained on generalized and unsupported allegations that they "acted with actual malice, motivated by hate," and their "treatment of Plaintiffs evinced a reckless disregard for their lives and well-being, an utter indifference to their rights, and ill will towards them." 4AC ¶¶ 344, 346. *See Barbre*, 935 A.2d at 717 ("[C]onclusory allegations of gross negligence [a]re not enough to bring the claim outside the immunity and non-liability provisions of the MTCA."). Plaintiffs' individual-capacity negligence claims against these defendants are therefore subject to dismissal.

For the foregoing reasons, DPSCS Defendants' motion shall be granted in part and denied in part with respect to Count XI. As to the individual-capacity negligence claims in Count XI, Gilliam's claims shall proceed against Housing and Custody Does. Plaintiffs' remaining claims in Count XI, including all of Holland's and Grey's individual-capacity negligence claims, shall be

---

[19]    Plaintiffs allege that, when Grey reported sexual harassment and threats by male inmates, Stewart blamed Grey's feminine appearance and threatened to assign her to a cell with a male inmate and to remove her from her educational program. 4AC ¶¶ 110–12. But they do not allege any negligent conduct attributable to Stewart.

Plaintiffs allege in Count X that "Defendants" failed to train correctional officers in "how to appropriately work with inmates with gender dysphoria[,]" *id.* ¶¶ 302–04, but they do not identify any training failure specific to any of the named defendants and do not plausibly allege any gross negligence or malice in any such training failure.

dismissed without prejudice. Count X shall also be dismissed without prejudice, for reasons explained in Part IV.E.1 *supra*.

### 3. Intentional Infliction of Emotional Distress

In Count XII, Plaintiffs assert claims for intentional infliction of emotional distress ("IIED") under Maryland common law against certain DPSCS officials and staff in their individual capacities. 4AC ¶¶ 347–53. These claims are based on Plaintiffs' allegations that these defendants intentionally failed to provide adequate medical care, failed to protect them from sexual abuse and the risk of sexual abuse by male inmates, subjected them to ridicule and harassment, and segregated them, all in violation of DPSCS policy. *Id.*

An IIED claim under Maryland law requires the plaintiff to show that (1) the defendant intentionally or recklessly engaged in (2) extreme and outrageous conduct (3) that caused (4) severe emotional distress. *See Ford v. Douglas*, 799 A.2d 448, 451 (Md. Ct. Spec. App. 2002) (citing *Harris v. Jones*, 380 A.2d 611 (Md. 1977)); *Valderrama v. Honeywell Tech. Sols., Inc.*, 473 F. Supp. 2d 658, 666 n.20 (D. Md. 2007) (citation omitted). "To meet the 'intentional or reckless' criterion of the first element, the plaintiff must allege and prove that the defendant either *desired* to inflict severe emotional distress, *knew* that such distress was *certain or substantially certain* to result from his conduct, or acted recklessly in deliberate disregard *of a high degree of probability* that the emotional distress will follow." *Foor v. Juv. Servs. Admin.*, 552 A.2d 947, 959 (Md. Ct. Spec. App. 1989), *cert. denied*, 558 A.2d 1206 (Md. 1989) (citations omitted). The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Harris*, 380 A.2d at 614 (Md. 1977); *see also Figueiredo-Torres v. Nickel*, 584 A.2d 69, 75 (Md. 1991) (finding IIED where a psychiatrist was sleeping with his patient's wife while

serving as the pair's marriage counselor). This is an exceedingly difficult standard to meet, making IIED "rarely viable" in Maryland. *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 247 (D. Md. 1997).

Furthermore, where the alleged tortfeasors are Maryland state employees acting within the scope of their employment, the plaintiff must show that they acted with gross negligence or malice to overcome immunity under the MTCA. *See Okwa v. Harper*, 757 A.2d 118, 128 (Md. 2000) ("State personnel . . . are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence.") (quoting Md. Code Ann., Cts. & Jud. Proc. § 5-522(b); *see also* Md. Code Ann., State Gov't § 12-105 (incorporating Cts. & Jud. Proc. § 5-522(b)). As explained in Part IV.E.2 *supra*, in this context, "malice" entails "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Nero*, 890 F.3d at 127 (quoting *Barbre*, 935 A.2d at 714). To establish that a government official acted with malice, the plaintiff must show an intentional act performed "without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Id.* (quoting *Bord*, 104 A.3d at 964).

Plaintiffs' allegations fall short of specifying conduct by any DPSCS Defendant that gives rise to a plausible IIED claim under Maryland law. Plaintiffs allege acts by the defendants that might be fairly characterized as outrageous and indecent, such as a correctional officer attempting to expose Holland to male inmates while she was showering. 4AC ¶ 166. But even assuming that the officer acted maliciously and with the intention of inflicting severe emotional distress, Plaintiffs do not allege that Holland was actually exposed or that she suffered severe emotional distress as a result of this incident. Ultimately, Plaintiffs do not identify any specific malicious,

extreme, and outrageous conduct by a DPSCS Defendant that either intentionally or recklessly caused actual, severe emotional distress.

The Court infers that severe emotional distress resulted from the sexual assaults that Gilliam and Grey suffered while placed with male inmates. But Plaintiffs do not allege facts to render plausible any claim that Plaintiffs were placed with male inmates maliciously based on an evil motive, any ill will toward them, or an intent that they be assaulted.

Plaintiffs allege that they all suffered emotional injuries, including depression and anxiety, from extended periods in administrative segregation and delays in hormone treatment. 4AC ¶¶ 56, 95, 206, 232, 259. Even assuming these emotional injuries were severe, Plaintiffs do not present enough facts to suggest that their hormone treatment was delayed with an evil or wrongful motive, a desire to inflict severe emotional distress, knowledge that severe emotional distress was certain to occur, or reckless disregard of a high probability that it would occur. Plaintiffs also fall short of alleging that their periods in administrative segregation were prolonged maliciously.

Although Plaintiffs allege on information and belief that Grey was placed in administrative segregation at Patuxent in retaliation for filing complaints and contacting an attorney to challenge DPSCS's conduct, 4AC ¶¶ 61, 196–97, they offer no facts to raise this allegation of retaliatory motive above the speculative level. To the contrary, Plaintiffs present other facts that suggest that Grey was placed in administrative segregation based on complaints that she had been sexually harassed and propositioned by a male inmate at Patuxent. *Id.* ¶¶ 150–53. Indeed, Grey was "told that she [was] in administrative segregation at Patuxent for her own protection." *Id.* ¶ 198. Grey's IIED claim requires both malice and either a desire to inflict severe emotional distress or knowledge that severe emotional distress was certain to result from the placement. Plaintiffs' allegations do not satisfy these requirements.

Accordingly, the Court finds that Plaintiffs' IIED claims fail and shall be dismissed without prejudice. DPSCS Defendants' motion will be granted as to Count XII.

## V.    CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss will be granted in part and denied in part.

Several of Plaintiffs' § 1983 constitutional claims will be dismissed. Gilliam's and Holland's official-capacity claims in Counts I, II, III, IV, and V will be dismissed without prejudice. Regarding Count IV, Holland's individual-capacity claims against Mobley and Partlow, and Grey's individual-capacity claims against Stewart and Peterson, will be dismissed without prejudice. Counts VI will be dismissed without prejudice.

Plaintiffs' other § 1983 constitutional claims will proceed in part. Counts I and IV will proceed against Custody and Housing Does in their individual capacities, and Counts II and V will proceed against Health Care Does in their individual capacities. Gilliam's individual-capacity claims in Count III against Housing and Custody Does will proceed. Grey's official-capacity claims in Count IV and V will proceed. Count VII will proceed against Housing and Custody Does but shall otherwise be dismissed without prejudice.

Plaintiffs' disability discrimination claims in Counts VIII and XI will proceed, except insofar as they are based on any denial or delay in medical treatment. Any disability discrimination claims based on inadequate medical treatment will be dismissed without prejudice.

Plaintiffs' tort claims in Counts X and XII will be dismissed without prejudice, and the individual-capacity negligence claims in Count XI will be dismissed in part. Gilliam's claims in Count XI will proceed against Housing and Custody Does but are otherwise dismissed without prejudice. Holland's and Grey's claims in Count XI will be dismissed without prejudice.

A separate Order will issue.

December, <u>20th</u> 2024

<u>/S/</u>

Matthew J. Maddox

United States District Judge